**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | | |
|---|---|---|
| AHMAD POOLE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 20 C 0014 |
| | ) | |
| EVARISTO AGUINALDO, et al., | ) | Hon. Manish S. Shah |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S COMBINED RESPONSE IN OPPOSITION TO DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT**

Stephen Weil
Maria Makar
LOEVY & LOEVY
311 N. Aberdeen, Third Floor
Chicago, IL 60607
(312) 243-5900
makar@loevy.com

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................1

PLAINTIFF'S STATEMENT OF ADDITIONAL FACTS .................................................2

LEGAL STANDARD..........................................................................................................13

ARGUMENT .......................................................................................................................14

    I.      Dr. Aguinaldo was deliberately indifferent to Poole's serious medical need..............16

    II.     Tomaras consciously disregarded Poole's serious medical need ...............................20

    III.    Jaburek and Norman knew of Poole's serious medical need and disregarded it .........22

CONCLUSION....................................................................................................................24

## TABLE OF AUTHORITIES

*Arnett v. Webster*, 658 F.3d 742 (7th Cir. 2011)..........................................................................15

*Berry v. Peterman*, 604 F.3d 435 (7th Cir. 2010) .......................................................................19

*Boretti v. Wiscomb*, 930 F.2d 1150 (6th Cir. 1991) ....................................................................23

*Conley v. Birch*, 796 F.3d 742 (7th Cir. 2015) .....................................................................14, 15

*Cooper v. Casey,* 97 F.3d 914 (7th Cir.1996) ......................................................................14, 16

*Diggs v. Ghosh*, 850 F.3d 905 (7th Cir. 2017)...............................................................................15

*Edwards v. Snyder*, 478 F.3d 827 (7th Cir. 2007) ................................................................17, 22

*Erickson v. Holloway*, 77 F.3d 1078 (8th Cir. 1996)...................................................................23

*Estelle v. Gamble,* 429 U.S. 97 (1976) .................................................................................14, 23

*Farmer v. Brennan*, 511 U.S. 825 (1994) .....................................................................................14

*Giles v. Ludwig*, 2014 WL 4358475 (N.D. Ill. Sept. 3, 2014) .....................................................20

*Gomez v. Randle*, 680 F.3d 859 (7th Cir. 2012) ..................................................................19, 22

*Greeno v. Daley*, 414 F.3d 645 (7th Cir. 2005) ...................................................................15, 19

*Grieveson v. Anderson*, 538 F.3d 763 (7th Cir. 2008)....................................................15, 17, 22

*Gutierrez v. Peters*, 111 F.3d 1364 (7th Cir. 1997) .....................................................................14

*Hansen v. Fincantieri Marine Grp., LLC*, 763 F.3d 832 (7th Cir. 2014) ....................................14

*Johnson v. Corizon Med. Servs. Inc.*, 2015 WL 1648208 (S.D. Ind. Apr. 14, 2015) ...................14

*Koehl v. Dalsheim*, 85 F.3d 86 (2d Cir. 1996)..............................................................................23

*Lawson v. Dallas County*, 286 F.3d 257 (5th Cir. 2002)..............................................................23

*Lewis v. McLean*, 864 F.3d 556 (7th Cir. 2017) ..........................................................................14

*Littler v. Martinez*, 2019 WL 1043256 (S.D. Ind., March 5, 2019)............................................20

*Martinez v. Mancusi,* 443 F.2d 921 (2d Cir. 1970).......................................................................23

*Miller v. Gonzalez*, 761 F.3d 822 (7th Cir. 2014) ........................................................................14

*Miller v. Campanella*, 794 F.3d 878, 880 (7th Cir. 2015) ..........................................................17

*Moore v. Wexford Health Services* 2023 WL 4492118 (N.D. Ill., 2023) ....................................19

*Morisch v. United States*, 653 F.3d 522 (7th Cir. 2011) ..............................................................20

*Ortiz v. Webster*, 655 F.3d 731 (7th Cir. 2011) ...........................................................................15

*Petties v. Carter*, 836 F.3d 722 (7th Cir. 2016) ............................................................14, 15, 17, 19

*Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816 (7th Cir. 2009) ....................................22

*Thomas v. Illinois*, 697 F.3d 612 (7th Cir. 2012) .........................................................................19

*Williams v. City of Chicago*, 733 F.3d 749 (7th Cir. 2013) .........................................................14

*Williams v. Mary Diane Schwarz, P.A.*, 2018 WL 1961143 (N.D. Ill. Apr. 26, 2018) ...........17, 20

Pursuant to Local Rule 56.1(b), Plaintiff Ahmad Poole, through his attorneys, respectfully submits this combined response in opposition to Defendants' motions for summary judgment:

## INTRODUCTION

This case concerns the complete disregard for Ahmad Poole's serious neck fracture while incarcerated at Stateville Correctional Center. The Defendants in this case, prison doctor Evaristo Aguinaldo, prison nurse Tina Tomaras, and prison guards Officer Jaburek and Officer Norman, each encountered Poole after an inmate attacked him and broke his neck on August 17, 2017. They knew about the attack, and knew Mr. Poole was experiencing severe neck pain. Yet Dr. Aguinaldo and Nurse Tomaras did not perform an exam, provide prescription pain medication, stabilize Poole's neck, expedite proper imaging, or treat the injury in any way. Poole was left in severe pain, unable to function, without a neck brace, for 13 days, until another doctor intervened. Even after that doctor intervened, Norman refused to carry out his medical orders. As for Jaburek, even though Poole told Jaburek about his neck pain multiple times, Jaburek did not retrieve a medical professional, talk to the doctor about Poole's concerns, or provide Poole a pillow for neck stabilization. Defendants neglected Poole's repeated, daily complaints of pain despite signs of a clear medical crisis that mandated immediate intervention.

Defendants delayed Poole's care, allowed him to remain in severe pain for several days, and affected the outcome of his eventual surgery, leading to chronic pain and limits on his daily activities. Each of these actions show deliberate indifference, precluding summary judgment. The Defendants moved for summary judgment, ignoring Poole's own testimony, his expert's opinions, and other evidence in the record precluding summary judgment. The Court should deny Defendants' motions.

## PLAINTIFF'S STATEMENT OF ADDITIONAL FACTS

### *Poole Injures his Neck*

1.      On August 17, 2017, Poole's cellmate, nicknamed "Killa B," attacked him. Killa B trashed Poole around and swung him into a headlock for about three minutes. Poole thought Killa B was trying to break his neck and felt like he was going to die. Ex. 1 (Poole Dep.) at 57:3-12; 58:24; 59:1-6; 65:8-24; 66:1-16; 68:11-24; 69:1-3.

2.      Sometime after, correctional officers arrived and stopped the attack. The officers pushed Killa B and Poole to the ground and escorted Killa B out of the cell. Ex. 1 (Poole Dep.) at 67:5-12.

3.      The officers placed Poole in handcuffs and he immediately felt pain in his neck. Poole stood up while cuffed, and "it felt like a building fell on [his] neck." Ex. 1 (Poole Dep.) at 67:13-15.

4.      Poole was concerned about his neck and immediately told the correctional officers about his severe pain, but they said nothing. Ex. 1 (Poole Dep.) at 73:14-18.

### *Poole Tells Jaburek About his Neck Pain*

5.      After the attack, Jaburek escorted Poole to the healthcare unit; Poole told him about his severe neck pain during the escort. Poole explained that he felt his neck popping with every step he took, and it felt like an electrical current was moving up and down his spine. Ex. 1 (Poole Dep.) at 33:19-24; 34:1-21; 150:6-14.

6.      Jaburek placed Poole by himself in a bullpen outside of the healthcare unit. Ex. 1 (Poole Dep.) at 73:19-23; 74:15-18. Jaburek did nothing to get Poole expedited medical care or alert medical staff about Poole's concerning symptoms.

7.      Poole waited there for approximately two and a half hours in extreme pain. Ex. 1

(Poole Dep.) at 78:5-8, 79:1-2.

### *Poole Seeks Medical Care from Defendant Nurse Tomaras*

8.      Eventually an officer went into the healthcare unit to get medical attention for Poole, and Defendant Nurse Tomaras came to the bullpen. Ex. 1 (Poole Dep.) at 80:6-19. Poole is certain it was Tomaras because he is familiar with her and described her to other prisoners to learn her last name. Ex. 1 (Poole Dep.) at 36:2-24; 172:13-24, 173:1-11. Tomaras also has an independent recollection of seeing Poole that day. Ex. 2 (Tomaras Dep.) at 18:2-9; 18:24; 19:1-8; 56:3-10; 70:6-7, 20-25; 71:1-10.

9.      Poole told Tomaras about his neck and what he had gone through that day. He described popping sounds when he moved his neck, severe pain from holding his head up, a feeling of misalignment, and an electrical current along his neck. Tomaras ignored his complaints, instead telling Poole he needed stitches for a cut near his eye from the attack. Tomaras then went back to the healthcare unit. Ex. 1 (Poole Dep.) at 31:3-8; 80:17-19; 81:1-10; Ex. 3 Poole 2037-2044 (Poole Grievance) at 2040.

10.     After Tomaras examined Poole's eye, Jaburek escorted Poole into the Healthcare Unit. Ex. 1 (Poole Dep.) at 79:12-15.

11.     Another nurse took Poole's vitals. Poole then saw Dr. Aguinaldo in Tomaras's presence and she heard the information Poole provided to Dr. Aguinaldo about his neck. Ex. 2 (Tomaras Dep.) at 22:7-11; 25:16-20.

12.     In her deposition, Tomaras testified that nurses can stabilize a patient's neck with a neck brace independently without a doctor's orders, or if a doctor orders it. Ex. 2 (Tomaras Dep.) at 56:11-21.

***Poole Seeks Medical Care from Defendant Dr. Aguinaldo***

13.     Poole immediately told Dr. Aguinaldo about his neck pain. Dr. Aguinaldo asked Poole to move his legs and fingers but did not examine his neck. Ex. 1 (Poole Dep.) at 82:2-10-12. Ex. 4 (Dr. Aguinaldo Dep., Vol II) at 147:20-23.

14.     Dr. Aguinaldo then stitched the cut near Poole's eye, and Poole asked about seeing another medical professional or getting an x-ray for his neck. Dr. Aguinaldo told Poole, "There is no x-ray technician." The medical records indicate that he then ordered x-rays and Tylenol 500 (the equivalent of over-the-counter Tylenol Extra Strength). Ex. 1 (Poole Dep.) at 82:13-20; Ex. 3 (Poole Grievance 2037-2044) at 3; Ex. 4 (Dr. Aguinaldo Dep., Vol II) at 140:9-18.

15.     In the meantime, Dr. Aguinaldo did not provide or order any bracing to stabilize Poole's neck.  Aguinaldo did not provide a neck brace, pillow, or improvised collar; nor did he manually stabilize Poole's neck with towels; nor did he position Poole on a flat surface; nor stabilize Poole by any other means; nor instruct Poole on stabilizing his neck. Ex. 1 (Poole Dep.) at 83:21, 84:5-12.

***Poole Describes His Neck Pain to Jaburek Again***

16.     Jaburek then escorted Poole to segregation, and on the walk Poole again described his neck pain to Jaburek. Poole had a cellmate in segregation, Jonathon Hernandez, whose deposition testimony corroborates Poole's experience in segregation. Ex. 3 Poole 2037-2044 (Poole Grievance) at 2040. Ex. 1 (Poole Dep.) at 150:17-22. Ex. 5 (Hernandez Dep.) at 12:20-23.

17.     Jaburek did not ensure that Poole could keep his medication in segregation. When Poole got to segregation, he had to remove his clothes, and his clothes and Tylenol were confiscated before he had even taken one dose.  Ex. 1 (Poole Dep.) at 85:1-19.

18.     While in segregation, Poole experienced severe neck pain, electrical shocks along

his spine, and inability to sleep or move his neck. Ex. 1 (Poole Dep.) at 86:2-23; 87:16-21. Ex. 5 (Hernandez Dep.) at 36:1-9.

19.     Poole did not have any pillows in segregation. Ex. 5 (Hernandez Dep.) at 33:23-25; 34:1-7,14-24; 37:2-6.

20.     The only way Poole could relieve his neck pain was by holding his head up and trying to position his neck in place with both hands. Ex. 3 Poole 2037-2044 (Poole Grievance) at 2040.

### *Poole Seeks Medical Care from Tomaras Again Two Days Later*

21.     On August 19, 2017, Poole went to the healthcare unit for a dressing change for his stitches. Tomaras performed the dressing change and Poole again told her about his neck pain and inability to sleep, eat, wash himself, or keep his head up for the past two days. She again ignored his complaints and "shooed [him] away like . . . a dog." Officers then escorted Poole back to segregation without a doctor visit or examination of his neck. Ex. 1 (Poole Dep.) at 28:10-19; Ex. 3 Poole 2037-2044 (Poole Grievance) at 2040.

22.     Tomaras does not recall her conversations about Poole's symptoms, but she testified that if a patient presented with neck trauma and described neck pain, electrical shocks, and inability to function, a nurse should typically tell the doctor. If the doctor was notified, the doctor likely would have wanted to see the x-ray results before seeing the patient again. There is no evidence in the record that she relayed Poole's symptoms to a doctor. Ex. 2 (Tomaras Dep.) at 73:17-25; 74:1-12.

### *August 21, 2017*

23.     Four days after the incident, Poole was scheduled to have bloodwork done. Poole told a nurse named Stephanie about the pain in his neck, that his neck felt out of place, and that he

felt shocking pains. Another nurse, Paige, walked in and Poole told her about his pain. Poole also complained that he had not received an x-ray. Nurse Stephanie and Nurse Paige told Poole that the x-ray technician does not perform x-rays every day. Ex. 3 Poole 2037-2044 (Poole Grievance) at 2040.

### *August 22, 2017*

24.    Five days after the injury, Poole received an x-ray pass but his x-ray was canceled. Ex. 3 Poole 2037-2044 (Poole Grievance) at 2040.

### *Poole Again Seeks Medical Care from Dr. Aguinaldo on August 24*

25.    On August 24, Poole received a pass to have his stitches removed, and he saw Dr. Aguinaldo. Poole again told Dr. Aguinaldo that he was having severe neck pain, felt popping and electrical shocks along his neck, and had to hold his head up with both hands to feel any relief. Poole asked for pain medication. Dr. Aguinaldo ignored Poole's complaints, told him nothing was wrong with him, and sent him back to segregation without a neck brace. Ex. 1 (Poole Dep.) at 91:14-21. Ex. 3 Poole 2037-2044 (Poole Grievance) at 2040.

### *Poole's Neck is X-rayed on August 25*

26.    On August 25, 2017, eight days after Poole first presented to the healthcare unit and saw Dr. Aguinaldo, he received an x-ray. Officers then took Poole back to segregation. Ex. 3 Poole 2037-2044 (Poole Grievance) at 2040.

### *Poole Seeks Medical Care from Dr. Aguinaldo Again on August 28*

27.    Poole received a pass for a follow-up appointment with Dr. Aguinaldo. Poole told Dr. Aguinaldo again about his neck pain, electric shocks, and how it hurt to even sit up. Dr. Aguinaldo told Poole his neck was fractured, but it would heal on its own and he would not need surgery. Ex. 3 Poole 2037-2044 (Poole Grievance) at 2041; Ex. 1 (Poole Dep.) at 92:6-19.

28.     Dr. Aguinaldo reviewed the radiology report but did not examine Poole's neck and again sent him back to segregation without a neck brace. Ex. 4 (Dr. Aguinaldo Dep., Vol II) at 147:4-7; Ex. 1 (Poole Dep.) at 93:23, 94:1-2.

### *Poole Finally Receives Medical Care from Dr. Obaisi on August 30*

29.     Two days after Poole saw Dr. Aguinaldo, he had an appointment with Dr. Obaisi. Dr. Obaisi retrieved and reviewed Poole's x-ray films. He immediately called an outside hospital, told Poole he was sending him off-site, and gave Poole a neck brace. Poole understood he was being referred to an outside treater for a fracture in his neck. Ex. 1 (Poole Dep.) at 93:6, 16; 94:3-19; 101:20-24.

### *Norman Escorts Poole for Transport to an Outside Hospital*

30.     After Dr. Obaisi got off the phone and gave Poole a neck brace, Poole had to wait for the escorting officers to leave for the outside hospital. Norman and Officer Hackett arrived to escort Poole for transport. Ex. 1 (Poole Dep.) at 95:8-18; 162:1-9. Ex. 6 (Norman Dep.) at 32:2-16.

31.     Dr. Obaisi told Norman to get Poole a wheelchair and call for an ambulance. Ex. 1 (Poole Dep.) at 96:5-17; 164:19-24, 165:1-9.

32.     Norman and Hackett did not get a wheelchair or ambulance. They escorted Poole through three checkpoints and down a flight of stairs to the Stateville van in handcuffs, waist chains, and ankle chains. Ex. 1 (Poole Dep.) at 96:19-24, 97:3-11; 156:15-20.

33.     They placed Poole in the van and transported him to St. Joseph's Hospital, keeping him in restraints and not buckling his seatbelt for stability. Ex. 1 (Poole Dep.) at 97:1-18; 158:3-17.

34.     Norman told Officer Hackett, who was a newer employee, how to get extra time to

manipulate the system, how to drive slow or fast, and how tock for extra overtime pay. Ex. 1 (Poole Dep.) at 162:22-24; 163:1-6.

35.    Norman had an independent recollection that Poole had neck pain on August 30, 2017. Ex. 6 (Norman Dep.) at 11:20-25; 12:1-3.

36.    Correctional Officers can verbalize concerns about prisoners to medical staff. Ex. 6 (Norman Dep.) at 21:11-14.

37.    Once at St. Joseph's, Poole received a CT scan. He described his symptoms to the medical staff at St. Joseph's and reported his neck pain as a 10 out of 10. He was then diagnosed with a displaced C3 facet fracture. Ex. 7 (St. Joseph Medical Records) Doctor A. RTP 0954.  Ex. 1 (Poole Dep.) at 103:7-24. Ex. 8 (St. Joseph Medical Record) Doctor A. RTP 0933.

38.    Poole was then transferred to UIC Hospital for a higher level of care. Ex. 9 (University of Illinois Admitting History/Physical Note) Poole 127.

39.    At UIC Hospital, he received an MRI, which demonstrated a right-sided inferior C3 facet fracture with perching. Ex. 1 (Poole Dep.) at 116:1-3. Ex. 10 (University of Illinois Medical Note) Poole 172.

40.    Poole was immediately placed in a Miami J Collar. Ex. 11 (Operative Report) at Doctor A. RTP 1025.

41.    Poole underwent surgery on September 7, 2017. Dr. Mehta performed a C3-C4 posterior cervical fusion. Ex. 12 (Surgery-Procedure Documentation) 78000-019 1394 43.

42.    Operative intervention was necessary because Poole had a perched facet and instability at the C3-C4 area. Over time, physiological loading could lead to stenosis of the spinal cord, which could lead to compression of the spinal cord or nerve roots. Ex. 13 (Dr. Mehta Dep.) at 46:18-24; 47:1-8.

### *Poole Continues to Suffer Neck Pain*

43.     Poole returned his neck brace on January 3, 2018. Ex. 14 (Outpatient Progress Note) Doctor A. RTP 1182.

44.     Poole continues to have neck pain. He cannot completely turn his neck to the right and has difficulty sleeping, and providers have told him he will have to learn how to live with this pain. Ex. 1 (Poole Dep.) at 99:17-24, 100: 1-16.

45.     Poole is currently taking Neurontin and Robaxin for nerve and neck pain, prescribed by Dr. Batista. Ex. 1 (Poole Dep.) at 21:2-24, 22:1-5.

### *Dr. Aguinaldo*

46.     Poole recalled complaining about his neck pain to every doctor and nurse he encountered after his injury. Ex. 1 (Poole Dep.) at 118:17-19.

47.     Dr. Aguinaldo has no independent recollection of Poole. Ex. 15 (Dr. Aguinaldo Dep., Vol I) at 14:2-21.

48.     Dr. Aguinaldo has the authority and discretion to send patients to an outside hospital. Ex. 15 (Dr. Aguinaldo Dep., Vol I) at 34:19-25; 35:1.

49.     In 2017, Dr. Aguinaldo encountered patients in the healthcare unit after a nurse saw the patient. The nurse would tell him about the patient. Ex. 15 (Dr. Aguinaldo Dep., Vol I) at 40:22-25; 41:1-10.

50.     Dr. Aguinaldo believes neck injuries can be very serious because they can cause paralysis. He believes the best practice when a patient presents with a neck injury is to provide a neck collar or brace. Ex. 15 (Dr. Aguinaldo Dep., Vol I) at 60:21-25; 61:1-25; 62:1-14.

51.     Dr. Aguinaldo believes if a patient presents with a serious neck injury, they should be sent offsite to an outpatient hospital. Ex. 15 (Dr. Aguinaldo Dep., Vol I) at 63:2-8.

52. Dr. Aguinaldo testified that recent trauma to the neck, pain for multiple days, excessive pain such that a patient cannot hold their head up without their hands, shooting pain, restricted movement, and electric shocks are all cause for concern. Ex. 15 (Dr. Aguinaldo Dep., Vol I) at 65:20-24.

53. Dr. Aguinaldo is not a specialist and believes the best practice for subluxation or a serious neck injury is to send the patient to an outside hospital to rule out anything serious. Ex. 15 (Dr. Aguinaldo Dep., Vol I) at 63:2-8; 67:10-25; 68:1-9.

54. According to Dr. Aguinaldo, it would be difficult and painful for a patient's neck to move if they had subluxation. Dr. Aguinaldo believes subluxation could be a serious medical condition. Ex. 4 (Dr. Aguinaldo Dep., Vol II) at 90:16-22; 91:1-5.

55. Dr. Aguinaldo believes a neck fracture is an emergency condition that should be sent to an outside hospital immediately. Ex. 4 (Dr. Aguinaldo Dep., Vol II) at 151:10-19.

56. Dr. Aguinaldo testified that Poole's neck needed to be stabilized because, according to the radiology report, he had a C3-C4 subluxation. Ex. 4 (Dr. Aguinaldo Dep., Vol II) at 202:1-2, 8-10.

57. Even if there is no instability present from a "fracture", best practice is to give a patient who presents with a neck injury a neck brace for conservative management. Ex. 4 (Dr. Aguinaldo Dep., Vol II) at 214:8-12.

58. It is not typical for radiologists to opine about further imaging or treatment required for patients. Ex. 4 (Dr. Aguinaldo Dep., Vol II) at 234:17-23.

### Dr. Leef

59. As a radiologist, Dr. Leef's obligation is only to report his findings to an ordering doctor. It is up to the ordering doctor to use their medical knowledge for further treatment or

10

follow-up. Ex. 16 (Dr. Leef Dep.) at 24:19-25; 25:1-3.

60.     As a rule, Dr. Leef does not try to dictate a patient's additional workup. Ex. 16 (Dr. Leef Dep.) at 50:22-25; 51:1-5.

61.     Although Dr. Leef did not catch the fracture on the x-ray, Dr. Leef hoped the referring physician would correlate the x-ray report with the clinical findings. Ex. 16 (Dr. Leef Dep.) at 51:9-20.

62.     A CT scan or MRI can catch things that an x-ray film cannot. Ex. 16 (Dr. Leef Dep.) at 53:20-25; 54:1-13.

### Dr. Davis's Expert Opinion

63.     Poole's medical expert, Dr. Davis, defined the standard of care as "the level at which a physician should complete an evaluation of a patient, be it starting from the initial discussion, complaint, [history and physical], subjective, whatever you have, all the way through physical exam to treatment to diagnostics, whatever we should do as a physician." Ex. 17 (Dr. Davis Dep.) at 16:3-12.

64.     Dr. Davis has been on medical review panels where he had to opine on whether he thought the treating doctor breached the standard of care. Ex. 17 (Dr. Davis Dep.) at 21:17-24; 23:24, 24:1-15.

65.     As a hospitalist in an emergency room setting, it is his responsibility to follow up on x-ray reports by recommending different imaging or follow-up, or referring a patient out. Ex. 17 (Dr. Davis Dep.) at 27:9-12, 29:17-24

66.     If the radiologist can see a fracture, they should report it, but a plain film will never ever diagnose all fractures. If there is a need for a better modality, a CT or MRI could catch a fracture that an x-ray could not. Ex. 17 (Dr. Davis Dep.) at 61:11-24, 62:1-7.

67.     That said, according to Dr. Davis, a doctor should not "chase imaging" and does not need imaging to treat a patient. A doctor should interview and listen to the patient, check vitals and perform an exam, and further check the patient to form their opinion, then use imaging to confirm their findings. Ex. 17 (Dr. Davis Dep.) at 165:7-11, 16-24.

68.     Dr. Davis explained that if a patient presents with neck trauma and pain, the provider should engage in differential diagnosis to rule out issues and determine the problem. This includes ordering imaging, but also protecting the patient and the patient's neck. Ex. 17 (Dr. Davis Dep.) at 96:1-15.

69.     In Poole's case, neck stabilization was necessary because Poole presented with neck trauma and was not able to be imaged in a timely manner. Dr. Davis testified that it is the doctor's responsibility to find a way to stabilize the neck. Ex. 17 (Dr. Davis Dep.) at 100:16-23 ("You've got to figure something out . . . . [Y]ou may not have resources, but you've got to figure out some resources on the spot . . . . "You need that collar . . . . [If] you don't have a collar, get that person to where they can get a collar.").

70.     Dr. Davis opined that the delay in proper imaging and delay in stabilizing Poole's neck delayed Poole from receiving necessary surgery until September 6, 2017. Ex. 18 (Dr. Davis's Expert Report) at 3.

71.     Dr. Davis explained that each instance where Poole encountered a health care practitioner and voiced his complaints, but did not intervene and provide treatment or stabilization, contributed to this delay. Ex. 17 (Dr. Davis Dep.) 102:18-23, 111:914, 21-23, 114:8-14, 116:14-21.

72.     Dr. Davis explained why Dr. Leef was not directly responsible for the delays in Poole's treatment. The modality of the x-ray failed, and it was the responsibility of the doctor

working up the case to order follow-up testing. Ex. 17 (Dr. Davis Dep.) at 118:7-13, 118:19-23, 119:1-8, 120:9-15.

73.     Dr. Mehta performed necessary surgery on Poole's active fracture to prevent a catastrophic ending from the unstable subluxation. Ex. 17 (Dr. Davis Dep.) at 130:16-19.

74.     The Defendants' delay in stabilizing Poole's neck and failing to get him care for several days worsened his surgical outcome, meaning it increased his chronic pain and the limitations on his daily activities post-surgery. Proper and timely treatment of Poole's fracture would have improved Poole's outcome. Ex. 17 (Dr. Davis Dep.) at 136:4-9: 137:1-4,14-20; 154:22-24, 155:1-4; Ex. 18 (Dr. Davis Report) at 5.

75.     Poole's neck should have been stabilized on August 17, and if his neck was stabilized earlier, he could have had a better surgical outcome. This is because a c-collar stabilizes the paraspinal muscles, bones, and soft tissue in the neck. Subluxation, meaning an unstable joint, can cause damage if it remains unstable. Ex. 17 (Dr. Davis Dep.) at 122: 12-18; 128: 1-4; 127:8-24.

76.     After reviewing Poole's medical records and some of the depositions in this case, Dr. Davis determined that Dr. Aguinaldo breached the standard of care by not stabilizing Poole's neck and expediting proper imaging, causing Poole pain and a delay in treatment in the days following his injury. Dr. Aguinaldo's delays also worsened Poole's surgical outcome, causing more chronic pain and limitations on daily activities. Ex. 18 (Dr. Davis's Expert Report) at 4.

## LEGAL STANDARD

At summary judgment, the moving party has the burden to establish that the case presents no genuine issues of material fact which require a trial to resolve. Fed. R. Civ. P. 56(c). When deciding whether a genuine dispute of fact exists, the Court must view the facts in the light most

favorable to Plaintiff, resolving all evidentiary conflicts in his favor. *Conley v. Birch*, 796 F.3d 742, 746 (7th Cir. 2015); *Williams v. City of Chicago*, 733 F.3d 749, 752 (7th Cir. 2013) (credibility issues must be given to a jury to decide); *Hansen v. Fincantieri Marine Grp., LLC*, 763 F.3d 832, 836 (7th Cir. 2014) (plaintiff is entitled to every reasonable inference); *see also Miller v. Gonzalez*, 761 F.3d 822, 828 (7th Cir. 2014) ("Deciding which inference to draw from [a] conversation is the task of a fact finder."). Circumstantial evidence is entitled to equal weight, especially in cases like this one that "turn on circumstantial evidence, often originating in a doctor's failure to conform to basic standards of care." *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) (en banc).

## ARGUMENT

To prevail on his claims, Poole must prove that he suffered from an objectively serious medical condition, and that Defendants acted with deliberate indifference to the condition. *Petties*, 836 F.3d at 728 (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). In this case, Defendants do not dispute that Poole suffered a serious medical condition. *See Lewis v. McLean*, 864 F.3d 556, 563 (7th Cir. 2017) (a serious medical need is one that either a physician has diagnosed as mandating treatment, or is so obvious that even a lay person would know a doctor's attention is required).[1]

Defendants' motion thus centers solely on whether they acted with deliberate indifference to Poole's serious medical need. Deliberate indifference requires a factfinder to inquire into the Defendants' subjective state of mind, a topic ill-suited for resolution at summary judgment.

---

[1] The Seventh Circuit has also held that extreme pain is similarly an objectively serious medical condition. *Gutierrez v. Peters*, 111 F.3d 1364, 1369-72 (7th Cir. 1997) (significant pain may constitute objectively serious medical condition) (collecting cases); *Cooper v. Casey*, 97 F.3d 914, 916 (7th Cir.1996) (objectively serious medical condition requires an "illness or injury . . . [which] is sufficiently serious *or painful* to make the refusal of assistance uncivilized") (emphasis added); *see also Johnson v. Corizon Med. Servs. Inc.*, 2015 WL 1648208, at *5 (S.D. Ind. Apr. 14, 2015) ("Severe pain constitutes a serious medical need sufficient to satisfy the first element of the deliberate indifference test.") (citing *Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976)).

*Conley*, 796 F.3d at 747 ("[S]tate of mind is an inquiry that ordinarily cannot be concluded on summary judgment." (quotation marks and citation omitted)). To establish deliberate indifference, a plaintiff must show that a defendant was aware of and disregarded a substantial risk of harm to the plaintiff. *Farmer*, 511 U.S. at 835; *Ortiz v. Webster*, 655 F.3d 731, 734 (7th Cir. 2011). Because prison officials "[r]arely if ever" admit that they acted with deliberate indifference, prisoners typically establish it through circumstantial evidence. *Petties*, 836 F.3d at 728.

The Seventh Circuit has identified multiple ways that a plaintiff can prove deliberate indifference through circumstantial evidence. First, "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005) (quoting *Farmer*, 511 U.S. at 842). A prisoner may also show deliberate indifference through evidence that "the defendant's chosen course of treatment departs radically from accepted professional practice," providing an inference that "no exercise of professional judgment actually occurred." *Diggs v. Ghosh*, 850 F.3d 905, 909 (7th Cir. 2017) (quotation marks and citation omitted). And when medical staff persist in a course of treatment they know is ineffective, choose an "easier and less efficacious treatment[,]" or refuse to take instructions from a specialist, an inference of deliberate indifference at summary judgment is appropriate. *Petties*, 836 F.3d at 729–30; *Arnett v. Webster*, 658 F.3d 742, 753-54 (7th Cir. 2011). Finally, an "inexplicable delay in treatment" which "exacerbate[s] the [plaintiff's] injury or unnecessarily prolong[s] [his] pain" warrants denial of summary judgment. *Petties*, 836 F.3d at 730–31; *see also Grieveson v. Anderson*, 538 F.3d 763, 779–80 (7th Cir. 2008) (delay in providing care actionable under the Eighth Amendment if evidence permits inference that plaintiff endured "many more hours of needless suffering for no reason").

Several of these situations outlined by the Seventh Circuit as indicative of deliberate

15

indifference are present here. At this stage, the Court must accept Poole's version of the facts as true, as well as all reasonable inferences drawn from that evidence. Based on the record, Defendants were deliberately indifferent to Poole's pain and neck fracture in 2017. The Court should deny Defendants' motions for summary judgment.

**I.**     **Dr. Aguinaldo was deliberately indifferent to Poole's serious medical need.**

Dr. Aguinaldo was aware of and consciously disregarded Poole's serious neck injury and pain. First, there is ample evidence that Dr. Aguinaldo knew Poole had serious pain and a serious neck injury. Dr. Aguinaldo learned of Poole's injury and pain when he saw him in the healthcare unit on August 17, 2023, after Tomaras saw Poole in the bullpen. PSOF at ¶ 13. Poole had obvious signs of a serious injury: he had suffered neck trauma, was reporting severe pain, and was holding his head up with his hands. PSOF at ¶ 13. Dr. Aguinaldo asked Poole to move his legs and fingers, indicating that Dr. Aguinaldo was checking for risks associated with a cervical fracture. *Id.* As further evidence of his knowledge, Dr. Aguinaldo ordered x-rays and Tylenol 500 (equivalent to over-the-counter Tylenol extra strength) after Poole complained about his neck, indicating that Dr. Aguinaldo believed that a fracture could explain Mr. Poole's symptoms. *Id.* at ¶ 14. From all this evidence, a jury can infer Dr. Aguinaldo knew Poole had a serious neck injury. The first prong of deliberate indifference is therefore satisfied for Dr. Aguinaldo. *See Cooper*, 97 F.3d 914 at 916 (objectively serious medical condition means severe pain or a serious injury).

In addition to knowledge, there is also evidence that Dr. Aguinaldo disregarded Poole's serious medical need. Dr. Aguinaldo did not examine Poole's neck, expedite imaging, stabilize the neck, prescribe pain medication, refer Poole to an outside specialist, or treat the injury in any way. *Id.* at ¶¶ 13–15. He stitched a cut near Poole's eye, and when Poole inquired about x-rays or seeing another medical professional for his neck pain, Dr. Aguinaldo failed to treat Poole when Poole

needed it. *Id.* at ¶ 14. Dr. Aguinaldo did not give Poole a neck brace or pillow; nor did he manually stabilize Poole's neck with towels; nor did he position Poole on a flat surface; nor stabilize Poole by any other means; nor instruct Poole on stabilizing his neck; nor improvise a collar and transfer Poole somewhere with a neck collar. *Id.* at ¶ 15. Dr. Aguinaldo failed to stabilize Poole's neck despite his deposition testimony that (1) neck injuries can be very serious, (2) best practice for patients presenting with a neck injury is to provide a neck brace, and (3) symptoms like Poole's are cause for concern. *Id.* at ¶¶ 50, 52.

As more evidence of Dr. Aguinaldo's disregard, he failed to send Poole to an outside hospital for stabilization and other treatment. Dr. Aguinaldo knew there was not an x-ray technician available at the prison the day Poole was injured, but he did not send him out or expedite the x-ray order. Dr. Aguinaldo sent Poole back to his cell even though he testified that he had authority to send patients to an outside hospital and believes patients with serious neck injuries should be sent off-site. *Id.* at ¶¶ 48, 52. Combined with Dr. Davis's expert testimony that a treater needs to "figure something out" to stabilize the neck, even where a neck collar is not available, *id.* at ¶ 69, a jury could infer Dr. Aguinaldo deviated from the standard of care without any reason, showing his deliberate indifference. Dr. Aguinaldo's "inexplicable delay in treatment," combined with "the seriousness of the condition and the ease of providing treatment," supports an inference of deliberate indifference. *Petties*, 836 F.3d at 730 (citing *Grieveson*, 538 F.3d at 779, then citing *Edwards v. Snyder*, 478 F.3d 827, 830–31 (7th Cir. 2007), and then citing *Miller v. Campanella*, 794 F.3d 878, 880 (7th Cir. 2015) (other citations omitted). Specifically, as set out in Dr. Davis's report and Dr. Aguinaldo's own testimony, the delay in providing Mr. Poole with the basic treatment of a neck brace and immediate imaging was a substantial departure from the standard of care in light of the evident risk that Mr. Poole had a neck fracture. *Williams v. Mary Diane*

*Schwarz, P.A.*, No. 15-cv-1691, 2018 WL 1961143, at *6–7 (N.D. Ill. Apr. 26, 2018) (holding that an expert opinion that a defendant's "chosen course of treatment" represented "a substantial departure from accepted medical judgment" permits a jury inference of deliberate indifference).

Seven days later, on August 24, 2017, Dr. Aguinaldo again disregarded Poole's known and serious neck injury, and again delayed the delivery of medical care. Poole explained to Dr. Aguinaldo again that he was having severe neck pain. PSOF ¶ 25. He told Dr. Aguinaldo his neck had a popping sound, it felt as if an electric current was running through his neck, and that he had to hold up his neck with both hands in order to stabilize it. *Id.* Poole, once again, requested pain medication. *Id.* Dr. Aguinaldo ignored Poole's complaints, told him nothing was wrong with him, and sent him back to segregation without a neck brace, x-ray, or pain medication. *Id.*

On August 28, 2017, eleven days after the injury, Dr. Aguinaldo disregarded Poole's serious medical need again. *Id.* ¶ 27. Poole again complained of severe neck pain, popping sounds, and pain sitting up, but Dr. Aguinaldo still did not treat the neck injury. At this point Poole had received an x-ray three days earlier. *Id.* ¶ 26. Dr. Aguinaldo reviewed the radiologist's report and told Poole he had a neck fracture, but still failed to treat the injury. He told Poole he would be out of segregation soon and his neck would heal on its own without surgery. *Id.* ¶ 27–28. This exchange is more evidence that Dr. Aguinaldo—who testified that he is not a specialist and that persons with neck injuries should be sent to the hospital for a workup to rule out more serious injuries, *id.* ¶ 53—both knew of and disregarded Mr. Poole's serious medical needs. And with Mr. Poole reporting severe pain despite the passage of so much time, a jury could infer that Dr. Aguinaldo knew Poole was not receiving the Tylenol 500, or at least knew it was not working. Despite this knowledge, like every other time he saw Poole, Dr. Aguinaldo sent Poole back to segregation without a neck brace, prescription medication, proper imaging, or outside referral. *Id.* ¶¶ 28.

18

All this evidence establishes Dr. Aguinaldo's disregard for Poole's serious pain and neck injury. Poole complained about his neck pain to Dr. Aguinaldo at every encounter, so a jury could infer that Dr. Aguinaldo knew that his regime for Poole was not working, or knew Poole was not receiving Tylenol. *See Greeno*, 414 F.3d at 655 (persisting in a course of treatment known to be ineffective supports inference of deliberate indifference). Aguinaldo's failure to develop any alternative pain management plan despite knowing that his was ineffective is itself sufficient to permit an inference of deliberate indifference. *Petties*, 836 F.3d at 729–30; *Greeno,* 414 F.3d at 655; *Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010) (collecting cases). Moreover, Dr. Aguinaldo's disregard for Poole's injury, including his failure to order proper and on-time imaging or stabilize the neck, delayed Poole's care and surgery. PSOF ¶¶ 29, 37–42. That delay alone is enough to establish deliberate indifference. *See Gomez v. Randle*, 680 F.3d 859, 865-66 (7th Cir. 2012) (plausible deliberate indifference claim based on four-day delay in treatment that prolonged plaintiff's pain, even though delay did not exacerbate injury). Not only did the delay cause severe pain, but Dr. Davis opined that the delay in stabilizing Poole's neck and failing to get him care for several days worsened his surgical outcome, meaning it increased his chronic pain and the limitations on his daily activities. PSOF at ¶ 74 ("Proper and timely treatment of Poole's fracture would have improved Poole's outcome."). These facts preclude summary judgment. *See Thomas v. Illinois*, 697 F.3d 612, 615 (7th Cir. 2012) (discussing "probabilistic harm" and "loss of chance" theory in the § 1983 context); *Moore v. Wexford Health Services, Inc.*, No. 19-cv-3892 2023 WL 4492118 (N.D. Ill., 2023) (denying summary judgment even where there was a "miniscule but possible" chance that treatment would have been more effective without the defendant's delay).

Dr. Aguinaldo spends much of his motion pointing the finger at the radiologist, Dr. Leef. ECF 135 at 5–8. This misses the point. Nowhere in his motion does Aguinaldo address the

19

significance of Poole's testimony about what he told Dr. Aguinaldo. Nor does Dr. Aguinaldo address the opinions offered by Dr. Davis, Poole's expert in emergency medicine. Poole's testimony about what he told Dr. Aguinaldo, combined with Aguinaldo's testimony and Dr. Davis's opinions about the standard of care for an injury like Poole's, permit the inference that Dr. Aguinaldo knew of Poole's serious medical need and ignored it. Dr. Davis concluded that Dr. Aguinaldo failed to respond to Poole's serious medical need, and deviated widely from accepted medical standards by not expediting proper imaging or stabilizing Poole's neck. *Id.* at ¶ 76. Dr. Davis attributed Dr. Aguinaldo's failures to treat the fracture to him, not to Dr. Leef. PSOF at 58–76. An expert's opinion that a defendant's "chosen course of treatment" represented "a substantial departure from accepted medical judgment" permits a jury inference of deliberate inference and precludes summary judgment. *Williams*, 2018 WL 1961143, at *6–7.

Dr. Aguinaldo's motion relies instead on his own expert's opinions, but where there are competing expert opinions, summary judgment is inappropriate. "Resolution of competing experts' opinions requires credibility determinations that are inappropriate for the Court to engage in at the summary judgment stage." *Giles v. Ludwig*, 2014 WL 4358475, at *3 (N.D. Ill. Sept. 3, 2014); *Morisch v. United States*, 653 F.3d 522, 529 (7th Cir. 2011) ("In a case of dueling experts, such as this one, it is left to the trier of fact, not the reviewing court, to decide how to weigh the competing expert testimony."). The same is true for Dr. Aguinaldo's reliance on his own version of the facts. *See Littler v. Martinez*, 2019 WL 1043256, at *19 (S.D. Ind., March 5, 2019) (a defendant's invitation to credit its facts over plaintiff's facts invites the court to commit legal error). The Court should deny Dr. Aguinaldo's motion for summary judgment.

## II.    Tomaras Consciously Disregarded Poole's serious medical need.

There is also sufficient evidence in the record to create a factual dispute as to Tomaras's awareness of and conscious disregard for Poole's serious medical needs. First, there is evidence

that Tomaras knew about Poole's serious pain and neck injury ever since she first saw Poole in the bullpen on the day of the fight, August 17, 2017, before he entered the healthcare unit. PSOF ¶ 10; Resp. to Tomaras SOF ¶ 15. Tomaras came to the bullpen after Poole asked officers to go the healthcare unit to get him immediate medical attention. *Id.* At the time, Poole showed clear signs of a serious injury: he reported severe neck pain and electrical currents running up his neck, described popping sounds in his neck and a feeling of misalignment, and he was holding his head up with his hands. PSOF at ¶ 11. Poole testified that he is certain that the nurse he saw was Tomaras. *Id.* at ¶ 10. Indeed, Tomaras has an independent recollection of seeing Poole on that day. *Id.* at ¶ 12; PSOF ¶ 10. Tomaras knew Poole was in severe pain and had a serious neck injury, so the first prong of deliberate indifference is satisfied.

Second, with this knowledge, Tomaras disregarded Poole's serious medical need. Tomaras ignored Poole's complaints and told him he needed stitches, having examined only his eye. Resp. to Tomaras SOF ¶ 16. She was then present when Dr. Aguinaldo saw Poole and heard their conversation. PSOF ¶ 13–14. She heard Poole's complaints to Dr. Aguinaldo about his neck pain and heard Dr. Aguinaldo dismiss Poole's complaints. *Id.* ¶ 14. Despite her awareness of Poole's neck issues, she did not request that Poole receive a neck brace, prescription pain medication, referral to a specialist, or expedited imaging.

Tomaras then disregarded Poole's serious medical needs again on August 19, 2017. Poole again told Tomaras about the pain in his neck and inability to sleep, eat, wash himself, or keep his head up for the past two days. *Id.* ¶ 21. She again ignored his complaints and "shooed [him] away like . . . a dog." *Id.* Poole was then escorted back to Segregation without seeing a doctor. *Id.* at ¶ 23. Tomaras did not provide him a neck brace, despite her ability to do so when a doctor is not on-site. Resp. to Tomaras SOF at ¶ 52. An obvious inference is that Tomaras knew Poole's

21

situation on August 17–19 was an emergency that required immediate care, but consciously disregarded his serious medical need and dismissed him without ever sending him to the healthcare unit or an outside specialist, recommending prescription pain medications or expedited imaging, nor providing a neck brace.

Poole received an x-ray eight days after Tomaras first saw him and received a neck brace and referral 13 days after she saw him. Seventh Circuit precedent establishes that her disregard of his emergent neck injury, causing severe pain and a 13-day delay in care, is sufficient to create a jury question on Tomaras's deliberate indifference. *See Gomez*, 680 F.3d at 865–66 (plausible deliberate indifference claim based on four-day delay that prolonged plaintiff's pain); *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 830–32 (7th Cir. 2009) (same); *Grieveson*, 538 F.3d at 779–80 (same); *Edwards v. Snyder*, 478 F.3d 827, 830–31 (7th Cir. 2007) (two-day delay may be sufficient).

Poole's evidence supports a strong inference that Tomaras consciously disregarded Plaintiff's serious medical need. Summary judgment is therefore inappropriate, and the Court should deny Tomaras's motion.

### III. Defendants Jaburek and Norman knew of Poole's serious medical need and disregarded it.

Both Jaburek and Norman knew about Poole's neck injury and pain. Poole complained to Jaburek about his serious neck pain on the day of the fight. PSOF ¶ 5. And both Jaburek and Norman were called to carry out medical orders: Jaburek when he escorted Poole on August 17, and Norman when he transported Poole on August 30. *Id.* at ¶ 30. This evidence establishes the first prong of deliberate indifference for both defendants.

Second, Jaburek and Norman disregarded Poole's serious medical needs. Jaburek left Poole alone immediately after his injury and did nothing to help him receive care. *Id.* at ¶ 5. As for

22

Norman, Dr. Obaisi told him to get Poole a wheelchair and call for an ambulance. *Id.* at ¶ 31. Instead, Norman escorted Poole through three checkpoints and down a flight of stairs in handcuffs, waist chains, and ankle chains. *Id.* at ¶ 32. He and Officer Hackett placed him in the prison van for transport without buckling his seatbelt, and Poole was unable to buckle it himself because they had him in restraints. *Id.* at ¶ 33. On the way to the hospital, the officers talked about how to milk the transport for extra time and overtime pay, *id.* at ¶ 34, allowing the inference that Norman disobeyed Dr. Obaisi's orders so he could receive overtime pay.

Norman's interference with Dr. Obaisi's medical orders to provide a wheelchair and ambulance is itself sufficient to preclude summary judgment. Ignoring or refusing to carry out medical orders can establish liability for prison guards. *Estelle*, 429 U.S. at 104–05 (holding that "intentionally interfering with the treatment once prescribed" can constitute an Eighth Amendment claim); *see Lawson v. Dallas County*, 286 F.3d 257, 263 (5th Cir. 2002) (affirming that disregard for follow-up care instructions for paraplegic could be deliberate indifference); *Koehl v. Dalsheim*, 85 F.3d 86, 88 (2d Cir. 1996) (holding denial of prescription eyeglasses needed to avoid double vision and loss of depth perception that resulted from prior head injury enough to allege deliberate indifference); *Erickson v. Holloway*, 77 F.3d 1078, 1080–81 (8th Cir. 1996) (finding that an officer's denial of an emergency room doctor's request to admit the prisoner and take x-rays could show deliberate indifference); *Boretti v. Wiscomb*, 930 F.2d 1150, 1156 (6th Cir. 1991) (finding the nurse's refusal after several direct requests to change the prisoner's wound dressings raised "a genuine issue" for trial).

Moreover, Norman's choice to make Poole walk in restraints, and Jaburek's choice to make Poole walk and then leave him alone without medical care, establish deliberate indifference. In *Martinez v. Mancusi*, the court held that a prisoner could bring claims against prison officials who

used force to remove him from a hospital when he was recovering from leg surgery. 443 F.2d 921, 924 (2d Cir. 1970). In that case, like this one, prison officials ignored the doctor's instructions that the prisoner could not walk and moved the prisoner without the doctor's permission. *See id.* Drawing all inferences in Poole's favor, Jaburek and Norman knew of Poole's serious medical need and failed to help Poole receive medical care, forced Poole to walk in restraints, disobeyed medical advice, and placed Poole in a van without a seatbelt. The Court should therefore deny Jaburek and Norman's motion for summary judgment.

## CONCLUSION

For the above reasons, the Court should deny Defendants' motions for summary judgment.

Respectfully submitted,

/s/ Maria Makar
*One of Plaintiff's Attorneys*

Stephen Weil
Maria Makar
LOEVY & LOEVY
311 N. Aberdeen, Third Floor
Chicago, IL 60607
(312) 243-5900
makar@loevy.com
*Attorneys for Plaintiff*