**THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| AHMAD POOLE (K95348), | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 20-CV-0014 |
| | ) | |
| | ) | |
| v. | ) | Honorable Manish S. Shah |
| | ) | |
| DR. E. AGUINALDO, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

# Exhibit 2

LOUISVILLE   LEXINGTON   LONDON   FLORENCE   CINCINNATI   INDIANAPOLIS   ORLANDO   JACKSONVILLE   TAMPA



# KENTUCKIANA
## —— COURT REPORTERS ——

# CASE NO. 20 C 0014

# AHMAD POOLE

# V.

# EVARISTO AGUINALDO, ET AL.

# DEPONENT:

# TINA TOMARAS

# DATE:

# January 27, 2022



schedule@kentuckianareporters.com

☎ 877.808.5856 | 502.589.2273

## www.kentuckianareporters.com

EXHIBIT 5

IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN

DISTRICT OF ILLINOIS

EASTERN DIVISION

CASE NO. 20 C 0014


AHMAD POOLE,

Plaintiff


v.


EVARISTO AGUINALDO, ET AL.,

Defendants


DEPONENT:   TINA TOMARAS

DATE:       JANUARY 27, 2022

REPORTER:   SANDRA VENTURA

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

EXHIBIT 5

Page 2

```
 1                  APPEARANCES
 2
 3   ON BEHALF OF THE PLAINTIFF, AHMAD POOLE:
 4   Isabella Aguilar, Esquire
 5   Loevy & Loevy
 6   311 North Aberdeen Street
 7   Third Street
 8   Chicago, Illinois 60607
 9   Telephone No.: (312) 243-5900
10   E-mail: aguilar@loevy.com
11   (Appeared via videoconference)
12
13   ON BEHALF OF THE DEFENDANT, STATE OF ILLINOIS:
14   Kristin Lindemann, Esquire
15   Assistant Attorney General
16   Illinois Attorney General's Office
17   100 West Randolph Street
18   Chicago, Illinois 60601
19   Telephone No.: (217) 782-6830
20   E-mail:  kristin.lindemann@ilag.gov
21   (Appeared via videoconference)
22
23
24
25
```

Page 3

```
 1             APPEARANCES (CONTINUED)
 2
 3   ON BEHALF OF THE DEFENDANTS, TINA TOMARAS AND EVARISTO
 4   AGUINALDO, M.D.:
 5   Logan N. Giaquinta, Esquire
 6   Connolly Krause, LLC
 7   500 West Madison Street
 8   Suite 3900
 9   Chicago, Illinois 60661
10   Telephone No.: (312) 253-6200
11   E-mail: lgiaquinta@cktrials.com
12   (Appeared via videoconference)
13
14   ALSO PRESENT: Savanna Squires, Videographer
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1                    INDEX
 2                                            Page
 3   PROCEEDINGS                               6
 4   DIRECT EXAMINATION BY MS. AGUILAR         8
 5   CROSS-EXAMINATION BY MR. GIAQUINTA        84
 6   CROSS-EXAMINATION BY MS. LINDEMANN        85
 7
 8                   EXHIBITS
 9   Exhibit                                   Page
10   1 - Grievance Document                    65
11   2 - Progress Note                         77
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1                   STIPULATION
 2
 3   The VIDEO deposition of TINA TOMARAS, taken at
 4   KENTUCKIANA REPORTERS, 30 SOUTH WACKER DRIVE, FLOOR 22,
 5   CHICAGO, ILLINOIS 60606, via videoconference in which
 6   all participants attended remotely, on THURSDAY, the
 7   27th day of JANUARY, 2022 at approximately 2:38 P.M.
 8   CST; said VIDEO deposition was taken pursuant to the
 9   Federal Rules of Civil Procedure.  The notarial act
10   involved the use of communication technology pursuant to
11   KRS 423.455.
12
13   It is agreed that SANDRA VENTURA, being a Notary Public
14   and Court Reporter for the State of Kentucky, may swear
15   the witness.
16
17
18
19
20
21
22
23
24
25
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

EXHIBIT 5

Page 6

```
1                    PROCEEDINGS
2        VIDEOGRAPHER:  My name is Savanna Squires.
3    I'm the online video technician, and Sandra Ventura
4    is the court reporter today representing Kentuckiana
5    Court Reporters located at 30 South Wacker Drive,
6    22nd Floor, Chicago, Illinois 60606.  Today is the
7    27th day of January 2022.  The time is 2:38 p.m.
8    We are convened by video conference to take the
9    deposition of Tina Tomaras in the matter of Ahmad
10   Poole versus Evaristo Aguinaldo, et al., pending in
11   the United States District Court for the Northern
12   District of Illinois, Eastern Division, Case Number
13   20C0014. Will everyone but the witness please state
14   your appearance, how you are attending and location
15   you are attending from, starting with the
16   plaintiff's counsel?
17       MS. AGUILAR:  Thank you.  Isabella Aguilar on
18   behalf of plaintiff's counsel.  I'm appearing by
19   Zoom from Glen Ellyn, Illinois.
20       MR. GIAQUINTA:  Logan Giaquinta,
21   G-I-A-Q-U-I-N-T-A, appearing on behalf of
22   defendants, Tina Tomaras and Dr. Evaristo Aguinaldo.
23   I'm appearing via Zoom from Chicago, Illinois.
24       MS. LINDEMANN:  Kristin Lindemann, Assistant
25   Attorney General for the State of Illinois on behalf
```

Page 7

```
1    of defendants, Jaburek and Norman, appearing via
2    Zoom from Chicago.
3        VIDEOGRAPHER:  Ms. Tomaras, can you please
4    state your full name for the record and hold your ID
5    up to the camera?
6        THE WITNESS:  Tina Brown.
7    Can you see that?
8        (WITNESS SHOWS LICENSE)
9        VIDEOGRAPHER:  Yes.  Thank you.
10       Q.  Okay.  Do all parties agree that the witness is, in
11   fact, Ms. Tomaras?
12       MR. GIAQUINTA:  Yep.
13       MS. AGUILAR:  I'm sorry.
14       MS. LINDEMANN:  Yes.
15       MS. AGUILAR:  Did you state, Ms. Tomaras, that
16   your name is Tina Brown?
17       THE WITNESS:  That is my name as of -- I was
18   married in 2020.
19       MS. AGUILAR:  Okay.  That's fine.  Then
20   plaintiff agrees.
21       VIDEOGRAPHER:  Okay.  Ms. Brown, will you
22   please hold your hand up to be sworn in by the court
23   reporter?
24       THE WITNESS:  (Raises hand).
25       COURT REPORTER:  Do you solemnly swear or
```

Page 8

```
1    affirm the testimony you're about to give in this
2    case will be the truth, the whole truth, nothing but
3    the truth so help you God?
4        THE WITNESS:  I do.
5        COURT REPORTER:  Thank you.
6        MS. AGUILAR:  May I begin?  Sorry.  I wasn't
7    sure.
8        MR. GIAQUINTA:  You may.
9        VIDEOGRAPHER:  Yes.  Thank you.
10       MS. AGUILAR:  Thank you.
11                 DIRECT EXAMINATION
12   BY MS. AGUILAR:
13       Q.  Good afternoon, Ms. Brown.
14       A.  Good afternoon.
15       Q.  Could you please state and spell your name for
16   the record?
17       A.  Tina Brown.  T-I-N-A.  B-R-O-W-N.
18       Q.  Okay.  Thank you.
19       MS. AGUILAR:  Let the record reflect that this
20   is the videotaped deposition of Tina Brown taken
21   pursuant to notice in the Federal Rules of Civil
22   Procedure.
23       Q.  Ms. Brown, you may be familiar with some of
24   the rules of depositions, but I'm just going to go
25   through them, okay?
```

Page 9

```
1        A.  Uh-huh.
2        Q.  You under --
3        A.  Okay.
4        Q.  Sorry.  I don't mean to interrupt you.
5            You understand that you're under oath?
6        A.  I do.
7        Q.  Okay.  And you understand that telling a lie
8    at a deposition is a crime?
9        A.  I do.
10       Q.  Okay.  The court reporter is taking down
11   everything we say, so it's really important to give
12   verbal answers such as no.  Things that are inaudible
13   are difficult for the court reporter to take down.  It's
14   a little more informal than testimony in court, but it's
15   really important that we speak one at a time so that the
16   court reporter doesn't have any issues; is that okay?
17       A.  Yes.
18       Q.  Okay.  Please let me know if there's any
19   technological issues.  Sometimes I've been freezing, so
20   just let me know.  And if that happens, I can rephrase a
21   question or repeat it, okay?
22       A.  Okay.
23       Q.  I'll try to ask questions that make sense to
24   you, and if they don't, please let me know, and I'll
25   rephrase it, okay?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

Kentuckiana
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

EXHIBIT 5

Page 10

1    A.   Okay.
2    Q.   If you do answer a question, I'm going to
3  assume that you understood the question; is that fair?
4    A.   Yes.
5    Q.   Okay.  Do you have any conditions today that
6  might affect your ability to provide truthful and
7  accurate testimony today?
8    A.   No.
9    Q.   Do you have any conditions that are affecting
10 your memory today?
11   A.   No.
12   Q.   Are you on any medications that might affect
13 your ability to provide truthful and accurate testimony?
14   A.   No.
15   Q.   Are you taking any medications that might
16 affect your memory?
17   A.   No.
18   Q.   Is there anything else that might affect your
19 ability to provide accurate testimony today?
20   A.   No.
21   Q.   Is there anything else that's affecting your
22 memory?
23   A.   No.
24   Q.   Okay.  Have you ever been a plaintiff or a
25 defendant in a civil lawsuit before?

Page 11

1    A.   Yes.
2    Q.   Okay.  Have you ever been a plaintiff?
3    A.   No.
4    Q.   Okay.  So you've been a defendant in a civil
5  lawsuit before?
6    A.   Yes.
7    Q.   And how many lawsuits would you say you've
8  been a defendant on before?
9    A.   Two.
10   Q.   Okay.  Do you know the names of those cases?
11   A.   No, I do not recall.
12   Q.   Okay.  Do you know the factual allegations of
13 either of those cases?
14   A.   One was an inmate that sued me because he was
15 written a ticket for masturbating in front of me at the
16 cell front.
17   Q.   Okay.  And do you know of the other factual
18 allegations for the other case you mentioned?
19   A.   I believe it was pertaining to dental work
20 that he had done in the dental department.
21   Q.   Okay.  And do you know if the dental work case
22 alleged a failure to provide medical treatment claim?
23   A.   I do not believe it was a failure for medical
24 treatment, no.
25   Q.   Okay.  Can you recall any of the complaints in

Page 12

1  that lawsuit or any of the charges in that lawsuit?
2         MR. GIAQUINTA:  Objection to the form.
3    A.   I believe it was regarding pain that he was
4  experiencing.
5    Q.   Okay.  And how did you come to be a defendant
6  in that specific case, if it was regarding dentist work?
7    A.   He was -- he was, at the time, stating that he
8  was not given proper pain medication.
9    Q.   Okay.  And was he alleging that you failed to
10 give him that medication?
11   A.   Not myself, per se.  The doctor that I was
12 working with that day.
13   Q.   Okay.  Do you know the resolution of that
14 case?
15   A.   I do not, as the inmate was caught hoarding
16 pain medication in his cell.  I don't know what the
17 actual resolution was for the case itself.
18   Q.   Okay.  Have you ever been arrested before?
19   A.   No.
20   Q.   Okay.  Have you ever had any administrative
21 complaints filed against you?
22   A.   No.
23   Q.   Are you aware of any grievances that have been
24 filed against you by any patients?
25   A.   Not that I'm aware of today.

Page 13

1    Q.   Okay.  Are you aware of any investigations
2  conducted as a result of grievances that you might have
3  been involved with?
4    A.   Not that I'm aware of.
5    Q.   Okay.  Have you ever been accused by a patient
6  of failing to provide medical treatment other than what
7  you've already discussed with me?
8    A.   No.
9    Q.   Have you ever been accused by any misconduct -
10 - strike that.
11        Have you ever been accused of any misconduct
12 by a patient other than what we've already talked about?
13   A.   No.
14   Q.   Okay.  Have you ever had your deposition taken
15 before?
16   A.   Yes.
17   Q.   Okay.  On how many occasions?
18   A.   Two.
19   Q.   Okay.  And those depositions involved your
20 employment with Wexford?
21   A.   Correct.
22   Q.   Okay.  Have you ever been retained as an
23 expert witness --
24        (WITNESS DISCONNECTS FROM ZOOM)
25        MS. AGUILAR:  Oh, I'm sorry.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

EXHIBIT 5

Page 14

1    VIDEOGRAPHER:  It looks like she dropped off.
2    Would you like to go off record?
3    MS. AGUILAR:  Yes, please.
4    VIDEOGRAPHER:  Okay.  We are off the record.
5    The time is 2:46 p.m.
6    (OFF THE RECORD)
7    VIDEOGRAPHER:  We are back on the record for
8    the deposition of Tina Tomaras being conducted by
9    videoconference.  My name is Savanna Squires.  Today
10   is January 27, 2022.  The time is 2:48 p.m.
11   MS. AGUILAR:  Thank you.
12   BY MS. AGUILAR:
13   Q.  Sorry about that, Ms. Tomaras.  I was asking a
14   question and I'll repeat that now.
15   A.  Okay.
16   Q.  Have you ever been retained as an expert
17   witness before?
18   A.  No.
19   Q.  Okay.  I want to discuss your independent
20   recollection of Ahmad Poole.  By independent
21   recollection, I mean what you actually recall as you sit
22   here today from August 2017 relating to Mr. Poole,
23   without the aid of documents and without the aid of
24   anything that you've been told in preparation for the
25   deposition.  Solely based on your memory.

Page 15

1    Do you understood what I mean by independent
2    recollection?
3    A.  Yes.
4    Q.  Do you have any independent recollection of
5    Ahmad Poole?
6    A.  I do.
7    Q.  Okay.  What is it that you remember about
8    Mr. Ahmad Poole?
9    A.  I know that he is an --
10   MR. GIAQUINTA:  Objection.  Form.
11   THE WITNESS:  Oops.  Sorry.
12   Q.  You can answer.
13   A.  I know that he is an inmate at Stateville
14   Correctional Center from the time I started -- well, I'm
15   not sure how long he was there but for a couple of
16   years.  And I do know that he was involved in a -- an
17   altercation with his cellmate, the date August 17th, I
18   believe.
19   Q.  Okay.  And how is it that you remember that
20   specific date, August 17th?
21   A.  Actually, I recall -- I didn't really recall,
22   you said the 17th, the exact date of the incident that
23   occurred, but I know that it occurred in August.
24   Q.  Okay.
25   MS. AGUILAR:  Okay.  Could someone read back

Page 16

1    the exact date?  I'm not sure I said it, and I just
2    want to clarify if I did or not.  So, can you please
3    read that back, the question I asked her regarding
4    independent recollection?  I believe I said August
5    2017, but if I can have a clarification on that.
6    (REQUESTED PORTION READ BACK BY REPORTER)
7    COURT REPORTER:  I can continue, if you'd like
8    me to.
9    MS. AGUILAR:  No.  That's fine.  Thank you.
10   BY MS. AGUILAR:
11   Q.  Ms. Tomaras, I don't believe I said August 17,
12   2017, so I'm just curious how you remember that exact
13   date of August 17, 2017.
14   A.  Well, I probably assumed 17 when you said
15   2017.  I didn't hear you say 2000, so I assumed you had
16   said August 17th.
17   Q.  Okay.  Thank you for the clarification.
18   Is there anything else that you remember
19   besides the fact that Mr. Poole was an inmate in August
20   2017 at Stateville Correctional Center?
21   A.  I know that he was in an altercation with his
22   cellmate.
23   Q.  Is there anything else you remember?
24   A.  I remember that on the day of the altercation
25   he was seen by a medical professional, M.D.

Page 17

1    Q.  Okay.  How many patients do you typically see
2    every day?
3    MR. GIAQUINTA:  Objection to form.  Isabella,
4    you might want to clarify.  Do you mean back in 2017
5    or now or...?
6    BY MS. AGUILAR:
7    Q.  I -- I mean just generally as a nurse at
8    Stateville Correctional Center, now or in 2017, how many
9    patients do you see every day?
10   A.  It would depend on the day and the situation
11   of the day, if we're on lockdown.  If -- normally they -
12   - doctors would see anywhere from 12 to 20 or so
13   patients.
14   Q.  Okay.  And 12 to 20 patients a day?
15   A.  Uh-huh.  Or more.  It just depends on the
16   doctor and it depends on the day.
17   Q.  Okay.  And as a nurse, how many patients do
18   you see on a typical day?
19   A.  Well, if I'm working with the doctor, I take
20   vitals on those patients that the doctor sees and
21   prepare them -- their -- their chart for the doctor to
22   see.  I don't see the patients.  I just prepare the
23   patient for the doctor.
24   Q.  Okay.  And do you typically remember details
25   about every patient that you encounter?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


Kentuckiana
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

EXHIBIT 5

The Deposition of TINA TOMARAS, taken on January 27, 2022

18..21

Page 18

1 A. Not every patient, no.
2 Q. Okay. So how is it that you remember details
3 about Ahmad Poole, in particular, from a case that
4 happened -- or an incident that happened over four years
5 ago?
6 A. Because, specifically, he had told the doctor
7 that his cellmate grabbed him by his braids and threw
8 him across the room. And he did have long braids, so I
9 remember that particular moment.
10 Q. Okay. We'll get into the conversations that
11 you remember and what you personally observed, so thank
12 you for letting me know that.
13 Is there anything else you remember about
14 Ahmad Poole on -- in August 2017 that you haven't
15 mentioned already?
16 A. Not -- not that I can recall.
17 Q. Okay. And was that the first time that you
18 encountered Ahmad Poole?
19 A. No.
20 Q. Okay. And how many occasions have you
21 encountered him?
22 A. I couldn't tell you how many occasions. We
23 pass medication daily, so it would depend on how many
24 times I was assigned to that particular cell house.
25 Q. Okay. Do you think you could probably give me

Page 19

1 an estimate? You know, was it five times, ten times, 20
2 times you've seen him? Just a range would be helpful.
3 A. Honestly, I worked there for six years. I
4 couldn't even imagine to give you a guesstimate of how
5 many times I actually saw him in the time that I worked
6 there.
7 Q. Okay. Could you say that it's a lot?
8 A. I could say it probably is a lot, but again,
9 dependent on what cell house I was -- you know, we all
10 have certain cell houses that we work. It would depend
11 on whether I was in that cell house, how often -- I
12 couldn't even guesstimate.
13 Q. Okay.
14 A. I know who he is.
15 Q. Do you have an independent recollection of any
16 communications that you had with Ahmad Poole?
17 A. No, I don't.
18 Q. So fair to say that you can't remember
19 anything that he said to you?
20 A. Not anything that I can think of in a normal
21 conversation.
22 Q. And you can't remember anything that you said
23 to him?
24 A. Some of the things I said to him were,
25 "Poole, I have your medication." I remember those

Page 20

1 things. I also remember a conversation, I can't tell
2 you when, that Mr. Poole, as I was walking, would have
3 said, "Hey, Tina, I got something for you." And I said,
4 "What is that?" And he said, "You'll see." I do recall
5 that because I didn't know what he meant by that. I was
6 guessing since I was given papers for the -- for this
7 deposition that maybe he was referring to that because
8 he refused to tell me what exactly he meant by that.
9 So I do recall that conversation.
10 Q. Okay. And you said you can't remember the
11 time frame of that conversation?
12 A. Honestly, I don't. I -- I would say it was
13 probably within six months of me leaving Stateville or
14 having, you know, last worked there. It was probably in
15 the last six months of that.
16 Q. Okay. And when did you leave Stateville?
17 A. May 31st of 2021.
18 Q. Okay. And was it a voluntary resignation?
19 A. It's not a resignation. I chose to go to
20 working as needed.
21 Q. Okay. So you're no longer full-time?
22 A. Correct.
23 Q. But you technically still are employed by
24 Wexford Health Services?
25 A. Yes.

Page 21

1 Q. Okay. But you're not working at Stateville
2 Correctional Center or you still are?
3 A. If I choose to go in on a basis and work for
4 them with help needed, I can, but I haven't been in five
5 -- since about June.
6 Q. Okay. And why is it that you haven't picked
7 up any shifts at Stateville Correctional Center since
8 June of 2021; if that's correct?
9 A. Because I make more money working where I'm
10 working right now, and I also get to choose the hours
11 that I want to work.
12 Q. Okay. I know you stated that you, and please
13 correct me if I'm incorrect on this, but I believe you
14 stated that Ahmad Poole talked to Dr. Aguinaldo in front
15 of you; is that correct?
16 A. Not in front of me. When a patient is put in
17 front of the doctor, we step away so that they can have
18 a conversation with that doctor.
19 Q. Okay. So how is it that you know what Ahmad
20 Poole said to the doctor?
21 MR. GIAQUINTA: Objection. Mischaracterizes
22 testimony. I don't believe she ever said that,
23 Isabella. I think she stated that she knew that he
24 saw Dr. Aguinaldo. I don't recall her testifying
25 about a conversation.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

EXHIBIT 5

The Deposition of TINA TOMARAS, taken on January 27, 2022

22..25

Page 22

1        MS. AGUILAR:  Ms. Ventura, can you repeat back
2    what she said regarding a conversation that Ahmad
3    Poole had with Dr. Aguinaldo, I believe she said?
4        (REQUESTED PORTION READ BACK BY REPORTER)
5        MS. AGUILAR:  Okay.  Thank you.
6    BY MS. AGUILAR:
7        Q.   Back to my question, Ms. Brown. How is it that
8    you know what he told the doctor?
9        A.   At the time, I may not have stepped away fast
10   enough or he spoke loud enough that I heard that
11   particular statement.
12       Q.   Okay.  Did you hear anything else that was
13   said to the doctor?
14       A.   No, I don't.
15       Q.   Okay.  Do you have an independent recollection
16   of anything Ahmad Poole said to anyone else other than
17   yourself or that one comment to Dr. Aguinaldo?
18       A.   No, I don't.
19       Q.   Okay.  Do you have an independent recollection
20   of anything anyone else said to Ahmad Poole?
21       A.   No, I don't.
22       Q.   Okay.  Do you have an independent recollection
23   of any of your visits with Ahmad Poole as a patient?  I
24   know you stated you had seen him a lot.
25       A.   At the cell front delivering medication, I saw

Page 23

1    him.
2        Q.   Okay.  Do you have any independent
3    recollection, though, of seeing him, how he appeared
4    during those visits possibly?
5        A.   He appeared --
6        MR. GIAQUINTA:  Objection to form.  Isabella,
7    are we still talking about August 2017, or are we
8    talking about in general?
9        MS. AGUILAR:  We're talking about in general
10   because she said she had seen him a lot.
11       MR. GIAQUINTA:  It might -- if she's passing
12   out medication at the cell front over a long period
13   of time, it might be helpful to close down the time
14   frame for that.
15       MS. AGUILAR:  Sure.
16   BY MS. AGUILAR:
17       Q.   Do you have an independent recollection of how
18   Ahmad Poole appeared in August 2017 when you encountered
19   him?
20       A.   I don't believe in August 2017, that
21   particular month, that I did see him.  I may have seen
22   him months after that or even a year.  As I said
23   previously, I was not stationed always in the same cell
24   house and it would depend on what cell house he was in.
25   I have no idea.  Every day our stations changed.

Page 24

1        Q.   Okay.  In August 2017, do you have any
2    independent recollection of him having any marks on his
3    face, such as a cut on his left cheek?
4        A.   Not to my recollection, no.
5        Q.   Okay.  Do you have any independent
6    recollection of any symptoms or conditions he was
7    complaining about?
8        A.   Not to my recollection.
9        Q.   Okay.  Can you tell me everything that you
10   independently recollect about your time with him in
11   August 2017?
12       A.   I recall being in the ER.  I do not recall
13   whether I was the nurse.  There are several that
14   initially prepared him for the doctor, but I do recall
15   being in the ER or near the ER on the day that he was
16   assaulted.
17       Q.   Okay.  Do you have an independent
18   recollection, as you sit here today, of any of the
19   symptoms that Ahmad Poole exhibited while he was at the
20   Health Care Unit on August 17, 2017?
21       A.   I don't have a recollection of actual
22   symptoms.  I recall that he did need to see the doctor.
23   And as I stated, I'm not sure who the nurse was that
24   actually put him in front of the doctor, because there
25   are several of us that work in different sections in the

Page 25

1    ER.
2        Q.   Okay.  Do you have an independent recollection
3    of whether or not while Ahmad Poole was at the Health
4    Care Unit in August 2017, that he complained of severe
5    pain in his neck?
6        A.   That, I don't know.  I -- again, I know that
7    he was there.  I know that it was post an altercation
8    with his cellmate, but not specifically, I don't recall.
9        Q.   Okay.
10       A.   Independently without an attorney stating.
11       Q.   Sure.  Do you have an independent recollection
12   of whether or not he had difficulty keeping his head up?
13       A.   My recollection was that he didn't -- his head
14   was up.  It was not, what we would call in nursing, any
15   obvious deformity, that I recall.  I don't recall seeing
16   his neck in any odd position.  He was talking.  When he
17   sat in front of the doctor, I don't recall his head
18   being in any other position rather than up.
19       Q.   Okay.  And you saw him talking to the doctor?
20       A.   I saw him sitting in front of the doctor.
21       Q.   Okay.  But then you walked away after that,
22   correct?
23       A.   I -- if I was working in the ER with other
24   doctors or doing treatments, I was back and forth.
25       Q.   Okay.  So would you have been able to see if

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

Kentuckiana
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

EXHIBIT 5

The Deposition of TINA TOMARAS, taken on January 27, 2022

26..29

**Page 26**

1  he continued holding his head up during the entire time
2  he was with Dr. Aguinaldo?
3     A.  Yes.
4     Q.  Okay.  So you can say definitively one way or
5  the other whether or not he kept his head up, then?
6     A.  I do not recall any obvious deformity or any
7  difference of how he held his head.
8     Q.  Could you explain what an obvious deformity is
9  to me?
10    A.  An obvious deformity would be somebody whose
11 head was to the right, to the left or a lump or a bone,
12 something not in your obvious normal appearance, how
13 your anatomy should be.
14    Q.  So would you consider that an objective
15 symptom of something may be wrong with a person's neck?
16       MR. GIAQUINTA:  Objection.  Form.
17    A.  So objective meaning something I can see?
18    Q.  Correct.
19    A.  Correct.  There was nothing objectively that I
20 saw that looked out of place.
21    Q.  Okay.  Do you know, though, if Ahmad Poole or
22 do you have -- strike that.
23       Do you have an independent recollection of
24 whether or not while Ahmad Poole was at the HCU in
25 August 2017, Ahmad Poole exhibited any popping sounds in

**Page 27**

1  his neck?
2        MR. GIAQUINTA:  Objection.  Form.
3     A.  Not to my recollection.
4     Q.  Okay.  Do you have an independent recollection
5  of whether or not, while he was at the HCU in August
6  2017, Ahmad Poole experienced shooting pain in his neck
7  and spine?
8     A.  Not to my recollection.
9     Q.  And do you have an independent recollection of
10 whether or not, while Ahmad Poole was at the HCU in
11 August 2017, he experienced sensation similar to
12 electric shocks in his neck?
13    A.  I would not know whether he experienced that
14 either.
15    Q.  Okay.  I'd like to talk to you about
16 communications with other parties.
17       Do you have any recollection of any Wexford
18 employees speaking to you about Ahmad Poole before?
19    A.  Not to my recollection.
20    Q.  Okay.  Do you have any recollection of any
21 IDOC employees speaking to you about Ahmad Poole?
22    A.  State -- state officers or employees?
23    Q.  Correct.  Anyone that works at the Illinois
24 Department of Corrections.
25    A.  Okay.  You said IDOT [sic] so I wasn't sure

**Page 28**

1  what you --
2     Q.  Oh, apologies.
3     A.  -- referred to.  Not to my knowledge, no.
4  Not to my recollection.
5     Q.  Okay.  Apologies.  And I meant IDOC.  I-D-O-C.
6  Apologies --
7     A.  Oh, okay.
8     Q.  -- if it sounded like DOT.
9     A.  Okay.
10    Q.  I will spell it out next time.  Sorry about
11 that.
12    A.  Not a problem.
13    Q.  Okay.  So you haven't spoken to Dr. Aguinaldo
14 about Ahmad Poole before?
15    A.  Not that I recall, no.  Once they see the
16 M.D., the M.D. writes orders on what he wants to do, and
17 I don't discuss that with the doctor.  He moves on to
18 the next patient.
19    Q.  Okay.  And you haven't spoken with Lieutenant
20 Jaburek about Ahmad Poole either, correct?
21    A.  No.
22    Q.  Okay.  And you've never spoken with Officer
23 Norman about Ahmad Poole before?
24    A.  No.
25    Q.  Okay.  Do you have any recollection of any

**Page 29**

1  person instructing you to provide any sort of medical
2  treatment to Ahmad Poole?
3     A.  Not to my knowledge.
4     Q.  Okay.  Do you have an independent recollection
5  of any treatment that was provided to Ahmad Poole at the
6  Health Care Unit in August of 2017?
7     A.  Again, it would depend on whether or not I
8  worked specifically with that doctor.  I don't recall
9  what their treatment was or what the doctor's orders
10 were in that case.
11    Q.  Do you have an independent recollection of
12 whether or not Ahmad Poole was sent outpatient to Saint
13 Joseph's Hospital?
14    A.  I do not have a recollection of that, no.
15    Q.  Okay.  How did you learn that you had been
16 named as a defendant in this lawsuit?
17    A.  I was served paperwork.
18    Q.  Okay.  Can you explain, in your own words,
19 what you believe this case is about?
20    A.  I believe it is, pursuant to what the
21 paperwork said that I was given, that Ahmad was not
22 given medical treatment on the day of his attack.
23    Q.  Okay.  Do you know why you personally have
24 been named as -- I'm sorry.  Strike that.
25       Do you know why you've been named as a

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
— COURT REPORTERS —

EXHIBIT 5

Page 30

1  defendant in this case?
2      A.   Because I was present in the ER, is what I
3  would assume.
4      Q.   Okay.  Have you read the complaint in this
5  lawsuit?
6      A.   Yes.
7      Q.   Do you know the allegations in the lawsuit?
8      A.   That I did not put him in front of proper
9  medical personnel --
10     Q.   Okay.
11     A.   -- I believe is what his -- his statement is.
12     Q.   Okay.  I don't want to know about any
13  conversations you've had with your attorneys.  Those are
14  privileged conversations.  But other than your attorney,
15  have you discussed this lawsuit with anyone before?
16     A.   No.
17     Q.   Okay.  You haven't discussed this with any
18  family members?
19     A.   No.
20     Q.   Okay.  And you haven't discussed this with
21  either Wexford employees or IDOC employees before?
22     A.   No.
23     Q.   Okay.  Can you please tell me everything that
24  you did to prepare for today's deposition?
25     A.   I went over the paperwork I was given for the

Page 31

1  deposition that I was served.
2      Q.   Okay.  And you went over those papers with
3  your attorney?
4      A.   Correct.
5      Q.   Okay.  Can you tell me what papers exactly you
6  went over with your attorney?
7      A.   The deposition that I was hand -- the
8  paperwork from the lawsuit that I was handed --
9      Q.   Okay.  Did those --
10     A.   -- that --
11     Q.   Apologies.  I don't mean to interrupt you.  You
12  can continue.
13     A.   Just the -- the papers that I was handed when
14  I was given the lawsuit details from Ahmad Poole's
15  attorneys.
16     Q.   Okay.  Have you seen any nursing progress
17  notes related to this case?
18     A.   No, I have not.
19     Q.   Okay.  Have you seen any medical records?
20     A.   No, I have not.
21     Q.   Okay.  And you've not seen any x-rays,
22  correct?
23     A.   No, I have not.
24     Q.   Okay.  How many times have you reviewed the
25  documents with your attorney?

Page 32

1      A.   A couple times.
2      Q.   Okay.  And how many times did you meet with
3  your lawyer to prepare for this deposition?
4      A.   One time.
5      Q.   And about how long did that last?
6      A.   About an hour, I believe.
7      Q.   I would like to talk to you now about your
8  background.  Where did you go to high school?
9      A.   Joliet West.
10     Q.   Okay.  And what year did you graduate?
11     A.   1986.
12     Q.   And after that, did you enroll in college?
13     A.   No.  I became a mom for several years.
14     Q.   Okay.  And what year did you begin going to
15  college?
16     A.   1998.
17     Q.   And did you get your degree in nursing?
18     A.   Licensed practical nurse.
19     Q.   Okay.  And when was that?
20     A.   That was in 2000.
21     Q.   Okay.  Is there any other degrees that you
22  have?
23     A.   No.
24     Q.   Do you have any other medical training, other
25  than the LPN -- I'm sorry.  Strike that.

Page 33

1      Do you have any other medical training?
2      A.   No, I don't.
3      Q.   Okay.  You currently work for Wexford Health
4  Services still, correct?
5      A.   Correct.
6      Q.   Do you work for anyone else besides Wexford at
7  this time?
8      A.   I do.
9      Q.   Okay.  Who do you work for?
10     A.   Interim HealthCare.
11     Q.   And what do you do in that role?
12     A.   I'm a licensed practical nurse.
13     Q.   And is that a full-time job?
14     A.   It's considered PRN.  I work as many or as
15  little hours as I want.
16     Q.   Okay.  I know you stated you worked as many or
17  little hours as you want, but do you have a set schedule
18  typically?
19     A.   Typically I work about 40 hours a week or
20  less, between 30 to 40.  No -- I have a certain day -- I
21  mean, I work whatever day I'm needed.
22     Q.   Okay.  And what are your job duties as an LPN?
23     A.   Assessment, give medication out, injections,
24  whatever the need be for my patients.
25     Q.   Okay.  And you can't diagnose, correct?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

EXHIBIT 5

The Deposition of TINA TOMARAS, taken on January 27, 2022

34..37

Page 34

1  A.  No.
2  Q.  Okay.  So you would agree with me that it
3  would be inappropriate for an LPN to consider a patient
4  malingering, right?
5         MR. GIAQUINTA:  Objection.  Form.
6  A.  Correct.
7  Q.  In your role as an LPN, have you ever treated
8  a neck injury before?
9  A.  Not specifically that I can remember.
10 Q.  Okay.  Have you ever treated a spinal injury
11 as an LPN before?
12 A.  I don't -- well, I worked with a quadriplegic.
13 Q.  Okay.  And in your current role -- I'm sorry.
14 I believe you said it was Interim; is that what -- the
15 company's title?
16 A.  Correct.
17 Q.  Okay.  Okay.  And working at Interim, is that
18 in a correctional facility, as well?
19 A.  No, it's not.
20 Q.  Okay.  So you work in a correctional
21 institution as far as Stateville -- no, sorry.  Strike
22 that.
23        So you worked in a correctional institution
24 for Wexford but you haven't done that since June of
25 2021, right?

Page 35

1  A.  Correct.
2  Q.  Okay.  So you're, essentially, no longer
3  working in correctional institutions, then, right?
4  A.  Correct.
5  Q.  And why is that?
6  A.  I chose to work for a company that paid me
7  more money and allowed me to make my own hours.
8  Q.  Okay.  When was the first time that you worked
9  in a correctional setting?
10 A.  When I started with Wexford, May 3rd of 2015.
11 Q.  And what made you motivated to apply to a job
12 in a correctional setting?
13 A.  It was something different, close to home.
14 Q.  Okay.  And did you enjoy your time working in
15 a correctional setting?
16 A.  I did.
17 Q.  Okay.  I believe you stated you started with
18 Wexford in 2015, correct?
19 A.  Correct.
20 Q.  What position did you hold when you began
21 working there?
22 A.  Licensed Practical Nurse.
23 Q.  Okay.  And you were a Licensed Practical Nurse
24 until you essentially stopped working at Stateville in
25 June of 2021?

Page 36

1  A.  Yes.
2  Q.  And that was always full-time?
3  A.  Yes, at that correctional center.
4  Q.  And what was that full-time schedule like?
5  A.  Every other weekend off, day shift, five days
6  a week.
7  Q.  So you didn't work overnights or weekends?
8  A.  Every other weekend I worked.
9  Q.  Oh, I'm sorry.  Every other weekend.  Okay.
10 A.  And I -- I did work occasional overnights.
11 It would depend on whether we were mandated to work and
12 stay, if there weren't enough staff.
13 Q.  Okay.  And I believe you stated that you
14 worked in different cell blocks, correct?
15 A.  Correct.
16 Q.  Can you explain what that means to me?
17 A.  It means the supervisor creates a schedule and
18 decides what nurse is going to work where for the day.
19 Q.  Okay.  So what could you be assigned to?  What
20 are the different options?
21 A.  I could be assigned to work with the clinic
22 doctors.  I could be assigned to work in the cell houses
23 to pass medication.  I could be assigned to work in the
24 infirmary.  I could be assigned to work in the ER.
25 Q.  Okay.  Could you describe the -- the job

Page 37

1  duties as an LPN in the ER to me, please?
2  A.  In the ER, we would do dressing changes,
3  injections, prepare patients to see the doctors.
4  Q.  Okay.  And so you would see patients -- they
5  would -- sorry.  Strike that.
6         So patients didn't have appointments, they
7  would just come to the ER, correct?
8  A.  No.  Patients had appointments for that day.
9  Q.  Oh, okay.  So to --
10 A.  They had a list.  Yes.  They had a list of
11 people that were to be seen by the doctor.  Every day
12 there's a list.
13 Q.  Okay.  Is that a physical list or an
14 electronic list?
15 A.  A physical list.
16 Q.  Okay.  And you had access to that?
17 A.  It was given every day.  It was given daily.
18 Q.  Okay.  Could you just walk me through -- a
19 patient comes to the ER, they have an appointment, what
20 happens next?
21 A.  The patients are brought to the bullpen.  The
22 officers alert us to who is there for their appointment.
23 And when their time frame comes up, they come in, vital
24 signs are taken and they're put in front of the doctor
25 for their appointment.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

Kentuckiana
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

EXHIBIT 5

Page 38

1    Q.   Okay.  And when the patient is then put in
2  front of the doctor, what, if anything, is communicated
3  by the LPN to the doctor?
4    A.   We don't communicate anything.  We do the
5  vital signs.  We sit the patient in front of the doctor.
6  The patient then communicates with the doctor what their
7  chief complaint is.
8    Q.   Okay.  So if a patient was complaining of
9  symptoms, you wouldn't communicate that to the doctor?
10   A.   No.  The patient communicates to the doctor,
11 just like when you and I go to the doctor, what their
12 chief complaint is.
13   Q.   Okay.  And I apologize for the screen.
14 My lighting is not the best.
15   A.   It's okay.
16   Q.   Sorry about that.
17   A.   It's okay.
18   Q.   I'm not trying to look, like, intimidating.
19 Okay.  Thank you for explaining that.
20        When it comes to having the patient tell the
21 doctor their chief complaints, is that a policy and
22 practice of Wexford?
23   A.   That's a policy in health care.  When you see
24 a doctor, you tell them what's going on with you.  You
25 explain to them what your symptoms are.  You talk to

Page 39

1  them about their care.
2    Q.   Okay.  But is it a policy and practice of
3  Wexford that the LPN does not communicate that to the
4  doctor?
5        MR. GIAQUINTA:  Object to form.
6    A.   No.  It's not a policy.  It's health care.
7  It's -- when I go to my doctor, I don't tell the nurse,
8  the nurse doesn't tell the doctor.  They put me in front
9  of my doctor, and I talk to the doctor about my
10 symptoms, my concerns.
11   Q.   Okay.  Were you trained on that?
12   A.   Trained on...?
13   Q.   Were you trained on the practice of not
14 telling the doctor a patient's symptoms?
15        MR. GIAQUINTA:  Objection.  Form.
16   A.   No.  I wasn't trained on that.
17   Q.   Okay.  I'm just trying to understand where
18 that practice originates from.
19   A.   It's health care.  It's medical.  When I go to
20 the doctor, I don't explain to the receptionist what is
21 going on with me and then she tells the nurse who then
22 tells the doctor.  I tell them I need to see the doctor.
23 I go in; the nurse takes my vital signs, as we do at
24 Stateville, and then I sit in front of the doctor.  And
25 I explain, this is why I'm here.  Doctor usually says,

Page 40

1  so what -- what are you here for?  What's going on?
2        And then I explain to the doctor, the same at
3  Stateville.  We know that they have an appointment
4  because they have an issue they need to discuss with the
5  doctor.  We take their vital signs.  Most people don't
6  want to talk to the nurses about what's going on with
7  them because they know that we cannot treat or diagnose.
8  They want to talk to the doctor.  So we do their vital
9  signs, write it down for the doctor, put the chart in
10 front of the doctor and the inmate when it's their turn,
11 and then they discuss whatever is going on with them
12 that they want to discuss with the doctor.
13   Q.   Okay.  So you stated you take the vital signs,
14 correct?
15   A.   Correct.
16   Q.   And you put that on a document?
17   A.   A progress note.
18   Q.   Okay.  What else do you put on the progress
19 note?
20   A.   I don't put anything else on the progress
21 note.  The doctor writes his notes and his orders on
22 that progress note.
23   Q.   Okay.  So if I was to show you a progress
24 note, your writing would not be on that progress note?
25   A.   I wouldn't know.  It would depend on whether I

Page 41

1  was the nurse that made the actual note.
2    Q.   Okay.  As a policy and practice of Wexford,
3  are -- are nurses to write down notes on progress notes?
4    A.   We do when we have --
5        MR. GIAQUINTA:  Objection.  Form.  Objection.
6  Calls for expert opinion.
7        MS. AGUILAR:  I don't believe that's an expert
8  opinion, Counsel.
9        MR. GIAQUINTA:  Objection.  Calls for
10 policymaker opinion and it's outside her expertise.
11 BY MS. AGUILAR:
12   Q.   Okay.  Ms. Brown, have you been trained on
13 progress notes before?
14   A.   Yes, I have.
15   Q.   Okay.  What have you been trained on?
16   A.   If there is -- if I have an actual patient
17 interaction with somebody, and the doctor is not
18 present, I do write on the progress note what their
19 complaint is and what my resolution is for them to see
20 the doctor and whatever is going on with them.
21   Q.   Okay.  So you're trained that if the doctor is
22 not present, then you are to write on the patient note?
23   A.   Correct.
24   Q.   Okay.
25   A.   If I have a patient experience, if I'm with

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



KENTUCKIANA
COURT REPORTERS

EXHIBIT 5

Page 42

1  the patient, for some reason or another.
2  Q.  Okay.  Do you supervise any employees?
3  A.  No, I do not.
4  Q.  Oh, I'm sorry.  Strike that.
5  Okay.  So you never supervised any employees
6  in August of 2017?
7  A.  No.
8  Q.  And no one reported to you?
9  A.  No.
10  Q.  Okay.  Who was your supervisor in 2017?
11  A.  Honestly, I don't know because we've gone
12  through a few supervisors.  I'm not sure exactly who the
13  supervisor was in August of 2017.
14  Q.  Okay.  When you left in 2021, do you know who
15  the supervisor was?
16  A.  Michelle Smith.
17  Q.  Michelle Smith.  Okay.  But you're not sure if
18  she was the supervisor in 2017, correct?
19  A.  I know she wasn't, because she didn't work for
20  Wexford at that time.
21  Q.  Okay.  Were you ever given a review by a
22  supervisor regarding your performance as an LPN at
23  Wexford?
24  A.  I think I once or twice received a review.
25  Q.  Okay.  And did you see that review?

Page 43

1  A.  Yes.
2  Q.  Okay.  And do you know what the review said?
3  A.  Basically that I performed my duties correctly
4  and satisfactory to their -- to their needs.
5  Q.  Okay.  And do you know when that review took
6  place?
7  A.  I don't know exactly when.
8  Q.  Okay.  Was it before you left in 2021 -- so --
9  A.  No.
10  Q.  -- strike that.
11  Okay.  Was it after 2017?
12  A.  I know I received a review after the first six
13  months of my working there, which would have been in
14  2015, but I'm not sure of any date of any other review.
15  We didn't have many.
16  Q.  Okay.  Are nurses or LPNs allowed to order
17  x-rays for patients?
18  A.  No, we are not.
19  Q.  Okay.  Only a doctor can order an x-ray?
20  A.  Correct.
21  Q.  Okay.  Would a patient be able to see a doctor
22  without seeing a nurse first?
23  A.  You -- it would depend on the circumstance.  If
24  the inmate was brought to Health Care, as Mr. Poole was
25  after an assault, then we would put them in front of the

Page 44

1  doctor, if there is a doctor present, without seeing a
2  nurse.
3  Q.  Okay.  What happens if there's no doctor
4  present?
5  A.  If there's no doctor present, it would also
6  depend on the circumstance.  They are able to sign up
7  for nurse sick call on a daily basis to be seen the very
8  next day.  If it is not considered an emergent situation
9  with bleeding or respiratory distress, then they would
10  be seen the following day.
11  Q.  Okay.  I know you stated bleeding and
12  respiratory distress equals emergency, but does any
13  other circumstance require you to think of it as an
14  emergency?
15  A.  Again, it would depend on the --
16  MS. LINDEMANN:  Objection.
17  A.  -- situation.
18  MS. LINDEMANN:  I think that misstates what the
19  witness said.  I don't think that's -- I don't think
20  she specifically said, distress equals anything.
21  MR. GIAQUINTA:  I'll join.
22  BY MS. AGUILAR:
23  Q.  Okay.  Ms. Brown, what constitutes an
24  emergency?
25  MR. GIAQUINTA:  Objection.  Form.  Might be

Page 45

1  helpful to provide some context for that.
2  MS. AGUILAR:  Sure.
3  BY MS. AGUILAR:
4  Q.  Ms. Brown, in the Health Care Unit, when
5  you're working as an LPN in the emergency room, what
6  constitutes an emergency?
7  A.  Respiratory distress that we are not able to
8  alleviate and bleeding that we're not able to stop.
9  Q.  Okay.  Does anything else constitute an
10  emergency?
11  A.  In medical anything could be an emergency.  You
12  would have to be specific.  I can't name -- I mean, I
13  don't -- I don't know what you would think would be --
14  respiratory and bleeding are the number one emergencies.
15  If it's not stoppable, absolutely, that is considered an
16  emergency.  If somebody cannot breathe, and we can't
17  help them alleviate their symptoms, absolutely that's an
18  emergency.
19  Q.  Would severe pain over the course of several
20  days in the neck be considered an emergency?
21  A.  Not if they've been given by a physician pain
22  medication.
23  Q.  Okay.  And can you tell me why that would --
24  that would mean there would no longer be an emergency
25  situation?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

Kentuckiana
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

EXHIBIT 5

Page 46

```
 1         MR. GIAQUINTA:  Objection.  Form.  I also
 2    believe that mischaracterizes what she said.
 3         A.   Bleeding --
 4         MS. LINDEMANN:  I'll join.
 5         A.   Bleeding is an emergency that can cause death,
 6    if not treated emergently.  And respiration, if you
 7    can't breathe, obviously is emergent, as well.  Those
 8    are the two extreme emergencies.
 9         Q.   Okay.  But would severe pain in the neck be
10    constituted as an emergency?
11         A.   I would not know that unless it was on a
12    specific case that I specifically saw somebody for
13    extreme pain.
14         Q.   Okay.  Would electric shocks down someone's
15    spine be considered an emergency?
16         A.   Those are subjective, not something that I can
17    personally see or feel myself.  Everybody's symptoms are
18    different pursuant to what they have going on.
19         Q.   Okay.  So if that's a subjective complaint,
20    how would that be -- how would that be assessed?
21         A.   They would be seen by a doctor.
22         MR. GIAQUINTA:  Object to this line of
23    questioning because it requires medical diagnosis,
24    which she already stated she cannot do.
25    BY MS. AGUILAR:
```

Page 47

```
 1         Q.   Okay.  If a patient presents to you, Ms.
 2    Brown, and they tell you that they have pain, as an LPN,
 3    what do you do?
 4         A.   As an --
 5         MR. GIAQUINTA:  Objection.  Form.
 6         A.   Oops.  Can I answer?
 7         Q.   Yes.
 8         MR. GIAQUINTA:  Yeah --
 9         A.   Okay.  As --
10         MR. GIAQUINTA:  -- if you understand the
11    question.
12         A.   As I understand question, I would -- if an
13    inmate, resident or patient has pain, I would then put
14    them in to see the doctor as soon as they can see one,
15    as there is one available.
16    BY MS. AGUILAR:
17         Q.   Okay.
18         A.   I would also -- the most that I, as an LPN,
19    can give a patient is Tylenol or Ibuprofen.  That is
20    also something that I would be able to do.
21         Q.   Okay.  Do you perform physical assessments on
22    patients?
23         A.   I do.
24         Q.   Okay.  Can you describe the physical
25    assessment process to me?
```

Page 48

```
 1         A.   The physical assessment would be dependent on
 2    what the complaint is.
 3         Q.   Okay.  If a patient presents with a neck
 4    injury, what is the physical assessment for that?
 5         A.   I would check range of motion, what the range
 6    of motion is, palpate the neck for any lumps and write
 7    down my findings and give them the next available
 8    appointment with the doctor.
 9         Q.   Okay.  And where would you write those
10    findings down on?
11         A.   In a chart on a progress note.
12         Q.   Okay.  And the doctor would have access to
13    that?
14         A.   The doctor would have access to it as soon as
15    the next appointment available would be.
16         Q.   Okay.  Is an LPN allowed to send a patient to
17    an outpatient hospital without anyone else's approval?
18         A.   No.  We would have to have the approval of the
19    M.D.
20         Q.   Okay.  And could that be any M.D. or is that a
21    specific M.D.?
22         A.   Any M.D. that happens to be on-call.
23         Q.   Okay.  So it wouldn't have to go through the
24    M.D. supervisor?
25         A.   It would -- I would go through whatever doctor
```

Page 49

```
 1    is on-call for that time.
 2         Q.   Okay.  I believe you're licensed in Illinois,
 3    correct?
 4         A.   Correct.
 5         Q.   Are you licensed in any other state?
 6         A.   No.
 7         Q.   Okay.  Have you ever been disciplined by the
 8    nursing or regulatory body in Illinois?
 9         A.   No, I have not been.
10         Q.   Okay.  Have you ever -- strike that.
11              Did you ever serve in the military?
12         A.   No, I have not.
13         Q.   Apart from what you've testified about
14    already, is there any other medical services outside
15    your job that you've not mentioned before?
16         A.   No, none that I can think of.
17         Q.   Okay.  I know you mentioned that there were
18    several nurses that would work in the emergency room; is
19    that correct?
20         A.   Correct.
21         Q.   About how many nurses would work in the
22    emergency room on any given shift?
23         A.   Between two to three depending on what we have
24    scheduled that day and what's going on.
25         Q.   Okay.  And how many doctors would be in a
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

EXHIBIT 5

Page 50

1  typical shift at the emergency room?
2      A.   Well, we had a doctor that usually worked out
3  of the ER, and we had another doctor or physician's
4  assistant that would be working in the back offices, in
5  the clinic area.
6      Q.   Okay.  Could you describe the emergency room
7  to me?  I know you stated there was a bullpen.  Could
8  you just describe it to me so I can envision what this
9  looked like?
10     A.   The emergency room --
11     Q.   Yes.
12     A.   -- the ER?
13     Q.   Yes.
14     A.   It has two beds and a curtain in between and a
15  desk where the nurses answer the phone and sit.
16     Q.   Okay.  And where's the bullpen in relation to
17  the -- those beds?
18     A.   It is out the door and around the corner.
19     Q.   And from the emergency room bed area,
20  could you hear what's going on in the bullpen?
21     A.   No, not from that area.
22     Q.   How close do you have to be to the
23  bullpen to hear what's going on in there?
24     A.   In the hallway by the bullpen.
25     Q.   Okay.  Is there doors that close the emergency

Page 51

1  room bullpen off from each other?
2      A.   There are metal doors that close it off with -
3  - they're, like, cell doors with slats.
4      Q.   Okay.  And where are the doctors located?  I
5  believe you stated there's one that's in the emergency
6  room, right?
7      A.   Correct.  And one that is usually in the
8  clinic area.
9      Q.   Okay.  How close --
10     MS. AGUILAR:  Actually, I'm sorry.  Can we take
11  a quick five-minute break, really quickly?
12     MR. GIAQUINTA:  Yeah.  Sure.
13     MS. AGUILAR:  Okay.
14     VIDEOGRAPHER:  We are off the record.  The time
15  is 3:35 p.m.
16     (OFF THE RECORD)
17     VIDEOGRAPHER:  We are back on record for the
18  deposition of Tina Tomaras being conducted by
19  videoconference.  The date is January 27, 2022.
20  The time is 3:41 p.m., and my name is Savanna
21  Squires.
22     MS. AGUILAR:  Thank you.
23  BY MS. AGUILAR:
24     Q.   Ms. Brown, do you know if there's any video
25  cameras in the HCU?

Page 52

1      A.   No, not to my knowledge.
2      Q.   Okay.  To your knowledge, they don't exist,
3  correct?
4      A.   Correct.
5      Q.   Okay.  Is there any way you document treatment
6  of patients that you haven't already discussed?
7      A.   No.
8      Q.   Okay.  I'd like to talk to you just generally
9  about the anatomy of the neck and spine.
10     A.   Okay.
11     Q.   Generally speaking, what is the medical
12  importance of the neck?
13     MR. GIAQUINTA:  Objection.  Calls for medical
14     expertise.  Outside her scope.  Also calls for
15     expert opinion.
16  BY MS. AGUILAR:
17     Q.   Ms. Tomaras, just so you know, in case you're
18  not -- if you're not instructed not to answer, you can
19  answer.  Your attorney is making objections.  They're
20  more for the record.  It's more like legal talk.
21     A.   Okay.
22     Q.   Do you --
23     A.   The importance of the spine, you were asking
24  about?
25     Q.   The neck.

Page 53

1      A.   The neck?  Well, it --
2      Q.   Yes.
3      A.   -- holds your head up, keeps your head
4  attached to the spine, the spinal column.
5      Q.   Okay.  And generally speaking, do you know
6  what is the importance of the spine?
7      MR. GIAQUINTA:  Same objection.
8      A.   You can answer.
9      A.   Every part of the body is important, every
10  aspect, the spinal column.  If you have a break in your
11  spinal column, you will not be able to move certain
12  parts of your body.
13     Q.   Okay.  If a patient has a neck injury, could
14  that be potentially serious?
15     MR. GIAQUINTA:  Sorry.  I didn't hear the
16     question, Isabella.
17     Q.   I said:  If a patient has a neck injury, could
18  that be potentially serious?
19     A.   It would depend on what the injury is.
20     Q.   But could it potentially be serious?
21     A.   Again, it would depend on the injury.  It
22  would depend on what type of injury.
23     Q.   But is it possible for it to be a serious
24  injury?
25     A.   It is possible.  Anything is possible,

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

EXHIBIT 5

Page 54

1 absolutely.
2     Q.  Okay.  What are some causes for concern
3 regarding a neck injury?
4         MR. GIAQUINTA:  Objection.  Calls for medical
5     opinion.
6     A.  Yeah.  I'm not a doctor.  I couldn't
7 speculate.
8     Q.  Okay.  I understand that you're not -- you're
9 not trained to diagnose, but as an LPN, are you trained
10 to recognize symptoms?
11     A.  Correct.
12     Q.  Okay.  So can you speak to symptoms of serious
13 injuries or things that are causes for concern?
14     A.  Cause for concern would be not being able to
15 hold your head up, which Mr. Poole was able to do at the
16 time that he was in the ER.
17     Q.  Okay.  And when you said that -- when he was
18 in the ER, which days are you speaking of, specifically?
19     A.  The date of the initial injury.
20     Q.  Okay.  So you're talking about August 17,
21 2017?
22     A.  Correct.
23     Q.  Okay.  And what about August 19, 2017?
24     A.  I don't know that I saw him on the 19th.
25     Q.  Okay.  If I postured to you that he was in the

Page 55

1 ER on August 19, 2017, and you don't have personal
2 knowledge of that, would it be fair to say that you
3 can't speak to whether or not he was holding his head
4 up?
5     A.  Correct.
6         MR. GIAQUINTA:  I'm going to object to form.
7     Q.  And if I was to posture to you that he
8 was in the ER on August 21, 2017, you could not speak to
9 whether or not he held his head up, correct?
10     A.  It would depend on what my --
11         MR. GIAQUINTA:  Object to form, again.
12         MS. LINDEMANN:  Isabella --
13     A.  -- days off --
14         MS. LINDEMANN:  Pardon me.  Isabella, could you
15     speak a little more slowly?  You're going really
16     fast right now.
17         MS. AGUILAR:  Can you guys hear me?
18         MS. LINDEMANN:  I can hear you but you're
19     speaking extremely quickly.  If you could just slow
20     down a little bit --
21         MS. AGUILAR:  Sure.
22         MS. LINDEMANN:  -- I think that would be
23     helpful.
24         MS. AGUILAR:  Sure.  Okay.
25         MS. LINDEMANN:  Thank you.

Page 56

1         MS. AGUILAR:  Absolutely.
2 BY MS. AGUILAR:
3     Q.  Ms. Brown, I believe you stated that when you
4 saw Ahmad Poole, he was holding his head up, correct? He
5 had no issues?
6     A.  On the date of the initial assault, correct.
7     Q.  Okay.  But you can't speak to other days he
8 was in the ER, that you didn't personally observe,
9 correct?
10     A.  Correct.
11     Q.  Okay.  Are nurses allowed to give patients
12 neck braces?
13     A.  It would, again, depend on the situation.
14     Q.  But are they able to?
15     A.  We -- we are on a doctor's order, correct.
16     Q.  Okay.  So a doctor would have to order the
17 neck brace before a nurse could hand one to a patient?
18     A.  If a doctor is not on site, then we would
19 stabilize the neck, if there is a neck injury.
20     Q.  Okay.  And how do you stabilize the neck?
21     A.  With a neck brace.
22     Q.  Is there any way else that you could
23 stabilize the neck?
24     A.  Not that we do at Stateville Correctional
25 Center.

Page 57

1     Q.  Okay.  If a patient presents with a neck
2 injury, are they required to lay down?
3     A.  No.
4     Q.  Okay.  Is laying down a part of a
5 stabilization process when a person has a neck injury?
6     A.  Not while being --
7         MR. GIAQUINTA:  Objection.  Form.
8     A.  -- examined.
9     Q.  Okay.  But after the examination, it might be
10 possible for that to happen?
11     A.  I've never seen anybody --
12         MR. GIAQUINTA:  Same objection.
13     Q.  Okay.  Do you know about -- or can you speak
14 to axial neck pain and a C3-C4 subluxation?
15         MR. GIAQUINTA:  Objection --
16     A.  No, I can't.
17         MR. GIAQUINTA:  -- calls for medical opinion
18     and expertise and also expert testimony.
19     Q.  Okay.  Do you have any personal knowledge of
20 any risk of harm that might result from not stabilizing
21 a patient's neck?
22         MR. GIAQUINTA:  Same objection.
23     A.  No, I do not.
24     Q.  Okay.  Should any testing be done to evaluate
25 if there is any sort of spinal cord injury if a patient

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

Kentuckiana
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

EXHIBIT 5

The Deposition of TINA TOMARAS, taken on January 27, 2022

58..61

Page 58

1  presents with certain symptoms such as electric pains
2  down their back?
3      MR. GIAQUINTA:  Same objection.
4      A.  That's above my --
5      MR. GIAQUINTA:  Calls for medical opinion and
6  expertise.
7      A.  Yeah.  It's above my scope of practice.
8      MS. AGUILAR:  Okay.  Could we just take another
9  quick five-minute break?  Sorry.  I'm getting these
10 -- I'm closing tomorrow, and I'm getting a bunch of
11 things.  So could we just take a quick five-minute
12 break?
13     MR. GIAQUINTA:  Sure.
14     THE WITNESS:  Okay.
15     MR. GIAQUINTA:  Congrats.
16     VIDEOGRAPHER:  We are off the record.  The time
17 is 3:48 p.m.
18     (OFF THE RECORD)
19     VIDEOGRAPHER:  We are back on record for the
20 deposition of Tina Tomaras being conducted by
21 videoconference.  My name the Savanna Squires.
22 Today is January 27, 2022.  The time is 3:55 p.m.
23     MS. AGUILAR:  Thank you.
24 BY MS. AGUILAR:
25     Q.  Ms. Brown, I would like to talk to you about

Page 59

1  your training as a Wexford employee.  What did Wexford
2  do to train you?
3      A.  We job shadow another nurse in each
4  department.
5      Q.  And that happened when you first got there?
6      A.  Correct.
7      Q.  Okay.  Was there any continuing training?
8      A.  We have continuing education pursuant to maybe
9  if there's a -- something we're doing differently in the
10 Health Care Unit, but nursing is nursing.  So there's
11 not usually -- unless we have a new piece of equipment
12 that we need to be trained on, then we would have a new
13 training procedure.
14     Q.  Okay.  And who would conduct that training?
15     A.  Whatever nurse they assign -- you mean for the
16 piece of equipment?
17     Q.  Yes.  So for any continuing training that you
18 get.
19     A.  The nursing supervisor.
20     Q.  Okay.  Did Wexford ever give you training on
21 their policy and procedures?
22     A.  We don't get training on them.  We have the
23 book that we read when we first start.  You read the
24 policies and procedures.
25     Q.  Okay.  And -- so that's a policies and

Page 60

1  procedures book; is it fair to say it's like a manual?
2      A.  It's a binder.
3      Q.  Okay.  And does Wexford go over them with you
4  or they just give you the book and that's sort of it?
5      A.  We're given a book.  We're told to go over it
6  and read the policy and procedures, and if we don't
7  understand something, they'll go over it for you.
8      Q.  Okay.  So is it assumed that employees will
9  read the manual?
10     A.  Well, we sit in the room where we specifically
11 do that --
12     Q.  Oh --
13     A.  -- for several hours.
14     Q.  Oh, okay.  And that's when you first started?
15     A.  Correct.
16     Q.  Okay.  Did Wexford ever provide you with
17 training regarding when to call a doctor?
18     A.  No, that's based on nursing judgment.
19     Q.  Okay.  And when you say nursing judgment,
20 could you elaborate on that?
21     A.  When you're trained in nursing school, you do
22 an assessment and -- with regards to what you feel is
23 something that is emergent, non-emergent, or the doctor
24 needs to be aware of, is what we do, nursing judgment.
25     Q.  Okay.  So is it fair to say it's like a

Page 61

1  nursing discretion?
2      A.  Well, it's an assessment.
3      Q.  Okay.  I'd like to talk to you about August
4  17, 2017, if that's okay.
5      A.  Okay.
6      Q.  Okay.  Do you have an independent recollection
7  of performing a physical assessment on Ahmad Poole that
8  day?
9      A.  I -- I do not.  I don't know what nurse was in
10 the ER and what position they performed at that time and
11 that day.
12     Q.  Okay.  So you're not sure if you were the
13 nurse who performed an assessment on him if one was
14 performed on him?
15     A.  Correct.
16     Q.  Okay.  Do you remember examining his face?
17     A.  I don't recall.  If I had, there would most
18 likely be a progress note regarding that.
19     Q.  We'll get to progress notes, and we'll
20 go over those, as well.  So I do appreciate you saying
21 that.
22         Do you know if anyone ordered an x-ray for
23 Ahmad Poole on August 17, 2017?
24     A.  I am not.  I don't know what the doctor's
25 orders were at that time.  I don't recall.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

EXHIBIT 5

The Deposition of TINA TOMARAS, taken on January 27, 2022

62..65

Page 62

1    Q.   Okay.  Do you have personal knowledge of
2    whether or not Ahmad Poole received a neck brace on
3    August 17, 2017?
4    A.   I do not.  I don't know what treatment was
5    given.  Again, I, you know, don't know what position I
6    was playing in the ER at that time or if I was just in
7    and out in the back with the doctors.  Because sometimes
8    in the back we do bring patients up front for certain
9    things.  I'm not sure what was ordered or what was given
10   or done treatment-wise.
11   Q.   Okay.  Do you have an independent recollection
12   of August 19, 2017?
13   A.   I do not.
14   Q.   Okay.  Do you have an independent recollection
15   of whether or not you saw Ahmad Poole that day?
16   A.   I do not have a recollection, no.
17   Q.   Okay.  And so it's fair to say you wouldn't
18   have an independent recollection of -- if you spoke with
19   him that day?
20   A.   No, I don't have a recollection.
21   Q.   Okay.  And you wouldn't have an independent
22   recollection of whether or not you performed a physical
23   assessment on him that day?
24   A.   No, I don't have a recollection.
25   Q.   Okay.  If a patient presents to the ER, and

Page 63

1    they ask to see a doctor but are not presented to a
2    doctor and sent back to their cell, is it fair to say
3    that they wouldn't have seen a doctor that day?
4    A.   No, it's not fair to say that.  It would
5    depend on the situation and who they encountered.
6    Q.   Okay.
7    A.   And what the specific complaint was.
8    Q.   Okay.  So if a patient is sent -- sent back to
9    a cell, how would he get back to the ER to see a doctor?
10   A.   He would sign up for a nurse sick call and be
11   brought up the next day to see nurse -- the nurse,
12   the call nurse, would see them the very next day in the
13   cell house.
14   Q.   Okay.  So fair to say, though, that he
15   wouldn't see a doctor that specific day, though, right?
16   He would have to wait for the next day?
17   A.   No.  It would depend on what the situation
18   was, whether it was emergent and who he talked to.
19   Q.   Okay.  I'd like to show you some exhibits, so
20   I'm going to show you my screen.
21   A.   Okay.
22   Q.   Just a second.  I know you're on your phone,
23   so it might be a little bit difficult to read this.  So
24   let me know if that's the issue you're having, all
25   right?

Page 64

1    A.   Okay.
2    Q.   Okay.  So I'm going to start sharing my
3    screen.
4        MS. AGUILAR:  This is Bates stamped -- Counsel
5    just for your knowledge.  It is Bates stamped -- if
6    I can find it.  Okay.  It's Bates stamped IDOC, IDOC
7    1 through 7.
8    BY MS. AGUILAR:
9    Q.   And I'm going to start sharing my screen now,
10   okay?
11   A.   Okay.
12   Q.   Do you see this document on your screen, Ms.
13   Brown, right here?
14   A.   I do.
15   Q.   Okay.  And can you tell me what that Bates
16   stamp is at the bottom?  When I say Bates stamp, it's
17   going to be this little thing right here, this number.
18   A.   The dates -- you mean specifically a stamp?
19   Q.   Yeah.  So there's like a -- it says IDOC0002;
20   do you see that?
21   A.   I see that, yeah.
22   Q.   Okay.  And do you see the top where it says,
23   Illinois Department -- I'm sorry.
24       Where it says Illinois Department of
25   Corrections?

Page 65

1    A.   I do.
2    Q.   Do you see that?
3        Okay.  And do you see Ahmad Poole's name on
4    this document?
5    A.   I do.
6    Q.   Okay.  Do you know what this document is?
7    A.   No, I do not.
8    Q.   Okay.  I'm going to represent to you that it's
9    a grievance document, okay?
10   A.   Okay.
11   Q.   And we're going to mark this as Exhibit 1.
12       (EXHIBIT 1 MARKED FOR IDENTIFICATION)
13   Q.   So we're going to go to this page, it's Bates
14   stamped IDOC -- sorry.  I'm going -- IDOC 4.
15   A.   Okay.
16   Q.   And I'm going to have you read to yourself 4
17   through 7.  And once you're done reading, let me know,
18   I'll go through the pages, and then I'm going to ask you
19   questions.  So read --
20   A.   Okay.
21   Q.   Oh, apologies.
22       (UNIDENTIFIED BACKGROUND NOISE)
23       COURT REPORTER:  Was that -- was that you,
24   Mr. Logan, that was speaking?
25       MR. GIAQUINTA:  I didn't say anything.  No.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

EXHIBIT 5

The Deposition of TINA TOMARAS, taken on January 27, 2022

66..69

Page 66

1    COURT REPORTER:  Okay.  Just wanted to make
2    sure.
3         MS. AGUILAR:  Yeah.  Apologies about that.
4    Sorry.  Hold on one second.  Apologies.  My dog just
5    came in the house.
6    BY MS. AGUILAR:
7         Q.   Ms. Brown, I'm going back to IDOC 4.  Let me
8    know if you cannot read this document.  We're just going
9    to start from the beginning, okay?
10        A.   Okay.
11        Q.   Okay.  So let me know, I can zoom in to make
12   it easier for you.  It's a little difficult to read.
13        A.   Okay.  I can zoom a little bit.
14        Q.   Let me know if you need me --
15        A.   Oops.  Hold on a second.  Okay.  There we go.
16             (WITNESS REVIEWS DOCUMENT)
17        A.   Okay.  I've got that page.
18        Q.   Okay.  I'm going to move to the page
19   underneath it, okay?  It's going to be marked IDOC 5.
20        A.   Okay.
21        Q.   It's a longer page.  Let me know, and I'll
22   scroll down, okay?
23        A.   Okay.
24             (WITNESS REVIEWS DOCUMENT)
25        A.   So does all of that pertain to me?  Because I

Page 67

1    see that he said he spoke to me in the bullpen, and then
2    he's discussing with Dr. Aguinaldo his symptoms.
3         Q.   Yes.  I mean, I'm going to ask you questions,
4    and I don't want to ask you questions when you haven't
5    seen a document.  I don't think that's very fair.
6         A.   Okay.
7         Q.   So I just want to give you the opportunity to
8    look it over.  But --
9         A.   Okay.
10        Q.   -- in terms of the document that refers to
11   you, I believe there is one other part that does refer
12   to you.
13        A.   Okay.  Is it down here?
14        Q.   I believe it's lower.
15        A.   Okay.
16        Q.   I would need a second, as well, to look at
17   this.  I can start asking questions, and then we can go
18   to the other pages, if you're fine with that, as well?
19        A.   Yeah.  That's fine.
20        Q.   Okay.  Do you know who wrote this grievance?
21        A.   I did see Ahmad Poole's signature on one of
22   the pages that you gave me.
23        Q.   Okay.  I'll represent to you that Ahmad Poole
24   did, in fact, write this.  And do you see when it's
25   dated?

Page 68

1         A.   No, I do not.  Let me look up here.
2         Q.   Okay.  Do you see this right here where my
3    mouse is?
4         A.   9-22-17.
5         Q.   Do you see that date?
6         A.   I do see it, yes.
7         Q.   Okay.  And you see his signature here, as
8    well, 9-22-17, Ahmad Poole, towards the bottom of the
9    page?
10        A.   Yes, I do.
11        Q.   Okay.  And I'm going to go now to the top
12   pages.  Do you know what this document is regarding?
13        A.   When he was brought to the bullpen in Health
14   Care from the day that he had his altercation.
15        Q.   And you agree with me that's August 17, 2017?
16        A.   That's what it says up on the top, yes.
17        Q.   Okay.  And I will apologize.  I'm, like,
18   having some technical difficulties.  Am I freezing for
19   anyone?
20        A.   Every once in a while, yeah.
21        Q.   Okay.  Let me know if that's an issue, and I
22   will repeat the question, okay?
23        A.   Okay.
24        Q.   Okay.  Okay.  So I would like to go to the
25   portion where Ahmad discusses waiting in the bullpen.

Page 69

1    And do you see where it says, the first three lines,
2    "Shortly after, Nurse Tina"?  Do you see this?
3         A.   I see it.
4         Q.   Okay.  Can you just read those sentences out
5    loud for the record, please?
6         A.   "Shortly after, Nurse Tina came out to examine
7    my injuries.  She" -- I don't know what that -- is that
8    noted?  "The cut beneath my eye."
9         Q.   Yeah.  Right here.
10        A.   "She checked the cut beneath my eye and asked
11   me:  What is the problem with my neck?  I told her about
12   the popping sounds it was making when" -- when -- I'm
13   not sure what that says, when -- I don't know the last -
14   - is it one word?  When...?
15        Q.   It's okay.  You can keep reading if it's too -
16   -
17        A.   Okay.
18        Q.   If it's legible to you, that's okay.  I don't
19   want you to guess.
20        A.   "How extremely bad it hurt just to hold it up.
21   How it felt out of place, and it" -- and it something.
22   "I could feel an electric current running up and down my
23   neck.  I was then escorted to the back of the Health
24   Care by Lieutenant Jaburek."
25        Q.   Okay.  I'll ask you --

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

EXHIBIT 5

The Deposition of TINA TOMARAS, taken on January 27, 2022

70..73

Page 70

1   A.   "I was" --
2   Q.   I'll ask you to --
3   A.   Okay.
4   Q.   -- actually stop reading at that point.
5   A.   Okay.
6   Q.   So is it fair to say that this is referring to
7   you as Nurse Tina?
8   A.   I was --
9        MR. GIAQUINTA:  Objection.  Form.
10  A.   Yeah.  We do have two --
11       MS. LINDEMANN:  I'll join.
12  A.   -- Tinas that worked at Stateville.
13  Q.   Oh, okay.  So you have --
14  A.   It could have been.
15  Q.   Okay.  So you have two Tinas that worked at
16  Stateville on August 17, 2017 in the Health Care Unit?
17  A.   I'm not sure who worked on what day, but there
18  are -- there were at one time two Tinas working in
19  Health Care.
20  Q.   Okay.  So it's possible that it was another
21  Tina and not yourself?
22  A.   It could have been, but I'm not sure.
23  Q.   Okay.  But you don't have an independent
24  recollection of this conversation?
25  A.   Not the conversation, no.

Page 71

1   Q.   Okay.  What do you have an independent
2   recollection of, if anything?
3   A.   That he -- that he was brought to Health Care
4   after an altercation, and that he was seen -- I did see
5   him in the ER by doctor -- he was being seen by Dr.
6   Aguinaldo.
7   Q.   Okay.  But you're unsure if you were the nurse
8   that he spoke with before seeing Dr. Aguinaldo?
9   A.   Correct.  I'm not sure about that.  I don't
10  recollect having a conversation in the bullpen.
11  Q.   Okay.  That's fine.  We're going to go down to
12  another section.  Give me just a minute to find it.
13  A.   Okay.
14  Q.   Okay.  We're going to look right there.  Do
15  you see where my mouse is at?  Right here.  Do you see
16  this mouse?
17  A.   I don't see a mouse.
18  Q.   Can you see this right here, my mouse moving?
19  A.   I can see it, right to the right corner, yeah.
20  Q.   Okay.  We'll -- we'll continue reading.
21  Can you start reading from right here, this word,
22  "Jaburek"?  Do you see that?
23  A.   I'm looking for Jaburek.
24  Q.   Do you see my mouse right here?
25  A.   I don't.  It might be behind -- last time it

Page 72

1   was kind of behind your picture where it is.
2   Q.   Can you see my mouse moving like --
3   A.   Let me see.  I see it.  I see it, right there.
4   I see it, right there.
5   Q.   Yeah.  If you could just starting reading,
6   like, right here.  Read --
7   A.   Okay.
8        MR. GIAQUINTA:  Are we asking her to read out
9        loud or to herself, again?
10  BY MS. AGUILAR:
11  Q.   Yes.  Please read out loud.
12  A.   Okay.  "Jaburek.  Received no pillow in
13  segregation and couldn't sleep if my neck went into the
14  wrong position.  It felt as if I was being electrocuted
15  in my neck.  The only way the pain would stop was if I
16  braced my head with my hands and shift my neck back in
17  place.  And you could hear it shift back in place for
18  the next two days.  But the pain got worse.  I couldn't
19  eat, sleep, wash up, and it was difficult for me to
20  move."  Do I --
21  Q.   Please continue reading.
22  A.   -- continue?
23  Q.   Yes.
24  A.   "8-19-17, I received an appointment to have a
25  dressing change for the stitches.  Once I made it to

Page 73

1   Health Care, Nurse Tina looked at me, my eye, and said,
2   send him back, when I tried to explain to her about my
3   neck, but she ignored me.  I was then escorted back to
4   segregation."
5   Q.   You can stop reading now.  I'm going to stop
6   sharing my screen, if that's okay with you.
7   A.   Sure.
8   Q.   Okay.  Do you know if the Nurse Tina that
9   Ahmad wrote about on August 19, '17 was yourself or not?
10  A.   I do not know.
11  Q.   Okay.  You don't have any recollection of
12  speaking with him that day?
13  A.   I don't.  We see several patients a day, and
14  over the past four, five, six years that I've been
15  there, I've seen many patients for different, various
16  things.  So I can't recollect a conversation like that.
17  Q.   Okay.  If a patient is describing the symptoms
18  that Ahmad Poole was explaining, specifically that he
19  couldn't eat, sleep, wash himself, keep his head up for
20  two days, should a nurse tell a doctor that or is it
21  okay to send a patient back in that circumstance?
22       MR. GIAQUINTA:  Objection to form.
23  A.   It would depend on whether the doctor was
24  waiting results.  If the doctor was notified, we would
25  go pursuant to what his orders were at the time.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Kentuckiana
COURT REPORTERS

EXHIBIT 5

Page 74

1  Q.  Okay.  Would a nurse share that with a doctor?
2  A.  Yes.
3  Q.  Okay.  And why is it important to -- I'm
4  sorry.  Strike that.
5      And why would a nurse share that with a
6  doctor?
7  A.  To decide whether or not the doctor wanted to
8  perform any other testing.  But, again, if he's already
9  had x-rays and they're waiting for results, a doctor is
10  going to wait to see what the results of that x-ray
11  show, if they've been treated to the extent that they
12  can until they receive testing.
13  Q.  Okay.  So if there is a time frame -- I'm
14  sorry.  Strike that.
15      So a patient might not see a doctor if a
16  doctor is waiting for results from testing then,
17  correct?
18  A.  Not -- not technically.  It would depend on
19  what's going on in the ER, what the patient is there for
20  that day.  We have doctors there every day, Monday
21  through Friday.
22  Q.  Okay.  But in this instance where Ahmad Poole
23  states that he came to the ER on August 19, 2017 and was
24  sent back to segregation, he didn't receive any
25  follow-up treatment from a doctor that day, correct?

Page 75

1      MR. GIAQUINTA:  Objection to form.  Objection
2  outside --
3  A.  Not to my knowledge.
4      MR. GIAQUINTA:  She already stated she doesn't
5  remember and she has no independent recollection of
6  that date.
7  BY MS. AGUILAR:
8  Q.  Okay.  But Ahmad Poole would not have been
9  able to see a doctor if he was sent back to segregation,
10  right?
11      MR. GIAQUINTA:  Same objection.  She has no
12  idea.
13  A.  Being in segregation doesn't mean you don't
14  see doctors.
15  Q.  Okay.  If a patient shows up to the ER and the
16  patient is sent back to the cell, I'm -- I'm
17  misunderstanding how a patient could then see the
18  doctor.
19      MR. GIAQUINTA:  Objection.  Argumentative.  Form.
20  Incomplete hypothetical.
21  Q.  Ms. Brown, you can answer the question.
22  A.  Oh, okay.
23      MR. GIAQUINTA:  If you understand it.
24  A.  Basically -- you said that was on the 19th.  I
25  saw in the notes that that was on the 19th.  So whatever

Page 76

1  testing the doctor has ordered from the 17th, given
2  whatever pain medication to the specific inmate, comes
3  back for -- to the ER for wound check, whatever the
4  doctor has ordered, the doctor can only go as far as
5  whatever results he has to diagnose and treat at that
6  point.
7      I don't know when he went for, or if he went
8  for an x-ray.  I do not know if he was in the ER and the
9  doctor was there.  The doctor may have said, when you --
10  when your results come in -- I honestly do not recall
11  what -- what transpired that day --
12  Q.  Would you as --
13  A.  -- in the ER.
14  Q.  Would you as an LPN in the ER have had any
15  documentation if an x-ray had been ordered?
16  A.  It would be in his chart, if the doctor
17  ordered it.
18  Q.  Okay.  So you would know in that moment if the
19  patient was awaiting results for a test?
20  A.  I would or the doctor that was sitting in the
21  ER at the time of the wound check would also know.
22  Q.  Okay.  And then that -- the decision to send a
23  patient back to the cell would be made based on that
24  documentation that you'd have in front of you?
25  A.  Or the word of the doctor.  If the doctor

Page 77

1  stated that he wasn't going to see him until the actual
2  results were in, then, at that point there is nothing to
3  do except for wait results.  It would depend on, again,
4  what the doctor would state.
5  Q.  Okay.  So as an LPN, you would communicate
6  with the doctor if you didn't have the documentation in
7  front of you, then?
8  A.  Well, if he was in ER, where the doctor was
9  seeing patients, seeing a wound check, usually the
10  doctor would pop up, take a look and then say, it's okay
11  for him to go back to the cell.
12  Q.  Okay.
13  A.  If I happen to be in the room and the doctor
14  is there, the doctor is aware of what's going on, and
15  the doctor says, at this time he can go back to his
16  cell.  That's doc -- you know, dependent on what
17  transpired in the ER with him and the doctor.
18      (EXHIBIT 2 MARKED FOR IDENTIFICATION)
19  Q.  Okay.  I'd like show you now what I'll mark as
20  Exhibit 2.  It's Bates stamped Poole 2 through 7.  Let
21  me know when you can see my screen, okay?  I'm going to
22  share my screen with you.
23  A.  Okay.  Okay.
24  Q.  Can you see my screen, Ms. Brown?
25  A.  I can.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

EXHIBIT 5

Page 78

1    Q.   Okay.  And do you know what this is?
2    A.   That's a progress note.
3    Q.   Okay.  And is this the progress notes you were
4  referring to when you said that as an LPN you will write
5  on a note?
6    A.   Correct.
7    Q.   Okay.
8    A.   If I have a patient interaction, yes.
9    Q.   Okay.  Do you see your handwriting on this
10  piece of paper?
11    A.   Let me look.
12         (WITNESS REVIEWS DOCUMENT)
13    A.   I do not.  Oop.
14    Q.   Okay.  Do you see your handwriting on this
15  piece of paper, document Bates stamped Poole 4?
16    A.   I have to get back to where I was.
17    Q.   No problem.
18    A.   Actually, I can't see it because I can't get
19  back to where I was on that screen.  This is...
20    Q.   Let me know when you're able to --
21    A.   Okay.  I found it.  I found it.  I found it.
22  Okay.
23    Q.   No problem.
24    A.   What -- what did you want me to look for on
25  this --

Page 79

1    Q.   Do you --
2    A.   -- particular paper?
3    Q.   Do you see your handwriting on this piece of
4  paper?
5    A.   No, I don't.
6    Q.   Okay.  None of this is your writing?
7    A.   No.
8    Q.   Okay.  Do you see your handwriting on this
9  Bates stamp Poole 5 document?
10    A.   No, I don't.
11    Q.   Okay.  And do you see your writing on this
12  page Poole 6?
13    A.   No, I don't.
14    Q.   Okay.  And fair to say you do not see it on
15  this document, Poole 7?
16    A.   No, I don't.
17    Q.   Okay.  Do you know this handwriting?  Is this
18  familiar to you, this writing?
19    A.   That writing looks to be from Dr. Aguinaldo.
20    Q.   Okay.  And have you seen Dr. Aguinaldo's
21  handwriting before?
22    A.   Yes.
23    Q.   Okay.  Are you able to read Dr. Aguinaldo's
24  handwriting?
25    A.   Not very well.

Page 80

1    Q.   Okay.  It -- would you be able to read
2  anything on this document for the record?
3    A.   Not very much.  On this side, I see up top,
4  "Call IA."
5    Q.   Do you know what that means?
6    A.   Internal affairs.
7    Q.   Okay.  Is anything else legible to you?
8    A.   I think that I see, "Tylenol 500, two tablets
9  three times a day for ten days.  X-ray."  I'm not sure
10  what the other word -- I see, x-ray.  "One x-ray,
11  follow-up when result is here."  I see that part.  I'm
12  not sure what -- I see, "Dressing change after two
13  days."  I think that's days or looks like maybe a
14  P. And then, "8-21-17, follow-up," something, "today 8-
15  21-17." I see that.  And, then, I see what looks -- I
16  see -- it looks like an RP, maybe another P, not sure
17  about the other one.  "HIV" I see.  And I don't really -
18  - I can't really make out what else it says.
19    Q.   Okay.  So the rest of it's illegible to you?
20    A.   Yeah, for me.  I don't -- I'm not used to his
21  writing.  I'm not able to really read exactly, and I'm
22  not definitely going to guess what it says.
23    Q.   Understood.  And if you were to get this
24  progress note, and you couldn't read it, what would be
25  your practice?

Page 81

1    A.   My practice would be to go to Dr. Aguinaldo
2  and ask, what does this say, so that I was aware, and
3  carry through with the order.
4    Q.   Okay.  And that's important for continuity of
5  care?
6    A.   Following his order?  Yes.
7    Q.   Or reading his handwriting and understanding
8  what he's asking for?
9    A.   Correct.
10    Q.   Okay.  And do you see a date for August 19,
11  2017 in any of these records?
12    A.   I see 8-21-17 --
13    Q.   Uh-huh.
14    A.   -- here at the bottom.
15    Q.   Right here.  Yep.
16    A.   Yes.
17    Q.   Okay.  But you don't see 8-19-2017?
18    A.   I do not.
19    Q.   Okay.  And if a nurse was to encounter a
20  patient on that day, were they supposed to write that
21  down on an outpatient progress note?
22    A.   If they had a patient encounter, yes.
23    Q.   Okay.  Would it ever be appropriate to not
24  document a patient encounter on an outpatient progress
25  note?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



Kentuckiana
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

EXHIBIT 5

Page 82

1    A.   Would it not be appropriate --
2    Q.   Would it ever --
3    A.   -- did you say?
4    Q.   Would it ever be appropriate to not document
5  an encounter with a patient on the outpatient progress
6  note?
7    A.   No.  If you have an encounter, you should
8  document it.
9    Q.   Okay.  And what all would go in that
10 documentation?
11   A.   What the complaint is, what transpired and
12 what treatment was given, if any.
13   Q.   Okay.  And if there's no documentation of an
14 outpatient interaction -- or strike that.
15        If there's no documentation of a patient
16 interaction, what would that mean?
17   A.   It would be an assumption that it wasn't an
18 interaction involving...
19   Q.   Okay.  As in, that it didn't happen?
20   A.   Correct.  That would be my assumption, is if
21 there's no documentation, that either -- it wasn't an
22 actual interaction with a patient.
23   Q.   Okay.  I will stop sharing my screen now.
24   A.   Okay.
25   Q.   Okay.  So I will represent to you that Ahmad

Page 83

1  Poole had surgery for his neck injury on August 30 of
2  2017 at UIC Health in Chicago.  He was then admitted to
3  the Health Care Unit on September 7, 2017.  Do you have
4  any recollection of seeing him between September 7th and
5  October 7, 2017 in the Health Care Unit?
6    A.   No.
7    Q.   Do you have any recollection of seeing
8  him at all after October or September of 2017?
9    A.   I've seen him in the cell house, I do not know
10 what date, passing medication.
11   Q.   Okay.  Do you know if that had to do with his
12 neck injury or his surgery regarding his neck?
13   A.   No.  He took psychotropic medications that
14 were delivered to him daily.  I believe twice a day.
15        MS. AGUILAR:  Okay.  We're getting close to the
16 end on here.  I just -- want to give me maybe, like,
17 ten minutes just for me to go over my notes?
18        THE WITNESS:  Okay.
19        MS. AGUILAR:  If that's okay, we'll just take a
20 quick break.
21        THE WITNESS:  Okay.
22        VIDEOGRAPHER:  We are off the record.  The time
23 is 4:31 p.m.
24        (OFF THE RECORD)
25        VIDEOGRAPHER:  We are back on record for the

Page 84

1  deposition of Tina Tomaras being conducted by
2  videoconference.  My name the Savanna Squires.
3  Today is January 27, 2022.  The time is 4:37 p.m.
4        MS. AGUILAR:  Thank you.
5        Ms. Brown, I don't have any other questions for
6  you at this time.  I'll open the floor to other
7  counsel.
8        THE WITNESS:  Okay.
9             CROSS-EXAMINATION
10 BY MR. GIAQUINTA:
11   Q.   Hi, Tina.  I've just got a few questions for
12 you.  Do you recall counsel asking you some questions
13 about progress notes?
14   A.   I do.
15   Q.   Tina, is it your policy and practice to chart
16 or create those patient notes whenever you have a
17 patient encounter?
18   A.   It is.
19   Q.   Sorry.  I didn't -- I didn't hear you.
20   A.   It is.  Yes.
21   Q.   Okay.  And I -- I think counsel might have
22 already asked you this, I just want to be sure.  Would
23 it be fair, then, to say that if there weren't any
24 charts or notes with a certain inmate on a certain date,
25 that would be because you didn't have a patient

Page 85

1  encounter with that inmate on that date?
2    A.   Correct.
3    Q.   Okay.  As an LPN at Stateville, would you have
4  been permitted to diagnose inmates?
5    A.   No.
6    Q.   As an LPN at Stateville, would you have been
7  permitted to send an inmate out to see an outside
8  specialist?
9    A.   No.
10   Q.   As an LPN at Stateville, could you order
11 x-rays?
12   A.   No.
13   Q.   Could you prescribe medical equipment, like,
14 say, a neck brace?
15   A.   No.
16        MR. GIAQUINTA:  Okay.  That's all I have.
17             CROSS-EXAMINATION
18 BY MS. LINDEMANN:
19   Q.   I just have a couple questions, as well.
20        Ms. Brown, my name is Kristin Lindemann.  I
21 represent Lieutenants Jaburek and Norman in this case.
22 Are you acquainted or familiar with Lieutenant Derek
23 Jaburek?
24   A.   I do know him.
25   Q.   Okay.  Do you also know Lieutenant Alphonso

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
— COURT REPORTERS —

EXHIBIT 5

Page 86

1  Norman?

2      A.  I do know him, yes.

3      Q.  Do you recall seeing Lieutenant Jaburek on

4  August 17th of 2017?

5      A.  Honestly, I don't.  I don't recall -- it's

6  been a very long time.  I don't recall who brought Mr.

7  Poole in.  I don't -- I don't recall.

8      Q.  That's understandable.

9          So my only other questions are -- are

10 regarding more about policy and procedure sort of

11 questions, along the lines of what happens in the ER

12 under certain circumstances.

13     A.  Okay.

14     Q.  Okay.  So, for example, if an inmate at

15 Stateville is brought to the ER without an appointment

16 because of -- of an emergency situation, how are they

17 seen given a doctor's schedule with appointments that

18 have already been set?

19     A.  In an emergency, they would usually be seen

20 that day by the M.D., if not immediately, dependent upon

21 the urgency.

22     Q.  Okay.  So on that -- on August 17th of 2017,

23 we've already talked about the plaintiff in this case,

24 Ahmad Poole, having been in an altercation with his

25 cellmate, right?

Page 87

1      A.  Right.

2      Q.  Okay.  And -- and we've already talked a

3  little bit about how he was brought to the bullpen

4  outside the ER after that altercation, correct?

5      A.  Correct.  Yes.

6      Q.  Okay.  So assuming -- or given those

7  circumstances and the type of injury that Mr. Poole was

8  complaining of, would it be -- what would the standard

9  be for the emergent nature of his injuries?  Would --

10 would it be a case of, drop everything and go see him

11 immediately?

12         MR. GIAQUINTA:  I'm going to object to the

13     form.  I don't think emergent nature has been

14     testified to by her.  I also think she stated she

15     didn't have any recollection.

16         Tina, you can answer, if you understand the

17     question.

18         THE WITNESS:  Oh, I'm sorry.

19 BY MS. LINDEMANN:

20     Q.  If you prefer me to rephrase the question,

21 Ms. Brown, I'm happy to do so.

22     A.  I -- I think I understood what you're saying.

23 The types of emergencies that are -- immediately get

24 into the ER, would be, somebody is profusely bleeding,

25 can't breathe immediately.  If those two items are not

Page 88

1  in place, then they will -- you know, and it's

2  considered -- there was an altercation, he's coming of

3  something, they -- usually the officers might state

4  what's going on.  The nurses will say, okay, he's going

5  to -- all the inmates hit the bullpen, unless, again,

6  it's an emergent situation where bleeding is excessive

7  and not be able to be stopped and breathing,

8  respiratory, is not taking place.

9          Otherwise, they will have their turn that day

10 with the doctor but it may not be in one minute, five

11 minutes, 20 minutes.  It's, you know, dependent on,

12 again, the emergence.  Just if -- as if I were to go to

13 an emergency room and I have a broken foot, I'm going to

14 wait six hours as opposed to somebody who is profusely

15 bleeding or not able to breathe.  Those are, you know,

16 the emergent situations.

17     Q.  Okay.  So when an inmate is brought to the

18 bullpen for an emergency that -- when they don't have an

19 appointment, how -- how are the medical professionals,

20 the nurses and the doctors inside the ER, notified that

21 there is somebody outside in the bullpen waiting to be

22 seen?

23     A.  The officer that usually brings them in will

24 let us know that they're in the bullpen.

25     Q.  Okay.  If -- if the officer were to come back

Page 89

1  half an hour later and say, hey, this guy's really

2  complaining, can you come see him now?  Would that

3  change how quickly the inmate was seen?

4      A.  We will discuss with the doctor, and the

5  doctor will finish up with the patient that they're with

6  and either see him or -- again, it's -- it's just

7  dependent on what the doctor's priority consists of at

8  that time based on the situation.

9          MS. LINDEMANN:  Okay.  Okay.  I don't think I

10     have any other questions.  Thank you so much for

11     your time this afternoon.  We really appreciate it.

12         THE WITNESS:  Thank you.

13         VIDEOGRAPHER:  Any other questions from

14     counsel?

15         MS. AGUILAR:  No further questions at this

16     time.

17         MR. GIAQUINTA:  I have none.

18         VIDEOGRAPHER:  Okay.  And did you --

19         MR. GIAQUINTA:  All right, Tina.  Thanks.

20     Oh, no.  Go ahead.  Sorry.

21         VIDEOGRAPHER:  Sorry.

22         And this concludes the deposition of Tina

23 Tomaras.  We are off the record.  The time is 4:46

24 p.m.

25         (DEPOSITION CONCLUDED at 4:46 P.M. CST)

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

EXHIBIT 5

The Deposition of TINA TOMARAS, taken on January 27, 2022

90

```
                                          Page 90
 1              CERTIFICATE OF REPORTER

 2          COMMONWEALTH OF KENTUCKY AT LARGE

 3

 4    I do hereby certify that the witness in the foregoing

 5    transcript was taken on the date, and at the time and

 6    place set out on the Title page hereof by me after first

 7    being duly sworn to testify the truth, the whole truth,

 8    and nothing but the truth; and that the said matter was

 9    recorded stenographically and mechanically by me and

10    then reduced to typewritten form under my direction, and

11    constitutes a true record of the transcript as taken,

12    all to the best of my skill and ability.  I certify that

13    I am not a relative or employee of either counsel, and

14    that I am in no way interested financially, directly or

15    indirectly, in this action.

16

17

18

19

20    Sandra Ventura

21

22    SANDRA VENTURA,

23    COURT REPORTER/NOTARY

24    MY COMMISSION EXPIRES ON: 08/15/2025

25    SUBMITTED ON:  2/07/2022
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



KENTUCKIANA
— COURT REPORTERS —

EXHIBIT 5

| Exhibits | | | | |
|---|---|---|---|---|
| **Exhibit 1_Tomaras** 65:11,12 | 54:21,23 55:1,8 61:4,23 62:3,12 68:15 70:16 74:23 81:11 83:2,3,5,8 86:4,22 | **4:46** 89:23,25 | **acquainted** 85:22 | 19:16 21:14,19 22:2,16,20,23 23:18 24:19 25:3 26:21,24, 25 27:6,10,18, 21 28:14,20,23 |
| **Exhibit 2_Tomaras** 77:18,20 | **2020** 7:18 | **5** | **actual** 12:17 24:21 41:1,16 77:1 82:22 | 29:2,5,12,21 31:14 56:4 61:7,23 62:2,15 65:3 67:21,23 68:8,25 73:9,18 74:22 75:8 82:25 86:24 |
| **1** | **2021** 20:17 21:8 34:25 35:25 42:14 43:8 | **5** 66:19 79:9 | **administrative** 12:20 | |
| **1** 64:7 65:11,12 | **2022** 6:7 14:10 51:19 58:22 84:3 | **500** 80:8 | **admitted** 83:2 | **aid** 14:23 |
| **12** 17:12,14 | | **6** | **affairs** 80:6 | **alert** 37:22 |
| **17** 16:11,13,14 24:20 54:20 61:4,23 62:3 68:15 70:16 73:9 | **20C0014** 6:13 | **6** 79:12 | **affect** 10:6,12, 16,18 | **allegations** 11:12,18 30:7 |
| | **21** 55:8 | **60606** 6:6 | **affecting** 10:9, 21 | **alleged** 11:22 |
| **17th** 15:17,20, 22 16:16 76:1 86:4,22 | **21-17** 80:15 | **7** | **affirm** 8:1 | **alleging** 12:9 |
| | **22nd** 6:6 | **7** 64:7 65:17 77:20 79:15 83:3,5 | **afternoon** 8:13,14 89:11 | **alleviate** 45:8, 17 |
| **19** 54:23 55:1 62:12 73:9 74:23 81:10 | **27** 14:10 51:19 58:22 84:3 | **7th** 83:4 | **agree** 7:10 34:2 68:15 | **allowed** 35:7 43:16 48:16 56:11 |
| **1986** 32:11 | **27th** 6:7 | **8** | **agrees** 7:20 | **Alphonso** 85:25 |
| **1998** 32:16 | **2:38** 6:7 | **8-** 80:14 | **Aguilar** 6:17 7:13,15,19 8:6, 10,12,19 13:25 14:3,11,12 15:25 16:9,10 17:6 22:1,5,6 23:9,15,16 41:7,11 44:22 45:2,3 46:25 47:16 51:10,13, 22,23 52:16 55:17,21,24 56:1,2 58:8,23, 24 64:4,8 66:3, 6 72:10 75:7 83:15,19 84:4 89:15 | **altercation** 15:17 16:21,24 25:7 68:14 71:4 86:24 87:4 88:2 |
| **19th** 54:24 75:24,25 | **2:46** 14:5 | **8-19-17** 72:24 | | **anatomy** 26:13 52:9 |
| **2** | **2:48** 14:10 | **8-19-2017** 81:17 | | answers 9:12 |
| 2 77:18,20 | **3** | **8-21-17** 80:14 81:12 | | **apologies** 28:2,5,6 31:11 65:21 66:3,4 |
| **20** 17:12,14 19:1 88:11 | **30** 6:5 33:20 83:1 | **9** | | **apologize** 38:13 68:17 |
| **2000** 16:15 32:20 | **31st** 20:17 | **9-22-17** 68:4,8 | | **appearance** 6:14 26:12 |
| **2015** 35:10,18 43:14 | 3:35 51:15 | **A** | **Aguinaldo** 6:10,22 21:14, 24 22:3,17 26:2 28:13 67:2 71:6,8 79:19 81:1 | **appeared** 23:3,5,18 |
| **2017** 14:22 16:5,12,13,15, 20 17:4,8 18:14 23:7,18,20 24:1,11,20 25:4 26:25 27:6,11 29:6 42:6,10, 13,18 43:11 | **3:41** 51:20 | **ability** 10:6,13, 19 | **Aguinaldo's** 79:20,23 | **appearing** 6:18,21,23 7:1 |
| | **3:48** 58:17 | **absolutely** 45:15,17 54:1 56:1 | **ahead** 89:20 | **apply** 35:11 |
| | **3:55** 58:22 | **access** 37:16 48:12,14 | **Ahmad** 6:9 14:20 15:5,8 18:3,14,18 | **appointment** |
| | **3rd** 35:10 | **accurate** 10:7, 13,19 | | |
| | **4** | **accused** 13:5, 9,11 | | |
| | **4** 65:14,16 66:7 78:15 | | | |
| | **40** 33:19,20 | | | |
| | **4:31** 83:23 | | | |
| | **4:37** 84:3 | | | |

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



EXHIBIT 5

37:19,22,25
40:3 48:8,15
72:24 86:15
88:19

**appointments**
37:6,8 86:17

**approval**
48:17,18

**area** 50:5,19,21
51:8

**Argumentive**
75:19

**arrested** 12:18

**aspect** 53:10

**assault** 43:25
56:6

**assaulted**
24:16

**assessed**
46:20

**assessment**
33:23 47:25
48:1,4 60:22
61:2,7,13 62:23

**assessments**
47:21

**assign** 59:15

**assigned**
18:24 36:19,21,
22,23,24

**assistant** 6:24
50:4

**assume** 10:3
30:3

**assumed**
16:14,15 60:8

**assuming** 87:6

**assumption**
82:17,20

**attached** 53:4

**attack** 29:22

**attending**
6:14,15

**attorney** 6:25

25:10 30:14
31:3,6,25 52:19

**attorneys**
30:13 31:15

**August** 14:22
15:17,20,23
16:4,11,13,16,
19 18:14 23:7,
18,20 24:1,11,
20 25:4 26:25
27:5,11 29:6
42:6,13 54:20,
23 55:1,8 61:3,
23 62:3,12
68:15 70:16
73:9 74:23
81:10 83:1
86:4,22

**awaiting** 76:19

**aware** 12:23,25
13:1,4 60:24
77:14 81:2

**axial** 57:14

―――――――

**B**

**B-R-O-W-N**
8:17

**back** 14:7
15:25 16:3,6
17:4 22:1,4,7
25:24 50:4
51:17 58:2,19
62:7,8 63:2,8,9
66:7 69:23
72:16,17 73:2,
3,21 74:24
75:9,16 76:3,23
77:11,15 78:16,
19 83:25 88:25

**background**
32:8 65:22

**bad** 69:20

**based** 14:25
60:18 76:23
89:8

**Basically** 43:3
75:24

**basis** 21:3 44:7

**Bates** 64:4,5,6,
15,16 65:13
77:20 78:15
79:9

**bed** 50:19

**beds** 50:14,17

**began** 35:20

**begin** 8:6
32:14

**beginning**
66:9

**behalf** 6:18,21,
25

**beneath** 69:8,
10

**binder** 60:2

**bit** 55:20 63:23
66:13 87:3

**bleeding** 44:9,
11 45:8,14
46:3,5 87:24
88:6,15

**blocks** 36:14

**body** 49:8 53:9,
12

**bone** 26:11

**book** 59:23
60:1,4,5

**bottom** 64:16
68:8 81:14

**brace** 56:17,21
62:2 85:14

**braced** 72:16

**braces** 56:12

**braids** 18:7,8

**break** 51:11
53:10 58:9,12
83:20

**breathe** 45:16
46:7 87:25
88:15

**breathing** 88:7

**bring** 62:8

**brings** 88:23

**broken** 88:13

**brought** 37:21
43:24 63:11
68:13 71:3
86:6,15 87:3
88:17

**Brown** 7:6,16,
21 8:13,17,20,
23 22:7 41:12
44:23 45:4 47:2
51:24 56:3
58:25 64:13
66:7 75:21
77:24 84:5
85:20 87:21

**bullpen** 37:21
50:7,16,20,23,
24 51:1 67:1
68:13,25 71:10
87:3 88:5,18,
21,24

**bunch** 58:10

―――――――

**C**

**C3-c4** 57:14

**call** 25:14 44:7
60:17 63:10,12
80:4

**calls** 41:6,9
52:13,14 54:4
57:17 58:5

**camera** 7:5

**cameras** 51:25

**care** 24:20 25:4
29:6 38:23
39:1,6,19 43:24
45:4 59:10
68:14 69:24
70:16,19 71:3
73:1 81:5 83:3,
5

**carry** 81:3

**case** 6:12 8:2
11:18,21 12:6,
14,17 18:3
29:10,19 30:1
31:17 46:12

52:17 85:21
86:23 87:10

**cases** 11:10,13

**caught** 12:15

**cell** 11:16
12:16 18:24
19:9,10,11
22:25 23:12,23,
24 36:14,22
51:3 63:2,9,13
75:16 76:23
77:11,16 83:9

**cellmate** 15:17
16:22 18:7 25:8
86:25

**center** 15:14
16:20 17:8
21:2,7 36:3
56:25

**change** 72:25
80:12 89:3

**changed** 23:25

**charges** 12:1

**chart** 17:21
40:9 48:11
76:16 84:15

**charts** 84:24

**check** 48:5
76:3,21 77:9

**checked** 69:10

**cheek** 24:3

**Chicago** 6:6,
23 7:2 83:2

**chief** 38:7,12,
21

**choose** 21:3,
10

**chose** 20:19
35:6

**circumstance**
43:23 44:6,13
73:21

**circumstance
s** 86:12 87:7

**civil** 8:21 10:25

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

EXHIBIT 5

11:4

claim 11:22

clarification 16:5,17

clarify 16:2 17:4

clinic 36:21 50:5 51:8

close 23:13 35:13 50:22,25 51:2,9 83:15

closing 58:10

college 32:12, 15

column 53:4, 10,11

comment 22:17

communicate 38:4,9 39:3 77:5

communicated 38:2

communicates 38:6,10

communications 19:16 27:16

company 35:6

company's 34:15

complained 25:4

complaining 24:7 38:8 87:8 89:2

complaint 30:4 38:7,12 41:19 46:19 48:2 63:7 82:11

complaints 11:25 12:21 38:21

concern 54:2, 13,14

concerns 39:10

CONCLUDED 89:25

concludes 89:22

conditions 10:5,9 24:6

conduct 59:14

conducted 13:2 14:8 51:18 58:20 84:1

conference 6:8

Congrats 58:15

considered 33:14 44:8 45:15,20 46:15 88:2

consists 89:7

constitute 45:9

constituted 46:10

constitutes 44:23 45:6

context 45:1

continue 16:7 31:12 71:20 72:21,22

continued 26:1

continuing 59:7,8,17

continuity 81:4

convened 6:8

conversation 19:21 20:1,9,11 21:18,25 22:2 70:24,25 71:10 73:16

conversations 18:10 30:13,14

cord 57:25

corner 50:18 71:19

correct 13:21 20:22 21:8,13, 15 25:22 26:18, 19 27:23 28:20 31:4,22 33:4,5, 25 34:6,16 35:1,4,18,19 36:14,15 37:7 40:14,15 41:23 42:18 43:20 49:3,4,19,20 51:7 52:3,4 54:11,22 55:5,9 56:4,6,9,10,15 59:6 60:15 61:15 71:9 74:17,25 78:6 81:9 82:20 85:2 87:4,5

correctional 15:14 16:20 17:8 21:2,7 34:18,20,23 35:3,9,12,15 36:3 56:24

Corrections 27:24 64:25

correctly 43:3

counsel 6:16, 18 41:8 64:4 84:7,12,21 89:14

couple 15:15 32:1 85:19

court 6:4,5,11 7:22,25 8:5 9:10,13,14,16 16:7 65:23 66:1

create 84:16

creates 36:17

crime 9:8

CROSS-EXAMINATION 84:9 85:17

CST 89:25

curious 16:12

current 34:13 69:22

curtain 50:14

cut 24:3 69:8, 10

_____

D

daily 18:23 37:17 44:7 83:14

date 15:17,20, 22 16:1,13 43:14 51:19 54:19 56:6 68:5 75:6 81:10 83:10 84:24 85:1

dated 67:25

dates 64:18

day 6:7 12:12 16:24 17:2,9, 10,11,14,16,18 23:25 24:15 29:22 33:20,21 36:5,18 37:8, 11,17 44:8,10 49:24 61:8,11 62:15,19,23 63:3,11,12,15, 16 68:14 70:17 73:12,13 74:20, 25 76:11 80:9 81:20 83:14 86:20 88:9

days 36:5 45:20 54:18 55:13 56:7 72:18 73:20 80:9,13

death 46:5

decide 74:7

decides 36:18

decision 76:22

defendant 10:25 11:4,8 12:5 29:16 30:1

defendants 6:22 7:1

definitively 26:4

deformity 25:15 26:6,8,10

degree 32:17

degrees 32:21

delivered 83:14

delivering 22:25

dental 11:19, 20,21

dentist 12:6

department 11:20 27:24 59:4 64:23,24

depend 17:10 18:23 19:10 23:24 29:7 36:11 40:25 43:23 44:6,15 53:19,21,22 55:10 56:13 63:5,17 73:23 74:18 77:3

dependent 19:9 48:1 77:16 86:20 88:11 89:7

depending 49:23

depends 17:15,16

deposition 6:9 8:20 9:8 13:14 14:8,25 20:7 30:24 31:1,7 32:3 51:18 58:20 84:1 89:22,25

depositions 8:24 13:19

Derek 85:22

describe 36:25 47:24 50:6,8

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

EXHIBIT 5

describing 73:17

desk 50:15

details 17:24 18:2 31:14

diagnose 33:25 40:7 54:9 76:5 85:4

diagnosis 46:23

difference 26:7

differently 59:9

difficult 9:13 63:23 66:12 72:19

difficulties 68:18

difficulty 25:12

DIRECT 8:11

disciplined 49:7

DISCONNECTS 13:24

discretion 61:1

discuss 14:19 28:17 40:4,11, 12 89:4

discussed 13:7 30:15,17, 20 52:6

discusses 68:25

discussing 67:2

distress 44:9, 12,20 45:7

District 6:11, 12

Division 6:12

doc 77:16

doctor 12:11

17:16,19,20,21, 23 18:6 21:17, 18,20 22:8,13 24:14,22,24 25:17,19,20 28:17 29:8 37:11,24 38:2, 3,5,6,9,10,11, 21,24 39:4,7,8, 9,14,20,22,24, 25 40:2,5,8,9, 10,12,21 41:17, 20,21 43:19,21 44:1,3,5 46:21 47:14 48:8,12, 14,25 50:2,3 54:6 56:16,18 60:17,23 63:1, 2,3,9,15 71:5 73:20,23,24 74:1,6,7,9,15, 16,25 75:9,18 76:1,4,9,16,20, 25 77:4,6,8,10, 13,14,15,17 88:10 89:4,5

doctor's 29:9 56:15 61:24 86:17 89:7

doctors 17:12 25:24 36:22 37:3 49:25 51:4 62:7 74:20 75:14 88:20

document 40:16 52:5 64:12 65:4,6,9 66:8,16,24 67:5,10 68:12 78:12,15 79:9, 15 80:2 81:24 82:4,8

documentation 76:15,24 77:6 82:10,13,15,21

documents 14:23 31:25

dog 66:4

door 50:18

doors 50:25 51:2,3

DOT 28:8

dressing 37:2 72:25 80:12

Drive 6:5

drop 87:10

dropped 14:1

duties 33:22 37:1 43:3

---

**E**

easier 66:12

Eastern 6:12

eat 72:19 73:19

education 59:8

elaborate 60:20

electric 27:12 46:14 58:1 69:22

electrocuted 72:14

electronic 37:14

Ellyn 6:19

else's 48:17

emergence 88:12

emergencies 45:14 46:8 87:23

emergency 44:12,14,24 45:5,6,10,11, 16,18,20,24 46:5,10,15 49:18,22 50:1, 6,10,19,25 51:5 86:16,19 88:13, 18

emergent 44:8 46:7 60:23 63:18 87:9,13 88:6,16

emergently 46:6

employed 20:23

employee 59:1

employees 27:18,21,22 30:21 42:2,5 60:8

employment 13:20

encounter 17:25 81:19,22, 24 82:5,7 84:17 85:1

encountered 18:18,21 23:18 63:5

end 83:16

enjoy 35:14

enroll 32:12

entire 26:1

envision 50:8

equals 44:12, 20

equipment 59:11,16 85:13

ER 24:12,15 25:1,23 30:2 36:24 37:1,2,7, 19 50:3,12 54:16,18 55:1,8 56:8 61:10 62:6,25 63:9 71:5 74:19,23 75:15 76:3,8, 13,14,21 77:8, 17 86:11,15 87:4,24 88:20

escorted 69:23 73:3

essentially 35:2,24

estimate 19:1

et al 6:10

evaluate 57:24

Evaristo 6:10, 22

Everybody's 46:17

exact 15:22 16:1,12

examination 8:11 57:9

examine 69:6

examined 57:8

examining 61:16

excessive 88:6

exhibit 65:11, 12 77:18,20

exhibited 24:19 26:25

exhibits 63:19

exist 52:2

experience 41:25

experienced 27:6,11,13

experiencing 12:4

expert 13:23 14:16 41:6,7 52:15 57:18

expertise 41:10 52:14 57:18 58:6

explain 26:8 29:18 36:16 38:25 39:20,25 40:2 73:2

explaining 38:19 73:18

extent 74:11

extreme 46:8, 13

extremely 55:19 69:20

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

EXHIBIT 5

**eye** 69:8,10
73:1

_____

**F**

**face** 24:3 61:16

**facility** 34:18

**fact** 7:11 16:19
67:24

**factual** 11:12,
17

**failed** 12:9

**failing** 13:6

**failure** 11:22,
23

**fair** 10:3 19:18
55:2 60:1,25
62:17 63:2,4,14
67:5 70:6 79:14
84:23

**familiar** 8:23
79:18 85:22

**family** 30:18

**fast** 22:9 55:16

**Federal** 8:21

**feel** 46:17
60:22 69:22

**felt** 69:21 72:14

**filed** 12:21,24

find 64:6 71:12

**findings** 48:7,
10

**fine** 7:19 16:9
67:18,19 71:11

**finish** 89:5

**five-minute**
51:11 58:9,11

**floor** 6:6 84:6

**follow-up**
74:25 80:11,14

**foot** 88:13

**form** 12:2
15:10 17:3 23:6

26:16 27:2 34:5
39:5,15 41:5
44:25 46:1 47:5
55:6,11 57:7
70:9 73:22
75:1,19 87:13

**found** 78:21

**frame** 20:11
23:14 37:23
74:13

**freezing** 9:19
68:18

**Friday** 74:21

**front** 11:15,16
21:14,16,17
22:25 23:12
24:24 25:17,20
30:8 37:24
38:2,5 39:8,24
40:10 43:25
62:8 76:24 77:7

**full** 7:4

**full-time** 20:21
33:13 36:2,4

_____

**G**

**G-I-A-Q-U-I-N-
T-A** 6:21

**gave** 67:22

**general** 6:25
23:8,9

generally 17:7
52:8,11 53:5

**Giaquinta** 6:20
7:12 8:8 12:2
15:10 17:3
21:21 23:6,11
26:16 27:2 34:5
39:5,15 41:5,9
44:21,25 46:1,
22 47:5,8,10
51:12 52:13
53:7,15 54:4
55:6,11 57:7,
12,15,17,22
58:3,5,13,15
65:25 70:9 72:8
73:22 75:1,4,

11,19,23 84:10
85:16 87:12
89:17,19

**give** 8:1 9:11
12:10 18:25
19:4 33:23
47:19 48:7
56:11 59:20
60:4 67:7 71:12
83:16

**Glen** 6:19

**God** 8:3

**Good** 8:13,14

**grabbed** 18:7

**graduate**
32:10

**grievance**
65:9 67:20

**grievances**
12:23 13:2

**guess** 69:19
80:22

**guessing** 20:6

**guesstimate**
19:4,12

**guy's** 89:1

**guys** 55:17

_____

**H**

half 89:1

**hallway** 50:24

**hand** 7:22,24
31:7 56:17

**handed** 31:8,
13

**hands** 72:16

**handwriting**
78:9,14 79:3,8,
17,21,24 81:7

**happen** 57:10
77:13 82:19

**happened**
18:4 59:5

**happy** 87:21

**harm** 57:20

**HCU** 26:24
27:5,10 51:25

**head** 25:12,13,
17 26:1,5,7,11
53:3 54:15
55:3,9 56:4
72:16 73:19

**health** 20:24
24:20 25:3 29:6
33:3 38:23
39:6,19 43:24
45:4 59:10
68:13 69:23
70:16,19 71:3
73:1 83:2,3,5

**Healthcare**
33:10

**hear** 16:15
22:12 50:20,23
53:15 55:17,18
72:17 84:19

**heard** 22:10

**held** 26:7 55:9

**helpful** 19:2
23:13 45:1
55:23

**hey** 20:3 89:1

**high** 32:8

**hit** 88:5

HIV 80:17

**hoarding**
12:15

**hold** 7:4,22
35:20 54:15
66:4,15 69:20

**holding** 26:1
55:3 56:4

**holds** 53:3

**home** 35:13

**honestly** 19:3
20:12 42:11
76:10 86:5

**hospital** 29:13

48:17

**hour** 32:6 89:1

**hours** 21:10
33:15,17,19
35:7 60:13
88:14

**house** 18:24
19:9,11 23:24
63:13 66:5 83:9

**houses** 19:10
36:22

**hurt** 69:20

**hypothetical**
75:20

_____

**I**

**I-D-O-C** 28:5

**IA** 80:4

**Ibuprofen**
47:19

**ID** 7:4

**idea** 23:25
75:12

**IDENTIFICATI
ON** 65:12 77:18

**IDOC** 27:21
28:5 30:21 64:6
65:14 66:7,19

**IDOC0002**
64:19

**IDOT** 27:25

**illegible** 80:19

**Illinois** 6:6,12,
19,23,25 27:23
49:2,8 64:23,24

**imagine** 19:4

**immediately**
86:20 87:11,23,
25

**importance**
52:12,23 53:6

**important**
9:11,15 53:9

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

EXHIBIT 5

The Deposition of TINA TOMARAS, taken on January 27, 2022

74:3 81:4

**inappropriate** 34:3

**inaudible** 9:12

**incident** 15:22 18:4

**Incomplete** 75:20

**incorrect** 21:13

**independent** 14:19,20 15:1,4 16:4 19:15 22:15,19,22 23:2,17 24:2,5, 17 25:2,11 26:23 27:4,9 29:4,11 61:6 62:11,14,18,21 70:23 71:1 75:5

**independently** 24:10 25:10

**infirmary** 36:24

**informal** 9:14

**initial** 54:19 56:6

**initially** 24:14

**injections** 33:23 37:3

**injuries** 54:13 69:7 87:9

**injury** 34:8,10 48:4 53:13,17, 19,21,22,24 54:3,19 56:19 57:2,5,25 83:1, 12 87:7

**inmate** 11:14 12:15 15:13 16:19 40:10 43:24 47:13 76:2 84:24 85:1,7 86:14 88:17 89:3

**inmates** 85:4 88:5

**inside** 88:20

**instance** 74:22

**institution** 34:21,23

**institutions** 35:3

**instructed** 52:18

**instructing** 29:1

**interaction** 41:17 78:8 82:14,16,18,22

**Interim** 33:10 34:14,17

**Internal** 80:6

**interrupt** 9:4 31:11

**intimidating** 38:18

**investigations** 13:1

**involved** 13:3, 19 15:16

**involving** 82:18

**Isabella** 6:17 17:3 21:23 23:6 53:16 55:12,14

**issue** 40:4 63:24 68:21

**issues** 9:16,19 56:5

**items** 87:25

—————

**J**

**Jaburek** 7:1 28:20 69:24 71:22,23 72:12 85:21,23 86:3

**January** 6:7 14:10 51:19 58:22 84:3

**job** 33:13,22

35:11 36:25 49:15 59:3

**join** 44:21 46:4 70:11

**Joliet** 32:9

**Joseph's** 29:13

**judgment** 60:18,19,24

**June** 21:5,8 34:24 35:25

—————

**K**

**keeping** 25:12

**Kentuckiana** 6:4

**kind** 72:1

**knew** 21:23

**knowledge** 28:3 29:3 52:1, 2 55:2 57:19 62:1 64:5 75:3

**Kristin** 6:24 85:20

—————

**L**

**lawsuit** 10:25 11:5 12:1 29:16 30:5,7,15 31:8, 14

**lawsuits** 11:7

**lawyer** 32:3

**lay** 57:2

**laying** 57:4

**learn** 29:15

**leave** 20:16

**leaving** 20:13

**left** 24:3 26:11 42:14 43:8

**legal** 52:20

**legible** 69:18 80:7

**letting** 18:12

**LICENSE** 7:8

**licensed** 32:18 33:12 35:22,23 49:2,5

**lie** 9:7

**Lieutenant** 28:19 69:24 85:22,25 86:3

**Lieutenants** 85:21

**lighting** 38:14

**Lindemann** 6:24 7:14 44:16,18 46:4 55:12,14,18,22, 25 70:11 85:18, 20 87:19 89:9

**lines** 69:1 86:11

**list** 37:10,12, 13,14,15

**located** 6:5 51:4

**location** 6:14

**lockdown** 17:11

**Logan** 6:20 65:24

**long** 15:15 18:8 23:12 32:5 86:6

**longer** 20:21 35:2 45:24 66:21

**looked** 26:20 50:9 73:1

**lot** 19:7,8 22:24 23:10

**loud** 22:10 69:5 72:9,11

**lower** 67:14

**LPN** 32:25 33:22 34:3,7,11 37:1 38:3 39:3 42:22 45:5

47:2,18 48:16 54:9 76:14 77:5 78:4 85:3,6,10

**LPNS** 43:16

**lump** 26:11

**lumps** 48:6

—————

**M**

**M.D.** 16:25 28:16 48:19,20, 21,22,24 86:20

**made** 35:11 41:1 72:25 76:23

**make** 9:23 21:9 35:7 66:1,11 80:18

**making** 52:19 69:12

**malingering** 34:4

**mandated** 36:11

**manual** 60:1,9

**mark** 65:11 77:19

**marked** 65:12 66:19 77:18

**marks** 24:2

**married** 7:18

**masturbating** 11:15

**matter** 6:9

**meaning** 26:17

**means** 36:16, 17 80:5

**meant** 20:5,8 28:5

**medical** 11:22, 23 13:6 16:25 29:1,22 30:9 31:19 32:24 33:1 39:19 45:11 46:23

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



EXHIBIT 5

49:14 52:11,13
54:4 57:17 58:5
85:13 88:19

**medication**
12:8,10,16
18:23 19:25
22:25 23:12
33:23 36:23
45:22 76:2
83:10

**medications**
10:12,15 83:13

**meet** 32:2

**members**
30:18

**memory** 10:10,
16,22 14:25

**mentioned**
11:18 18:15
49:15,17

**metal** 51:2

**Michelle**
42:16,17

**military** 49:11

**minute** 71:12
88:10

**minutes** 83:17
88:11

**mischaracteri
zes** 21:21 46:2

**misconduct**
13:9,11

**misstates**
44:18

**misunderstan
ding** 75:17

**mom** 32:13

**moment** 18:9
76:18

**Monday** 74:20

**money** 21:9
35:7

**month** 23:21

**months** 20:13,
15 23:22 43:13

**motion** 48:5,6

**motivated**
35:11

**mouse** 68:3
71:15,16,17,18,
24 72:2

**move** 53:11
66:18 72:20

**moves** 28:17

**moving** 71:18
72:2

———————

**N**

———————

**named** 29:16,
24,25

**names** 11:10

**nature** 87:9,13

**neck** 25:5,16
26:15 27:1,6,12
34:8 45:20 46:9
48:3,6 52:9,12,
25 53:1,13,17
54:3 56:12,17,
19,20,21,23
57:1,5,14,21
62:2 69:11,23
72:13,15,16
73:3 83:1,12
85:14

**needed** 20:20
21:4 33:21

NOISE 65:22

**non-emergent**
60:23

**normal** 19:20
26:12

**Norman** 7:1
28:23 85:21
86:1

**Northern** 6:11

**note** 40:17,19,
21,22,24 41:1,
18,22 48:11
61:18 78:2,5
80:24 81:21,25
82:6

**noted** 69:8

**notes** 31:17
40:21 41:3,13
61:19 75:25
78:3 83:17
84:13,16,24

**notice** 8:21

**notified** 73:24
88:20

**number** 6:12
45:14 64:17

**nurse** 17:7,17
24:13,23 32:18
33:12 35:22,23
36:18 39:7,8,
21,23 41:1
43:22 44:2,7
56:17 59:3,15
61:9,13 63:10,
11,12 69:2,6
70:7 71:7 73:1,
8,20 74:1,5
81:19

**nurses** 40:6
41:3 43:16
49:18,21 50:15
56:11 88:4,20

**nursing** 25:14
31:16 32:17
49:8 59:10,19
60:18,19,21,24
61:1

———————

**O**

———————

**oath** 9:5

**object** 39:5
46:22 55:6,11
87:12

**objection** 12:2
15:10 17:3
21:21 23:6
26:16 27:2 34:5
39:15 41:5,9
44:16,25 46:1
47:5 52:13 53:7
54:4 57:7,12,
15,22 58:3 70:9
73:22 75:1,11,
19

**objections**
52:19

**objective**
26:14,17

**objectively**
26:19

**observe** 56:8

**observed**
18:11

**obvious** 25:15
26:6,8,10,12

**occasional**
36:10

**occasions**
13:17 18:20,22

**occurred**
15:23

**October** 83:5,8

**odd** 25:16

**officer** 28:22
88:23,25

**officers** 27:22
37:22 88:3

**offices** 50:4

**on-call** 48:22
49:1

**online** 6:3

**Oop** 78:13

**Oops** 15:11
47:6 66:15

**open** 84:6

**opinion** 41:6,8,
10 52:15 54:5
57:17 58:5

**opportunity**
67:7

**opposed** 88:14

**options** 36:20

**order** 43:16,19
56:15,16 81:3,6
85:10

**ordered** 61:22
62:9 76:1,4,15,

17

**orders** 28:16
29:9 40:21
61:25 73:25

**originates**
39:18

**outpatient**
29:12 48:17
81:21,24 82:5,
14

**overnights**
36:7,10

———————

**P**

———————

**p.m.** 6:7 14:5,
10 51:15,20
58:17,22 83:23
84:3 89:24,25

**pages** 65:18
67:18,22 68:12

**paid** 35:6

**pain** 12:3,8,16
25:5 27:6
45:19,21 46:9,
13 47:2,13
57:14 72:15,18
76:2

**pains** 58:1

**palpate** 48:6

**paper** 78:10,15
79:2,4

papers 20:6
31:2,5,13

**paperwork**
29:17,21 30:25
31:8

**Pardon** 55:14

**part** 53:9 57:4
67:11 80:11

**parties** 7:10
27:16

**parts** 53:12

**pass** 18:23
36:23



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

EXHIBIT 5

passing 23:11
83:10

past 73:14

patient 13:5,12
17:23,25 18:1
21:16 22:23
28:18 34:3
37:19 38:1,5,6,
8,10,20 41:16,
22,25 42:1
43:21 47:1,13,
19 48:3,16
53:13,17 56:17
57:1,25 62:25
63:8 73:17,21
74:15,19 75:15,
16,17 76:19,23
78:8 81:20,22,
24 82:5,15,22
84:16,17,25
89:5

patient's 39:14
57:21

patients 12:24
17:1,9,13,14,
17,20,22 33:24
37:3,4,6,8,21
43:17 47:22
52:6 56:11 62:8
73:13,15 77:9

pending 6:10

people 37:11
40:5

perform 47:21
74:8

performance
42:22

performed
43:3 61:10,13,
14 62:22

performing
61:7

period 23:12

permitted
85:4,7

person 29:1
57:5

person's

26:15

personal 55:1
57:19 62:1

personally
18:11 29:23
46:17 56:8

personnel
30:9

pertain 66:25

pertaining
11:19

phone 50:15
63:22

physical
37:13,15 47:21,
24 48:1,4 61:7
62:22

physician
45:21

physician's
50:3

picked 21:6

picture 72:1

piece 59:11,16
78:10,15 79:3

pillow 72:12

place 26:20
43:6 69:21
72:17 88:1,8

plaintiff 7:20
10:24 11:2
86:23

plaintiff's
6:16,18

playing 62:6

point 70:4 76:6
77:2

policies 59:24,
25

policy 38:21,23
39:2,6 41:2
59:21 60:6
84:15 86:10

policymaker
41:10

Poole 6:10
14:20,22 15:5,8
16:19 18:3,14,
18 19:16,25
20:2 21:14,20
22:3,16,20,23
23:18 24:19
25:3 26:21,24,
25 27:6,10,18,
21 28:14,20,23
29:2,5,12 43:24
54:15 56:4
61:7,23 62:2,15
67:23 68:8
73:18 74:22
75:8 77:20
78:15 79:9,12,
15 83:1 86:7,24
87:7

Poole's 31:14
65:3 67:21

pop 77:10

popping 26:25
69:12

portion 16:6
22:4 68:25

position 25:16,
18 35:20 61:10
62:5 72:14

possibly 23:4

post 25:7

posture 55:7

postured
54:25

potentially
53:14,18,20

practical 32:18
33:12 35:22,23

practice 38:22
39:2,13,18 41:2
58:7 80:25 81:1
84:15

prefer 87:20

preparation
14:24

prepare 17:21,
22 30:24 32:3
37:3

prepared
24:14

prescribe
85:13

present 30:2
41:18,22 44:1,
4,5

presented
63:1

presents 47:1
48:3 57:1 58:1
62:25

previously
23:23

priority 89:7

privileged
30:14

PRN 33:14

problem 28:12
69:11 78:17,23

procedure
8:22 59:13
86:10

procedures
59:21,24 60:1,6

PROCEEDING
S 6:1

process 47:25
57:5

professional
16:25

professionals
88:19

profusely
87:24 88:14

progress
31:16 40:17,18,
20,22,23,24
41:3,13,18
48:11 61:18,19
78:2,3 80:24
81:21,24 82:5
84:13

proper 12:8
30:8

provide 10:6,
13,19 11:22
13:6 29:1 45:1
60:16

provided 29:5

psychotropic
83:13

pursuant 8:21
29:20 46:18
59:8 73:25

put 21:16 24:24
30:8 37:24 38:1
39:8 40:9,16,
18,20 43:25
47:13

_____

Q

quadriplegic
34:12

question 9:21
10:2,3 14:14
16:3 22:7
47:11,12 53:16
68:22 75:21
87:17,20

questioning
46:23

questions
9:23 65:19
67:3,4,17 84:5,
11,12 85:19
86:9,11 89:10,
13,15

quick 51:11
58:9,11 83:20

quickly 51:11
55:19 89:3

_____

R

raises 7:24

range 19:2
48:5

read 15:25
16:3,6 22:4
30:4 59:23
60:6,9 63:23

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

EXHIBIT 5

65:16,19 66:8, 12 69:4 72:6,8, 11 79:23 80:1, 21,24

**reading** 65:17 69:15 70:4 71:20,21 72:5, 21 73:5 81:7

**reason** 42:1

**recall** 11:11,25 14:21 15:21 18:16 20:4,9 21:24 24:12,14, 22 25:8,15,17 26:6 28:15 29:8 61:17,25 76:10 84:12 86:3,5,6, 7

**receive** 74:12, 24

**received** 42:24 43:12 62:2 72:12,24

**receptionist** 39:20

**recognize** 54:10

**recollect** 24:10 71:10 73:16

**recollection** 14:20,21 15:2,4 16:4 19:15 22:15,19,22 23:3,17 24:2,4, 6,8,18,21 25:2, 11,13 26:23 27:3,4,8,9,17, 19,20 28:4,25 29:4,11,14 61:6 62:11,14,16,18, 20,22,24 70:24 71:2 73:11 75:5 83:4,7 87:15

**record** 7:4 8:16,19 14:2,4, 6,7 51:14,16,17 52:20 58:16,18, 19 69:5 80:2 83:22,24,25 89:23

**records** 31:19 81:11

**refer** 67:11

**referred** 28:3

**referring** 20:7 70:6 78:4

**refers** 67:10

**reflect** 8:19

**refused** 20:8

**regulatory** 49:8

**related** 31:17

**relating** 14:22

**relation** 50:16

**remember** 15:7,19 16:12, 18,23,24 17:24 18:2,9,11,13 19:18,22,25 20:1,10 34:9 61:16 75:5

**repeat** 9:21 14:14 22:1 68:22

**rephrase** 9:20, 25 87:20

**reported** 42:8

**reporter** 6:4 7:23,25 8:5 9:10,13,16 16:6 7 22:4 65:23 66:1

**Reporters** 6:5

**represent** 65:8 67:23 82:25 85:21

**representing** 6:4

**REQUESTED** 16:6 22:4

**require** 44:13

**required** 57:2

**requires** 46:23

**resident** 47:13

**resignation** 20:18,19

**resolution** 12:13,17 41:19

**respiration** 46:6

**respiratory** 44:9,12 45:7,14 88:8

**rest** 80:19

**result** 13:2 57:20 80:11

**results** 73:24 74:9,10,16 76:5,10,19 77:2,3

**retained** 13:22 14:16

**review** 42:21, 24,25 43:2,5, 12,14

**reviewed** 31:24

**REVIEWS** 66:16,24 78:12

**risk** 57:20

**role** 33:11 34:7, 13

**room** 18:8 45:5 49:18,22 50:1, 6,10,19 51:1,6 60:10 77:13 88:13

**RP** 80:16

**rules** 8:21,24

**running** 69:22

_____

**S**

**Saint** 29:12

**Sandra** 6:3

**sat** 25:17

**satisfactory**

43:4

**Savanna** 6:2 14:9 51:20 58:21 84:2

**schedule** 33:17 36:4,17 86:17

**scheduled** 49:24

**school** 32:8 60:21

**scope** 52:14 58:7

**screen** 38:13 63:20 64:3,9,12 73:6 77:21,22, 24 78:19 82:23

**scroll** 66:22

**section** 71:12

**sections** 24:25

**sees** 17:20

**segregation** 72:13 73:4 74:24 75:9,13

**send** 48:16 73:2,21 76:22 85:7

**sensation** 27:11

**sense** 9:23

**sentences** 69:4

**September** 83:3,4,8

**serve** 49:11

**served** 29:17 31:1

**services** 20:24 33:4 49:14

**set** 33:17 86:18

**setting** 35:9, 12,15

**severe** 25:4 45:19 46:9

**shadow** 59:3

**share** 74:1,5 77:22

**sharing** 64:2,9 73:6 82:23

**shift** 36:5 49:22 50:1 72:16,17

**shifts** 21:7

**shocks** 27:12 46:14

**shooting** 27:6

**Shortly** 69:2,6

**show** 40:23 63:19,20 74:11 77:19

**shows** 7:8 75:15

**sic** 27:25

**sick** 44:7 63:10

**side** 80:3

**sign** 44:6 63:10

**signature** 67:21 68:7

**signs** 37:24 38:5 39:23 40:5,9,13

**similar** 27:11

**sit** 14:21 24:18 38:5 39:24 50:15 60:10

**site** 56:18

**sitting** 25:20 76:20

**situation** 17:10 44:8,17 45:25 56:13 63:5,17 86:16 88:6 89:8

**situations** 88:16

**slats** 51:3

**sleep** 72:13,19 73:19

**slow** 55:19

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

EXHIBIT 5

The Deposition of TINA TOMARAS, taken on January 27, 2022

100

slowly 55:15

Smith 42:16,17

Solely 14:25

solemnly 7:25

someone's 46:14

sort 29:1 57:25 60:4 86:10

sounded 28:8

sounds 26:25 69:12

South 6:5

speak 9:15 54:12 55:3,8,15 56:7 57:13

speaking 27:18,21 52:11 53:5 54:18 55:19 65:24 73:12

specialist 85:8

specific 12:6 15:20 45:12 46:12 48:21 63:7,15 76:2

specifically 18:6 25:8 29:8 34:9 44:20 46:12 54:18 60:10 64:18 73:18

speculate 54:7

spell 8:15 28:10

spinal 34:10 53:4,10,11 57:25

spine 27:7 46:15 52:9,23 53:4,6

spoke 22:10 62:18 67:1 71:8

spoken 28:13, 19,22

Squires 6:2

14:9 51:21 58:21 84:2

stabilization 57:5

stabilize 56:19,20,23

stabilizing 57:20

staff 36:12

stamp 64:16, 18 79:9

stamped 64:4, 5,6 65:14 77:20 78:15

standard 87:8

start 59:23 64:2,9 66:9 67:17 71:21

started 15:14 35:10,17 60:14

starting 6:15 72:5

state 6:13,25 7:4,15 8:15 27:22 49:5 77:4 88:3

stated 21:12, 14,23 22:24 24:23 33:16 35:17 36:13 40:13 44:11 46:24 50:7 51:5 56:3 75:4 77:1 87:14

statement 22:11 30:11

states 6:11 74:23

Stateville 15:13 16:20 17:8 20:13,16 21:1,7 34:21 35:24 39:24 40:3 56:24 70:12,16 85:3, 6,10 86:15

stating 12:7

25:10

stationed 23:23

stations 23:25

stay 36:12

step 21:17

stepped 22:9

stitches 72:25

stop 45:8 70:4 72:15 73:5 82:23

stoppable 45:15

stopped 35:24 88:7

strike 13:10 26:22 29:24 32:25 34:21 37:5 42:4 43:10 49:10 74:4,14 82:14

subjective 46:16,19

subluxation 57:14

sued 11:14

supervise 42:2

supervised 42:5

supervisor 36:17 42:10,13, 15,18,22 48:24 59:19

supervisors 42:12

supposed 81:20

surgery 83:1, 12

swear 7:25

sworn 7:22

symptom 26:15

symptoms 24:6,19,22 38:9,25 39:10, 14 45:17 46:17 54:10,12 58:1 67:2 73:17

————————

T

T-I-N-A 8:17

tablets 80:8

takes 39:23

taking 9:10 10:15 88:8

talk 27:15 32:7 38:25 39:9 40:6,8 52:8,20 58:25 61:3

talked 13:12 21:14 63:18 86:23 87:2

talking 23:7,8, 9 25:16,19 54:20

technical 68:18

technically 20:23 74:18

technician 6:3

technological 9:19

telling 9:7 39:14

tells 39:21,22

ten 19:1 80:9 83:17

terms 67:10

test 76:19

testified 49:13 87:14

testifying 21:24

testimony 8:1 9:14 10:7,13,19 21:22 57:18

testing 57:24 74:8,12,16 76:1

thing 64:17

things 9:12 19:24 20:1 54:13 58:11 62:9 73:16

threw 18:7

ticket 11:15

time 6:7 9:15 12:7 14:5,10 15:14 18:17 19:5 20:11 22:9 23:13 24:10 26:1 28:10 32:4 33:7 35:8,14 37:23 42:20 49:1 51:14,20 54:16 58:16,22 61:10,25 62:6 70:18 71:25 73:25 74:13 76:21 77:15 83:22 84:3,6 86:6 89:8,11, 16,23

times 18:24 19:1,2,5 31:24 32:1,2 80:9

Tina 6:9,22 7:6, 16 8:17,20 14:8 20:3 51:18 58:20 69:2,6 70:7,21 73:1,8 84:1,11,15 87:16 89:19,22

Tinas 70:12,15, 18

title 34:15

today 6:4,6 10:5,7,10,19 12:25 14:9,22 24:18 58:22 80:14 84:3

today's 30:24

told 14:24 18:6 22:8 60:5 69:11

Tomaras 6:9, 22 7:3,11,15

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

EXHIBIT 5

14:8,13 16:11
51:18 52:17
58:20 84:1
89:23

**tomorrow**
58:10

**top** 64:22
68:11,16 80:3

**train** 59:2

**trained** 39:11,
12,13,16 41:12,
15,21 54:9
59:12 60:21

**training** 32:24
33:1 59:1,7,13,
14,17,20,22
60:17

**transpired**
76:11 77:17
82:11

**treat** 40:7 76:5

**treated** 34:7,10
46:6 74:11

**treatment**
11:22,24 13:6
29:2,5,9,22
52:5 62:4 74:25
82:12

**treatment-
wise** 62:10

**treatments**
25:24

truth 8.2,3

**truthful** 10:6,
13

**turn** 40:10 88:9

**Tylenol** 47:19
80:8

**type** 53:22 87:7

**types** 87:23

**typical** 17:18
50:1

**typically** 17:1,
24 33:18,19

---

**U**

**Uh-huh** 9:1
17:15 81:13

**UIC** 83:2

**underneath**
66:19

**understand**
9:5,7 39:17
47:10,12 54:8
60:7 75:23
87:16

**understandabl
e** 86:8

**understanding**
81:7

**understood**
10:3 15:1 80:23
87:22

**UNIDENTIFIE
D** 65:22

**Unit** 24:20 25:4
29:6 45:4 59:10
70:16 83:3,5

**United** 6:11

**unsure** 71:7

**urgency** 86:21

---

**V**

Ventura 6:3
22:1

**verbal** 9:12

**versus** 6:10

**video** 6:3,8
51:24

**videoconferen
ce** 14:9 51:19
58:21 84:2

**visits** 22:23
23:4

**vital** 37:23 38:5
39:23 40:5,8,13

**vitals** 17:20

---

**voluntary**
20:18

---

**W**

**Wacker** 6:5

**wait** 63:16
74:10 77:3
88:14

**waiting** 68:25
73:24 74:9,16
88:21

**walk** 37:18

**walked** 25:21

**walking** 20:2

**wanted** 66:1
74:7

**wash** 72:19
73:19

**week** 33:19
36:6

**weekend** 36:5,
8,9

**weekends**
36:7

**West** 32:9

**Wexford** 13:20
20:24 27:17
30:21 33:3,6
34:24 35:10,18
38:22 39:3 41:2
42:20,23 59:1
20 60:3,16

**word** 69:14
71:21 76:25
80:10

**words** 29:18

**work** 11:19,21
12:6 19:10
21:3,11 24:25
33:3,6,9,14,19,
21 34:20 35:6
36:7,10,11,18,
21,22,23,24
42:19 49:18,21

**worked** 19:3,5
20:14 29:8

---

33:16 34:12,23
35:8 36:8,14
50:2 70:12,15,
17

**working** 12:12
17:19 20:20
21:1,9,10 25:23
34:17 35:3,14,
21,24 43:13
45:5 50:4 70:18

**works** 27:23

**worse** 72:18

**wound** 76:3,21
77:9

**write** 40:9 41:3,
18,22 48:6,9
67:24 78:4
81:20

**writes** 28:16
40:21

**writing** 40:24
79:6,11,18,19
80:21

**written** 11:15

**wrong** 26:15
72:14

**wrote** 67:20
73:9

---

**X**

**x-ray** 43:19
61:22 74:10
76:8,15 80:9,10

**x-rays** 31:21
43:17 74:9
85:11

---

**Y**

**year** 23:22
32:10,14

**years** 15:16
18:4 19:3 32:13
73:14

---

**Z**

**zoom** 6:19,23
7:2 13:24
66:11,13

---

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

EXHIBIT 5