**THE UNITED STATES DISTRICT COURT FOR**
**THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| AHMAD POOLE (K95348), | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 20-CV-0014 |
| | ) | |
| v. | ) | |
| | ) | Honorable Manish S. Shah |
| DR. E. AGUINALDO, *et al*., | ) | |
| | ) | |
| Defendants. | ) | |

# Exhibit 6

```
 1              IN THE UNITED STATRES DISTRICT COURT FOR THE
 2            NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION
 3                    HONORABLE CHARLES R. NORGLE, SR
 4                         CASE NO. 20 C 0014
 5
 6                              AHMAD POOLE,
 7                                Plaintiff
 8
 9                                   V.
10
11                     EVARISTO AGUINALDO, ET AL.,
12                                Defendants
13
14
15
16
17
18
19
20
21
22
23    DEPONENT:  ALPHONSO NORMAN
24    DATE:       JANUARY 31, 2022
25    REPORTER:  KRYSTAL M. BARNES
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
                                    Page 2
1               APPEARANCES
2
3   ON BEHALF OF THE PLAINTIFF, AHMAD POOLE:
4     Isabella Aguilar, Esquire
5     Loevy & Loevy
6     311 North Aberdeen Street
7     Third Floor
8     Chicago, Illinois 60607
9     Telephone No.: (312) 243-5900
10    E-mail: aguilar@loevy.com
11    (Appeared via videoconference)
12
13  ON BEHALF OF THE DEFENDANTS, DR. EVARISTO AGUINALDO AND
14  TINA TOMARAS:
15    Logan Giaquinta, Esquire
16    Connolly Krause, LLC
17    500 West Madison Street
18    Suite 3900
19    Chicago, IL 60661
20    Telephone No.: (312) 466-7277
21    E-mail: lgiaquinta@cktrials.com
22    (Appeared via videoconference)
23
24
25
```

```
                                    Page 4
1                 INDEX
2                                         Page
3   PROCEEDINGS                             6
4   DIRECT EXAMINATION BY MS. AGUILAR       7
5   CROSS EXAMINATION BY MS. LINDEMANN      45
6   REDIRECT EXAMINATION BY MS. AGUILAR     51
7
8                EXHIBITS
9   Exhibit                                 Page
10    1      Emergency hospitalization form Dr
11           A RTP 04310                     38
12    2      Saint Joseph Medical Center EDM
13           patient record POOLE 102,
14           POOLE 113, POOLE 115            41
15
16
17
18
19
20
21
22
23
24
25
```

```
                                    Page 3
1          APPEARANCES (CONTINUED)
2
3   ON BEHALF OF THE DEFENDANTS, LT. DEREK JABUREK AND
4   ALPHONSO NORMAN:
5     Kristin Lindemann, Esquire
6     Assistant Attorney General
7     100 West Randolph Street
8     Chicago, Illinois 60601
9     Telephone No.: (312) 814-3000
10    E-mail: kristin.lindemann@ilag.gov
11    (Appeared via videoconference)
12
13  Also Present:
14    Amanda Dement, Videographer
15
16
17
18
19
20
21
22
23
24
25
```

```
                                    Page 5
1               STIPULATION
2
3   The VIDEO deposition of ALPHONSO NORMAN was taken at
4   KENTUKIANA COURT REPORTERS, 30 SOUTH WACKER DRIVE, 22ND
5   FLOOR, CHICAGO, ILLINOIS 60606 via videoconference in
6   which all participants attended remotely, on MONDAY, the
7   31st day of JANUARY 2022 at approximately 10:01 a.m.;
8   said deposition was taken pursuant to the FEDERAL Rules
9   of Civil Procedure. The above-referenced notarial act
10  involved the use of communication technology.
11  Specifically, the court reporter appeared by
12  videoconference pursuant to KRS 423.455 and complied
13  with all statutory requirements.
14
15  It is agreed that KRYSTAL M. BARNES, being a Notary
16  Public and Court Reporter, may swear the witness.
17
18
19
20
21
22
23
24
25
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-00014 Document #: 142-5 Filed: 09/09/23 Page 4 of 24 PageID #:2028
The Deposition of ALPHONSO NORMAN, taken on January 31, 2022
6..9

Page 6

```
 1              PROCEEDINGS
 2
 3       VIDEOGRAPHER:  My name is Amanda Dement.  I'm
 4  the online video technician, and Krystal Barnes is
 5  the court reporter today, representing Kentuckiana
 6  Reporters, located at 30 South Wacker Drive,
 7  Chicago, Illinois 60606.  Today is the 31st day of
 8  January 2022.  The time is 10:01 a.m.  We are
 9  convened by video conference to take the deposition
10  of Lieutenant Alphonso Norman in the matter of
11  Ahmad Poole versus Evaristo Aguinaldo, et al.,
12  pending in the United States District Court for the
13  Northern Division of Illinois Eastern Division,
14  Case Number 20 C 0014.  Will everyone but the
15  witness please state your appearance, how you're
16  attending, and the location you're attending from,
17  starting with plaintiff's counsel?
18       MS. AGUILAR:  Thank you.  Isabella Aguilar on
19  behalf of the plaintiff, Mr. Ahmad Poole.  I'm
20  appearing via Zoom from Glen Ellyn, Illinois.
21       MR. GIAQUINTA:  Logan Giaquinta, counsel for
22  defendants, Evaristo Aguinaldo and Tina Tomaras,
23  appearing remotely via Zoom from Chicago, Illinois.
24       MS. LINDEMANN:  Kristin Lindemann, assistant
25  attorney general for the state of Illinois, on
```

Page 7

```
 1  behalf of defendants, Norman and Juburek, appearing
 2  via Zoom from Chicago.
 3       VIDEOGRAHER:  Okay.  Thank you.  Lieutenant
 4  Norman, will you please state your full name for
 5  the record?
 6       THE WITNESS:  Lieutenant Alphonso Norman.
 7       VIDEOGRAPHER:  Okay.  Thank you.  Do all
 8  parties stipulate that the witness is, in fact,
 9  Lieutenant Norman?
10       MS. AGUILAR:  Yes.
11       VIDEOGRAPHER:  Okay.
12       MS. LINDEMANN:  Yes.
13       VIDEOGRAPHER:  Mr. -- Lieutenant Norman, will
14  you please raise your right hand to be sworn in by
15  the court reporter?
16       COURT REPORTER:  Do you solemnly swear or
17  affirm that the testimony you are about to give
18  will be the truth, the whole truth, and nothing but
19  the truth?
20       THE WITNESS:  Yes.
21       COURT REPORTER:  Counsel may begin.
22              DIRECT EXAMINATION
23  BY MS. AGUILAR:
24       Q    Thank you.  Good morning, Lieutenant Norman.
25       A    Good morning.
```

Page 8

```
 1       Q    Could you please state and spell your name for
 2  the record?
 3       A    My first name is Alphonso, A-L-P-H-O-N-S-O.  My
 4  last name is Norman, N-O-R-M-A-N.
 5       Q    Thank you.  Let the record reflect that this
 6  is the video tape deposition of Lieutenant Alphonso
 7  Norman, taken pursuant to the rules of civil procedure.
 8  Lieutenant Norman, my name is Isabella Aguilar, and I'm
 9  an attorney for the plaintiff in this case, Ahmad Poole.
10  Have you ever been deposed before?
11       A    Yes, ma'am.
12       Q    Okay.  So you might be familiar with the
13  rules, but I'll still just go over them with you, if
14  that's okay.
15       A    That's fine.
16       Q    Okay.  If you have any confusion about my
17  question or how I phrased a question, please ask me to
18  rephrase it, okay?  If you answer it, I'm going to
19  assume that you understood it; is that fair to say?
20       A    Yes.
21       Q    Okay.  I ask that you please keep your answers
22  verbal and audible, which you're already doing a great
23  job of, so please just continue with that.
24       A    Okay.
25       Q    I would ask that you let me finish my question
```

Page 9

```
 1  before you begin your answer and as the same courtesy, I
 2  will do my very best to not cut you off and make sure
 3  that you had finished your answer before I follow up
 4  with another question.
 5       A    Okay.
 6       Q    Your attorney may object, or Mr. Giaquinta may
 7  object, but you can still answer if you understand the
 8  question.
 9       A    Okay.
10       Q    Do you have any conditions today that might
11  affect your ability to provide truthful and accurate
12  testimony today?
13       A    No.
14       Q    Okay.  Do you have any conditions today that
15  are affecting your memory?
16       A    No.
17       Q    Are you on any medications that might affect
18  your ability to provide truthful and accurate testimony
19  today?
20       A    No.
21       Q    Are you on any medications that are affecting
22  your memory?
23       A    No.
24       Q    Is there anything else that might affect your
25  ability to provide accurate and truthful testimony today
```

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 10

1  that I haven't mentioned?
2      A    No.
3      Q    Okay.  Where do you currently work?
4      A    Currently work at Stateville Correctional
5  Center, Crest Hill, Illinois.
6      Q    Okay.  And who is your employer?
7      A    Illinois Department of Corrections.
8      Q    Okay.  Do you have an independent memory of
9  Mr. Ahmad Poole?  And I'm going to define independent
10  memory or independent recollection.  When I say
11  independent recollection or independent memory, I mean
12  what you can remember as you sit here today, based on
13  your memory, not based on any documentation, and not
14  based on anything that anyone might've told you, like
15  your attorney.  Do you understand what I mean when I say
16  independent recollection and memory?
17      A    Are we talking about a specific time period or
18  just in general?
19      Q    I just want to clarify the question.  Do you
20  mean when I'm talking about Mr. Poole?
21      A    Yes.
22      Q    Okay.  We're going to be talking about him in
23  a specific time period mostly, but I just want to make
24  sure that you understand when I say independent
25  recollection.

Page 11

1      A    Yes.
2      Q    Okay.  So you do understand when I say
3  independent recollection?
4      A    Yes.
5      Q    Okay.  So do you have an independent
6  recollection of Mr. Ahmad Poole?
7      A    Yes.
8      Q    Okay.  What do you recall about Mr. Poole?
9      A    He lived in the cell house that I worked in
10  for a year.
11      Q    Okay.  Is there anything else that you can
12  recall about him, maybe the way he looks, physical
13  description, or anything like that?
14      A    Physical description, he's lighter complected,
15  braids, is the last time I saw him.
16      Q    Okay.  Is there anything else that you can
17  recall about Mr. Poole today?
18      A    Nothing besides the time we took him to the
19  hospital.
20      Q    Okay.  We'll also talk about that a little bit
21  later.  Do you have an independent recollection, as you
22  sit here today, of any signs or symptoms that Mr. Poole
23  experienced while he was at Stateville in August of
24  2017?
25      A    Yes.

Page 12

1      Q    Okay.  And what is the independent
2  recollection?
3      A    That he had some -- he had pain in his neck.
4      Q    Okay.  Is there anything else that you
5  remember?
6      A    No.
7      Q    Okay.  And were these independent
8  recollections based on observations?
9      A    No.  I was told by medical staff.
10      Q    Oh, okay.  And do you have an independent
11  recollection of who told you about those symptoms that
12  Mr. Poole was experiencing?
13      A    No.
14      Q    Okay.  Can you tell me everything that you did
15  to prepare for today's deposition, such as documents you
16  reviewed, maybe grievances, complaints, things along
17  those lines?
18      A    The only documents I received was the -- was
19  the complaints, and I -- I looked over that when I
20  received it.
21      Q    Okay.  Do you remember who gave the complaint
22  to you?
23      A    I can't remember that at this time.
24      Q    Okay.  Do you remember the last time you
25  reviewed the document?

Page 13

1      A    No, I do not.
2      Q    Okay.  Are there any other documents that you
3  reviewed to prepare for today's deposition?
4      A    No.
5      Q    Okay.  I want to talk about conversations that
6  you had about your deposition today, but I want to
7  preface it by saying I'm not interested in any
8  conversations you had with your attorneys.  Those are
9  privileged conversations, okay?
10      A    Okay.
11      Q    So how many times did you meet with your
12  lawyer to prepare for today's deposition?
13      A    On the phone, twice.
14      Q    Okay.  And how long did those phone
15  conversations last?
16      A    Between 15, 20 minutes.
17      Q    Okay.  Other than your attorney, did you speak
18  with anyone else about your deposition today?
19      A    No.
20      Q    Okay.  How did you first learn about this
21  lawsuit?
22      A    When I received the complaint.
23      Q    Okay.  What is your understanding of what this
24  lawsuit is about?
25      A    I'm actually not sure.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckiana22reporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:20-cv-00014 Document #: 140-5 Filed: 09/09/23 Page 6 of 24 PageID #:2030
The Deposition of LIEUTENANT NORMAN, taken on January 4, 2022

14..17

Page 14

1   Q   Okay.  Do you know why you're being named as
2   the defendant in this case?
3   A   No.
4   Q   Okay.  But you read the complaints and
5   allegations against you, correct?
6   A   Yes.
7   Q   Okay.  Have you discussed this lawsuit with
8   anyone who works for Wexford Health Services?
9   A   No.
10  Q   Have you discussed this lawsuit with anyone
11  who works for the Illinois Department of Corrections?
12  A   No.
13  Q   Okay.  So fair to say you've not discussed
14  this lawsuit with Lieutenant Juburek?
15  A   No.
16  Q   And you've not discussed this lawsuit
17  with Officer Hackett?
18  A   No.
19  Q   Okay.  Have you ever been a plaintiff in a
20  civil suit before?
21  A   I don't believe so.
22  Q   Okay.  Have you ever been a defendant in a
23  civil suit before?
24  A   I don't believe so.
25  Q   Okay.  So fair to say this is the first time

Page 15

1   that you've been named as a defendant in a civil suit?
2   A   Yes.
3   Q   Okay.  Have you ever been arrested before?
4   A   Yes.
5   Q   Okay.  Have you ever been convicted of a
6   crime?
7   A   No.
8   Q   Okay.  I believe you'd stated you'd been
9   deposed before, correct?
10  A   Yes.
11  Q   How many times have you been deposed?
12  A   I believe this is my second time.
13  Q   Okay.  And what were you deposed for the first
14  time, if you can remember?
15  A   I can't remember.
16  Q   Okay.  Have you ever testified in court
17  before?
18  A   No.
19  Q   So fair to say you've never been an expert
20  witness in a case before, then?
21  A   No.
22  Q   Okay.  Do you remember any of the details of
23  the first case you were deposed in, as in if it
24  concerned prisoners at Stateville possibly?
25  A   I think it was prisoners at Stateville, but I

Page 16

1   think it was revolving medical staff.  Like, I don't --
2   I don't what my role in that was.
3   Q   Okay.  So you don't remember the facts of that
4   case, then?
5   A   No.
6   Q   Okay.  I'd like to talk a little bit about
7   your background, Lieutenant Norman, if that's okay?
8   A   It's fine.
9   Q   Where did you grow up?
10  A   Chicago, Illinois.  Chicago, Illinois, and
11  Bolingbrook, Illinois.
12  Q   And where did you go to high school?
13  A   Romeoville High School.
14  Q   And what year did you graduate?
15  A   1999.
16  Q   Okay.  Following your graduation from high
17  school, can you tell me what, if any, universities or
18  colleges you attended?
19  A   I took some classes at DeVry.
20  Q   Okay.  Did you graduate from DeVry University?
21  A   I did not.
22  Q   Okay.  When did you first begin working in a
23  correctional setting?
24  A   11-17-03.
25  Q   Okay.  And why did you apply to a job in a

Page 17

1   correctional setting?
2   A   I needed a job.
3   Q   Okay.  So it wasn't for a specific reason,
4   necessarily?
5   A   No.
6   Q   Okay.  So prior to 2003, I believe you stated,
7   you'd never worked in a correctional setting before,
8   correct?
9   A   Correct.
10  Q   Okay.  In 2003, where did you work, what
11  institution?
12  A   Stateville Correctional Center.
13  Q   Okay.  And the Illinois Department of
14  Corrections was your employer at that time, correct?
15  A   Correct.
16  Q   And what was your job title in 2003?
17  A   Correctional officer.
18  Q   Okay.  And when did you become a lieutenant?
19  A   April 1, 2019.
20  Q   Okay.  Congratulations, by the way.
21  A   Thank you.
22  Q   What was the application process like to
23  become a correctional officer?
24  A   Application was basic questions, previous
25  employment, education, things like that, and then there

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-00014 Document #: 140-5 Filed: 09/00/23 Page 7 of 24 PageID #:2039
Lee Deposition of Lieutenant Norman taken on January 31, 2022
18..21

**Page 18**

1  was a written test.
2     Q     Okay.  Was there a background check?
3     A     Yes.
4     Q     And would you say this was, like, a lengthy
5  process?
6     A     Yes.
7     Q     Okay.  Can you talk to me a little bit about
8  the training process once you were onboarded as an
9  employee?
10    A     Six-week academy in Springfield, come home on
11 the weekends, book work, physical training, and
12 instructions on the rules and regulations of the
13 department and --
14    Q     Okay.
15    A     -- and firearms training.
16    Q     Apologies, I didn't mean to interrupt you.
17 Okay.  And so when you have this training, is it in-
18 person instruction, or do you also receive anything,
19 like, physical, like a manual or anything along those
20 lines?
21    A     We don't receive anything physical to take
22 home.  It's just instructional.
23    Q     Okay.  And do you receive ongoing instructions
24 or ongoing training?
25    A     Per assignment.  New assignments, we're

**Page 19**

1  supposed to read over the rules for that particular
2  assignment.
3     Q     Okay.
4     A     It's -- I'm sorry.
5     Q     No, I'm sorry.  There's a little bit of a lag
6  --
7     A     Got you.
8     Q     -- over Zoom.  You know, in person, I would be
9  able to see you, and I would know, okay, he's not done
10 and vice versa.  So no problem.  I do apologize for
11 that.
12    A     No problem.  I'm done.
13    Q     Okay.  And how are you made aware of Illinois
14 Department of Corrections' policies and practices?  Oh,
15 Lieutenant Norman, can you still hear me?
16    A     I can still hear you, but I can't see you.
17    Q     Oh, okay.  You're good.
18    A     Oh, I can see you.  Okay.  Can you hear me?
19    Q     Yes, I can hear you.  Please let me know if
20 you need me to repeat the question.
21    A     Please repeat the question.
22    Q     Absolutely.  Lieutenant Norman, how were you
23 made aware of Illinois Department of Corrections'
24 policies and practices?
25    A     We have training once a year in, like, a class

**Page 20**

1  -- in a classroom setting, where we go over the current
2  rules of the department.  We sign once we understand
3  what those procedures and rules are.
4     Q     Okay.  And who provides that training?
5     A     That training is done by the training
6  coordinator of the department at the time.
7     Q     Okay.   And is the coordinator a correctional
8  officer or supervisor?
9     A     Supervisor.
10    Q     Okay.  Is there a policy when two individuals
11 are in a fight, specifically two individuals who are
12 incarcerated?
13    A     Yes.
14
15        MS. LINDEMANN:  Objection.  Vague.
16    Q     Okay.  Do you know the policy when two
17 individuals are fighting and they are cell mates,
18 for example?
19    A     Yes.
20    Q     What is that policy?
21    A     We separate the individuals, restrain them,
22 and provide medical -- we take them to the medical to be
23 evaluated.
24    Q     Okay.  And is it the policy to always take
25 individuals to medical, or is there any discretion in

**Page 21**

1  that decision?
2     A     No, we always offer medical attention.
3     Q     Okay.  Do correctional officers have any
4  discretion when a patient is returned to their cell from
5  the HCU?
6     A     Can you rephrase the question?
7     Q     Yes.  Is it solely a medical provider's
8  determination when a patient has to go back to their
9  cell, and not a correctional officer's?
10    A     That's correct.
11    Q     Okay.  Can a correctional officer verbalize
12 any concerns to medical professionals, such as nurses or
13 doctors?
14    A     Yes.
15    Q     Okay.  What would be a concern worth
16 discussing with a medical professional?
17    A     For instance, if we're making rounds and
18 somebody's having trouble breathing, we would call the
19 medical professionals and let them know they're -- that
20 person is having trouble breathing.
21    Q     Okay.  Are there any other reasons that a
22 correctional officer might discuss any concerns with a
23 medical professional?
24    A     No.
25    Q     Okay.  And is this -- strike that.  Please

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 22

1  correct me if I misstate your testimony.  Is it fair to
2  say that if there's a respiratory issue, you would
3  notify medical professionals?
4      A   Yes.
5      Q   Okay.  And is this based on an Illinois
6  Department of Correction policy or practice?
7      A   Yes.
8      Q   Okay.  I'd like to talk about any
9  certifications, if you have any.  Do you have any
10 special certifications?
11     A   No.
12     Q   Okay.  Have you ever received any awards?
13     A   No.
14     Q   Okay.  Did you ever serve in the armed forces
15 before?
16     A   No.
17     Q   Okay.  Have you ever been fired or demoted
18 from any job?
19     A   No.
20     Q   Have you ever been disciplined while working
21 any job involving corrections or law enforcement before?
22     A   No.
23     Q   Okay.  Have you ever had a review during your
24 time at Stateville?
25     A   Yes.

Page 23

1      Q   Okay.  And what is that review process like?
2      A   Every year, our performance is reviewed.  Our
3  attendance is reviewed.
4      Q   Okay.  And what has your reviews been for the
5  past few years?
6      A   Pretty good, pretty consistent.
7      Q   Okay.  And who was your supervisor in August
8  of 2017, if you can remember?
9      A   I cannot remember.
10     Q   Okay.  Do -- strike that.  Is there any
11 turnover with supervisors at Stateville in the
12 correctional officer capacity?
13     A   Yes.
14     Q   Okay.  So has there been turnover since August
15 of 2017?
16     A   Yes.
17     Q   Okay.  And that's why you can't remember who
18 it was?
19     A   Correct.
20     Q   Okay.  Do you know where Saint Joseph's
21 Hospital is located?
22     A   Yes.
23     Q   How far is it from Stateville?
24     A   Approximately 15 minutes.
25     Q   Have you ever transported a prisoner there

Page 24

1  before?
2      A   Yes.
3      Q   Okay.  About how many times, would you say?
4      A   Probably over 50.
5      Q   Okay.  And does the Illinois Department of
6  Corrections have a policy and practice for transporting
7  prisoners to Saint Joseph's?
8      A   Yes.
9      Q   Could you tell me what that policy and
10 practice is?
11     A   Two officers per individual in custody,
12 individual in custody is to be restrained, and we take
13 them and register them in the ER.
14     Q   Okay.  And how is that individual restrained?
15     A   One way is a black -- black box metal
16 restraints and we also have waist chains that -- that is
17 determined by medical which set of restraints are used.
18     Q   Okay.  Are prisoners ever handcuffed when
19 they're being restrained?
20     A   They are handcuffed.
21     Q   Okay.  And they are always handcuffed, or is
22 it discretionary?
23     A   They're always handcuffed.
24     Q   Okay.  What is your understanding of why a
25 prisoner might be transported to Saint Joseph's?

Page 25

1      A   Medical situation that can't be handled at the
2  prison.
3      Q   Okay.  And do you ever talk to the doctors
4  when transporting the patients they are sending
5  off-site?
6      A   I rarely talk to doctors.
7      Q   Okay.  Who would you talk to before
8  transporting a prisoner to Saint Joseph's, for example?
9      A   The nurse.
10     Q   Okay.  And what does the nurse discuss with
11 you?
12     A   Their -- the mode of transport.
13     Q   Would a nurse describe anything with the
14 patient's condition or provide any sort of medical
15 documents?
16     A   She provides us medical documents that we hand
17 over to the medical staff when we get to the hospital.
18     Q   Okay.  But she doesn't discuss any symptoms or
19 conditions that the patient is experiencing?
20     A   Sometimes.
21     Q   Okay.  Do you have an independent recollection
22 of whether or not the nurse discussed any of Mr. Poole's
23 conditions or symptoms with you?
24     A   No, I don't remember that.
25     Q   Okay.  Is there any concern, when transporting

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 26

1  a prisoner, for their pain?
2      A    No, not from -- I do security so.
3      Q    Okay.  So in the security's capacity, it's not
4  your duty to make a ride to a hospital as painless as
5  possible?
6      A    Can you rephrase that?
7      Q    Sure.  Do you ever try to make a ride for a
8  prisoner comfortable, I suppose?
9      A    We drive safely to the destination.
10     Q    Okay.  And if a patient, or a prisoner,
11  verbalized discomfort during that ride, would anything
12  be done at that time?
13     A    We try to make them as comfortable as
14  possible.
15     Q    Okay.  I'd like to talk about your job duties
16  as a correctional officer in 2017.  What were your
17  specific job duties?
18     A    Correctional officer, sometimes at the prison,
19  sometimes at the hospital, depending on where I was
20  assigned that day.
21     Q    Okay.  And what duties does a correctional
22  officer have, just so that I can understand it?
23     A    We control individual in custody movement from
24  one place to the next.  We make sure the houses are
25  secure, and if there's anything to do that specific day,

Page 27

1  like run showers or anything like that, we do that.  And
2  then we're responsible for making rounds on our
3  galleries every 30 minutes to ensure that everybody's
4  safe.
5      Q    Okay.  And there might not be a typical day,
6  but would you say that -- no, strike that.  What does a
7  typical day look like, if that exists in the
8  correctional setting?
9      A    A typical day can change per --
10         MS. LINDEMANN:  Isabella, could you maybe
11     specify who you're directing the question to?  It's
12     a little vague.
13         MS. AGUILAR:  Sure.
14         MS. LINDEMANN:  Is it for a correctional
15     officer?  Are we still talking about August of
16     2017?
17         MS. AGUILAR:  Sure, that's fair.
18  BY MS. AGUILAR:
19     Q    Lieutenant Norman, I would like to make the
20  time frame, generally, as I'm asking these questions,
21  August of 2017 correctional officer duties.  So what
22  does a typical day for a correctional officer look like,
23  and what did it look like, I guess, in August 2017?
24     A    A regular day consists of, back then, roll
25  call, get your assignment, get your equipment, go to

Page 28

1  your assigned unit, count, turn in your count, run
2  showers, run chow, run yard, secure the house, turn in
3  your equipment, go home.
4      Q    And what are the possible shifts in
5  August 2017?
6      A    7:00 to 3:00, 3:00 to 11:00, 11:00 to 7:00.
7      Q    And what shift did you work, if you can
8  remember?
9      A    7:00 to 3:00.
10     Q    Okay.  And was that a full-time position that
11  you had in August of 2017?
12     A    Yes.
13     Q    Okay.  I know now that you're a lieutenant,
14  correct?
15     A    Correct.
16     Q    How did your job duties change once you became
17  a lieutenant?
18     A    Instead of doing all that stuff I just said, I
19  instruct people to do those same things.
20     Q    Okay.  So you're now a supervisor?
21     A    Correct.
22     Q    Okay.  Does a correctional officer job have a
23  high turnover rate?
24     A    Not that I know of.
25         MS. LINDEMANN:  Currently or in 2017?

Page 29

1         MS. AGUILAR:  Thank you, Kristin, for the
2     clarification.
3  BY MS. AGUILAR:
4      Q    Yeah, I guess in August of 2017.
5      A    Not that I know of.
6      Q    Okay.  Would you consider the job stressful?
7      A    Not -- not really.
8      Q    Okay.  In August of 2017, about how many
9  prisoners did you monitor on any given day?
10     A    Anywhere from 200 to 300, depending where
11  you're assigned to.
12     Q    Okay.  And how many correctional officers are
13  monitoring that amount of prisoners?
14     A    Six.
15     Q    Okay.  In August of 2017, did you ever work
16  on-call hours for Stateville?
17     A    No.
18     Q    Okay.  Did you work holidays?
19     A    Holidays are regular days for us.
20     Q    Okay.  And what is the pay structure for
21  correctional officers in August of 2017?
22     A    Can you rephrase the question, please?
23     Q    Sure.  How often are you paid -- strike that.
24  How often were you paid in August of 2017?  Was it
25  biweekly?  Was it weekly?  Was it monthly?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-00014 Document #: 147-5 Filed: 09/09/23 Page 10 of 24 PageID #:2034
The Deposition of ANTHONY NORMAN, taken January 11, 2022
30..33

Page 30

1    A    Twice a month.
2    Q    Okay.  So it was biweekly, then?
3    A    Yes.
4    Q    Okay.  And is there an overtime structure at
5    Illinois Department of Corrections?
6    A    Yes.
7    Q    Okay.  Could you explain that overtime
8    structure to me?
9    A    Yes.  You're -- my assigned shift was 7:00 to
10   3:00.  Anything after 3:00 was considered overtime.
11   Q    Okay.  How much is overtime pay?  Is it
12   time-and-a-half?
13   A    Yes.
14   Q    Okay.  Is there a cap on overtime?
15   A    Yes.  You can only work two shifts in a row.
16   We can't -- we can't go into the third shift.
17   Q    I understand.  I'd like to talk to you a
18   little bit about grievances.
19   A    Okay.
20   Q    Do you know how grievances work?
21   A    I know that individuals in custody submit
22   grievances when something -- when they have an issue
23   with something.
24   Q    Okay.  Have you ever seen a grievance before?
25   A    Yes.

Page 31

1    Q    Okay.  As a correctional officer in August of
2    2017, did you ever answer a grievance?
3    A    No.
4    Q    Okay.  And as a lieutenant now, do you ever
5    answer grievances?
6    A    No.
7    Q    Okay.  Does anyone review a grievance with a
8    correctional officer if their name's in that grievance?
9    A    Not that I know of.  I'm not aware.
10   Q    Okay.  Do you know how grievances are tracked,
11   if they are?
12   A    No.
13   Q    Okay.  So is it fair to say that if a
14   correctional officer -- no, strike that.  Does anyone
15   discuss the contents of a grievance with someone who is
16   named in the grievance?
17   A    Not that I'm aware.
18   Q    Okay.  I'd like to talk to you now about
19   Mr. Poole, if that's okay?
20   A    It's okay.
21   Q    Okay.  Specifically, I'd like to talk to you
22   about August 30, 2017.
23   A    Okay.
24   Q    Do you have an independent recollection of
25   that day?

Page 32

1    A    Somewhat.
2    Q    Okay.  Can you tell me what you remember about
3    that day?
4    A    I remember driving Mr. Poole, or transporting
5    Mr. Poole, to Saint Joseph's Hospital.
6    Q    Okay.  Do you have an independent recollection
7    of who you were transporting Mr. Poole with?
8    A    Yes.
9    Q    Okay.  And who was that individual?
10   A    Officer Hackett, I believe.
11   Q    Okay.  And had you worked with Officer Hackett
12   before?
13   A    No.
14   Q    Okay.  So was this your first time working
15   with him, then?
16   A    Yes.
17   Q    Okay.  And he would have been the driver,
18   because I believe you said you did security, correct?
19   A    I mean, we -- either one of us could've
20   driven.  I believe he drove, though.
21   Q    Oh, okay.  So there's not necessarily
22   designated roles, both officers are considered security?
23   A    Yes.
24   Q    Okay.  I understand.  Do you have an
25   independent recollection of speaking with Dr. Obaisi on

Page 33

1    that day?
2    A    No.
3    Q    Okay.  Do you have an independent recollection
4    of speaking with a nurse on that day?
5    A    Yes.
6    Q    Do you know who that nurse was?
7    A    No.
8    Q    Okay.  Had you spoken with that nurse before
9    that day?
10   A    I'm not sure.  I don't remember who it was.
11   Q    Okay.  Do you have an independent recollection
12   of speaking with Officer Hackett that day?
13   A    Yes.
14   Q    Okay.  Do you have an independent
15   recollection --
16        MS. LINDEMANN:  Isabella, can you guys slow
17        down a little bit?  You're -- for me, with the Zoom
18        delay, it's going really fast, and I'm barely being
19        able to keep up, much less interject any
20        objections.
21        MS. AGUILAR:  Sure, sure.
22        MS. LINDEMANN:  Sorry.
23        MS. AGUILAR:  No, no problem.  I do speak
24        quickly sometimes.
25        MS. LINDEMANN:  You both are just going, like,


Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-00014 Document #: 147-5 Filed: 09/09/23 Page 11 of 24 PageID #:2035
The Deposition of LIEUTENANT NORMAN, taken on January 31, 2022
34..37

Page 34

```
1    super fast so
2              MS. AGUILAR:  No problem.  Apologies about
3    that.
4              MS. LINDEMANN:  No problem.  Thank you.
5              MS. AGUILAR:  Of course.
6    BY MS. AGUILAR:
7         Q    Sorry, Lieutenant Norman, I'll rephrase the
8    question -- or I'll repeat it because I obviously lost
9    track, too.  Do you have an independent recollection of
10   speaking with Officer Hackett that day?
11        A    I'm pretty sure we spoke.
12        Q    Okay.  Do you remember the contents of that
13   discussion?
14        A    No.
15        Q    Okay.  Do you remember if you discussed
16   Mr. Poole with Officer Hackett at all that day?
17        A    No.
18        Q    Okay.  I believe you stated that you had
19   transported prisoners, over your time as a correctional
20   officer, around 50 times, fair?
21        A    Fair.
22        Q    Okay.  And what was your practice when
23   transporting prisoners?  Did you ever discuss the
24   transport with your fellow correctional officer?
25        A    We discussed who -- whose role is whose.
```

Page 35

```
1    That's pretty much all the discussion.
2         Q    Okay.  You didn't discuss anything further,
3    like, for example, the patient that you were
4    transporting or any of the conditions or complaints that
5    that person had?
6         A    No.
7         Q    Okay.  Do you have an independent recollection
8    of driving from Stateville to Saint Joseph's Hospital?
9         A    Yes.
10        Q    Okay.  And do you have an independent
11   recollection of driving from Saint Joseph's to UI
12   Health?
13        A    No.
14        Q    Okay.
15             MS. AGUILAR:  Could we just take a quick,
16        like, ten-minute break?  I have to use the
17        restroom.
18             VIDEOGRAPHER:  Okay.  We'll go off the record
19        at 10:33 a.m.
20             (OFF THE RECORD)
21             VIDEOGRAPHER:  Okay.  We are back on the
22        record for the deposition of Lieutenant Norman
23        being conducted by video conference.  My name is
24        Amanda Dement.  Today is the 31st day of January.
25        The time is 10:40 a.m.  You may begin.
```

Page 36

```
1              MS. AGUILAR:  Thank you.
2    BY MS. AGUILAR:
3         Q    I believe, Lieutenant Norman, the last
4    question I asked was if you have an independent
5    recollection of driving Mr. Poole from Saint Joseph's
6    Hospital to UI Health, correct?
7         A    Correct, and I don't believe I made that trip.
8         Q    Okay.  So you only have an independent
9    recollection of driving him from Stateville to Saint
10   Joseph's?
11        A    Correct.
12        Q    Okay.  And would it have been standard for two
13   other correctional officers to have taken a patient from
14   one hospital to another?
15        A    Yes.
16        Q    Okay.  And would that have been due to shift
17   changes?
18        A    Yes.
19        Q    Okay.  If there was a shift change, would that
20   have been documented on August 30, 2017?
21        A    I'm not sure.
22        Q    Okay.  One second.  Do you know if Illinois
23   Department of Corrections has a policy for transporting
24   prisoners with neck injuries?
25        A    No.
```

Page 37

```
1         Q    Okay.  You're not sure if they have a policy,
2    or you're not aware of a policy?
3         A    I'm not aware of a policy.
4         Q    Okay.  I believe you stated that you would've
5    had documentation from the nurses to give to Saint
6    Joseph's Hospital staff, correct?
7         A    Correct.
8         Q    Okay.  Would you have had x-rays if they
9    existed?
10        A    Not me personally, no.
11        Q    Okay.  And how would these documents be, I
12   suppose, given to the correctional officer to then be
13   given to the medical staff?
14        A    In an envelope.
15        Q    Okay.  And you wouldn't have opened the
16   envelope?
17        A    Correct.
18        Q    You can't testify to what was inside of it?
19        A    Correct.
20        Q    Okay.  Do you have an independent recollection
21   of whether or not Mr. Poole was verbalizing any
22   complaints regarding severe neck pain during the drive?
23        A    No.
24        Q    Okay.  So you can't say either way if he was
25   verbalizing complaints?
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-00014 Document #: 147-5 Filed: 09/09/23 Page 12 of 24 PageID #:2836
The Deposition of MATTHEW NORMAN, taken on January 11, 2022

38..41

Page 38

```
 1      A    Correct.
 2      Q    Okay.  Do you have an independent recollection
 3 of his demeanor on the way to Saint Joseph's?
 4      A    Yes.
 5      Q    Okay.  And what is the independent
 6 recollection?
 7      A    Seemed fine.  He was no trouble or anything
 8 like that.
 9      Q    Okay.  And when you say "seemed fine," can you
10 describe that to me?  Like, what was his position, et
11 cetera?  How did you determine he seemed fine?
12      A    He was sitting up in the back patiently, just
13 waiting to get to the hospital.
14      Q    Okay.  And he wasn't causing any issues or
15 being disrespectful towards anyone?
16      A    No, he was fine.
17      Q    Okay.  I'm going to show you what I'm going to
18 mark as Exhibit 1, and I'm going to share my screen.  I
19 will preface this by saying I have been having technical
20 difficulties and Comcast is coming out to fix my Wi-Fi.
21 So if we have any issues, please let me know.  I will
22 rephrase questions, repeat questions.  So I want to make
23 sure you can clearly understand what I'm asking you,
24 okay?
25           (EXHIBIT 1 MARKED FOR IDENTIFICATION)
```

Page 39

```
 1      A    Okay.
 2      Q    Okay.  I'm going to share my screen now.  Let
 3 me know when you can see this.
 4      A    I can see it.
 5      Q    Okay.  So I'm going to show you what is Bates
 6 stamped as Doctor A. RTP 0431.  Do you see that on the
 7 bottom right here?
 8      A    I see it.
 9      Q    Okay.  And do you know what this document is?
10      A    No.
11      Q    Okay.  Do you see where it says,
12 "Emergency/Hospitalization Notification Form"?
13      A    Yes.
14      Q    I'm going to represent to you that this
15 is a form that was completed by Dr. Obaisi.  Do you see
16 this right here, referring physician?
17      A    Yes.
18      Q    Okay.  And I'm going to represent to you that
19 this is regarding Ahmad Poole, who is the plaintiff in
20 this case, and that this document was filled out on
21 August 30, 2017, okay?
22      A    Yes.
23      Q    Do you see where it says, "Type of Service"?
24      A    Yes.
25      Q    Okay.  And do you see where it says, "ER,"
```

Page 40

```
 1 which I believe stands for emergency room?
 2      A    Yes.
 3      Q    Okay.  And do you see where it says,
 4 "Transportation"?
 5      A    Yes.
 6           And then you see where it's check marked or
 7 X'd for state vehicle?
 8      A    Yes.
 9      Q    Okay.  And so it's fair to say that this is
10 the document that you would've had taking Mr. Poole to
11 Saint Joseph's?
12      A    I wasn't aware of whatever was in the
13 envelope.
14      Q    Okay.  Is it fair to say that the state
15 vehicle was the car that you were in with Mr. Poole and
16 Officer Hackett, I believe you said?
17      A    Yes, that's correct.
18      Q    Okay.  And do you see where it says, "Specific
19 Reason For Emergency Treatment or Admission, Recent
20 fight, x-ray done on 8/25/17 to skull & spine"?
21      A    I see that.
22      Q    Okay.  I'm now going to show you what I'll
23 mark as Exhibit 2, and I will tell you that this is
24 Bates stamped Poole 102, Poole 113, I'm sorry, Poole --
25 I believe that says 112 actually.  No, Poole 113, and
```

Page 41

```
 1 Poole 115.  I'm going to represent to you that these are
 2 documents from Saint Joseph's.  I'll represent to you
 3 that Mr. Poole was transported from Saint Joseph's to UI
 4 Health Hospital, okay?
 5           (EXHIBIT 2 MARKED FOR IDENTIFICATION)
 6      A    Okay.
 7      Q    Okay.  Do you see where it says Ahmad Poole is
 8 the patient?
 9      A    I see that.
10      Q    Okay.  And can you read, for the record, this
11 -- what is highlighted in yellow?
12      A    I'm sorry, I'll pull my screen closer.
13      Q    No problem.  I can also zoom in if you cannot
14 see it well.
15      A    Can you zoom it?  Can you zoom in on that for
16 me?
17      Q    Absolutely, yes.  Can you see this better?
18      A    Yes.
19      Q    Okay.  Can you please read, for the record,
20 what the highlighted wording says, starting here?
21      A    "Paint Present, Yes.  Pain Intensity, 10 (out
22 of 10).  Pain Scale Used, 0-10."
23      Q    Okay.  I'm going to stop sharing my screen,
24 but I will come -- I'm sorry.  Actually, can you read
25 for me what this date says?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-00014 Document #: 147-5 Filed: 09/09/23 Page 13 of 24 PageID #:2035
The Deposition of WILLIAM NORMAN, taken on January 11, 2022
42..45

Page 42

1    A    August 30, 2017.
2    Q    Okay.  Would you agree with me that this
3  document was made on August 30, 2017, based on the
4  documentation here?
5    A    Based on the documentation, yes.
6    Q    Okay.  And this was the day that you
7  transported Mr. Poole, correct?
8    A    I don't remember the exact date.
9    Q    Okay.  We can go back to Exhibit 1.  Exhibit 1
10 it states here the date was August 30, 2017, correct?
11   A    Yes.
12   Q    And you already testified that you were in the
13 state vehicle transportation, correct?
14   A    Correct.
15   Q    Okay.  So then is it fair to say that the day
16 that this document was created is the same day that you
17 transported Mr. Poole?
18   A    Correct.
19   Q    Okay.  I'm going to stop sharing my screen for
20 a second.  We'll come back to this exhibit, which I've
21 already marked as Exhibit 2.  Would you agree with me
22 that on this 10 out of 10 subjective scale, the highest
23 level of pain someone could have is a 10?
24   A    Not trained in medical terminology.
25   Q    Okay.  And it was your testimony today,

Page 43

1  Lieutenant Norman, that Mr. Poole was not making any
2  complaints on the way to Saint Joseph's, correct?
3    A    Correct.
4    Q    But based on the documentation, he told the
5  medical professionals his pain was a 10 out of 10,
6  correct?
7    A    Based on the documentations, correct.
8    Q    Okay.  So it's your testimony today that even
9  though he was telling the medical professionals he had a
10 10 out of 10 pain, that he didn't verbalize anything in
11 the car?
12        MS. LINDEMANN:  Objection.  Misstates his
13 testimony.
14   Q    Lieutenant Norman, you can answer the
15 question.
16   A    Can you rephrase the question?
17   Q    Yes.  Did Mr. Poole make any verbalizations
18 about his pain in the car with you and Officer Hackett
19 on the way to Saint Joseph's?
20   A    Not that I can remember.
21   Q    Okay.  You can't remember, either way, if he
22 made verbalizations?
23   A    I don't remember him saying anything.
24   Q    Okay.  So it's your testimony today that he
25 didn't say anything -- that you don't remember him

Page 44

1  saying anything, correct?
2    A    Correct.
3    Q    Okay.  Even though he told the medical
4  professionals his pain was a 10 out of 10?
5    A    Correct.
6    Q    Okay.  Would you agree with me that it would
7  be inappropriate to make a car ride more painful for
8  someone with a neck injury who was about to undergo
9  surgery for neck pain?
10   A    Yes.
11   Q    Okay.  Would you agree with me that Mr. Poole
12 had no control over the car ride?
13   A    Correct.
14   Q    Okay.  And he had no control over his own
15 being since he was in the custody and care of the
16 Illinois Department of Corrections, correct?
17   A    Correct.
18   Q    Okay.  Therefore, only the Illinois Department
19 of Corrections could provide him with the care that he
20 needs, right?
21   A    Correct.
22        MS. LINDEMANN:  Objection.  That -- that's
23 very vague.
24   Q    Okay.  Mr. Poole couldn't theoretically call
25 an ambulance for himself, correct?

Page 45

1    A    Correct.
2    Q    And he couldn't have a family member or a
3  loved one drive him to a hospital, correct?
4    A    Correct.
5    Q    Only Illinois Department of Correction staff
6  could do that, right?
7    A    Correct, or medical staff.
8    Q    Okay.  So if Mr. Poole was being driven
9  erratically to the hospital, there's nothing he could do
10 about that, right?
11   A    No.
12   Q    Only an Illinois Department of Corrections
13 staff member could prevent that, right?
14   A    Correct.
15        MS. AGUILAR:  Okay.  I have nothing further at
16 this time for you, Lieutenant Norman, and I want to
17 say thank you for your time, and I'll open the
18 floor to other counsel to ask questions.
19        THE WITNESS:  Thank you.
20        MR. GIAQUINTA:  No questions from me.
21        MS. LINDEMANN:  Okay.  I have a few questions
22 for Lieutenant Norman.
23        THE WITNESS:  Yes.
24                CROSS EXAMINATION
25 BY MS. LINDEMANN:

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-00014 Document #: 147-5 Filed: 09/09/23 Page 14 of 24 PageID #:2038
The Deposition of LT. PERCY NORMAN, taken on January 11, 2022
46..49

Page 46

1    Q    Lieutenant Norman, have you received any
2  medical training at all ever?
3    A    No.
4    Q    You don't have any medical certifications?
5    A    No.
6    Q    You've never attended medical school?
7    A    No.
8    Q    Have you ever attended nursing school?
9    A    No.
10   Q    Okay.  Could you walk me through the procedure
11  that was in place in August of 2017 for transporting
12  individuals in custody from Stateville to Saint Joe's,
13  beginning with how an officer first is assigned or
14  becomes aware of their responsibility to do that job?
15   A    Sure.  If the individual in custody is usually
16  in the healthcare at this time and is usually being
17  evaluated by a medical staff who decides that the
18  individual in custody needs further -- further care than
19  the prison can provide, medical staff alerts the shift
20  commander that the individual in custody needs to go to
21  the hospital.  Medical staff also determines if -- what
22  kind of transportation would be used to get the
23  individual in custody.  Once the shift commander gets
24  that information, he looks at his roster, determines two
25  available officers.  We then get restraints.  We get

Page 47

1  paperwork from medical.  We restrain the individual in
2  custody.  We bring the van inside the -- inside the
3  gate.  We take the individual in custody from the
4  healthcare to the van, leave the gate, and drive to the
5  hospital.  And we go straight to the emergency room
6  where we register the individual in custody.  And they
7  usually put us right in the room.
8    Q    Okay.  You mentioned that there are methods of
9  transport; is that correct?
10   A    That's correct.
11   Q    What methods of transport are available under
12  these circumstances?
13   A    Under these circumstances, I'm aware of two.
14  There's state vehicle, which is -- which is here on
15  grounds, which is us -- which is us.  And there's the
16  ambulance option, as well.
17   Q    Okay.  And did you say that it's the medical
18  professionals who determine which method of transport is
19  used?
20   A    Yes.
21   Q    Okay.  Are individuals in custody always
22  walked to the vehicle, or are there other -- are they
23  sometimes put in a wheelchair?
24   A    Sometimes, they're put in wheelchairs.
25   Q    Who makes the decision regarding whether

Page 48

1  they're in a wheelchair, or whether they're walking?
2    A    Usually medical staff.
3    Q    Okay.  Specifically, regarding the transport
4  of the plaintiff in this case, Mr. Poole, do you recall
5  if he walked to the vehicle or if he was in a
6  wheelchair?
7    A    I do not recall.
8    Q    Okay.  You also mentioned earlier that you
9  didn't recall transporting Mr. Poole from Saint Joe's to
10  UIC; is that correct?
11   A    Correct.
12   Q    Okay.  So just in general, under department
13  rules and policies, if you transport an individual in
14  custody to Saint Joe's and your shift is about to end or
15  is going to end before a decision has been made about
16  whether the plaintiff, or inmate, is being admitted,
17  what is the procedure that is followed by Stateville?
18   A    In the case of a shift change, then we would
19  be relieved by two other officers from the 3:00 to 11:00
20  shift.
21   Q    So if I'm understanding you correctly, two
22  different officers come to the hospital, and then the
23  two who were there go back to Stateville and end their
24  shift?
25   A    Go back to Stateville, turn in our equipment,

Page 49

1  then go home.
2    Q    Okay.  And I'm sorry, did you testify
3  regarding whether or not you remember if that procedure
4  was followed on the day that Mr. Poole was taken to
5  Saint Joseph's?
6    A    I believe we were relieved.
7    Q    Okay.  So then you would've only been
8  responsible for transporting him from Stateville to
9  Saint Joseph's on August 31, 2017; is that correct?
10   A    That's correct.
11   Q    Okay.  Do you recall, on August 30, 2017, if
12  there was anything unusual about the trip from
13  Stateville to Saint Joseph's Hospital --
14   A    No.
15   Q    -- in terms of the road?
16   A    No.
17   Q    Do you remember what the weather was like?  Was
18  there any -- a storm that day?
19   A    No, it was -- it was -- from what I can
20  recall, it was a very calm day.
21   Q    Okay.  What's the road like between Stateville
22  and Saint Joseph's Hospital?
23   A    It's a pretty smooth ride.
24   Q    Okay.  Is it like a county highway?
25   A    No, it's like, at times, a three-lane both



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-00014 Document #: 147-5 Filed: 09/09/23 Page 15 of 24 PageID #:2039
The Deposition of MATTHEW NORMAN, taken on January 11, 2021

50..53

Page 50

1  ways, main street, but sometimes two-lanes, but it's not
2  like a highway.  There are -- there are stoplights.
3      Q    Okay.  Do you happen to know what the speed
4  limit in that part of that road is?
5      A    No.
6      Q    Okay.  Would it be 55 or over?
7      A    No.
8      Q    It would be less than that?
9      A    Yes.
10     Q    Okay.  Have you worked with Officer Hackett
11 since August 30, 2017?
12     A    Worked with, no.  Seen, yes.
13     Q    Okay.  Do you recall him driving erratically
14 on the day that you transported Mr. Poole to Saint
15 Joseph's Hospital?
16     A    No.
17     Q    Okay.  If he had driven erratically, would you
18 remember?
19     A    I believe so.
20     Q    Okay.  If he had been driving erratically,
21 would you have done anything to correct that behavior?
22     A    Yes.
23     Q    What would you have done?
24     A    Asked him to slow down or stop driving like
25 that, something -- something like that.

Page 51

1      Q    Okay.  Did -- no, I don't -- have you ever
2  experienced that situation where you were transporting
3  an individual in custody to a hospital and the driver
4  was being unsafe?
5      A    No.
6           MS. LINDEMANN:  Okay.  I don't think I have
7      any other questions for you at this point, Mr. --
8      or Lieutenant Norman.  I almost called you mister.
9      Okay.  Any redirect, Isabella?
10          MS. AGUILAR:  Yes, I do.
11                REDIRECT EXAMINATION
12 BY MS. AGUILAR:
13     Q    Based on what Ms. Lindemann asked, I do have
14 some redirect, Lieutenant Norman, if that's okay.
15     A    Uh-huh.
16     Q    I believe you had stated previously that all
17 prisoners are handcuffed in the transport vehicle,
18 correct?
19     A    Correct.
20     Q    Okay.  So Mr. Poole would not have been able
21 to buckle himself in a seatbelt, right?
22     A    Right.
23     Q    Okay.  Do you recall buckling Mr. Poole in his
24 seat?
25     A    It's standard procedure.

Page 52

1      Q    Okay.  So would you have done it or Officer
2  Hackett have done that?
3      A    I don't remember whose role was whose at that
4  time.
5      Q    Okay.  But you're confident that Mr. Poole was
6  buckled in his seat?
7      A    Yes.
8      Q    Okay.  And this is based off of the policies
9  and procedures versus your independent recollection?
10     A    Correct, this is based off policies and
11 procedures.
12     Q    Okay.  I also believe you stated that when
13 you're relieved by officers at shift change, that you
14 then go back to Stateville and they now take over the
15 monitoring of the patient, correct?
16     A    Correct.
17     Q    Okay.  When you are relieved by officers, are
18 there any communications that are had at that shift
19 change?
20     A    I guess --
21          MS. LINDEMANN:  Objection.  Vague.
22     Communications between?
23     Q    Communications between Lieutenant Norman and
24 the relieving correctional officer.
25     A    Yes.

Page 53

1      Q    Okay.  And what are those discussions?
2      A    We usually tell them whatever the last thing
3  that the medical staff said, that we're just waiting on
4  results or something like that.  And then we -- we
5  exchange it -- I mean, we exchange -- if we have to
6  exchange equipment, we do that, and then we leave.
7      Q    Okay.  Is there any documentation that is
8  exchanged?
9      A    The paperwork that we bring with us is still
10 there, but there is no hand-to-hand documentation.
11     Q    I understand.  So would a medical professional
12 also hand the relieving officer documentation as well?
13     A    When they're discharged, yes.
14          MS. AGUILAR:  Okay.  I understand.  Okay.  I
15     have nothing further at this time.
16          MS. LINDEMANN:  I have nothing further either.
17          MS. AGUILAR:  Logan, do you have anything for
18     this witness?
19          MR. GIAQUINTA:  Nope, nothing from me.
20          MS. AGUILAR:  Okay.  Thank you so much,
21     Lieutenant Norman, for taking time out of your
22     Monday to speak with us.  I appreciate it and --
23          THE WITNESS:  No problem.
24          MS. AGUILAR:  -- I just want to say thanks.
25          THE WITNESS:  Thank you.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 54

1      MS. LINDEMANN:  Lieutenant Norman, would you
2  like to review the transcript or are you confident
3  waiving your signature and trusting the court
4  reporter did an excellent job and got everything
5  down correctly?
6      THE WITNESS:  I'm good.  I'm confident.
7      MS. LINDEMANN:  Okay.  So we'll waive
8  signature.
9      COURT REPORTER:  Okay.  Perfect.  Okay.  And
10  then last but not least, I just need orders, both
11  transcript and video from all parties, starting
12  with Ms. Aguilar.
13      MS. AGUILAR:  Thank you.  Plaintiff will not
14  be ordering either at this time.
15      COURT REPORTER:  Okay.
16      MS. LINDEMANN:  And yes, I would like a copy
17  of the transcript.  I don't need the video.
18      COURT REPORTER:  Okay.
19      MS. LINDEMANN:  E-Tran is great.
20      COURT REPORTER:  Yep.
21      MR. GIAQUINTA:  We'll take an E-Tran copy,
22  too.  Also, no need for the video for us.
23      COURT REPORTER:  Okay.  Okay.  Absolutely. Not
24  a problem.  And then we can go ahead and go off the
25  record.

Page 55

1  (DEPOSITION CONCLUDED AT 11:06 A.M.)

Page 56

1              CERTIFICATE OF REPORTER
2
3
4   I do hereby certify that the witness in the foregoing
5  transcript was taken on the date, and at the time and
6  place set out on the Stipulation page hereof by me after
7  first being duly sworn to testify the truth, the whole
8  truth, and nothing but the truth; and that the said
9  matter was recorded by me and then reduced to
10  typewritten form under my direction, and constitutes a
11  true record of the transcript as taken, all to the best
12  of my skills and ability. I certify that I am not a
13  relative or employee of either counsel, and that I am in
14  no way interested financially, directly or indirectly,
15  in this action.
16
17
18
19
20
21
22  KRYSTAL BARNES
23  COURT REPORTER / NOTARY
24  COMMISSION EXPIRES ON: 12/08/2029
25  SUBMITTED ON:  02/09/2022

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



**502.589.2273** Phone
**502.584.0119** Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

---

### Exhibits

**Exhibit 1_
Norman** 38:18,
25 42:9

**Exhibit 2_
Norman** 40:23
41:5 42:21

---

### 0

**0-10** 41:22

**0014** 6:14

**0431** 39:6

---

### 1

**1** 17:19 38:18,
25 42:9

**10** 41:21,22
42:22,23 43:5,
10 44:4

**102** 40:24

**10:01** 6:8

**10:33** 35:19

**10:40** 35:25

**11-17-03** 16:24

**112** 40:25

**113** 40:24,25

**115** 41:1

**11:00** 28:6
48:19

**11:06** 55:1

**15** 13:16 23:24

**1999** 16:15

---

### 2

**2** 40:23 41:5
42:21

**20** 6:14 13:16

**200** 29:10

---

**2003** 17:6,10,
16

**2017** 11:24
23:8,15 26:16
27:16,21,23
28:5,11,25
29:4,8,15,21,24
31:2,22 36:20
39:21 42:1,3,10
46:11 49:9,11
50:11

**2019** 17:19

**2022** 6:8

---

### 3

**30** 6:6 27:3
31:22 36:20
39:21 42:1,3,10
49:11 50:11

**300** 29:10

**31** 49:9

**31st** 6:7 35:24

**3:00** 28:6,9
30:10 48:19

---

### 5

**50** 24:4 34:20

**55** 50:6

---

### 6

**60606** 6:7

---

### 7

**7:00** 28:6,9
30:9

---

### 8

**8/25/17** 40:20

---

### A

**A-L-P-H-O-N-
S-O** 8:3

**a.m.** 6:8 35:19,
25 55:1

**ability** 9:11,18,
25

**Absolutely**
19:22 41:17
54:23

**academy**
18:10

**accurate** 9:11,
18,25

**Admission**
40:19

**admitted** 48:16

**affect** 9:11,17,
24

**affecting** 9:15,
21

**affirm** 7:17

**agree** 42:2,21
44:6,11

**Aguilar** 6:18
7:10,23 8:8
27:13,17,18
29:1,3 33:21,23
34:2,5,6 35:15
36:1,2 45:15
51:10,12 53:14,
17,20,24 54:12,
13

**Aguinaldo**
6:11,22

**ahead** 54:24

**Ahmad** 6:11,19
8:9 10:9 11:6
39:19 41:7

**alerts** 46:19

**allegations**
14:5

**Alphonso** 6:10
7:6 8:3,6

---

**Amanda** 6:3
35:24

**ambulance**
44:25 47:16

**amount** 29:13

**answers** 8:21

**Apologies**
18:16 34:2

**apologize**
19:10

**appearance**
6:15

**appearing**
6:20,23 7:1

**application**
17:22,24

**apply** 16:25

**Approximately**
23:24

**April** 17:19

**armed** 22:14

**arrested** 15:3

**assigned**
26:20 28:1
29:11 30:9
46:13

**assignment**
18:25 19:2
27:25

**assignments**
18:25

**assistant** 6:24

**assume** 8:19

**attendance**
23:3

**attended** 16:18
46:6,8

**attending** 6:16

**attention** 21:2

**attorney** 6:25
8:9 9:6 10:15
13:17

**attorneys** 13:8

---

**audible** 8:22

**August** 11:23
23:7,14 27:15,
21,23 28:5,11
29:4,8,15,21,24
31:1,22 36:20
39:21 42:1,3,10
46:11 49:9,11
50:11

**awards** 22:12

**aware** 19:13,23
31:9,17 37:2,3
40:12 46:14
47:13

---

### B

**back** 21:8
27:24 35:21
38:12 42:9,20
48:23,25 52:14

**background**
16:7 18:2

**barely** 33:18

**Barnes** 6:4

**based** 10:12,
13,14 12:8 22:5
42:3,5 43:4,7
51:13 52:8,10

**basic** 17:24

**Bates** 39:5
40:24

**begin** 7:21 9:1
16:22 35:25

**beginning**
46:13

**behalf** 6:19 7:1

**behavior**
50:21

**bit** 11:20 16:6
18:7 19:5 30:18
33:17

**biweekly**
29:25 30:2

**black** 24:15

**Bolingbrook**

---



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

16:11

**book** 18:11

**bottom** 39:7

**box** 24:15

**braids** 11:15

**break** 35:16

**breathing** 21:18,20

**bring** 47:2 53:9

**buckle** 51:21

**buckled** 52:6

**buckling** 51:23

**C**

**call** 21:18 27:25 44:24

**called** 51:8

**calm** 49:20

**cap** 30:14

**capacity** 23:12 26:3

**car** 40:15 43:11,18 44:7,12

**care** 44:15,19 46:18

**case** 6:14 8:9 14:2 15:20,23 16:4 39:20 48:4,18

**causing** 38:14

**cell** 11:9 20:17 21:4,9

**Center** 10:5 17:12

**certifications** 22:9,10 46:4

**cetera** 38:11

**chains** 24:16

**change** 27:9 28:16 36:19

**check** 18:2 40:6

**Chicago** 6:7, 23 7:2 16:10

**chow** 28:2

**circumstances** 47:12,13

**civil** 8:7 14:20, 23 15:1

**clarification** 29:2

**clarify** 10:19

**class** 19:25

**classes** 16:19

**classroom** 20:1

**closer** 41:12

**colleges** 16:18

**Comcast** 38:20

**comfortable** 26:8,13

**commander** 46:20,23

**communications** 52:18,22,23

**complaint** 12:21 13:22

**complaints** 12:16,19 14:4 35:4 37:22,25 43:2

**complected** 11:14

**completed** 39:15

**concern** 21:15 25:25

**concerned** 15:24

**concerns** 21:12,22

48:18 52:13,19

**CONCLUDED** 55:1

**condition** 25:14

**conditions** 9:10,14 25:19, 23 35:4

**conducted** 35:23

**conference** 6:9 35:23

**confident** 52:5 54:2,6

**confusion** 8:16

**Congratulations** 17:20

**considered** 30:10 32:22

**consistent** 23:6

**consists** 27:24

**contents** 31:15 34:12

**continue** 8:23

**control** 26:23 44:12,14

**convened** 6:9

**conversations** 13:5,8,9,15

**convicted** 15:5

**coordinator** 20:6,7

**copy** 54:16,21

**correct** 14:5 15:9 17:8,9,14, 15 21:10 22:1 23:19 28:14,15, 21 32:18 36:6, 7,11 37:6,7,17, 19 38:1 40:17 42:7,10,13,14, 18 43:2,3,6,7 44:1,2,5,13,16, 17,21,25 45:1, 3,4,7,14 47:9,

10 48:10,11 49:9,10 50:21 51:18,19 52:10, 15,16

**Correction** 22:6 45:5

**correctional** 10:4 16:23 17:1,7,12,17,23 20:7 21:3,9,11, 22 23:12 26:16, 18,21 27:8,14, 21,22 28:22 29:12,21 31:1, 8,14 34:19,24 36:13 37:12 52:24

**corrections** 10:7 14:11 17:14 22:21 24:6 30:5 36:23 44:16,19 45:12

**Corrections'** 19:14,23

**correctly** 48:21 54:5

**could've** 32:19

**counsel** 6:17, 21 7:21 45:18

**count** 28:1

**county** 49:24

**court** 6:5,12 7:15,16,21 15:16 54:3,9, 15,18,20,23

**courtesy** 9:1

**created** 42:16

**Crest** 10:5

**crime** 15:6

**CROSS** 45:24

**current** 20:1

**custody** 24:11, 12 26:23 30:21 44:15 46:12,15, 18,20,23 47:2, 3,6,21 48:14 51:3

**cut** 9:2

**D**

**date** 41:25 42:8,10

**day** 6:7 26:20, 25 27:5,7,9,22, 24 29:9 31:25 32:3 33:1,4,9, 12 34:10,16 35:24 42:6,15, 16 49:4,18,20 50:14

**days** 29:19

**decides** 46:17

**decision** 21:1 47:25 48:15

**defendant** 14:2,22 15:1

**defendants** 6:22 7:1

**define** 10:9

**delay** 33:18

**demeanor** 38:3

**Dement** 6:3 35:24

**demoted** 22:17

**department** 10:7 14:11 17:13 18:13 19:14,23 20:2,6 22:6 24:5 30:5 36:23 44:16,18 45:5,12 48:12

**depending** 26:19 29:10

**deposed** 8:10 15:9,11,13,23

**deposition** 6:9 8:6 12:15 13:3, 6,12,18 35:22 55:1

**describe** 25:13 38:10


Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

description
11:13,14

designated
32:22

destination
26:9

details 15:22

determination
21:8

determine
38:11 47:18

determined
24:17

determines
46:21,24

Devry 16:19,20

difficulties
38:20

DIRECT 7:22

directing
27:11

discharged
53:13

disciplined
22:20

discomfort
26:11

discretion
20:25 21:4

discretionary
24:22

discuss 21:22
25:10,18 31:15
34:23 35:2

discussed
14:7,10,13,16
25:22 34:15,25

discussing
21:16

discussion
34:13 35:1

discussions
53:1

disrespectful

38:15

District 6:12

Division 6:13

Doctor 39:6

doctors 21:13
25:3,6

document
12:25 39:9,20
40:10 42:3,16

documentatio
n 10:13 37:5
42:4,5 43:4
53:7,10,12

documentatio
ns 43:7

documented
36:20

documents
12:15,18 13:2
25:15,16 37:11
41:2

drive 6:6 26:9
37:22 45:3 47:4

driven 32:20
45:8 50:17

driver 32:17
51:3

driving 32:4
35:8,11 36:5,9
50:13,20,24

drove 32:20

due 36:16

duties 26:15,
17,21 27:21
28:16

duty 26:4

_____

E

_____

E-TRAN 54:19,
21

earlier 48:8

Eastern 6:13

education

17:25

Ellyn 6:20

emergency
40:1,19 47:5

Emergency/
hospitalizatio
n 39:12

employee 18:9

employer 10:6
17:14

employment
17:25

end 48:14,15,
23

enforcement
22:21

ensure 27:3

envelope
37:14,16 40:13

equipment
27:25 28:3
48:25 53:6

ER 24:13 39:25

erratically
45:9 50:13,17,
20

et al 6:11

evaluated
20:23 46:17

Evaristo 6:11,
22

everybody's
27:3

exact 42:8

EXAMINATIO
N 7:22 45:24
51:11

excellent 54:4

exchange
53:5,6

exchanged
53:8

exhibit 38:18,

25 40:23 41:5
42:9,20,21

existed 37:9

exists 27:7

experienced
11:23 51:2

experiencing
12:12 25:19

expert 15:19

explain 30:7

_____

F

_____

fact 7:8

facts 16:3

fair 8:19 14:13,
25 15:19 22:1
27:17 31:13
34:20,21 40:9,
14 42:15

familiar 8:12

family 45:2

fast 33:18 34:1

fellow 34:24

fight 20:11
40:20

fighting 20:17

filled 39:20

fine 8:15 16:8
38:7,9,11,16

finish 8:25

finished 9:3

firearms 18:15

fired 22:17

fix 38:20

floor 45:18

follow 9:3

forces 22:14

form 39:12,15

frame 27:20

full 7:4

full-time 28:10

_____

G

_____

galleries 27:3

gate 47:3,4

gave 12:21

general 6:25
10:18 48:12

generally
27:20

Giaquinta 6:21
9:6 45:20 53:19
54:21

give 7:17 37:5

Glen 6:20

good 7:24,25
19:17 23:6 54:6

graduate
16:14,20

graduation
16:16

great 8:22
54:19

grievance
30:24 31:2,7,8,
15,16

grievances
12:16 30:18,20,
22 31:5,10

grounds 47:15

grow 16:9

guess 27:23
29:4 52:20

guys 33:16

_____

H

_____

Hackett 14:17
32:10,11 33:12
34:10,16 40:16
43:18 50:10
52:2



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

**hand** 7:14
25:16 53:12

**hand-to-hand**
53:10

**handcuffed**
24:18,20,21,23
51:17

**handled** 25:1

**happen** 50:3

**HCU** 21:5

**Health** 14:8
35:12 36:6 41:4

**healthcare**
46:16 47:4

**hear** 19:15,16,
18,19

**high** 16:12,13,
16 28:23

**highest** 42:22

**highlighted**
41:11,20

**highway** 49:24
50:2

**Hill** 10:5

**holidays**
29:18,19

**home** 18:10,22
28:3 49:1

**hospital** 11:19
23:21 25:17
26:4,19 32:5
35:8 36:6,14
37:6 38:13 41:4
45:3,9 46:21
47:5 48:22
49:13,22 50:15
51:3

**hours** 29:16

**house** 11:9
28:2

**houses** 26:24

---

**I**

---

**IDENTIFICATI
ON** 38:25 41:5

**Illinois** 6:7,13,
20,23,25 10:5,7
14:11 16:10,11
17:13 19:13,23
22:5 24:5 30:5
36:22 44:16,18
45:5,12

**in-** 18:17

**inappropriate**
44:7

**incarcerated**
20:12

**independent**
10:8,9,10,11,
16,24 11:3,5,21
12:1,7,10 25:21
31:24 32:6,25
33:3,11,14 34:9
35:7,10 36:4,8
37:20 38:2,5
52:9

**individual**
24:11,12,14
26:23 32:9
46:15,18,20,23
47:1,3,6 48:13
51:3

**individuals**
20:10,11,17,21,
25 30:21 46:12
47:21

**information**
46:24

**injuries** 36:24

**injury** 44:8

**inmate** 48:16

**inside** 37:18
47:2

**instance** 21:17

**institution**
17:11

**instruct** 28:19

---

**instruction**
18:18

**instructional**
18:22

**instructions**
18:12,23

**Intensity** 41:21

**interested**
13:7

**interject** 33:19

**interrupt** 18:16

**involving**
22:21

**Isabella** 6:18
8:8 27:10 33:16
51:9

**issue** 22:2
30:22

**issues** 38:14,
21

---

**J**

---

**January** 6:8
35:24

**job** 8:23 16:25
17:2,16 22:18,
21 26:15,17
28:16,22 29:6
46:14 54:4

**Joe's** 46:12
48:9,14

**Joseph's**
23:20 24:7,25
25:8 32:5 35:8,
11 36:5,10 37:6
38:3 40:11
41:2,3 43:2,19
49:5,9,13,22
50:15

**Juburek** 7:1
14:14

---

**K**

---

**Kentuckiana**
6:5

---

**kind** 46:22

**Kristin** 6:24
29:1

**Krystal** 6:4

---

**L**

---

**lag** 19:5

**law** 22:21

**lawsuit** 13:21,
24 14:7,10,14,
16

**lawyer** 13:12

**learn** 13:20

**leave** 47:4 53:6

**lengthy** 18:4

**level** 42:23

**lieutenant**
6:10 7:3,6,9,13,
24 8:6,8 14:14
16:7 17:18
19:15,22 27:19
28:13,17 31:4
34:7 35:22 36:3
43:1,14 45:16,
22 46:1 51:8,14
52:23 53:21
54:1

**lighter** 11:14

**limit** 50:4

**Lindemann**
6:24 7:12 20:15
27:10,14 28:25
33:16,22,25
34:4 43:12
44:22 45:21,25
51:6,13 52:21
53:16 54:1,7,
16,19

**lines** 12:17
18:20

**lived** 11:9

**located** 6:6
23:21

**location** 6:16

---

**Logan** 6:21
53:17

**long** 13:14

**looked** 12:19

**lost** 34:8

**loved** 45:3

---

**M**

---

**made** 19:13,23
36:7 42:3 43:22
48:15

**main** 50:1

**make** 9:2 10:23
26:4,7,13,24
27:19 38:22
43:17 44:7

**makes** 47:25

**making** 21:17
27:2 43:1

**manual** 18:19

**mark** 38:18
40:23

**marked** 38:25
40:6 41:5 42:21

**mates** 20:17

**matter** 6:10

**medical** 12:9
16:1 20:22,25
21:2,7,12,16,
19,23 22:3
24:17 25:1,14,
16,17 37:13
42:24 43:5,9
44:3 45:7 46:2,
4,6,17,19,21
47:1,17 48:2
53:3,11

**medications**
9:17,21

**meet** 13:11

**member** 45:2,
13

**memory** 9:15,
22 10:8,10,11,
13,16

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

mentioned 10:1 47:8 48:8

metal 24:15

method 47:18

methods 47:8, 11

might've 10:14

minutes 13:16 23:24 27:3

misstate 22:1

Misstates 43:12

mister 51:8

mode 25:12

Monday 53:22

monitor 29:9

monitoring 29:13 52:15

month 30:1

monthly 29:25

morning 7:24, 25

movement 26:23

_____

**N**

N-O-R-M-A-N 8:4

name's 31:8

named 14:1 15:1 31:16

necessarily 17:4 32:21

neck 12:3 36:24 37:22 44:8,9

needed 17:2

Norman 6:10 7:1,4,6,9,13,24 8:4,7,8 16:7 19:15,22 27:19 34:7 35:22 36:3

43:1,14 45:16, 22 46:1 51:8,14 52:23 53:21 54:1

Northern 6:13

Notification 39:12

notify 22:3

Number 6:14

nurse 25:9,10, 13,22 33:4,6,8

nurses 21:12 37:5

nursing 46:8

_____

**O**

Obaisi 32:25 39:15

object 9:6,7

Objection 20:15 43:12 44:22 52:21

objections 33:20

observations 12:8

off-site 25:5

offer 21:2

officer 14:17 17:17,23 20:8 21:11,22 23:12 26:16,18,22 27:15,21,22 28:22 31:1,8,14 32:10,11 33:12 34:10,16,20,24 37:12 40:16 43:18 46:13 50:10 52:1,24 53:12

officer's 21:9

officers 21:3 24:11 29:12,21 32:22 36:13 46:25 48:19,22 52:13,17

on-call 29:16

onboarded 18:8

ongoing 18:23,24

online 6:4

open 45:17

opened 37:15

option 47:16

ordering 54:14

orders 54:10

overtime 30:4, 7,10,11,14

_____

**P**

paid 29:23,24

pain 12:3 26:1 37:22 41:21,22 42:23 43:5,10, 18 44:4,9

painful 44:7

painless 26:4

Paint 41:21

paperwork 47:1 53:9

part 50:4

parties 7:8 54:11

past 23:5

patient 21:4,8 25:19 26:10 35:3 36:13 41:8 52:15

patient's 25:14

patiently 38:12

patients 25:4

pay 29:20 30:11

pending 6:12

people 28:19

Perfect 54:9

performance 23:2

period 10:17, 23

person 18:18 19:8 21:20 35:5

personally 37:10

phone 13:13, 14

phrased 8:17

physical 11:12,14 18:11, 19,21

physician 39:16

place 26:24 46:11

plaintiff 6:19 8:9 14:19 39:19 48:4,16 54:13

plaintiff's 6:17

point 51:7

policies 19:14, 24 48:13 52:8, 10

policy 20:10, 16,20,24 22:6 24:6,9 36:23 37:1,2,3

Poole 6:11,19 8:9 10:9,20 11:6,8,17,22 12:12 31:19 32:4,5,7 34:16 36:5 37:21 39:19 40:10,15, 24,25 41:1,3,7 42:7,17 43:1,17 44:11,24 45:8 48:4,9 49:4 50:14 51:20,23 52:5

Poole's 25:22

position 28:10 38:10

possibly 15:24

practice 22:6 24:6,10 34:22

practices 19:14,24

preface 13:7 38:19

prepare 12:15 13:3,12

Present 41:21

pretty 23:6 34:11 35:1 49:23

prevent 45:13

previous 17:24

previously 51:16

prior 17:6

prison 25:2 26:18 46:19

prisoner 23:25 24:25 25:8 26:1,8,10

prisoners 15:24,25 24:7, 18 29:9,13 34:19,23 36:24 51:17

privileged 13:9

problem 19:10,12 33:23 34:2,4 41:13 53:23 54:24

procedure 8:7 46:10 48:17 49:3 51:25

procedures 20:3 52:9,11

PROCEEDINGS 6:1

process 17:22 18:5,8 23:1

professional



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

21:16,23 53:11

**professionals** 21:12,19 22:3 43:5,9 44:4 47:18

**provide** 9:11, 18,25 20:22 25:14 44:19 46:19

**provider's** 21:7

**pull** 41:12

**pursuant** 8:7

**put** 47:7,23,24

**Q**

**question** 8:17, 25 9:4,8 10:19 19:20,21 21:6 27:11 29:22 34:8 36:4 43:15,16

**questions** 17:24 27:20 38:22 45:18,20, 21 51:7

**quick** 35:15

**quickly** 33:24

**R**

**raise** 7:14

**rarely** 25:6

**rate** 28:23

**read** 14:4 19:1 41:10,19,24

**reason** 17:3 40:19

**reasons** 21:21

**recall** 11:8,12, 17 48:4,7,9 49:11,20 50:13 51:23

**receive** 18:18, 21,23

**received** 12:18,20 13:22 22:12 46:1

**Recent** 40:19

**recollection** 10:10,11,16,25 11:3,6,21 12:2, 11 25:21 31:24 32:6,25 33:3, 11,15 34:9 35:7,11 36:5,9 37:20 38:2,6 52:9

**recollections** 12:8

**record** 7:5 8:2, 5 35:18,20,22 41:10,19 54:25

**redirect** 51:9, 11,14

**referring** 39:16

**reflect** 8:5

**register** 24:13 47:6

**regular** 27:24 29:19

**regulations** 18:12

**relieved** 48:19 49:6 52:13,17

**relieving** 52:24 53:12

**remember** 10:12 12:5,21, 23,24 15:14,15, 22 16:3 23:8,9, 17 25:24 28:8 32:2,4 33:10 34:12,15 42:8 43:20,21,23,25 49:3,17 50:18 52:3

**remotely** 6:23

**repeat** 19:20, 21 34:8 38:22

**rephrase** 8:18 21:6 26:6 29:22

34:7 38:22 43:16

**reporter** 6:5 7:15,16,21 54:4,9,15,18, 20,23

**Reporters** 6:6

**represent** 39:14,18 41:1,2

**representing** 6:5

**respiratory** 22:2

**responsibility** 46:14

**responsible** 27:2 49:8

**restrain** 20:21 47:1

**restrained** 24:12,14,19

**restraints** 24:16,17 46:25

**restroom** 35:17

**results** 53:4

**returned** 21:4

**review** 22:23 23:1 31:7 54:2

**reviewed** 12:16,25 13:3 23:2,3

**reviews** 23:4

**revolving** 16:1

**ride** 26:4,7,11 44:7,12 49:23

**road** 49:15,21 50:4

**role** 16:2 34:25 52:3

**roles** 32:22

**roll** 27:24

**Romeoville** 16:13

**room** 40:1 47:5,7

**roster** 46:24

**rounds** 21:17 27:2

**row** 30:15

**RTP** 39:6

**rules** 8:7,13 18:12 19:1 20:2,3 48:13

**run** 27:1 28:1,2

**S**

**safe** 27:4

**safely** 26:9

**Saint** 23:20 24:7,25 25:8 32:5 35:8,11 36:5,9 37:5 38:3 40:11 41:2,3 43:2,19 46:12 48:9,14 49:5,9,13,22 50:14

**scale** 41:22 42:22

**school** 16:12, 13,17 46:6,8

**screen** 38:18 39:2 41:12,23 42:19

**seat** 51:24 52:6

**seatbelt** 51:21

**secure** 26:25 28:2

**security** 26:2 32:18,22

**security's** 26:3

**sending** 25:4

**separate** 20:21

**serve** 22:14

**Service** 39:23

**Services** 14:8

**set** 24:17

**setting** 16:23 17:1,7 20:1 27:8

**severe** 37:22

**share** 38:18 39:2

**sharing** 41:23 42:19

**shift** 28:7 30:9, 16 36:16,19 46:19,23 48:14, 18,20,24 52:13, 18

**shifts** 28:4 30:15

**show** 38:17 39:5 40:22

**showers** 27:1 28:2

**sign** 20:2

**signature** 54:3,8

**signs** 11:22

**sit** 10:12 11:22

**sitting** 38:12

**situation** 25:1 51:2

**Six-week** 18:10

**skull** 40:20

**slow** 33:16 50:24

**smooth** 49:23

**solely** 21:7

**solemnly** 7:16

**somebody's** 21:18

**sort** 25:14

**South** 6:6

**speak** 13:17 33:23 53:22



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

speaking 32:25 33:4,12 34:10

special 22:10

specific 10:17, 23 17:3 26:17, 25 40:18

specifically 20:11 31:21 48:3

speed 50:3

spell 8:1

spine 40:20

spoke 34:11

spoken 33:8

Springfield 18:10

staff 12:9 16:1 25:17 37:6,13 45:5,7,13 46:17,19,21 48:2 53:3

stamped 39:6 40:24

standard 36:12 51:25

stands 40:1

starting 6:17 41:20 54:11

state 6:15,25 7:4 8:1 40:7,14 42:13 47:14

stated 15:8 17:6 34:18 37:4 51:16 52:12

states 6:12 42:10

Stateville 10:4 11:23 15:24,25 17:12 22:24 23:11,23 29:16 35:8 36:9 46:12 48:17,23,25 49:8,13,21 52:14

stipulate 7:8

stop 41:23 42:19 50:24

stoplights 50:2

storm 49:18

straight 47:5

street 50:1

stressful 29:6

strike 21:25 23:10 27:6 29:23 31:14

structure 29:20 30:4,8

stuff 28:18

subjective 42:22

submit 30:21

suit 14:20,23 15:1

super 34:1

supervisor 20:8,9 23:7 28:20

supervisors 23:11

suppose 26:8 37:12

supposed 19:1

surgery 44:9

swear 7:16

sworn 7:14

symptoms 11:22 12:11 25:18,23

——————
T

taking 40:10 53:21

talk 11:20 13:5 16:6 18:7 22:8

25:3,6,7 26:15 30:17 31:18,21

talking 10:17, 20,22 27:15

tape 8:6

technical 38:19

technician 6:4

telling 43:9

ten-minute 35:16

terminology 42:24

terms 49:15

test 18:1

testified 15:16 42:12

testify 37:18 49:2

testimony 7:17 9:12,18,25 22:1 42:25 43:8,13,24

theoretically 44:24

thing 53:2

things 12:16 17:25 28:19

three-lane 49:25

time 6:8 10:17, 23 11:15,18 12:23,24 14:25 15:12,14 17:14 20:6 22:24 26:12 27:20 32:14 34:19 35:25 45:16,17 46:16 52:4 53:15,21 54:14

time-and-a-half 30:12

times 13:11 15:11 24:3 34:20 49:25

Tina 6:22

title 17:16

today 6:5,7 9:10,12,14,19, 25 10:12 11:17, 22 13:6,18 35:24 42:25 43:8,24

today's 12:15 13:3,12

told 10:14 12:9, 11 43:4 44:3

Tomaras 6:22

track 34:9

tracked 31:10

trained 42:24

training 18:8, 11,15,17,24 19:25 20:4,5 46:2

transcript 54:2,11,17

transport 25:12 34:24 47:9,11,18 48:3,13 51:17

transportation 40:4 42:13 46:22

transported 23:25 24:25 34:19 41:3 42:7,17 50:14

transporting 24:6 25:4,8,25 32:4,7 34:23 35:4 36:23 46:11 48:9 49:8 51:2

Treatment 40:19

trip 36:7 49:12

trouble 21:18, 20 38:7

trusting 54:3

truth 7:18,19

truthful 9:11, 18,25

turn 28:1,2 48:25

turnover 23:11,14 28:23

two-lanes 50:1

Type 39:23

typical 27:5,7, 9,22

——————
U

Uh-huh 51:15

UI 35:11 36:6 41:3

UIC 48:10

undergo 44:8

understand 9:7 10:15,24 11:2 20:2 26:22 30:17 32:24 38:23 53:11,14

understanding 13:23 24:24 48:21

understood 8:19

unit 28:1

United 6:12

universities 16:17

University 16:20

unsafe 51:4

unusual 49:12

——————
V

vague 20:15 27:12 44:23 52:21

van 47:2,4



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:20-cv-00014 Document #: 147-5 Filed: 09/30/23 Page 24 of 24 PageID #:2048
The Deposition of ALPHONSO NORMAN, taken on January 7, 2022

64

**vehicle** 40:7,15
42:13 47:14,22
48:5 51:17

**verbal** 8:22

**verbalizations**
43:17,22

**verbalize**
21:11 43:10

**verbalized**
26:11

**verbalizing**
37:21,25

**versa** 19:10

**versus** 6:11
52:9

**vice** 19:10

**video** 6:4,9 8:6
35:23 54:11,17,
22

**VIDEOGRAHE
R** 7:3

---

**W**

---

**Wacker** 6:6

**waist** 24:16

**waiting** 38:13
53:3

**waive** 54:7

**waiving** 54:3

**walk** 46:10

**walked** 47:22
48:5

**walking** 48:1

**ways** 50:1

**weather** 49:17

**weekends**
18:11

**weekly** 29:25

**Wexford** 14:8

**wheelchair**
47:23 48:1,6

**wheelchairs**
47:24

**Wi-fi** 38:20

**wording** 41:20

**work** 10:3,4
17:10 18:11
28:7 29:15,18
30:15,20

**worked** 11:9
17:7 32:11
50:10,12

**working** 16:22
22:20 32:14

**works** 14:8,11

**worth** 21:15

**would've** 37:4
40:10 49:7

**written** 18:1

---

**X**

---

**X'D** 40:7

**x-ray** 40:20

**x-rays** 37:8

---

**Y**

---

**yard** 28:2

**year** 11:10
16:14 19:25
23:2

**years** 23:5

**yellow** 41:11

---

**Z**

---

**zoom** 6:20,23
7:2 19:8 33:17
41:13,15



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS