**THE UNITED STATES DISTRICT COURT FOR**
**THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| AHMAD POOLE (K95348), ) | |
| ) | |
| Plaintiff, ) | Case No. 20-CV-0014 |
| ) | |
| ) | |
| v. ) | Honorable Manish S. Shah |
| ) | |
| DR. E. AGUINALDO, *et al.*, ) | |
| ) | |
| Defendants. ) | |

# Exhibit 17

JOHN GILBERT  DAVIS, M.D.
June 08, 2023

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION


AHMAD POOLE (K-95348),           )
                                 )
          Plaintiff,             )
                                 )
     -vs-                        )   No. 20 C 00014
                                 )
DR. EVARISTO AGUINALDO, et al.,  )
                                 )
          Defendants.            )
_____  )


          The deposition of JOHN GILBERT DAVIS, M.D.,

called by the Defendants for examination, pursuant to

notice and pursuant to the Federal Rules of Civil

Procedure for the United States District Courts

pertaining to the taking of depositions, taken before

Emily R. Pellegrino, Certified Shorthand Reporter and

Notary Public within and for the County of Cook and

State of Illinois, at 311 North Aberdeen Street, 3rd

Floor, Chicago, Illinois, commencing at the hour of

10:01 a.m. on the 8th day of June, A.D., 2023.

EXHIBIT 7

## JOHN GILBERT DAVIS, M.D.
### June 08, 2023

**Page 2**

```
 1   A P P E A R A N C E S :
 2       LOEVY & LOEVY
         MS. MARIA MAKAR
 3       311 North Aberdeen Street, 3rd Floor
         Chicago, Illinois  60607
 4       (312) 243-5900
         makar@loevy.com
 5
             On behalf of the Plaintiff;
 6
         OFFICE OF THE ILLINOIS ATTORNEY GENERAL
 7       MS. KRISTIN L. LINDEMANN
         100 West Randolph Street, 13th Floor
 8       Chicago, Illinois  60601
         (773) 590-7821
 9       kristin.lindemann@ilag.gov
10           On behalf of the Defendants,
             Lieutenant Jaburek and Lieutenant
11           Norman;
12       CONNOLLY KRAUSE, LLC
         MR. ROBERT S. TENGESDAL
13       500 West Madison Street, Suite 3900
         Chicago, Illinois  60661
14       (312) 253-6200
         rtengesdal@cktrials.com
15
             On behalf of the Defendants,
16           Dr. Evaristo Aguinaldo and
             Tina Tomaras;
17
     ALSO PRESENT:  Ms. Arzu Singh (Loevy associate)
18               Ms. Toni Houston (Loevy associate)
19                   *    *    *
20
21
22
23
24
```

**Page 3**

```
 1           I N D E X
 2   WITNESS              DX   CX  RDX  RCX
 3   JOHN GILBERT DAVIS, M.D.
 4     By Mr. Tengesdal    4       175
       By Ms. Makar             169
 5
 6
          E X H I B I T S
 7
     DAVIS
 8   DEPOSITION EXHIBIT         MARKED FOR ID
 9   Exhibit 1                  7
     Exhibit 2                  30
10   Exhibit 3                  32
     Exhibit 4                  36
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

**Page 4**

```
 1                    (Witness duly sworn.)
 2           JOHN GILBERT DAVIS, M.D.,
 3   called as a witness herein, having been first duly
 4   sworn, was examined and testified as follows:
 5                    EXAMINATION
 6   BY MR. TENGESDAL:
 7       Q.  Good morning, Doctor.  How are you?  My name
 8   is Robert Tengesdal.  I represent Dr. Aguinaldo and
 9   Tina Tomaras.
10           Can you please state your name and spell it
11   for the record?
12       A.  My name is John Gilbert Davis, J-o-h-n,
13   G-i-l-b-e-r-t, D-a-v-i-s.
14       Q.  Dr. Davis, is this your first time giving a
15   deposition as an expert?
16       A.  It is.
17       Q.  Have you given a deposition as a treating
18   physician previously?
19       A.  I have.
20       Q.  Okay.  So no difference other than now
21   you're serving as an expert.  So I'm going to ask you
22   some questions about your role here in this case.
23   Please let me finish the question before you give an
24   answer and I'll do the same.  Okay?
```

**Page 5**

```
 1       A.  Sounds good.
 2       Q.  If I ask you a question and if you don't
 3   understand it, please let me know and we'll try to
 4   rephrase it for you.  Okay?
 5       A.  Sure.
 6       Q.  All right.  What do you got there in front
 7   of you in the folder?
 8       A.  I have materials that my counsel provided me
 9   with kind of all the records that I reviewed, so that
10   I can find them.
11       Q.  Okay.  Anything else other than medical
12   records in there?
13       A.  There's depositions.
14       Q.  Okay.  And let me ask you, what did you
15   review in preparation for today?
16       A.  So I reviewed my statement and then I
17   reviewed some of the records previous to coming in
18   today.
19       Q.  Okay, great.  How did you get involved in
20   this case?
21       A.  So I was asked by a friend of mine who knows
22   I'm a physician to say if I wanted to help her
23   company out and if I had the time to do it, so that's
24   kind of how it came to fruition.
```

EXHIBIT 7

JOHN GILBERT  DAVIS, M.D.
June 08, 2023

**Page 6**

1  Q. Who's the friend?  What's her name?
2  A. Dana Ferrara.
3  Q. What's her company?
4  A. She works for this law firm.
5  Q. Oh, okay.  So it wasn't like an outside
6  expert service?
7  A. No.
8  Q. Okay.  Are you aware there was a previous
9  expert in the case?
10  A. I am.
11  Q. Okay.  And do you recall who that expert
12  was?
13  A. The name was Dr. Beatty.
14  Q. Do you know Dr. Beatty at all?
15  A. I do not.
16  Q. Okay.  When were you first contacted?  Do
17  you recall?
18  A. It was a few months ago.  I don't remember
19  the exact date.
20  Q. Okay.  And when you were retained in this
21  case, asked to take a look at this stuff, what were
22  you asked to do?
23  A. I was asked to provide an opinion on a case
24  that was currently pending.

**Page 7**

1  Q. Okay.  Were you ever told that your opinions
2  could not exceed the disclosure of Dr. Beatty?
3  MS. MAKAR: Objection, privilege.  I would
4  just instruct with your answer not say anything
5  protected by attorney-client privilege.
6  THE WITNESS: Yeah, I don't know what that
7  means.
8  BY MR. TENGESDAL:
9  Q. Okay.  Are you aware that there's a court
10  order that says that you're a substitute expert and
11  your expertise, your opinions have to be confined to
12  Dr. Beatty's report?
13  A. Okay.  I'm not aware of that.
14  Q. Okay.  That's all I'm asking.
15  A. Okay.  The answer's no.
16  Q. Okay.  I've got a copy of your CV here.
17  Let's mark this as Exhibit 1 if we could.
18  (Whereupon, Davis Deposition
19  Exhibit 1 was marked for
20  identification.)
21  BY MR. TENGESDAL:
22  Q. Is this a true and accurate copy of your CV,
23  Doctor?
24  A. It is.

**Page 8**

1  Q. I want to ask you a little bit about your
2  CV.
3  A. Sure.
4  Q. First thing is, tell us where you went to
5  medical school, Doctor.
6  A. I went to the University of Illinois College
7  of Medicine.
8  Q. What year did you complete your medical
9  degree?
10  A. 19 -- medical degree, 2000.
11  Q. 2000.  Okay.  And did you do your medical
12  education at the University of Illinois downtown
13  Chicago?
14  A. It was University of Illinois, but it was at
15  Peoria, Illinois.
16  Q. Okay.  Did you do the full years at Peoria?
17  A. Of med school?
18  Q. Yeah.
19  A. The way Illinois works is you do one year at
20  Champaign-Urbana and you do the last three at a site.
21  I did my last three years at Peoria.
22  Q. Did you do a residency?
23  A. I did.
24  Q. Where did you do the residency, Doctor?

**Page 9**

1  A. I did the residency at the same place I did
2  my med school which was University of Illinois at
3  Peoria.
4  Q. Did you ever rotate into the medical campus
5  in downtown Chicago for U of I?
6  A. I did not.
7  Q. What was your residency in?
8  A. Combined internal medicine and pediatrics.
9  Q. Okay.  Are you board certified in
10  pediatrics?
11  A. I am not.
12  Q. Okay.  And how long is the internal medicine
13  residency?
14  A. Internal medicine residency by itself is
15  three years.  As is the pediatrics three years.
16  Q. It looks like your residency was four years,
17  two months?
18  A. Correct.  It's basically combined residency
19  where they're doing all aspects of internal medicine
20  and pediatrics and they basically combine it into a
21  four-year program.
22  Q. Got you.  Did you ever receive any sort of
23  certification in pediatrics?
24  A. I did not.

EXHIBIT 7

JOHN GILBERT DAVIS, M.D.
June 08, 2023

Page 10

1    Q.   Have you ever practiced as a pediatrician?
2    A.   I did.
3    Q.   For how long?
4    A.   For about 10 years.
5    Q.   Where did you practice as a pediatrician at?
6    A.   That would be at St. James Hospital in
7    Chicago Heights, Illinois.
8    Q.   Okay.  Did you also do internal medicine or
9    was your practice at St. James confined to
10   pediatrics?
11   A.   It was more inclined for internal medicine,
12   probably 75, 25.
13   Q.   Okay.  And currently where you're at in
14   Munster, are you a hundred percent internal medicine
15   now?
16   A.   Yes.
17   Q.   Okay.  What states are you licensed in,
18   Doctor?
19   A.   Indiana.
20   Q.   Okay.  Do you have any license in Illinois?
21   A.   I do not.
22   Q.   You do not.  At any time have you ever been
23   licensed in Illinois?
24   A.   Yeah.  I was licensed until about 2017 or

Page 11

1    '18.
2    Q.   Okay.  And what year did you complete your
3    internal medicine/pediatric residency then?
4    A.   2004.
5    Q.   And then after you completed the residency
6    in 2004 combined, did you ever sit for the pediatrics
7    board?
8    A.   I did.
9    Q.   Did you pass?
10   A.   I did not.
11   Q.   In 2024, did you sit for the internal
12   medicine residency board?
13   A.   I did not.  I waited a year or so.
14   Q.   Okay.  Did you take the board for internal
15   medicine in 2005?
16   A.   No.
17   Q.   When did you first take the board for
18   internal medicine?
19   A.   I want to say 2000 -- it was 2005 or 2006,
20   one of those.
21   Q.   Okay.  Did you pass on the first attempt?
22   A.   I did not.
23   Q.   Okay.  Did you take it again?
24   A.   I did.

Page 12

1    Q.   Okay.  And did you pass the second time?
2    A.   I did.
3    Q.   Okay.  And from your CV, it looks like
4    you're currently board certified, got to recertify in
5    2027; is that correct?
6    A.   Yes.
7    Q.   Okay.  I saw in your CV you're currently
8    practicing as a hospitalist, correct?
9    A.   That's correct.
10   Q.   Are you aware that there is a board
11   certification for hospitalists?
12   A.   There is now.
13   Q.   Okay.  And have you taken that for -- to
14   become board certified as a hospitalist?
15   A.   I have not.
16   Q.   Why not?
17   A.   Because my job does not require me to.
18   Q.   Okay.  Makes sense.  I get it.
19   A.   I'm grandfathered in, as they say.  I think
20   the board certification is pretty new, but I'm not
21   sure how new.
22   Q.   All right.  You practice currently as a
23   hospitalist; is that right?
24   A.   I do.

Page 13

1    Q.   Tell us what hospital you're at.
2    A.   I'm at community hospital in Munster,
3    Indiana.
4    Q.   And if you could tell us, what are your
5    duties as a hospitalist?  What does a hospitalist do?
6    A.   So a hospitalist would be an inpatient
7    primary care physician, so essentially if somebody's
8    sick enough to come into the emergency room, the
9    emergency room doctor sees them and determines
10   whether they're sick enough to come to the hospital
11   or go home.  If they're determined to be sick enough
12   to come into the hospital, they will contact the
13   hospitalist or the appropriate subspecialist,
14   depending on who the patient is.  Generally we will
15   bring them in.  If it's something that we handle on
16   our own, then we'll handle on our own.  If we need a
17   subspecialist, cardiologist, pulmonologist, then we
18   will request those doctors to come on board and help
19   us with the condition.  We pretty much see the
20   patient from the beginning of the hospital stay to
21   the time that they go home.
22   Q.   And as a hospitalist, are you typically the
23   physician in charge of doing the discharge summary?
24   A.   Indeed.

EXHIBIT 7

JOHN GILBERT DAVIS, M.D.
June 08, 2023

Page 14

1    Q.   Okay.  All right.  Would you agree you're
2  not certified since you're a hospitalist internal
3  medicine doctor as a spine surgeon?
4    A.   I am not.
5    Q.   Okay.  Would you agree you do not have any
6  training in the performance of spinal surgery?
7    A.   I would agree with that.
8    Q.   Okay.  Would you agree you never performed a
9  spine operation?
10    A.   I would agree with that.
11    Q.   Okay.  Would you agree you do not have any
12  privileges at a hospital or outpatient surgery center
13  to perform surgery?
14    A.   I would agree with that.
15    Q.   Okay.  Would you agree you never performed a
16  cervical fusion surgery?
17    A.   I would agree with that.
18    Q.   All right.  Do you know why you're
19  substituting for Dr. Beatty a neurosurgeon since you
20  have no training as a spine surgeon in this case?
21    A.   I do.
22    Q.   Why?
23         MS. MAKAR:  Objection, privilege.
24         Just answer to the extent you're not

Page 15

1  breaking privilege would be my advice.
2         THE WITNESS:  I heard that there was a
3  problem with the previous physician Dr. Beatty, and
4  so I was asked to replace him.
5  BY MR. TENGESDAL:
6    Q.   Okay.  But you're aware Dr. Beatty was a
7  neurosurgeon?
8    A.   I am aware of that.
9    Q.   Okay.  Do you know why you as an internal
10  medicine physician are substituting for a
11  neurosurgeon?
12    A.   Nope.
13    Q.   Okay.  Have you ever practiced in a jail or
14  prison setting as a physician?
15    A.   I have not.
16    Q.   Okay.  Have you ever -- looking at your CV,
17  I didn't see any publications.  Have you ever
18  published in a peer-reviewed medical journal?
19    A.   No.
20    Q.   Have you ever written articles published on
21  medical practice in a correctional setting?
22    A.   No.
23    Q.   Have you ever authored any peer-reviewed
24  journal, article, medical literature, textbook on

Page 16

1  standard of care?
2    A.   No.
3    Q.   Okay.  Can you define for us, Doctor, what
4  is standard of care?  I saw that in the report
5  numerous times.
6    A.   Sure.  So for me standard of care is the
7  level at which a physician should complete an
8  evaluation of a patient, be it starting from the
9  initial discussion, complaint, H&P, subjective
10  whatever you have, all the way through physical exam
11  to treatment to diagnostics, whatever we should do as
12  a physician.  That is what I would define that as.
13    Q.   Okay.  And since you're here serving in a
14  legal context, do you know what the legal definition
15  of standard of care is that the law holds a physician
16  to?
17    A.   Nope.
18    Q.   Would you agree then your application of
19  standard of care is not a legal application standard
20  of care?
21         MS. MAKAR:  Objection, calls for a legal
22  conclusion, outside the scope of his expertise.
23         THE WITNESS:  What's the question again?
24

Page 17

1  BY MR. TENGESDAL:
2    Q.   Sure.  Would you agree your definition of
3  standard of care, as you're applying it in the
4  report, is not that of a legal definition of a
5  standard of care since you're unaware of what that
6  even is?
7         MS. MAKAR:  Same objection.
8         THE WITNESS:  I'm unaware, because I don't
9  know what the legal definition is.
10  BY MR. TENGESDAL:
11    Q.   Okay.  Did you do anything to look in an
12  internal medicine textbook, journal article to
13  determine what the standard of care is for treating a
14  similar-situated patient such as Mr. Poole on
15  August 17th, 2017?
16    A.   No.
17    Q.   Why not?
18    A.   Because I know how to practice medicine as a
19  physician.
20    Q.   Okay.  Did you do anything to look at --
21  review any literature/textbook on treatment of
22  cervical spine injuries?
23    A.   I do a little research.
24    Q.   Okay.  What did you look at?

EXHIBIT 7

JOHN GILBERT DAVIS, M.D.
June 08, 2023

Page 18

1    A.  I looked at system, a medical system called
2    UpToDate, so I had to look at some up some of the
3    specifics of some of the fractures and things like
4    that.
5    Q.  Did you look that up on UpToDate prior to
6    the report that we received?
7    A.  Yes.
8    Q.  Okay.  And what specific -- what topics did
9    you look up?
10       MS. MAKAR:  Objection, I wouldn't answer to
11   the extent you are breaking attorney-client
12   privilege.
13   BY MR. TENGESDAL:
14   Q.  Doctor, I'm asking you what you looked up on
15   UpToDate.
16   A.  I looked up spinal fractures, C1-C2
17   fractures.
18   Q.  Okay.  What type of fractures did you look
19   up in the cervical spine?
20   A.  I mean, I don't remember specifically.
21   Q.  Do you recall the context when you looked up
22   the UpToDate article?  Was that on surgical fixation
23   of fractures?
24   A.  No.

Page 19

1    Q.  Did you look up anything else other than
2    cervical fracture at C1-C2?
3    A.  No.
4    Q.  Did your reviewing of that literature, did
5    that pose -- did it help you in your opinions in this
6    case?
7    A.  No.  I think it was more just informational.
8    Q.  When you say more just informational, tell
9    me what you mean by that.
10   A.  So if there's something that I don't know
11   the definition to, if a fracture is, for example,
12   perched and I am not privy to that information, then
13   I look it up so that I can inform myself, educate
14   myself.
15   Q.  Okay.  And did you look up what a perched
16   fracture is?
17   A.  I did.
18   Q.  And when you looked up what a perched
19   fracture is, what did you find?
20   A.  It's basically a radiologic finding where
21   there are two different vertebral structures and if
22   there's instability, then that is one of the possible
23   sequela of a fracture.
24   Q.  Okay.  And when you looked up what a perched

Page 20

1    fracture is, what two vertebral structures are
2    involved in that?
3    A.  Well, it can be any two vertebral
4    structures.  I was looking more for the C1-C2 in the
5    subluxation.
6    Q.  Okay.  Anything else that you looked up
7    definitions, anything else prior to the report?
8    A.  Not off the top of my head.
9    Q.  Okay.  And did you look up any literature in
10   preparation for today?
11   A.  No, I did not.
12   Q.  When you looked at Dr. Beatty's report, was
13   there anything in there that he mentioned that you
14   looked up in the literature?
15   A.  Not specifically.  I pretty much figured out
16   what I needed to learn.
17   Q.  Got you.  Would you agree for cervical spine
18   injuries, there's conservative management versus
19   surgical intervention?
20       MS. MAKAR:  Objection, leading.
21       THE WITNESS:  Am I aware that -- I'm sorry.
22   BY MR. TENGESDAL:
23   Q.  Sure.  A patient that has a cervical injury
24   can they be treated conservatively as opposed to

Page 21

1    surgical intervention?
2    A.  Yes.
3    Q.  Did you do anything to look up the surgical
4    procedure that was performed in this case
5    specifically?
6    A.  I did not.
7    Q.  Okay.  Are you aware of what surgical
8    procedure was performed in this case?
9    A.  Yeah.  I remember reading it.
10   Q.  What was done?
11   A.  I would have to look it up, because it was
12   pretty specific.  I'd have to look at the surgical
13   report.
14   Q.  Do you know who the surgeon was that
15   performed surgery on Mr. Poole?
16   A.  I do not.
17   Q.  Indiana medical review panel; are you still
18   on that?
19   A.  So these are -- basically to explain what it
20   is.  You get queried and there are three physicians
21   and you get a letter that says, you need to opine on
22   this case.  So the ones that are in my CV are
23   completed, but I believe I'm actually supposed to be
24   on another one coming up.

EXHIBIT 7

JOHN GILBERT  DAVIS, M.D.
June 08, 2023

**Page 22**

1    Q.   And how do you get appointed to the panel?
2    A.   They send you an e-mail.
3    Q.   Okay.
4    A.   In the state of Indiana, it's kind of a
5    civic duty.
6    Q.   Oh.
7    A.   So that in Indiana you cannot bring suit
8    until the medical panel says that there is merit.  So
9    I'm being called to participate.
10   Q.   It's been a few years since I did Indiana
11   medmal case.  That's why I was just wondering if you
12   had to apply to like the governor to be on it or if
13   you randomly get an e-mail?
14   A.   It's like jury duty.  They will let you know
15   which -- to be fair, I've been getting a bunch of
16   them.  Like more than my colleagues, so it's actually
17   something that is -- it's a duty, but not something
18   that I cherish.
19   Q.   Okay.  And the ones that you have listed,
20   Jeffrey Hanes.  All I want to know is, was the doctor
21   that you were reviewing on the panel, was that an
22   internal medicine doctor?
23   A.   That, I don't remember.
24   Q.   Okay.  Have you ever reviewed a case for the

**Page 23**

1    Indiana panel for the conduct of a physician who
2    wasn't an internal medicine doctor?
3    A.   Yes.
4    Q.   Okay.  And what case was that?  Because
5    we've got two here.
6    A.   So in these cases, there's going to be,
7    specifically if there's a hospitalist in the case,
8    they'll bring the hospitalist.  If there is a
9    cardiology or an intensivist, they will bring in
10   those type of physicians to bring in.  So there's
11   going to be three different types of physicians to
12   opine on the different aspects of the case.
13        So I don't remember much of any of them to
14   tell you the truth.
15   Q.   Okay.  So you just gave a good example.
16   A.   Yeah.
17   Q.   So if three or four physicians are being
18   sued, they're all different specialties, if you get
19   the e-mail at jury duty, you're asked to opine on the
20   hospitalist?
21   A.   Asked to opine on the entirety of the case,
22   but as a hospitalist, I kind of bring a specific
23   point of view.
24   Q.   Okay.  Got you.  All right.  Have you ever

**Page 24**

1    opined when you've been on the review panel that you
2    thought that a doctor has breached the standard of
3    care?
4    A.   I have to think back.  I believe so.  I
5    believe on one of them I did.
6    Q.   Okay.  All right.  Tell me a little bit
7    about your -- I know you gave me a little overview.
8    But tell me about your practice as a hospitalist in
9    Munster.
10   A.   Sure.  So, for example, we have a certain
11   number of patients we see a day.  We come in.  We
12   know exactly they're all hospitalized patients.  For
13   the most part, we're either getting new patients from
14   the overnight team or they're patients we have been
15   seeing hopefully through their hospitalization.
16        So on the day to day I'm talking to the
17   patient, seeing if they're getting better, talk to
18   the subspecialists if they're involved, kind of
19   quarterbacking the treatment team to, this patient's
20   complicated, they have a different organ system that
21   we need to get in line.  Did we get them all in line?
22   Is this person safe to go home?  Do we need some
23   other things done before they go home?  Coordinating
24   them, getting them followed up in the outpatient

**Page 25**

1    setting so kind of seeing them through the hospital
2    stay.
3    Q.   And tell me if this is accurate.  I've heard
4    people describe hospitalists as kind of the air
5    traffic control in the hospital directing the patient
6    so they go to appropriate specialist.  Does that
7    sound true?
8    A.   That would be fair.
9    Q.   Okay.  And when you're serving as a
10   hospitalist, do you refer the patient to other
11   subspecialists or is that the ER doctor when the
12   patient first comes in?
13   A.   Both.  So if the patient is in the ER and
14   they are -- they know exactly what's going on and
15   they're having a heart attack and they need the
16   cardiologist, they will directly call the
17   cardiologist.  They'll let us know the patient's
18   coming in.
19        If the patient has a cough, it looks like
20   they have pneumonia, need to come in, they will call
21   us, we'll accept the patient.  If we need other
22   specialists, we'll get them on board.  If we don't,
23   then we will handle the case.  It happens both ways.
24   Q.   Is the hospitalist for the patient that's

EXHIBIT 7

JOHN GILBERT DAVIS, M.D.
June 08, 2023

Page 26

1  being admitted when patients go in to see other
2  subspecialists, are you involved?  Do you get the
3  reports from those subspecialists or does it go to
4  the ER doctor?
5      A.  So pretty much once they're in the hospital,
6  all of that funnels through us.  So if they need a
7  surgery, we'll talk to the surgeon, we'll read their
8  op report, we'll talk to them.  When do you think the
9  patient is stable to go home?  We handle the
10  nonsurgical issues.
11          Oh, this patient's blood sugar is crazy
12  after surgery, this patient's blood pressure.  We
13  will handle some of the nonsurgical issues while the
14  subspecialist handles their part of the case.
15      Q.  Okay.  As a hospitalist, have you ever had
16  the occasion when you see a patient that you are the
17  ordering physician, say, for X-rays?
18      A.  Yes.
19      Q.  Okay.  And if you were the ordering
20  physician, the hospitalist directing care, do you
21  then receive the radiology report?
22      A.  Yes.
23      Q.  When you order X-rays, I take it you're in a
24  hospital, they have facilities to take X-rays?

Page 27

1      A.  That's correct.
2      Q.  And at the hospital you're at, are the
3  X-rays studies, are they read by radiologists?
4      A.  They are.
5      Q.  Okay.  Once they're read by a radiologist,
6  do you then receive -- are you electronic medical
7  records?
8      A.  Yeah, we have electronic medical records.
9      Q.  Okay.  Do you receive the report?  Did
10  someone hand it to you or do they tell you you get a
11  notification and it's on the computer?
12      A.  It is our responsibility to follow up on it.
13  If it's critical, then the radiologist will give us a
14  call.
15      Q.  Okay.  And is that called a critical read?
16      A.  You'd have to ask the radiologist what they
17  call it.  When they have something that they need to
18  talk to us about, they'll reach out to us.  I'm sure
19  they have a term for it.
20      Q.  Okay.  So do you have a term for it?  You
21  called it critical.  Critical finding maybe?
22      A.  I don't call it anything.  I just act on it.
23  You know, I mean, it's kind of a thing that -- as the
24  day's going, I'm -- maybe there is a name for it if

Page 28

1  it is a critical read or something that they'll put
2  on there.  We contact -- you'll see on the report..
3  we contacted the ER physician.  We contacted Davis,
4  like they'll put something on there, but I'm unaware
5  what it's actually called.  For me it's just an
6  actionable thing that I need to address.
7      Q.  Is radiology, is that a medical
8  subspecialty?
9      A.  It is.
10      Q.  Are radiologists, are they the physicians
11  that their training, their board certification all
12  goes to reading imaging whether it's X-ray, CT, or
13  MRI?
14      A.  Yes.
15      Q.  Is that why they read the X-rays because
16  they're the specialist?
17      A.  Yes.  They can -- they are specialists in
18  reading the films.  Depending on your subspecialty,
19  some subspecialties read their own films.
20      Q.  Sure.  Such as the surgeon?
21      A.  Exactly.
22      Q.  Okay.  But before the surgeon ever gets to
23  read their own films, isn't it typically that the
24  radiologist looks at it first, dictates a report?

Page 29

1      A.  Yes.
2      Q.  Okay.  You're familiar, I take it over your
3  career you've seen a lot of radiology reports?
4      A.  Sure.  Yes.
5      Q.  Would you agree it's common when you get a
6  radiology report that they have a section entitled,
7  findings and impression?
8      A.  Yes.
9      Q.  Are those the sections you, as a physician
10  concentrate on when you're reading the the report?
11      A.  Yes.
12      Q.  Okay.  And have you seen before in X-ray
13  reports that radiologists generate where they list
14  the findings and then make a comment such as
15  correlate the findings clinically?
16      A.  Yes.
17      Q.  Okay.  Have you ever seen where
18  radiologists, if it's a critical read recommends
19  that the patient be sent -- if it's a fracture in the
20  cervical spine say to a spine surgeon?
21      A.  They don't recommend the follow up.  They
22  might recommend a different mode of imaging, but they
23  leave the actual, this person needs to see this kind
24  of a doctor to the hospitalist essentially.

EXHIBIT 7

JOHN GILBERT  DAVIS, M.D.
June 08, 2023

Page 30

1    Q.   Okay.  And what you just told me that you
2  see after say an X-ray, it might say, recommend CT or
3  MRI?
4    A.   Yes.
5    Q.   Okay.  And then you as a physician, if you
6  see an X-ray report come back, fracture, recommend CT
7  or MRI, then it's up to you to order that study?
8    A.   Yes.
9    Q.   One of the reasons you would order it is
10  because a radiologist suggested it, right?
11    A.   Yes.
12    Q.   Okay.  All right.  So let's -- you can put
13  your CV off to the side.  I'm done with that now.
14        I'm going to ask you a little bit about --
15  we're going to mark this as No. 2 -- it's what we got
16  your expert fees.
17             (Whereupon, Davis Deposition
18              Exhibit 2 was marked for
19              identification.)
20  BY MR. TENGESDAL:
21    Q.   All right.  Doctor, we have Exhibit No. 2
22  what we received with the report.  Have you ever seen
23  this before?
24    A.   No, I haven't seen this before.

Page 31

1    Q.   Okay.  Is it your agreement in this case
2  that for records review, expert report, deposition,
3  and deposition preparation flat fee of 4,000?
4    A.   Yes.
5    Q.   Okay.  So you've got a lot of materials in
6  this case.  How many hours do you think you spent
7  reviewing the materials?
8    A.   No idea.
9    Q.   And you didn't have to submit a bill,
10  because you're getting a flat check, right?
11    A.   Exactly.  I'd done the work before I had to
12  document hourly, but this is not the case.
13    Q.   When you say no idea, do you know if it
14  would be more than 10 hours?
15    A.   It would be more than 10 hours.
16    Q.   More than 20?
17    A.   I have no idea.  I mean, I kind of -- I'm
18  just not on the clock.  But, I mean, 20 hours would
19  probably be the upward edge of it, I guess, if I
20  were to...
21    Q.   All right.  And you haven't submitted any
22  statements other than $4,000 for services?
23    A.   Correct.
24    Q.   Got you.  All right.

Page 32

1             MR. TENGESDAL:  This is 3, please.
2             (Whereupon, Davis Deposition
3              Exhibit 3 was marked for
4              identification.)
5  BY MR. TENGESDAL:
6    Q.   All right.  Doctor, take a look at Exhibit
7  No. 3.  Does this look familiar to you?
8    A.   It does.
9    Q.   Okay.  And it looks like there's a total of,
10  what is it, four or five pages?  Four?
11    A.   Four.
12    Q.   Okay.  The assignment on Page 1 of Exhibit
13  No. 3, is that what you were asked to do, sir?
14    A.   Yes.
15    Q.   And it says you were asked to opine on the
16  medical care given to Mr. Poole from the date of
17  August 17th, 2017.  Would you agree there's nothing
18  in there from that date till the end?
19    A.   Would I agree what again?
20    Q.   It says from the date of August 17th, 2017,
21  but there's no end date.
22    A.   Oh.  So what's the question?
23    Q.   What were you asked to opine from?
24  August 17th, 2017 to current or where?

Page 33

1    A.   I hadn't really thought about it.  I don't
2  know the answer to that question.  I mean, all I have
3  is the records that I have been given, so I imagine I
4  can't really opine on anything past those dates.
5    Q.   Okay.  And the material review section, if
6  we can take a look at that.
7    A.   Uh-huh.
8    Q.   Is that an itemization of all the materials
9  you received in this case?
10    A.   Yes.
11    Q.   I want to ask you first about the Fourth
12  Amended Complaint.  That's the lawsuit.  Did you
13  review that?
14    A.   What would -- like the actual -- like court
15  documents?
16    Q.   Yeah.
17    A.   No, I didn't review that.
18    Q.   Okay.  Grievance documents.  IDOC 1 through
19  7; did you review that?
20    A.   Yes.
21    Q.   Okay.  And what are grievance documents,
22  Doctor?
23    A.   I don't know.
24    Q.   Okay.  Did the grievance documents, did that

EXHIBIT 7

JOHN GILBERT DAVIS, M.D.
June 08, 2023

Page 34

1  form any basis of any of your opinions that you're
2  here to discuss today?
3      A.   No.
4      Q.   Okay.  There's a lot of medical records in
5  this case.  Do you know why you didn't receive the
6  entire chart from the Illinois Department of
7  Corrections?
8      A.   I have no idea.
9      Q.   Okay.  Do you know if you received all of
10 the depositions that have been taken in this case?
11     A.   I don't know if I've received all the
12 depositions that have been taken.  I know what I was
13 given.
14     Q.   Okay.  The UIC medical records, you got
15 selected pages.  Do you know why you were not
16 provided the entire chart?
17     A.   I do not.
18     Q.   Did you ever ask is there anything
19 additional that would help me in arriving at my
20 opinions in this case?
21     A.   I assumed that my counsel gave me all the
22 appropriate materials.
23     Q.   Okay.  And one of the documents, it's the
24 last one, Doctor, it says, The previous expert report

Page 35

1  rendered by Dr. Beatty.  Is that something you
2  received?
3      A.   The previous expert report rendered by
4  Dr. Beatty, yes.
5      Q.   And did you review the previous expert
6  report of Dr. Beatty?
7      A.   Yes.
8      Q.   Okay.  Deposition of Dr. Mehta.  Who's that?
9      A.   I don't remember.
10     Q.   Okay.  Deposition of Ahmad Poole.  Who's
11 that?
12     A.   That's the plaintiff.
13     Q.   Okay.  And deposition of Dr. Aguinaldo?
14     A.   That's the defendant.
15     Q.   Okay.
16     A.   Can I amend something that I said?  When you
17 asked me did I read the Fourth Amended Complaint, I
18 don't remember reading that, but I read it, because I
19 read everything that they provided me.  If that was
20 the legal part of it, then I probably just tuned it
21 out.  I know I said I did not review it.  Everything
22 that's on here, I reviewed.
23     Q.   Sure.  That's fine, Doctor.
24     A.   I apologize.

Page 36

1      Q.   Then I just have to ask you, when you read
2  that legal document --
3      A.   Yes.
4      Q.   -- did anything in there, did you use, did
5  it form a basis of any of your opinions?
6      A.   It did not.
7      Q.   Okay.
8                     (Whereupon, Davis Deposition
9                      Exhibit 4 was marked for
10                     identification.)
11 BY MR. TENGESDAL:
12     Q.   Okay.  What we're going to mark as Exhibit 4
13 is -- it looks like it's the listing of the materials
14 you reviewed.  So that we don't have to have you go
15 through all your stuff, we'll go right over it.
16     A.   Okay.
17     Q.   And if we can have you turn to tab three of
18 Exhibit 4.  This is a physician's note.  It says,
19 8-17-2017, Dr. A, RTP for request to produce 0479.
20 That's listed in your materials reviewed.
21     A.   Correct.
22     Q.   At the bottom you see where there's a 749?
23     A.   I do, yes.
24     Q.   Did you review this?

Page 37

1      A.   I did review this.
2      Q.   Okay.  Did this document form anything as a
3  basis of any of your opinions in this case?
4      A.   Yes, it did.
5      Q.   And tell me how.
6      A.   So if this is a report on the day of the
7  injury or the altercation, part of what my finding
8  was, the subjective finding under S has a zero or
9  nothing.  The objective finding, which is the
10 physical exam, shows laceration.  It says that they
11 repaired the laceration in the assessment and plan.
12 The nurse has signed it and then the physician has
13 cosigned this note.
14     Q.   Okay.  Do you know who drafted the note?
15     A.   I mean, I -- whoever K and this name and the
16 RN is probably who formulated the majority of this
17 note.
18     Q.   Okay.  It's Nurse Carnahan.
19     A.   Carnahan.
20     Q.   Do you know if Nurse Carnahan, after she
21 completed this form, gave to Dr. Aguinaldo who
22 then stated that he would like to see the offender
23 immediately?
24              MS. MAKAR:  Objection, calls for

EXHIBIT 7

JOHN GILBERT DAVIS, M.D.
June 08, 2023

Page 38

1   speculation.
2       THE WITNESS:  I have no idea what happened
3   with the actual paper and what was transpiring
4   between the nurse and the physician.
5   BY MR. TENGESDAL:
6       Q.   Okay.  Do you know if in the depositions it
7   was discussed as to what actually happened?
8       A.   Okay.  Sure.  I don't remember that
9   specifically, but...
10      Q.   Okay.  Would it be appropriate after an
11  individual prisoner got into a fight suffered
12  lacerations and scratches and presented to a
13  physician, that they say, I would like to see the
14  patient immediately?
15      A.   Repeat the question.
16      Q.   Sure.
17      A.   Thanks.
18      Q.   Is it your -- tell me your understanding of
19  what happened to Mr. Poole.
20      A.   Like from the altercation and whatnot?
21      Q.   Yeah.
22      A.   Okay.
23      MS. MAKAR:  Objection, outside the scope,
24  lack of personal knowledge.

Page 39

1   BY MR. TENGESDAL:
2       Q.   You did read Mr. Poole's deposition, right?
3       A.   I did.
4       Q.   And Mr. Poole testified as to what happened
5   to him, right?
6       A.   Yes.
7       Q.   Okay.  So what did Mr. Poole say happened to
8   him?
9       A.   Mr. Poole said he had an altercation with
10  another man in his cell.  It was physical.
11  Eventually it got broken up and he suffered injuries
12  from that altercation.
13      Q.   Okay.  And did Mr. Poole then go down to the
14  health care unit?
15      A.   Yes, he did.
16      Q.   Okay.  And I'm talking in reasonable
17  proximity to the event.  He didn't wait like a week.
18  He asked to go to the health care unit, right?
19      A.   It sounds like he went to the health care
20  unit that same day, yes.
21      Q.   When he came to the health care unit, when
22  he was initially triaged by a nurse, that's similar
23  to what happens when a patient comes to an ER.
24  They're triaged by a nurse; is that right?

Page 40

1       A.   Yes.
2       Q.   Okay.  And the reason you triage a patient
3   is to determine -- to direct the care; is that
4   correct?
5       A.   That's correct.
6       Q.   Okay.  So if Nurse Carnahan wrote this down,
7   that there was a one inch laceration to the left
8   cheek, two scratches to the right neck, and a scratch
9   to the left forehead and she presented that to
10  Dr. Aguinaldo, would it be reasonable for him to say,
11  I'd like to see the patient immediately?
12      A.   That would be reasonable.
13      MS. MAKAR:  Objection, calls for
14  speculation, incomplete hypothetical.
15      THE WITNESS:  That would be a reasonable
16  thing for him to do.
17  BY MR. TENGESDAL:
18      Q.   Okay.  And do you know how long it was after
19  the altercation to where Dr. Aguinaldo actually saw
20  Mr. Poole?
21      A.   I do not know.
22      Q.   Okay.  Do you know how long it was from the
23  time that he presented and was sitting in health care
24  to the time Dr. Aguinaldo saw him?

Page 41

1       A.   I do not know that.
2       Q.   Do you recall the days that Dr. Aguinaldo
3   saw Mr. Poole?
4       A.   I can look it up, because I know there were
5   multiple occasions.
6       Q.   Okay.  What would help you to look it up?
7       A.   I can look at my notes.  I can look at your
8   guy's notes.  Initial 8-17, got sutures on 8-17, had
9   the wound rechecked on 8-19, had lab work on the
10  21st.  That may or may not.  I have no idea whether
11  they encountered a health care professional or if it
12  was just a lab draw.  He had suture removed on 8-24.
13  That was a patient encounter.  X-rays completed.
14  That might not be a patient encounter.  8-27, he did
15  see a physician.  The plain film was noted to be
16  positive.  I don't think he saw a physician on the
17  27th.
18      Q.   Okay.
19      A.   There was a positive plain film read.  The
20  X-ray is reviewed on 8-30.  I imagine there is an
21  encounter there because the second physician came in
22  at that point.  So those are the encounters that I
23  had kind of documented.
24      Q.   Okay.  How about 8-28, August 28th, 2017?

EXHIBIT 7

JOHN GILBERT DAVIS, M.D.
June 08, 2023

Page 42

1    Do you have anything in your notes about that
2    encounter?
3        A.   8-28?
4        Q.   Yeah.
5        A.   I do not.
6        Q.   Okay.  And did you take notes in that little
7    book you got there about the case?
8        A.   Uh-huh.
9             MS. MAKAR:  Objection.
10            To the extent that it's protected by
11   privilege, you do not have to answer.
12   BY MR. TENGESDAL:
13       Q.   Your attorneys didn't write that for you,
14   did they?  You wrote that, right, in your book?
15       A.   Yeah, this is my writing.
16            MS. MAKAR:  Objection.
17   BY MR. TENGESDAL:
18       Q.   Okay.  So this is your notes of your review
19   of the materials?
20       A.   Yes.
21       Q.   Okay.  Do you have anything for 8-28?
22       A.   For 8-28, no.
23       Q.   Do you know if Mr. Poole was seen by a
24   physician on August 28th?

Page 43

1        A.   I don't have that noted.  I can look it up.
2        Q.   Okay.  Well, I thought that's what you were
3    doing?  What else are you going to look it up on?
4             MS. MAKAR:  Objection.  I object to the
5    extent you're asking for drafts.
6    BY MR. TENGESDAL:
7        Q.   Doctor, I'm just asking you if a physician
8    saw the patient on August 28th, 2017.
9        A.   I am looking that up.  Is that okay?
10       Q.   Yeah.  No, I'm responding to your counsel.
11       A.   I thought you meant me.
12       Q.   No, you referenced notes.  What do you got
13   there in front of you?  What are you referencing?
14       A.   This is the materials that I have had on the
15   computer, but it's printed out, so it's basically the
16   materials reviewed.
17       Q.   Okay.  Got you.
18       A.   8-28.  Okay.  So I have a note here X-ray
19   done 8-27.  Okay.  So, yes, this patient was seen by
20   a medical professional on 8-28.
21       Q.   Can you show me what you're looking at?
22   Just spin it.
23       A.   Oh, sorry.
24       Q.   Okay.  So you reviewed a note from 8-28-17.

Page 44

1        A.   Yes.
2        Q.   Do you know who wrote the note?  Who saw the
3    patient on that day?
4        A.   I cannot tell from this.
5        Q.   Okay.  Let's have you go now to the
6    exhibit -- the binder.  So looking at tab four, the
7    first note Page 251 at the bottom, 8-17-17.  Do you
8    know whose note this is?
9        A.   Okay.  Help me again.  Tab four, what
10   number?
11       Q.   Page 251 at the bottom?
12       A.   251 at the bottom.
13       Q.   And it says there's a 218 as well.  So look
14   at the big number, the 251.
15       A.   Oh, okay.  Got it.  I'm looking at the wrong
16   number.
17       Q.   I'm sorry?
18       A.   251.  I've got it.
19       Q.   Okay.  Is this a note you reviewed?
20       A.   It is.
21       Q.   Okay.  Do you know who wrote this note?
22       A.   Not off -- not right now.
23       Q.   Okay.  Let's go to the next page of tab four
24   of Exhibit 4.  Page 252?

Page 45

1        A.   252, got it.
2        Q.   Okay.  Do you know who the author of this
3    note was?
4        A.   I do not.
5        Q.   Okay.  Next page, Doctor, 253.  That's a
6    date of 8-21-17?
7        A.   Okay.
8        Q.   Do you know who is the author of this note?
9        A.   No, I don't know who the author of this note
10   is.
11       Q.   Okay.  So the first note the 8-17 and now
12   the 8-21, did these notes play any basis in any of
13   your opinions in this case?
14       A.   To the extent I could understand what was in
15   there.
16       Q.   Okay.  Did you do anything to try to
17   determine on those two pages from 8-17, 8-21 that you
18   couldn't read what was written?
19       A.   On my own, yes.
20       Q.   What did you do?
21       A.   Tried to figure what it said.
22       Q.   How did you try to figure out?  Just reading
23   it?
24       A.   Just reading it.  And without having

EXHIBIT 7

JOHN GILBERT DAVIS, M.D.
June 08, 2023

Page 46

1  somebody who knows what this is, I didn't have
2  anybody to interpret it for me.
3      Q.   Got you.  All right.  Let's look at the next
4  note, Page 254.  This is from 8-24-17.  Do you know
5  who the author of this note is?
6      A.   I do not.
7      Q.   Okay.  And do you know if the 8-24 note that
8  we're looking at there, did that play any role in any
9  basis of your opinions in this case?
10     A.   To the extent that I could understand it and
11  read it, yes.
12     Q.   Okay.  Next page, Page 255, tab 4,
13  Exhibit 4, the 8-28-17 note, did this play any basis
14  in your opinions in this case?
15     A.   Yes.
16     Q.   How so?
17     A.   To the extent that I could understand who --
18  what was going on there, I tried to determine what
19  was going on that day.
20     Q.   Okay.  Do you know who wrote this 8-28 note?
21     A.   I do not know who specifically wrote that
22  8-28 note.
23     Q.   Okay.  And then the next one, Page 256
24  Doctor.  This is August 30, 2017 M.D. note.

Page 47

1           Do you know who the author of this note was?
2      A.   This says Dr. Obaisi.
3      Q.   Okay.  And did this note from August 30,
4  Doctor, did you use any of this information as a
5  basis of your opinions in this case?
6      A.   Yes.
7      Q.   Okay.  All right.  Now, if we can skip ahead
8  a little bit.  I want to ask you about Page 465.  It
9  looks like this.
10     A.   Okay.
11     Q.   Doctor, are you on Page 465?
12     A.   I am on Page 465.
13     Q.   This document's entitled "Segregation Sick
14  Call Rounds Chart."  Do you know what this note --
15  what this is for?
16     A.   Not really, no.
17     Q.   Do you know if Mr. Poole, after he had his
18  altercation, was sent to segregation?
19          MS. MAKAR:  Objection, outside the scope,
20  speculation.
21          THE WITNESS:  I do not know.
22  BY MR. TENGESDAL:
23     Q.   Do you know what segregation is in a prison?
24     A.   I'm sure I don't know intricate details.  I

Page 48

1  kind of get an idea.  But I would say, no, I do not
2  know exactly what this means.
3      Q.   Since this was provided to you, Page 465,
4  the segregation sick call rounds chart, when you
5  looked at this, did this form any basis of your
6  opinions in this case?
7      A.   This did not.
8      Q.   Okay.  Are you aware -- do you see in that
9  first box here, Doctor, let me show you for
10  reference, it says, nurse sick call.  Seen in
11  segregation.  No complaints.
12          Did you see that box when you were doing
13  your review?
14     A.   I did.
15     Q.   Okay.  And did you see that it's checked on
16  August 18th, 19th, 20, 21, 22, 23, 24, 25, 26, 27,
17  28, 29, 30, and 31 that he has no complaints?
18          MS. MAKAR:  Objection, leading, speculation,
19  lack of personal knowledge.
20          THE WITNESS:  So according to this
21  documentation from the 18th through the 31st, a nurse
22  saw the patient and they marked no complaints.
23  BY MR. TENGESDAL:
24     Q.   Is that your understanding of the document?

Page 49

1      A.   Yeah, that's all I can glean from that
2  document.
3      Q.   Okay.  So when you reviewed this document
4  and you saw from the 18th through the 31st when a
5  nurse saw Mr. Poole in segregation and charted no
6  complaints, did that have anything to do with your
7  opinions?  Did you consider this document?
8          MS. MAKAR:  Objection, repetitive
9  questioning.
10          THE WITNESS:  Well, no, I didn't understand
11  what the document said before, so it couldn't have
12  played in my opinion.
13  BY MR. TENGESDAL:
14     Q.   Okay.  What is it that you didn't understand
15  before?
16     A.   I didn't know what I was looking at.
17     Q.   Okay.
18     A.   So basically -- I had no guidance as to what
19  this meant.  I mean, I read the heading of it and
20  kind of review it, but if I'm not given any kind of
21  context as opposed to something where I'm more
22  familiar like a medical note, then I read it, and if
23  I don't understand it, then it's not going to play a
24  part in my opinion.

EXHIBIT 7

JOHN GILBERT DAVIS, M.D.
June 08, 2023

Page 50

1    Q.   Now, having reviewed it, do you have an
2  understanding of what's contained on Page 465?
3    A.   I do.
4    Q.   What's your understanding now, Doctor?
5       MS. MAKAR:  Objection, outside the scope.
6       THE WITNESS:  So as I said previously, so
7  sounds like -- looks like, from the 18th through the
8  31st, the patient was in segregation.  In rounds the
9  nurse went and sees the patient and documents there
10  were no complaints.
11  BY MR. TENGESDAL:
12    Q.   Okay.  Thank you.
13       MS. MAKAR:  Should we take a break?  It's
14  been about an hour.
15       THE WITNESS:  I agree.
16       MS. MAKAR:  10 minutes.
17       MR. TENGESDAL:  Sure.  I just ask, doctor --
18  I know you haven't done this, but you're not allowed
19  to talk with counsel about the case during breaks.
20       THE WITNESS:  She told me that.
21       MS. MAKAR:  I told him that.
22            (Whereupon, a break was taken,
23              after which the following
24              proceedings were had:)

Page 51

1  BY MR. TENGESDAL:
2    Q.   Doctor, let's turn to Page 718, if we could.
3    A.   Same section?
4    Q.   Yeah, same section.
5    A.   Okay.
6    Q.   It looks like it's the X-ray report.  It's
7  the page after the prescription order.  Tab 4 still?
8    A.   Tab 4.  I have 751 and then my numbers
9  disappear.
10    Q.   It's about eight pages after the last one we
11  looked at.
12    A.   Got it.
13    Q.   Want me to find it for you?
14    A.   Yeah.
15    Q.   All right.  I'll show you in Exhibit 4, tab
16  4, Page 718, it says, State of Illinois Department of
17  Corrections X-ray report.
18       Did you review this as a basis of your
19  opinions?
20    A.   I did.
21    Q.   Did this form any basis of your opinions,
22  Doctor?
23    A.   Yes.
24    Q.   How so?

Page 52

1    A.   So this was the diagnosis of the --
2  diagnosis of subluxation on the original X-ray.
3    Q.   Okay.  And if you could, do you see where --
4  what's -- inmate's name, what's listed there?
5    A.   Mr. Poole.
6    Q.   Okay.  What date do we got there?
7    A.   8 something.
8    Q.   Do you know if the testimony was that this
9  was done on 8-17, August 17th?
10    A.   I mean, if you're saying it's August 17th,
11  August 17th.
12    Q.   Okay.  And do you know what dates
13  Dr. Aguinaldo ordered the X-rays?
14    A.   I can look.
15    Q.   Are you referencing your notes in the book?
16    A.   I'm referencing my notes and I have -- okay.
17  Now, I'm confused.  Is this the 17th or is this a 27?
18  Is this a 17 or a 27?  Because I have -- the
19  original altercation was on the 17th, correct?  And
20  so this would say that he got the X-ray the same day.
21  I don't believe that is correct.  So I'm not sure
22  what date this is right here.
23    Q.   My question is, not even looking at the
24  form, do you know from the testimony of Dr. Aguinaldo

Page 53

1  the date he ordered the X-rays?
2    A.   I have noted that the X-ray was ordered on
3  the 22nd, but it was not completed at that time.
4    Q.   Okay.  So you're saying it was ordered on
5  the 22nd of August?
6    A.   That's what I have in my notes.
7    Q.   Okay.  And where did you get that from?
8    A.   Reviewing these records.
9    Q.   Okay.  The deposition of the doctor,
10  Dr. Aguinaldo, did he testify as to the date the
11  X-rays were ordered?
12    A.   If he put the date in there, I do not
13  remember exactly what day he said.
14    Q.   Okay.  Do you know what date the X-rays were
15  taken?
16    A.   In my notes, it's X-ray completed on 8-25.
17    Q.   Okay.  And in your notes for 8-25 X-rays
18  completed, where did you get that information?
19    A.   From the records from my review.
20    Q.   Okay.  And any specific record?
21    A.   No, I don't remember which specific record.
22  I mean, as I'm going through the notes where there's
23  notes that I can comprehend where the X-ray was
24  actually ordered, that's kind of what I concluded.

EXHIBIT 7

JOHN GILBERT DAVIS, M.D.
June 08, 2023

Page 54

1    Q.   Okay.  Do you see at the bottom of Page 718,
2  there's a stamp August 25, 2017?
3    A.   I see that, August 25, 2017.
4    Q.   C. Rogers, RTR.  Do you know what the
5  abbreviation RTR is for?
6    A.   No, I don't.
7    Q.   Do you know if RTR is radiology tech?
8         MS. MAKAR:  Objection, repetitive
9  questioning.
10        THE WITNESS:  Yeah, I don't know.
11  BY MR. TENGESDAL:
12   Q.   Okay.  What's the evidence in the case as
13  far as deposition testimony as to when the X-rays
14  were taken?
15   A.   I can look it up.  In whose deposition?
16  Which deposition am I looking for?
17   Q.   I'm just asking if you know.
18   A.   No, not off the top of my head.  I would
19  have look it up.  Do you want me look it up?
20   Q.   Do you have any reason to disagree that the
21  X-rays were taken on August 25th?
22   A.   No, I don't have any reason to disagree the
23  X-rays were taken on the 25th.
24   Q.   Your own report states, cervical spine

Page 55

1  X-rays taken on August 25th, right?
2    A.   So you asked me if I have a problem with
3  that.  I said no.
4    Q.   I just asked you and you didn't know if they
5  were taken; you needed to look it up.  So I'm saying
6  your own report has the date, right?
7    A.   Sure.
8    Q.   So no disagreement the X-rays were taken on
9  August 25th?
10   A.   25th.  August 25th.
11   Q.   Got you.  Do you know what date the
12  radiologist read the X-rays?
13   A.   I do not know what date the radiologist read
14  the X-ray, but it's going to be on his report.
15   Q.   Okay.
16   A.   I have the M.D. notes on 8-27 that there is
17  a positive plain film.
18   Q.   Okay.  And we've got the -- right in front
19  of you there is the radiology report, correct?
20   A.   It is.
21   Q.   Does the radiology report, does it list the
22  date the radiologist completed the report?
23   A.   I don't see that.  I see a date, which seems
24  to be the date -- okay.  I apologize.  This is the

Page 56

1  radiologist's report.  So if the radiologist, if this
2  is his report, it is the 27th when the initial read
3  is.
4    Q.   Okay.  The read was on August 27, 2017 by
5  the radiologist according to what's on the document?
6    A.   Correct.
7    Q.   Got you.  Do you know who the radiologist
8  is, the name?
9    A.   No, I don't know off the top of my head.
10   Q.   Do you know if the radiologist was
11  deposed in this case?
12   A.   I am not sure if the radiologist was
13  deposed.
14   Q.   Do you know if it was actually plaintiff's
15  counsel's firm that took the deposition of the X-ray
16  radiologist?
17        MS. MAKAR:  Objection, outside of scope,
18  outside of personal knowledge.
19        THE WITNESS:  I don't know.
20  BY MR. TENGESDAL:
21   Q.   It's outside of your personal knowledge
22  because according to the materials reviewed, you were
23  never provided the radiologist's deposition, were
24  you?

Page 57

1         MS. MAKAR:  Objection, repetitive
2  questioning.
3         THE WITNESS:  If it's not listed in here,
4  then I didn't receive it.
5  BY MR. TENGESDAL:
6    Q.   Do you know why you would not receive the
7  deposition of the radiologist in this case?
8         MS. MAKAR:  Objection, speculation.
9         THE WITNESS:  No, idea.
10  BY MR. TENGESDAL:
11   Q.   Did you ever ask that the radiology report
12  here, did the radiologist ever give a deposition?
13   A.   Did I ever ask that?  No, I did not.
14   Q.   Yeah.  Did you ever ask if the radiologist
15  provided any testimony in the case outside of the
16  deposition?
17   A.   I did not.
18   Q.   Okay.  Do you know what the radiologist
19  testified to as far as a fracture?  This radiologist.
20        MS. MAKAR:  Objection --
21        MR. TENGESDAL:  Yeah.
22        MS. MAKAR:  Objection, repetitive
23  questioning, speculation.
24        THE WITNESS:  So this radiologist lists

EXHIBIT 7

JOHN GILBERT DAVIS, M.D.
June 08, 2023

Page 58

1    subluxation. So I'm not sure what your question is.
2    BY MR. TENGESDAL:
3        Q. I know you didn't get the deposition of the
4    radiologist. But are you aware the radiologist
5    testified that he missed the fracture?
6        MS. MAKAR: Objection, repetitive
7    questioning, outside the scope.
8        THE WITNESS: No.
9    BY MR. TENGESDAL:
10       Q. Okay. Do you know the radiologist testified
11   that he never conveyed orally the results of the
12   X-ray to Dr. Aguinaldo or any other physician?
13       A. Unaware.
14       Q. If there's a fracture on an X-ray, is it the
15   responsibility of the radiologist to read that, find
16   it, and put it in the report that there's a fracture?
17       A. Yes.
18       Q. Okay. If the radiologist reads a film and
19   doesn't put in the report that there's a fracture and
20   doesn't contact the physician to tell him there's a
21   fracture of the cervical spine, would you agree the
22   physician wouldn't know?
23       MS. MAKAR: Objection, speculation,
24   incomplete hypothetical.

Page 59

1        THE WITNESS: You don't know what you don't
2    know. So if the radiologist has not conveyed that,
3    then the physician won't know.
4    BY MR. TENGESDAL:
5        Q. Okay. Is it a breach of the standard of
6    care for a radiologist to not report a fracture
7    visualized on cervical spine films?
8        MS. MAKAR: Objection, outside the scope of
9    his report.
10       THE WITNESS: Repeat the question? I'm
11   sorry.
12       MR. TENGESDAL: We'll have court reporter
13   read it back.
14       (Whereupon, the record was
15       read as requested.)
16       THE WITNESS: That, I'm not sure. Because
17   it depends on the fracture. It depends on how they
18   communicate. At some point, there should be some
19   communication. The modality of that, I am not sure.
20   It's probably specific to each practice.
21   BY MR. TENGESDAL:
22       Q. Okay. Do you know if Mr. Poole had a
23   fracture in his cervical spine?
24       A. He did have a cervical spine fracture

Page 60

1    diagnosed.
2        Q. Okay. And where was the fracture?
3        A. I can look it up. You want me to read the
4    report? I mean --
5        Q. Sure.
6        A. Sure. Mr. Poole had based on -- this is the
7    CT and the MRI. This is the CT. A closed displaced
8    right C3 facet fracture.
9        Q. Okay. If a radiologist such as in this case
10   reviews the film and does a report on August 27th and
11   there's a right C3 facet fracture, is that something
12   the radiologist should put in the report?
13       MS. MAKAR: Objection, outside the scope.
14       THE WITNESS: It is in the report, so yes.
15   BY MR. TENGESDAL:
16       Q. Oh, it's in doctor -- the report in front of
17   you, Page 718, please show me where it says fracture.
18       A. No, no, no. You asked me where the fracture
19   was, and I went to the CT to answer your question
20   that it's a C3 facet fracture. If we're going back
21   to this document, let's go back to this document.
22       Q. Yeah. Okay. That's why I used the words
23   August 27th. Because the CT was done when?
24       A. After. It doesn't matter when, but it was

Page 61

1    after.
2        Q. Okay. Well, it matter's for the question.
3        A. Okay. But you asked me specifically what
4    fracture was, so I needed to look it up. I can look
5    at any report and tell you what the fracture was,
6    which was a C3 facet fracture.
7        Q. I appreciate that.
8        A. Okay.
9        Q. But I've got a different question, though.
10       A. Okay. Let's have it.
11       Q. So the August 27th radiology report --
12       A. Correct.
13       Q. -- if on the cervical spine plain films
14   there's a C3 facet fracture on the right, is that
15   something the radiologist should report to the
16   referring physician?
17       A. If he sees it, yes. If he doesn't see it,
18   he's not going to report it.
19       Q. Okay. Well, is that something a radiologist
20   should see, a fracture on a cervical spine film?
21       MS. MAKAR: Objection, outside the scope.
22       THE WITNESS: Yeah, I can't answer that,
23   because that's exactly why we have different
24   modalities. So a plain film will never ever diagnose

EXHIBIT 7

JOHN GILBERT DAVIS, M.D.
June 08, 2023

**Page 62**

1   all fractures. If there is a need for a better
2   modality, which is CT or MR, that will pick up
3   fractures that maybe a plain film doesn't. So the
4   answer is if a radiologist does see a fracture, yes.
5   If the answer to the question is does every X-ray
6   show the fracture, the answer is probably no. And
7   that's why they have back ups.
8   BY MR. TENGESDAL:
9       Q.   Okay. In addition to them not giving you
10  Dr. Leef, the radiologist deposition, are you aware
11  they never provided you the plain films that were
12  looked at and reported on on August 27th by Dr. Leef?
13      A.   Very aware that I didn't see the plain
14  films.
15      Q.   You're also very aware that you didn't ask
16  to see the plain films, right?
17      A.   I did not ask because I cannot read them, so
18  it would have done me no good to have the plain
19  films. As we kind of covered, the radiologists,
20  their job is to do these reads and give me the
21  information. So, yes, I could have asked for those
22  films. It wouldn't have done me any good.
23      Q.   Okay. Would your answer be the same then
24  for CT and MRI; that's why you didn't ask it, because

**Page 63**

1   you don't read it at the hospitals?
2       A.   There you go. Exactly.
3       Q.   Got you. You said earlier in your testimony
4   that other subspecialists such as surgeons, they will
5   review the imaging, right?
6       A.   Usually they do.
7       Q.   Is it your understanding that a spine
8   surgeon is able to look at a spine X-ray?
9       A.   Yes.
10      Q.   Okay. Do you know if anyone in this case
11  has opined that the X-rays clearly show a fracture
12  that Dr. Leef missed on August 27th?
13      A.   Unaware of any of that.
14      Q.   Okay. So did Dr. Leef recommend superior
15  imaging such as a CT or MRI follow up in his
16  August 27th report?
17           MS. MAKAR: Objection, speculation.
18           THE WITNESS: From this form, I cannot glean
19  a recommendation for follow-up imaging.
20  BY MR. TENGESDAL:
21      Q.   Okay. From the form, you can glean, though,
22  that Dr. Leef did not report to Dr. Aguinaldo that
23  there's a right-sided C3 facet fracture?
24           MS. MAKAR: Objection, speculation.

**Page 64**

1           THE WITNESS: That is not in this report.
2   BY MR. TENGESDAL:
3       Q.   Okay. Let's move forward to Page -- you'll
4   see at the bottom, it's little numbers, Doctor, 2994.
5   It's the Presence St. Joseph Medical Center document.
6       A.   Little in the corner 2994. Going forward in
7   the same section?
8       Q.   Yeah. It looks like this, Doctor.
9       A.   Okay. Got it.
10      Q.   Okay. This was in the packet of records you
11  were provided by counsel for Mr. Poole.
12           Did you read this and use this as anything
13  of a basis of your opinions?
14      A.   I did read this and used it as part of the
15  basis of my opinion.
16      Q.   Okay. Let me ask you to look at the bottom
17  where it says consults.
18      A.   Okay.
19      Q.   And do you see where it says, 1502,
20  Dr. Johanek; radiology, informed me of critical read.
21  There is an inferior facet fracture at C3 with
22  perching on C4. Do you see that?
23      A.   I do.
24      Q.   Remember we discussed earlier radiologists

**Page 65**

1   in providing critical reads?
2       A.   We did.
3       Q.   Is that term used here, critical read?
4       A.   It is. It is in there, yes, critical read.
5       Q.   All right. Doctor, if there's an inferior
6   facet fracture with C3 with perching on C4, would you
7   agree that's a critical read?
8       A.   I would agree with that.
9       Q.   Would you agree that the radiologist at
10  Presence St. Joseph Hospital, once he saw that,
11  called up the physician and reported that, the
12  critical read of the fracture?
13           MS. MAKAR: Objection, speculation.
14           THE WITNESS: That, I don't know how he
15  conveyed that.
16  BY MR. TENGESDAL:
17      Q.   Will, we know he conveyed it at least in a
18  note, right?
19      A.   Correct.
20      Q.   Okay. And in this case would you agree
21  we've seen no evidence that Dr. Leef, the
22  radiologist, ever conveyed a critical read of a right
23  C3 inferior facet fracture with perching to
24  Dr. Aguinaldo in the radiology report?

EXHIBIT 7

JOHN GILBERT DAVIS, M.D.
June 08, 2023

**Page 66**

1    MS. MAKAR: Objection, speculation.
2    THE WITNESS: That was not in that radiology
3  report.
4  BY MR. TENGESDAL:
5    Q.   Okay. Do you have any reason to disagree?
6  I know you weren't given the deposition of Dr. Leef,
7  but --
8    MS. MAKAR: Objection.
9  BY MR. TENGESDAL:
10    Q.   -- did Dr. Leef ever testify I never
11  communicated with Dr. Aguinaldo outside of the
12  report?
13    A.   What was the question again? I'm sorry.
14    Q.   Do you have any reason to disagree that
15  Dr. Leef testified that other than the report, he
16  never contacted Dr. Aguinaldo to give a critical read
17  of a cervical spine fracture?
18    MS. MAKAR: Objection, outside the scope,
19  personal knowledge, incomplete hypothetical.
20    THE WITNESS: So I have no knowledge, so I
21  have no reason to disagree or agree.
22  BY MR. TENGESDAL:
23    Q.   And you have no knowledge, you were never
24  provided Dr. Leef's deposition, right?

**Page 67**

1    MS. MAKAR: Objection, repetitive
2  questioning.
3    THE WITNESS: I was not.
4  BY MR. TENGESDAL:
5    Q.   Okay. Do you know if when the patient
6  presented to Presence St. Joseph Hospital, whether or
7  not he had any clinical sign in his cervical spine?
8    A.   I can read the report based on their
9  emergency and their examination on what their
10  findings were.
11    Q.   Okay. So you want to look at the history of
12  present illness the page prior to the one we were
13  just looking at. And tell us, what is -- we're
14  looking, Doctor, at Page 1 of 5, little numbers down
15  there, 2993.
16    A.   2993.
17    Q.   It says -- this is a Presence St. Joseph
18  record. Can you tell us, what is history of present
19  illness?
20    A.   I'm just trying to get my dates, what date
21  this is. You want me to read the history of present
22  illness?
23    Q.   Let's do that first. I agree with you.
24  What date is this record, Doctor?

**Page 68**

1    A.   Quick chart created at 8-30 -- 8-30-17. Got
2  it. History of present illness is basically the
3  report, patient comes in, ER doctor whoever intakes
4  them, gets the -- shuts up and let's the patient
5  speak and tell them what happened. The story of what
6  brought them in.
7    Q.   What's charted there for history of present
8  illness on Page 2993, Doctor? Just read it for us.
9    A.   For sure. 34-year-old male inmate in police
10  custody presents with neck pain times two weeks.
11  Patient reports he was an altercation two weeks ago,
12  was placed in a head lock and twisted his neck.
13  Since then the patient has had pain in the back of
14  his neck, a portion of weakness, numbness, or
15  tingling, no head injury, no loss of consciousness.
16  No other injuries. Patient was seen in the prison
17  infirmary today. Plain films showing possible C3-4
18  subluxation so was sent to the ED for further
19  evaluation.
20    Q.   Okay. And you're saying this is what -- in
21  the history of present illness when the doctor lets
22  the patient tell him what their symptoms are?
23    A.   Yes.
24    Q.   Did Mr. Poole on August 30, 2017 report to

**Page 69**

1  the emergency room physician at presence that he had
2  no weakness, numbness, or tingling?
3    MS. MAKAR: Objection, speculation.
4    THE WITNESS: He reports no weakness,
5  numbness, or tingling in that report, yes.
6  BY MR. TENGESDAL:
7    Q.   Okay. In Mr. Poole's deposition, did he
8  ever state that he had any weakness, numbness, or
9  tingling?
10    A.   I'm sorry. One more time.
11    Q.   In Mr. Poole's deposition when he was
12  telling us the story of his injury, did he ever
13  report and say, you know what, I had weakness,
14  numbness, and tingling?
15    A.   I would have to review it, but I don't know
16  just off the top of my head whether those were
17  specific complaints of his.
18    Q.   Okay. Would you agree his encounter on
19  August 30 with the emergency room doctor, he reported
20  no weakness, numbness, or tingling in the cervical
21  spine?
22    MS. MAKAR: Objection, speculation, asked
23  and answered.
24    THE WITNESS: According to the report, no

EXHIBIT 7

JOHN GILBERT DAVIS, M.D.
June 08, 2023

Page 70

1  witness -- no weakness, tingling, numbness, or
2  tingling.
3  BY MR. TENGESDAL:
4      Q.  Okay.  Let's look at Page 2994 again.
5      A.  Okay.
6      Q.  And I want to draw your attention to the
7  medical decision-making section.
8      A.  Okay.
9      Q.  Do you see where it says, Patient is
10  declining offer of pain medication?
11      A.  Patient is declining offer of pain
12  medication.  That is in there.
13      Q.  Does the ER chart Presence St. Joseph
14  Hospital on August 30th indicate when asked, would
15  you like pain medicine, Mr. Poole declined?
16      A.  According to this, he was offered -- patient
17  is declining offer for pain medication.  I agree with
18  that.
19      Q.  Let's put this aside for a second.  Doctor,
20  if you could have the report in front of you.
21      A.  (Indicating).
22      Q.  No, your report.
23      A.  Oh, got it.
24      Q.  Thank you.  All right.  Can you direct us

Page 71

1  where in the report Exhibit 3 your opinions chart?
2      A.  My opinion starts on following opinion -- on
3  the third of the fourth page -- the third page.
4      Q.  All right.  And is that the sentence that
5  says, I hold the following opinions to a reasonable
6  degree of medical certainty?
7      A.  That is correct.
8      Q.  All right.  What's a reasonable degree of
9  medical certainty?  What's that definition?
10      A.  According -- I mean, it says that nothing is
11  a hundred percent, but in general I can use my
12  experience to state that this is the most likely --
13  these are the most likely facts based on my opinion.
14      Q.  Okay.  When I looked at your opinions
15  following on Page 3 that sentence, would you agree
16  there's no citation to any specific page of a
17  deposition?
18      A.  I did not cite the specific pages of the
19  deposition.
20      Q.  Okay.  Would you agree in these opinions
21  when you give your opinion, you don't use any medical
22  record or deposition testimony to support it?
23          MS. MAKAR:  Objection, misstates testimony.
24          THE WITNESS:  Yeah, I would disagree with

Page 72

1  that.
2  BY MR. TENGESDAL:
3      Q.  Okay.  Show me then -- let's start with
4  deposition testimony.
5          Where in your opinions are you referencing
6  deposition testimony?
7      A.  Okay.  I mean, as opposed to like the
8  medical record?  Like what specific parts are
9  pointing to deposition which is -- that, I don't
10  know.  I mean...
11      Q.  Okay.
12      A.  I kind of formed an opinion in a whole as
13  opposed to thinking, okay, this is the depositions
14  that I've read, this is where this comes from, this
15  is from the medical records.  Essentially I read all
16  the depositions, but I tried to use the strategy of
17  reading the depositions last, because what I want to
18  do is focus on the records, because that's what I'm
19  here to do.
20      Q.  Okay.  Where in your opinions then do you
21  cite specific references from the medical records in
22  this case?
23      A.  You want me to, like, go through each one
24  and then go to the space where I've got it from?

Page 73

1      Q.  I'm asking you where in your opinions in any
2  of the paragraphs do you chart and use actual pulling
3  things out of the medical record and putting it in
4  there?
5      A.  In which instances?
6      Q.  Yeah.  Which opinion?
7      A.  Oh, okay.  Got you.
8          MS. MAKAR:  Objection, asked and answered.
9          THE WITNESS:  So my first opinion where the
10  patient initially presented describes symptoms.
11  Essentially my first opinion is there's no
12  documentation that there was any attempt to
13  stabilize.  So that was basically something that was
14  probably lacking in the record.  There's no record of
15  any kind of C-collar administered.
16          Second, through the records on the 17th if
17  there was a thorough workup done, it was not
18  documented.  So that was gleaned from the record when
19  we went over the first document where the subjective
20  had a zero with a line through it.  That is from the
21  record not adequate documentation.
22          So then if we go on timeline, basically the
23  injury occurred on the 17th through a series of
24  delays.  The patient didn't get his X-ray, ongoing

EXHIBIT 7

Page 74

```
 1  pain, according to the chart, so these type of things
 2  should have been addressed in a more timely manner.
 3  That's just gleaned from the record and the dates
 4  that kind of followed.
 5          Keep it moving.  My opinion as below.
 6  Examine the patient on the 17th.  Didn't have
 7  subjective complaints in there.  That's from the
 8  record.  Should have been immediately provided a
 9  C-collar as we kind of said in an acute setting.  If
10  he was in ER, he would have had that placed in order
11  to at least stabilize.
12          The timing of it, if you have -- I felt that
13  was breaching the standard of care based on the
14  amount of time that the imaging -- between the actual
15  event and the imaging.
16          The X-ray was read positive on the 25th.
17  Another five days went by before the follow-up
18  action, which would be repeat imaging, the CT, that's
19  gleaned from the records.  That breached the standard
20  of care in my opinion.
21          Skipping down to the last paragraph there,
22  more of a recordkeeping type of deal, but kind of as
23  I kind of alluded to earlier, subjective should
24  document the patient's issues.  The objective
```

Page 75

```
 1  portion, again, this is all from the record, was
 2  lacking in pertinent positives or negatives on the
 3  examination.  So essentially all of my opinions are
 4  from the record.
 5      Q.  I only -- the purpose of my question was, on
 6  the last page of your report, that's the only one
 7  where I see you referenced the physician's note.
 8  RTP0749.  Would you agree?
 9      A.  I would agree.
10          MS. MAKAR:  Objection, asked and answered.
11  BY MR. TENGESDAL:
12      Q.  Okay.  You said the X-ray was read positive
13  on August 25th.  I thought it was August 27th.
14      A.  X-ray completed on the 25th.  Read as
15  positive on the 27th.  X-ray's completed on the 25th
16  and not responded to until the 30th.  So this is
17  completion -- the read, you are correct, I believe
18  was the 27th as the document that we were just going
19  over.
20      Q.  But your report never says anything about
21  was read positive on August 27th, right?
22      A.  No, that's not in there.
23      Q.  Okay.
24      A.  But it does encompass that time frame for
```

Page 76

```
 1  which August 25th through 30th where nothing was
 2  done.  But that is not in there, correct.
 3      Q.  Got you.  And that note we talked about
 4  where the S was left blank, that was Nurse Carnahan's
 5  note, right?
 6      A.  Cosigned by the physician.  Which, in
 7  essence, means that the physician is -- that is their
 8  note.
 9      Q.  No.  The physician signed that he would like
10  to see the patient immediately, right?
11          MS. MAKAR:  Objection.
12          THE WITNESS:  So, I mean, if that's the
13  semantics of the note, then I don't understand the
14  note.  What I was understanding was, this is the
15  nurse's note and I agree with all this and I need to
16  see the patient immediately.  If that's not what that
17  means, then maybe that's not what that means, but...
18  BY MR. TENGESDAL:
19      Q.  Did Dr. Aguinaldo then see the patient on
20  August 17th?
21      A.  Yes.
22      Q.  Did Dr. Aguinaldo then write his own note?
23      A.  Yes.
24      Q.  Okay.
```

Page 77

```
 1      A.  There were other notes in there, yes.
 2      Q.  So Dr. Aguinaldo sees the patient, looks at
 3  the nurse's form, and then conducts his own
 4  evaluation, right?
 5      A.  Sure.
 6      Q.  Did he do a subjective/objective plan on
 7  August 17th?
 8      A.  Those are one of those notes that I can't
 9  read.  So if those were his notes and they have the
10  subjective and objective in the assessment and plan,
11  then that would be correct documentation.
12      Q.  Okay.  All right.  Let's look at the --
13  going back to your opinions, and I want the first
14  paragraph that says on August 17, 2017, the big one.
15      A.  Yes.  Where are we?  On the events?
16      Q.  Here.  Right here.  Page 3.
17      A.  Page 3.  Okay.
18      Q.  Right under where you say, This is my
19  opinions starts.
20      A.  Okay.
21      Q.  Let's just start.  So Mr. Poole did not have
22  neck issues prior to August 17th, 2017; is that an
23  opinion you have?
24      A.  Yes.
```

EXHIBIT 7

JOHN GILBERT DAVIS, M.D.
June 08, 2023

Page 78

1    Q.   Okay.  How can you have that opinion without
2  having records prior to August 17th then?
3    A.   I'm sorry.
4    Q.   Your records that you were given --
5    A.   Right.
6    Q.   -- and this is just what you were given.
7    A.   Right.
8    Q.   Start on August 17th.  You didn't review any
9  of his prior records, right?
10   A.   Correct.
11   Q.   Would you agree you don't know if he had any
12 neck issues prior to August 17th because as a
13 physician you didn't have the records to review?
14   A.   Yeah, that's fair.
15   Q.   Okay.  So now let's look at the big
16 paragraph under it.
17        So Mr. Poole reported that he had pain
18 radiating to his spine, weakness holding his head,
19 different sensations such as popping, right?
20   A.   Yes.
21   Q.   Okay.  How come he didn't report that on
22 August 30th when he was at Saint Joseph's Medical
23 Center?
24        MS. MAKAR:  Objection, speculation,

Page 79

1  incomplete hypothetical.
2        THE WITNESS:  I don't know.
3  BY MR. TENGESDAL:
4    Q.   Okay.  Given the account that we have from
5  Mr. Poole, would you agree that that can be neck
6  trauma?
7    A.   Yeah.  Sorry.
8    Q.   Mr. Poole was put in a headlock, right?
9    A.   Yes.  That was the report, yes.
10   Q.   Okay.  When you're put in a headlock, if
11 someone twists your neck, can you get injury to the
12 muscles?
13   A.   You can sustain injuries, yes.
14   Q.   Okay.  What are the names of the muscles in
15 the cervical spine?
16   A.   I'm not sure why you're asking me anatomy
17 questions.  You want me to look up the paraspinal
18 muscles?
19   Q.   No.  I'm asking you because you've been
20 delineated as an expert here to opine on cervical
21 spine conditions, injury, and future injury and
22 causes of pain.
23   A.   Sure.
24   Q.   So because of that, I'm allowed to ask you

Page 80

1  your knowledge of the relevant anatomical structures.
2  That's why I'm doing it.  Okay?
3    A.   Got you.  I mean, I can look that up and
4  read it to you.  I do not have that in the back of my
5  head just as something to come out.
6    Q.   Okay.  Do you know what the -- how many
7  vertebra in the cervical spine?
8    A.   C-spine, eight of them.
9    Q.   How much?
10   A.   Seven C-spine, 12 T, L -- I can't remember
11 the L spine.
12   Q.   Well, I won't ask you, because he didn't
13 have an injury there, so don't worry about that one.
14 Thank you.
15        Where you say acutely spinal subluxation
16 causes can become worse and lead to a catastrophic
17 neurologic injury, while that may be true, would you
18 agree in this case there's no catastrophic neurologic
19 injury to Mr. Poole?
20   A.   I would agree with that from the knowledge
21 that I have he did not suffer a catastrophic injury.
22   Q.   Okay.  The next sentence says, Chronically
23 spinal subluxation can lead to slowly worsening
24 spinal issues and/or pain.

Page 81

1        What's your definition of when something
2  becomes chronic?
3    A.   Like time wise?
4    Q.   Yes.
5    A.   So depending on what we're talking for an
6  injury, for bone injury, I would imagine chronic
7  would be over a month.  But specific for bones versus
8  other things, I would have to look it up to see what
9  the exact timeline for chronic is.
10   Q.   Got you.  Dr. Mehta, he's the neurosurgeon
11 at UIC.  Other than doing the surgery, did he see the
12 patient in follow up?
13        MS. MAKAR:  Objection, speculation, outside
14 the scope.
15        THE WITNESS:  I would have to look at the
16 record, but I would be surprised if a neurosurgeon
17 performed surgery and did not see the patient in
18 follow up.  I'm pretty sure I saw that note.
19 BY MR. TENGESDAL:
20   Q.   Okay.  Dr. Mehta in his deposition, did he
21 ever opine that the patient had worsening spinal
22 issues and/or pain?
23   A.   I would have to review his deposition to
24 give you an exact answer.

EXHIBIT 7

JOHN GILBERT  DAVIS, M.D.
June 08, 2023

Page 82

1    Q.  Okay.  Would you agree, though, when you
2  wrote the sentence chronically spinal subluxation can
3  lead to slowly worsening spinal issues and/or pain,
4  you didn't add in, as evidenced by the medical record
5  on page so and so or Dr. Mehta's neurosurgeon's notes
6  or testimony?
7    A.  No, I didn't annotate that.  There are no
8  annotations there.
9    Q.  Okay.  Would you agree you do not know if
10  Mr. Poole has had slowly worsening spinal issues
11  and/or pain?
12       MS. MAKAR:  Objection, foundation.
13       THE WITNESS:  I would be unaware unless I
14  was reading his further records.
15  BY MR. TENGESDAL:
16    Q.  Okay.  The associate facet facture will
17  acutely cause significant pain.  Is that an opinion
18  you have in this case?
19    A.  Yes.
20    Q.  Okay.  And since you're using the term
21  significant, what is your definition of significant
22  pain?
23    A.  Pain requiring medication, physical therapy,
24  those type of things.

Page 83

1    Q.  Okay.  Are you familiar with the Mankoski
2  pain scale?
3    A.  I am not.
4    Q.  Without using the name, do you still use
5  the tell me what your pain is, sir, 1 to 10?
6    A.  Yes.
7    Q.  Okay.  Are you aware on the pain scale from
8  1 to 10 there's mild, moderate, severe?
9    A.  Sure.
10    Q.  Okay.  We saw the August 30th note when he
11  was present at St. Joseph's Hospital and said,
12  hey, you want some pain medicine, what did he say?
13    A.  It said he declined pain management.
14    Q.  So the man in significant pain, declined
15  pain management on August 30th when we know he had a
16  fracture, right?
17       MS. MAKAR:  Objection, leading, asked and
18  answered.
19       THE WITNESS:  Yeah, I don't know how to
20  answer that question.
21  BY MR. TENGESDAL:
22    Q.  Okay.  That's fine.  When you get a facet
23  fracture, tell me how the mechanism of injury occurs.
24    A.  Usually it's traumatic.  Sometimes people do

Page 84

1  have preconditions that kind of subject them to those
2  type of injuries.  Sometimes people with Down
3  syndrome can just turn their neck and they can
4  sustain that fracture.  But for the most vast
5  majority, it needs to be some kind of traumatic
6  event.
7    Q.  If you get a sprain/strain to the cervical
8  spine, injury to the muscular component of the neck,
9  can that produce pain as well?
10    A.  It can.
11    Q.  Okay.  So if somebody puts you in a head
12  lock, twists it and you get a sprain/strain and you
13  come see a physician, that could be a competent cause
14  of pain; would you agree?
15    A.  What do you mean by competent?
16    Q.  It's well-known -- you as a physician, if
17  someone says that, you do an exam, you palpate them,
18  range of motion, it looks like they got muscle spasm;
19  that could be a cause of pain if they say they got
20  pain?
21    A.  It is in the differential diagnosis, yes.
22    Q.  Okay.  What's the name of the ligaments that
23  hold the seven cervical vertebra together?
24    A.  I couldn't tell you that what looking it up.

Page 85

1    Q.  Okay.  When you get an injury to the
2  cervical spine such as Mr. Poole has described, can
3  you get swelling and inflammation?
4    A.  Injuries can cause swelling and
5  inflammation, yes.
6    Q.  Okay.  And an injury such as Mr. Poole
7  received getting his neck wrenched, if he gets an
8  injury to the soft tissues of the neck, will that
9  swell up over time?
10    A.  It's possible, yes.
11    Q.  Okay.  Have you ever seen people come into
12  the ER and they say, yesterday I got in a car wreck,
13  got whiplash, my neck, I didn't really feel anything,
14  but today I woke up and I didn't feel good, my neck
15  feels stiff, and it's painful?
16       MS. MAKAR:  Objection, relevance.
17       THE WITNESS:  Not personally.
18  BY MR. TENGESDAL:
19    Q.  Okay.  Do you know how long it takes before
20  an insult to the soft tissues causes the pain
21  mediators to produce pain?
22    A.  I imagine everybody's a little bit
23  different.  Some people might not even feel the pain,
24  and that's why the inflammation gets better and they

EXHIBIT 7

JOHN GILBERT DAVIS, M.D.
June 08, 2023

Page 86

1    might feel it a day later.
2       Q.  Okay.  Would you agree in your report
3    there's no rebuttal to anybody's deposition saying,
4    well, you know, this person testified like this; I
5    disagree with them?
6       A.  To be honest, I didn't know that was part of
7    my job to go in and opine on other depositions, so I
8    did not do that.
9       Q.  Okay.  I'm just saying your report doesn't.
10   I'm not saying why you did or didn't.  I'm just
11   saying --
12      A.  It's not in there.  And for whatever reason
13   to your point, it doesn't matter why it's not in
14   there.
15      Q.  Okay.  The three depositions you were
16   provided, do any of those form a basis of the
17   opinions that you have in this report?
18      A.  No.  They provided some information I
19   imagine, but my opinion is based on my review of the
20   records.
21      Q.  Okay.  Before you put pencil to paper, as
22   they say, and come up with your opinions in the case,
23   do you think it's important that an expert be
24   provided all of the depositions in the case?

Page 87

1      A.  It's a good question.  I suppose it depends
2    on what the guidance is for what I'm supposed to be
3    doing.  If I am supposed to be opining on what these
4    other doctors are doing based on their conversations
5    with the attorneys, then sure.  But if I think my job
6    is to look in a vacuum, see what the record shows,
7    see what my opinion of what was going on, then those
8    things don't really matter if that's my job, if my
9    job is to opine on the record.
10      Q.  Okay.  Could it be important to your
11   opinions to learn that the radiologist who's
12   responsible for the X-ray report in this case
13   testified that he missed the fracture and never
14   communicated to Dr. Aguinaldo that there was a
15   fracture?
16        MS. MAKAR:  Objection, asked and answered.
17        THE WITNESS:  You're asking what my opinion
18   on that is?
19   BY MR. TENGESDAL:
20      Q.  Yeah.  Could it be important to your
21   opinions?
22      A.  Actually, I don't think so.
23      Q.  Okay.  So do you believe you can render an
24   opinion against a physician that they didn't do

Page 88

1    something in response to an X-ray report when it
2    wasn't even in the X-ray report?
3        MS. MAKAR:  Objection, asked and answered.
4        THE WITNESS:  I can because there were other
5    events prior to the X-ray and there were other
6    encounters that might have been able to -- there were
7    other encounters where he might have been able to do
8    something different despite there not being an X-ray.
9    BY MR. TENGESDAL:
10      Q.  Okay.  What was the process for ordering
11   X-rays at Stateville?
12      A.  I don't know how they order X-rays at
13   Stateville.
14      Q.  Okay.  Do you know where the X-ray machine
15   is located at the prison where Mr. Poole's serving
16   his time?
17      A.  I do not.
18      Q.  If the testimony is that Dr. Aguinaldo
19   ordered the X-ray on August 17th, have you seen
20   anything to dispute that in your review?
21      A.  I don't believe he ordered an X-ray on the
22   17th.  I believe he ordered it on the 22nd.  But it
23   was not done for whatever reason.  It got -- you
24   know, they had to send him for the machine.  Whatever

Page 89

1    the reason was, it wasn't completed until the 25th.
2    So I think we have disconcerting -- I think -- seen
3    on the 17th and then I have X-ray ordered on the
4    22nd.  I think that's two different things.
5      Q.  Okay.  Do you know once the -- whatever date
6    it is, do you know what the process is once the
7    physician, I want cervical spine X-rays?  What
8    happens next?
9      A.  No idea.
10      Q.  Okay.  Would you agree it's the physician's
11   job to recommend the X-ray but the physician isn't
12   the one that actually goes and takes the X-ray?
13      A.  That's always the case.
14      Q.  Okay.  Do you know what the definition is of
15   proximate cause?
16        MS. MAKAR:  Objection --
17        THE WITNESS:  What's the word?
18        MS. MAKAR:  -- calls for a legal conclusion.
19        THE WITNESS:  The definition of what?  I'm
20   sorry.
21   BY MR. TENGESDAL:
22      Q.  Proximate cause.
23      A.  Proximate cause.  I don't know what that
24   means.

EXHIBIT 7

JOHN GILBERT DAVIS, M.D.
June 08, 2023

Page 90

1    Q.   Okay.  Would you agree in this case you
2    don't have any opinions on proximate cause?
3    A.   No.
4         MS. MAKAR:  Objection, calls for a legal
5    conclusion, asked and answered.
6         THE WITNESS:  I do not, because I don't know
7    what that means.
8    BY MR. TENGESDAL:
9    Q.   Okay.  And if you don't know what it means,
10   obviously you can't have an opinion on it, right?
11   A.   There you go.
12   Q.   There you go.  Okay, thanks.
13        All right.  So you do have opinions on this
14   case as to the condition of Mr. Poole's neck
15   currently in pain; am I right?
16   A.   Yes.
17   Q.   All right.  Can you explain to me then why
18   you didn't ask to examine Mr. Poole?
19   A.   No.
20   Q.   Okay.  Would you agree you weren't able to
21   perform a cervical spine examination of Mr. Poole?
22   A.   I would agree with that.
23   Q.   Would you agree you weren't able to do range
24   of motion of Mr. Poole?

Page 91

1    A.   Agreed.
2    Q.   Would you agree you were not able to do
3    cervical compression testing of his cervical spine?
4         MS. MAKAR:  Objection, asked and answered.
5         THE WITNESS:  I would agree with that.
6    BY MR. TENGESDAL:
7    Q.   Okay.  Would you agree in order to come up
8    with a diagnosis, an impression, a plan, an opinion
9    as to his current state, it would be beneficial for
10   you as a physician licensed to perform an examination
11   on the patient?
12   A.   It would be beneficial.
13   Q.   But in this case you weren't afforded that
14   opportunity to do; is that right?
15        MS. MAKAR:  Objection, asked and answered.
16        THE WITNESS:  No.  I only have records.
17   BY MR. TENGESDAL:
18   Q.   Okay.  All right.  Let's go back to your
19   opinions.
20   A.   Okay.
21   Q.   So let's go to that next paragraph, the one
22   that says, In these cases.
23   A.   Yes, in these cases.
24   Q.   It says, In these cases, the standard of

Page 92

1    care requires stabilization -- or stabilizing,
2    apologies, the spine with a C-collar and requesting
3    appropriate imaging in a timely manner.
4         Okay.  So you're saying that imaging wasn't
5    requested in an appropriate manner?
6    A.   Yes.
7    Q.   Okay.  But Dr. Aguinaldo testified that he
8    ordered X-rays on August 17th in his note when he saw
9    the patient.  Are you aware of that?
10   A.   I am not.  Because from what I could glean
11   from my review of the notes, is that the X-ray was
12   ordered on the 22nd.  So if there's something that
13   says he ordered on the 17th, then I would have to
14   accept that.
15   Q.   Okay.  And that's all I'm asking you, if you
16   recalled that he testified that on August 17th, 2017,
17   he ordered the cervical spine X-rays?
18   A.   I wasn't aware -- you're talking about a
19   deposition.  I am not aware that he said that.  I
20   mean, I probably read through it, but okay.
21   Q.   Go back to tab four, if we can look at that
22   first page.
23   A.   Sure.
24   Q.   On August 17, 2017, you would agree you

Page 93

1    didn't even know that was Dr. Aguinaldo's note,
2    right?
3    A.   No.  I did not know specifically because I
4    don't know his signature.  So, no, I do not know
5    specifically that's his note.
6    Q.   And in the plan section, it was your
7    testimony that you weren't able to read that, right?
8    A.   I didn't even know where your plan section
9    is on this to tell you the truth, so the answer is
10   no, I could not read it.
11   Q.   Do you see how there's two columns.  Look on
12   the right on the top.
13   A.   Yep.  Right column.
14   Q.   Okay.  Do you see an assessment or plan or A
15   and P?
16   A.   Yeah.
17   Q.   S at the top in the left column.
18   A.   Subjective on the left.
19   Q.   Is objective down at the bottom?
20   A.   Oh, I see.  Okay.  So this whole column is a
21   plan.  Got it.  Okay.
22   Q.   Earlier you testified SOAP for subjective,
23   objective, assessment and plan.  That's a typical
24   note, right?

EXHIBIT 7

JOHN GILBERT DAVIS, M.D.
June 08, 2023

Page 94

1    A.   Yes.
2    Q.   And if I represent to you this is
3  Dr. Aguinaldo's note on August 17th, would you agree
4  now you see the S, O, A, and the P?
5    A.   I can agree with that.  Absolutely.
6    Q.   Okay.  So going back to this opinion then,
7  if Dr. Aguinaldo in his deposition and in his
8  interpretation of his note in Mr. Poole was that the
9  X-ray was ordered on August 17th at the initial first
10  patient encounter, would you agree that's appropriate
11  of a physician to do given Mr. Poole's complaints?
12        MS. MAKAR:  Objection, misstates the
13  evidence.
14        MR. TENGESDAL:  Actually, it doesn't.
15        MS. MAKAR:  Objection, calls for
16  speculation.
17        THE WITNESS:  So -- I'm sorry.  Can you
18  repeat the question?
19        MR. TENGESDAL:  Sure.  We'll have it read
20  back for you if we could.  Thank you.
21             (Whereupon, the record was
22              read as requested.)
23        THE WITNESS:  Yes.
24

Page 95

1  BY MR. TENGESDAL:
2    Q.   Now, when you used the phrase C-collar,
3  would you agree that there's multiple types of
4  C-collars?
5    A.   There are.
6    Q.   Tell me all the different types.
7    A.   I can't tell you all the different types off
8  the top of my head.
9    Q.   Tell me the ones you know then.
10    A.   I don't know the names of them.  I just know
11  that there are stabilization collars.  There are
12  different sizes.  There are different kinds.  They're
13  made out of different materials.  The names of them I
14  do not know off the top of my head.
15    Q.   Okay.  Do you know if there's rigid
16  C-collars and soft C-collars?
17    A.   They're rigid and soft, correct.
18    Q.   Okay.  And help me understand this opinion.
19  When you say in these cases, what do you mean by in
20  these cases?
21    A.   So in the sense of an acute injury is kind
22  of what I'm referring to.  There's an acute injury
23  essentially you are seeing a physician in an
24  emergency department kind of situation.  In that

Page 96

1  situation, if you are told that you have sustained
2  neck trauma and you have -- you're describing
3  symptoms, one, you'd need to get a differential and
4  make sure you list the worst things that you need to
5  protect against, and then you need to figure out what
6  you're going to do to figure out what the problem is.
7  So in my opinion in these cases, if you get a story
8  that you have neck trauma, you have pain symptoms,
9  you're deciding to image it at some point, whether
10  it's the 17th or if I was mistaken for it, then at
11  that point if you're concerned enough to need the
12  imaging, you should protect the patient and protect
13  the neck.
14    Q.   Okay.
15    A.   That would be the reason for a C-collar.
16    Q.   When Mr. Poole presented on August 17th
17  after his alteration with his cellmate, where
18  anatomically were his injuries?
19    A.   He said it was in his neck.
20    Q.   Okay.
21    A.   According to the record.
22    Q.   All right.  Well, didn't we look at a record
23  in this case, the one by the -- by the nurse where
24  there was no subjective, where there was other areas

Page 97

1  that he had an injury to?
2    A.   That is correct.  There was nothing listed
3  in the subjective portion.
4    Q.   Let's look at tab three.
5    A.   Sure.
6    Q.   See the subjective section?
7    A.   I do.
8    Q.   Read that for me, please.
9    A.   Zero.
10    Q.   No.  What's listed for subjective?
11    A.   Oh, objective.  Apologies.
12    Q.   No.
13    A.   Objective, 1 inch laceration to the left
14  check, two scratches to left cheek, scratch to left
15  forehead.
16    Q.   And what's the assessment?
17    A.   Laceration to the left cheek.
18    Q.   Did Dr. Aguinaldo, did he suture the patient
19  where he had the lacerations?
20    A.   Seen by Dr. Aguinaldo for stitches to left
21  cheek, yes.
22    Q.   Okay.  So in addition to the two scratches
23  on his right neck, he had injuries to other parts of
24  his head, correct?

EXHIBIT 7

JOHN GILBERT DAVIS, M.D.
June 08, 2023

Page 98

1    A.  Correct.
2    Q.  Okay.  And those were addressed by
3  Dr. Aguinaldo via stitches?
4    A.  Correct.
5    Q.  Okay.  And a laceration, does that mean an
6  opening, a cut in the skin?
7    A.  That is a cut in the skin.
8    Q.  Is it important to fix lacerations in order
9  that a patient doesn't become infected?
10    A.  Indeed.  Yes.
11    Q.  And you want to try to avoid scars as well;
12  is that right?
13    A.  Yes.
14    Q.  So in the objective findings by the nurse,
15  other than the scratches to the right neck, was there
16  anything else that was charted for the neck?
17    A.  In the objective, no.
18    Q.  Okay.  Would you agree there's no charting
19  that the patient had muscle spasms?
20    A.  There is nothing documented under S.  So the
21  patient, according to this, had zero complaints when
22  he came in under subjective.
23    Q.  Okay.
24    A.  Even though he had facial lacerations.

Page 99

1    Q.  Okay.  So immediately after he gets in the
2  altercation, he comes down -- he's got -- he's got
3  lacerations on his face.  Would you agree you can
4  have lacerations but it doesn't bother you physically
5  causing pain?
6    A.  No, I can't agree with that.  I don't -- I
7  mean, everybody's different.  I mean -- no, I can't
8  offer an opinion on that.
9    Q.  Okay.  That's fine.  Thank you.
10    MS. MAKAR:  Let's take a break.  Do you want
11  more time to eat or how much time do you want?  You.
12    THE WITNESS:  Oh, I'm good.  I don't need to
13  take a break.
14    MS. MAKAR:  Let's just do 10 minutes then.
15    MR. TENGESDAL:  Are we going to take a lunch
16  break?
17    MS. MAKAR:  Do you want to?
18    MR. TENGESDAL:  Because if we do, why don't
19  we just do it now.
20    MS. MAKAR:  Okay.
21    (Whereupon, a discussion was
22    had off the record and a lunch
23    break was taken, after which the
24    following proceedings were had:)

Page 100

1    MR. TENGESDAL:  Back on the record.  Can you
2  read back the last question?
3    (Whereupon, the record was
4    read as requested.)
5  BY MR. TENGESDAL:
6    Q.  Would you agree that Dr. Aguinaldo addressed
7  the open lacerations and, in fact, provided stitches
8  to the man?
9    A.  I would agree with that from the record.
10    Q.  Okay.  And as far as the standard of care as
11  far as stabilizing the spine with the C-collar, would
12  you agree that doesn't involve lacerations to the
13  cheek or the forehead?
14    A.  They would be separate entities.  I would
15  agree with that.
16    Q.  Okay.  So in this case, it's your opinion
17  that a C-collar was required because there were two
18  scratches found to the right neck?
19    A.  My opinion is that the C-collar was required
20  because the patient presented with trauma and was not
21  able to be imaged in a timely manner, so that's why
22  he needed the C-collar, not because of the
23  lacerations or scratches.
24    Q.  Okay.  Are you aware of the literature that

Page 101

1  indicates that C-collar shouldn't be worn for
2  extended period of time?
3    A.  No, I'm unaware of that.
4    Q.  Do you know if a C-collar was
5  available at the prison health care unit?
6    A.  That, I do not know.
7    Q.  When you say the event occurring on August
8  17th should have initiated a thorough workup, what do
9  you mean by thorough workup?
10    A.  History and physical, examination, anything
11  medically needed to do on the spot, a/k/a, repairing
12  lacerations and any further evaluation that needs it
13  be completed.
14    Q.  And history and physical, as we went over
15  the note.  S for subjective, O for objective,
16  correct?
17    A.  That is correct.
18    Q.  Would you agree today now you agree that was
19  done as far as the history and physical exam?
20    A.  That what was done?
21    Q.  That Dr. Aguinaldo charted and took a
22  history under the subjective and did an objective
23  examination under the O for the 8-17 note that's the
24  first one on tab four, Doctor?

EXHIBIT 7

JOHN GILBERT DAVIS, M.D.
June 08, 2023

Page 102

1    A.   The 8-17 note, if that is Dr. Aguinaldo's
2  note, then I would agree with that.
3    Q.   Thank you.  All right.  The delay in the
4  X-ray led to a cascade of delays.  Let's just start
5  with that.
6    A.   Sure.
7    Q.   Would you agree you don't know why the X-ray
8  took a number of days after it was ordered by
9  Dr. Aguinaldo?
10    A.   I do not.
11    Q.   Would you agree you do not have an opinion
12  that it was actually Dr. Aguinaldo that was directly
13  responsible for those delays in getting the X-ray?
14    A.   I don't know who was responsible for
15  delaying the X-ray.
16    Q.   Okay.  When you say cascade of delays, tell
17  me what you mean by that.
18    A.   I feel like there were opportunities to
19  intervene which would be any point at which you are
20  encountering a health care practitioner and if you
21  voice your complaints and the proper treatment
22  doesn't ensue, then that would be the delay I'm
23  referring to.
24    Q.   Okay.  Would the cascade of delays, would

Page 103

1  that be something that was occurring after the
2  initial treatment date of August 17th?
3    A.   Correct.
4    Q.   Okay.  Did you see anywhere in the record
5  that Mr. Poole said on the following day, August
6  18th, My neck pain is unbearable, any other symptoms,
7  and requested to be seen in the health care unit?
8    A.   I can look.  Off the top of my head, I do
9  not think that happened.  On the 18th?
10    Q.   Yeah.
11    A.   Yeah.  So there is no record of that
12  happening on the 18th.
13    Q.   Okay.  And if there's not a cascade of delay
14  on the 18th, he didn't present with any complaints
15  and was seen by Dr. Aguinaldo; would you agree?
16    MS. MAKAR:  Objection, leading.
17    THE WITNESS:  On what day?
18  BY MR. TENGESDAL:
19    Q.   Sure.  If the man didn't make any complaints
20  and request health care to leave segregation and come
21  down to be evaluated with Dr. Aguinaldo, would you
22  agree there's nothing Dr. Aguinaldo could have done?
23    A.   If he does not see the patient, then he --
24  there's nothing he can do at that point.  I agree

Page 104

1  with that.
2    Q.   Would that hold true for subsequent date
3  until he actually has the patient in front of him,
4  there's nothing he can do?
5    MS. MAKAR:  Objection, calls for
6  speculation.
7    THE WITNESS:  I have no idea what the follow
8  up protocol is, but if the patient is not sitting in
9  front of him, he cannot physically treat that
10  patient.
11  BY MR. TENGESDAL:
12    Q.   Okay.  And then on August 21st, I take it
13  you're aware that that was the date where labs were
14  taken.  I think he wanted hepatitis and HIV.  Do you
15  recall that?
16    A.   I do.  I don't remember the exact labs, but
17  I knew there was lab work.  I think those were the
18  results.
19    Q.   Okay.  Are you aware Dr. Aguinaldo testified
20  that on August 21st when he saw the patient,
21  Mr. Poole did not make any complaints to him of neck
22  pain?
23    A.   If that's what he said in his deposition, I
24  reviewed it and that's what he said.

Page 105

1    Q.   Okay.  And the chart note on August 21st,
2  also does not indicate that he complained of neck
3  pain; are you aware of that?
4    A.   I can't -- I cannot read this guy's note,
5  but -- so, no, I can't opine on that.
6    Q.   Okay.  Would you agree that there was no
7  cascade of delay on August 21st if, in fact,
8  Mr. Poole came into the health care unit and there's
9  no medical charting that he made complaints of neck
10  pain?
11    MS. MAKAR:  Objection, speculation about a
12  hypothetical.
13    THE WITNESS:  So if we're asking based on
14  the record, then if there's nothing documented here
15  that he was complaining, then we have to -- I can
16  only opine on the record.
17  BY MR. TENGESDAL:
18    Q.   Okay.  And the same thing.  If you -- when
19  you see patients when they come in and they see a --
20  if they have neck pain, you address -- you do an
21  exam, I guess of the neck areas opposed to checking
22  the toes, right?
23    A.   Yes.  You examine the pertinent parts of the
24  body as opposed to a full exam.

EXHIBIT 7

JOHN GILBERT DAVIS, M.D.
June 08, 2023

Page 106

1    Q.  Good way to say it better.  Okay.

2       On August 24th, the patient presented and

3  under the plans it indicates that he removed the

4  stitches.  That's about one week after the stitching

5  up of the laceration; is that common that you take

6  stitches out a week later?

7    A.  7 to 10 days a pretty common, yes.

8    Q.  Did you want to look at something before I

9  ask you the next question?

10    A.  No, I'm just correlating.

11    Q.  Okay.  Thank you.  So it would be standard

12  of care, reasonable then a week later, as he told him

13  follow up in a week, comes in, looks at him, takes

14  the stitches out?

15    A.  That is a reasonable thing.

16    Q.  Okay.  And if on the August 24th note,

17  Mr. Poole does not make any complaints of neck pain,

18  would it be also reasonable then that the doctor does

19  not perform an exam?

20       MS. MAKAR:  Objection, speculation on an

21  incomplete hypothetical.

22       THE WITNESS:  So if the record states that

23  there is no complaint, then there would not be an

24  exam.

Page 107

1  BY MR. TENGESDAL:

2    Q.  Okay.  Got you.  And then the final date

3  Dr. Aguinaldo sees him August 28th.  Do you recall

4  the testimony of what occurred on that date?

5    A.  Whose testimony?

6    Q.  Oh, you're right.  Do you recall what

7  Dr. Aguinaldo's testimony was on August 28th, what

8  happened at that patient encounter?

9    A.  No, I did not.

10    Q.  Okay.  And if the note, which was

11  interpreted by Dr. Aguinaldo, and, in fact, states

12  that on that date, he had the X-ray report and went

13  over it with Mr. Poole, do you have any reason to

14  disagree with about that?

15       MS. MAKAR:  Objection, speculation, leading.

16       THE WITNESS:  I don't.  A lot of it has to

17  do with being able to read it, but... No, I can't

18  disagree because I can't read it.

19  BY MR. TENGESDAL:

20    Q.  Let me give you a hypothetical.  If the

21  first date Dr. Aguinaldo has the X-ray report is 8-28

22  because it wasn't interpreted until August 27th, is

23  it custom and practice that when you see the patient

24  after you get the report that you explain it to the

Page 108

1  patient?

2       MS. MAKAR:  Objection, incomplete

3  hypothetical.

4       THE WITNESS:  That would be the expectation.

5  BY MR. TENGESDAL:

6    Q.  Okay.  And would you agree -- I think you

7  already have, but let me ask you again.

8       Would you agree that a physician such as

9  yourself or Dr. Aguinaldo would rely on the

10  interpretation of the radiologist as to what's

11  contained in the imaging report?

12    A.  Yes.

13    Q.  Okay.  And if Dr. Aguinaldo reported the

14  findings, would you agree he could not on August 28th

15  tell him he had a fracture since that wasn't in the

16  radiology report?

17       MS. MAKAR:  Objection, incomplete

18  hypothetical.

19       THE WITNESS:  The fracture was not in that

20  original X-ray report.

21  BY MR. TENGESDAL:

22    Q.  Since it wasn't in there, Dr. Aguinaldo

23  can't be faulted for not telling him he had a

24  fracture because it's not in the report, right?

Page 109

1       MS. MAKAR:  Objection, calls for a legal

2  conclusion.

3       THE WITNESS:  There was no fracture

4  mentioned, so there was nothing he could have reacted

5  to there.

6  BY MR. TENGESDAL:

7    Q.  Okay.  When Dr. Aguinaldo reads the X-ray

8  report, sees the subluxation, and tells Mr. Poole I

9  would like to get a follow up, talk to the medical

10  director of the facility, have him look at you to the

11  import of the finding of the subluxation, would that

12  be reasonable to do?

13    A.  That would be partially reasonable of what

14  to do.

15    Q.  Okay.  And isn't it a fact that's the case

16  that Dr. Obaisi saw the patient two days later?

17    A.  Yes, 8-30.

18    Q.  Do you know if when Dr. Obaisi saw the

19  patient two days later from referral to Dr. Aguinaldo

20  to look at the import of the subluxation finding as

21  to whether or not Dr. Obaisi at that time had the

22  actual X-rays?

23    A.  That, I do not know.

24    Q.  Okay.  Would you agree Dr. Obaisi made the

EXHIBIT 7

JOHN GILBERT DAVIS, M.D.
June 08, 2023

Page 110

1    medical judgment to send the patient off to the
2    hospital for CT?
3        A.  Yes.
4        Q.  And that's what happened in this case,
5    right?
6        A.  Yes.
7        Q.  Okay.  Forgive me my ignorance.  But when
8    you're in the hospital setting as a hospitalist, do
9    you have multiple hospitalists working there or is it
10   just you?
11       A.  We have multiple seeing a lot of patients,
12   so we each have a team of patients.
13       Q.  Okay.  Are you afforded the opportunity at
14   the hospital if you have a question that you can
15   consult with some of your other colleagues such as
16   other hospitalists on staff?
17       A.  Yes.
18       Q.  Do you do that as a normal practice?
19       A.  Yes.
20       Q.  Do most physicians do that as a normal
21   practice?
22       A.  Yes.
23       Q.  It's why they call it the practice of
24   medicine.  Everybody doesn't know everything, right?

Page 111

1        A.  Yes.
2        Q.  Is there any specific time period that you
3    can tell me where there was a cascade of delay from
4    August 17th to August 30th since Dr. Aguinaldo was
5    never apprised that there was an actual fracture of
6    the facet at C3?
7            MS. MAKAR:  Objection, mischaracterization
8    of the evidence.
9            THE WITNESS:  So I count each delay as an
10   encounter with a health care professional.  So the
11   17th and then wound check 19th, suture removal 19th,
12   M.D. note from the 28th, those -- each opportunity
13   there represents a chance to intervene since there
14   wasn't mention I constitute that as a delay.
15       Q.  Well, can somebody -- can there be a delay
16   if when you get the report back whether it's one day
17   or seven days, the report doesn't give you the
18   critical read finding in this case of a fracture?
19           MS. MAKAR:  Objection, leading, compound,
20   speculation.
21           THE WITNESS:  There is no fracture
22   mentioned, but there is subluxation there.  So there
23   is pathology there.  Two different kinds, yes.
24

Page 112

1    BY MR. TENGESDAL:
2        Q.  Did the radiologist based on his reading of
3    subluxation suggest further imaging?
4        A.  Not according to that document.
5        Q.  Okay.  Did the radiologist state correlate
6    clinically the subluxation finding?
7            MS. MAKAR:  Objection, outside the scope.
8            THE WITNESS:  I don't think that was in that
9    report.
10   BY MR. TENGESDAL:
11       Q.  Okay.  Are you aware that you can have a
12   subluxation without requiring surgical intervention?
13       A.  I am aware of that.
14       Q.  Okay.  Did the radiologist say this is a
15   subluxation that's a critical read; you need to
16   stabilize the patient's neck and make a surgical
17   referral?
18           MS. MAKAR:  Objection, lack of personal
19   knowledge, outside the scope.
20           THE WITNESS:  What was the question?  What's
21   the beginning of the question?
22           MR. TENGESDAL:  We'll read it back.
23           THE WITNESS:  Yeah.
24

Page 113

1            (Whereupon, the record was
2             read as requested.)
3            THE WITNESS:  The report states that he
4    reported a subluxation and that was it.
5    BY MR. TENGESDAL:
6        Q.  That was it.  Okay.  You don't have personal
7    knowledge that the radiologist because again you
8    weren't given the deposition, right?
9            MS. MAKAR:  Objection, misstates the
10   testimony.
11           THE WITNESS:  That is correct.
12   BY MR. TENGESDAL:
13       Q.  Okay.  All right.  So was there a delay from
14   the -- strike that.
15           What date did he actually arrive at UIC
16   hospital?  Do you recall?
17       A.  I can look it up.
18       Q.  Sure.  Go ahead.
19       A.  August -- 8-31 was the day, I believe, he
20   arrived at UIC?
21       Q.  Do you have any reason to disagree he got
22   there actually late on the night of 8-30, but they
23   didn't write up the note until the 31st?
24       A.  I believe that's fair.

EXHIBIT 7

JOHN GILBERT DAVIS, M.D.
June 08, 2023

**Page 114**

1    Q.   Okay.  So from August 31st, count that whole
2    day, September 1, 2, 3, 4, 5, 6, would you agree that
3    was seven days before he had surgery?
4    A.   Count that off one more time.
5    Q.   Sure.  All day the 31st, 1, 2, 3, 4, 5, 6.
6    Would you agree that's seven days?
7    A.   Sure.
8    Q.   Okay.  Is that part of the cascade of
9    delays, that seven days from the time he gets to UIC
10   to the time he gets surgery?
11   A.   No.
12   Q.   Why not?
13   A.   Because at that point, his C-spine is
14   protected.
15   Q.   Okay.  At that time, though, he didn't get
16   surgical intervention; would you agree?
17   A.   Agree.
18   Q.   Absent surgical intervention, although they
19   locked it up in a collar, he's still experiencing
20   pain, right?
21   A.   I can't answer that.
22   Q.   All right.  Well, it was in the UIC records.
23   They were giving him strong narcotics, weren't they?
24   A.   So in the H&P 34-year-old prisoner who

**Page 115**

1    presents with neck pain, so, yes, he had pain.  He's
2    had neck pain for the last two weeks, so in detail he
3    has neck pain at UIC.
4    Q.   Would you agree that the neurosurgeon at UIC
5    let him lie there in the bed with neck pain for seven
6    days before he stabilized the spine?
7    A.   I have no knowledge of his ongoing care
8    between -- for those seven days.
9    Q.   Okay.  Do you know if the records reflect
10   that he had seven days of ongoing pain as he was
11   waiting for surgery?
12   A.   I do not know if he has seven days of
13   ongoing pain in the records prior to surgery.
14   Q.   Okay.  Do you know if prior to surgery his
15   pain went away?
16   A.   I do not know if his pain went away prior to
17   surgery.
18   Q.   Do you know why the neurosurgeon waited
19   seven days to perform surgery?
20        MS. MAKAR:  Objection, speculation, outside
21   the scope, personal knowledge.
22        THE WITNESS:  I do not.
23   BY MR. TENGESDAL:
24   Q.   Well, you don't have a personal knowledge of

**Page 116**

1    any of this, because you weren't aware of any of
2    that, right?
3    A.   No, that I do not.
4    Q.   You testified you're just basing it off your
5    read of the records, right?
6    A.   That's what I'm doing.
7    Q.   That's what you're doing.  All right.  So do
8    you recall Dr. Mehta saying based on the exam of
9    neurosurgery on August 31st, there was no acute
10   neurosurgical needs for this patient?
11   A.   The attending's note says that operative
12   intervention or stabilization are planned.  It does
13   not opine on how soon they need to do the procedure.
14   Q.   Do you have an opinion as to whether or not
15   Mr. Poole being in pain waiting seven days was a
16   cascade of delay?
17   A.   I would not say that's part of the cascade
18   of delay, because he had been diagnosed.  He had his
19   injuries stabilized and if it is a nonemergent
20   surgery, the neurosurgeon will make that
21   determination.
22   Q.   Okay.  Do you know what a Miami J collar is?
23   A.   I do not.
24   Q.   Okay.  Mr. Poole by neurosurgery was placed

**Page 117**

1    in a Miami J collar.  Do you know if that was
2    different than any other collar that could have been
3    available to him at either the prison or St. Joseph?
4    A.   I --
5        MS. MAKAR:  Objection, speculation.
6        THE WITNESS:  I am not aware of what
7    C-collars were available at each facility.
8    BY MR. TENGESDAL:
9    Q.   Okay.  Let's go to the next paragraph, sir.
10   Where you say, the delay in diagnosis in treatment
11   likely caused Mr. Poole unnecessary pain as a
12   C-collar is both protective to prevent worsening of
13   injury and therapeutic as immobilizing the injury
14   helps reduce pain.
15        Do you know if a fracture at C3 on the right
16   will produce pain even if you're in a C-collar?
17   A.   Will -- the question, Would the person have
18   pain even if they're in a C-collar?  It's possible.
19   Q.   Well, when he was in a Miami J collar at
20   UIC, was he experiencing pain?
21   A.   Uh-huh.  According to the record, yep.
22   Q.   Yes?
23   A.   Yes.
24   Q.   Okay.  Delay in diagnosis.  Would you agree

EXHIBIT 7

JOHN GILBERT DAVIS, M.D.
June 08, 2023

Page 118

1  that the delay in diagnosis of a fracture is directly
2  attributable to the radiologist fade failing to tell
3  Dr. Aguinaldo that there's a fracture on the right of
4  C3?
5      MS. MAKAR:  Objection, calls for a legal
6  conclusion.
7      THE WITNESS:  I wouldn't say he was directly
8  responsible, because as I said previously, different
9  modalities are better at diagnosing different
10  injuries.  So he saw one thing on that film.  He saw
11  subluxation.  He was not able to diagnose the
12  fracture.  That is not a failure.  That is a failure
13  of the modality.
14  BY MR. TENGESDAL:
15      Q.  Well, his testimony is he missed the
16  fracture.
17      A.  That's true.
18      Q.  Okay.
19      A.  I mean, if you can't see it on the film,
20  then you can't call it.  That's why you have to do
21  the follow up films, CTs and MRIs.
22      Q.  Exactly.  The radiologist failed to say
23  perform a CT and MRI, correct?
24      MS. MAKAR:  Objection, asked and answered.

Page 119

1      THE WITNESS:  That's not how it works.
2  Radiologists do not order follow-up tests.  That is
3  reliant 100 percent on the practicing ordering
4  physician.
5  BY MR. TENGESDAL:
6      Q.  Do radiologist recommend advanced imaging?
7      A.  Recommend is the correct word, but they do
8  not order.
9      Q.  Okay.  And can a physician rely on a
10  radiologist if they say, I'm looking at the films,
11  I'm not sure if there's a fracture or not; I
12  recommend CT or MRI?
13      A.  That does occur, yes.
14      Q.  Okay.  And you as a physician then would
15  look at that and say, okay, if the radiologist
16  think's that's necessary, it seems reasonable to me,
17  I'm going to order it?
18      MS. MAKAR:  Objection, incomplete
19  hypothetical.
20      THE WITNESS:  That would be a reasonable
21  thing to do if the radiologist recommends it, yes.
22  BY MR. TENGESDAL:
23      Q.  In your practice, is that something you
24  typically do if a radiologist tells you they're not

Page 120

1  sure about a finding and they recommend advanced
2  imaging, that you agree with that?
3      A.  I agree with that.
4      Q.  In this case, Dr. Aguinaldo wasn't afforded
5  that opportunity because it didn't say, Dr. Leef, I
6  recommend doing CT or MRI?
7      MS. MAKAR:  Objection, leading,
8  mischaracterization of the evidence.
9      THE WITNESS:  Yeah.  That's not the way we
10  practice.  Like if you're a practicing physician, we
11  are making the diagnosis and the radiologist helps
12  us, so, in other words, as the hospitalist, I'm
13  calling the shots.  If somebody recommends me do
14  something, I do it.  But that responsibility is on
15  the doctor working up the case.
16  BY MR. TENGESDAL:
17      Q.  Isn't it the responsibility to call a
18  fracture a fracture the radiologist, that's why you
19  send the films to him?
20      A.  If you see it, then yes.  If you don't, then
21  you don't.
22      Q.  Well, we know you and Dr. Aguinaldo wouldn't
23  see the fracture, right?
24      A.  Exactly.

Page 121

1      Q.  Would you agree Dr. Aguinaldo couldn't
2  diagnose a fracture based on he's not a radiologist
3  and the radiologist never conveyed a fracture?
4      MS. MAKAR:  Objection, misstates the
5  evidence, speculation.
6      THE WITNESS:  I don't know what
7  Dr. Aguinaldo's ability to read plain C-spine films
8  is.  Some people like an ER physician, who's kind of
9  a general position, can read those themselves.  I
10  don't know what this level of expertise reading films
11  is.
12  BY MR. TENGESDAL:
13      Q.  Sure you do.  He testified in his
14  deposition.  He said he doesn't -- he just testified
15  similar to you.
16      A.  Well, there you go.
17      Q.  He relies on the radiologist.
18      A.  Like I said, I read his deposition and the
19  amount that I remember exactly what he said is zero.
20  So if you're saying that he said that, I'm not going
21  to argue with him.
22      Q.  Okay.  Has neurosurgeon Dr. Mehta opined
23  that failing to use a C-collar worsened the injury,
24  the fracture or the subluxation?

EXHIBIT 7

JOHN GILBERT DAVIS, M.D.
June 08, 2023

Page 122

1    A.   If that's part of the deposition, I would
2  have to review what he said.
3    Q.   Okay.  Well, would you be surprised to learn
4  that Dr. Mehta has no opinion that not wearing a
5  C-collar caused or contributed to an injury or
6  worsening?
7    A.   That's his opinion.
8    Q.   Well, would you have any reason, you, to
9  disagree with that?
10   A.   Yeah, I disagree with that.
11   Q.   Okay.
12   A.   I think his outcome could have been better
13  if he had the C-collar.
14   Q.   Doesn't the C-collar stabilize the
15  paraspinal muscles in the neck?
16   A.   It stabilizes everything in your neck,
17  paraspinal muscles, bones, soft tissues.  That's the
18  goal.
19   Q.   Well, the facet was a free floating
20  fragment, right?
21   A.   That's what the report said.
22   Q.   Well, the C-collar isn't going to stabilize
23  a free-floating fragment, is it?
24       MS. MAKAR:  Objection, asked and answered.

Page 123

1       THE WITNESS:  It does not.  It stabilizes
2  subluxation.
3  BY MR. TENGESDAL:
4    Q.   Okay.  What was the degree of subluxation
5  here?
6    A.   I can look it up.
7    Q.   Okay.
8    A.   Fracture of the right sided inferior -- this
9  is the MRI report, Page 1039.  Fracture of the right
10  sided inferior C3 facet with perching and minimal
11  anterolisthesis of C3-4 level.  Accompanying edema in
12  the soft tissue surrounding the C3-4 facet joint.  No
13  evidence of cord compression, hemorrhage within the
14  canal, or traumatic disc herniation.
15       There's minimal anterior increased two
16  signal of the bilaterally nonspecific in nature,
17  otherwise, vertebral body heights appear maintained.
18       So according to the MRI report, there's
19  minimal anterior rotation subluxation on the right
20  side.
21   Q.   Does the CT indicate how much the
22  subluxation was?
23   A.   Let's see.  Let's check it out.
24       Findings, CT, Page 0955.  Findings, there's

Page 124

1  minimally displaced fractures seen involving the tip
2  of the inferior right C3 articular facet with slight
3  anterior displacement of C3 with respect to C4
4  measuring 1 millimeter.  The right inferior articular
5  facet is perched over the right superior C4 facet.
6  The left C3-4 articulation is well-maintained.
7  Remaining C levels no additional fractures noted.
8       So there's minimally displaced fractures
9  involving the tip of the right C3 with slight
10  anterior displacement of C3 with respect to C4
11  measuring 1 millimeter.  That is what the CT found.
12   Q.   So that's the answer to the question.  Is
13  1 millimeter of subluxation, correct?
14   A.   1 millimeter subluxation.
15   Q.   Okay.  Since you're not a spine surgeon, do
16  you know if there was any significance to
17  1 millimeter of anterior translation?
18   A.   I don't -- I am not a spinal surgeon, but I
19  know the more subluxation there is, the worse it is.
20   Q.   Okay.  The MRI says there's no compression
21  of the cord, right?
22   A.   The MRI says there's no compression of the
23  cord, correct.
24   Q.   Okay.  And during the entire time he was

Page 125

1  seen in neurosurgery, are you aware he has -- they
2  testified Dr. Mehta there's no neurological injury?
3    A.   I'm aware of that.
4    Q.   So would you agree the 1 millimeter
5  subluxation didn't cause or contribute to any injury
6  to the man?
7    A.   I don't know if I can agree with that
8  because I don't know if that 1 millimeter can cause
9  pain or not.  But it didn't cause anything
10  catastrophic, I can agree with that.
11   Q.   All right.  And since you don't know, you're
12  not a spine surgeon, you don't have an opinion?
13   A.   To whether 1 millimeter would cause pain.  I
14  don't know if it would cause pain or not.
15   Q.   Okay.  All right.  Let's go to the next
16  paragraph.  Mr. Poole continues to have pain
17  requiring ongoing medical management.
18       Where did you get that opinion from?
19   A.   That's what I've been told.  There is no
20  record of that.
21   Q.   Were you told since there's no record
22  of it, where he has pain?
23   A.   No.
24   Q.   Okay.  So would you agree then you don't

EXHIBIT 7

JOHN GILBERT DAVIS, M.D.
June 08, 2023

Page 126

1  have that opinion since you don't have a record of it
2  and you don't know the location?
3        MS. MAKAR:  Objection, misstates the
4  testimony.
5        THE WITNESS:  What was the question?
6        MR. TENGESDAL:  Read it back.
7             (Whereupon, the record was
8             read as requested.)
9        THE WITNESS:  I do not have an exact --
10  yeah, know the location or if he still has pain or
11  where exactly it is.
12  BY MR. TENGESDAL:
13     Q.  And as a result then, do you agree you do
14  not have the opinion that Mr. Poole continues to have
15  pain requiring ongoing medical management?
16        MS. MAKAR:  Objection, asked and answered.
17        THE WITNESS:  I won't be able to comment on
18  that, because I don't have that record.
19  BY MR. TENGESDAL:
20     Q.  When you say earlier intervention for
21  Mr. Poole's injury may well have improved his
22  postoperative outcome, where did you get that opinion
23  from?  Were you told that as well?
24     A.  No, that's my opinion.

Page 127

1     Q.  Okay.  So I don't see any date here where
2  you provide when the earlier intervention should have
3  occurred?
4        MS. MAKAR:  Objection, leading.
5        THE WITNESS:  Where should the intervention
6  have occurred?
7  BY MR. TENGESDAL:
8     Q.  Yeah.  Let me ask you a full question.
9  Earlier intervention, what day?
10     A.  August 17.
11     Q.  Okay.  And when you say may, why do you say
12  may?
13     A.  May what?
14     Q.  May well have improved.
15     A.  It may.  Possibly.  There's within a scope
16  of possibility if his neck is stabilized earlier,
17  then there can be a different outcome from his
18  surgery.  That is my opinion.
19     Q.  Okay.  And tell me how stabilization would
20  have changed the outcome of his surgery.
21     A.  How does stabilization change the outcome
22  of the surgery?  Well, if you are subluxing, which means
23  an unstable joint, and if you continue to be unstable
24  and not stabilize that joint over time, then, yes,

Page 128

1  damage can occur, damage such as osteoarthritis, the
2  grinding of bones against each other.  It might not
3  be acute things, but things can also occur down the
4  line as chronic if things aren't taken care of in an
5  expedited manner.
6     Q.  When you say over time, you'd agree
7  osteoarthritis takes years to occur?
8     A.  Absolutely.
9     Q.  Okay.  That doesn't apply then because
10  Mr. Poole had his intervention on September 6th from
11  an injury on August 17th, right?
12     A.  These are chronic issues.
13     Q.  And, in fact, is that why Dr. Mehta
14  offered surgery to prevent chronic long-term issues?
15        MS. MAKAR:  Objection, speculation,
16  misstates his testimony.
17        THE WITNESS:  Yeah.  I do not know what his
18  specific reason to perform surgery is.  I'm sure
19  that's part of it.  I'm sure also to repair fractures
20  so that that instability doesn't cause problems is
21  also and likely the most important reason he did
22  surgery.  However, I do not know the specifics of his
23  mindset.
24

Page 129

1  BY MR. TENGESDAL:
2     Q.  Three weeks, would you agree that's the time
3  period from when he got injured on the 17th to the
4  time he had surgery on September 6th?
5     A.  Yep.  Those are the dates.
6     Q.  Okay.  And would you agree three weeks,
7  that's the acute phase?
8     A.  That's acute.
9     Q.  Would you agree then that he was stabilized,
10  had surgery on September 6th during the acute and not
11  the chronic phase?
12     A.  That is true.
13     Q.  Okay.  Would you agree then since it was
14  performed surgical stabilization in the acute stage,
15  earlier intervention, whether it be a week, 10 days,
16  wouldn't have affected his long-term outcome?
17        MS. MAKAR:  Objection, misstates his
18  testimony.
19        THE WITNESS:  I disagree with that.
20  BY MR. TENGESDAL:
21     Q.  Well, do you know Dr. Mehta's opinion
22  on that, the neurosurgeon?
23     A.  No.  But you can tell me.
24     Q.  Well, Dr. Mehta, do you know if he testified

EXHIBIT 7

JOHN GILBERT DAVIS, M.D.
June 08, 2023

Page 130

1    that he performed stabilization so that long-term, as
2    you've indicated, chronically he doesn't develop that
3    in the years down the road?
4        A.   Okay.  I'm not aware of that, but I'm
5    sure --
6        Q.   No, I'm just saying, Doctor, if that's his
7    testimony, do you have any reason to disagree with
8    that on a medical basis?
9        A.   Nope.
10       Q.   Okay.
11       A.   So he said the only reason he performed
12   surgery was to prevent issues down the road.  There's
13   no fear for acute issues.
14       Q.   Well, he already had acute issues, the
15   fracture, right?
16       A.   Exactly.  That's why he did the surgery.  He
17   did a surgery because he had an active fracture to
18   prevent it from subluxing so he would not have a
19   catastrophic ending.
20       Q.   Well, what surgery did he do?
21       A.   You can look it up.  I can look it up and
22   read it to you.  He aligned, you know, a fixation.  I
23   can read you the surgical report.
24       Q.   Do you know without reading the surgical

Page 131

1    report?
2        A.   No, not exactly what he did.
3        Q.   Okay.
4        A.   A laminectomy.  I know he had to stabilize.
5    But the actual procedure itself, I am not a
6    neurosurgeon, so I would have to read the report.
7        Q.   The actual injury of this man to the
8    fracture occurred when he lost the fight and got his
9    neck snapped by his cellmate, right?
10       A.   I mean, if you're saying that's a fact,
11   sure, that's what happened.  That's probably where he
12   sustained his injury.
13       Q.   Okay.  And as to the inferior facet, do you
14   recall from Dr. Mehta's surgical report that the
15   fracture was displaced?
16       A.   I would have to read his report.
17       Q.   Okay.  Do you know what a displaced fracture
18   is?
19       A.   Sure.
20       Q.   What is it?
21       A.   So if a nondisplaced, the bones are right
22   there, there's a fracture but nothing had moved.  If
23   it is displaced, then they are out of line and need
24   to be realigned.

Page 132

1        Q.   Okay.  Do you know where a facet is on the
2    cervical spine?
3        A.   I mean, if you're looking at anatomical
4    circle, and then the facets are part of the actual
5    vertebral spine, they kind of pouch, pooch out.
6        Q.   So when you say his injury may well have
7    improved his postoperative outcome, if there was
8    earlier intervention, what was his postoperative
9    outcome?
10       A.   Where are we starting?
11       Q.   Same paragraph, second sentence.  I'll read
12   it to you, Doctor.
13            Where you say, Earlier intervention for
14   Mr. Poole's injury may well have improved his
15   postoperative outcome, what's his postoperative
16   outcome?
17       A.   Well, I don't have the record, but I was
18   informed he still has postoperative pain.
19       Q.   Would you agree the surgery was required
20   because he sustained traumatic injuries in the fight
21   with his cellmate?
22       A.   I could agree with that.
23       Q.   As to the postoperative outcome, are you
24   aware of Dr. Mehta's testimony?

Page 133

1        A.   I am not.  Not off the top of my head, no.
2        Q.   Do you have any reason to disagree that when
3    a patient gets a C3-C4 fusion stabilization as what
4    Dr. Mehta did in this case, that as a result you can
5    have ongoing pain?
6        A.   I am aware you can have postop pain, yes.
7        Q.   Can you have postop pain you required
8    fixation and fusion as a result of the trauma caused
9    by your cellmate to you?
10       A.   Yes, you can have pain with that.
11       Q.   Are you aware that that's what Dr. Mehta
12   stated, it's common and you can have postoperative
13   pain ongoing due to the nature of your injury even if
14   everything is stabilized in alignment by the
15   neurosurgeon?
16       A.   Am I aware that he said that?
17       Q.   Yeah.
18       A.   I'll take your word for it.
19       Q.   Okay.
20       A.   I'm not going to disagree.
21       Q.   As a medical doctor and scientist, do you
22   have any reason to disagree with that?
23       A.   No.
24       Q.   Okay.  Do you know why Mr. Poole didn't file

EXHIBIT 7

JOHN GILBERT DAVIS, M.D.
June 08, 2023

Page 134

1 a lawsuit naming the man who traumatically injured
2 him and broke his neck?
3        MS. MAKAR: Objection, speculation, outside
4 the scope.
5        THE WITNESS: Yeah, that's not my job.
6 BY MR. TENGESDAL:
7    Q. Okay. You do agree the cause of the
8 breaking of his neck, the facet fracture and the
9 subluxation was the traumatic incident with his
10 cellmate, right?
11        MS. MAKAR: Objection, asked and answered.
12        THE WITNESS: I can't tell you that a
13 hundred percent but probably. If he didn't have
14 anything going on and then he had a fight and then
15 his neck's hurt, that's probably where it came from.
16 BY MR. TENGESDAL:
17    Q. Okay.
18    A. I don't have any knowledge.
19    Q. So if the postoperative outcome and his
20 postoperative pain is as a result of the fixation and
21 fusion, the man needed that no matter what date it
22 occurred, right?
23        MS. MAKAR: Objection, asked and answered,
24 leading.

Page 135

1        THE WITNESS: You might need to rephrase
2 that.
3 BY MR. TENGESDAL:
4    Q. Sure. Mr. Poole, he's in an altercation
5 with his cellmate, sustains a traumatic injury. Am I
6 correct on that?
7    A. Sounds like the facts, yes.
8    Q. Okay. Ultimately when he gets a CT and an
9 MRI done and advanced imaging, it shows a fracture on
10 the right side of C3, inferior facet, and 1
11 millimeter of anterior translation, right?
12    A. That is what it says, yes.
13    Q. Would you agree more probably true than not
14 the cause of that injury was the fight?
15        MS. MAKAR: Objection, asked and answered.
16        THE WITNESS: Yeah, I don't know how many
17 times you want me to say that. But yes, I just
18 answered that question. We can move on.
19 BY MR. TENGESDAL:
20    Q. Okay.
21    A. Yeah.
22    Q. Okay. So he needed surgery and if the
23 postoperative pain is caused by fixing two vertebra
24 together and fusing them, that needed to be done?

Page 136

1    A. Indeed. There was also pain before the
2 surgery.
3    Q. Sure. But this sentence -- I'm only talking
4 about your sentence. And you say he may well have
5 improved his postoperative outcome.
6    A. Yes. That's exactly what I'm saying.
7 Because if you treat the fracture properly
8 beforehand, you can have a better more improved
9 outcome after surgery.
10    Q. Why does Dr. Mehta say that there was no
11 reason for acute neurosurgical intervention on this
12 patient?
13        MS. MAKAR: Objection --
14        THE WITNESS: Because --
15        MS. MAKAR: -- asked and answered,
16 speculation.
17        THE WITNESS: I did answer that question.
18 Because there was no acute neurosurgical intervention
19 required.
20 BY MR. TENGESDAL:
21    Q. So there was no emergency to the procedure?
22        MS. MAKAR: Objection, misstates him his
23 testimony.
24        THE WITNESS: The urgency is not my concern.

Page 137

1 What the concern is that before they even got to the
2 surgical aspect of it, that had there been proper
3 care at that point, then the postoperative outcome
4 may have been improved.
5 BY MR. TENGESDAL:
6    Q. Well, Dr. Aguinaldo's care had nothing to do
7 with what was required, surgical stabilization
8 fusion, right?
9        MS. MAKAR: Objection, misstates his
10 testimony.
11        THE WITNESS: Yeah, I would disagree with
12 that wholeheartedly.
13 BY MR. TENGESDAL:
14    Q. Okay. So if Dr. Aguinaldo did something
15 different, he wouldn't require surgical
16 stabilization?
17    A. He certainly would have required surgical
18 stabilization, but his outcome may have improved if
19 he had had the proper care for three weeks before
20 surgery.
21    Q. Okay. And is the reason you're qualifying
22 it as a may because you're not a neurosurgeon?
23    A. Not based on my not being a neurosurgeon.
24 Based on me not being able to exactly read exactly

EXHIBIT 7

JOHN GILBERT DAVIS, M.D.
June 08, 2023

Page 138

1  what part of his pain comes from a fracture in a
2  fight versus what part of his pain comes from
3  surgical repair. My opinion is that they are
4  related. Dr. Mehta's may be different.
5      Q.  Okay. And if Dr. Mehta's is different
6  because he's a neurosurgeon who performed the
7  procedure, would you defer to him?
8      A.  Defer what to him?
9      Q.  As to the cause of this postoperative pain.
10     A.  No, I would not. Because there was
11  preoperative trauma that could contribute.
12     Q.  Did Dr. Mehta testify that preoperative
13  trauma contributed?
14     A.  That, I would have to look at his testimony.
15     Q.  Okay. Did Dr. Mehta reduce the subluxation
16  during the procedure?
17     A.  I can look at that and see what he said in
18  his op note.
19     Q.  Okay. Well, do you know without looking at
20  the op note?
21     A.  No. I don't know the operative procedure or
22  his note just without reviewing it. No, I don't.
23     Q.  Do you know if reducing a subluxation
24  manually by distracting the head, turning it to the

Page 139

1  right would get rid of the subluxation?
2      A.  I do not know that. No, I'm not that kind
3  of doctor.
4      Q.  If Dr. Mehta did it, do you have an opinion
5  that he did that inappropriately?
6      A.  No.
7          MS. MAKAR:  Objection, asked and answered.
8  BY MR. TENGESDAL:
9      Q.  Would reducing a subluxation, would that
10  reduce the man's pain?
11     A.  Possibly.
12     Q.  Okay. Do you know what the reason was that
13  Dr. Mehta performed a fusion and stabilization?
14     A.  To eliminate the instability of the joint.
15     Q.  Okay. Would you agree since it's fused,
16  there's a good surgical fusion construct as
17  demonstrated on X-ray that the fusion was successful?
18     A.  I can't disagree with that.
19     Q.  Okay.
20     A.  I don't know the success or failure of the
21  surgery. I don't.
22     Q.  Do you know the purpose of doing a fusion?
23     A.  To prevent the further subluxation.
24     Q.  Okay. Do you know what is the pain causing

Page 140

1  mechanism if Mr. Poole has postoperative pain?
2      A.  What is the pain mechanism?
3      Q.  Yeah.
4      A.  Like what's causing the pain?
5      Q.  Yeah, what's the generator.
6      A.  Probably the incision and the inserted
7  equipment and the suture closure, things that
8  Dr. Mehta did during the operation.
9      Q.  Okay. Do you know if Dr. Mehta testified
10  that you would expect those findings for two to three
11  months?
12     A.  I don't know that off the top of my head,
13  but I wouldn't disagree if that's what he said.
14     Q.  Okay. So we've got the incision's healed.
15  Let's say he has pain chronically long term.
16          Do you know what the pain generating
17  mechanism is of that?
18     A.  No, I do not.
19     Q.  Do you know whether the cervical spine has a
20  lordosis or kyphosis?
21     A.  Whether his spine has lordosis or kyphosis.
22     Q.  Any patient. If you looked at a cervical
23  spine X-ray, what are they supposed to have, a
24  lordosis or kyphosis?

Page 141

1      A.  That, I don't know off the top of my head.
2  I would have to delve into the field.
3      Q.  Okay. Do you know if as a result of the
4  stabilization, that that has altered his normal
5  kyphosis or lordosis in his cervical spine?
6          MS. MAKAR:  Objection, asked and answered.
7          THE WITNESS:  As an outcome of his surgical
8  procedure?
9          MR. TENGESDAL:  (Indicating).
10         THE WITNESS:  That, I don't know. I would
11  have to look it up.
12  BY MR. TENGESDAL:
13     Q.  Do you know if Dr. Mehta testified and the
14  record indicates that as a result of stabilization
15  from C3 to C4, that he has lost the normal lordosis
16  in his cervical spine?
17     A.  I am not aware of that.
18     Q.  Okay. Well, are you aware if you lose the
19  lordosis in your cervical spine due to fusion of two
20  levels, that that can be a competent cause of pain
21  postoperatively?
22     A.  Yes, I'm aware of that.
23     Q.  Okay. So if Mr. Poole has a loss of his
24  lordosis at C3-C4 as a result of the cervical fusion,

EXHIBIT 7

JOHN GILBERT  DAVIS, M.D.
June 08, 2023

---

Page 142

1   could that be the cause of his postoperative pain?

2        MS. MAKAR:  Objection, asked and answered,

3   speculation, incomplete hypothetical.

4        THE WITNESS:  It can be a portion of it.  As

5   I alluded to before, anything postoperative is at

6   play in terms of pain causing things and pain

7   management.  That does not preclude what happened

8   before the surgery from causing some of the

9   contribution of the pain postoperatively.

10       Q.  We're only talking here -- this opinion's

11  about postoperative outcome.

12           So when you say outcome --

13       A.  Wait, wait, wait.  My opinion is only about

14  postoperative outcome?  That's not true.

15       Q.  No, that's what I'm asking you about.

16       A.  Oh, that's what you're asking me.  That's

17  not what you said.  You said my deposition is only

18  based on the postoperative outcome.

19       Q.  No.  No.

20       THE WITNESS:  Can you read that back,

21  please.

22               (Whereupon, the record was

23                read as requested.)

24

---

Page 143

1   BY MR. TENGESDAL:

2        Q.  This opinion.

3        A.  Got it.

4        Q.  So I'll ask again.  Like you said, we're

5   talking over each other.  It's my fault.

6            I'm just asking you now.  We already talked

7   about the preceding.

8        A.  Got you.

9        Q.  Now I'm just talking, Doctor, about the

10  postoperative outcome.

11       A.  Okay.

12       Q.  When you say his postoperative outcome may

13  have been different, what's the outcome?

14       A.  The outcome is how you were able to live

15  life after your surgery.  Quality of life, that type

16  of thing.

17       Q.  Okay.  Would you agree you don't have any

18  opinion that says his quality of life has changed in

19  this or this way?

20       MS. MAKAR:  Objection, misstates his

21  testimony and mischaracterizes the evidence.

22       THE WITNESS:  So I don't have records of

23  post -- the post encounters.

24

---

Page 144

1   BY MR. TENGESDAL:

2        Q.  I can't help you.  They didn't give me the

3   opportunity to give you the full chart, sir.  You

4   only got what you got.

5        A.  Yep.

6        Q.  Do you know why you didn't get those records

7   so that you could support your opinion?

8        MS. MAKAR:  Objection, outside the scope,

9   speculation.

10       THE WITNESS:  Yeah.  I took the records that

11  I was given and made my opinion.

12  BY MR. TENGESDAL:

13       Q.  Sure.  And you just told me that in order --

14  this is why I asked you earlier why there's no

15  citation to records in some of these opinions.

16           If you had those records, had the

17  opportunity to review them, would you agree then you

18  may have a basis for the postoperative outcome

19  opinion?

20       MS. MAKAR:  Objection, misstates his

21  testimony.

22       THE WITNESS:  What's the question again?

23               (Whereupon, the record was

24                read as requested.)

---

Page 145

1        THE WITNESS:  I don't think I understand the

2   question.

3   BY MR. TENGESDAL:

4        Q.  Okay.  So you're saying you were never given

5   the records postoperatively; am I correct on that?

6        A.  I mean, I -- these are the records that I

7   was given.  So if there are postoperative like follow

8   ups in there, they were in there, then I was able to

9   review them.

10       Q.  Okay.

11       MS. MAKAR:  Let's take a break.  We're at an

12  hour again.  10 minutes?

13       MR. TENGESDAL:  How about two or three?

14       MS. MAKAR:  Two or three minutes?

15       MR. TENGESDAL:  Yeah.

16       MS. MAKAR:  I have to use the restroom.

17       MR. TENGESDAL:  Oh, fine.

18               (Whereupon, a break was taken,

19                after which the following

20                proceedings were had:)

21  BY MR. TENGESDAL:

22       Q.  Looking at your opinions, the sentence where

23  it says, It is my opinion with a reasonable degree of

24  medical certainty; do you see that?

---

EXHIBIT 7

JOHN GILBERT DAVIS, M.D.
June 08, 2023

Page 146

1    A.   Page 3?

2    Q.   Yeah.

3    A.   Yes, I've got it.

4    Q.   Okay.  So a lot of these, it looks like, we
5    already talked about.  When you talk about
6    Dr. Aguinaldo examines the patient on August 17 and
7    given the history of present illness and the
8    patient's subjective complaints, he should have
9    received expedited imaging of the neck and should
10   have immediately been provided stabilizing C-collar.

11        We already talked about your opinions on the
12   C-collar; would you agree?

13   A.   We talked about C-collars.

14   Q.   Do you have anything else to add about the
15   C-collar opinion?

16   A.   No.  I think my opinion is there, yeah.  No
17   further opinions.

18   Q.   Okay.  You say the delay of obtaining
19   imaging of Mr. Poole's neck until August 25th
20   breaches the standard of care.  Would you agree we
21   already discussed that you don't know why it took
22   till August 25th for the X-rays to be taken?

23   A.   I would agree with that.  I think it's a
24   delay, but I don't why there was a delay.

Page 147

1    Q.   As far as Dr. Aguinaldo's use of his medical
2    judgment in fixing the lacerations on the face, would
3    you agree that's reasonable for a physician to do?

4    A.   That was reasonable.

5    Q.   Do you know what Dr. Aguinaldo's medical
6    judgment was as to the diagnosis of the cervical
7    spine on August 17th?

8    A.   I'm sorry.  What's the question again?

9         MR. TENGESDAL:  Read it back.

10             (Whereupon, the record was

11             read as requested.)

12        THE WITNESS:  I don't.  According to the
13   record, he doesn't really say much about the neck;
14   it's mostly about the facial lacerations as far as I
15   can glean.

16   BY MR. TENGESDAL:

17   Q.   Okay.  Do you know if Dr. Aguinaldo based on
18   his note or his deposition testimony ever suspected a
19   fracture of the cervical spine?

20        MS. MAKAR:  Objection, speculation.

21        THE WITNESS:  Yeah, I don't know if that was
22   part of his thought process.

23   BY MR. TENGESDAL:

24   Q.   Okay.  I think we talked about the rest of

Page 148

1    that paragraph.  So let's look at that last paragraph
2    that goes into the next section.

3         This is where you talk about the subjective
4    S portion and the O.  We already talked about that
5    when we looked at the note that the SOAP are actually
6    on the August 17th note, right?

7    A.   They are two separate notes.  So there is
8    one where there's the 17th that does have the SOAP.
9    Presuming that's Dr. Aguinaldo.  There is another one
10   that I was referencing in a different portion that
11   the nurse filled out that doesn't have that portion
12   filled out.  So, yes, we did cover that and there is
13   this portion on the 17th.

14   Q.   Okay.  Got you.  So you would agree then
15   based on what we talked about today on that
16   August 17th long note written by Dr. Aguinaldo, there
17   is an S subjective, O objective, A assessment, and P
18   plan on that note?

19   A.   There is an S an O and under the plan
20   section there is a filled out section.

21   Q.   All right.  So that takes care of that.  So
22   let's look at the last paragraph then.

23        Second sentence, a delay in treatment gives
24   said injury time to worsen and thus possibly affects

Page 149

1    the surgical outcome as well as subjects Mr. Poole to
2    sequela of chronic pain.

3         Let's talk about that, if we could.  Is
4    there any testimony that the fracture worsened?

5    A.   Not that I'm aware of.

6    Q.   Okay.  Is there any testimony or advanced
7    imaging that shows that the subluxation worsened?

8    A.   Well, there's only one time point, so
9    there's no way to tell if it worsened or not.  So
10   basically based on one test we know that it's there;
11   we can't tell over time whether it's getting worse or
12   not.

13   Q.   Okay.  And, again, you weren't given the
14   X-rays from the facility that were read on
15   August 27th by the radiologist, right?

16        MS. MAKAR:  Objection, asked and answered.

17        THE WITNESS:  I read reports.

18   BY MR. TENGESDAL:

19   Q.   Okay.  Do you know if you actually put the
20   X-rays up on a view box that you can see 1 millimeter
21   of anterior translation on the X-ray?

22   A.   Not on an X-ray.  Maybe on a CT or MRI.

23   Q.   Okay.  Are you testifying that you can't see
24   anterior translation on an X-ray?

EXHIBIT 7

JOHN GILBERT DAVIS, M.D.
June 08, 2023

Page 150

1  A. Oh, subluxation. Yes, you can see that
2 subluxation on a plain film. Apologies.
3  Q. No, it's fine. And you said there's only
4 one point in time.
5  So would you agree that there's another
6 point in time that you haven't reviewed the X-rays
7 where there could be anterior translation?
8  A. Are we talking about subluxation?
9  Q. Yeah. Okay.
10  A. Repeat the question one more time.
11  (Whereupon, the record was
12  read as requested.)
13  MS. MAKAR: Objection, speculation.
14  THE WITNESS: By point in time, I mean,
15 there are no comparative films, so there is no way to
16 grade worsening.
17 BY MR. TENGESDAL:
18  Q. Okay. And if there's no way to grade
19 worsening, then you can't have an opinion as to
20 whether or not that worsened over tile?
21  MS. MAKAR: Objection, misstates his
22 testimony.
23  THE WITNESS: It possibly could worsen.
24

Page 151

1 BY MR. TENGESDAL:
2  Q. Right. But you can't give an opinion
3 because you don't have the two comparisons?
4  MS. MAKAR: Objection, asked and answered,
5 misstates his testimony.
6  THE WITNESS: Yeah. I mean, I can opine
7 based on my experience that over time, yeah, things
8 can get worse over time.
9 BY MR. TENGESDAL:
10  Q. Okay. And in order for you to opine that a
11 subluxation got worse, you would need to compare two
12 films, right?
13  A. That's correct.
14  Q. Okay. And in this case you can't compare
15 two films because you yourself told me there's only
16 one film?
17  A. That is correct. To which case I would say
18 could be impacted.
19  Q. Right. And without the benefit of two films
20 for you to look at or two radiologists that say the
21 same thing, you can't give that opinion?
22  MS. MAKAR: Objection, asked and answered.
23  THE WITNESS: I can give my opinion that
24 there is possibilities that are unforeseen, so, yeah,

Page 152

1 that is my opinion to.
2 BY MR. TENGESDAL:
3  Q. Okay. And then tell me how -- what's the
4 basis of your opinion other than your speculation?
5  A. My experience.
6  Q. Experience doing what, comparing radiology
7 films to see if subluxation's worsened?
8  A. Seeing patients that have had issues either
9 traumatic or surgical that have issues over time
10 because the chronicity of the time.
11  Q. Okay. Well, there's no chronicity here.
12 This is all acute?
13  A. Which is why is says possibly that could be
14 impacted. And possibly affect the surgical outcome.
15  Q. Okay. Other than a possibility, you don't
16 have any medical imaging to back up the opinion; is
17 that correct?
18  MS. MAKAR: Objection, misstates his
19 testimony, asked and answered.
20  THE WITNESS: Yeah. Overall that is not
21 changing my opinion. I am saying in the
22 postoperative period, things have a possibility of
23 getting worse, but I do not have that qualifier
24 because I do not have repeat films.

Page 153

1 BY MR. TENGESDAL:
2  Q. Let me be more specific then. My question
3 is, a delay in treatment gives said injury time to
4 worsen. I'm talking the period prior to surgery,
5 Doctor.
6  A. Uh-huh.
7  Q. Do you have any basis, medical evidence to
8 show that from 8-17 to the time of the CT on
9 August 30th, that there was any worsening of the
10 subluxation?
11  A. There are no imaging that shows that it is
12 worsened the subluxation.
13  Q. Okay. So then do you have anything to hang
14 your opinion on that it possibly could have occurred?
15  MS. MAKAR: Objection, asked and answered.
16  THE WITNESS: Yeah. I am not implying that
17 there was worsening of the subluxation. Basically by
18 the patient not having catastrophic injury, you know,
19 I don't know. But here we have the possibility of
20 there's an injury that can cause pain, then there's
21 surgery can cause pain. If there's a time between
22 which you could have done an intervention and maybe
23 make the preoperative period of time a little bit
24 better, more safe, then that was an opportunity

EXHIBIT 7

JOHN GILBERT DAVIS, M.D.
June 08, 2023

---

**Page 154**

1  there.  So there is no imaging, but it is my opinion
2  that just over time things do get worse if they are
3  not handled and addressed in an appropriate manner.
4  BY MR. TENGESDAL:
5      Q.  Okay.  Were you aware that when you have a
6  perched facet, the joint is actually locked up so
7  that it can't worsen?
8      A.  No.  I've never heard that before.
9      Q.  Okay.  Well, if a one fragment is perched
10 and locked on the other one, would you agree that can
11 prevent movement of the joint?
12     A.  No, I can't agree on that, because that's
13 not what kind of doctor I am.
14     Q.  The only reason you can't agree is because
15 you're not a surgeon that takes care of those
16 conditions?
17     MS. MAKAR:  Objection, misstates his
18 testimony.
19     THE WITNESS:  I am not a surgeon that works
20 on those fractures.
21 BY MR. TENGESDAL:
22     Q.  Okay.  And when you say delay in treatment
23 can possibly effect the surgical outcome, explain
24 that to me.

---

**Page 155**

1      A.  I consider stabilizing the injury part of
2  the treatment and if the injury is unstable for an
3  amount of time, it stands to reason that the
4  situation could worsen.  That's my opinion.
5      Q.  Okay.  But you're saying possibly could
6  effect the surgical outcome.  What anatomically
7  pathophysiologically by a delay would cause the
8  surgical outcome to be affected?
9      A.  Surgical outcome includes postoperative
10 pain.  Postoperative pain can be affected by
11 preoperative issues, whether they're addressed or
12 not.
13     Q.  What preoperative issues can affect
14 postoperative pain in a C3-C4 cervical fusion?
15     A.  Subluxation, instability, pain, inability to
16 live life.
17     Q.  Okay.  What was the surgical outcome in this
18 case?
19     A.  He got his C1-C2 fusion.  He got the
20 fracture repaired.  I can look at the report.
21     Q.  Okay.  Where do you get -- C1 is atlas.  C2
22 is access.  They're not involved Atlas.
23     A.  Say that again.
24     Q.  C1 is atlas.  C2 is the access.  They're not

---

**Page 156**

1  involved in this case.  Why are you saying there's a
2  C1-C2 fusion?
3      A.  Apologies.  I'll look at the report and tell
4  my where the surgery was.  I shouldn't be guessing.
5      Q.  Where was the fracture at, what level?
6      A.  The C-spine.  I'll look at it right now.
7  You want me to read the report?  I mean, I can read
8  you the MRI report or the surgical report.
9      Q.  I thought you told me the fracture was on C3
10 on the right, the facet?
11     A.  Yeah, I apologize.  I believe that I just
12 read it's C3 and C4.  Yep, C3-C4.  Apologies.  I
13 misspoke.
14     Q.  Okay.  So postoperative outcome as a result
15 of fusion, how was that affected in this case?
16     A.  Say that again.  I missed it.
17     Q.  Sure.  What postoperative surgical outcome
18 was affected in this case?
19     MS. MAKAR:  Objection, asked and answered.
20     THE WITNESS:  Pain, ability to function.
21 BY MR. TENGESDAL:
22     Q.  Okay.  Did Mr. Poole ever report in
23 subsequent visits after surgery to his neurosurgeon
24 Dr. Mehta that he had difficulty in his ability to

---

**Page 157**

1  function?
2      MS. MAKAR:  Objection, outside the scope.
3      THE WITNESS:  I could review those post
4  notes to see exactly what this complaints were in
5  postoperative period.
6  BY MR. TENGESDAL:
7      Q.  I'm only interested in his ability to
8  function.
9      A.  Okay.
10     Q.  You just testified that it could affect his
11 ability to function.  Did Mr. Poole ever report to
12 Dr. Mehta postsurgically that he had difficulties in
13 his abilities to function?
14     A.  I don't know.
15     Q.  Okay.  Did he, Mr. Poole ever report to
16 Dr. Mehta that he had pain postsurgically?
17     A.  I don't know off the top of my head.
18     Q.  Do you know if Dr. Mehta ever told
19 Mr. Poole, looked him in the eyes, the neurosurgeon
20 and said, well, you can have pain as a natural
21 consequence of me screwing and bolting two of your
22 cervical vertebra together?
23     MS. MAKAR:  Objection, speculation, asked
24 and answered.

EXHIBIT 7

JOHN GILBERT DAVIS, M.D.
June 08, 2023

Page 158

1    THE WITNESS: I am unaware of that
2  conversation.
3  BY MR. TENGESDAL:
4    Q. Okay. So you have no knowledge as to what
5  the possible effects are then to Mr. Poole of the
6  surgical outcome?
7    MS. MAKAR: Objection, misstates his
8  testimony.
9    THE WITNESS: Yeah, that's two different
10  questions. What the possible outcomes are?
11    MR. TENGESDAL: Yeah.
12    THE WITNESS: There are a lot of possible
13  outcomes that I have laid out here.
14  BY MR. TENGESDAL:
15    Q. Okay. So as you sit here today, two to
16  three months postsurgically, did he have any
17  complaints?
18    A. I do not have knowledge of that.
19    Q. Okay. So you don't have an opinion then --
20    A. Right.
21    Q. -- as to whether or not he has any
22  postsurgical pain?
23    A. I do not know his postop course.
24    Q. Okay. Next sentence you say -- or same

Page 159

1  subject.
2    Surgical outcome as well subjects Mr. Poole
3  to sequela of chronic pain.
4    What is exactly subjecting him to chronic
5  pain?
6    A. Injury, surgery.
7    Q. Okay.
8    A. Possibly.
9    Q. In order to cause pain, you're aware you
10  have to have a pain generating structure to do that,
11  right?
12    A. A pain generating structure?
13    Q. Yeah.
14    A. I mean...
15    MS. MAKAR: Objection, asked and answered.
16    THE WITNESS: I'm aware something has to
17  happen to cause pain. I never heard it put in those
18  terms, but...
19  BY MR. TENGESDAL:
20    Q. Okay. Well, what then is the mechanism of
21  causing chronic pain to the man?
22    A. What causes chronic pain?
23    Q. First of all, do you have an opinion that he
24  has chronic pain?

Page 160

1    A. This is -- these are all possibilities. So
2  no, I do not have an opinion whether he has chronic
3  pain.
4    Q. Do you also not have an opinion as to what
5  the cause of the chronic pain is then?
6    A. I do not know exactly what his chronic pain
7  is from. I know that there are possibilities of what
8  it is from.
9    Q. Okay. Next sentence, you say, when a bone
10  fracture worsens from delays in treatment. Does that
11  apply to Mr. Poole's fracture?
12    MS. MAKAR: Objection, asked and answered.
13    THE WITNESS: When a bone fracture worsens
14  from delays in treatment, when the bone misaligns.
15  Yeah, that's true.
16  BY MR. TENGESDAL:
17    Q. Okay. So I'm just -- you've got multiple
18  things in that sentence, so I want to just
19  concentrate.
20    When you say a bone fracture worsens from
21  delays in treatment, what evidence do you have that
22  his C3 fracture worsened, if anything?
23    A. I don't have evidence that it got worse.
24    Q. Okay. So that's what I'm saying. We're

Page 161

1  talking about Mr. Poole and his fracture today.
2    So would you agree that then you don't have
3  evidence that his bone fracture worsened?
4    MS. MAKAR: Objection, misstates his
5  testimony.
6    THE WITNESS: So what are we talking about?
7  Timeline?
8  BY MR. TENGESDAL:
9    Q. No. I'm talking about do you have any
10  evidence that his bone fracture worsened?
11    A. No. He had a fracture and then he had a
12  repair.
13    Q. Okay. That's all I'm asking about.
14    A. Okay.
15    Q. All right. When you say where the bones are
16  misaligned due to a failure to stabilize, what do you
17  mean by that?
18    A. If you don't get a repair, if you heal and
19  you're not repaired, then the healing can cause
20  subsequent problems.
21    Q. Right. In this case, that doesn't apply as
22  well, because he got a C3-C4 stabilization, fusion,
23  right?
24    MS. MAKAR: Objection, asked and answered.

EXHIBIT 7

JOHN GILBERT DAVIS, M.D.
June 08, 2023

---

Page 162

1    THE WITNESS: So, yeah, he got surgically
2  repaired.
3  BY MR. TENGESDAL:
4    Q. Okay. So this also then doesn't apply
5  because the bones aren't misaligned because Dr. Mehta
6  testified that got a good surgical fusion construct
7  and the purpose of his surgery was to align C3 and
8  C4, right?
9    MS. MAKAR: Objection, leading, misstates
10  his testimony.
11    THE WITNESS: Yeah. He got -- he did get
12  surgical repair. That, I cannot disagree with.
13  BY MR. TENGESDAL:
14    Q. Okay. In part of the surgical repair, did
15  Dr. Mehta align C3 and C4 when he put two little
16  plates on there, drilled some pilot holes and put
17  some screws connecting C3-4, put some bone chips in
18  there, and let it all fuse together?
19    A. That did happen three weeks after his
20  injury, yeah.
21    Q. And once that happened, that stabilized the
22  spine, that was, in fact, the purpose of the surgery;
23  is that right?
24    A. That's fair.

---

Page 163

1    Q. Okay. Would you agree then you don't have
2  an opinion that the structural integrity of the
3  tissues in Mr. Poole's case were impacted?
4    MS. MAKAR: Objection, misstates his
5  testimony.
6    THE WITNESS: No. If he had imaging that
7  showed edema, tissue edema, then, yeah, I believe the
8  tissue was impacted.
9  BY MR. TENGESDAL:
10    Q. Well, the tissue was impacted because he got
11  in a fight and he got his ass whipped and he got his
12  neck broke, right? So he got swelling of the
13  tissues?
14    MS. MAKAR: Objection, asked and answered.
15    THE WITNESS: The reason he has tissue
16  inflammation does not matter to me. The fact that he
17  had it is what matters.
18  BY MR. TENGESDAL:
19    Q. Right. But he had it as a result of the
20  traumatic event, not by somebody not doing anything,
21  right?
22    MS. MAKAR: Objection, asked and answered.
23    THE WITNESS: I disagree with that.
24

---

Page 164

1  BY MR. TENGESDAL:
2    Q. Okay. So when you say the tissue could be
3  impacted, that sounds like something that could
4  happen but you don't have any medical document or
5  imaging that shows that, right?
6    A. Yeah. I mean, here's the thing about, like,
7  pain. There is no imaging that can cause pain. So
8  structural integrity, if the imaging says that there
9  is edema and inflammation, then that tissue is
10  impacted. The actual sequela of it, that all depends
11  on the patient.
12    Q. And --
13    A. But, yeah --
14    Q. Sorry.
15    A. -- structural integrity is documented on the
16  imaging to have been impacted.
17    Q. And the structural integrity of the tissue
18  was certainly impacted when Dr. Mehta went in there,
19  made a cut C3-C4, retracted the muscles, put some
20  screws, drilled holes in there, and fused the two
21  bones and put some bone chips in there so that it
22  gets healed together, right?
23    MS. MAKAR: Objection, asked and answered.
24    THE WITNESS: Okay. So that's the second

---

Page 165

1  time you tried to make me through a neurosurgical
2  case, which is fine. But here's the thing, whether
3  it came from a fight, whether it came from postop,
4  nobody's going to be able to give you a percentage
5  that says, oh, this is a percentage from this and
6  this is a percentage from that.
7    My opinion is that you get your neck swung
8  around, you don't get your C-collar put on, and you
9  have imaging that shows inflammation, then that's
10  going to be impacted. That is where I'm going right
11  there, structural integrity.
12  BY MR. TENGESDAL:
13    Q. Well, the imaging that showed inflammation,
14  you didn't see that until you got the CT when he was
15  out of the prison?
16    A. Yeah. You also have a patient that says, my
17  neck hurts. So there's other ways. You don't need
18  imaging to treat a patient. The way we like to
19  practice, my standard of practice is I treat the
20  patient who's sitting in front of me, interview,
21  vital signs, exam. Anything behind that is helping
22  me confirm what I'm doing with the patient. I don't
23  chase -- you don't chase imaging. You do your job
24  and you let the imaging confirm.

---

EXHIBIT 7

JOHN GILBERT DAVIS, M.D.
June 08, 2023

Page 166

1  Q.  Okay.  I don't even get this next one, but
2  let's give it a shot.
3      Such worsening or misalignment will cause
4  the patient more pain and limitations on daily
5  activities.  You're not saying the patient currently
6  has misalignment, are you?
7  A.  No.
8  Q.  Okay.
9  A.  This is based on if you have worsening or
10 misalignment based on delay, not putting your
11 C-collar on, then things can happen like this.
12 Q.  I'm confused.  Because when we saw those
13 notes when he's in segregation and he said he had no
14 complaints and he didn't come down, how much pain was
15 the guy in?  Why didn't he request a C-collar?
16     MS. MAKAR:  Objection, speculation,
17 misstates the evidence.
18     THE WITNESS:  That's not my job.
19 BY MR. TENGESDAL:
20 Q.  It's also not Dr. Aguinaldo's job to go
21 fetch people when they're in segregation, is it?
22 A.  I don't know how his job works.
23 Q.  Okay.  Fair enough.
24 A.  His job is probably to treat his patient.

Page 167

1  Beyond that, the logistics of it, I am not sure how
2  he does that.
3  Q.  Okay.  I think we talked about this, but it
4  looks like it's your sum-up opinion.  Mr. Poole's
5  outcome would have been better had his initial
6  encounters with Dr. Aguinaldo been different.
7      Have we discussed that?
8  A.  We've discussed a little bit.
9  Q.  Okay.  So let's discuss it in entirety then.
10 So how would his outcome have been better had his
11 initial encounters with Dr. Aguinaldo been different?
12 A.  I believe that his postop, if he's having
13 postop pain, if you treat something earlier, then you
14 assume that hopefully your post outcome is better.
15 Q.  Okay.  Where can I find this in the medical
16 literature to support this opinion?
17 A.  Where can you find what?
18 Q.  What you just testified to.  That if you
19 treat earlier, the postoperative outcome will be
20 better?
21 A.  Possibly.
22 Q.  Okay.
23 A.  This is not a rule.  But 100 percent the
24 earlier you treat something in general, yeah, you

Page 168

1  should be able to get a better outcome as opposed to
2  delayed treatment.
3  Q.  But you're not a surgeon, right?
4  A.  No.
5      MS. MAKAR:  Objection, asked and answered.
6  BY MR. TENGESDAL:
7  Q.  Would you have any reason to disagree if a
8  well-respected spine surgeon testifies in this case
9  and says there's absolutely no scientific basis for
10 the opinion that had this man been treated earlier,
11 that his surgical outcome would have been different?
12     MS. MAKAR:  Objection, leading, asked and
13 answered.
14     THE WITNESS:  Yeah.  The surgical outcome, I
15 would 100 percent rely on his opinion.  Whether he
16 were to say that 100 percent of this pain is from my
17 surgery, I would disagree.
18 BY MR. TENGESDAL:
19 Q.  On what basis?
20 A.  That it was previous injury.
21 Q.  Okay.  Wasn't the injury, in fact, fixed by
22 Dr. Mehta?
23 A.  But there was pain associated with that
24 injury before the surgical intervention, so before

Page 169

1  Dr. Mehta was able to intervene.
2  Q.  Sure.  He had pain until he got
3  stabilization?
4  A.  There you go.
5      MS. MAKAR:  Objection, misstates his
6  testimony.
7  BY MR. TENGESDAL:
8  Q.  And he was given pain medication throughout,
9  correct?
10 A.  That's not what the record states.
11 Q.  What record doesn't state it?
12 A.  You just called up one of the UIC -- I
13 believe, the UIC where it documents at that visit he
14 did not accept pain medicine.  So that was different.
15 Q.  Oh, I see what you're saying.  Yeah, it was
16 the Saint Joseph record.
17 A.  Saint Joseph.  Apologies.  The UIC he did
18 have a lot of pain.
19 Q.  Okay.  So the UIC he had pain.  They give
20 him pain medicine.  But when he was at Saint Joseph,
21 they offered him, he declined?
22 A.  That's what the record states.
23     MR. TENGESDAL:  All right.  That's all I
24 have.

EXHIBIT 7

JOHN GILBERT  DAVIS, M.D.
June 08, 2023

Page 170

1    MS. MAKAR:  What did you say?  That's it?
2    MR. TENGESDAL:  That's all I have.
3    MS. MAKAR:  Okay.  I have questions for you.
4              EXAMINATION
5    BY MS. MAKAR:
6    Q.   Okay.  So when you were asked about the
7    postoperative outcome and the opining you did on
8    that, is that from examining Mr. Poole or from your
9    expertise about what can happen in any case with any
10   patient when there's a delay?
11   A.   That is from my experience of dealing with
12   postop patients.  I did not examine Mr. Poole.
13   Q.   And when you made your opinion about his
14   ability to function and his possible pain, were you
15   basing that on your examination of him or your
16   experience with what can happen with any patient who
17   has this type of care and delay in treatment?
18   A.   That's based on my experience with these
19   type of patients that are undergoing these issues.
20   Q.   So you're saying in every case when there's
21   a delay, there could be a worsened outcome and you
22   can opine on that without knowing about one specific
23   patient's imaging?
24   A.   Exactly.  The whole -- our point is to

Page 171

1    diagnose it in a timely fashion, avoiding delays so
2    that things don't get worse.  I would agree with
3    that.
4    Q.   And when you said that you look at the
5    medical records and you look at the deposition, but
6    you rely more on the medical records, is that because
7    they are more close in time and they effect the
8    patient's treatment?
9    A.   I put more weight on the facts of the case,
10   because that's basically what I thought my job is.  I
11   read the other -- you know, the depositions, but I
12   felt like that's more the legal side of it and my job
13   is to do the medical side.
14   Q.   And you didn't give any one deposition more
15   weight than another in making your pinion?
16   A.   I read them, but I did not like take weight.
17   Q.   So when you were asked is it a doctor's
18   responsibility to fetch their patient, is it a
19   doctor's responsibility to examine a patient if they
20   feel an examination is necessary?
21   A.   It is a doctor's responsibility to do an
22   examination.
23   Q.   Is there any follow up responsibility of a
24   doctor in treating a patient to make sure his plan or

Page 172

1    recommendation is carried out?
2    A.   There is.  So if you initially see a patient
3    and you start to diagnose, then now you are
4    responsible to follow up on all of things that you're
5    looking for.  So if it's blood work, imaging,
6    whatever you do to diagnose that patient, it is the
7    physician's responsibility to follow up on those
8    tests and then address them properly with the
9    patient.
10   Q.   Is it also part of your responsibility to
11   make sure what you document is interpreted correctly,
12   is documented correctly, et cetera?
13   A.   Documentation is part of the standard of
14   care.  We need to document everything that we do
15   essentially.
16   Q.   And for a doctor, regardless of setting, is
17   it their responsibility to get stabilization when
18   they think it's necessary or to get imaging when they
19   think it's necessary?
20   A.   That is our job, yes.
21   Q.   So even if a C-collar, for example, is not
22   on hand, if you think it's necessary, what would you
23   do in that circumstance?
24   A.   Figure something out.  You've got to figure

Page 173

1    something out.  If you were there, you may not have
2    resources, but you've got to figure out some
3    resources on the spot.
4    Q.   Like a --
5    A.   You need that collar.  You need to, if you
6    don't have a collar, get that person to where they
7    can get a collar.
8    Q.   So going back really quickly to a doctor's
9    responsibility.  You know is it part of your
10   responsibility as you're examining the patient to ask
11   everything you need to ask and have all the
12   information you need to make a plan?
13   MR. TENGESDAL:  Objection, beyond the scope
14   of the expert report Rule 26.
15   THE WITNESS:  Could you repeat the question?
16   MS. MAKAR:  Could you say it back?
17   THE WITNESS:  Sorry.
18        (Whereupon, the record was
19         read as requested.)
20   THE WITNESS:  Yes.
21   BY MS. MAKAR:
22   Q.   And we talked about differential diagnosis.
23   Can you explain what that is and what it means you do
24   when you're examining a patient?

EXHIBIT 7

JOHN GILBERT DAVIS, M.D.
June 08, 2023

Page 174

1    A.   So a differential diagnosis is a list that a
2  physician should formulate in their head formally or
3  informally that kind of takes us through the possible
4  diagnoses that we are dealing with.
5        Basically as a Doctor, you are to triage the
6  worst case scenario down to the most benign and with
7  that differential you have a list of different things
8  that you need to keep in mind while you're diagnosing
9  the patient actively.
10   Q.   And when you in response to counsel's
11  questions say that you can't disagree about something
12  because you don't know, do you mean you can't
13  disagree or agree?
14   A.   I cannot disagree or agree, because I have
15  no knowledge.
16   Q.   Even taking as true what you heard about
17  other doctors and their testimony and their opinion,
18  does that change your opinion in your report?
19   A.   No, it does not.
20   Q.   Even taking as true about what you heard
21  about the radiologist and what he may or may not have
22  missed, does that change any of the opinions in your
23  report?
24   A.   It does not.

Page 175

1    Q.   Last question.  So when you're examining a
2  patient, if you need to know something about their
3  history leading up to that examination, what do you
4  do?
5    A.   Ask them or go on the record of what you've
6  got.  Past records, I should say.
7        MS. MAKAR:  That's it.
8        THE COURT REPORTER:  What was the last part
9  of that?
10       THE WITNESS:  Past records.  Past medical
11  records.
12       MS. MAKAR:  Thank you, Doctor.
13       MR. TENGESDAL:  Do you have any questions?
14       MS. LINDEMANN:  Nothing from me.
15           FURTHER EXAMINATION
16  BY MR. TENGESDAL:
17   Q.   Just a couple quick follow ups in relation
18  to responsibilities of a doctor following up on
19  tests.
20       Would you agree the record indicates that
21  that's what Dr. Aguinaldo did in this case as far as
22  the labs?
23       MS. MAKAR:  Objection.
24       THE WITNESS:  As far as what?

Page 176

1  BY MR. TENGESDAL:
2    Q.   The labs.  He ordered labs that --
3    A.   Oh, labs.  Got you.
4    Q.   He saw the patient and then reported it.
5    A.   Yeah.  I mean, he's got reports in here.  He
6  ordered the labs and things like that.
7    Q.   Did you see any evidence that Mr. Poole came
8  down seeking health care for neck pain and
9  Dr. Obaisi, Dr. Aguinaldo, or any other physician
10  refused to see him in the month of August 2017?
11   A.   I don't see any documentation of refusal to
12  see the patient in the record.
13   Q.   Okay.  You testified that stabilization with
14  the C-collar and that, that's when the doctor
15  believes it's necessary, right?
16   A.   That would be correct.
17   Q.   Okay.  So the doctor has to believe it's
18  necessary in order to do the stabilization?
19   A.   Yeah.  Because the doctor has to put the
20  order in, yes.  Yeah.
21   Q.   Okay.  All right.  Has anybody in this case,
22  including Dr. Mehta, testified that the C-collar
23  affected the outcome of this patient?
24       MS. MAKAR:  Objection, asked and answered.

Page 177

1        THE WITNESS:  Is that documented?  No.
2        MR. TENGESDAL:  Yeah.  Okay.  That's all I
3  have.  Thank you, sir.
4        Do you want to reserve or waive signature?
5        MS. MAKAR:  We'll reserve.
6        THE COURT REPORTER:  Are you ordering?
7        MR. TENGESDAL:  Yes.  I'll take a copy.
8        MS. LINDEMANN:  I'll take a copy too,
9  please.
10       THE COURT REPORTER:  Do you want a copy?
11       MS. MAKAR:  No, we're good.
12           (Witness excused at 2:50 p.m.)
13
14
15
16
17
18
19
20
21
22
23
24

EXHIBIT 7

JOHN GILBERT  DAVIS, M.D.
June 08, 2023

Page 178

1
2        IN THE UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF ILLINOIS
3                  EASTERN DIVISION
4   AHMAD POOLE (K-95348),            )
                                      )
5            Plaintiff,               )
                                      )
6        -vs-                         )  No. 20 C 00014
                                      )
7   DR. EVARISTO AGUINALDO, et al.,   )
                                      )
8            Defendants.              )
    _____)
9
10            I, JOHN GILBERT DAVIS, M.D., being first
    duly sworn, on oath, say that I am the deponent in
11   the aforesaid deposition, that I have read the
    foregoing transcript of my deposition taken June 8,
12   2023, consisting of Pages 1 through 180 inclusive,
    taken at the aforesaid time and place and that the
13   foregoing is a true and correct transcript of my
    testimony so given.
14         _____ Corrections have been submitted
           _____ No corrections have been
15             submitted
16
17        _____
18
19            JOHN GILBERT DAVIS, M.D., Deponent
20   SUBSCRIBED AND SWORN TO
    before me this _____ day
21   of _____ A.D., 2023.
    _____
22   Notary Public
23
24

Page 179

1   NORTHERN DISTRICT OF ILLINOIS )
                                  )
    EASTERN DIVISION              )
2   STATE OF ILLINOIS             )
                                  )
                                  )  SS:
3   COUNTY OF COOK                )
4        I, Emily R. Pellegrino, Certified Shorthand
5   Reporter in and for the County of Cook, State of
6   Illinois, do hereby certify that on the 8th of June,
7   A.D., 2023, the deposition of the witness, JOHN
8   GILBERT DAVIS, M.D., called by the Defendants, was
9   taken before me, reported stenographically and was
10   thereafter reduced to typewriting through
11   computer-aided transcription.
12        The said witness, JOHN GILBERT DAVIS, M.D.,
13   was first duly sworn to tell the truth, the whole
14   truth, and nothing but the truth, and was then
15   examined upon oral interrogatories.
16        I further certify that the foregoing is a
17   true, accurate and complete record of the questions
18   asked of and answers made by the said witness, at the
19   time and place hereinabove referred to.
20        The signature of the witness was not waived
21   by agreement.
22        Pursuant to Rule 30(e) of the Federal Rules
23   of Civil Procedure for the United States District
24   Courts, if deponent fails to read and sign this

Page 180

1   deposition transcript within 30 days or make other
2   arrangements for reading and signing thereof, this
3   deposition transcript may be used as fully as though
4   signed, and the instant certificate will then
5   evidence such failure to read and sign this
6   deposition transcript as the reason for signature
7   being waived.
8        The undersigned is not interested in the
9   within case, nor of kin or counsel to any of the
10   parties.
11        Witness my official signature and seal as
12   Notary Public, in and for Cook County, Illinois, on
13   this 9th day of June, A.D., 2023.
14
15
16
17
18        Emily R. Pellegrino, CSR
          200 West Jackson Boulevard, Suite 600
19        Chicago, Illinois  60606
20
    License No. 084-004503
21
22
23
24

EXHIBIT 7

_____

        **Exhibits**
_____

**EX 0001 Dr.**
 **John Davis 0608**
**23**
  3:9 7:17,19

**EX 0002 Dr.**
 **John Davis 0608**
**23**
  3:9 30:18,21

**EX 0003 Dr.**
 **John Davis 0608**
**23**
  3:10 32:3,6,7,
 12,13 71:1

**EX 0004 Dr.**
 **John Davis 0608**
**23**
  3:10 36:9,12,
 18 44:24 46:13
 51:15

_____

          **$**
_____

**$4,000**
  31:22

_____

          **0**
_____

**0479**
  36:19

**0955**
  123:24

_____

          **1**
_____

**1**
  7:17,19 32:12
 33:18 67:14
 83:5,8 97:13
 114:2,5 124:4,
 11,13,14,17
 125:4,8,13
 135:10 149:20

**10**
  10:4 31:14,15
 50:16 83:5,8
 99:14 106:7
 129:15 145:12

**100**
  119:3 167:23
 168:15,16

**1039**
  123:9

**12**
  80:10

**1502**
  64:19

**17**
  52:18 77:14
 92:24 127:10
 146:6

**17th**
  17:15 32:17,
 20,24 52:9,10,
 11,17,19
 73:16,23 74:6
 76:20 77:7,22
 78:2,8,12
 88:19,22 89:3
 92:8,13,16
 94:3,9 96:10,
 16 101:8 103:2
 111:4,11
 128:11 129:3
 147:7 148:6,8,
 13,16

**18**
  11:1

**18th**
  48:16,21 49:4
 50:7 103:6,9,
 12,14

**19**
  8:10

**19th**
  48:16 111:11

_____

          **2**
_____

**2**
  30:15,18,21
 114:2,5

**20**
  31:16,18 48:16

**2000**
  8:10,11 11:19

**2004**
  11:4,6

**2005**
  11:15,19

**2006**
  11:19

**2017**
  10:24 17:15
 32:17,20,24
 41:24 43:8
 46:24 54:2,3
 56:4 68:24
 77:14,22
 92:16,24
 176:10

**2024**
  11:11

**2027**
  12:5

**21**
  48:16

**218**
  44:13

**21st**
  41:10 104:12,
 20 105:1,7

**22**
  48:16

**22nd**
  53:3,5 88:22
 89:4 92:12

**23**
  48:16

**24**
  48:16

**24th**
  106:2,16
 111:11

**25**
  10:12 48:16
 54:2,3

**251**
  44:7,11,12,14,
 18

**252**
  44:24 45:1

**253**
  45:5

**254**
  46:4

**255**
  46:12

**256**
  46:23

**25th**
  54:21,23 55:1,
 9,10 74:16
 75:13,14,15
 76:1 89:1
 146:19,22

**26**
  48:16 173:14

**27**
  48:16 52:17,18
 56:4

EXHIBIT 7

JOHN GILBERT DAVIS, M.D.
June 08, 2023

**27th**
  41:17 56:2
  60:10,23 61:11
  62:12 63:12,16
  75:13,15,18,21
  107:22 149:15

**28**
  48:17

**28th**
  41:24 42:24
  43:8 107:3,7
  108:14 111:12

**29**
  48:17

**2993**
  67:15,16 68:8

**2994**
  64:4,6 70:4

**2:50**
  177:12

---

**3**

**3**
  32:1,3,7,13
  71:1,15 77:16,
  17 114:2,5
  146:1

**30**
  46:24 47:3
  48:17 68:24
  69:19

**30th**
  70:14 75:16
  76:1 78:22
  83:10,15 111:4
  153:9

**31**
  48:17

**31st**
  48:21 49:4

  50:8 113:23
  114:1,5 116:9

**34-year-old**
  68:9 114:24

---

**4**

**4**
  36:9,12,18
  44:24 46:12,13
  51:7,8,15,16
  114:2,5

**4,000**
  31:3

**465**
  47:8,11,12
  48:3 50:2

---

**5**

**5**
  67:14 114:2,5

---

**6**

**6**
  114:2,5

**6th**
  128:10 129:4,
  10

---

**7**

**7**
  33:19 106:7

**718**
  51:2,16 54:1
  60:17

**749**
  36:22

**75**

  10:12

**751**
  51:8

---

**8**

**8**
  52:7

**8-17**
  41:8 45:11,17
  52:9 101:23
  102:1 153:8

**8-17-17**
  44:7

**8-17-2017**
  36:19

**8-19**
  41:9

**8-21**
  45:12,17

**8-21-17**
  45:6

**8-24**
  41:12 46:7

**8-24-17**
  46:4

**8-25**
  53:16,17

**8-27**
  41:14 43:19
  55:16

**8-28**
  41:24 42:3,21,
  22 43:18,20
  46:20,22
  107:21

**8-28-17**
  43:24 46:13

**8-30**

  41:20 68:1
  109:17 113:22

**8-30-17**
  68:1

**8-31**
  113:19

---

**A**

**a/k/a**
  101:11

**abbreviation**
  54:5

**abilities**
  157:13

**ability**
  121:7 156:20,
  24 157:7,11
  170:14

**able**
  63:8 88:6,7
  90:20,23 91:2
  93:7 100:21
  107:17 118:11
  126:17 137:24
  143:14 145:8
  165:4 168:1
  169:1

**Absent**
  114:18

**absolutely**
  94:5 128:8
  168:9

**accept**
  25:21 92:14
  169:14

**access**
  155:22,24

**Accompanying**
  123:11

EXHIBIT 7

JOHN GILBERT DAVIS, M.D.
June 08, 2023

account
79:4

accurate
7:22 25:3

act
27:22

action
74:18

actionable
28:6

active
130:17

actively
174:9

activities
166:5

actual
29:23 33:14
38:3 73:2
74:14 109:22
111:5 131:5,7
132:4 164:10

acute
74:9 95:21,22
116:9 128:3
129:7,8,10,14
130:13,14
136:11,18
152:12

acutely
80:15 82:17

add
82:4 146:14

addition
62:9 97:22

additional
34:19 124:7

address
28:6 105:20
172:8

addressed
74:2 98:2
100:6 154:3
155:11

adequate
73:21

administered
73:15

admitted
26:1

advanced
119:6 120:1
135:9 149:6

advice
15:1

affect
152:14 155:13
157:10

affected
129:16 155:8,
10 156:15,18
176:23

affects
148:24

afforded
91:13 110:13
120:4

ago
6:18 68:11

agree
14:1,5,7,8,10,
11,14,15,17
16:18 17:2
20:17 29:5
32:17,19 50:15
58:21 65:7,8,
9,20 66:21
67:23 69:18
70:17 71:15,20
75:8,9 76:15
78:11 79:5

80:18,20 82:1,
9 84:14 86:2
89:10 90:1,20,
22,23 91:2,5,7
92:24 94:3,5,
10 95:3 98:18
99:3,6 100:6,
9,12,15 101:18
102:2,7,11
103:15,22,24
105:6 108:6,8,
14 109:24
114:2,6,16,17
115:4 117:24
120:2,3 121:1
125:4,7,10,24
126:13 128:6
129:2,6,9,13
132:19,22
134:7 135:13
139:15 143:17
144:17 146:12,
20,23 147:3
148:14 150:5
154:10,12,14
161:2 163:1
171:2 174:13,
14 175:20

Agreed
91:1

agreement
31:1

Aguinaldo
4:8 35:13
37:21 40:10,
19,24 41:2
52:13,24 53:10
58:12 63:22
65:24 66:11,16
76:19,22 77:2
87:14 88:18
92:7 94:7
97:18,20 98:3
100:6 101:21

102:9,12
103:15,21,22
104:19 107:3,
11,21 108:9,
13,22 109:7,19
111:4 118:3
120:4,22 121:1
137:14 146:6
147:17 148:9,
16 167:6,11
175:21 176:9

Aguinaldo's
93:1 94:3
102:1 107:7
121:7 137:6
147:1,5 166:20

ahead
47:7 113:18

Ahmad
35:10

air
25:4

align
162:7,15

aligned
130:22

alignment
133:14

allowed
50:18 79:24

alluded
74:23 142:5

alteration
96:17

altercation
37:7 38:20
39:9,12 40:19
47:18 52:19
68:11 99:2
135:4

EXHIBIT 7

JOHN GILBERT DAVIS, M.D.
June 08, 2023

**altered**
  141:4

**amend**
  35:16

**Amended**
  33:12 35:17

**amount**
  74:14 121:19
  155:3

**anatomical**
  80:1 132:3

**anatomically**
  96:18 155:6

**anatomy**
  79:16

**and/or**
  80:24 81:22
  82:3,11

**annotate**
  82:7

**annotations**
  82:8

**answer**
  4:24 7:4 14:24
  18:10 33:2
  42:11 60:19
  61:22 62:4,5,
  6,23 81:24
  83:20 93:9
  114:21 124:12
  136:17

**answer's**
  7:15

**answered**
  69:23 73:8
  75:10 83:18
  87:16 88:3
  90:5 91:4,15
  118:24 122:24
  126:16 134:11,

23 135:15,18
136:15 139:7
141:6 142:2
149:16 151:4,
22 152:19
153:15 156:19
157:24 159:15
160:12 161:24
163:14,22
164:23 168:5,
13 176:24

**anterior**
  123:15,19
  124:3,10,17
  135:11 149:21,
  24 150:7

**anterolisthesis**
  123:11

**anybody**
  46:2 176:21

**anybody's**
  86:3

**anyone**
  63:10

**apologies**
  92:2 97:11
  150:2 156:3,12
  169:17

**apologize**
  35:24 55:24
  156:11

**application**
  16:18,19

**apply**
  22:12 128:9
  160:11 161:21
  162:4

**applying**
  17:3

**appointed**
  22:1

**appreciate**
  61:7

**apprised**
  111:5

**appropriate**
  13:13 25:6
  34:22 38:10
  92:3,5 94:10
  154:3

**areas**
  96:24 105:21

**argue**
  121:21

**around**
  165:8

**arrive**
  113:15

**arrived**
  113:20

**arriving**
  34:19

**article**
  15:24 17:12
  18:22

**articles**
  15:20

**articular**
  124:2,4

**articulation**
  124:6

**asked**
  5:21 6:21,22,
  23 15:4 23:19,
  21 32:13,15,23
  35:17 39:18
  55:2,4 60:18
  61:3 62:21
  69:22 70:14
  73:8 75:10
  83:17 87:16

88:3 90:5
91:4,15 118:24
122:24 126:16
134:11,23
135:15 136:15
139:7 141:6
142:2 144:14
149:16 151:4,
22 152:19
153:15 156:19
157:23 159:15
160:12 161:24
163:14,22
164:23 168:5,
12 170:6
171:17 176:24

**asking**
  7:14 18:14
  43:5,7 54:17
  73:1 79:16,19
  87:17 92:15
  105:13 142:15,
  16 143:6
  161:13

**aspect**
  137:2

**aspects**
  9:19 23:12

**ass**
  163:11

**assessment**
  37:11 77:10
  93:14,23 97:16
  148:17

**assignment**
  32:12

**associate**
  82:16

**associated**
  168:23

**assume**
  167:14

EXHIBIT 7

assumed
  34:21
atlas
  155:21,22,24
attack
  25:15
attempt
  11:21 73:12
attending's
  116:11
attention
  70:6
attorney-client
  7:5 18:11
attorneys
  42:13 87:5
attributable
  118:2
August
  17:15 32:17,
  20,24 41:24
  42:24 43:8
  46:24 47:3
  48:16 52:9,10,
  11 53:5 54:2,
  3,21 55:1,9,10
  56:4 60:10,23
  61:11 62:12
  63:12,16 68:24
  69:19 70:14
  75:13,21 76:1,
  20 77:7,14,22
  78:2,8,12,22
  83:10,15 88:19
  92:8,16,24
  94:3,9 96:16
  101:7 103:2,5
  104:12,20
  105:1,7 106:2,
  16 107:3,7,22
  108:14 111:4
  113:19 114:1

116:9 127:10
128:11 146:6,
19,22 147:7
148:6,16
149:15 153:9
176:10
author
  45:2,8,9 46:5
  47:1
authored
  15:23
available
  101:5 117:3,7
avoid
  98:11
avoiding
  171:1
aware
  6:8 7:9,13
  12:10 15:6,8
  20:21 21:7
  48:8 58:4
  62:10,13,15
  83:7 92:9,18,
  19 100:24
  104:13,19
  105:3 112:11,
  13 116:1 117:6
  125:1,3 130:4
  132:24 133:6,
  11,16 141:17,
  18,22 149:5
  154:5 159:9,16

─────────────

**B**

back
  24:4 30:6
  59:13 60:20,21
  62:7 68:13
  77:13 80:4
  91:18 92:21

94:6,20 100:1,
2 111:16
112:22 126:6
142:20 147:9
152:16 173:8,
16
based
  60:6 67:8
  71:13 74:13
  86:19 87:4
  105:13 112:2
  116:8 121:2
  137:23,24
  142:18 147:17
  148:15 149:10
  151:7 166:9,10
  170:18
basically
  9:18,20 19:20
  21:19 43:15
  49:18 68:2
  73:13,22
  149:10 153:17
  171:10 174:5
basing
  116:4 170:15
basis
  34:1 36:5 37:3
  45:12 46:9,13
  47:5 48:5
  51:18,21
  64:13,15 86:16
  130:8 144:18
  152:4 153:7
  168:9,19
Beatty
  6:13,14 7:2
  14:19 15:3,6
  35:1,4,6
Beatty's
  7:12 20:12
bed

115:5
beginning
  13:20 112:21
behind
  165:21
believe
  21:23 24:4,5
  52:21 75:17
  87:23 88:21,22
  113:19,24
  156:11 163:7
  167:12 169:13
  176:17
believes
  176:15
below
  74:5
beneficial
  91:9,12
benefit
  151:19
benign
  174:6
better
  24:17 62:1
  85:24 106:1
  118:9 122:12
  136:8 153:24
  167:5,10,14,20
  168:1
big
  44:14 77:14
  78:15
bilaterally
  123:16
bill
  31:9
binder
  44:6

EXHIBIT 7

JOHN GILBERT DAVIS, M.D.
June 08, 2023

bit
    8:1 24:6 30:14
    47:8 85:22
    153:23 167:8

blank
    76:4

blood
    26:11,12 172:5

board
    9:9 11:7,12,
    14,17 12:4,10,
    14,20 13:18
    25:22 28:11

body
    105:24 123:17

bolting
    157:21

bone
    81:6 160:9,13,
    14,20 161:3,10
    162:17 164:21

bones
    81:7 122:17
    128:2 131:21
    161:15 162:5
    164:21

book
    42:7,14 52:15

bother
    99:4

bottom
    36:22 44:7,11,
    12 54:1 64:4,
    16 93:19

box
    48:9,12 149:20

breach
    59:5

breached
    24:2 74:19

breaches
    146:20

breaching
    74:13

break
    50:13,22
    99:10,13,16,23
    145:11,18

breaking
    15:1 18:11
    134:8

breaks
    50:19

bring
    13:15 22:7
    23:8,9,10,22

broke
    134:2 163:12

broken
    39:11

brought
    68:6

bunch
    22:15

_____

**C**

C-COLLAR
    73:15 74:9
    92:2 95:2
    96:15 100:11,
    17,19,22
    101:1,4
    117:12,16,18
    121:23 122:5,
    13,14,22
    146:10,12,15
    165:8 166:11,
    15 172:21
    176:14,22

C-COLLARS
    95:4,16 117:7
    146:13

C-SPINE
    80:8,10 114:13
    121:7 156:6

C1
    155:21,24

C1-c2
    18:16 19:2
    20:4 155:19
    156:2

C2
    155:21,24

C3
    60:8,11,20
    61:6,14 63:23
    64:21 65:6,23
    111:6 117:15
    118:4 123:10
    124:2,3,9,10
    135:10 141:15
    156:9,12
    160:22 162:7,
    15

C3-4
    68:17 123:11,
    12 124:6
    162:17

C3-c4
    133:3 141:24
    155:14 156:12
    161:22 164:19

C4
    64:22 65:6
    124:3,5,10
    141:15 156:12
    162:8,15

call
    25:16,20
    27:14,17,22
    47:14 48:4,10

110:23 118:20
    120:17

called
    4:3 18:1 22:9
    27:15,21 28:5
    65:11 169:12

calling
    120:13

calls
    16:21 37:24
    40:13 89:18
    90:4 94:15
    104:5 109:1
    118:5

campus
    9:4

canal
    123:14

car
    85:12

cardiologist
    13:17 25:16,17

cardiology
    23:9

care
    13:7 16:1,4,6,
    15,19,20 17:3,
    5,13 24:3
    26:20 32:16
    39:14,18,19,21
    40:3,23 41:11
    59:6 74:13,20
    92:1 100:10
    101:5 102:20
    103:7,20 105:8
    106:12 111:10
    115:7 128:4
    137:3,6,19
    146:20 148:21
    154:15 170:17
    172:14 176:8

EXHIBIT 7

JOHN GILBERT DAVIS, M.D.
June 08, 2023

career
  29:3

Carnahan
  37:18,19,20
  40:6

Carnahan's
  76:4

carried
  172:1

cascade
  102:4,16,24
  103:13 105:7
  111:3 114:8
  116:16,17

case
  4:22 5:20 6:9,
  21,23 14:20
  19:6 21:4,8,22
  22:11,24 23:4,
  7,12,21 25:23
  26:14 31:1,6,
  12 33:9 34:5,
  10,20 37:3
  42:7 45:13
  46:9,14 47:5
  48:6 50:19
  54:12 56:11
  57:7,15 60:9
  63:10 65:20
  72:22 80:18
  82:18 86:22,24
  87:12 89:13
  90:1,14 91:13
  96:23 100:16
  109:15 110:4
  111:18 120:4,
  15 133:4
  151:14,17
  155:18 156:1,
  15,18 161:21
  163:3 165:2
  168:8 170:9,20
  171:9 174:6

175:21 176:21

cases
  23:6 91:22,23,
  24 95:19,20
  96:7

catastrophic
  80:16,18,21
  125:10 130:19
  153:18

caused
  117:11 122:5
  133:8 135:23

causing
  99:5 139:24
  140:4 142:6,8
  159:21

cell
  39:10

cellmate
  96:17 131:9
  132:21 133:9
  134:10 135:5

center
  14:12 64:5
  78:23

certain
  24:10

certainly
  137:17 164:18

certainty
  71:6,9 145:24

certification
  9:23 12:11,20
  28:11

certified
  9:9 12:4,14
  14:2

cervical
  14:16 17:22
  18:19 19:2

20:17,23 29:20
54:24 58:21
59:7,23,24
61:13,20 66:17
67:7 69:20
79:15,20 80:7
84:7,23 85:2
89:7 90:21
91:3 92:17
132:2 140:19,
22 141:5,16,
19,24 147:6,19
155:14 157:22

cetera
  172:12

Champaign-urbana
  8:20

chance
  111:13

change
  127:21 174:18,
  22

changed
  127:20 143:18

changing
  152:21

charge
  13:23

chart
  34:6,16 47:14
  48:4 68:1
  70:13 71:1
  73:2 74:1
  105:1 144:3

charted
  49:5 68:7
  98:16 101:21

charting
  98:18 105:9

chase
  165:23

check
  31:10 97:14
  111:11 123:23

checked
  48:15

checking
  105:21

cheek
  40:8 97:14,17,
  21 100:13

cherish
  22:18

Chicago
  8:13 9:5 10:7

chips
  162:17 164:21

chronic
  81:2,6,9
  128:4,12,14
  129:11 149:2
  159:3,4,21,22,
  24 160:2,5,6

chronically
  80:22 82:2
  130:2 140:15

chronicity
  152:10,11

circle
  132:4

circumstance
  172:23

citation
  71:16 144:15

cite
  71:18 72:21

civic
  22:5

clearly
  63:11

EXHIBIT 7

JOHN GILBERT DAVIS, M.D.
June 08, 2023

clinical
  67:7

clinically
  29:15 112:6

clock
  31:18

close
  171:7

closed
  60:7

closure
  140:7

collar
  114:19 116:22
  117:1,2,19
  173:5,6,7

collars
  95:11

colleagues
  22:16 110:15

College
  8:6

column
  93:13,17,20

columns
  93:11

combine
  9:20

combined
  9:8,18 11:6

come
  13:8,10,12,18
  24:11 25:20
  30:6 78:21
  80:5 84:13
  85:11 86:22
  91:7 103:20
  105:19 166:14

comes

  25:12 39:23
  68:3 72:14
  99:2 106:13
  138:1,2

comment
  29:14 126:17

common
  29:5 106:5,7
  133:12

communicate
  59:18

communicated
  66:11 87:14

communication
  59:19

community
  13:2

company
  5:23 6:3

comparative
  150:15

compare
  151:11,14

comparing
  152:6

comparisons
  151:3

competent
  84:13,15
  141:20

complained
  105:2

complaining
  105:15

complaint
  16:9 33:12
  35:17 106:23

complaints
  48:11,17,22

  49:6 50:10
  69:17 74:7
  94:11 98:21
  102:21 103:14,
  19 104:21
  105:9 106:17
  146:8 157:4
  158:17 166:14

complete
  8:8 11:2 16:7

completed
  11:5 21:23
  37:21 41:13
  53:3,16,18
  55:22 75:14,15
  89:1 101:13

completion
  75:17

complicated
  24:20

component
  84:8

compound
  111:19

comprehend
  53:23

compression
  91:3 123:13
  124:20,22

computer
  27:11 43:15

concentrate
  29:10 160:19

concern
  136:24 137:1

concerned
  96:11

concluded
  53:24

conclusion
  16:22 89:18
  90:5 109:2
  118:6

condition
  13:19 90:14

conditions
  79:21 154:16

conduct
  23:1

conducts
  77:3

confined
  7:11 10:9

confirm
  165:22,24

confused
  52:17 166:12

connecting
  162:17

consciousness
  68:15

consequence
  157:21

conservative
  20:18

conservatively
  20:24

consider
  49:7 155:1

constitute
  111:14

construct
  139:16 162:6

consult
  110:15

consults
  64:17

EXHIBIT 7

JOHN GILBERT DAVIS, M.D.
June 08, 2023

**contact**
  13:12 28:2
  58:20

**contacted**
  6:16 28:3
  66:16

**contained**
  50:2 108:11

**context**
  16:14 18:21
  49:21

**continue**
  127:23

**continues**
  125:16 126:14

**contribute**
  125:5 138:11

**contributed**
  122:5 138:13

**contribution**
  142:9

**control**
  25:5

**conversation**
  158:2

**conversations**
  87:4

**conveyed**
  58:11 59:2
  65:15,17,22
  121:3

**Coordinating**
  24:23

**copy**
  7:16,22 177:7,
  8,10

**cord**
  123:13 124:21,
  23

**corner**
  64:6

**correct**
  9:18 12:5,8,9
  27:1 31:23
  36:21 40:4,5
  52:19,21 55:19
  56:6 61:12
  65:19 71:7
  75:17 76:2
  77:11 78:10
  95:17 97:2,24
  98:1,4 101:16,
  17 103:3
  113:11 118:23
  119:7 124:13,
  23 135:6 145:5
  151:13,17
  152:17 169:9
  176:16

**correctional**
  15:21

**Corrections**
  34:7 51:17

**correctly**
  172:11,12

**correlate**
  29:15 112:5

**correlating**
  106:10

**cosigned**
  37:13 76:6

**cough**
  25:19

**counsel**
  5:8 34:21
  43:10 50:19
  64:11

**counsel's**
  56:15 174:10

**count**
  111:9 114:1,4

**couple**
  175:17

**course**
  158:23

**court**
  7:9 33:14
  59:12 175:8
  177:6,10

**cover**
  148:12

**covered**
  62:19

**crazy**
  26:11

**created**
  68:1

**critical**
  27:13,15,21
  28:1 29:18
  64:20 65:1,3,
  4,7,12,22
  66:16 111:18
  112:15

**CT**
  28:12 30:2,6
  60:7,19,23
  62:2,24 63:15
  74:18 110:2
  118:23 119:12
  120:6 123:21,
  24 124:11
  135:8 149:22
  153:8 165:14

**CTS**
  118:21

**current**
  32:24 91:9

**custody**

  68:10

**custom**
  107:23

**cut**
  98:6,7 164:19

**CV**
  7:16,22 8:2
  12:3,7 15:16
  21:22 30:13

———————————

                D

**D-A-V-I-S**
  4:13

**daily**
  166:4

**damage**
  128:1

**Dana**
  6:2

**date**
  6:19 32:16,18,
  20,21 45:6
  52:6,22 53:1,
  10,12,14 55:6,
  11,13,22,23,24
  67:20,24 89:5
  103:2 104:2,13
  107:2,4,12,21
  113:15 127:1
  134:21

**dates**
  33:4 52:12
  67:20 74:3
  129:5

**Davis**
  4:2,12,14 7:18
  28:3 30:17
  32:2 36:8

**day**
  24:11,16 37:6

EXHIBIT 7

39:20 44:3
46:19 52:20
53:13 86:1
103:5,17
111:16 113:19
114:2,5 127:9

**day's**
27:24

**days**
41:2 74:17
102:8 106:7
109:16,19
111:17 114:3,
6,9 115:6,8,
10,12,19
116:15 129:15

**deal**
74:22

**dealing**
170:11 174:4

**deciding**
96:9

**decision-making**
70:7

**declined**
70:15 83:13,14
169:21

**declining**
70:10,11,17

**defendant**
35:14

**defer**
138:7,8

**define**
16:3,12

**definition**
16:14 17:2,4,9
19:11 71:9
81:1 82:21
89:14,19

**definitions**
20:7

**degree**
8:9,10 71:6,8
123:4 145:23

**delay**
102:3,22
103:13 105:7
111:3,9,14,15
113:13 116:16,
18 117:10,24
118:1 146:18,
24 148:23
153:3 154:22
155:7 166:10
170:10,17,21

**delayed**
168:2

**delaying**
102:15

**delays**
73:24 102:4,
13,16,24 114:9
160:10,14,21
171:1

**delineated**
79:20

**delve**
141:2

**demonstrated**
139:17

**department**
34:6 51:16
95:24

**depending**
13:14 28:18
81:5

**depends**
59:17 87:1
164:10

**deposed**
56:11,13

**deposition**
4:15,17 7:18
30:17 31:2,3
32:2 35:8,10,
13 36:8 39:2
53:9 54:13,15,
16 56:15,23
57:7,12,16
58:3 62:10
66:6,24 69:7,
11 71:17,19,22
72:4,6,9
81:20,23 86:3
92:19 94:7
104:23 113:8
121:14,18
122:1 142:17
147:18 171:5,
14

**depositions**
5:13 34:10,12
38:6 72:13,16,
17 86:7,15,24
171:11

**describe**
25:4

**described**
85:2

**describes**
73:10

**describing**
96:2

**detail**
115:2

**details**
47:24

**determination**
116:21

**determine**

17:13 40:3
45:17 46:18

**determined**
13:11

**determines**
13:9

**develop**
130:2

**diagnose**
61:24 118:11
121:2 171:1
172:3,6

**diagnosed**
60:1 116:18

**diagnoses**
174:4

**diagnosing**
118:9 174:8

**diagnosis**
52:1,2 84:21
91:8 117:10,24
118:1 120:11
147:6 173:22
174:1

**diagnostics**
16:11

**dictates**
28:24

**difference**
4:20

**different**
19:21 23:11,
12,18 24:20
29:22 61:9,23
78:19 85:23
88:8 89:4
95:6,7,12,13
99:7 111:23
117:2 118:8,9
127:17 137:15

EXHIBIT 7

JOHN GILBERT DAVIS, M.D.

June 08, 2023

138:4,5 143:13
148:10 158:9
167:6,11
168:11 169:14
174:7

**differential**
84:21 96:3
173:22 174:1,7

**difficulties**
157:12

**difficulty**
156:24

**direct**
40:3 70:24

**directing**
25:5 26:20

**directly**
25:16 102:12
118:1,7

**director**
109:10

**disagree**
54:20,22 66:5,
14,21 71:24
86:5 107:14,18
113:21 122:9,
10 129:19
130:7 133:2,
20,22 137:11
139:18 140:13
162:12 163:23
168:7,17
174:11,13,14

**disagreement**
55:8

**disappear**
51:9

**disc**
123:14

**discharge**

13:23

**disclosure**
7:2

**disconcerting**
89:2

**discuss**
34:2 167:9

**discussed**
38:7 64:24
146:21 167:7,8

**discussion**
16:9 99:21

**displaced**
60:7 124:1,8
131:15,17,23

**displacement**
124:3,10

**dispute**
88:20

**distracting**
138:24

**doctor**
4:7 7:23 8:5,
24 10:18 13:9
14:3 16:3
18:14 22:20,22
23:2 24:2
25:11 26:4
29:24 30:21
32:6 33:22
34:24 35:23
43:7 45:5
46:24 47:4,11
48:9 50:4,17
51:2,22 53:9
60:16 64:4,8
65:5 67:14,24
68:3,8,21
69:19 70:19
101:24 106:18
120:15 130:6

132:12 133:21
139:3 143:9
153:5 154:13
171:24 172:16
174:5 175:12,
18 176:14,17,
19

**doctor's**
171:17,19,21
173:8

**doctors**
13:18 87:4
174:17

**document**
31:12 36:2
37:2 48:24
49:2,3,7,11
56:5 60:21
64:5 73:19
74:24 75:18
112:4 164:4
172:11,14

**document's**
47:13

**documentation**
48:21 73:12,21
77:11 172:13
176:11

**documented**
41:23 73:18
98:20 105:14
164:15 172:12
177:1

**documents**
33:15,18,21,24
34:23 50:9
169:13

**doing**
9:19 13:23
43:3 48:12
80:2 81:11
87:3,4 116:6,7

120:6 139:22
152:6 163:20
165:22

**downtown**
8:12 9:5

**drafted**
37:14

**drafts**
43:5

**draw**
41:12 70:6

**drilled**
162:16 164:20

**due**
133:13 141:19
161:16

**duly**
4:1,3

**duties**
13:5

**duty**
22:5,14,17
23:19

---

**E**

**e-mail**
22:2,13 23:19

**earlier**
63:3 64:24
74:23 93:22
126:20 127:2,
9,16 129:15
132:8,13
144:14 167:13,
19,24 168:10

**eat**
99:11

**ED**
68:18

EXHIBIT 7

JOHN GILBERT DAVIS, M.D.
June 08, 2023

**edema**
123:11 163:7
164:9

**edge**
31:19

**educate**
19:13

**education**
8:12

**effect**
154:23 155:6
171:7

**effects**
158:5

**eight**
51:10 80:8

**either**
24:13 117:3
152:8

**electronic**
27:6,8

**eliminate**
139:14

**emergency**
13:8,9 67:9
69:1,19 95:24
136:21

**encompass**
75:24

**encounter**
41:13,14,21
42:2 69:18
94:10 107:8
111:10

**encountered**
41:11

**encountering**
102:20

**encounters**

41:22 88:6,7
143:23 167:6,
11

**end**
32:18,21

**ending**
130:19

**ensue**
102:22

**entire**
34:6,16 124:24

**entirety**
23:21 167:9

**entities**
100:14

**entitled**
29:6 47:13

**equipment**
140:7

**ER**
25:11,13 26:4
28:3 39:23
68:3 70:13
74:10 85:12
121:8

**essence**
76:7

**essentially**
13:7 29:24
72:15 73:11
75:3 95:23
172:15

**et**
172:12

**evaluated**
103:21

**evaluation**
16:8 68:19
77:4 101:12

**event**
39:17 74:15
84:6 101:7
163:20

**events**
77:15 88:5

**Eventually**
39:11

**Everybody**
110:24

**everybody's**
85:22 99:7

**evidence**
54:12 65:21
94:13 111:8
120:8 121:5
123:13 143:21
153:7 160:21,
23 161:3,10
166:17 176:7

**evidenced**
82:4

**exact**
6:19 81:9,24
104:16 126:9

**exactly**
24:12 25:14
28:21 31:11
48:2 53:13
61:23 63:2
118:22 120:24
121:19 126:11
130:16 131:2
136:6 137:24
157:4 159:4
160:6 170:24

**exam**
16:10 37:10
84:17 101:19
105:21,24
106:19,24
116:8 165:21

**examination**
4:5 67:9 75:3
90:21 91:10
101:10,23
170:4,15
171:20,22
175:3,15

**examine**
74:6 90:18
105:23 170:12
171:19

**examined**
4:4

**examines**
146:6

**examining**
170:8 173:10,
24 175:1

**exceed**
7:2

**excused**
177:12

**exhibit**
7:17,19 30:18,
21 32:3,6,12
36:9,12,18
44:6,24 46:13
51:15 71:1

**expect**
140:10

**expectation**
108:4

**expedited**
128:5 146:9

**experience**
71:12 151:7
152:5,6
170:11,16,18

**experiencing**
114:19 117:20

EXHIBIT 7

JOHN GILBERT DAVIS, M.D.

June 08, 2023

**expert**
4:15,21 6:6,9,
11 7:10 30:16
31:2 34:24
35:3,5 79:20
86:23 173:14

**expertise**
7:11 16:22
121:10 170:9

**explain**
21:19 90:17
107:24 154:23
173:23

**extended**
101:2

**extent**
14:24 18:11
42:10 43:5
45:14 46:10,17

**eyes**
157:19

---

**F**

**face**
99:3 147:2

**facet**
60:8,11,20
61:6,14 63:23
64:21 65:6,23
82:16 83:22
111:6 122:19
123:10,12
124:2,5 131:13
132:1 134:8
135:10 154:6
156:10

**facets**
132:4

**facial**
98:24 147:14

**facilities**
26:24

**facility**
109:10 117:7
149:14

**fact**
100:7 105:7
107:11 109:15
128:13 131:10
162:22 163:16
168:21

**facts**
71:13 135:7
171:9

**facture**
82:16

**fade**
118:2

**failed**
118:22

**failing**
118:2 121:23

**failure**
118:12 139:20
161:16

**fair**
22:15 25:8
78:14 113:24
162:24 166:23

**familiar**
29:2 32:7
49:22 83:1

**far**
54:13 57:19
100:10,11
101:19 147:1,
14 175:21,24

**fashion**
171:1

**fault**
143:5

**faulted**
108:23

**fear**
130:13

**fee**
31:3

**feel**
85:13,14,23
86:1 102:18
171:20

**feels**
85:15

**fees**
30:16

**felt**
74:12 171:12

**Ferrara**
6:2

**fetch**
166:21 171:18

**field**
141:2

**fight**
38:11 131:8
132:20 134:14
135:14 138:2
163:11 165:3

**figure**
45:21,22 96:5,
6 172:24 173:2

**figured**
20:15

**file**
133:24

**filled**
148:11,12,20

**film**
41:15,19 55:17
58:18 60:10
61:20,24 62:3
118:10,19
150:2 151:16

**films**
28:18,19,23
59:7 61:13
62:11,14,16,
19,22 68:17
118:21 119:10
120:19 121:7,
10 150:15
151:12,15,19
152:7,24

**final**
107:2

**find**
5:10 19:19
51:13 58:15
167:15,17

**finding**
19:20 27:21
37:7,8,9
109:11,20
111:18 112:6
120:1

**findings**
29:7,14,15
67:10 98:14
108:14 123:24
140:10

**fine**
35:23 83:22
99:9 145:17
150:3 165:2

**finish**
4:23

**firm**
6:4 56:15

EXHIBIT 7

JOHN GILBERT DAVIS, M.D.
June 08, 2023

first
 4:3,14 6:16
 8:4 11:17,21
 25:12 28:24
 33:11 44:7
 45:11 48:9
 67:23 73:9,11,
 19 77:13 92:22
 94:9 101:24
 107:21 159:23

five
 32:10 74:17

fix
 98:8

fixation
 18:22 130:22
 133:8 134:20

fixed
 168:21

fixing
 135:23 147:2

flat
 31:3,10

floating
 122:19

focus
 72:18

folder
 5:7

follow
 27:12 29:21
 63:15 81:12,18
 104:7 106:13
 109:9 118:21
 145:7 171:23
 172:4,7 175:17

follow-up
 63:19 74:17
 119:2

followed

24:24 74:4

following
 50:23 71:2,5,
 15 99:24 103:5
 145:19 175:18

follows
 4:4

forehead
 40:9 97:15
 100:13

Forgive
 110:7

form
 34:1 36:5
 37:2,21 48:5
 51:21 52:24
 63:18,21 77:3
 86:16

formally
 174:2

formed
 72:12

formulate
 174:2

formulated
 37:16

forward
 64:3,6

found
 100:18 124:11

foundation
 82:12

four
 9:16 23:17
 32:10,11 44:6,
 9,23 92:21
 101:24

four-year
 9:21

fourth
 33:11 35:17
 71:3

fracture
 19:2,11,16,19,
 23 20:1 29:19
 30:6 57:19
 58:5,14,16,19,
 21 59:6,17,23,
 24 60:2,8,11,
 17,18,20 61:4,
 5,6,14,20
 62:4,6 63:11,
 23 64:21 65:6,
 12,23 66:17
 83:16,23 84:4
 87:13,15
 108:15,19,24
 109:3 111:5,
 18,21 117:15
 118:1,3,12,16
 119:11 120:18,
 23 121:2,3,24
 123:8,9
 130:15,17
 131:8,15,17,22
 134:8 135:9
 136:7 138:1
 147:19 149:4
 155:20 156:5,9
 160:10,11,13,
 20,22 161:1,3,
 10,11

fractures
 18:3,16,17,18,
 23 62:1,3
 124:1,7,8
 128:19 154:20

fragment
 122:20,23
 154:9

frame
 75:24

free
 122:19

free-floating
 122:23

friend
 5:21 6:1

front
 5:6 43:13
 55:18 60:16
 70:20 104:3,9
 165:20

fruition
 5:24

full
 8:16 105:24
 127:8 144:3

function
 156:20 157:1,
 8,11,13 170:14

funnels
 26:6

fuse
 162:18

fused
 139:15 164:20

fusing
 135:24

fusion
 14:16 133:3,8
 134:21 137:8
 139:13,16,17,
 22 141:19,24
 155:14,19
 156:2,15
 161:22 162:6

future
 79:21

EXHIBIT 7

JOHN GILBERT DAVIS, M.D.
June 08, 2023

## G

G-I-L-B-E-R-T
    4:13

gave
    23:15 24:7
    34:21 37:21

general
    71:11 121:9
    167:24

Generally
    13:14

generate
    29:13

generating
    140:16 159:10,
    12

generator
    140:5

getting
    22:15 24:13,
    17,24 31:10
    85:7 102:13
    149:11 152:23

Gilbert
    4:2,12

give
    4:23 27:13
    57:12 62:20
    66:16 71:21
    81:24 107:20
    111:17 144:2,3
    151:2,21,23
    165:4 166:2
    169:19 171:14

given
    4:17 32:16
    33:3 34:13
    49:20 66:6
    78:4,6 79:4

    94:11 113:8
    144:11 145:4,7
    146:7 149:13
    169:8

giving
    4:14 62:9
    114:23

glean
    49:1 63:18,21
    92:10 147:15

gleaned
    73:18 74:3,19

goal
    122:18

goes
    28:12 89:12
    148:2

going
    4:21 23:6,11
    25:14 27:24
    30:14,15 36:12
    43:3 46:18,19
    49:23 53:22
    55:14 60:20
    61:18 64:6
    75:18 77:13
    87:7 94:6 96:6
    99:15 119:17
    121:20 122:22
    133:20 134:14
    165:4,10 173:8

good
    4:7 5:1 23:15
    62:18,22 85:14
    87:1 99:12
    106:1 139:16
    162:6 177:11

governor
    22:12

grade
    150:16,18

grandfathered
    12:19

great
    5:19

grievance
    33:18,21,24

grinding
    128:2

guess
    31:19 105:21

guessing
    156:4

guidance
    49:18 87:2

guy
    166:15

guy's
    41:8 105:4

## H

H&p
    16:9 114:24

hand
    27:10 172:22

handle
    13:15,16 25:23
    26:9,13

handled
    154:3

handles
    26:14

Hanes
    22:20

hang
    153:13

happen
    159:17 162:19
    164:4 166:11

grandfathered
    12:19

happened
    38:2,7,19
    39:4,7 68:5
    103:9 107:8
    110:4 131:11
    142:7 162:21

happening
    103:12

head
    20:8 54:18
    56:9 68:12,15
    69:16 78:18
    80:5 84:11
    95:8,14 97:24
    103:8 133:1
    138:24 140:12
    141:1 157:17
    174:2

heading
    49:19

headlock
    79:8,10

heal
    161:18

healed
    140:14 164:22

healing
    161:19

health
    39:14,18,19,21
    40:23 41:11
    101:5 102:20
    103:7,20 105:8
    111:10 176:8

heard
    15:2 25:3
    154:8 159:17
    174:16,20

heart
    25:15

EXHIBIT 7

JOHN GILBERT DAVIS, M.D.

June 08, 2023

**heights**
  10:7 123:17

**help**
  5:22 13:18
  19:5 34:19
  41:6 44:9
  95:18 144:2

**helping**
  165:21

**helps**
  117:14 120:11

**hemorrhage**
  123:13

**hepatitis**
  104:14

**herniation**
  123:14

**hey**
  83:12

**history**
  67:11,18,21
  68:2,7,21
  101:10,14,19,
  22 146:7 175:3

**HIV**
  104:14

**hold**
  71:5 84:23
  104:2

**holding**
  78:18

**holds**
  16:15

**holes**
  162:16 164:20

**home**
  13:11,21
  24:22,23 26:9

**honest**

  86:6

**hospital**
  10:6 13:1,2,
  10,12,20 14:12
  25:1,5 26:5,24
  27:2 65:10
  67:6 70:14
  83:11 110:2,8,
  14 113:16

**hospitalist**
  12:8,14,23
  13:5,6,13,22
  14:2 23:7,8,
  20,22 24:8
  25:10,24
  26:15,20 29:24
  110:8 120:12

**hospitalists**
  12:11 25:4
  110:9,16

**hospitalization**
  24:15

**hospitalized**
  24:12

**hospitals**
  63:1

**hour**
  50:14 145:12

**hourly**
  31:12

**hours**
  31:6,14,15,18

**hundred**
  10:14 71:11
  134:13

**hurt**
  134:15

**hurts**
  165:17

**hypothetical**
  40:14 58:24
  66:19 79:1
  105:12 106:21
  107:20 108:3,
  18 119:19
  142:3

---

**I**

**idea**
  31:8,13,17
  34:8 38:2
  41:10 48:1
  57:9 89:9
  104:7

**identification**
  7:20 30:19
  32:4 36:10

**IDOC**
  33:18

**ignorance**
  110:7

**Illinois**
  8:6,12,14,15,
  19 9:2 10:7,
  20,23 34:6
  51:16

**illness**
  67:12,19,22
  68:2,8,21
  146:7

**image**
  96:9

**imaged**
  100:21

**imagine**
  33:3 41:20
  81:6 85:22
  86:19

**imaging**

  28:12 29:22
  63:5,15,19
  74:14,15,18
  92:3,4 96:12
  108:11 112:3
  119:6 120:2
  135:9 146:9,19
  149:7 152:16
  153:11 154:1
  163:6 164:5,7,
  8,16 165:9,13,
  18,23,24
  170:23 172:5,
  18

**immediately**
  37:23 38:14
  40:11 74:8
  76:10,16 99:1
  146:10

**immobilizing**
  117:13

**impacted**
  151:18 152:14
  163:3,8,10
  164:3,10,16,18
  165:10

**implying**
  153:16

**import**
  109:11,20

**important**
  86:23 87:10,20
  98:8 128:21

**impression**
  29:7 91:8

**improved**
  126:21 127:14
  132:7,14
  136:5,8 137:4,
  18

**inability**
  155:15

**EXHIBIT 7**

inappropriately
 139:5

inch
 40:7 97:13

incident
 134:9

incision
 140:6

incision's
 140:14

inclined
 10:11

includes
 155:9

including
 176:22

incomplete
 40:14 58:24
 66:19 79:1
 106:21 108:2,
 17 119:18
 142:3

increased
 123:15

Indeed
 13:24 98:10
 136:1

Indiana
 10:19 13:3
 21:17 22:4,7,
 10 23:1

indicate
 70:14 105:2
 123:21

indicated
 130:2

indicates
 101:1 106:3
 141:14 175:20

Indicating
 70:21 141:9

individual
 38:11

infected
 98:9

inferior
 64:21 65:5,23
 123:8,10
 124:2,4 131:13
 135:10

infirmary
 68:17

inflammation
 85:3,5,24
 163:16 164:9
 165:9,13

inform
 19:13

informally
 174:3

information
 19:12 47:4
 53:18 62:21
 86:18 173:12

informational
 19:7,8

informed
 64:20 132:18

initial
 16:9 41:8 56:2
 94:9 103:2
 167:5,11

initially
 39:22 73:10
 172:2

initiated
 101:8

injured
 129:3 134:1

injuries
 17:22 20:18
 39:11 68:16
 79:13 84:2
 85:4 96:18
 97:23 116:19
 118:10 132:20

injury
 20:23 37:7
 68:15 69:12
 73:23 79:11,21
 80:13,17,19,21
 81:6 83:23
 84:8 85:1,6,8
 95:21,22 97:1
 117:13 121:23
 122:5 125:2,5
 126:21 128:11
 131:7,12
 132:6,14
 133:13 135:5,
 14 148:24
 153:3,18,20
 155:1,2 159:6
 162:20 168:20,
 21,24

inmate
 68:9

inmate's
 52:4

inpatient
 13:6

inserted
 140:6

instability
 19:22 128:20
 139:14 155:15

instances
 73:5

instruct
 7:4

insult
 85:20

intakes
 68:3

integrity
 163:2 164:8,
 15,17 165:11

intensivist
 23:9

interested
 157:7

internal
 9:8,12,14,19
 10:8,11,14
 11:3,11,14,18
 14:2 15:9
 17:12 22:22
 23:2

interpret
 46:2

interpretation
 94:8 108:10

interpreted
 107:11,22
 172:11

intervene
 102:19 111:13
 169:1

intervention
 20:19 21:1
 112:12 114:16,
 18 116:12
 126:20 127:2,
 5,9 128:10
 129:15 132:8,
 13 136:11,18
 153:22 168:24

interview
 165:20

intricate

EXHIBIT 7

47:24

**involve**
100:12

**involved**
5:19 20:2
24:18 26:2
155:22 156:1

**involving**
124:1,9

**issues**
26:10,13 74:24
77:22 78:12
80:24 81:22
82:3,10
128:12,14
130:12,13,14
152:8,9
155:11,13
170:19

**itemization**
33:8

---

**J**

---

**J-O-H-N**
4:12

**jail**
15:13

**James**
10:6,9

**Jeffrey**
22:20

**job**
12:17 62:20
86:7 87:5,8,9
89:11 134:5
165:23 166:18,
20,22,24
171:10,12
172:20

**Johanek**
64:20

**John**
4:2,12

**joint**
123:12 127:23,
24 139:14
154:6,11

**Joseph**
64:5 65:10
67:6,17 70:13
117:3 169:16,
17,20

**Joseph's**
78:22 83:11

**journal**
15:18,24 17:12

**judgment**
110:1 147:2,6

**jury**
22:14 23:19

---

**K**

---

**keep**
74:5 174:8

**kind**
5:9,24 22:4
23:22 24:18
25:1,4 27:23
29:23 31:17
41:23 48:1
49:20 53:24
62:19 72:12
73:15 74:4,9,
22,23 84:1,5
95:21,24 121:8
132:5 139:2
154:13 174:3

**kinds**
95:12 111:23

**knew**
104:17

**know**
5:3 6:14 7:6
14:18 15:9
16:14 17:9,18
19:10 21:14
22:14,20 24:7,
12 25:14,17
27:23 31:13
33:2,23 34:5,
9,11,12,15
35:21 37:14,20
38:6 40:18,21,
22 41:1,4
42:23 44:2,8,
21 45:2,8,9
46:4,7,20,21
47:1,14,17,21,
23,24 48:2
49:16 50:18
52:8,12,24
53:14 54:4,7,
10,17 55:4,11,
13 56:7,9,10,
14,19 57:6,18
58:3,10,22
59:1,2,3,22
63:10 65:14,17
66:6 67:5
69:13,15 72:10
78:11 79:2
80:6 82:9
83:15,19 85:19
86:4,6 88:12,
14,24 89:5,6,
14,23 90:6,9
93:1,3,4,8
95:9,10,14,15
101:4,6 102:7,
14 109:18,23
110:24 115:9,
12,14,16,18
116:22 117:1,
15 120:22

**knew**
104:17

121:6,10
124:16,19
125:7,8,11,14
126:2,10
128:17,22
129:21,24
130:22,24
131:4,17 132:1
133:24 135:16
138:19,21,23
139:2,12,20,
22,24 140:9,
12,16,19
141:1,3,10,13
144:6 146:21
147:5,17,21
149:10,19
153:18,19
157:14,17,18
158:23 160:6,7
166:22 171:11
173:9 174:12
175:2

**knowing**
170:22

**knowledge**
38:24 48:19
56:18,21
66:19,20,23
80:1,20 112:19
113:7 115:7,
21,24 134:18
158:4,18
174:15

**kyphosis**
140:20,21,24
141:5

---

**L**

---

**lab**
41:9,12 104:17

**labs**

EXHIBIT 7

JOHN GILBERT DAVIS, M.D.

June 08, 2023

104:13,16
175:22 176:2,
3,6

**laceration**
37:10,11 40:7
97:13,17 98:5
106:5

**lacerations**
38:12 97:19
98:8,24 99:3,4
100:7,12,23
101:12 147:2,
14

**lack**
38:24 48:19
112:18

**lacking**
73:14 75:2

**laid**
158:13

**laminectomy**
131:4

**late**
113:22

**law**
6:4 16:15

**lawsuit**
33:12 134:1

**lead**
80:16,23 82:3

**leading**
20:20 48:18
83:17 103:16
107:15 111:19
120:7 127:4
134:24 162:9
168:12 175:3

**learn**
20:16 87:11
122:3

**leave**
29:23 103:20

**led**
102:4

**Leef**
62:10,12
63:12,14,22
65:21 66:6,10,
15 120:5

**Leef's**
66:24

**left**
40:7,9 76:4
93:17,18
97:13,14,17,20
124:6

**legal**
16:14,19,21
17:4,9 35:20
36:2 89:18
90:4 109:1
118:5 171:12

**lets**
68:21

**letter**
21:21

**level**
16:7 121:10
123:11 156:5

**levels**
124:7 141:20

**license**
10:20

**licensed**
10:17,23,24
91:10

**lie**
115:5

**life**
143:15,18

155:16

**ligaments**
84:22

**limitations**
166:4

**LINDEMANN**
175:14 177:8

**line**
24:21 73:20
128:4 131:23

**list**
29:13 55:21
96:4 174:1,7

**listed**
22:19 36:20
52:4 57:3
97:2,10

**listing**
36:13

**lists**
57:24

**literature**
15:24 19:4
20:9,14 100:24
167:16

**literature/
textbook**
17:21

**little**
8:1 17:23
24:6,7 30:14
42:6 47:8
64:4,6 67:14
85:22 153:23
162:15 167:8

**live**
143:14 155:16

**located**
88:15

**location**
126:2,10

**lock**
68:12 84:12

**locked**
114:19 154:6,
10

**logistics**
167:1

**long**
9:12 10:3
40:18,22 85:19
140:15 148:16

**long-term**
128:14 129:16
130:1

**look**
6:21 17:11,20,
24 18:2,5,9,18
19:1,13,15
20:9 21:3,11,
12 32:6,7 33:6
41:4,6,7 43:1,
3 44:13 46:3
52:14 54:15,19
55:5 60:3 61:4
63:8 64:16
67:11 70:4
77:12 78:15
79:17 80:3
81:8,15 87:6
92:21 93:11
96:22 97:4
103:8 106:8
109:10,20
113:17 119:15
123:6 130:21
138:14,17
141:11 148:1,
22 151:20
155:20 156:3,6
171:4,5

**EXHIBIT 7**

JOHN GILBERT DAVIS, M.D.

June 08, 2023

**looked**
18:1,14,16,21
19:18,24 20:6,
12,14 48:5
51:11 62:12
71:14 140:22
148:5 157:19

**looking**
15:16 20:4
43:9,21 44:6,
15 46:8 49:16
52:23 54:16
67:13,14 84:24
119:10 132:3
138:19 145:22
172:5

**looks**
9:16 12:3
25:19 28:24
32:9 36:13
47:9 50:7 51:6
64:8 77:2
84:18 106:13
146:4 167:4

**lordosis**
140:20,21,24
141:5,15,19,24

**lose**
141:18

**loss**
68:15 141:23

**lost**
131:8 141:15

**lot**
29:3 31:5 34:4
107:16 110:11
146:4 158:12
169:18

**lunch**
99:15,22

---

**M**

**M.D.**
4:2 46:24
55:16 111:12

**machine**
88:14,24

**made**
95:13 105:9
109:24 144:11
164:19 170:13

**maintained**
123:17

**majority**
37:16 84:5

**MAKAR**
7:3 14:23
16:21 17:7
18:10 20:20
37:24 38:23
40:13 42:9,16
43:4 47:19
48:18 49:8
50:5,13,16,21
54:8 56:17
57:1,8,20,22
58:6,23 59:8
60:13 61:21
63:17,24 65:13
66:1,8,18 67:1
69:3,22 71:23
73:8 75:10
76:11 78:24
81:13 82:12
83:17 85:16
87:16 88:3
89:16,18 90:4
91:4,15 94:12,
15 99:10,14,
17,20 103:16
104:5 105:11
106:20 107:15

108:2,17 109:1
111:7,19
112:7,18 113:9
115:20 117:5
118:5,24
119:18 120:7
121:4 122:24
126:3,16 127:4
128:15 129:17
134:3,11,23
135:15 136:13,
15,22 137:9
139:7 141:6
142:2 143:20
144:8,20
145:11,14,16
147:20 149:16
150:13,21
151:4,22
152:18 153:15
154:17 156:19
157:2,23 158:7
159:15 160:12
161:4,24 162:9
163:4,14,22
164:23 166:16
168:5,12 169:5
170:1,3,5
173:16,21
175:7,12,23
176:24 177:5,
11

**make**
29:14 96:4
103:19 104:21
106:17 112:16
116:20 153:23
165:1 171:24
172:11 173:12

**Makes**
12:18

**making**
120:11 171:15

**male**
68:9

**man**
39:10 83:14
100:8 103:19
125:6 131:7
134:1,21
159:21 168:10

**man's**
139:10

**management**
20:18 83:13,15
125:17 126:15
142:7

**Mankoski**
83:1

**manner**
74:2 92:3,5
100:21 128:5
154:3

**manually**
138:24

**mark**
7:17 30:15
36:12

**marked**
7:19 30:18
32:3 36:9
48:22

**material**
33:5

**materials**
5:8 31:5,7
33:8 34:22
36:13,20 42:19
43:14,16 56:22
95:13

**matter**
60:24 86:13
87:8 134:21
163:16

EXHIBIT 7

**matter's**
61:2

**matters**
163:17

**mean**
18:20 19:9
27:23 31:17,18
33:2 37:15
49:19 52:10
53:22 60:4
71:10 72:7,10
76:12 80:3
84:15 92:20
95:19 98:5
99:7 101:9
102:17 118:19
131:10 132:3
145:6 150:14
151:6 156:7
159:14 161:17
164:6 174:12
176:5

**means**
7:7 48:2 76:7,
17 89:24 90:7,
9 127:22
173:23

**meant**
43:11 49:19

**measuring**
124:4,11

**mechanism**
83:23 140:1,2,
17 159:20

**med**
8:17 9:2

**mediators**
85:21

**medical**
5:11 8:5,8,10,
11 9:4 15:18,
21,24 18:1

21:17 22:8
27:6,8 28:7
32:16 34:4,14
43:20 49:22
64:5 70:7
71:6,9,21
72:8,15,21
73:3 78:22
82:4 105:9
109:9 110:1
125:17 126:15
130:8 133:21
145:24 147:1,5
152:16 153:7
164:4 167:15
171:5,6,13
175:10

**medically**
101:11

**medication**
70:10,12,17
82:23 169:8

**medicine**
8:7 9:8,12,14,
19 10:8,11,14
11:12,15,18
14:3 15:10
17:12,18 22:22
23:2 70:15
83:12 110:24
169:14,20

**medicine/**
**pediatric**
11:3

**medmal**
22:11

**Mehta**
35:8 81:10,20
116:8 121:22
122:4 125:2
128:13 129:24
133:4,11
136:10 138:12,

15 139:4,13
140:8,9 141:13
156:24 157:12,
16,18 162:5,15
164:18 168:22
169:1 176:22

**Mehta's**
82:5 129:21
131:14 132:24
138:4,5

**mention**
111:14

**mentioned**
20:13 109:4
111:22

**merit**
22:8

**Miami**
116:22 117:1,
19

**mild**
83:8

**millimeter**
124:4,11,13,
14,17 125:4,8,
13 135:11
149:20

**mind**
174:8

**mindset**
128:23

**mine**
5:21

**minimal**
123:10,15,19

**minimally**
124:1,8

**minutes**
50:16 99:14
145:12,14

**misaligned**
161:16 162:5

**misalignment**
166:3,6,10

**misaligns**
160:14

**mischaracterizat**
**ion**
111:7 120:8

**mischaracterizes**
143:21

**missed**
58:5 63:12
87:13 118:15
156:16 174:22

**misspoke**
156:13

**misstates**
71:23 94:12
113:9 121:4
126:3 128:16
129:17 136:22
137:9 143:20
144:20 150:21
151:5 152:18
154:17 158:7
161:4 162:9
163:4 166:17
169:5

**mistaken**
96:10

**modalities**
61:24 118:9

**modality**
59:19 62:2
118:13

**mode**
29:22

**moderate**
83:8

EXHIBIT 7

month
  81:7 176:10

months
  6:18 9:17
  140:11 158:16

morning
  4:7

motion
  84:18 90:24

move
  64:3 135:18

moved
  131:22

movement
  154:11

moving
  74:5

MRI
  28:13 30:3,7
  60:7 62:24
  63:15 118:23
  119:12 120:6
  123:9,18
  124:20,22
  135:9 149:22
  156:8

MRIS
  118:21

multiple
  41:5 95:3
  110:9,11
  160:17

Munster
  10:14 13:2
  24:9

muscle
  84:18 98:19

muscles
  79:12,14,18
  122:15,17

164:19

muscular
  84:8

_____

N

_____

name
  4:7,10,12 6:1,
  13 27:24 37:15
  52:4 56:8 83:4
  84:22

names
  79:14 95:10,13

naming
  134:1

narcotics
  114:23

natural
  157:20

nature
  123:16 133:13

necessary
  119:16 171:20
  172:18,19,22
  176:15,18

neck
  40:8 68:10,12,
  14 77:22 78:12
  79:5,11 84:3,8
  85:7,8,13,14
  90:14 96:2,8,
  13,19 97:23
  98:15,16
  100:18 103:6
  104:21 105:2,
  9,20,21 106:17
  112:16 115:1,
  2,3,5 122:15,
  16 127:16
  131:9 134:2,8
  146:9,19
  147:13 163:12

165:7,17 176:8

neck's
  134:15

need
  13:16 21:21
  24:21,22
  25:15,20,21
  26:6 27:17
  28:6 62:1
  76:15 96:3,4,
  5,11 99:12
  112:15 116:13
  131:23 135:1
  151:11 165:17
  172:14 173:5,
  11,12 174:8
  175:2

needed
  20:16 55:5
  61:4 100:22
  101:11 134:21
  135:22,24

needs
  29:23 84:5
  101:12 116:10

negatives
  75:2

neurologic
  80:17,18

neurological
  125:2

neurosurgeon
  14:19 15:7,11
  81:10,16
  115:4,18
  116:20 121:22
  129:22 131:6
  133:15 137:22,
  23 138:6
  156:23 157:19

neurosurgeon's
  82:5

neurosurgery
  116:9,24 125:1

neurosurgical
  116:10 136:11,
  18 165:1

never
  14:8,15 56:23
  58:11 61:24
  62:11 66:10,
  16,23 75:20
  87:13 111:5
  121:3 145:4
  154:8 159:17

night
  113:22

nobody's
  165:4

nondisplaced
  131:21

nonemergent
  116:19

nonspecific
  123:16

nonsurgical
  26:10,13

normal
  110:18,20
  141:4,15

note
  36:18 37:13,
  14,17 43:18,24
  44:2,7,8,19,21
  45:3,8,9,11
  46:4,5,7,13,
  20,22,24 47:1,
  3,14 49:22
  65:18 75:7
  76:3,5,8,13,
  14,15,22 81:18
  83:10 92:8
  93:1,5,24

EXHIBIT 7

JOHN GILBERT DAVIS, M.D.
June 08, 2023

94:3,8 101:15,
23 102:1,2
105:1,4 106:16
107:10 111:12
113:23 116:11
138:18,20,22
147:18 148:5,
6,16,18

**noted**
41:15 43:1
53:2 124:7

**notes**
41:7,8 42:1,6,
18 43:12 45:12
52:15,16 53:6,
16,17,22,23
55:16 77:1,8,9
82:5 92:11
148:7 157:4
166:13

**notification**
27:11

**number**
24:11 44:10,
14,16 102:8

**numbers**
51:8 64:4
67:14

**numbness**
68:14 69:2,5,
8,14,20 70:1

**numerous**
16:5

**nurse**
37:12,18,20
38:4 39:22,24
40:6 48:10,21
49:5 50:9 76:4
96:23 98:14
148:11

**nurse's**
76:15 77:3

---

**O**

**Obaisi**
47:2 109:16,
18,21,24 176:9

**object**
43:4

**objection**
7:3 14:23
16:21 17:7
18:10 20:20
37:24 38:23
40:13 42:9,16
43:4 47:19
48:18 49:8
50:5 54:8
56:17 57:1,8,
20,22 58:6,23
59:8 60:13
61:21 63:17,24
65:13 66:1,8,
18 67:1 69:3,
22 71:23 73:8
75:10 76:11
78:24 81:13
82:12 83:17
85:16 87:16
88:3 89:16
90:4 91:4,15
94:12,15
103:16 104:5
105:11 106:20
107:15 108:2,
17 109:1
111:7,19
112:7,18 113:9
115:20 117:5
118:5,24
119:18 120:7
121:4 122:24
126:3,16 127:4
128:15 129:17
134:3,11,23
135:15 136:13,

22 137:9 139:7
141:6 142:2
143:20 144:8,
20 147:20
149:16 150:13,
21 151:4,22
152:18 153:15
154:17 156:19
157:2,23 158:7
159:15 160:12
161:4,24 162:9
163:4,14,22
164:23 166:16
168:5,12 169:5
173:13 175:23
176:24

**objective**
37:9 74:24
77:10 93:19,23
97:11,13
98:14,17
101:15,22
148:17

**obtaining**
146:18

**obviously**
90:10

**occasion**
26:16

**occasions**
41:5

**occur**
119:13 128:1,
3,7

**occurred**
73:23 107:4
127:3,6 131:8
134:22 153:14

**occurring**
101:7 103:1

**occurs**
83:23

**offender**
37:22

**offer**
70:10,11,17
99:8

**offered**
70:16 128:14
169:21

**okay**
4:20,24 5:4,
11,14,19 6:5,
8,11,16,20
7:1,9,13,14,
15,16 8:11,16
9:9,12 10:8,
13,17,20 11:2,
14,21,23 12:1,
3,7,13,18
14:1,5,8,11,15
15:6,9,13,16
16:3,13 17:11,
20,24 18:8,18
19:15,24 20:6,
9 21:7 22:3,
19,24 23:4,15,
24 24:6 25:9
26:15,19 27:5,
9,15,20 28:22
29:2,12,17
30:1,5,12
31:1,5 32:9,12
33:5,18,21,24
34:4,9,14,23
35:8,10,13,15
36:7,12,16
37:2,14,18
38:6,8,10,22
39:7,13,16
40:2,6,18,22
41:6,18,24
42:6,18,21
43:2,9,17,18,
19,24 44:5,9,
15,19,21,23

EXHIBIT 7

JOHN GILBERT DAVIS, M.D.
June 08, 2023

45:2,5,7,11,16
46:7,12,20,23
47:3,7,10
48:8,15 49:3,
14,17 50:12
51:5 52:3,6,
12,16 53:4,7,
9,14,17,20
54:1,12 55:15,
18,24 56:4,10
57:18 58:10,18
59:5,22 60:2,
9,22 61:2,3,8,
10,19 62:9,23
63:10,14,21
64:3,9,10,16,
18 65:20 66:5
67:5,11 68:20
69:7,18 70:4,
5,8 71:14,20
72:3,7,11,13,
20 73:7 75:12,
23 76:24
77:12,17,20
78:1,15,21
79:4,10,14
80:2,6,22
81:20 82:1,9,
16,20 83:1,7,
10,22 84:11,22
85:1,6,11,19
86:2,9,15,21
87:10,23
88:10,14 89:5,
10,14 90:1,9,
12,20 91:7,18,
20 92:4,7,15,
20 93:14,20,21
94:6 95:15,18
96:14,20 97:22
98:2,5,18,23
99:1,9,20
100:10,16,24
101:4 102:16,
24 103:4,13

104:12,19
105:1,6,18
106:1,11,16
107:2,10
108:6,13
109:7,15,24
110:7,13
112:5,11,14
113:6,13
114:1,8,15
115:9,14
116:22,24
117:9,24
118:18 119:9,
14,15 121:22
122:3,11
123:4,7
124:15,20,24
125:4,15,21,24
126:20 127:1,
11,19 128:9,13
129:6,13,21
130:4,10
131:3,13,17
132:1 133:19,
24 134:7,17
135:8,20,22
137:14,21
138:5,15,19
139:12,15,19,
24 140:9,14
141:3,18,23
143:11,17
145:4,10
146:4,18
147:17,24
148:14 149:6,
13,19,23
150:9,18
151:10,14
152:3,11,15
153:13 154:5,
9,22 155:5,17,
21 156:14,22
157:9,15

158:4,15,19,24
159:7,20
160:9,17,24
161:13,14
162:4,14 163:1
164:2,24
166:1,8,23
167:3,9,15,22
168:3,21
169:19 170:3,6
176:13,17,21
177:2

**once**
26:5 27:5
65:10 89:5,6
162:21

**one**
8:19 11:20
19:22 21:24
24:5 30:9
34:23,24 40:7
46:23 51:10
67:12 69:10
72:23 75:6
77:8,14 80:13
89:12 91:21
96:3,23 101:24
106:4 111:16
114:4 118:10
148:8,9 149:8,
10 150:4,10
151:16 154:9,
10 166:1
169:12 170:22
171:14

**ones**
21:22 22:19
95:9

**ongoing**
73:24 115:7,
10,13 125:17
126:15 133:5,
13

**op**
26:8 138:18,20

**open**
100:7

**opening**
98:6

**operation**
14:9 140:8

**operative**
116:11 138:21

**opine**
21:21 23:12,
19,21 32:15,23
33:4 79:20
81:21 86:7
87:9 105:5,16
116:13 151:6,
10 170:22

**opined**
24:1 63:11
121:22

**opining**
87:3 170:7

**opinion**
6:23 49:12,24
64:15 71:2,13,
21 72:12 73:6,
9,11 74:5,20
77:23 78:1
82:17 86:19
87:7,17,24
90:10 91:8
94:6 95:18
96:7 99:8
100:16,19
102:11 116:14
122:4,7
125:12,18
126:1,14,22,24
127:18 129:21
138:3 139:4
142:13 143:2,

EXHIBIT 7

18 144:7,11,19
145:23 146:15,
16 150:19
151:2,21,23
152:1,4,16,21
153:14 154:1
155:4 158:19
159:23 160:2,4
163:2 165:7
167:4,16
168:10,15
170:13 174:17,
18

**opinion's**
142:10

**opinions**
7:1,11 19:5
34:1,20 36:5
37:3 45:13
46:9,14 47:5
48:6 49:7
51:19,21 64:13
71:1,5,14,20
72:5,20 73:1
75:3 77:13,19
86:17,22
87:11,21 90:2,
13 91:19
144:15 145:22
146:11,17
174:22

**opportunities**
102:18

**opportunity**
91:14 110:13
111:12 120:5
144:3,17
153:24

**opposed**
20:24 49:21
72:7,13
105:21,24
168:1

**orally**
58:11

**order**
7:10 26:23
30:7,9 51:7
74:10 88:12
91:7 98:8
119:2,8,17
144:13 151:10
159:9 176:18,
20

**ordered**
52:13 53:1,2,
4,11,24 88:19,
21,22 89:3
92:8,12,13,17
94:9 102:8
176:2,6

**ordering**
26:17,19 88:10
119:3 177:6

**organ**
24:20

**original**
52:2,19 108:20

**osteoarthritis**
128:1,7

**outcome**
122:12 126:22
127:17,20,21
129:16 132:7,
9,15,16,23
134:19 136:5,9
137:3,18 141:7
142:11,12,14,
18 143:10,12,
13,14 144:18
149:1 152:14
154:23 155:6,
8,9,17 156:14,
17 158:6 159:2
167:5,10,14,19

168:1,11,14
170:7,21
176:23

**outcomes**
158:10,13

**outpatient**
14:12 24:24

**outside**
6:5 16:22
38:23 47:19
50:5 56:17,18,
21 57:15 58:7
59:8 60:13
61:21 66:11,18
81:13 112:7,19
115:20 134:3
144:8 157:2

**overnight**
24:14

**overview**
24:7

——————————

**P**

——————————

**p.m.**
177:12

**packet**
64:10

**page**
32:12 44:7,11,
23,24 45:5
46:4,12,23
47:8,11,12
48:3 50:2
51:2,7,16 54:1
60:17 64:3
67:12,14 68:8
70:4 71:3,15,
16 75:6 77:16,
17 82:5 92:22
123:9,24 146:1

**pages**
32:10 34:15
45:17 51:10
71:18

**pain**
68:10,13
70:10,11,15,17
74:1 78:17
79:22 80:24
81:22 82:3,11,
17,22,23 83:2,
5,7,12,13,14,
15 84:9,14,19,
20 85:20,21,23
90:15 96:8
99:5 103:6
104:22 105:3,
10,20 106:17
114:20 115:1,
2,3,5,10,13,
15,16 116:15
117:11,14,16,
18,20 125:9,
13,14,16,22
126:10,15
132:18 133:5,
6,7,10,13
134:20 135:23
136:1 138:1,2,
9 139:10,24
140:1,2,4,15,
16 141:20
142:1,6,9
149:2 153:20,
21 155:10,14,
15 156:20
157:16,20
158:22 159:3,
5,9,10,12,17,
21,22,24
160:3,5,6
164:7 166:4,14
167:13 168:16,
23 169:2,8,14,
18,19,20

EXHIBIT 7

170:14 176:8

**painful**
85:15

**palpate**
84:17

**panel**
21:17 22:1,8,
21 23:1 24:1

**paper**
38:3 86:21

**paragraph**
74:21 77:14
78:16 91:21
117:9 125:16
132:11 148:1,
22

**paragraphs**
73:2

**paraspinal**
79:17 122:15,
17

**part**
24:13 26:14
35:20 37:7
49:24 64:14
86:6 114:8
116:17 122:1
128:19 132:4
138:1,2 147:22
155:1 162:14
172:10,13
173:9 175:8

**partially**
109:13

**participate**
22:9

**parts**
72:8 97:23
105:23

**pass**

11:9,21 12:1

**past**
33:4 175:6,10

**pathology**
111:23

**pathophysiologic
ally**
155:7

**patient**
13:14,20 16:8
17:14 20:23
24:17 25:5,10,
12,13,19,21,24
26:9,16 29:19
38:14 39:23
40:2,11 41:13,
14 43:8,19
44:3 48:22
50:8,9 67:5
68:3,4,11,13,
16,22 70:9,11,
16 73:10,24
74:6 76:10,16,
19 77:2 81:12,
17,21 91:11
92:9 94:10
96:12 97:18
98:9,19,21
100:20 103:23
104:3,8,10,20
106:2 107:8,23
108:1 109:16,
19 110:1
116:10 133:3
136:12 140:22
146:6 153:18
164:11 165:16,
18,20,22
166:4,5,24
170:10,16
171:18,19,24
172:2,6,9
173:10,24
174:9 175:2

176:4,12,23

**patient's**
24:19 25:17
26:11,12 74:24
112:16 146:8
170:23 171:8

**patients**
24:11,12,13,14
26:1 105:19
110:11,12
152:8 170:12,
19

**pediatrician**
10:1,5

**pediatrics**
9:8,10,15,20,
23 10:10 11:6

**peer-reviewed**
15:18,23

**pencil**
86:21

**pending**
6:24

**people**
25:4 83:24
84:2 85:11,23
121:8 166:21

**Peoria**
8:15,16,21 9:3

**percent**
10:14 71:11
119:3 134:13
167:23 168:15,
16

**percentage**
165:4,5,6

**perched**
19:12,15,18,24
124:5 154:6,9

**perching**
64:22 65:6,23
123:10

**perform**
14:13 90:21
91:10 106:19
115:19 118:23
128:18

**performance**
14:6

**performed**
14:8,15 21:4,
8,15 81:17
129:14 130:1,
11 138:6
139:13

**period**
101:2 111:2
129:3 152:22
153:4,23 157:5

**person**
24:22 29:23
86:4 117:17
173:6

**personal**
38:24 48:19
56:18,21 66:19
112:18 113:6
115:21,24

**personally**
85:17

**pertinent**
75:2 105:23

**phase**
129:7,11

**phrase**
95:2

**physical**
16:10 37:10
39:10 82:23
101:10,14,19

EXHIBIT 7

**physically**
99:4 104:9

**physician**
4:18 5:22
13:7,23 15:3,
10,14 16:7,12,
15 17:19 23:1
26:17,20 28:3
29:9 30:5
37:12 38:4,13
41:15,16,21
42:24 43:7
58:12,20,22
59:3 61:16
65:11 69:1
76:6,7,9 78:13
84:13,16 87:24
89:7,11 91:10
94:11 95:23
108:8 119:4,9,
14 120:10
121:8 147:3
174:2 176:9

**physician's**
36:18 75:7
89:10 172:7

**physicians**
21:20 23:10,
11,17 28:10
110:20

**pick**
62:2

**pilot**
162:16

**pinion**
171:15

**place**
9:1

**plain**
41:15,19 55:17
61:13,24 62:3,
11,13,16,18

**68:17 121:7**
150:2

**plaintiff**
35:12

**plaintiff's**
56:14

**plan**
37:11 77:6,10
91:8 93:6,8,
14,21,23
148:18,19
171:24 173:12

**planned**
116:12

**plans**
106:3

**plates**
162:16

**play**
45:12 46:8,13
49:23 142:6

**played**
49:12

**please**
4:10,23 5:3
32:1 60:17
97:8 142:21
177:9

**pneumonia**
25:20

**point**
23:23 41:22
59:18 86:13
96:9,11 102:19
103:24 114:13
137:3 149:8
150:4,6,14
170:24

**pointing**
72:9

**police**
68:9

**pooch**
132:5

**Poole**
17:14 21:15
32:16 35:10
38:19 39:4,7,
9,13 40:20
41:3 42:23
47:17 49:5
52:5 59:22
60:6 64:11
68:24 70:15
77:21 78:17
79:5,8 80:19
82:10 85:2,6
90:18,21,24
94:8 96:16
103:5 104:21
105:8 106:17
107:13 109:8
116:15,24
117:11 125:16
126:14 128:10
133:24 135:4
140:1 141:23
149:1 156:22
157:11,15,19
158:5 159:2
161:1 170:8,12
176:7

**Poole's**
39:2 69:7,11
88:15 90:14
94:11 126:21
132:14 146:19
160:11 163:3
167:4

**popping**
78:19

**portion**
68:14 75:1

**97:3 142:4**
148:4,10,11,13

**pose**
19:5

**position**
121:9

**positive**
41:16,19 55:17
74:16 75:12,
15,21

**positives**
75:2

**possibilities**
151:24 160:1,7

**possibility**
127:16 152:15,
22 153:19

**possible**
19:22 68:17
85:10 117:18
158:5,10,12
170:14 174:3

**possibly**
127:15 139:11
148:24 150:23
152:13,14
153:14 154:23
155:5 159:8
167:21

**post**
143:23 157:3
167:14

**postop**
133:6,7 158:23
165:3 167:12,
13 170:12

**postoperative**
126:22 132:7,
8,15,18,23
133:12 134:19,
20 135:23

EXHIBIT 7

JOHN GILBERT DAVIS, M.D.
June 08, 2023

136:5 137:3 138:9 140:1 142:1,5,11,14,18 143:10,12 144:18 145:7 152:22 155:9,10,14 156:14,17 157:5 167:19 170:7

**postoperatively**
141:21 142:9 145:5

**postsurgical**
158:22

**postsurgically**
157:12,16 158:16

**pouch**
132:5

**practice**
10:5,9 12:22 15:21 17:18 24:8 59:20 107:23 110:18,21,23 119:23 120:10 165:19

**practiced**
10:1 15:13

**practicing**
12:8 119:3 120:10

**practitioner**
102:20

**preceding**
143:7

**preclude**
142:7

**preconditions**
84:1

**preoperative**

138:11,12 153:23 155:11,13

**preparation**
5:15 20:10 31:3

**prescription**
51:7

**presence**
64:5 65:10 67:6,17 69:1 70:13

**present**
67:12,18,21 68:2,7,21 83:11 103:14 146:7

**presented**
38:12 40:9,23 67:6 73:10 96:16 100:20 106:2

**presents**
68:10 115:1

**pressure**
26:12

**Presuming**
148:9

**pretty**
12:20 13:19 20:15 21:12 26:5 81:18 106:7

**prevent**
117:12 128:14 130:12,18 139:23 154:11

**previous**
5:17 6:8 15:3 34:24 35:3,5 168:20

**previously**
4:18 50:6 118:8

**primary**
13:7

**printed**
43:15

**prior**
18:5 20:7 67:12 77:22 78:2,9,12 88:5 115:13,14,16 153:4

**prison**
15:14 47:23 68:16 88:15 101:5 117:3 165:15

**prisoner**
38:11 114:24

**privilege**
7:3,5 14:23 15:1 18:12 42:11

**privileges**
14:12

**privy**
19:12

**probably**
10:12 31:19 35:20 37:16 59:20 62:6 73:14 92:20 131:11 134:13,15 135:13 140:6 166:24

**problem**
15:3 55:2 96:6

**problems**
128:20 161:20

**procedure**
21:4,8 116:13 131:5 136:21 138:7,16,21 141:8

**proceedings**
50:24 99:24 145:20

**process**
88:10 89:6 147:22

**produce**
36:19 84:9 85:21 117:16

**professional**
41:11 43:20 111:10

**program**
9:21

**proper**
102:21 137:2,19

**properly**
136:7 172:8

**protect**
96:5,12

**protected**
7:5 42:10 114:14

**protective**
117:12

**protocol**
104:8

**provide**
6:23 127:2

**provided**
5:8 34:16 35:19 48:3 56:23 57:15 62:11 64:11

EXHIBIT 7

66:24 74:8
86:16,18,24
100:7 146:10

**providing**
65:1

**proximate**
89:15,22,23
90:2

**proximity**
39:17

**publications**
15:17

**published**
15:18,20

**pulling**
73:2

**pulmonologist**
13:17

**purpose**
75:5 139:22
162:7,22

**put**
28:1,4 30:12
53:12 58:16,19
60:12 70:19
79:8,10 86:21
149:19 159:17
162:15,16,17
164:19,21
165:8 171:9
176:19

**puts**
84:11

**putting**
73:3 166:10

---

**Q**

---

**qualifier**
152:23

**qualifying**
137:21

**quality**
143:15,18

**quarterbacking**
24:19

**queried**
21:20

**question**
4:23 5:2 16:23
32:22 33:2
38:15 52:23
58:1 59:10
60:19 61:2,9
62:5 66:13
75:5 83:20
87:1 94:18
100:2 106:9
110:14 112:20,
21 117:17
124:12 126:5
127:8 135:18
136:17 144:22
145:2 147:8
150:10 153:2
173:15 175:1

**questioning**
49:9 54:9
57:2,23 58:7
67:2

**questions**
4:22 79:17
158:10 170:3
174:11 175:13

**quick**
68:1 175:17

**quickly**
173:8

---

**R**

---

**radiating**

78:18

**radiologic**
19:20

**radiologist**
27:5,13,16
28:24 30:10
55:12,13,22
56:1,5,7,10,
12,16 57:7,12,
14,18,19,24
58:4,10,15,18
59:2,6 60:9,12
61:15,19 62:4,
10 65:9,22
87:11 108:10
112:2,5,14
113:7 118:2,22
119:6,10,15,
21,24 120:11,
18 121:2,3,17
149:15 174:21

**radiologist's**
56:1,23

**radiologists**
27:3 28:10
29:13,18 62:19
64:24 119:2
151:20

**radiology**
26:21 28:7
29:3,6 54:7
55:19,21 57:11
61:11 64:20
65:24 66:2
108:16 152:6

**randomly**
22:13

**range**
84:18 90:23

**reach**
27:18

**reacted**
109:4

**read**
26:7 27:3,5,15
28:1,15,19,23
29:18 35:17,
18,19 36:1
39:2 41:19
45:18 46:11
49:19,22
55:12,13 56:2,
4 58:15 59:13,
15 60:3 62:17
63:1 64:12,14,
20 65:3,4,7,
12,22 66:16
67:8,21 68:8
72:14,15 74:16
75:12,14,17,21
77:9 80:4
92:20 93:7,10
94:19,22 97:8
100:2,4 105:4
107:17,18
111:18 112:15,
22 113:2 116:5
121:7,9,18
126:6,8
130:22,23
131:6,16
132:11 137:24
142:20,23
144:24 147:9,
11 149:14,17
150:12 156:7,
12 171:11,16
173:19

**reading**
21:9 28:12,18
29:10 35:18
45:22,24 72:17
82:14 112:2
121:10 130:24

**reads**

EXHIBIT 7

JOHN GILBERT DAVIS, M.D.
June 08, 2023

58:18 62:20
65:1 109:7

**realigned**
131:24

**reason**
40:2 54:20,22
66:5,14,21
86:12 88:23
89:1 96:15
107:13 113:21
122:8 128:18,
21 130:7,11
133:2,22
136:11 137:21
139:12 154:14
155:3 163:15
168:7

**reasonable**
39:16 40:10,
12,15 71:5,8
106:12,15,18
109:12,13
119:16,20
145:23 147:3,4

**reasons**
30:9

**rebuttal**
86:3

**recall**
6:11,17 18:21
41:2 104:15
107:3,6 113:16
116:8 131:14

**recalled**
92:16

**receive**
9:22 26:21
27:6,9 34:5
57:4,6

**received**
18:6 30:22
33:9 34:9,11

35:2 85:7
146:9

**recertify**
12:4

**rechecked**
41:9

**recommend**
29:21,22 30:2,
6 63:14 89:11
119:6,7,12
120:1,6

**recommendation**
63:19 172:1

**recommends**
29:18 119:21
120:13

**record**
4:11 53:20,21
59:14 67:18,24
71:22 72:8
73:3,14,18,21
74:3,8 75:1,4
81:16 82:4
87:6,9 94:21
96:21,22 99:22
100:1,3,9
103:4,11
105:14,16
106:22 113:1
117:21 125:20,
21 126:1,7,18
132:17 141:14
142:22 144:23
147:10,13
150:11 169:10,
11,16,22
173:18 175:5,
20 176:12

**recordkeeping**
74:22

**records**
5:9,12,17

27:7,8 31:2
33:3 34:4,14
53:8,19 64:10
72:15,18,21
73:16 74:19
78:2,4,9,13
82:14 86:20
91:16 114:22
115:9,13 116:5
143:22 144:6,
10,15,16
145:5,6 171:5,
6 175:6,10,11

**reduce**
117:14 138:15
139:10

**reducing**
138:23 139:9

**refer**
25:10

**reference**
48:10

**referenced**
43:12 75:7

**references**
72:21

**referencing**
43:13 52:15,16
72:5 148:10

**referral**
109:19 112:17

**referring**
61:16 95:22
102:23

**reflect**
115:9

**refusal**
176:11

**refused**
176:10

**related**
138:4

**relation**
175:17

**relevance**
85:16

**relevant**
80:1

**reliant**
119:3

**relies**
121:17

**rely**
108:9 119:9
168:15 171:6

**Remaining**
124:7

**remember**
6:18 18:20
21:9 22:23
23:13 35:9,18
38:8 53:13,21
64:24 80:10
104:16 121:19

**removal**
111:11

**removed**
41:12 106:3

**render**
87:23

**rendered**
35:1,3

**repair**
128:19 138:3
161:12,18
162:12,14

**repaired**
37:11 155:20
161:19 162:2

EXHIBIT 7

JOHN GILBERT DAVIS, M.D.
June 08, 2023

repairing
101:11

repeat
38:15 59:10
74:18 94:18
150:10 152:24
173:15

repetitive
49:8 54:8
57:1,22 58:6
67:1

rephrase
5:4 135:1

replace
15:4

report
7:12 16:4 17:4
18:6 20:7,12
21:13 26:8,21
27:9 28:2,24
29:6,10 30:6,
22 31:2 34:24
35:3,6 37:6
51:6,17 54:24
55:6,14,19,21,
22 56:1,2
57:11 58:16,19
59:6,9 60:4,
10,12,14,16
61:5,11,15,18
63:16,22 64:1
65:24 66:3,12,
15 67:8 68:3,
24 69:5,13,24
70:20,22 71:1
75:6,20 78:21
79:9 86:2,9,17
87:12 88:1,2
107:12,21,24
108:11,16,20,
24 109:8
111:16,17
112:9 113:3

122:21 123:9,
18 130:23
131:1,6,14,16
155:20 156:3,
7,8,22 157:11,
15 173:14
174:18,23

reported
62:12 65:11
69:19 78:17
108:13 113:4
176:4

reporter
59:12 175:8
177:6,10

reports
26:3 29:3,13
68:11 69:4
149:17 176:5

represent
4:8 94:2

represents
111:13

request
13:18 36:19
103:20 166:15

requested
59:15 92:5
94:22 100:4
103:7 113:2
126:8 142:23
144:24 147:11
150:12 173:19

requesting
92:2

require
12:17 137:15

required
100:17,19
132:19 133:7
136:19 137:7,

17

requires
92:1

requiring
82:23 112:12
125:17 126:15

research
17:23

reserve
177:4,5

residency
8:22,24 9:1,7,
13,14,16,18
11:3,5,12

resources
173:2,3

respect
124:3,10

responded
75:16

responding
43:10

response
88:1 174:10

responsibilities
175:18

responsibility
27:12 58:15
120:14,17
171:18,19,21,
23 172:7,10,17
173:9,10

responsible
87:12 102:13,
14 118:8 172:4

rest
147:24

restroom
145:16

result
126:13 133:4,8
134:20 141:3,
14,24 156:14
163:19

results
58:11 104:18

retained
6:20

retracted
164:19

review
5:15 17:21
21:17 24:1
31:2 33:5,13,
17,19 35:5,21
36:24 37:1
42:18 48:13
49:20 51:18
53:19 63:5
69:15 78:8,13
81:23 86:19
88:20 92:11
122:2 144:17
145:9 157:3

reviewed
5:9,16,17
22:24 35:22
36:14,20 41:20
43:16,24 44:19
49:3 50:1
56:22 104:24
150:6

reviewing
19:4 22:21
31:7 53:8
138:22

reviews
60:10

rid
139:1

EXHIBIT 7

**right**
  5:6 12:22,23
  14:1,18 23:24
  24:6 30:10,12,
  21 31:10,21,24
  32:6 36:15
  39:2,5,18,24
  40:8 42:14
  44:22 46:3
  47:7 51:15
  52:22 55:1,6,
  18 60:8,11
  61:14 62:16
  63:5 65:5,18,
  22 66:24 70:24
  71:4,8 75:21
  76:5,10 77:4,
  12,16,18 78:5,
  7,9,19 79:8
  83:16 90:10,
  13,15,17
  91:14,18 93:2,
  7,12,13,24
  96:22 97:23
  98:12,15
  100:18 102:3
  105:22 107:6
  108:24 110:5,
  24 113:8,13
  114:20,22
  116:2,5,7
  117:15 118:3
  120:23 122:20
  123:8,9,19
  124:2,4,5,9,21
  125:11,15
  128:11 130:15
  131:9,21
  134:10,22
  135:10,11
  137:8 139:1
  148:6,21
  149:15 151:2,
  12,19 156:6,10
  158:20 159:11

  161:15,21,23
  162:8,23
  163:12,19,21
  164:5,22
  165:10 168:3
  169:23 176:15,
  21

**right-sided**
  63:23

**rigid**
  95:15,17

**RN**
  37:16

**road**
  130:3,12

**Robert**
  4:8

**Rogers**
  54:4

**role**
  4:22 46:8

**room**
  13:8,9 69:1,19

**rotate**
  9:4

**rotation**
  123:19

**rounds**
  47:14 48:4
  50:8

**RTP**
  36:19

**RTP0749**
  75:8

**RTR**
  54:4,5,7

**rule**
  167:23 173:14

---

**S**

**safe**
  24:22 153:24

**Saint**
  78:22 169:16,
  17,20

**saying**
  52:10 53:4
  55:5 68:20
  86:3,9,10,11
  92:4 116:8
  121:20 130:6
  131:10 136:6
  145:4 152:21
  155:5 156:1
  160:24 166:5
  169:15 170:20

**says**
  7:10 21:21
  22:8 32:15,20
  34:24 36:18
  37:10 44:13
  47:2 48:10
  51:16 60:17
  64:17,19 67:17
  70:9 71:5,10
  75:20 77:14
  80:22 84:17
  91:22,24 92:13
  116:11 124:20,
  22 135:12
  143:18 145:23
  152:13 164:8
  165:5,16 168:9

**scale**
  83:2,7

**scars**
  98:11

**scenario**
  174:6

**school**
  8:5,17 9:2

**scientific**
  168:9

**scientist**
  133:21

**scope**
  16:22 38:23
  47:19 50:5
  56:17 58:7
  59:8 60:13
  61:21 66:18
  81:14 112:7,19
  115:21 127:15
  134:4 144:8
  157:2 173:13

**scratch**
  40:8 97:14

**scratches**
  38:12 40:8
  97:14,22 98:15
  100:18,23

**screwing**
  157:21

**screws**
  162:17 164:20

**second**
  12:1 41:21
  70:19 73:16
  132:11 148:23
  164:24

**section**
  29:6 33:5
  51:3,4 64:7
  70:7 93:6,8
  97:6 148:2,20

**sections**
  29:9

**see**
  13:19 15:17
  24:11 26:1,16

EXHIBIT 7

JOHN GILBERT DAVIS, M.D.
June 08, 2023

28:2 29:23
30:2,6 36:22
37:22 38:13
40:11 41:15
48:8,12,15
52:3 54:1,3
55:23 61:17,20
62:4,13,16
64:4,19,22
70:9 75:7
76:10,16,19
81:8,11,17
84:13 87:6,7
93:11,14,20
94:4 97:6
103:4,23
105:19 107:23
118:19 120:20,
23 123:23
127:1 138:17
145:24 149:20,
23 150:1 152:7
157:4 165:14
169:15 172:2
176:7,10,11,12

**seeing**
24:15,17 25:1
95:23 110:11
152:8

**seeking**
176:8

**sees**
13:9 50:9
61:17 77:2
107:3 109:8

**segregation**
47:13,18,23
48:4,11 49:5
50:8 103:20
166:13,21

**selected**
34:15

**semantics**
76:13

**send**
22:2 88:24
110:1 120:19

**sensations**
78:19

**sense**
12:18 95:21

**sentence**
71:4,15 80:22
82:2 132:11
136:3,4 145:22
148:23 158:24
160:9,18

**separate**
100:14 148:7

**September**
114:2 128:10
129:4,10

**sequela**
19:23 149:2
159:3 164:10

**series**
73:23

**service**
6:6

**services**
31:22

**serving**
4:21 16:13
25:9 88:15

**setting**
15:14,21 25:1
74:9 110:8
172:16

**seven**
80:10 84:23
111:17 114:3,
6,9 115:5,8,

10,12,19
116:15

**severe**
83:8

**shot**
166:2

**shots**
120:13

**show**
43:21 48:9
51:15 60:17
62:6 63:11
72:3 153:8

**showed**
163:7 165:13

**showing**
68:17

**shows**
37:10 87:6
135:9 149:7
153:11 164:5
165:9

**shuts**
68:4

**sick**
13:8,10,11
47:13 48:4,10

**side**
30:13 123:20
135:10 171:12,
13

**sided**
123:8,10

**sign**
67:7

**signal**
123:16

**signature**
93:4 177:4

**signed**
37:12 76:9

**significance**
124:16

**significant**
82:17,21 83:14

**signs**
165:21

**similar**
39:22 121:15

**similar-situated**
17:14

**sir**
32:13 83:5
117:9 144:3
177:3

**sit**
11:6,11 158:15

**site**
8:20

**sitting**
40:23 104:8
165:20

**situation**
95:24 96:1
155:4

**sizes**
95:12

**skin**
98:6,7

**skip**
47:7

**Skipping**
74:21

**slight**
124:2,9

**slowly**
80:23 82:3,10

EXHIBIT 7

JOHN GILBERT DAVIS, M.D.
June 08, 2023

snapped
  131:9

SOAP
  93:22 148:5,8

soft
  85:8,20 95:16,
  17 122:17
  123:12

somebody's
  13:7

sort
  9:22

sound
  25:7

sounds
  5:1 39:19 50:7
  135:7 164:3

space
  72:24

spasm
  84:18

spasms
  98:19

speak
  68:5

specialist
  25:6 28:16

specialists
  25:22 28:17

specialties
  23:18

specific
  18:8 21:12
  23:22 53:20,21
  59:20 69:17
  71:16,18 72:8,
  21 81:7 111:2
  128:18 153:2
  170:22

specifically
  18:20 20:15
  21:5 23:7 38:9
  46:21 61:3
  93:3,5

specifics
  18:3 128:22

speculation
  38:1 40:14
  47:20 48:18
  57:8,23 58:23
  63:17,24 65:13
  66:1 69:3,22
  78:24 81:13
  94:16 104:6
  105:11 106:20
  107:15 111:20
  115:20 117:5
  121:5 128:15
  134:3 136:16
  142:3 144:9
  147:20 150:13
  152:4 157:23
  166:16

spell
  4:10

spent
  31:6

spin
  43:22

spinal
  14:6 18:16
  80:15,23,24
  81:21 82:2,3,
  10 124:18

spine
  14:3,9,20
  17:22 18:19
  20:17 29:20
  54:24 58:21
  59:7,23,24
  61:13,20 63:7,

8 66:17 67:7
  69:21 78:18
  79:15,21 80:7,
  11 84:8 85:2
  89:7 90:21
  91:3 92:2,17
  100:11 115:6
  124:15 125:12
  132:2,5
  140:19,21,23
  141:5,16,19
  147:7,19
  162:22 168:8

spot
  101:11 173:3

sprain/strain
  84:7,12

St
  10:6,9 64:5
  65:10 67:6,17
  70:13 83:11
  117:3

stabilization
  92:1 95:11
  116:12 127:19,
  21 129:14
  130:1 133:3
  137:7,16,18
  139:13 141:4,
  14 161:22
  169:3 172:17
  176:13,18

stabilize
  73:13 74:11
  112:16 122:14,
  22 127:24
  131:4 161:16

stabilized
  115:6 116:19
  127:16 129:9
  133:14 162:21

stabilizes

122:16 123:1

stabilizing
  92:1 100:11
  146:10 155:1

stable
  26:9

staff
  110:16

stage
  129:14

stamp
  54:2

standard
  16:1,4,6,15,19
  17:3,5,13 24:2
  59:5 74:13,19
  91:24 100:10
  106:11 146:20
  165:19 172:13

stands
  155:3

start
  72:3 77:21
  78:8 102:4
  172:3

starting
  16:8 132:10

starts
  71:2 77:19

state
  4:10 22:4
  51:16 69:8
  71:12 91:9
  112:5 169:11

stated
  37:22 133:12

statement
  5:16

statements
  31:22

EXHIBIT 7

states
10:17 54:24
106:22 107:11
113:3 169:10,
22

Stateville
88:11,13

stay
13:20 25:2

stiff
85:15

stitches
97:20 98:3
100:7 106:4,6,
14

stitching
106:4

story
68:5 69:12
96:7

strategy
72:16

strike
113:14

strong
114:23

structural
163:2 164:8,
15,17 165:11

structure
159:10,12

structures
19:21 20:1,4
80:1

studies
27:3

study
30:7

stuff

6:21 36:15

subject
84:1 159:1

subjecting
159:4

subjective
16:9 37:8
73:19 74:7,23
77:10 93:18,22
96:24 97:3,6,
10 98:22
101:15,22
146:8 148:3,17

subjective/
objective
77:6

subjects
149:1 159:2

subluxation
20:5 52:2 58:1
68:18 80:15,23
82:2 109:8,11,
20 111:22
112:3,6,12,15
113:4 118:11
121:24 123:2,
4,19,22
124:13,14,19
125:5 134:9
138:15,23
139:1,9,23
149:7 150:1,2,
8 151:11
153:10,12,17
155:15

subluxation's
152:7

subluxing
127:22 130:18

submit
31:9

submitted
31:21

subsequent
104:2 156:23
161:20

subspecialist
13:13,17 26:14

subspecialists
24:18 25:11
26:2,3 63:4

subspecialties
28:19

subspecialty
28:8,18

substitute
7:10

substituting
14:19 15:10

success
139:20

successful
139:17

sued
23:18

suffer
80:21

suffered
38:11 39:11

sugar
26:11

suggest
112:3

suggested
30:10

suit
22:7

sum-up
167:4

summary
13:23

superior
63:14 124:5

support
71:22 144:7
167:16

suppose
87:1

supposed
21:23 87:2,3
140:23

sure
5:5 8:3 12:21
16:6 17:2
20:23 24:10
27:18 28:20
29:4 35:23
38:8,16 47:24
50:17 52:21
55:7 56:12
58:1 59:16,19
60:5,6 68:9
77:5 79:16,23
81:18 83:9
87:5 92:23
94:19 96:4
97:5 102:6
103:19 113:18
114:5,7 119:11
120:1 121:13
128:18,19
130:5 131:11,
19 135:4 136:3
144:13 156:17
167:1 169:2
171:24 172:11

surgeon
14:3,20 21:14
26:7 28:20,22
29:20 63:8
124:15,18
125:12 154:15,

EXHIBIT 7

JOHN GILBERT DAVIS, M.D.
June 08, 2023

19 168:3,8

**surgeons**
63:4

**surgery**
14:6,12,13,16
21:15 26:7,12
81:11,17
114:3,10
115:11,13,14,
17,19 116:20
127:18,20,22
128:14,18,22
129:4,10
130:12,16,17,
20 132:19
135:22 136:2,9
137:20 139:21
142:8 143:15
153:4,21
156:4,23 159:6
162:7,22
168:17

**surgical**
18:22 20:19
21:1,3,7,12
112:12,16
114:16,18
129:14 130:23,
24 131:14
137:2,7,15,17
138:3 139:16
141:7 149:1
152:9,14
154:23 155:6,
8,9,17 156:8,
17 158:6 159:2
162:6,12,14
168:11,14,24

**surgically**
162:1

**surprised**
81:16 122:3

**surrounding**
123:12

**suspected**
147:18

**sustain**
79:13 84:4

**sustained**
96:1 131:12
132:20

**sustains**
135:5

**suture**
41:12 97:18
111:11 140:7

**sutures**
41:8

**swell**
85:9

**swelling**
85:3,4 163:12

**sworn**
4:1,4

**swung**
165:7

**symptoms**
68:22 73:10
96:3,8 103:6

**syndrome**
84:3

**system**
18:1 24:20

---

**T**

---

**tab**
36:17 44:6,9,
23 46:12 51:7,
8,15 92:21
97:4 101:24

**take**
6:21 11:14,17,
23 26:23,24
29:2 32:6 33:6
42:6 50:13
99:10,13,15
104:12 106:5
133:18 145:11
171:16 177:7,8

**taken**
12:13 34:10,12
50:22 53:15
54:14,21,23
55:1,5,8 99:23
104:14 128:4
145:18 146:22

**takes**
85:19 89:12
106:13 128:7
148:21 154:15
174:3

**taking**
174:16,20

**talk**
24:17 26:7,8
27:18 50:19
109:9 146:5
148:3 149:3

**talked**
76:3 143:6
146:5,11,13
147:24 148:4,
15 167:3
173:22

**talking**
24:16 39:16
81:5 92:18
136:3 142:10
143:5,9 150:8
153:4 161:1,6,
9

**team**

24:14,19
110:12

**tech**
54:7

**tell**
8:4 13:1,4
19:8 23:14
24:6,8 25:3
27:10 37:5
38:18 44:4
58:20 61:5
67:13,18 68:5,
22 83:5,23
84:24 93:9
95:6,7,9
102:16 108:15
111:3 118:2
127:19 129:23
134:12 149:9,
11 152:3 156:3

**telling**
69:12 108:23

**tells**
109:8 119:24

**Tengesdal**
4:6,8 7:8,21
15:5 17:1,10
18:13 20:22
30:20 32:1,5
36:11 38:5
39:1 40:17
42:12,17 43:6
47:22 48:23
49:13 50:11,17
51:1 54:11
56:20 57:5,10,
21 58:2,9
59:4,12,21
60:15 62:8
63:20 64:2
65:16 66:4,9,
22 67:4 69:6
70:3 72:2

EXHIBIT 7

75:11 76:18
79:3 81:19
82:15 83:21
85:18 87:19
88:9 89:21
90:8 91:6,17
94:14,19 95:1
99:15,18
100:1,5 103:18
104:11 105:17
107:1,19
108:5,21 109:6
112:1,10,22
113:5,12
115:23 117:8
118:14 119:5,
22 120:16
121:12 123:3
126:6,12,19
127:7 129:1,20
134:6,16
135:3,19
136:20 137:5,
13 139:8
141:9,12 143:1
144:1,12
145:3,13,15,
17,21 147:9,
16,23 149:18
150:17 151:1,9
152:2 153:1
154:4,21
156:21 157:6
158:3,11,14
159:19 160:16
161:8 162:3,13
163:9,18 164:1
165:12 166:19
168:6,18
169:7,23 170:2
173:13 175:13,
16 176:1
177:2,7

**term**
27:19,20 65:3

82:20 140:15

**terms**
142:6 159:18

**test**
149:10

**testified**
4:4 39:4 57:19
58:5,10 66:15
86:4 87:13
92:7,16 93:22
104:19 116:4
121:13,14
125:2 129:24
140:9 141:13
157:10 162:6
167:18 176:13,
22

**testifies**
168:8

**testify**
53:10 66:10
138:12

**testifying**
149:23

**testimony**
52:8,24 54:13
57:15 63:3
71:22,23 72:4,
6 82:6 88:18
93:7 107:4,5,7
113:10 118:15
126:4 128:16
129:18 130:7
132:24 136:23
137:10 138:14
143:21 144:21
147:18 149:4,6
150:22 151:5
152:19 154:18
158:8 161:5
162:10 163:5
169:6 174:17

**testing**
91:3

**tests**
119:2 172:8
175:19

**textbook**
15:24 17:12

**Thank**
50:12 70:24
80:14 94:20
99:9 102:3
106:11 175:12
177:3

**thanks**
38:17 90:12

**therapeutic**
117:13

**therapy**
82:23

**thing**
8:4 27:23 28:6
40:16 105:18
106:15 118:10
119:21 143:16
151:21 164:6
165:2

**things**
18:3 24:23
73:3 74:1 81:8
82:24 87:8
89:4 96:4
128:3,4 140:7
142:6 151:7
152:22 154:2
160:18 166:11
171:2 172:4
174:7 176:6

**think**
12:19 19:7
24:4 26:8 31:6
41:16 86:23
87:5,22 89:2,4

103:9 104:14,
17 108:6 112:8
122:12 145:1
146:16,23
147:24 167:3
172:18,19,22

**think's**
119:16

**thinking**
72:13

**third**
71:3

**thorough**
73:17 101:8,9

**thought**
24:2 33:1
43:2,11 75:13
147:22 156:9
171:10

**three**
8:20,21 9:15
21:20 23:11,17
36:17 86:15
97:4 129:2,6
137:19 140:10
145:13,14
158:16 162:19

**tile**
150:20

**till**
32:18 146:22

**time**
4:14 5:23
10:22 12:1
13:21 40:23,24
53:3 69:10
74:14 75:24
81:3 85:9
88:16 99:11
101:2 109:21
111:2 114:4,9,
10,15 124:24

EXHIBIT 7

JOHN GILBERT DAVIS, M.D.

June 08, 2023

127:24 128:6
129:2,4 148:24
149:8,11
150:4,6,10,14
151:7,8 152:9,
10 153:3,8,21,
23 154:2 155:3
165:1 171:7

**timeline**
73:22 81:9
161:7

**timely**
74:2 92:3
100:21 171:1

**times**
16:5 68:10
135:17

**timing**
74:12

**Tina**
4:9

**tingling**
68:15 69:2,5,
9,14,20 70:1,2

**tip**
124:1,9

**tissue**
123:12 163:7,
8,10,15 164:2,
9,17

**tissues**
85:8,20 122:17
163:3,13

**today**
5:15,18 20:10
34:2 68:17
85:14 101:18
148:15 158:15
161:1

**toes**
105:22

**told**
7:1 30:1
50:20,21 96:1
106:12 125:19,
21 126:23
144:13 151:15
156:9 157:18

**Tomaras**
4:9

**top**
20:8 54:18
56:9 69:16
93:12,17 95:8,
14 103:8 133:1
140:12 141:1
157:17

**topics**
18:8

**total**
32:9

**traffic**
25:5

**training**
14:6,20 28:11

**translation**
124:17 135:11
149:21,24
150:7

**transpiring**
38:3

**trauma**
79:6 96:2,8
100:20 133:8
138:11,13

**traumatic**
83:24 84:5
123:14 132:20
134:9 135:5
152:9 163:20

**traumatically**
134:1

**treat**
104:9 136:7
165:18,19
166:24 167:13,
19,24

**treated**
20:24 168:10

**treating**
4:17 17:13
171:24

**treatment**
16:11 17:21
24:19 102:21
103:2 117:10
148:23 153:3
154:22 155:2
160:10,14,21
168:2 170:17
171:8

**triage**
40:2 174:5

**triaged**
39:22,24

**true**
7:22 25:7
80:17 104:2
118:17 129:12
135:13 142:14
160:15 174:16,
20

**truth**
23:14 93:9

**try**
5:3 45:16,22
98:11

**trying**
67:20

**tuned**
35:20

**turn**
36:17 51:2

84:3

**turning**
138:24

**twisted**
68:12

**twists**
79:11 84:12

**two**
9:17 19:21
20:1,3 23:5
40:8 45:17
68:10,11 89:4
93:11 97:14,22
100:17 109:16,
19 111:23
115:2 123:15
135:23 140:10
141:19 145:13,
14 148:7
151:3,11,15,
19,20 157:21
158:9,15
162:15 164:20

**type**
18:18 23:10
29:18 74:1,22
82:24 84:2
143:15 170:17,
19

**types**
23:11 95:3,6,7

**typical**
93:23

**typically**
13:22 28:23
119:24

---

**U**

---

**Uh-huh**
33:7 42:8
117:21 153:6

EXHIBIT 7

JOHN GILBERT DAVIS, M.D.

June 08, 2023

**UIC**
  34:14 81:11
  113:15,20
  114:9,22
  115:3,4 117:20
  169:12,13,17,
  19

**Ultimately**
  135:8

**unaware**
  17:5,8 28:4
  58:13 63:13
  82:13 101:3
  158:1

**unbearable**
  103:6

**undergoing**
  170:19

**understand**
  5:3 45:14
  46:10,17
  49:10,14,23
  76:13 95:18
  145:1

**understanding**
  38:18 48:24
  50:2,4 63:7
  76:14

**unforeseen**
  151:24

**unit**
  39:14,18,20,21
  101:5 103:7
  105:8

**University**
  8:6,12,14 9:2

**unnecessary**
  117:11

**unstable**
  127:23 155:2

**ups**
  62:7 145:8
  175:17

**Uptodate**
  18:2,5,15,22

**upward**
  31:19

**urgency**
  136:24

---

**V**

**vacuum**
  87:6

**vast**
  84:4

**versus**
  20:18 81:7
  138:2

**vertebra**
  80:7 84:23
  135:23 157:22

**vertebral**
  19:21 20:1,3
  123:17 132:5

**view**
  23:23 149:20

**visit**
  169:13

**visits**
  156:23

**visualized**
  59:7

**vital**
  165:21

**voice**
  102:21

---

**W**

**wait**
  39:17 142:13

**waited**
  11:13 115:18

**waiting**
  115:11 116:15

**waive**
  177:4

**want**
  8:1 11:19
  22:20 33:11
  47:8 51:13
  54:19 60:3
  67:11,21 70:6
  72:17,23 77:13
  79:17 83:12
  89:7 98:11
  99:10,11,17
  106:8 135:17
  156:7 160:18
  177:4,10

**wanted**
  5:22 104:14

**way**
  8:19 16:10
  106:1 120:9
  143:19 149:9
  150:15,18
  165:18

**ways**
  25:23 165:17

**weakness**
  68:14 69:2,4,
  8,13,20 70:1
  78:18

**wearing**
  122:4

**week**

  39:17 106:4,6,
  12,13 129:15

**weeks**
  68:10,11 115:2
  129:2,6 137:19
  162:19

**weight**
  171:9,15,16

**well-known**
  84:16

**well-maintained**
  124:6

**well-respected**
  168:8

**went**
  8:4,6 39:19
  50:9 60:19
  73:19 74:17
  101:14 107:12
  115:15,16
  164:18

**whatnot**
  38:20

**whiplash**
  85:13

**whipped**
  163:11

**wholeheartedly**
  137:12

**wise**
  81:3

**witness**
  4:1,3 7:6 15:2
  16:23 17:8
  20:21 38:2
  40:15 47:21
  48:20 49:10
  50:6,15,20
  54:10 56:19
  57:3,9,24 58:8

EXHIBIT 7

59:1,10,16
60:14 61:22
63:18 64:1
65:14 66:2,20
67:3 69:4,24
70:1 71:24
73:9 76:12
79:2 81:15
82:13 83:19
85:17 87:17
88:4 89:17,19
90:6 91:5,16
94:17,23 99:12
103:17 104:7
105:13 106:22
107:16 108:4,
19 109:3
111:9,21
112:8,20,23
113:3,11
115:22 117:6
118:7 119:1,20
120:9 121:6
123:1 126:5,9,
17 127:5
128:17 129:19
134:5,12
135:1,16
136:14,17,24
137:11 141:7,
10 142:4,20
143:22 144:10,
22 145:1
147:12,21
149:17 150:14,
23 151:6,23
152:20 153:16
154:19 156:20
157:3 158:1,9,
12 159:16
160:13 161:6
162:1,11
163:6,15,23
164:24 166:18
168:14 173:15,

17,20 175:10,
24 177:1,12

**woke**
85:14

**wondering**
22:11

**word**
89:17 119:7
133:18

**words**
60:22 120:12

**work**
31:11 41:9
104:17 172:5

**working**
110:9 120:15

**works**
6:4 8:19 119:1
154:19 166:22

**workup**
73:17 101:8,9

**worn**
101:1

**worry**
80:13

**worse**
80:16 124:19
149:11 151:8,
11 152:23
154:2 160:23
171:2

**worsen**
148:24 150:23
153:4 154:7
155:4

**worsened**
121:23 149:4,
7,9 150:20
152:7 153:12
160:22 161:3,

10 170:21

**worsening**
80:23 81:21
82:3,10 117:12
122:6 150:16,
19 153:9,17
166:3,9

**worsens**
160:10,13,20

**worst**
96:4 174:6

**wound**
41:9 111:11

**wreck**
85:12

**wrenched**
85:7

**write**
42:13 76:22
113:23

**writing**
42:15

**written**
15:20 45:18
148:16

**wrong**
44:15

**wrote**
40:6 42:14
44:2,21 46:20,
21 82:2

---

**X**

**X-RAY**
28:12 29:12
30:2,6 41:20
43:18 51:6,17
52:2,20 53:2,
16,23 55:14

56:15 58:12,14
62:5 63:8
73:24 74:16
75:12,14 87:12
88:1,2,5,8,14,
19,21 89:3,11,
12 92:11 94:9
102:4,7,13,15
107:12,21
108:20 109:7
139:17 140:23
149:21,22,24

**X-ray's**
75:15

**X-RAYS**
26:17,23,24
27:3 28:15
41:13 52:13
53:1,11,14,17
54:13,21,23
55:1,8,12
63:11 88:11,12
89:7 92:8,17
109:22 146:22
149:14,20
150:6

---

**Y**

**yeah**
7:6 8:18 10:24
21:9 23:16
27:8 33:16
38:21 42:4,15
43:10 49:1
51:4,14 54:10
57:14,21 60:22
61:22 64:8
71:24 73:6
78:14 79:7
83:19 87:20
93:16 103:10,
11 112:23
120:9 122:10

EXHIBIT 7

JOHN GILBERT DAVIS, M.D.
June 08, 2023

126:10 127:8
128:17 133:17
134:5 135:16,
21 137:11
140:3,5 144:10
145:15 146:2,
16 147:21
150:9 151:6,7,
24 152:20
153:16 156:11
158:9,11
159:13 160:15
162:1,11,20
163:7 164:6,13
165:16 167:24
168:14 169:15
176:5,19,20
177:2

**year**
8:8,19 11:2,13

**years**
8:16,21 9:15,
16 10:4 22:10
128:7 130:3

**yesterday**
85:12

---

**Z**

---

**zero**
37:8 73:20
97:9 98:21
121:19

EXHIBIT 7

# John G. Davis

Greater Chicago Area

 jaydavis12@msn.com, jaydavis312@gmail.com   312-399-9765

 linkedin.com/in/jaydavismd

## Summary

I am currently board-certified internal medicine having focused the entirety of an 18-year career on hospitalist medicine. I have been employed at Community Hospital in Munster, Indiana as part of the Community Care Network. My practice is based entirely in the in-patient setting where I serve as a primary care provider. To put it simply, I am a hospital doctor. My job is evaluate, diagnose and treat adult patients in all hospital settings including, but not limited to the emergency department, intensive care units, intermediate care units & general medical floors. I am charged with managing complicated patients, some with multiple concurrent issues, from admission to discharge. In my role I interact daily with multiple subspecialist physicians as we perform as a team to help our patients recover.

Board Certifications: Internal Medicine (2027)

Specialties: Management of hospitalized patients.

## Experience

 **Internal Medicine Hospitalist**

**Community Hospital- Munster, IN (April 2014- present)**

Vituity
December 2022- present

Community Care Network
Apr 2014 – November 2022 (8 years 7 months)
Management of adult inpatients.

**Internal Medicine/ Pediatrics Hospitalist**
Optimus Hospitalists & Pediatric Subspecialists
Sep 2004 - May 2013 (8 years 9 months)
Management of internal medicine & pediatric inpatients.

**Resident Physician**
University of Illinois
Jun 2000 - Jul 2004 (4 years 2 months)
Medical residency training at St. Francis Medical Center, Children's Hospital of Illinois, Methodist Medical Center, and Proctor Hospital.

John G. Davis - page 1



EXHIBIT
DAVIS
1
EXHIBIT 7

From 1997-2000, spent the final 3 years of medical school at the above sites as well.

**Athletic Complex Building Supervisor**
Washington University in St. Louis Athletic Department
Aug 1994 - May 1996 (1 year 10 months)

# Education

**University of Illinois College of Medicine**
M.D. 1996 - 2000

**Washington University in St. Louis**
BS, African and African American Science, Biology 1992 – 1996

# Licenses & Certifications

**Board Certified Internist** - American Board of Internal Medicine
Initial certification 2007. Re-certification Oct 2017. Renewal Oct 2027

# Medical Legal Experience

Indiana Medical Review Panels:

- *Jefffey Haines v. L Falotico DO, et. al* (IDOI Claim 1021188)

- *Lenda Dowdy, Personal Representative of the Estate of James Dowdy v. Michael G. Moore, M.D., et al.* (IDOI Claim 1020472)

EXHIBIT 7

## DISCLOSURE OF EXPERT DR. DAVIS FEES

**Expert Services** (including but not limited
to records review, expert report, deposition,
and deposition preparation):                                    $4000

1



EXHIBIT 7

April 27, 2023

Maria Makar
*LOEVY & LOEVY*
311 N. Aberdeen, 3rd Floor
Chicago, IL 60607

**RE:** *Ahmad Poole v. Dr. Evaristo Aguinaldo, Derek Jaburek, Alphonso Norman, and Tina Tomaras*

Dear Ms. Makar,

My report in the above-referenced matter follows:

Assignment:

I am asked to review written materials regarding the aforementioned case and render an opinion on the medical care given to Mr. Poole from the date of August 17, 2017, regarding his medical care at Stateville Correctional Center on and around that time.

I have also reviewed the previous report rendered by Dr. Beatty (Neurosurgeon, previous medical expert opinion).

Qualifications:

I am a licensed physician practicing as a hospitalist at Community Hospital in Munster, IN. I am board certified in Internal Medicine. I have not previously performed duties as a medical expert. I have, however, participated in several Indiana Medical Review Panels reviewing physicians' care in cases of malpractice claims.

My C.V. is attached as an exhibit.

Indiana Medical Review Panels:

- *Jefffey Haines v. L Falotico DO, et. al* (IDOI Claim 1021188)

- *Lenda Dowdy, Personal Representative of the Estate of James Dowdy v. Michael G. Moore, M.D., et al.* (IDOI Claim 1020472)

Material reviewed:

- Fourth Amended Complaint, *Poole v. Dr. Evaristo Aguinaldo, et al.*, 20-C-00014
- Grievance Documents IDOC 1-7
- Physician's note 8/17/2017 Doctor A. RTP 0749
- 03.16.22–8.17.17 to 8.30.17 medical notes
- Dr. Obaisi referral document Doctor A. RTP 0431
- Document transfer summary IDOC 08/30/2017 Poole 008-009
- Dr. Obaisi referral to St. Joseph's Doctor A. RTP 0751, Doctor A. RTP 0431



EXHIBIT

DAVIS

3

EXHIBIT 7

- St. Joseph's Physician Evaluation Doctor A. RTP 0952-0956
- Neck pain a ten at St. Joseph's 08/30/2017 Doctor A. RTP 0933
- UIC Admission documents Doctor A. RTP 0964-0968
- UIC Radiology reports Doctor A. RTP 1037-1041
- Wexford approval of surgery post-op visit Poole 078
- Medical records after surgery Doctor A. RTP 0865, Poole 009, Poole 053-056
- One year post op Poole 083
- X ray reports Doctor A. RTP 0718-0723
- Dr. Obaisi note 08/30/2017 (78000-019) 000256
- Dr. Evaristo Aguinaldo's Answers to Plaintiff's First Set of Requests for Admission
- Deposition of Dr. Aguinaldo
- Deposition of Dr. Mehta
- Deposition of Ahmad Poole
- Plaintiff Ahmad Poole's deposition transcript
- Dr. Ankit Mehta's deposition transcript
- Dr. Aguinaldo's deposition transcript
- Previous expert report rendered by Dr Beatty

The events:

On Thursday August 17, 2017, Mr. Poole had a physical altercation in his cell where he claims to have had his hair pulled, being placed in a headlock, and throttled by his cellmate before freeing himself. The conflict resulted in a laceration around his right eye requiring sutures. In addition, Mr. Poole complained of neck pain following the altercation. He notes that he informed several medical and nonmedical staff members regarding his neck symptoms. He described the pain as severe with associated symptoms of pain extending to his lower spine, weakness in his neck, 'popping sounds', etc. The physician, Dr. Aguinaldo, did not document neck exam at that time. No x-rays were performed at that time. C-collar was not placed at that time. The patient remained undiagnosed.

On August 19, Mr. Poole received a wound check for the eye laceration. Mr. Poole maintains that he continued to have neck issues. No x-rays were performed, c-collar was not placed at that time.

On Monday, August 21, Mr. Poole had blood drawn for lab work.

On Tuesday, August 22, Mr. Poole had several x-rays ordered including c spine films.

On Thursday, August 24, Mr. Poole had the sutures removed.

On Friday, August 25, Mr. Poole had his x-rays completed.

The note from Sunday, August 27 noted the positive findings on neck x-rays for C3-4 subluxation.

EXHIBIT 7

On Wednesday, August 30, Mr. Poole was referred to medical director Dr. Obaisi. This encounter documents neck exam. Mr. Poole was provided with c-collar at that time and sent to St. Joseph's Hospital for CT neck. CT neck was positive for C3-4 subluxation, right C3 facet fracture with perching on C4 facet. Mr. Poole was transferred to UI Health under an accepting neurosurgery team. Subsequent MRI confirmed diagnosis it was recommended that Mr. Poole have surgery to stabilize his spinal subluxation.

On September 6, 2017, Mr. Poole underwent surgical intervention to stabilize his injury. Since this time the patient has experienced chronic pain requiring medical management and physical therapy.

I hold the following opinions to a reasonable degree of medical certainty:

Mr. Poole did not have neck issues prior to August 17, 2017.

On August 17, 2017, Mr. Poole experienced neck trauma. He expressed concern for his neck to personnel available at the facility. Mr. Poole's history of the trauma, followed by complaints of pain in the neck with associated pain radiating to his spine, weakness holding his head, different sensations such as 'popping' are all symptoms concerning for spinal injury. Acutely, spinal subluxation causes can become worse and lead to catastrophic neurological injury. Chronically, spinal subluxation can lead to slowly worsening spinal issues and or pain. The associated facet fracture will acutely cause significant pain.

In these cases, the standard of care requires stabilizing the spine with a c-collar and requesting appropriate imaging in a timely manner. The event occurring on August 17 should have initiated a thorough workup of Mr. Poole's injuries at that time. The delay in the x-ray led to a cascade of delays that precluded Mr. Poole from receiving necessary surgical intervention for his neck injury until September 6, 2017.

The delay in diagnosis and treatment likely caused Mr. Poole unnecessary pain as a c-collar is both protective (to prevent worsening of the injury) and therapeutic (as immobilizing the injury helps reduce pain).

Mr. Poole continues to have pain requiring ongoing medical management. Earlier intervention for Mr. Poole's injury may well have improved his postoperative outcome.

It is my opinion within a reasonable degree of medical certainty that Dr. Aguinaldo breached the minimal standard of care as below:

Dr. Aguinaldo examined the patient on August 17, 2017. Given the history of present illness and the patient's subjective complaints, Mr. Poole should have received expedited imaging of his neck and should have immediately been provided with a stabilizing c-collar until such time as such imaging could be obtained. The delay of obtaining imaging of Mr. Poole's neck until August 25 breaches the standard of care. Failing to address the positive findings on cervical spine x-rays completed on August 25 until August 30 breaches the standard of care.

Dr. Aguinaldo also breached the standard of care with the lack of documentation in the medical record. Specifically, the "Subjective" or "S" portion of the record should document Mr.

EXHIBIT 7

Poole's physical complaints at the time of the encounter. The "Objective" or "O" portion of the record should document pertinent positive and pertinent negative findings per the physician's physical examination. (Physician's note 8/17/2017 Doctor A. RTP 0749.)

The delays described above caused an unnecessary delay in treatment. A delay in treatment gives said injury time to worsen and thus, possibly affects the surgical outcome as well as subjects Mr. Poole to sequela of chronic pain. When a bone fracture worsens from delays in treatment, or the bones are misaligned due to a failure to stabilize, the structural integrity of the tissue could be impacted. Such worsening or misalignment will cause the patient more pain and limitations on daily activities. It is my opinion that Mr. Poole's outcome would have been better had his initial encounters with Dr. Aguinaldo been different.

Best,

*JOHN G DAVIS M.D.*
JOHN G DAVIS M.D. (Apr 27, 2023 20:38 CDT)

John G. Davis, MD

EXHIBIT 7

# Final Expert Report - Dr. Davis

Final Audit Report                                                          2023-04-28

| | |
|---|---|
| Created: | 2023-04-28 |
| By: | Maria Makar (makar@loevy.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAbliwv5RОb7zEIfudr-FzLmdaEhX7a7Jf |

## "Final Expert Report - Dr. Davis" History

📄 Document created by Maria Makar (makar@loevy.com)
2023-04-28 - 1:22:46 AM GMT

📧 Document emailed to jaydavis12@msn.com for signature
2023-04-28 - 1:23:13 AM GMT

📄 Email viewed by jaydavis12@msn.com
2023-04-28 - 1:30:29 AM GMT

✍️ Signer jaydavis12@msn.com entered name at signing as JOHN G DAVIS M.D.
2023-04-28 - 1:38:51 AM GMT

✍️ Document e-signed by JOHN G DAVIS M.D. (jaydavis12@msn.com)
Signature Date: 2023-04-28 - 1:38:53 AM GMT - Time Source: server

✅ Agreement completed.
2023-04-28 - 1:38:53 AM GMT

 **Adobe Acrobat Sign**

EXHIBIT 7

1. Fourth Amended Complaint, *Poole v. Dr. Evaristo Aguinaldo, et al.*, 20-C-00014

2. Grievance Documents IDOC 1-7

3. Physician's note 8/17/2017 Doctor A. RTP 0749

4. 03.16.22–8.17.17 to 8.30.17 medical notes

5. Dr. Obaisi referral document Doctor A. RTP 0431

6. Document transfer summary IDOC 08/30/2017 Poole 008-009

7. Dr. Obaisi referral to St. Joseph's Doctor A. RTP 0751, Doctor A. RTP 0431

8. St. Joseph's Physician Evaluation Doctor A. RTP 0952-0956

9. Neck pain a ten at St. Joseph's 08/30/2017 Doctor A. RTP 0933

10. UIC Admission documents Doctor A. RTP 0964-0968

11. UIC Radiology reports Doctor A. RTP 1037-1041

12. Wexford approval of surgery post-op visit Poole 078

13. Medical records after surgery Doctor A. RTP 0865, Poole 009, Poole 053-056

14. One year post op Poole 083

15. X ray reports Doctor A. RTP 0718-0723

16. Dr. Obaisi note 08/30/2017 (78000-019) 000256

17. Dr. Evaristo Aguinaldo's Answers to Plaintiff's First Set of Requests for Admission

18. Previous expert report rendered by Dr. Beatty



EXHIBIT
DAVIS
4

EXHIBIT 7

1

EXHIBIT 7

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

AHMAD POOLE,                              )
                                          )
            Plaintiff,                    )    Case No. 20 C 00014
                                          )
      v.                                  )    Hon. Charles R. Norgle, Sr.
                                          )
DR. EVARISTO AGUINALDO, DEREK )
JABUREK, ALPHONSO NORMAN,                 )
and TINA TOMARAS,                         )
                                          )
            Defendants.                   )    JURY TRIAL DEMANDED

## FOURTH AMENDED COMPLAINT

Plaintiff, Ahmad Poole, by and through his attorneys, Loevy & Loevy,

complains of Defendants Dr. Evaristo Aguinaldo, Derek Jaburek, Alphonso

Norman, and Tina Tomaras, and states as follows:

### Introduction

1.      On August 17, 2017, Mr. Poole's cellmate grabbed Mr. Poole by his

dreadlocks and aggressively thrashed his head side to side, jerking, twisting, and

pulling Mr. Poole's head and neck, and put Mr. Poole in a headlock, using his arm to

squeeze Mr. Poole's neck with force.

2.      Following this attack, Mr. Poole repeatedly reported to Defendants

that he was in severe pain and believed something in his neck was broken. He

complained to Defendants that he felt and heard a popping sensation in his neck

EXHIBIT 7

when he moved, felt like something in his neck was out of place, had difficulty supporting his head, and felt pain shoot up and down his neck with every step.

3.      Defendants ignored Mr. Poole's complaints and refused to examine, treat, or refer Mr. Poole to a specialist for his neck injury. Because of Defendants' delay in evaluating or treating Mr. Poole, he needlessly suffered pain that was unnecessarily prolonged.

## Jurisdiction and Venue

4.      This Court has jurisdiction of the action pursuant to 28 U.S.C. §§ 1331.

5.      Venue is proper under 28 U.S.C. § 1391(b). On information and belief, Defendants reside in this judicial district, and the events giving rise to the claims asserted herein all occurred within this district.

## Parties

6.      Plaintiff Ahmad Poole is in the custody of the Illinois Department of Corrections (IDOC). At all times relevant to the events at issue in this case, Mr. Poole was housed at Stateville Correctional Center (Stateville).

7.      At all times relevant to his involvement in this case, Defendant Evaristo Aguinaldo was a physician at Stateville and an employee of Wexford. Defendant Aguinaldo is sued here in his individual capacity. At all times relevant to the events at issue in this case, Defendant Aguinaldo was acting under color of law and within the scope of his employment with Wexford.

8.      At all times relevant to his involvement in this case, Defendant Derek Jaburek was employed by the IDOC and worked at Stateville Correctional Center.

2

EXHIBIT 7

Defendant Jaburek is sued here in his individual capacity. At all times relevant to the issues in this case, Defendant Jaburek was acting under color of law and within the scope of his employment with the IDOC.

9.     At all times relevant to his involvement in this case, Defendant Alphonso Norman was employed by the IDOC and worked at Stateville Correctional Center. Defendant Norman is sued here in his individual capacity. At all times relevant to the issues in this case, Defendant Norman was acting under color of law and within the scope of his employment with the IDOC.

10.     At all times relevant to her involvement in this case, Defendant Tina Tomaras was a registered nurse at Stateville and an employee of Wexford. Defendant Tomaras is sued here in her individual capacity. At all times relevant to the events at issue in this case, Defendant Tomaras was acting under color of law and within the scope of her employment with Wexford.

### Allegations

11.     On August 17, 2017, Mr. Poole was meditating in his cell when his cellmate asked him a question. When Mr. Poole failed to answer his question quickly enough, the cellmate physically attacked Mr. Poole.

12.     During the fight that ensued, Mr. Poole's cellmate, who was approximately 230-240 pounds, grabbed Mr. Poole by his dreadlocks and aggressively thrashed his head side to side, jerking, twisting, and pulling Mr. Poole's head and neck, and eventually put Mr. Poole in a headlock, using his arm to squeeze Mr. Poole's neck with force.

3

EXHIBIT 7

13.     When correctional officers responded to the fight, Mr. Poole was lying on the floor of his cell, bleeding from a wound under his eye. When the correctional officers handcuffed Mr. Poole and stood him up, he immediately felt severe pain and intense pressure in his neck.

14.     Mr. Poole immediately told the correctional officers that something was wrong and that he was experiencing severe pain and pressure in his neck.

15.     Despite the obvious injuries to Mr. Poole's eye and neck, and the cellmate having no obvious injuries, Defendant Jaburek walked Mr. Poole's cellmate to the HCU first, simply because he was closer to the entry of the cell when Defendant Jaburek arrived.

16.     During the walk from Mr. Poole's cell to the Healthcare Unit (HCU), Mr. Poole told Defendant Jaburek that something was wrong with his neck, that it felt like something in his neck was popping, and that with every step and when he turned his head even slightly it felt like an electric shock went up and down his neck.

17.     When they arrived at the HCU, Defendant Jaburek placed Mr. Poole in a bullpen outside the HCU and took no further action to ensure that he received timely attention from medical staff. On information and belief, Defendant Jaburek did not inform medical staff of the radiating pain and pressure that Mr. Poole had notified Defendant Jaburek he was experiencing. Mr. Poole was left in the bullpen for more than one and a half hours without any medical attention or care.

4

EXHIBIT 7

18.     While he was waiting in the bullpen, Mr. Poole yelled towards the HCU that his neck was in severe pain and that he needed medical assistance immediately because he thought his neck was broken.

19.     Mr. Poole also sent several passing correctional officers to the HCU to find out why he wasn't getting medical care for the extreme pain and popping sound and sensation in his neck.

20.     During the hour and a half that Mr. Poole had to wait in the bullpen, none of the medical staff, including Defendants Aguinaldo and Tomaras, came out to the bullpen to address Mr. Poole's complaints about his neck.

21.     At no point did Defendant Jaburek, who was in the HCU waiting to escort Mr. Poole and his cellmate to segregation, intervene to ensure that Mr. Poole was given medical care while he was waiting in the bullpen.

22.     After an hour and a half, Defendant Tomaras finally came to the bullpen to see Mr. Poole. Defendant Tomaras looked at Mr. Poole's eye and informed him that he needed stitches.

23.     Mr. Poole told Defendant Tomaras that his neck was in extreme pain and that it hurt just trying to hold his head up. He explained that he felt the sensation of a shock running up and down his spine and that his neck felt "out of place" and made a popping sound when he took a step or moved his neck.

24.     Defendant Tomaras ignored Mr. Poole's complaints. Defendant Tomaras did not provide Mr. Poole with any medical care, examine Mr. Poole's neck, conduct any sort of assessment, or provide Mr. Poole with a brace for his neck.

5

EXHIBIT 7

Instead, Defendant Tomaras made Mr. Poole walk to the HCU, escorted by Defendant Jaburek.

25.     When he arrived in the HCU, Mr. Poole complained to Defendant Aguinaldo that he was in a fight and his cellmate grabbed him by his dreadlocks and thrashed him back and forth. Mr. Poole further explained that his cellmate put him in a headlock and pulled, jerked, and twisted his neck like he was trying to break it.

26.     Mr. Poole told Defendant Aguinaldo that he believed something in his neck was broken, and he repeatedly complained to Defendant Aguinaldo of severe pain, difficulty keeping his head up, and a popping sound and sensation when he moved his neck. Defendant Aguinaldo ignored Mr. Poole's complaints.

27.     When Mr. Poole attempted to lie back on the examination table so Defendant Aguinaldo could put stitches in the wound under his eye, he felt extreme pain and could not support his own head. To lie down, a nurse had to support Mr. Poole's head for him. A nurse also had to lift and support Mr. Poole's head when he was instructed by Defendant Aguinaldo to return to a sitting position.

28.     Defendant Aguinaldo told Mr. Poole to "stop faking it" and told him "there's nothing wrong with you," or words to that effect.

29.     Mr. Poole asked Defendant Aguinaldo for an x-ray, and Defendant Aguinaldo responded that there was no x-ray technician.

30.     Defendant Aguinaldo failed to provide an adequate examination of the area where Mr. Poole complained of severe pain. A proper examination based on the

EXHIBIT 7

complaints Mr. Poole was reporting would have informed Defendant Aguinaldo that Mr. Poole required the use of a brace or other supportive device for his neck. Yet Defendant Aguinaldo did not examine Mr. Poole's neck injury, provide him with a neck brace or any other treatment for his neck, or arrange for Mr. Poole to be seen by a specialist.

31.     When Defendant Aguinaldo was done stitching Mr. Poole's eye, Defendant Jaburek handcuffed Mr. Poole and escorted him to segregation. Mr. Poole was not given a brace, pillow, or any other support for his neck.

32.     The pain in Mr. Poole's neck continued to worsen. Mr. Poole could not eat, sleep, or wash himself due to the extreme pain, and it continued to get more difficult to move. Every time Mr. Poole's neck moved, it felt like an electric shock and like something was out of place. The only minor relief Mr. Poole could get was when he supported his head with both hands while laying down.

33.     On August 19, 2017, Mr. Poole received a pass for an appointment in the HCU to have the dressings on his stitches changed.

34.     Mr. Poole was handcuffed behind his back for the walk to the HCU. Every step was excruciatingly painful.

35.     At the HCU, Mr. Poole was seen by Defendant Tomaras. Defendant Tomaras briefly looked at Mr. Poole's eye and told the escorting officer to "take him back," or words to that effect. Mr. Poole complained to Defendant Tomaras about the extreme pain in his neck and the symptoms he continued to suffer, but she ignored him and gestured to the escorting officer to take Mr. Poole away. Defendant

7

EXHIBIT 7

Tomaras did not provide Mr. Poole with any medical care, arrange for Mr. Poole to be seen by a specialist, or even alert a doctor to Mr. Poole's symptoms. Instead, she sent Mr. Poole back to his cell.

36.     On August 21, 2017, Mr. Poole was at the HCU for bloodwork following the fight. Mr. Poole complained to two nurses, Nurses Stephanie and Paige, about the popping sounds and severe pain in his neck. He further reported that something felt out of place and that he experienced shocking pains up and down his neck. Mr. Poole also complained that he still had not been given or scheduled for an x-ray. Both nurses examined Mr. Poole and felt the popping in his neck, but they said that they did not believe that there was an x-ray technician available because the one that was on site had left. Mr. Poole was returned to segregation.

37.     On August 22, 2017, Mr. Poole received a pass for an x-ray. Mr. Poole sat in the bullpen outside the HCU for approximate four to five hours without a neck brace or any other support for his neck, but his x-ray was inexplicably cancelled. Mr. Poole did not receive an x-ray or see any medical personnel that day.

38.     On August 24, 2017, Mr. Poole received a pass to the HCU to have the stitches under his eye removed. While at the HCU, Mr. Poole again complained to Defendant Aguinaldo that there was a popping sound and severe pain in his neck every time he took a step or moved his head in any way. Mr. Poole further explained that it felt like an electric current running through his neck, and that he had to support his neck with both hands to stabilize it. Defendant Aguinaldo told Mr. Poole that "nothing is wrong with you, stop acting," or words to that effect. Defendant

EXHIBIT 7

Aguinaldo did not provide any examination or treatment to Mr. Poole and did not seek a referral for evaluation or treatment by a specialist.

39.     On or about August 25, 2017, eight days after Mr. Poole's fight with his cellmate, Mr. Poole finally received an x-ray of his neck. After the x-ray, Mr. Poole was taken back to segregation.

40.     On August 28, 2017, Mr. Poole received an HCU pass for a follow-up with Defendant Aguinaldo. Mr. Poole was handcuffed behind his back and escorted to the HCU.

41.     Defendant Aguinaldo read Mr. Poole the test results of the bloodwork he received and stated that everything was "fine." Defendant Aguinaldo then reviewed the x-ray technician's report, became very apprehensive, and stated that "your injury is nothing, and it will heal on its own," or words to that effect.

42.     Mr. Poole repeated to Defendant Aguinaldo all of the symptoms he had been continually experiencing and that had been worsening since August 17, 2017. Defendant Aguinaldo laughed at Mr. Poole and told him to "stop acting like a baby, you'll be out of segregation soon," or words to that effect. Defendant Aguinaldo then told Mr. Poole that he had a fracture in his neck "but it wasn't bad" and he wouldn't need surgery. Mr. Poole asked Defendant Aguinaldo to submit a request for Mr. Poole to see the Medical Director because Defendant Aguinaldo was not a specialist. Defendant Aguinaldo did not arrange for Mr. Poole to be seen by a specialist or provide him with any meaningful examination or treatment, even after learning of the fracture in Mr. Poole's neck. Instead, he sent Mr. Poole back to segregation.

9

EXHIBIT 7

43.     On August 30, 2017, Mr. Poole received a pass to see Dr. Obaisi. When Mr. Poole arrived at the HCU, Dr. Obaisi had no idea why Mr. Poole was there to see him. Mr. Poole described the August 17 incident and told Dr. Obaisi about what Defendant Aguinaldo told him about the x-ray results and technician report. Dr. Obaisi said neither the x-ray nor the technician report was in Mr. Poole's medical records and sent a nurse to retrieve them.

44.     After Dr. Obaisi reviewed the x-rays and technician's report, he filled out some forms and made a phone call. Mr. Poole could hear Dr. Obaisi on the phone telling an outside hospital that he had a patient with an injury that needed a CAT scan and an MRI to determine whether there were additional injuries. Dr. Obaisi then gave Mr. Poole a neck brace and informed him that he was immediately being sent to the emergency room at St. Joseph's Hospital.

45.     Defendant Norman and correctional officer Hatchet arrived at the HCU to escort Mr. Poole to the hospital. Dr. Obaisi instructed them to call for an ambulance, but Defendant Norman refused and told Dr. Obaisi he would drive Mr. Poole himself. Mr. Poole overheard Defendant Norman comment to Officer Hatchet that driving Mr. Poole to the hospital would mean "extra money for me." Dr. Obaisi also instructed Defendant Norman and Officer Hatchet to get a wheelchair for Mr. Poole, but again, Defendant Norman refused and said that Mr. Poole could walk.

46.     After leaving the HCU, Defendant Norman shackled Mr. Poole from his ankles to his wrists and forced Mr. Poole to walk from the HCU to the parking lot where the vans were located. When Officer Hatchet offered to pull the van up to

EXHIBIT 7

the door, Defendant Norman refused and said that Mr. Poole could walk. All of this unnecessary walking caused Mr. Poole extreme and unnecessary pain.

47.     During the drive to St. Joseph Hospital, Mr. Poole was not belted into the vehicle. Despite Mr. Poole's serious injury, Officer Hatchet drove erratically in a way that forced Mr. Poole to be unnecessarily thrown back and forth in the back of the vehicle. Defendant Norman did nothing to intervene to stop Officer Hatchet from driving erratically.

48.     Mr. Poole presented to St. Joseph's Hospital and received a CAT Scan. Mr. Poole was informed that his neck injury was serious and that he would be immediately transferred to University of Illinois (UOI) for surgery.

49.     The medical staff at St. Joseph's Hospital asked Defendant Norman if they needed an ambulance to transport Mr. Poole to UOI. Defendant Norman, despite having no adequate medical training, responded that Mr. Poole would not require an ambulance. Once they were in the van, Defendant Norman again told Officer Hatchet that they would "get plenty of overtime out of this trip," or words to that effect. Officer Hatchet drove erratically, unnecessarily speeding up and abruptly hitting the breaks, which made the drive to UOI exceptionally painful. Defendant Norman again failed to intervene to stop Officer Hatchet from driving erratically, causing Mr. Poole unnecessary pain.

50.     At UOI, Mr. Poole underwent additional testing, including an MRI. The MRI showed that Mr. Poole had a fracture at the C3 facet of his spine, and abnormal alignment of the bones at the C3-C4 level.

EXHIBIT 7

51.     Mr. Poole was admitted to UOI and had surgery on September 6, 2017.
A posterior fixation device was attached with four screws at the C3 and C4
vertebral levels, and a C3-C4 laminectomy was performed, meaning a portion of the
vertebral bone had to be removed.

52.     Because of Defendants' refusal to properly examine and treat Mr.
Poole's fractured neck, Mr. Poole suffered extreme pain unnecessarily, potentially
exacerbating his injury. Mr. Poole continues to experience pain in his neck,
including nerve pain, and is unable to lift weights and exercise at the level he could
before his neck injury. Mr. Poole is also unable to turn his head completely to the
right, and basic tasks like cooking, which require Mr. Poole to bend his neck slightly
downward for even a short period of time, cause Mr. Poole a lot of pain.

## COUNT I
### 42 U.S.C. § 1983 – Denial of Medical Care (Eighth Amendment)
### All Defendants

4.     Plaintiff incorporates each paragraph of this Second Amended
Complaint as if fully restated here.

5.     As described more fully above, Defendants had notice of Mr. Poole's
medical needs and the seriousness of his medical needs, and knew the risk of harm
to Mr. Poole if he did not receive appropriate medical care. Despite that knowledge,
Defendants failed to provide him with any proper medical care or access to medical
care, in violation of the Eighth Amendment to the United States Constitution.

6.     As a result of Defendants' unjustified and unconstitutional conduct,
Mr. Poole experienced pain, suffering, emotional distress, and injury.

12

EXHIBIT 7

7.     The misconduct described in this Count was objectively unreasonable

and was undertaken intentionally, with malice, and/or with reckless indifference to

Mr. Poole's rights.

8.     Alternatively, Defendants were deliberately indifferent to Mr. Poole's

objectively serious medical needs, and their actions were undertaken intentionally,

with malice, and/or with reckless indifference to Mr. Poole's rights.

**COUNT II[1]**
**42 U.S.C. § 1983 – Failure to Intervene (Eighth Amendment)**
**Defendants Norman and Jaburek**

9.     Plaintiff incorporates each paragraph of this Second Amended

Complaint as if fully restated here.

10.     As described more fully above, Defendants had a reasonable

opportunity to prevent the violation of Mr. Poole's constitutional rights as set forth

above had they been so inclined, but failed to do so.

11.     Defendants' failures to act were intentional, done with malice, and/or

done with reckless indifference to Mr. Poole's rights.

12.     As a direct and proximate result of Defendants' misconduct, Mr.

Poole's rights were violated and he suffered injuries, including pain, suffering, and

emotional distress.

13.     Mr. Poole's injuries were caused by employees of the IDOC and

Wexford, including but not limited to the individually named Defendants, who acted

pursuant to the policies and practices described more fully above.

---

[1] Plaintiff understands that pursuant to Dkt. 75, the Court has dismissed Count II as against
Defendants Aguinaldo and Tomaras. The parties agree that Plaintiff's failure-to-intervene claim
against these Defendants is preserved for appellate review pursuant to *Bastian v. Petren Resources
Corp*, 892 F.2d 680, 683 (7th Cir. 1990).

EXHIBIT 7

Wherefore, Plaintiff Ahmad Poole respectfully requests that this Court enter

a judgment in his favor and against Defendants Dr. Evaristo Aguilado, Derek

Jaburek, Alphonso Norman, and Tina Tomaras, awarding compensatory damages,

punitive damages, injunctive relief, attorneys' fees and costs, and any other relief

this Court deems just and appropriate.

### JURY DEMAND

Plaintiff Ahmad Poole hereby demands a trial by jury pursuant to Rule 38(b)

of the Federal Rules of Civil Procedure on all issues so triable.

Dated: March 4, 2022                    Respectfully submitted,

                                        /s/ Isabella Aguilar
                                        *One of Plaintiff Poole's Attorneys*

                                        Jon Loevy
                                        Sarah Grady
                                        Isabella Aguilar
                                        LOEVY & LOEVY
                                        311 North Aberdeen St., 3rd Floor
                                        Chicago, Illinois 60607
                                        (312) 243-5900

EXHIBIT 7

2

EXHIBIT 7

K95348  POOLE, AHMAD          **IGRV Inmate History**

| Igrv Code | Hearing/Rec Date | Igrv Loc | Hearing Loc | Chair Code | Mail Code | Comments Field |
|-----------|------------------|----------|-------------|------------|-----------|----------------|
| MEDICAL | 01/08/2018 | STA | STA | DEKN | G | GRV# H572. DTD 9/22/17 GRVS MED TX RECEIVED FOR NECK INJURY THAT OCCURI |
| PP | 09/23/2016 | STA | STA | LIQU | G | GRV# 2953. GRVS PP TAKEN DURING SHAKEDOWN BY TACT UNIT. PP (WALKMAN) H |
| PP | 09/08/2016 | STA | STA | LIQU | G | GRV 3359. REQUESTS REIMBURSED FOR ITEMS TAKEN DURING SHAKEDOWN. REI |

**IDOC000001**

EXHIBIT 7

Bruce Rauner
Governor



John Baldwin
Acting Director

## The Illinois Department of Corrections

1301 Concordia Court. P.O. Box 19277 • Springfield. IL 62794-9277 • (217) 558-2200 TDD: (800) 526-0844

Offender: _Poole, Ahmad_                           _1/8/18_
                                                    Date

ID# : _K95348_

Facility: _Stateville_

This is in response to your grievance received on _1/3/18_. This office has determined the issue will be addressed without a formal hearing. A review of the Grievance, Grievance Officer/CAO response to the grievance has been conducted. For a grievance that is direct review by the ARB, a review of the Grievance has been conducted.

Your issue regarding: Grievance dated: _9/22/17_   Grievance Number: _H572_   Griev Loc: _Stateville_

- [ ] Transfer denied by the Facility
- [ ] Dietary _____
- [ ] Personal Property _____
- [ ] Mailroom/Publications _____
- [ ] Assignment (job, cell) _____
- [ ] Commissary / Trust Fund _____
- [ ] Conditions (cell conditions, cleaning supplies, etc.) _____
- [ ] Disciplinary Report: Dated: _____ Incident # _,_
- [x] Other _Medical - treatment received for neck injured 8/17/17_

Based on a review of all available information, this office has determined your grievance to be:

- [ ] Affirmed, Warden _____ is advised to provide a written response of corrective action to this office by _____.
- [ ] Denied, in accordance with DR504F, this is an administrative decision.
- [x] Denied, this office finds the issue was appropriately addressed by the facility Administration.
- [ ] Denied as the facility is following the procedures outlined in DR525.
- [ ] Denied as procedures were followed in accordance with DR 420 for removal/denial of an offender from/for an assignment.
- [ ] Denied as this office finds no violation of the offender's due process in accordance with DR504.80 and DR504.30. This office is reasonably satisfied the offender committed the offense cited in the report.
- [ ] Other: _Medical records reflect offender assessed and provided medical treatment deemed necessary by the facility medical staff._

FOR THE BOARD: _Debbie Knauer_          CONCURRED: _John R. Baldwin_   1/9/18
                Debbie Knauer                          John R. Baldwin
                Administrative Review Board            Acting Director

CC: Warden, _Stateville_ Correctional Center
    _Poole_ , ID# _K95348_

*Mission: To serve justice in Illinois and increase public safety by promoting positive change in offender behavior, operating successful reentry programs, and reducing victimization.*

www.illinois.gov/idoc          **IDOC000002**

EXHIBIT 7

ILLINOIS DEPARTMENT OF CORRECTIONS
**RESPONSE TO COMMITTED PERSON'S GRIEVANCE**

E519

| Grievance Officer's Report | |
|---|---|

Date Received: 10/05/17      Date of Review: 12/11/17      Grievance # H572

Committed Person: Ahmad Poole      ID #: K95348

Nature of Grievance: Medical Treatment

**Facts Reviewed:** Grievant claims on a grievance dated 9/22/17 that he and his cell mate had a physical altercation on 8/17/17 after which he was escorted to the Health Care Unit by Lt. Jaburek. Offender claims that his neck was making popping sounds and he had a cut under his eye and he was examined by a nurse and Dr. Aguinaldo and given stiches. Offender was seen in the Health Care Unit on 8/19/17 to have the dressing changed under his eye. Offender claims that he received a pass for X-ray on 8/22/17 but it was cancelled. Offender claims that he was seen by Dr. Aguinaldo on 8/24/17 and discussed issues with his neck and had X-rays taken on 8/25/17. Offender claims that he was seen by Dr. Aguinaldo for follow up on 8/28/17 and told that he had a fracture in his neck which wouldn't need surgery. Offender claims that he was seen by Medical Director Dr. Obaisi on 8/30/17 and sent to St. Joseph's Hospital where he was given a CT scan. Offender claims that he was transferred to UIC Hospital where he was given an MRI, had surgery where a plate and 2 screws were implanted in his neck and bones were fused together. Offender claims that he did not receive proper medical attention from Dr. Aguinaldo.

Grievance Officer finds according to Health Care Unit staff "After reviewing offender's medical record. He was seen the day it happened 8/17/17; followed up on 8/21/17, still waiting for X-ray to be done; 8/24/17 to get stitches out; and 8/28/17 referred to medical director. X-ray was done on 8/22/17, read on 8/27/17 by radiologist. Seen by Dr. Obaisi on 8/30/17, sent to local hospital."

*Grievance Officer has no medical expertise or authority to contradict the doctor's/DON's/RN's recommendation / diagnosis.*

**Recommendation:**      **DENIED** as grievant appears to be receiving medical care at this time.

David Mansfield, CCII          *David Mansfield, CC II*
Print Grievance Officer's Name        Grievance Officer's Signature
(Attach a copy of Committed Person's Grievance, including counselor's response if applicable)

| Chief Administrative Officer's Response | |
|---|---|

Date Received: 12.12.17    ☒ I concur    ☐ I do not concur    ☐ Remand

Comments:

Chief Administrative Officer's Signature                   12.12.17
                                                          Date

**RECEIVED**

JAN 03 2018

ADMINISTRATIVE
REVIEW BOARD

EXHIBIT 7

10 of 4 PAGES

ILLINOIS DEPARTMENT OF CORRECTIONS
**OFFENDER'S GRIEVANCE**

| Date: 9/22/17 | Offender: (Please Print) AHMAD Poole | IDs: K95348 |

| Present Facility: STATEVILLE | Facility where grievance issued occurred: STATEVILLE |

**NATURE OF GRIEVANCE**

- [ ] Personal Property
- [ ] Mail Handling
- [ ] Restoration of Good Time
- [ ] ADA Disability Accommodation
- [x] Staff Conduct
- [ ] Dietary
- [x] Medical Treatment
- [ ] HIPAA
- [ ] Transfer Denial by Facility
- [ ] Transfer Denial by Transfer Coordinator
- [ ] Other (specify):

- [ ] Disciplinary Report: ____/____/____
  Date of Report

Note: Protective Custody Denials may be grieved immediately via the local administration on the protective custody status notification.

Complete: Attach a copy of any pertinent document (such as a Disciplinary Report, Shakedown Record, etc.) and send to:
Counselor, unless the issue involves discipline, is deemed an emergency, or is subject to direct review by the Administrative Review Board.
Grievance Officer, only if the issue involves discipline at the present facility or issue not resolved by Counselor.
Chief Administrative Officer, only if EMERGENCY grievance.
Administrative Review Board, only if the issue involves transfer denial by the Transfer Coordinator, protective custody, involuntary administration of psychotropic drugs, issues from another facility except personal property issues, or issues not resolved by the Chief Administrative Officer.

Summary of Grievance (Provide information including a description of what happened, when and where it happened, and the name or identifying information for each person involved): ON THE ABOVE DATE 9/17/17 AND SAW IT 3-11 ME AND MY CELL MATE GOT INTO A PHYSICAL ALTERCATION SGT K SMITH AND C/O ANISTASIO BROKE UP THE FIGHT. I WAS THEN ESCORTED TO THE HEALTHCARE FACILITY BY LT TABUREK. I TOLD LT TABUREK THAT IT FELT LIKE SOMETHING WAS BROKE IN MY NECK BC EVERYTIME I TRY TO TURN AND HEAR A POPPING SOUND, NOT ONLY THAT IT HURT EXTREMELY BAD JUST TO HOLD MY HEAD UP. IF I TURNED MY NECK TO FAST I COULD NEVER FEEL AN ELECTRIC CURRENT SHOOTED AND DOWN THE SPINE IN MY NECK. LT TABUREK PUT ME IN THE OUTSIDE BULLPEN AND LEFT ME THERE FOR 25 TO 30 MIN. I BEGAN TO HOLLER TO GET SOMEONES ATTENTION BC THE PAIN WAS SEVERE AND I NEEDED IMMEDIATE MEDICAL ASSISTANCE. MAJOR SAUVER CROSSED MY PATH AND I EXPLAINED TO HIM WHAT MY ISSUE WAS. MAJOR SAUVIER WENT TO HEALTHCARE AND EVALUATED

Relief Requested: TO HAVE DR ASUWUAND REPRIMANDED SUSPENDED FOR 1 MONTH WITH NO PAY, C/O NORMAN REPRIMANDED-SUSPENDED FOR 2 WEEKS WITH NO PAY

- [ ] Check only if this is an EMERGENCY grievance due to a substantial risk of imminent personal injury or other serious or irreparable harm to self.

| ahmad Poole | K95348 | 9,22,17 |
| Offender's Signature | IDs | Date |

(Continue on reverse side if necessary)

---

**Counselor's Response (if applicable)**

Date Received: 10, 3, 17

- [ ] Send directly to Grievance Officer
- [ ] Outside jurisdiction of this facility. Send to Administrative Review Board, P.O. Box 19277, Springfield, IL 62794-9277

Response: A copy of this grievance has been forwarded to the HCU ADR for review and response and the original grievance has been forwarded to the grievance office. DO NOT send your copy to the HCU or the Grievance Officer. You will receive a final response when HCU responds to same.

| A RICSPY | | 10 3, 17 |
| Print Counselor's Name | Counselor's Signature | Date of Response |

---

RECEIVED JAN 03 2018 ADMINISTRATIVE REVIEW BOARD

**EMERGENCY REVIEW**

Date Received: ____/____/____

Is this determined to be of an emergency nature?

- [ ] Yes; expedite emergency grievance.
- [ ] No; an emergency is not substantiated. Offender should submit this grievance in the normal manner.

| | |
| Chief Administrative Officer's Signature | Date |

Distribution: Master File; Offender          Page 1          DOC 0046 (8/2012)

Printed on Recycled Paper

IDOC000004

EXHIBIT 7

ILLINOIS DEPARTMENT OF CORRECTIONS
**OFFENDER'S GRIEVANCE** (Continued)

THE SGT MONTEZ. ON THE PROBLEM. ONCE MAJOR SAWYER LEFT SGT MONTEZ LEFT ME. OUT IN THE BULLPEN AFTER CONSTANTLY HAVING OFFICERS KNOCK ON THE DOOR SGT MONTEZ TOLD ME. I HAD TO WAIT UNTIL THEY GOT THE DIARY UMP, OR SHORTLY AFTER NURSE TINA CAME OUT TO EXAMINE MY INJURIES SHE CHECKED THE CUT BENEATH MY EYE, AND ASKED ME WHAT IS THE ISSUE WITH MY NECK, I TOLD HER ABOUT THE POPPING SOUNDS IT WAS MAKING WHEN MY LEAD HOW EXTREMELY BAD IT HURT JUST TO HOLD IT UP, HOW IT FELT OUT OF PLACE AND IT MOVED, I COULD FEEL ALL ELECTRIC CURRENT RUNNING UP AND DOWN MY NECK, I WAS THEN ESCORTED TO THE BACK OF THE HEALTHCARE BY DR JABURIC, I WAS ASKED TO SIT DOWN BY DR AGUINALDO ON THE MEDICAL BED, HE ASKED ME TO EXPLAIN MY INJURIES, I DID SO AND OBVIOUSLY HE COULD SEE THE CUT BENEATH MY EYE, I TOLD HIM ABOUT THE FIGHT WITH THE CELLMATE, HOW HE TWISTED AND PULLED ON MY HAIR THAT LED TO ME BEING IN A HEADLOCK, HOW HE JERKED, TWISTED AND PULLED ON MY NECK AS IF TRYING TO BREAK IT DR AGUINALDO ASKED ME TO LIE DOWN, SO HE CAN PROCEED TO PUT THE STITCHES BENEATH MY EYE, I COULDN'T LIE DOWN ON MY OWN, SO ONE OF THE NURSE ASSISTANTS HELD MY HEAD FOR ME. AFTER DR AGUINALDO WAS FINISHED PUTTING MY STITCHES IN I ASKED HIM ABOUT MY NECK, HE TOLD ME TO STOP TAKING, NOTHING IS WRONG WITH ME, I ASKED FOR A X-RAY, HE SAID THERE WAS NO X-RAY TECHNICIAN. AND ASKED ME TO MOVE MY FINGERS, ARMS AND LEGS AND ASKED DO I FEEL ANY NUMBNESS, HE STATED I WAS JUST FEELING THE SORE-NESS FROM THE FIGHT AND IN A COUPLE DAYS IT WOULD GO AWAY, DR AGUINALDO DIDN'T GIVE ME A NECK BRACE I WAS HANDCUFFED TO THE BACK AND WALKED TO THE SEGREGATION UNIT BY IT. JABURIC, I RECIEVED NO PILLOW IN SEGREGATION, AND COULDN'T SLEEP. IF MY NECK WENT INTO THE WRONG POSITION IT FELT AS IF I WAS BEING ELECTRICUTED IN MY NECK, THE ONLY WAY THE PAIN WOULD STOP WAS IF I GRACED MY HEAD WITH BOTH MY HANDS AND SHIFT MY NECK BACK IN PLACE AND YOU COULD HEAR IT SHIFT BACK IN PLACE FOR THE NEXT 2 DAYS THE PAIN GOT WORSE, I COULDN'T EAT SLEEP, WASH UP AND IT WAS DIFFICULT FOR ME TO MOVE, 8/19/17 I RECIEVED A APPOINTMENT TO HAVE A DRESSING CHANGE FOR THE STITCHES, ONCE I MADE IT TO HEALTHCARE NURSE TINA LOOKED AT MY EYE, AND SAID SEND HIM BACK WHEN I TRIED TO EXPLAIN TO HER ABOUT MY NECK, BUT SHE IGNORED ME. I WAS THEN ESCORTED BACK TO SEGREGATION, 8/21/17 I WAS SCHEDULED TO HAVE BLOODWORK DONE AT HEALTHCARE FROM THE FIGHT, STEPHANIE DID THE PROCEDURE, I TOLD HER ABOUT THE SITUATION WITH MY NECK FROM THE POPPING SOUND, THE WAY IT FELT OUT OF PLACE, AND HOW I FELT IN OUT SHOCKING PAINS RUNNING UP AND DOWN MY NECK, NURSE PAIGE CAME INTO GIVE THE MEDS FIRST, AND I EXPLAINED TO HER THE MATTER ALSO AND STILL NOT RECIEVING A X-RAY, STEPHANIE AND PAIGE BOTH STATED THERE'S NO EVERYDAY X-RAY TECHNICIAN B/C THE ONE THAT WORK HERE LEFT, 8/22/17 RECIEVED A PASS FOR X-RAY, BUT IT WAS LATER CANCELLED, FIVE DAYS AFTER THE INCIDENT AND STILL NO X-RAY WITH ALL THE PAIN COMPLICATIONS, 8/24/17 I RECIEVED A PASS TO HAVE THE STITCHES REMOVED, DR AGUINALDO DECIDED NOT TO REMOVE THEM AND HAD ONE OF THE NURSE ASSISTANTS TO REMOVE THEM AFTER THE ASSISTANT WAS DONE I EXPLAINED TO DR AGUINALDO AGAIN FOR THE SECOND TIME THE PROBLEMS I WAS HAVING WITH MY NECK. THE POPPING SOUND, THE FEELING OF ELECTRIC CURRENT RUNNING THROUGH MY NECK IF MOVED THE WRONG WAY, HOW I HAD TO BRACE MY NECK WITH BOTH HANDS TO STABILIZE IT, ONCE AGAIN DR AGUINALDO IGNORED ME MEDICAL ASSISTANCE AND STATED NOTHING IS WRONG WITH ME STOP ASKING I WAS THEN ESCORTED BACK TO SEGREGATION, 8/25/17, I WAS FINALLY CALLED FOR A X-RAY AT NRC EIGHT DAYS LATER THE X-RAY TECHNICIAN TOOK AS MANY PICTURES AS NECESSARY SHE NEEDED, FROM MANY DIFFERENT ANGLES, AFTER SHE WAS DONE, I ASKED FROM HER EXPERIENCE COULD SHE TELL ME HAS ANY DAMAGE BEEN DONE TO MY NECK, SHE STATED FROM HER VIEW BUT

DOC 0046 (8/20)

Distribution: Master File; Offender       Printed on Recycled Paper

3 of 4 PAGES

ILLINOIS DEPARTMENT OF CORRECTIONS
## OFFENDER'S GRIEVANCE

| Date: 9/22/17 | Offender: (Please Print) AHMAD Poole | ID#: K-95348 |
| Present Facility: | | Facility where grievance issue occurred: |

**NATURE OF GRIEVANCE:**

- [ ] Personal Property
- [x] Staff Conduct
- [ ] Transfer Denial by Facility
- [ ] Mail Handling
- [ ] Dietary
- [ ] Transfer Denial by Transfer Coordinator
- [ ] Restoration of Good Time
- [x] Medical Treatment
- [ ] ADA Disability Accommodation
- [ ] HIPAA
- [ ] Other (specify):

- [ ] Disciplinary Report: _____ / _____ / _____
  Date of Report                    Facility where issued

Note: Protective Custody Denials may be grieved immediately via the local administration on the protective custody status notification.

Complete: Attach a copy of any pertinent document (such as a Disciplinary Report, Shakedown Record, etc.) and send to:
Counselor, unless the issue involves discipline, is deemed an emergency, or is subject to direct review by the Administrative Review Board.
Grievance Officer, only if the issue involves discipline at the present facility or issue not resolved by Counselor.
Chief Administrative Officer, only if EMERGENCY grievance.
Administrative Review Board, only if the issue involves transfer denial by the Transfer Coordinator, protective custody, involuntary
administration of psychotropic drugs, issues from another facility except personal property issues, or issues not resolved by the Chief
Administrative Officer.

Summary of Grievance (Provide information including a description of what happened, when and where it happened, and the name or identifying information for each person involved): EVERYTHING WAS FINE AND SHE WOULDN'T LET THE DEPUTIES TELL MR. I WAS THEN ESCORTED BACK TO SEGREGATION. 8/28/17 I RECIEVED A FOLLOW UP APPEARANCE WITH DR. ABUINIDO. HE REVIEWED THE DOCUMENTS TO THE BLOODWORK THAT WAS DONE. HE STATED EVERYTHING WAS FINE, WHEN IT CAME TIME TO READ THE X-RAY TECHNICIANS REPORT AND REVIEW THE X-RAYS FOR MY NECK. HE WAS VERY APPREHENSIVE, AND STATED THE INTERIA WAS NOTHING AND THAT IT WOULD HEAL ON ITS OWN. WHEN I REITERATED WHAT I'VE BEEN SAYING SINCE THE DAY OF THE INCIDENT 8/17/17 ABOUT THE POPPING SOUND FEELING LIKE I WAS BEING CHOKED AND HOW IT HURTED TO JUST SIT IT UP IN A REGULAR POSITION FOR A LONG PERIOD OF TIME. HE TOLD ME TO STOP ACTING LIKE A BABY, AND I'LL BE OUT OF SEGREGATION SOON. HE STATED I HAD A FRACTURE IN MY NECK BUT IT WASN'T BAD AND I WOULDN'T NEED SURGERY.

Relief Requested: _____

- [ ] Check only if this is an EMERGENCY grievance due to a substantial risk of imminent personal injury or other serious or irreparable harm to self.

| ahmad Poole | K-95348 | 9, 22, 17 |
| Offender's Signature | ID# | Date |

(Continue on reverse side if necessary)

---

### Counselor's Response (if applicable)

| Date Received: _____ / _____ / _____ | [ ] Send directly to Grievance Officer | [ ] Outside jurisdiction of this facility. Send to Administrative Review Board, P.O. Box 19277, Springfield, IL 62794-9277 |

Response: _____

| Print Counselor's Name | Counselor's Signature | Date of Response |

---

### EMERGENCY REVIEW

RECEIVED
JAN 03 2018
ADMINISTRATIVE REVIEW BOARD

| Date Received: _____ / _____ / _____ | Is this determined to be of an emergency nature? | [ ] Yes; expedite emergency grievance [ ] No; an emergency is not substantiated. Offender should submit this grievance in the normal manner. |

_____ / _____ / _____
Chief Administrative Officer's Signature                    Date

Distribution: Master File; Offender                 Page 1                 DOC 0046 (8/2012)
Printed on Recycled Paper

IDOC000006

EXHIBIT 7

4 of 4 PAGES

HE SENT ME IN TO SEE THE MEDICAL DIRECTOR B/C HE WASN'T A BONE SPECIALIST. THIS WAS THE THIRD TIME I SEEN DR AGUINALDO, AND EACH TIME HE TOOK MY INJURY/COMPLAINTS AS A JOKE AND DENIED ME THE PROPER MEDICAL TREATMENT. SINCE THE DAY OF THE INCIDENT 8/17/17 HE DIDN'T SEND ME OUT FOR X-RAY NOR DID HE GIVE ME A NECK BRACE. AFTER OUR FOLLOW UP APPOINT-MENT DR AGUINALDO STILL DIDN'T ISSUE ME A NECK BRACE. I WAS THEN ESCORTED BACK TO SEGREGATION WITH A FRACTURE IN MY NECK, THAT I'VE BEEN MOVING BACK + FORTH WITH UNPROTECT-ED FOR ELEVEN DAYS. 8/30/17 RECIEVED A PASS TO SEE THE MEDICAL DIRECTOR DR. OBAISI WHO HAD NO IDEA WHY I WAS THERE, AND STATED HE JUST SEEN ME, WHEN HE DIDN'T. HE DIDN'T EVEN HAVE THE RIGHT DOCUMENTS FROM MY HISTORY IN THE RECORD BOOK. ONCE I TOLD HIM THE REASONS FOR MY PRESENCE. HE SENT A NURSE ASSISTANT TO RETRIEVE THE X-RAY REPORT AND PHOTO'S. DR OBAISI READ THE X-RAY TECHNICIANS REPORT THE SAME REPORT THAT DR. AGUINALDO VIEWED FIRST, BUT REFUSED TO GIVE ME ANY TYPE OF MEDICAL ASSISTANCE. DR. OBAISI BEGAN TO FILL OUT PAPER WORK MADE A PHONE CALL AND TOLD ME, I'M HEADING TO THE EMERGENCY ROOM ST. JOSEPH HOSPITAL. THE WIT TEAM SHOWED UP C/O NORMAN AND. C/O HATCHET. DR OBAISI SAID CALL FOR A AMBULANCE BUT C/O NORMAN SAID NO HE'LL DRIVE. DR. OBAISI SAID GIVE HIM A WHEEL CHAIR C/O NORMAN SAID NO HE COULD WALK. I WAS GIVEN A NECK BRACE, SHACKLED FROM HANDS TO FEET AND HEADED TO THE HOSPITAL. ONCE OUTSIDE THE BUILDING C/O NORMAN HAD ME WALK UNTILWAY THROUGH THE PARKING LOT TO GET IN THE VAN. AT ST. JOSEPH I WAS GIVEN A CT SCAN, BUT WAS LATER TRANSFERED TO UIC HOSPITAL. ST. JOSEPH ASKED DID WE NEED A AMBULANCE. ONCE AGAIN C/O NORMAN SAID NO. AT UIC HOSPITAL I WAS GIVEN A MRI. LATER ON HAD SURGERY WHERE A PLATE AND 2 TWO SCREWS WAS IMPLANTED IN MY NECK AND MY BONES WAS FUSED TOGETHER. DUE TO DR AGUINALDO'S FAILURE TO GIVE ME THE PROPER MEDICAL TREATMENT, WHO KNOWS HOW SEVERE THE DAMAGE THAT WAS DONE AND THE DAMAGE IT USED CAUSE. IN THE SHORT/LONG TERM, I COULD OF BEEN PARALYZED OR EVEN WORSE DIED. B/C OF DR AGUINALDO NEGLECT AND NOT TAKING MY INJURY AS A SERIOUS MANNER. DR AGUINALDO DELIBERATELY DENIED ME THE PROPER MEDICAL ASSISTANCE, THAT WAS NEEDED. THREE TIMES. IT TOOK A TOTAL OF BUSINESS 13 DAYS TO RECIEVE TREATMENT FOR A FRACTURED NECK

IT TOOK ME A MINUTE TO WRITE THIS GRIEVANCE, B/C I WAS IN SEGREGATION WITH A SERIOUS NECK INJURY. THAT WOULDN'T ALLOW ME TO WRITE OR SIT UP FOR LONG PERIODS OF TIME. I THEN HAD SURGERY AT UIC WHERE I STAYED FOR NINE DAYS. I'M JUST NOW GETTING BETTER. BUT THE PAIN IS STILL SEVERE AND STILL HAVE COMPLICATIONS.

EXHIBIT 7

3

EXHIBIT 7

ID#: K95348

Examination: 8/17/17 Time: 3:40 ☐ am ☑ pm   Physician Contacted: ☑ Yes ☐ No

S (Subjective Findings): _____

O (Objective Findings): 1" laceration to (L) cheek, 2 scratches to (R) neck. Scratch to (L) forehead.

Vitals: T 97⁴  P 118  R 20  BP 125/82  Tetanus 2009

A (Evaluation of Injury): laceration to (L) cheek

P (Treatment and Follow-up): Seen by Dr. Aquinaldo, 4 stitches to (L) cheek.

Disposition of patient:
☐ Return to assignment   ☐ Housing Unit   ☐ Lay in   ☐ Infirmary   ☑ Segregation
☐ Off-site referral for treatment (Destination) _____

K. Carnahen
Print Name of Person Completing Form

RN
Title

_____ (Signature)

8/17/17
Date

**To Be Completed By Physician**

I have reviewed this report and would like to see this offender: ☐ Immediately ☐ Next Sick Call ☐ PRN

Dr. Acula
Print Physician Name

_____
Physician's Signature

Side 2

8-17-17
Date

Distribution: Offender Medical File

*Printed on Recycled Paper*

DOC 0313 (Eff. 07/2008)
(Replaces DCA7111-1A1)

Doctor A. RTP 0749

EXHIBIT 7

4

EXHIBIT 7

ILLINOIS DEPARTMENT OF CORRECTIONS

## Offender Outpatient Progress Notes

STATEVILLE CORRECTIONAL Center

Offender Information:

| | | |
|---|---|---|
| Poole | Ahmed | ID#: K95348 |
| Last Name | First Name | MI |

| Date/Time | Subjective, Objective, Assessment | Plans |
|---|---|---|
| 08/14/17 3:50 P | *(illegible handwritten notes)* | *(illegible handwritten notes)* |

Distribution: Offender's Medical Record

*Printed on Recycled Paper*

DOC 0084 (Eff. 9/2002)
(Replaces DC 7147)

EXHIBIT 7

ILLINOIS DEPARTMENT OF CORRECTIONS

**Offender Outpatient Progress Notes**

**Stateville Correctional Center**

Offender Information:

| | | |
|---|---|---|
| Poole | Ahmad | ID#: K95348 |
| Last Name | First Name MI | |

| Date/Time | Subjective, Objective, Assessment | Plans |
|---|---|---|
| 8-18-17 | **PRE-SEGREGATION CHART REVIEW** | |
| 11:08 PM | RN / LPN NOTE: | |
| | Offenders chart was reviewed, and there | |
| | are no contraindications to segregation | |
| | placement. | |
| | Double celling form completed. | |
| | | D. Pagem |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

Distribution: Offender's Medical Record

DOC 0084 (Eff. 9/2002
(Replaces DC 7147)

Printed on Recycled Paper

EXHIBIT 7

ILLINOIS DEPARTMENT OF CORRECTIONS

**Offender Outpatient Progress Notes**

STATEVILLE CORRECTIONAL Center

Offender Information:

| POOLE | AHMAD | | ID#: K95348 |
|---|---|---|---|
| Last Name | First Name | MI | |

| Date/Time | Subjective, Objective, Assessment. | Plans |
|---|---|---|
| 8/21/17 @ 1000 BP: 130/88 HR: 60 RR: 16 | MD Note F/c C.I.C. (?) | |
| | | |
| | U Alcow | |
| | | |
| | | 8/28/17 |
| | | |
| | A C.A.C. | |
| | | |

DOC 0084 (Eff. 9/2002)
(Replaces DC 7147)

Printed on Recycled Paper

(78000-019) 000253    220

EXHIBIT 7

ILLINOIS DEPARTMENT OF CORRECTIONS

Offender Outpatient Progress Notes

STATEVILLE CORRECTIONAL Center

Offender Information:

| Last Name | First Name | MI | ID#: |
|-----------|-----------|-----|------|
| Poole | Ahmad | | K95348 |

| Date/Time | Subjective, Objective, Assessment | Plans |
|-----------|-----------------------------------|-------|
| | MD w/p | |
| 8-24-17 | | |
| BPN6685 | | |
| 8968 | | |
| | | |

Distribution: Offender's Medical Record

DOC 0084 (Eff. 9/2002)
(Replaces DC 7147)

*Printed on Recycled Paper*

EXHIBIT 7

ILLINOIS DEPARTMENT OF CORRECTIONS

**Offender Outpatient Progress Notes**

STATEVILLE CORRECTIONAL Center

Offender Information:

Poole                 Ahmad              ID#: K95348
Last Name             First Name    MI

| Date/Time | Subjective, Objective, Assessment | Plans |
|-----------|-----------------------------------|-------|
| 8/28/19 | | |
| @ 9:40 Am | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

Distribution: Offender's Medical Record

Printed on Recycled Paper

DOC 0084 (Eff. 9/2002)
(Replaces DC 7147)

EXHIBIT 7

ILLINOIS DEPARTMENT OF CORRECTIONS

Offender Outpatient Progress Notes

STATEVILLE CORRECTIONAL Center

**Offender Information:**

| | | | |
|---|---|---|---|
| Poole | Ahmad | | ID#: K95348 |
| Last Name | First Name | MI | |

| Date/Time | Subjective, Objective, Assessment | Plans |
|---|---|---|
| 8-30-11 1145 pm | MD Note | |

Distribution: Offender's Medical Record

DOC 0084 (Eff. 9/2002)
(Replaces DC 7147)

Printed on Recycled Paper

EXHIBIT 7

ILLINOIS DEPARTMENT OF CORRECTIONS
**Offender Health Status Transfer Summary**

**Transferring Facility:**

Stateville Correctional Center

Date: 8.30.17   Time: 12:00   ☐ a.m. ☑ p.m.

**Offender Information:**
Last Name: Poole   First Name: Ahmed   MI:   ID#: K95348

**Transfer Screening** (completed by transferring facility health care staff):

Allergies: NKDA   Food Handler Approved:

Current / Acute Conditions / Problems: recent fight pt neck was squeezed and twisted.

Chronic Conditions / Problems: ∅

**Current Medications** (name, dosage, frequency, and duration):

Acute Short-term: Tylenol 500mg PRN

Chronic Long-term: ∅

Chronic Psychotropic: ∅

**Current Treatments:** ∅

**Therapeutic Diets:** regular

**Follow-Up Care:** RHC

**Chronic Clinics:** ∅

**Specialty Referrals:** St. Joseph medical center ER for CT scan of neck

**Significant Medical History:** S/p fx femur in 1994; sickle cell trait

**Physical Disabilities / Limitations:** ∅

**Assistive Devices / Prosthetics:** ∅     ☐ Glasses   ☐ Dentures

**Mental Health Issues:** ☐ Hx Suicide Attempt: Date: ___/___/___   ☐ Hx Psych Med  ☐ Hx MPC / STC  Substance Abuse: ☐ Alcohol ☐ Drugs

R & C Use Only: ☐ LAB  ☐ EKG  ☐ CXR  ☐ Dental  ☐ MEDS  ☐ MH  ☐ Other: _____  ☐ Packet Complete

D. Pagern
Print Name and Title

D. Pagern
Signature

8.30.17
Date

**Reception Screening** (completed by receiving facility health care staff):

Facility: STATEVILLE C C   Date: 9.8.17   Time: 10:3   ☐ a.m. ☑ p.m.

**Subjective:**

Current Complaint: ∅

Assessment: I/M A&Ox3, clear speech, slow

Current Medications/Treatment: See new orders

unsteady gait, I/M has neck brace.

staples to back of neck

R. ordered nithell

**Objective:**

Physical Appearance/Behavior: calm + cooperative

**Plan: Disposition:**
☑ Health Information Given   ☐ Emergency Referral: _____
☐ Sick Call: Urgent / Routine

Deformities: Acute/Chronic:

☐ Medication Evaluation   ☐ Therapeutic Diet   ☐ Special Housing   ☐ Chronic Clinics
☐ Work / Program Limitation  ☐ Specialty Referrals  ☐ Other (specify): _____
☐ Infirmary Placement: _____
☐ Other (specify): _____

T: 97.1   P: 98   R: 16   B/P: 143/49

K. Curnahir, RN
Printed Name and Title

Signature

___/___/___
Date

**For adult transition center transfers only:**

I understand that medical and dental care are my responsibility while I am housed in a transition center. I also understand that if I am in need of health care and I cannot afford to pay for it, I may be transferred back into a facility within the Department that can provide my medical, mental health, or dental needs.

_____   _____   _____   ☐ a.m. ☐ p.m.
Offender's Signature   Date   Time

Distribution: Offender's Medical Record; Transferring Facility;

DOC 0090 (Eff. 9/2012)

EXHIBIT 7

ILLINOIS DEPARTMENT OF CORRECTIONS
**HIV Rapid Test Report**

_Stateville_
(Facility)

Offender Name: _Poole, Ahmad_     ID #: _K95348_
(Print Name)

Date of Test: _8-23-17_     Time of Test: _1020_     ☒ a.m.
☐ p.m.

Lot Number: _____     Expiration Date: _____

HIV rapid test administered by:

_Drasern_
(Print Name)

Results of HIV rapid test:

☑ Negative     ☐ Positive

Distribution:   Laboratory Section in     Printed on Recycled Paper     DOC 0444 (Rev. 12/2014)
Medical Record.

ILLINOIS DEPARTMENT OF CORRECTIONS

**Offender Outpatient Progress Notes**

STATEVILLE CORRECTIONAL _____ Center

Offender Information:

Last Name: Poole    First Name: Ahmad    MI: ____    ID#: 695318

| Date/Time | Subjective, Objective, Assessment | Plans |
|---|---|---|
| 8/23/17 10,20 air | (in note) LFT, Mega Kap panel, PPR | |
| 9/8/17 10:30p | RN Note S: "I'm good." O: I/m AAO3, clear speech, slow, steady gait. I/m has 17 staples to back of neck and a neck brace. Limited mobility to neck A: 23° Infirmary | SCJP P: 23° admit to Infirmary [signature] |
| 9/8/17 11:50 pm | RN Note S: "I need my pain pills." O: I/m up in cell. Neck brace in place (continued) | M Jensen, RN |

Distribution: Offender's Medical Record

*Printed on Recycled Paper*

DOC 0084 (Eff. 9/2002)
(Replaces DC 7147)

EXHIBIT 7



## Wexford Health
### S O U R C E S   I N C O R P O R A T E D

12-18-22

## Medical Director QA Emergency Reporting Form

| | |
|---|---|
| **Inmate Name:** Poole Ahmad | **Date/Time Sent Out:** 8-30-17  11:45 Am |
| **Facility Name:** Stateville | **ED Hospital Location:** St Joseph Hosp - Joliet |
| **DOC#:** K9324  **DOB:** | **Referring Site Physician Name:** S. Obaisi, MD |
| **Referring Site Physician Signature:** S. obaisi | |

**RMD Notified of non 911:**

| **Emergency Medical HX:** | **Referring site physician location:** ☐ Off Site ☐ On Site |
|---|---|
| Alteration 2 weeks ago | **Transportation:** ☐ Ambulance ☐ Air ☐ State Vehicle |
| The pt neck was Twisted and | **PMHX/PSHX/MEDS/ALLERGIES/SH:** |
| squeezed. XR: C3 subluxation | Cred R fenol boc |
| **Trauma condition result of:** ☑ Altercation ☐ Sports  ☐ Work ☐ N/A | and surgery 1998 |

| **Physical Exam w/vitals:** | **On-Site Interventions and Patient Response:** |
|---|---|
| alert oriale x 4 | C Collar applied |
| hands neck Restricted | No Focus Neurological |
| Rotation & extension full but Bfl | finds |
| T:97.8  BP:112/74  HR: 69  RR: 16  Pulse Ox: | |

**Reason sent to ED:** C+ Scan neck and mangnat as indicated

| **ED Physician Name spoken to initially:** You NP | **ED Physician Name spoken to in follow-up:** |
|---|---|
| **Time:** 4:35     Jennie | **Time:** |
| **Discussion & Plan w/ED Physician initially:** | **Discussion & Plan w/ED Physician for follow-up:** |
| Cssue explaindg | |
| need for imaging | |

**Disposition:** ☐ Admit ☐ Return to Site  Date and Time: _____ Transfer to: _____

**\*\*\*UM Director Only:** ☐ ED Referral Appropriate ☐ ER Preventable -- No staff available onsite to adequately eval / Inappropriate medical info from Nursing staff / Insufficient site medical team clinical mgmt. capabilities / Lack of necessary or operational equipment / Sent by security/ Infirmary Capabilities / Not medically necessary / Insufficient information

**Signature** _____ **Date** _____-

**\*\*Please send or scan the completed form to 412 937-9151 or 412 539-0419. E-mail : erqaforms@wexfordhealth.com**

Revised: October 19, 2015

EXHIBIT 7

AX COMPLETED FORM TO:
(412) 937-9151

WEXFORD

## EMERGENCY / HOSPITALIZATION NOTIFICATION FORM

ENTER SITE NAME: Stateville

DATE: 8/30/117

REFERENCE NUMBER: 695-8400

INMATE NAME: Poole Ahmad

INMATE NUMBER: 695348

DOB: 12-15-82

REFERRING PHYSICIAN

TYPE OF SERVICE:

| | |
|---|---|
| ☒ ER | ADMIT THROUGH ER | ER TO OBSERVATION |
| DIRECT ADMIT | HOSPITAL-TO-HOSPITAL TRANSFER | SCHEDULED ADMISSION |
| URGENT RADIOLOGY/X-RAY | URGENT OFFICE | OTHER |

Dr Obaisi

FACILITY/PLACE OF SERVICE:

ADDRESS:

TELEPHONE:

TREATING PHYSICIAN:

TRANSPORTATION:  AMBULANCE  ☒ STATE VEHICLE  OTHER

## SPECIFIC REASON FOR EMERGENCY TREATMENT OR ADMISSION

Recent fight
Xray done on 8/25/17 to Skull & spine

ADMISSION DATE: TIME:

DATE OUT: TIME:

RETURN DATE: TIME:

JAIL SITE INSURANCE INFO:

TRANSMITTAL DATE: TIME:

BY:

EXHIBIT 7



ILLINOIS DEPARTMENT OF CORRECTIONS

**Segregation Sick Call Rounds Chart**

Offender Name: Poole, Ahmad

Discharge Date:

ID#: K 93398   Housing Unit: X-4W   Admission Date: 8/17/17

Facility: SI+

| MONTH: | HOUR | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | YEAR: 25 | 26 | 27 | 28 | 29 | 30 | 31 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Nurse Sick Call Seen in Segregation No Complaints | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Nurse Sick Call Seen in Segregation See Progress Note Medical Complaints Addressed | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Dr. Sick Call Segregation Rounds No Complaints | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Dr. Sick Call Segregation Rounds See Progress Note Medical Complaints Addressed | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |

| Signature | Initials | Signature | Initials | Signature | Initials |
|---|---|---|---|---|---|
| | | | | | |

Side 1

Printed on Recycled Paper

Distribution: Offender Medical File

DOC 0314 (Eff. 07/2006)

EXHIBIT 7

MEDICATION ADMINISTRATION RECORD

BOSWELL PRESCRIPTION CENTER
888-629-6694 • Fax: 844-448-5397

| MEDICATIONS | HOUR | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

ACETAMINOPHEN 500MG CAP
53188782 POOLE, AHMAD

Vitamin A&D Oin

Reorder From: MED-PASS 800-438-8884

Diagnosis

EXHIBIT 7

## MEDICATION NOTES

**INSTRUCTIONS:**
- Initial appropriate box when medication or treatment is given.
- Circle initials when medication or treatment is refused.
- State reason for refusal under Medication Notes.
- State reason and result for PRN Medication or Treatment.
- Indicate injection site with appropriate code.

**INJECTION SITE CODES:**

1. Abdomen Left
2. Abdomen Right
3. Arm (Deltoid) Left
4. Arm (Deltoid) Right

5. Buttocks (Gluteus) Left
6. Buttocks (Gluteus) Right
7. Thigh (Quadriceps) Left
8. Thigh (Quadriceps) Right

9. Upper Back Left
10. Upper Back Right
11. Upper Chest Left
12. Upper Chest Right

**RESULT CODES:**

A. Effective
B. Slightly Effective
C. Ineffective
D. No Effect Observed

**NON ADMINISTERED MEDICATION REASON CODES:**

1. Refused by Inmate
2. Inmate did not show
3. Inmate not in cell
4. Security lockdown
5. Medication held (state reason)
6. Medication out of stock

| DATE | TIME | INIT. | MEDICATION - DOSE | ROUTE | REASON | RESULT | DATE | TIME | INIT. | MEDICATION - DOSE | ROUTE | REASON | RESULT |
|------|------|-------|-------------------|-------|--------|--------|------|------|-------|-------------------|-------|--------|--------|
| | | | | | | | | | | | | | |

Form # 6182LMR1

EXHIBIT 7

## MEDICATION ADMINISTRATION RECORD

### BOSWELL PHARMACY SERVICES
814-629-1397 • Fax: 814-629-7644

| EFFECTIVE DATES | MEDICATIONS | HOUR | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Original Order 7/8/2017 | NASACORT ALLERGY (10.8ML) 55MCG SPR AGUINALDO JR, EVARISTO PLACE 1 SPRAY(S) IN EACH NOSTRIL DAILY | 0700 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Discontinue 10/3/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Rx # | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Original Order 7/8/2017 | VITAMIN A & D (28GM) OIN AGUINALDO JR, EVARISTO APPLY EVERY DAY | 0700 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Discontinue 8/4/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Rx # | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |

**Allergies:** NO KNOWN DRUG ALLERGY, NO KNOWN DRUG ALLERGIES

Charting for: 08/01/2017 Through 08/31/2017

| | |
|---|---|
| **Facility** | STATEVILLE CORR CTR |
| Reorder From: | MED-PASS 800-438-8884 |

POOLE, AHMAD, K95348

**Location:** B80G

EXHIBIT 7

MEDICATION ADMINISTRATION RECORD

BOSWELL PHARMACY SERVICES

814-629-1397 • Fax: 814-629-7644

| MEDICATIONS | HOUR | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 |

A+D ointment to AA
DD

EFFECTIVE DATE: 8/28/17

Location

Allergies: NKA

Facility: STAR

Inmate Name and Number: Poole, Ahmad

Date of Birth or Soc. Sec. No.: 2.18.82    R95-398

Form # 0182LMR (Rev. 06/15)

Reorder From: MED-PASS® 800-438-8884

Charting for: Sept 2017

Diagnosis

Form IN91071418

(78000-019) 000542    509

EXHIBIT 7

*BEGIN USING FROM BOTTOM UP

**State of Illinois**
**Dept. of Corrections**

**PRESCRIPTION ORDER**
**Chart Copy (Not a prescription)**

Patient _Poole, Ahmad_ Reg. # _K95348_ Date: _8-30-17_

Problem _____

ORDER: (Physician's Signature After Last Order)
_Send inmate to St. Joseph ER for evaluation_
_may use waist chains for todays WRIT only._

DEA/Illinois Lic. # _____ Physician (Print) _____ M.D.

☐ May Substitute
☐ May Not Substitute _____ M.D.

DCA 7000
IL 426-1417 Noted by: _D. Paslin_ Date: _8-30-17_

---

**State of Illinois**
**Dept. of Corrections**

**PRESCRIPTION ORDER**
**Chart Copy (Not a prescription)**

Patient _Poole Ahmad_ Reg. # _K95348_ Date: _8-28-17_

Problem _____

ORDER: (Physician's Signature After Last Order) _____
_Add out Gm ⨯ 3 wk_

DEA/Illinois Lic. # _____ Physician (Print) _____ M.D.

☐ May Substitute
☐ May Not Substitute _____ M.D.

DCA 7000
IL 426-1417 Noted by: _Allie f_ Date: _8-28-17_

---

**State of Illinois**
**Dept. of Corrections**

**PRESCRIPTION ORDER**
**Chart Copy (Not a prescription)**

Patient _Poole Ahmad_ Reg. # _K95348_ Date: _8-15-17_

Problem _____

ORDER: (Physician's Signature After Last Order) _____

DEA/Illinois Lic. # _____ Physician (Print) _____ M.D.

☐ May Substitute
☐ May Not Substitute _____ M.D. _8/10/10_

DCA 7000
IL 426-1417 Noted by: _____

**(78000-019) 000691**   658

EXHIBIT 7

*Poole, Ahmad*
*XLW01*

*12-1882*

AUG 2 2 2017

STATEVILLE CORRECTIONAL CENTER

FOR X-RAY TECH ONLY

### STATE OF ILLINOIS - DEPARTMENT OF CORRECTIONS

### X-RAY REPORT

Inmate's Name: *Poole, Ahmun* Number: *K95348* Date: *8-17-17*

\_\_e: _____

Reason for X-Ray: *Skull 4-DR, 4-DR (L) Orbit 4-DR*

*Neck, Abd, Both Skull & Trans*

*Acut*

*Hand?*

Ordering Physician

Findings: *Cerv Spine: Anterior Subluxation of C3 in relation to C4; Otherwise neg.*

*Need shoulder films*

② *Left Hand* — *Both areas appear normal.*

③ *Skull*

*M.D.*
*27 Aug 2017*

Date: _____

### FOR CORRECTIONAL CENTER HEALTH CARE UNIT PERSONNEL ONLY

☐ I have reviewed the recommendations contained in this report.

Date: _____    _____
Signature and Title

IL 426-18393    DCA 42066

AUG 2 5 2017   *(Rogers  R.t.(R))*

EXHIBIT 7




Stateville-Routine
16300 S. Route 53
Cresthill, IL 60435

A

**UNIVERSITY OF ILLINOIS**
Hospital and Health Sciences System

Reference Laboratory

840 South Wood Street,
Room 170 (M/C 750)
Chicago, Illinois 60612
Ph# (877)FOR-LABS
Fredrick Behm, M.D., Director

| PATIENT NAME | PATIENT ID | DOB | SEX | STATUS | DESTINATION |
|---|---|---|---|---|---|
| POOLE, AHMED K95348 | A209-95348 | 12/18/1982 | M | Final | D209 |
| PHYSICIAN | COLLECT DATE & TIME | DATE OF SERVICE | | PRINTED ON | PAGE |
| | 08/23/2017 10:20 | 08/23/2017 23:00 | | 08/24/2017 9:03 | 1 |

| REQUISITION NO. | PT. LAB NO. | LAB REF NO. |
|---|---|---|
| A209.9799 | | |

COMMENTS:

| Diagnostic Procedure | Result In Range | Out of Range | Units | Reference Range |
|---|---|---|---|---|
| HEP B CORE AB,TOTAL | NEGATIVE | | | NEG |

(NOTE)
The test is performed using Abbott Architect
Chemiluminescent
Microparticle Immunoassay.

| | | | | |
|---|---|---|---|---|
| HEP A IGG AB | NEGATIVE | | | NEG |

(NOTE)
The test is performed using Abbott Architect
Chemiluminescent
Microparticle Immunoassay.

| | | | | |
|---|---|---|---|---|
| HEP B SURFACE AB,QUA | 8.6 | | mIU/mL | |

(NOTE)
<8.0 mIU/mL:     Negative     Individual is considered not to

have immunity to HBV

infection.
8.0-11.9 mIU/mL:  Equivocal    The immune status of the individual

should be further

assessed, such as

follow-up

>=12.0 mIU/mL:   Positive     Individual is considered to have

immunity to HBV

infection.
The test is performed using Abbott Architect
Chemiluminescent
Microparticle Immunoassay.

| | | | | |
|---|---|---|---|---|
| HEP B SURFACE AG | NEGATIVE | | | NEG |

(NOTE)
The test is performed using Abbott Architect
Chemiluminescent
Microparticle Immunoassay.

| | | | | |
|---|---|---|---|---|
| HEP C ANTIBODY | NEGATIVE | | | NEG |

(NOTE)
The test is performed using Abbott Architect
Chemiluminescent
Microparticle Immunoassay.

Continued on the next page
POOLE, AHMED K95348             08/24/2017 09:03                    D209

d-24-17

**(78000-019) 000732**   699

EXHIBIT 7



Stateville-Routine
16300 S. Route 53
Cresthill, IL  60435

**UNIVERSITY OF ILLINOIS**
Hospital and Health Sciences System

Reference Laboratory

840 South Wood Street,
Room 170 (M/C 750)
Chicago, Illinois 60612
Ph# (877)FOR-LABS
Fredrick Behm, M.D., Director

| PATIENT NAME | | | PATIENT ID | DOB | SEX | STATUS | DESTINATION |
|---|---|---|---|---|---|---|---|
| POOLE, AHMED K95348 | | | A209-95348 | 12/18/1982 | M | Final | D209 |
| PHYSICIAN | | | COLLECT DATE & TIME | DATE OF SERVICE | | PRINTED ON | PAGE |
| | | | 08/23/2017 10:20 | 08/23/2017 23:00 | | 08/24/2017   9:03 | 2 |
| REQUISITION NO. | PT. LAB NO. | LAB REF NO. | | | | | |
| A209.9799 | | | | | | | |

COMMENTS:

| Diagnostic Procedure | Result In Range | Result Out of Range | Units | Reference Range |
|---|---|---|---|---|
| LIVER PROF | | | | |
| ALBUMIN | 4.5 | | GM/DL | 3.4-5.0 |
| BILIRUBIN,TOTAL | | 1.6 H | MG/DL | 0-1.2 |
| BILIRUBIN, DIRECT | | 0.3 H | MG/DL | 0-0.2 |
| ALK PHOS | 53 | | U/L | 40-125 |
| AST | 20 | | U/L | 10-40 |
| ALT | 15 | | U/L | 10-50 |
| TOTAL PROTEIN | 7.6 | | G/DL | 6.0-8.0 |
| SYPHILIS INITIAL SER | NON REACTIVE | | | NREAC |

(NOTE)
SYPHILIS SEROLOGY RESULT INTERPRETATION
Syphilis Initial Ser: Non Reactive
                        "Negative for syphilis IgG
antibodies."
Syphilis Initial Ser: Reactive
Syphilis RPR, Qual: Reactive
                        "Consistent with past or
current
                        syphilis infection."(see RPR
Quant)
Syphilis Initial Ser: Reactive
Syphilis RPR, Qual: Non Reactive
FTA-ABS: Reactive
                        "Possible syphilis infection
requiring
                        historical and clinical
evaluation."
Syphilis Initial Ser: Reactive
Syphilis RPR, Qual: Non Reactive
FTA-ABS: Non Reactive
                        "Unconfirmed EIA. Unlikely to
be syphilis.
                        If patient is at high risk for
syphilis,
                        retest in 1 month."
NOTE: ALL REACTIVE SYPHILIS SEROLOGY RESULTS ARE REPORTED
TO
THE CHICAGO DEPARTMENT OF PUBLIC HEALTH.

POOLE, AHMED K95348             08/24/2017 09:03                    D209



Stateville-Routine
16300`S. Route 53
Cresthill, IL 60435

**UNIVERSITY OF ILLINOIS**
Hospital and Health Sciences System

Reference Laboratory

840 South Wood Street,
Room 170 (M/C 750)
Chicago, Illinois 60612
Ph# (877) FOR-LABS
Fredrick Behm, M.D., Director

| PATIENT NAME | | PATIENT ID | DOB | SEX | STATUS | DESTINATION | |
|---|---|---|---|---|---|---|---|
| POOLE, AHMED K95348 | | A209-95348 | 12/18/1982 | M | Final | D209 | |
| PHYSICIAN | | COLLECT DATE & TIME | DATE OF SERVICE | | PRINTED ON | | PAGE |
| | | 08/23/2017 10:20 | 08/23/2017 23:00 | | 08/24/2017 9:03 | | 3 |
| REQUISITION NO. | PT. LAB NO. | LAB REF NO. | | | | | |
| A209.9799 | | | | | | | |
| COMMENTS: | | | | | | | |

| | Result | | | |
|---|---|---|---|---|
| Diagnostic Procedure | In Range | Out of Range | Units | Reference Range |

End of Report

POOLE, AHMED K95348                08/24/2017 09:03                                D209

**(78000-019) 000734**  701

EXHIBIT 7

ID#: K45348

Examination: 8/17/17  Time: 3:40  ☐ am ☑ pm  Physician Contacted: ☑ Yes ☐ No

S (Subjective Findings): ∅

O (Objective Findings): 1" laceration to (L) cheek, 2 scratches to (R) neck
Scratch to (L) forehead.

Vitals: T 97⁴  P 118  R 20  BP 125/82  Tetanus 2009

A (Evaluation of Injury): laceration to (L) cheek

P (Treatment and Follow-up): Seen by D. Aguinaldo, 4 stitches
to (L) cheek.

Disposition of patient:
☐ Return to assignment   ☐ Housing Unit   ☐ Lay in   ☐ Infirmary   ☑ Segregation
☐ Off-site referral for treatment (Destination) _____

K. Carnahan
Print Name of Person Completing Form

RN
Title

Signature

8/17/17
Date

---

## To Be Completed By Physician

I have reviewed this report and would like to see this offender: ☑ Immediately  ☐ Next Sick Call  ☐ PRN

Dr Aguilt
Print Physician Name

Physician's Signature

2-17-17
Date

Side 2

Distribution:  Offender Medical File

*Printed on Recycled Paper*

DOC 0313 (Eff. 07/2008)
(Replaces DCA7111-1A1)

ILLINOIS DEPARTMENT OF CORRECTIONS

## Offender Injury Report

Offender Name: Poole          ID#: K95348

Age: 33    Date of Birth: 12/18/83    Sex: M    Race: B

Date of Injury: 8/17/17    Time of Injury: 3:30 ☐am ☐pm    Location: Bravo

How did the injury occur? ∅

_____

_____

_____

Was it witnessed by staff? ☐ No  ☐ Yes (If yes, please list names)

_____

_____

**Location in facility:**

☐ LTA (gym, basketball, football, etc.)

☐ Group (therapy)

☒ Housing Unit (cell, dayroom, tv room, etc.)

☐ School (classroom, library)

☐ Kitchen

☐ Other _____

**Type of Injury:**

☐ Sports

☐ Assault

☐ Job Related

☐ Non-job Related

☐ Self-inflicted

☒ Fight

_____        _____        _____
Signature                Title                    Date  8/17/17

**(Medical Report on Reverse Side)**

Side 1

(78000-019) 000750   717

EXHIBIT 7

ILLINOIS DEPARTMENT OF CORRECTIONS
**Medical Special Services Referral and Report**

Steuteville .
(Facility)

Offender's Name: Poole ahmad _____ ID# K95348

Reason for Referral: ☐ Consult ☐ Non-Formulary Medications ☐ Medical Equipment
☐ Evaluation ☐ Management
☐ Procedure/service (specify) _____
☐ Other (specify) _____

Urgent: ☐ Yes ☐ No

Referred to: St. Joeo ER _____

Rationale for Referral: _____

S. Oxuot _____     _____     8/30/17
Print Referring Practitioner's Name     Referring Practitioner's Signature     Date

Report of Referral (Use Reverse Side, if necessary)

Findings: _____

Assessment: _____

Recommendations/Plans: _____

_____     _____     _____
Print Practitioner's Name     Practitioner's Signature     Date

Facility Medical Director Use Only
I have reviewed the recommendations and:

☐ Approve.

☐ Deny or revise as indicated on the Notification of Medical Service Referral Denial or Revision,
DOC 0255.

_____     _____     _____
Print Facility Medical Director's Name     Facility Medical Director's Signature     Date

**(78000-019) 000751**    718

EXHIBIT 7

## Illinois Department of Corrections
## MEDICAL PERMIT
## Stateville Correctional Center

Offender Name: POLO- ANMAN          Number: K5534
                                            K95348

Housing Unit: B

☐ New Order          ☐ Change
☐ Renewal            ☐ Cancel

☐ Low Bunk           ☐ State Boots / Special Shoes_____
☐ Low Gallery        ☐ Slow Walk          ☐ C-Pap Machine
☐ Crutches_____     ☐ No Gym/Yard        ☐ Medical Lay-in
☐ Shower ____ X week ☐ Hearing Aid        ☑ Ice 2×Dy
☐ Waist Chain        ☐ Leather Restraints    + 3 Dy
☐ Other:_____

Comments: Tom for_____

Start Date: 2-17-17          Expiration Date: 2-20-17

Authorized By:
MD _____ Date: 2-17-17

Reviewed By: _____

Entered into OTS By: _____

**(78000-019) 000752**   719

EXHIBIT 7

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER IN CASE NO. 1:20-CV-00014

PRESENCE SAINT JOSEPH MEDICAL CENTER
333 N. Madison
Joliet, IL

## HEALTH INFORMATION MANAGEMENT

**NAME:** POOLE,AHMAD K95348          **DOB/AGE/SEX:** ▮▮▮▮▮ - 34 – M
**HOME PHONE:** (815)727-6141
**PHYSICIAN:**                        **ADMIT DATE:**
**NONSTAFF:**
**NONSTAFF FAX #:**
**UNIT #:** DC01881219                **DIS DATE:** 08/30/17
**ACCT#:** DC0029381580               **LOC/RM/BED:** D01EDA -

### ER PHYSICIAN DOCUMENTATION
REPORT # : 0830-1094

Chart created at 08/30/2017 15:02 by Nicholas Sever

Chart closed at 08/30/2017 21:04

Patient Registered at 08/30/2017 13:29, departure at 08/30/2017 20:57

Patient Registered at: 08/30/2017 13:29  Patient Seen at: 08/30/2017
14:34   Historian: Patient and Transfer   PCP: Unknown,Unknown MD

Chief Complaint:NECK PAIN STATEVILLE

Initial Vital Signs reviewed.

I confirm that the attending physician has examined the patient, reviewed my
documentation on the patient's chart, and discussed the evaluation, plan of
care and disposition of the patient with me..

Patient interviewed by me.

Temperature: 36.9 C (98.4 F). Pulse: 68. Respiratory
Rate: 16. Blood-pressure: 147/99. Oxygen Saturation: 99% room air; Normal.

History of Present Illness:

34 Year old male inmate in police custody presents with neck pain x2 weeks.
Patient reports he was in an altercation 2 weeks ago, was placed in a head
lock and twisted his neck. Since then, the patient has had pain in the back of
the neck. He reports no weakness, numbness or tingling. No head injury, no
loss of consciousness. No other injuries. Patient was seen in the prison
infirmary today, had plain films showing possible C3-C4 subluxation so he was
sent to the ED for further evaluation.

HPI Elements: Onset: 2 Weeks ago; Location: neck; Severity: now [10];
Context: Trauma

Review of Systems. Constitutional: negative for Chills or Fever Eyes: negative
for Eye Pain or Vis. Changes Ear/Nose/Throat: negative for Congestion or Sore
Throat Cardio-Vascular: negative for Chest Pain or Palpitations Skin: negative

Page 1 of 5
Print time:  at

(78000-014) 2993

EXHIBIT 7

**CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER IN CASE NO. 1:20-CV-00014**

PRESENCE SAINT JOSEPH MEDICAL CENTER
HEALTH INFORMATION MANAGEMENT
REPORT # : 0830-1094

**NAME:** POOLE,AHMAD K95348          **UNIT #:** DC01881219          **ACCT #:** DC0029381580

for Itch or Rash Respiratory: negative for Cough or Dyspnea GI: negative for
Nausea or Vomiting GU: negative for Dysuria or Hematuria Musculo-Skeletal:
negative for Back Pain Neurological: negative for Confusion, Numbness or
Weakness

Past Medical History:

Sickle cell trait

Medications: None.

Allergies: Reviewed RN Note

Social History:

Incarcerated/Police custody

Physical Examination: General: Alert; no apparent distress
HEENT:  Head: Atraumatic.   Oropharynx /
Throat: Moist mucous membranes. Neck: No Lymphadenopathy; C-collar in place.
Midline tenderness in C3-C4 area. No palpable deformity. Respiratory: No Resp
Distress Cardio-Vascular: RRR Extremity: Normal Equal pulses Neurological:
Alert, Oriented X3, Normal Sensation, No Gross Weakness, Speech Normal and 5/5
UE/LE Strength Skin: No rash, Warm and Dry Psychological: Mood/Affect Normal

Medical Decision Making

34 Year old male inmate in custody presents with neck pain after an
altercation 2 weeks ago. He does have some midline tenderness on exam but
otherwise is neurologic exam is within normal limits. He presented the prison
infirmary were a plain film of his C-spine was suggestive of C3 subluxation
according to the report. I have no images accompanying the patient
independently verify this. Plan for CT in the ED. Patient is declining offer
of pain medication. CT C-spine does show a displaced inferior right facet
fracture at C3 with perching on C4. There is also anterior translation of C3
on C4 of 1 mm. Patient is mid maintained in cervical spinal precautions while
in the emergency department. We have no spine coverage today. The University
Illinois at Chicago was called for consultation. They recommend transfer.
Patient is agreeable with this plan. Risks and benefits of transfer were
discussed. Patient will be transported by state vehicle, he is declining
ambulance transport.

Re-Evaluation:

16:27: Updated patient on plan for transfer to UIC. He's agreeable. NPO for
now..

Consults:

15:02: Dr. Johanek; radiology; Informed me of critical read: there is an
inferior facet fracture at C3 with perching on C4

(78000-014) 2994

EXHIBIT 7

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER IN CASE NO. 1:20-CV-00014

PRESENCE SAINT JOSEPH MEDICAL CENTER
HEALTH INFORMATION MANAGEMENT
REPORT # : 0830-1094

**NAME:** POOLE,AHMAD K95348      **UNIT #:** DC01881219      **ACCT #:** DC0029381580

16:11: UIC; has accepted transfer under Dr. Charbel; provided clinical information to the neurosurgery resident

Additional Information: Discussed Results, Diagnosis and Follow-Up with Patient.

Clinical Impression:

1. Closed displaced right C3 facet fracture

Disposition: Transferred UIC. Condition: Stable

Electronically signed by Nicholas Sever on 08/30/2017 at 21:04

Direct patient care supervision and electronic documentation review by John Paik MD on 08/30/2017 21:34.

Imaging Study Obtained:
CT CERVICAL SPINE WO CONTRAST, Status:Signed Report Available

PRESENCE SAINT JOSEPH MEDICAL CENTER

333 North Madison Street

Joliet, IL

NAME: POOLE,AHMAD K95348 DOB/AGE/SEX: 12/18/1982 - 34 - M

PHYSICIAN: ADMIT DATE:

UNIT #: DC01881219 DIS DATE:

ACCT #: DC0029381580 LOC/RM/BED: D01EDA-

DIAGNOSTIC IMAGING SERVICES

CT/CT CERVICAL SPINE WO CONTRAST: 0830-0119

ORDER DATE: 08/30/17

REPORT #: 0830-0377

CT Cervical Spine

History: Altercation, neck pain.

Technique: Helical images of the cervical spine were obtained without the use of IV contrast.

Coronal and sagittal reformatted images were created and interpreted.

(78000-014) 2995

EXHIBIT 7

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER IN CASE NO. 1:20-CV-00014

PRESENCE SAINT JOSEPH MEDICAL CENTER
HEALTH INFORMATION MANAGEMENT
REPORT # : 0830-1094

**NAME:** POOLE,AHMAD K95348      **UNIT #:** DC01881219      **ACCT #:** DC0029381580

Patients undergoing CT with documentation that one or more of the following dose reductions

techniques were used:

Automated exposure control

Adjustment of the mA and/or kV according to patient size

Use of iterative reconstruction technique

Comparison: None.

Findings:

There is a minimally displaced fractures seen involving the tip of the inferior right C3 articular

facet with slight anterior displacement of C3 with respect to C4 measuring 1 mm. The right inferior

C3 articular facet is perched over the right superior C4 facet. The left-sided C3-4 articulation is

well-maintained.

The remaining cervical levels appear normal in height, mineralization and alignment. No additional

fractures are noted.

Intervertebral disc heights appear well-maintained.

Pre-vertebral soft tissues are within normal limits.

Pre-dental space is normal.

Impression:

There is a minimally displaced fracture identified involving the tip of the inferior right C3

articular facet which is perched over the top of the right superior C4 facet. There is very slight

anterior translation of C3 with respect to C4 noted measuring 1 mm. This was reported to Nicholas

Sever, PA-C by myself via telephone on August 30, 2017 at 1500 hours.

Page 4 of 5
Print time:  at

(78000-014) 2996

EXHIBIT 7

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER IN CASE NO. 1:20-CV-00014

PRESENCE SAINT JOSEPH MEDICAL CENTER
HEALTH INFORMATION MANAGEMENT
REPORT # : 0830-1094

**NAME:** POOLE,AHMAD K95348       **UNIT #:** DC01881219       **ACCT #:** DC0029381580

DICTATED: Andrew Johanek D.O.

<Electronically signed by Andrew Johanek D.O. in OV>

Andrew Johanek D.O.

08/30/17 1509

DRAFT UNTIL SIGNED

S: Signed

D: 08/30/17 1459

T: 08/30/17 1459 PS

REPORT#:0830-0377

CC: Nicholas A Sever, P.A.; Unknown Unknown


of 2

Radiology: Discussed with Radiologist, Image Reviewed and Interpreted by
Radiologist.

DICTATED: Nicholas A Sever P.A.
<Electronically signed by Nicholas A Sever P.A. in OV>

Nicholas A Sever P.A.
08/31/17 0105
**DRAFT UNTIL SIGNED**

S: Signed
D: 08/31/17 0105
T: 08/31/17 0105 FS

REPORT#:0830-1094

CC:

Page 5 of 5
Print time:  at

(78000-014) 2997

EXHIBIT 7

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER IN CASE NO. 1:20-CV-00014

**PRESENCE SAINT JOSEPH MEDICAL CENTER**
**333 N. Madison**
**Joliet, IL**

## HEALTH INFORMATION MANAGEMENT

**NAME:** POOLE,AHMAD K95348          **DOB/AGE/SEX:** ███████ - 34 – M
**HOME PHONE:** (815)727-6141
**PHYSICIAN:**                        **ADMIT DATE:**
**NONSTAFF:**
**NONSTAFF FAX #:**
**UNIT #:** DC01881219
**ACCT#:** DC0029381580              **DIS DATE:**
                                     **LOC/RM/BED:** D01EDA -

**ER PHYSICIAN DOCUMENTATION**
REPORT # : 0830-1159

Chart created at 08/30/2017 16:35 by John Paik MD

Chart closed at 08/30/2017 16:35

Patient Registered at 08/30/2017 13:29

Patient Registered at: 08/30/2017 13:29  Patient Seen at: 08/30/2017
14:34  Historian: Patient  PCP: Unknown,Unknown MD

Chief Complaint:NECK PAIN STATEVILLE

Triage Note reviewed and Initial Vital Signs reviewed.

Documented by kaur,navedeep for Paik,John at 30 Aug 2017, 16:29.

I have independently evaluated the patient \T\ agree with the advanced practice
provider's diagnostic and treatment plan unless elsewhere noted.

All medical record entries made by the Scribe were at my direction and
personally dictated by me. I have reviewed the chart and agree that the record
accurately reflects my personal performance of the history, physical exam,
assessment and plan. I have also personally directed, reviewed, and agree with
the discharge instructions. .

Patient interviewed by me.

Discussed the evaluation, plan of care, and disposition of the patient with
the mid-level provider.

Temperature: 36.9 C (98.4 F). Pulse: 68. Respiratory
Rate: 16. Blood-pressure: 147/99. Oxygen Saturation: 99% room air; Normal.

History of Present Illness:

All medical record entries made by the Scribe were at my direction and
personally dictated by me. I have reviewed the chart and agree that the record
accurately reflects my personal performance of the history, physical exam,
assessment and plan. I have also personally directed, reviewed, and agree with

Page 1 of 3
Print time: at

EXHIBIT 7

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER IN CASE NO. 1:20-CV-00014

PRESENCE SAINT JOSEPH MEDICAL CENTER
HEALTH INFORMATION MANAGEMENT
REPORT # : 0830-1159

**NAME:** POOLE,AHMAD K95348    **UNIT #:** DC01881219    **ACCT #:** DC0029381580

the discharge instructions.
By signing my name below, I, Navedeep Kaur, attest that this documentation has
been prepared under the direction and in the presence of Dr. Paik.
Electronically signed: Navedeep Kaur, Scribe. 8/30/17.
**********************************

I saw and evaluated the patient after discussion with the PA-C. The patient's
symptoms and history were reviewed with the patient. Briefly, the pt is a 34
y/o male with PMHx of sickle cell trait who presents to the ED in c-collar
from Statesville with complaint of neck pain x2 weeks. The pain is moderate
and worse with movement. Pt was involved in a physical altercation two weeks
ago. He had an x-ray on 8/23/17 and a repeat x-ray today at a clinic and was
sent to the ED for further evaluation. No numbness or tingling. No vision
changes. Physical exam findings: no eyelid droop, PERRL, equal and intact hand
grip strength, sensation intact throughout upper extremity, no c-spine
tenderness.

Essentially, 34 year old sent from Statesville after being in a physical
altercation two weeks ago and had neck pain and subsequently had an x-ray done
at Statesville that showed possible subluxation of C3-C4 and sent to our ED
for further evaluation with a C-collar. Initial vital signs show that patient
is afebrile and hemodynamically stable. On exam, he has no cervical spine
tenderness. There is no eyelid droop. Pupils are equal and reactive to light.
Strength and sensation intact in the upper extremity. We do not have spine
surgery on call and it neurosurgeon would not provide any recommendations were
reviewed imaging given that they are not on spine call today. Therefore, I did
speak to Dr. Charbelle who stated that he could not give further
recommendations without image review and evaluation and recommended admission
to UIC to a med surg bed. We will keep the c-collar in place.

Consults:

16:00: Dr. Charbelle; Discussed case.

Clinical Impression:

1. Closed displaced right C3 facet fracture

Electronically signed by John Paik, MD on 08/30/2017 at 16:35

Radiology: Image Reviewed and Interpreted by Radiologist.

DICTATED: John M Paik M.D.
<Electronically signed by John M Paik M.D. in OV>

John M Paik M.D.
08/30/17 2040
**DRAFT UNTIL SIGNED**

S: Signed
D: 08/30/17 2040
T: 08/30/17 2040 FS

(78000-014) 2999

EXHIBIT 7

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER IN CASE NO. 1:20-CV-00014

**PRESENCE SAINT JOSEPH MEDICAL CENTER**
**HEALTH INFORMATION MANAGEMENT**
REPORT # : 0830-1159

**NAME:** POOLE,AHMAD K95348    **UNIT #:** DC01881219    **ACCT #:** DC0029381580

REPORT#:0830-1159

CC:

Page 3 of 3
Print time: at

(78000-014) 3000

EXHIBIT 7

## CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER IN CASE NO. 1:20-CV-00014

| Sasan Payvar, M.D. | Medical Director |
|---|---|
| Michael Arthofer, M.D. | Edward Bruno, M.D. |
| Brian Fagan, M.D. | John S. Groch, M.D. |
| Mickey B. Jester, D.O. | Andrew Johanek, D.O |
| Terry Kushner, M.D. | Noah Schwind, M.D |
| Joshua Tepper, M.D. | Raj Vasnani, M.D. |
| Alex Wu, M.D. | |

**PRESENCE SAINT JOSEPH MEDICAL CENTER**
333 North Madison Street
Joliet, IL

### DIAGNOSTIC IMAGING SERVICES

**NAME:** POOLE,AHMAD K95348
**ORDERING:** Nicholas A Sever P.A.
**ATTENDING:**

**DOB/AGE/SEX:** ▮▮▮▮▮ 34 - M
**ADMIT DATE:**
**NONSTAFF:**

**UNIT # :** DC01881219
**ACCT #:** DC0029381580

**DIS DATE:**
**LOC/RM/BED:** D01EDA -

**DIAGNOSTIC IMAGING**
CT/CT CERVICAL SPINE WO CONTRAST : 0830-0119
DATE PERFORMED: 08/30/17
REPORT #: 0830-0377

CT Cervical Spine

History: Altercation, neck pain.

Technique: Helical images of the cervical spine were obtained without the use of IV contrast. Coronal and sagittal reformatted images were created and interpreted.

Patients undergoing CT with documentation that one or more of the following dose reductions techniques were used:
Automated exposure control
Adjustment of the mA and/or kV according to patient size
Use of iterative reconstruction technique

Comparison: None.

Findings:

There is a minimally displaced fractures seen involving the tip of the inferior right C3 articular facet with slight anterior displacement of C3 with respect to C4 measuring 1 mm. The right inferior C3 articular facet is perched over the right superior C4 facet. The left-sided C3-4 articulation is well-maintained.

The remaining cervical levels appear normal in height, mineralization and alignment. No additional fractures are noted.

Intervertebral disc heights appear well-maintained.

Pre-vertebral soft tissues are within normal limits.

Pre-dental space is normal.

Impression:

There is a minimally displaced fracture identified involving the tip of the inferior right C3 articular facet which is perched over the top of the right superior C4 facet. There is very slight anterior translation of C3

1
Print time; at

(78000-014) 3001

**EXHIBIT 7**

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER IN CASE NO. 1:20-CV-00014

**PRESENCE SAINT JOSEPH MEDICAL CENTER**
**DIAGNOSTIC IMAGING SERVICES**

**NAME:** POOLE,AHMAD K95348      **UNIT #:** DC01881219      **ACCT #:** DC0029381580

with respect to C4 noted measuring 1 mm. This was reported to Nicholas Sever, PA-C by myself via telephone on August 30, 2017 at 1500 hours.

DICTATED: Andrew Johanek D.O.
<Electronically signed by Andrew Johanek D.O. in OV>

Andrew Johanek D.O.
08/30/17 1509
**DRAFT UNTIL SIGNED**

S: Signed
D: 08/30/17 1459
T: 08/30/17 1459 PS

REPORT#:0830-0377

CC: Nicholas A Sever, P.A.; Unknown Unknown

(78000-014) 3002

EXHIBIT 7

```
[barcode]
DC0029381580    DOB: 12/18/82        DC01881219
POOLE,AHMAD K95348                    08/30/17
                                     M 34
```

**Presence**
Saint Joseph Medical Center

| DATE 8-30-17 | Arrival Time 1330 | Stated Complaint Neck Pain | | Room 1 | Room Time 1330 |
|---|---|---|---|---|---|

B/P 47/99 68 R 16 T 98.5 □ AX □ O □ R □ T SpO2 at 99 Percent Triage RN: Jenne

ESI/Triage Level 1 2 3 4 5 • | Weight 185 □ Scale □ Estimated | Height 5'7 | Pain Score 10 □ Scale 0-10 □ Faces | □ FLACC

Allergies: NKDA   Pertinent History: Sickle cell trait   Other:

LMP _____   POP _____   Time Seen by ERMD/MLP: _____

| Imaging Orders: | | Lab Orders: | | |
|---|---|---|---|---|
| □ Chest        □ Portable | | □ CBC | □ Amylase | □ Blood Culture times |
| □ Cervical Spine Acute Trauma □ 5 view | | □ WBBMP | □ Lipase | □ RBSA |
| □ Abdominal Series  □ KUB  □ Flat and Upright | | □ CK | □ CMP | □ Influenza |
| □ Right | | □ Troponin | □ Hepatic FCT. | □ Mono. Spot |
| □ Left | | □ D-Dimer | □ ETOH | □ RSV |
| □ CT Head Without Contrast  □ CT Head With Contrast | | | | |
| □ CT Angiogram  □ With contrast  □ Without contrast  □ R/O PE | | □ CHF-BNP | □ DSSQ | □ GC |
| □ CT | | | □ DSUR | □ Chlamydia |
| □ US Pelvic OB, Endovaginal IF NECESSARY | | □ Pro-time/PTT | □ Accu-check | □ Wet Prep |
| □ US Doppler Pelvic Non-OB, Endovaginal IF NECESSARY | | □ Lactic Acid | □ HCG  □ Urine  □ Serum | □ Wound Culture |
| □ US | | □ Magnesium | □ HCG Quant. | □ Type/Screen |
| □ Venous Doppler  □ Right  □ Upper Extremity  □ Bilateral  □ Arterial Doppler  □ Left  □ Lower Extremity  □ R/O DVT | | □ UA  □ C + S | | □ Hemoccult |
| **IV/Medication Orders:** | | **Respiratory/CV:** | | |
| □ TD/TT 0.5 ML IM | | □ 12 Lead EKG | □ Cardiac Monitor | □ Old Record  / |
| □ IV 0.9 NaCl at ____ Bolus □ Saline Lock | | □ ABG  □ O2 at | | Liters per minute |
| □ IV 0.9 NaCl at ____ ml/hr | | □ Nebulizer Treatment | | |
| Pre-Printed Order Set(s): | | □ PEF before and after Neb | | |
| □ CAP Order: after Blood Cultures times 2 | | □ Pulse Oximetry | | |
| **Non-ICU patients:** | | Behavioral Health Panel - Adult | | |
| □ Rocephin 2 grams IVPB PLUS Zithromax 500 mg IVPB | | □ Regular Diet | | |
| ❖ If Beta-Lactam allergic: | | | | |
| □ Levaquin 750 mg IVPB | | □ CBC  □ WBBMP  □ DSUR (Urine Toxicology) | | |
| **ICU patients CAP Pneumonia** | | □ Alcohol  □ HCG Urine | | |
| □ Rocephin 2 grams IVPB PLUS Zithromax 500 mg IVPB | | | | |
| ❖ If Beta-Lactam allergic: | | | | |
| □ Levaquin 750 mg IVPB PLUS Azactam 1 gram IVPB | | | | |
| □ HEALTHCARE ASSOCIATED PNEUMONIA | | Subsequent Orders: | | |
| □ Zosyn 4.5 grams IVPB PLUS Levaquin 750 mg IVPB | | Time: | Order: | RN Initials |
| ❖ If Beta-Lactam allergic: | | | | |
| □ Levaquin 750 mg IVPB PLUS Azactam 2 gram IVPB | | | | |
| □ ASPIRATION PNEUMONIA | | | Char bel | |
| ADD the medication below to the above selected medications | | | | |
| □ Cleocin 600 mg/ IVPB | | | | |
| Discharge Orders/Instructions: | | | | |
| | | | | |
| Diagnosis: | | | | |
| Diagnosis: | | | | |
| Physician Signature: | | Time of Initial Orders: | | |

PS 2633 (R-3/13)※   EMERGENCY SERVICES PHYSICIAN RECORD

CANARY – Receiving Hospital
PINK – Attending M.D.

**Presence™**
Saint Joseph Medical Center

DC0029381580    DOB: 12/18/82
POOLE, AHMAD K95348

DC01881219

08/30/17
M 34

PATIENT
TRANSFER
CERTIFICATIO
CONSENT FOR

Page 1 o

## TO BE COMPLETED BY PHYSICIAN AUTHORIZING TRANSFER:

_____ Notification of on-call physician

Time notified _____ Time appeared _____
Refused or failed to appear _____
Name of on-call physician _____
Address of on-call physician _____
_____

_____ The patient has been stabilized such that, within reasonable medical probability, no material deterioration of the patient's condition is likely to result from transfer.

_____ Patient's condition has not been stabilized.

_____ Patient is a pregnant woman who is having contractions.

_____ Stabilization of patient to the extent of the medical facilities capabilities.

_____ The patient, (or legally responsible person acting on the patient's behalf) has consented to the transfer in writing.

_____ The receiving facility has available space and qualified personnel for the treatment of the patient.

_____ The receiving facility has agreed to accept the patient and provide appropriate medical treatment.

_____ The receiving facility will be provided with appropriate medical records of the examination and treatment of the patient.

## I DIRECT THAT THE PATIENT BE TRANSFERRED CONSISTENT WITH THESE INSTRUCTIONS:

The patient will be transferred by:   Name of service or agency _____ IDOC _____
with qualified personnel and transportation equipment, as required, including the use of necessary and medically appropriate life support measures as designated below:

_____ Ambulance / BLS

_____ Ambulance / ALS / Standard operating procedures to be followed

_____ Helicopter

_____ Other     state veh-cl

_____ Patient has been advised that they may be responsible for the cost of their ambulance transfer.

## MEDICAL ORDERS:

If radio contact is to be maintained during transfer, on-line medical direction over the patient's care to be exercised by:

_____ This hospital

_____ Destination hospital

_____ Other _____

(78000-019) 3104

8

EXHIBIT 7

Presence*
Saint Joseph Medical Center

DC0029381580     DOB: 12/18/82
POOLE, AHMAD K95348

DC01881219

08/30/17
M 34

PATIEN
TRANSF
CERTIFICA
CONSENT I

Page

I certify that based upon the reasonable risks and benefits to the patient, and based upon the information ava
at the time of the patient's examination, the medical benefits reasonably expected from the provision of appro
medical treatment at another medical facility outweigh the increased risks to the individual's medical condition
in the case of pregnancy/labor to mother and unborn child, from affecting the transfer.

THIS CERTIFICATION IS BASED UPON THE FOLLOWING:

BENEFITS: Specialist consultation

RISKS: decompensation during travel

ALTERNATIVES: outpatient follow up

Name / Signature of Physician Transferring Patient:

Physician Transferring PATK     DATE 8/30/17   TIME 1622   PHONE 815 741 7660

Name of Physician and Hospital Contacted / Accepted Patient's Transfer:

Charbel     DATE 8/30/17   TIME 1615   PHONE 855-455-4
Physician

UIC     DATE 8/30/17   TIME 1615   PHONE 855-455-
Hospital                                                                    4771

TO BE COMPLETED BY PATIENT (Check one of the following).

After being provided an appropriate medical screening examination based upon the information available at the
time of the examination and being informed of the risks, benefits and alternatives reasonably expected from the
provision of appropriate medical treatment, the risks involved in a transfer to another institution and the options
available, I am aware that I may be responsible for transfer charges, I do hereby:

_____ Accept responsibility and agree to transfer.

_____ Refuse to consent to further treatment or examination.

_____ Refuse to transfer to recommended facility. Request transfer to

_____ (facility).

_____ Refuse to consent to the appropriate transfer offered.

_____ Involuntary transfer to Long Term Facility.

Ahmad Poole
Signature of Patient (of Legally Responsible Person Acting On Patient's Behalf)*   DATE 8/30/17   TIME 1620

*Indicate relationship to patient

Witness                                                         DATE 8/30/17   TIME 1620

5094 East 1-312-996-1087

(78000-019) 3105

9

EXHIBIT 7

```
DATE: 09/08/17 @ 0126        Saint Joseph Medical Center EDM *LIVE*              PAGE 1
USER: D01QUISA                       EDM Patient Record
```

Patient  POOLE,AHMAD K95348                         Account No. DC0029381580
Age/Sex  34/M                                       Unit No. DC01881219

----ER Caregivers----                               Arrival Date/Time  08/30/17 1337
Physician     Paik,John M M.D.                      Triage Date/Time   08/30/17 1344
Practitioner  Nicholas A Sever P.A.
Nurse         Melissa Bertoletti                    Date of Birth  12/18/1982
PCP           Unknown,Unknown

Stated Complaint  NECK PAIN STATEVILLE
Chief Complaint   Neck Injury/Pain
       Priority  L3

Primary Impression
Closed C3 fracture
Secondary Impressions

Departure Disposition  02 GENERAL HOSPITAL          Departure Date/Time  08/30/17 2057
Departure Comment      TRANSFER TO UIC
Departure Condition    Good

## Allergies

| Allergy or Adverse Reaction | Type | Severity | Date | Ver |
|---|---|---|---|---|
| No Known Drug Allergy | Allergy | | 08/30/17 | N |

## Assessments

**Fall Risk Assessment**

By Jenna N Sarna, RN                                on 08/30/17 at 1344

**Fall History/Anticoagulant Therapy**
*History of Falls*                    No
*Is patient receiving the following medication therapy?*
*Other Fall Risk Considerations*

**Hendrich II - SELECT ALL THAT APPLY**
*Confusion / Disorientation*
*Depression*
*Altered Elimination*
*Dizziness / Vertigo*
*Gender (Male)*                    1
*Antiepileptics / Anticonvulsants*
*Benzodiazepines*

**Get UP and GO Test (Rising from Chair)**
*Get Up and Go Test*          Able to Rise/Single Movmt

**Hendrich II - Total Risk Score**
*Total (5 or greater = High Risk)*
                          1
*Score is less than 5, however pt is still a fall risk*

**Prevention Measures (ALL Patients)**
*Standard Fall Prevention Measures (For ALL Patients)*

EXHIBIT 7

```
DATE: 09/08/17 @ 0126        Saint Joseph Medical Center EDM *LIVE*              PAGE 2
USER: D01QUISA                    EDM Patient Record
```

| Patient | POOLE,AHMAD K95348 | Account No. DC0029381580 |
| Age/Sex | 34/M | Unit No. DC01881219 |

Adequate Lighting; Bed Down, Brakes Locked

### Prevention Measures-For Pt. at HIGH RISK
*Fall Prevention Measures for Patient at Fall Risk*

### Additional Prevention Measures
*Additional Fall Prevention Measures (select all that apply)*

### Comment
*Comment*

### Historical Med Review

By Jenna N Sarna, RN                                          on 08/30/17 at 1344

### Historical Med Review
    *Historical Meds entered/reviewed?*
           Yes
    *Source of Medication List*    Patient/Family recall
    *Disposition of Home Medications*
           No Meds brought in
    *Historical Med Comment*    NO MEDS

### MU - Smoking History/Exposure

By Jenna N Sarna, RN                                          on 08/30/17 at 1344

### Smoking History & Exposure
    *Patient age*    13 Years or older
    *Smoking Status*    Smoker,current status UNK
    *Past Smoke Exposure*    No
    *Current Smoke Exposure*    No
    *Provide Information on Smoking Cessation*
           No
    *Have You Smoked in the Last 12 Months*
           No
    *Approximately how many cigarettes per day?*
    *If you are a former smoker, when did you quit?*
    *Do you dip or chew tobacco?*
    *Level of dependence*
    *Patient Requests Smoking Cessation Referral*
    *Other Types of Smoking*

### Triage (Primary)

By Jenna N Sarna, RN                                          on 08/30/17 at 1344

### Arrival
    *Reason for visit*    NECK PAIN X 2 WEEKS
    *Onset of Chief Complaint*    08/30/17
    *Time*    1345

Patient   POOLE,AHMAD K95348                          Account No. DC0029381580
Age/Sex   34/M                                        Unit No. DC01881219

   *Mode of Arrival*                  Police
   *Other mode of arrival*
   *Accompanied by*                    Police
   *Accompanied by other*
   *Patient age under 18/ OB patient/ Behavioral Health patient?*
                                       No
   *Have you been hospitalized within the last 30 days*
                                       No
   *Date of discharge*
   *Name of Hospital, City/State*
   *Why were you hospitalized*

Communication
   *Preferred Language*                English
   *Communication Barriers*
   *Communication Barrier Comment*

Temperature
   *Temperature (Fahrenheit)*          98.5 (degrees F)
   *Temperature (Calculated Celsius)*
                                    36.94740 (degrees C)
   *Source*                            Oral
   *Temperature Comment*
   *Temperature Result for SIRS*       Does not meet criteria

Pulse
  Occurrence #1
   *Pulse Rate*                        68 (bpm)
   *Side*
   *Location*                          Monitor
   *Pulse Comment*
   *Pulse Result for SIRS*             Does not meet criteria

Respirations
   *Respiratory Rate*                  16 (bpm)
   *Respiratory Comment*
   *Respiration Result for SIRS*       Does not meet criteria

Pulse Oximetry
   *Saturation*                        99 (%)
   *Oxygen Delivery Method*            Room Air
   *Pulse Oximeter Comment*
   *Saturation result for SIRS*        Does not meet criteria

Blood Pressure
  Occurrence #1
   *Blood Pressure Systolic*           147 (mm Hg)
   *Blood Pressure Diastolic*          99 (mm Hg)
   *Blood Pressure Mean*               115 (mm Hg)
   *Side*                              Left
   *Blood Pressure Comment*
   *SBP Result for SIRS*               Does not meet criteria

Presence of Pain

```
DATE: 09/08/17 @ 0126      Saint Joseph Medical Center EDM *LIVE*        PAGE 4
USER: D01QUISA                      EDM Patient Record
```

| Patient  POOLE, AHMAD K95348 | Account No. DC0029381580 |
| --- | --- |
| Age/Sex  34/M | Unit No. DC01881219 |

```
   Pain Present?                       Yes
   Pain Intensity                      10 (out of 10)
   Pain Scale Used                     0-10
   Acceptable Level of Pain
```

**Weight/Height**
```
   Weight (Kilograms)                  84.00 (kg)
   Weight (Calculated Pounds)          184.800 (lbs)
   Weight Measurement Method
   Height (Feet)                       5 (ft)
   Height (Inches)                     7 (in.)
   Height (Calculated Inches)          67 (in)
   Height (Calculated Centimeters)
                                       170.18 (cm)
```

**Suspected Infection (18+ Yr)**
```
   Pt hx suggest new/suspected/confirmed inf or high-risk cond?
                                       No
```

**Sepsis Screening Tool (18+ Yr)**
```
   Additional Signs and symptoms of infection, present and new
                                       No additional criteria
   SIRS Result                         Negative
```

**Neutropenic/Sepsis Screening**
```
   Do you have Cancer and treated w/Chemo w/in the last 14 days
                                       No
   Fever (Temperature of 100.4F in Triage or at home)
                                       No
   Comment
```

| Triage (Secondary) | |
| --- | --- |
| By Jenna N Sarna, RN | on 08/30/17 at 1344 |

**Medical History**
```
   Information provided by             Patient
   Other Information provided by
   Past Medical History
   Past Surgical History               None
   Other Medical History               SICKLE CELL TRAIT
   Has patient reached menarche?
   Date Last Menstrual Period
   COMMENT
   Is the patient pregnant?
   Are you being followed by Palliative Care?
```

**Infectious Disease**
```
   Hx Drug Resistant Organism          No
   Colonized with resistant organism:
                                       NONE
   Explain other colonized w/ resist organism
```

```
DATE: 09/08/17 @ 0126        Saint Joseph Medical Center EDM *LIVE*          PAGE 5
USER: D01QUISA                        EDM Patient Record
```

```
Patient  POOLE,AHMAD K95348                    Account No  DC0029381580
Age/Sex  34/M                                  Unit No  DC01881219
```

### Tuberculosis(TB) Risk Screening
    *TB Exposure*          No
    *TB Risk Factors*     None
    *TB Symptoms*       None

### Recent Travel Screening
    *Have you traveled in the last month*
                    No
    *Regions visited in the last month*
    *Region Comment*
    *Date of departure*
    *Date of return*

### Exposure Screening
    *Contact w/ someone with a communicable disease in last month*
                    No
    *Diseases exposed to*
    *Specify Other*
    *Exposure date*

### Symptoms
    *Symptoms in the last week*
    *Other symptoms in the last week*

### Violence Screening
    *Does Patient have a history of:*
                    Violence
    *Is patient currently seeking treatment for:*
                    Assault
    *Is patient under the influence of alcohol/drugs?*
                    No
    *Patient Placed in Private Room:*
    *Violence screening comment*    PT ASSAULTED BY ANOTHER INMATE 2 WEEKS AGO

### Suicide Screening (13+ Yr)
    *In last 14 days have you experienced or had concerns about*
                    Denies Experience/Concern
    *Comment*
    *Report Positive Findings to the Clinician/Physician*
                    No Positive Findings

### Abuse Screen
    *Current or History of Abuse/Neglect in the last 6 months*
                    None
    *Suspected Abuse?*      No
    *Abuse Screen Comment*

### Pediatric Screening (0-15 Yr)
    *Any concern for safety at home?*
    *Hx Physical Abuse*
    *Presenting injuries consistent with patient's explanation?*
    *If concerns are present, referral made to*
    *Referral Comment:*

```
DATE: 09/08/17 @ 0126        Saint Joseph Medical Center EDM *LIVE*              PAGE 6
USER: D01QUISA                    EDM Patient Record

Patient  POOLE.AHMAD K95348                       Account No. DC0029381580
Age/Sex  34/M                                        Unit No. DC01881219
```

**Trauma Categorization for Trauma Centers**
    *GCS*
    *RTS*
    *Trauma Category*

**Vital Signs Adult**

By Jenna N Sarna, RN                                 on 08/30/17 at 1718


**Temperature**
    *Temperature Source*
    *Temperature - Unit of Measure*

**Temperature - Celcius**
    *Temperature (Celsius)*
    *Temperature (Calculated Fahrenheit)*

**Temperature - Fahrenheit**
    *Temperature (Fahrenheit)*
    *Temperature (Calculated Celsius)*

**Pulse**
  Occurrence #1
    *Pulse Rate*               77 (bpm)
    *Rhythm*                Regular
    *Side*
    *Location*             Monitor
    *Strength*
    *Method*
    *Pulse Position*

**Respirations**
    *Respiratory Rate*     18 (bpm)
    *Depth*                Normal
    *Effort*               Normal; Non-Labored
    *Pattern*             Regular

**Pulse Oximetry**
    *Saturation*          99 (%)
    *Oxygen Delivery Method*  Room Air
    *Oxygen Flow Rate*
    *FI02*
    *EtC02*

**Blood Pressure**
  Occurrence #1
    *Blood Pressure Systolic*  141 (mm Hg)
    *Blood Pressure Diastolic*  94 (mm Hg)
    *Blood Pressure Mean*    110 (mm Hg)
    *Location*             Left Arm
    *Source*              Automatic Cuff
    *Blood Pressure Position*  Sitting

```
DATE: 09/08/17 @ 0126        Saint Joseph Medical Center EDM *LIVE*        PAGE 7
USER: D01QUISA                     EDM Patient Record
```

Patient  POOLE, AHMAD K95348                              Account No. DC0029381580
Age/Sex  34/M                                             Unit No. DC01881219

### Pain
*Pain Intensity*
*Nonverbal / Cognitively Impaired*
*Pain Scale*

### Major Medical Assessment

By Melissa Bertoletti, RN                                    on 08/30/17 at 1929

### Neurological System Assessment
*Neurological System Within Normal Limits*
                     Yes
*Neurological Symptoms*        No Symptoms
*Arousable To*            Alert
*Oriented To*             Person; Place; Time; Events
*Hand Grips Equal*        Grips Equal
*Fontanelle (if applicable)*

### Glascow Coma Scale (Adult)
*Glasgow Coma Scale Eye Opening*  Spontaneous
*Glasgow Coma Scale Verbal*     Oriented
*Glasgow Coma Scale Motor*      Obeys Commands
*Glasgow Coma Scale Total*      15 (points)

### Glascow Coma Scale (Pediatric)
*Eye Opening*
*Verbal Response*
*Motor Response*
*Glascow Coma Score Total (Infant)*

### Eye Opening
Occurrence #1
*Side*                  Both
*Reaction*           Brisk
*Size*                  4 (mm)
*Equality*           PERL

### Neurological
*Neurological Comment*

### Psychosocial
*Psychosocial Comment*

### Cardiovascular Assessment
*Cardiovascular System Within Normal Limits*
                    Yes
*Cardiovascular Symptoms*
*Jugular Vein Distention*     No
*Capillary Refill*        Less Than 3 Seconds
*Circulatory Tenderness Description*

### Edema
Occurrence #

EXHIBIT 7

```
DATE: 09/08/17 @ 0126      Saint Joseph Medical Center EDM *LIVE*          PAGE 8
USER: D01QUISA                  EDM Patient Record

Patient  POOLE,AHMAD K95348                      Account No. DC0029381580
Age/Sex  34/M                                    Unit No. DC01881219
```

    *Side*
    *Location*
    *Type*
    *Degree*

**Cardiovascular**
    *Cardiovascular Comment*

**Respiratory System Assessment**
    *Respiratory System Within Normal Limits*
                                    Yes

    *Respiratory Symptoms*
    *Depth*                         Normal
    *Respiratory Effort*            Non-Labored
    *Lung Expansion*                Symmetrical

**Auscultation**
  *Occurrence #1*
    *Location*                      Throughout
    *Modifier*                      Anterior
    *Phase*                         Inspiratory/Expiratory
    *Lung Sounds*                   Clear
  *Occurrence #2*
    *Location*                      Throughout
    *Modifier*                      Posterior
    *Phase*                         Inspiratory/Expiratory
    *Lung Sounds*                   Clear

**Cough**
    *Cough Description*
    *Sputum Amount*
    *Sputum Consistency*
    *Sputum Color*
    *Sputum Comment*

**Respiratory**
    *Respiratory Comment*

**Gastrointestinal Assessment**
    *Gastrointestinal Assessment: WNL*
                                    Yes

    *Gastrointestinal Symptoms*
    *Abdomen Description*           Non-Tender; Soft

**Bowel Sounds**
    *Bowel Sound*                   Active

**Nausea/Vomiting**
    *Nausea/Emesis*                 No
    *Emesis Description*

**Gastrointestinal**
    *Gastrointestinal Comment*

EXHIBIT 7

```
DATE: 09/08/17 @ 0126        Saint Joseph Medical Center EDM *LIVE*              PAGE 9
USER: D01QUISA                    EDM Patient Record
```

Patient   POOLE,AHMAD K95348                         Account No. DC0029381580
Age/Sex   34/M                                       Unit No  DC01881219

**Urinary Assessment**
   *Genitourinary System Within Normal Limits*
                                        Yes
   *Genitourinary Symptoms*             No Symptoms
   *Associated Symptoms - Genitourinary*
                                        No Symptoms

**Voiding Pattern**
   *Bladder Pattern*                    Normal

**Urine**
   *Urine Appearance*                   Clear
   *Urine Color*                        Amber
   *Urine Odor*
   *Diapers*

**Musculoskeletal**
   *Musculoskeletal System Within Normal Limits*
                                        No
   *Musculoskeletal Comment*            C/O NECK PAIN

**Integumentary Assessment**
   *Integumentary Assessment Within Normal Limits*
                                        Yes
   *Integumentary comment*

**Vital Signs Adult**

**By Melissa Bertoletti, RN**                         on 08/30/17 at 1929

**Temperature**
   *Temperature Source*                 Oral
   *Temperature - Unit of Measure*      Fahrenheit

**Temperature - Celcius**
   *Temperature (Celsius)*
   *Temperature (Calculated Fahrenheit)*

**Temperature - Fahrenheit**
   *Temperature (Fahrenheit)*           98.6 (degrees F)
   *Temperature (Calculated Celsius)*
                                        37.00296 (degrees C)

**Pulse**
  Occurrence #1
   *Pulse Rate*                         62 (bpm)
   *Rhythm*                             Regular
   *Side*                               Left
   *Location*                           Monitor
   *Strength*                           Normal
   *Method*                             Mechanical
   *Pulse Position*                     Sitting

EXHIBIT 7

```
DATE: 09/08/17 @ 0126        Saint Joseph Medical Center EDM *LIVE*          PAGE 10
USER: D01QUISA                     EDM Patient Record
```

| Patient   POOLE, AHMAD K95348 | Account No  DC0029381580 |
|---|---|
| Age/Sex   34/M | Unit No  DC01881219 |

**Respirations**
- Respiratory Rate — 16 (bpm)
- Depth — Normal
- Effort — Normal
- Pattern — Regular

**Pulse Oximetry**
- Saturation — 98 (%)
- Oxygen Delivery Method — Room Air
- Oxygen Flow Rate
- FIO2
- EtCO2

**Blood Pressure**
- Occurrence #1
  - Blood Pressure Systolic — 128 (mm Hg)
  - Blood Pressure Diastolic — 71 (mm Hg)
  - Blood Pressure Mean — 90 (mm Hg)
  - Location — Left Arm
  - Source — Automatic Cuff
  - Blood Pressure Position — Sitting

**Pain**
- Pain Intensity — 4 (out of 10)
- Nonverbal / Cognitively Impaired
- Pain Scale — 0-10

**Intake and Output**

By Melissa Bertoletti, RN                                    on 08/30/17 at 1930

**Intake**
- Oral Intake
- Tube Feeding Amount
- Tube Feeding Flush
- Number of Breastfeeding Episodes
- Blood Product Type
- Intake, Blood Product Amount (non-TAR)
- Intake, Autotransfusion Amount
- Intake, Peritoneal Dialysis Amount
- Intake, Continuous Bladder Irrigation
- Drain Flush
- Intake, Other Amount

**Total Intake**
- Total, Intake Amount

**Output**
- Output, Urine Amount — 300.00 (ml)
- Void Measurement Method — Measured
- Urinary Output Device
- Number of Continent Voids
- Number of Incontinent Voids

EXHIBIT 7

Patient  POOLE,AHMAD K95348                      Account No. DC0029381580
Age/Sex  34/M                                       Unit No. DC01881219

    *Total Number of Voids*
    *Output, Autotransfusion Blood Amount*
    *Output, Peritoneal Dialysis Amount*
    *Output, Net Hemodialysis Amount*
    *Actual CRRT UF*
    *Output, Continuous Bladder Irrigation*
    *Output, Stool Amount*
    *Stool Output Method*
    *Number of Continent Bowel Movements*
    *Number of Incontinent Bowel Movements*
    *Total Number of Bowel Movements*
    *Output, Urine/Stool Mix Amount*
    *Output, Emesis Amount*
    *Episodes of Emesis*
    *Estimated Blood Loss*
    *Quantified (Actual) Blood Loss*
    *Other Output Amount* `

**Gastric Drainage**
  *Occurrence #*
    *Gastric Tube Types*
    *Gastric Tube Location*
    *Output, Gastric Drainage Amount*

**Chest Tube Output**
  *Occurrence #*
    *Chest Tube Position*
    *Chest Tube Location*
    *Drainage Color*
    *Suction Amount*
    *Output, Chest Tube Drainage Amount*

**Drain Output**
  *Occurrence #*
    *Drain Position*
    *Drain Location*
    *Drain Type*
    *Drainage Color*
    *Drainage Odor*
    *Output, Drainage Amount*

**Total Output**
    *Total, Output Amount*          300.00 (ml)

**Vital Signs Adult**

By Melissa Bertoletti, RN                          on 08/30/17 at 2030

**Temperature**
    *Temperature Source*          Oral
    *Temperature – Unit of Measure*  Fahrenheit

**Temperature – Celcius**

EXHIBIT 7

```
DATE: 09/08/17 @ 0126     Saint Joseph Medical Center EDM *LIVE*          PAGE 12
USER: D01QUISA                    EDM Patient Record

Patient  POOLE,AHMAD K95348              Account No. DC0029381580
Age/Sex  34/M                             Unit No. DC01881219
```

    *Temperature (Celsius)*
    *Temperature (Calculated Fahrenheit)*

**Temperature - Fahrenheit**
    *Temperature (Fahrenheit)*     98.3 (degrees F)
    *Temperature (Calculated Celsius)*
                          36.83628 (degrees C)

**Pulse**
  <u>Occurrence #1</u>
    *Pulse Rate*          64 (bpm)
    *Rhythm*            Regular
    *Side*
    *Location*          Monitor
    *Strength*         Normal
    *Method*           Mechanical
    *Pulse Position*     Sitting

**Respirations**
    *Respiratory Rate*    16 (bpm)
    *Depth*            Normal
    *Effort*           Normal
    *Pattern*          Regular

**Pulse Oximetry**
    *Saturation*        100 (%)
    *Oxygen Delivery Method*  Room Air
    *Oxygen Flow Rate*
    *FIO2*
    *EtCO2*

**Blood Pressure**
  <u>Occurrence #1</u>
    *Blood Pressure Systolic*  126 (mm Hg)
    *Blood Pressure Diastolic* 70 (mm Hg)
    *Blood Pressure Mean*    88 (mm Hg)
    *Location*          Left Arm
    *Source*           Automatic Cuff
    *Blood Pressure Position*  Sitting

**Pain**
    *Pain Intensity*       4 (out of 10)
    *Nonverbal / Cognitively Impaired*
    *Pain Scale*         0-10

**Disposition/Discharge**

**By Melissa Bertoletti, RN**               on 08/30/17 at 2040

**Disposition**
    *Departure Mode*      Ambulatory
    *Report Given to RN name* WILLIAM R.N.
    *Transferred to Room Number* UIC

EXHIBIT 7

```
DATE: 09/08/17 @ 0126      Saint Joseph Medical Center EDM *LIVE*        PAGE 13
USER: D01QUISA                     EDM Patient Record

Patient  POOLE,AHMAD K95348                    Account No. DC0029381580
Age/Sex  34/M                                  Unit No. DC01881219


Accompanied by
     Accompanied by                    GUARDS

IV/Equipment/Foley
     IV Fluids Infusing on Admission/Transfer
     IV Discontinued/Catheter Intact
     IV Discontinued Date
     IV Discontinued Time
     Equipment/ Accompanied on Admission/Transfer
     Foley on Disposition from ED
     DC Foley Date
     DC Foley Time

Vital Signs Prior to Discharge/Transfer
   Occurrence #
     Blood Pressure Location
     Blood Pressure Systolic
     Blood Pressure Diastolic

     Pulse Rate
     Respiratory Rate
     O2 Sat by Pulse Oximetry
     Temperature (Fahrenheit)
     Temperature Source
     Pain Intensity
     Pain Scale
     GCS Score                         15

Instructions
     Teaching Recipient               Patient; Other
     Primary Language                 English
     Return to ED for
     Return to ED on
     Patient offered ability to access their Health Information
                                       Yes
     Was Patient Discharged by Ambulance?
                                       No
     Was patient treated for Opioid/Heroin overdose?
                                       No

Tests Pending at Discharge
     Tests Pending at Discharge

School/Work Release
     No Physical Education or Sports until
     Return to work or school
     Return to work with restrictions
```

EXHIBIT 7

```
DATE: 09/08/17 @ 0126      Saint Joseph Medical Center EDM *LIVE*        PAGE 14
USER: DO1QUISA                    EDM Patient Record
```

| Patient | POOLE,AHMAD K95348 | Account No. DC0029381580 |
|---|---|---|
| Age/Sex | 34/M | Unit No. DC01881219 |

### Patient Notes

**By: Jenna N Sarna, RN**       On: 08/30/17 - 1340
PT IS INMATE AT STATESVILLE HERE TODAY FOR A CT SCAN. PER PT, HE WAS IN A
PHYSICAL ALTERCATION 2 WEEKS AGO THAT RESULTED IN NECK PAIN. PER PT, HE WAS IN
A HEAD LOCK WHEN HE WAS PULLED AND HAD HIS NECK STRAINED. PT STATES THAT PAIN
HAS IMPROVED, BUT HE STILL RATES IT AS 10/10. SECURITY NOTIFIED, PT UNDRESSED
AND PUT IN GOWN. PT WANDED. CORRECTION OFFICERS AT BEDSIDE. AWAITING
EVALUATION.

**By: Sarah E Quigley, RN**       On: 08/30/17 - 1420
ERPA AT BEDSIDE EVALUATING PT.

**By: Sarah E Quigley, RN**       On: 08/30/17 - 1425
PT TO CT VIA CART IN STABLE CONDITION.

**By: Jenna N Sarna, RN**       On: 08/30/17 - 1530
PT IN ROOM RESTING ON CART IN STABLE CONDITION. NO QUESTIONS OR CONCERNS AT
THIS TIME.

**By: Jenna N Sarna, RN**       On: 08/30/17 - 1540
C-SPINE PRECAUTIONS TO REMAIN IN PLACE.

**By: Jenna N Sarna, RN**       On: 08/30/17 - 1620
PT TO BE TRANSFERRED TO UIC FOR SPECIALTY CARE. TRANSFER CONSENT FORM SIGNED
AND OBTAINED. PT WILL BE TRANSFERRED DOWNTOWN VIA POLICE TRANSPORT.

**By: Jenna N Sarna, RN**       On: 08/30/17 - 1626
DISC OF IMAGES REQUESTED.

**By: Jenna N Sarna, RN**       On: 08/30/17 - 1717
PT RESTING ON BED COMFORTABLY AWAITING TRANSPORT NOTIFICATION. VSS ON MONITOR.
PT REMAINS NPO

**By: Jenna N Sarna, RN**       On: 08/30/17 - 1818
STILL AWAITING CALL BACK WITH BED NOTIFICATION FROM UIC. PT RESTING IN BED WITH
POLICE AT BEDSIDE. C-SPINE PRECAUTIONS STILL IN PLACE.

**By: Jenna N Sarna, RN**       On: 08/30/17 - 1821
UIC CALLED - PT HAS BED AND IT IS BEING CLEANED. UIC WILL CALL AS SOON AS BED
IS CLEAN AND READY. WILL NOT PROVIDE ROOM NUMBER AT THIS TIME. HOA NOTIFIED AND
AWARE.

**By: Melissa Bertoletti, RN**       On: 08/30/17 - 1929
ASSUMED CARE OF PT FROM JENNA R.N.  PT IS ALERT AND ORIENTED X 3.  CERVICAL
COLLAR IN PLACE.  PT'S LEFT ARM IS SHACKLED TO THE ED CART AND THERE ARE 2
STATESVILLE GUARDS AT THE BEDSIDE.  PT IS COOPERATIVE.  C/O NECK PAIN 4/10  AT
THIS TIME.  WAITING FOR UIC TO CALL WITH A ROOM NUMBER FOR THE PT.  PT AND THE
STATESVILLE GUARDS UPDATED ON PT'S PLAN OF CARE.  WILL CONTINUE TO MONITOR.

**By: Melissa Bertoletti, RN**       On: 08/30/17 - 1930
PT DENIES ANY NUMBNESS, WEAKNESS OR TINGLING.

EXHIBIT 7

```
DATE: 09/08/17 @ 0126      Saint Joseph Medical Center EDM *LIVE*          PAGE 15
USER: D01QUISA                    EDM Patient Record
```

```
Patient  POOLE,AHMAD K95348                    Account No. DC0029381580
Age/Sex  34/M                                  Unit No. DC01881219
```

**By: Melissa Bertoletti, RN**      On: 08/30/17 - 1931
PT VOIDED 300MLS CLEAR YELLOW URINE PER URINAL.

**By: Melissa Bertoletti, RN**      On: 08/30/17 - 2030
TRANSFER CENTER FROM UIC CALLED, PT HAS A BED 594 EAST.

**By: Melissa Bertoletti, RN**      On: 08/30/17 - 2031
REPORT CALLED TO WILLIAM R.N.

**By: Melissa Bertoletti, RN**      On: 08/30/17 - 2040
PT ALERT AND ORIENTED X 3.  PT WILL BE TRANSFERRED TO UIC PER STATESVILLE
GUARDS.  CERVICAL COLLAR IN PLACE.  TRANSFER PAPERWORK GIVEN TO THE STATESVILLE
GUARDS.  AMBULATED OUT OF FACILITY WITH THE STATESVILLE GUARDS.

### Diagnoses

```
M54.2       CERVICALGIA
S12.290A    OTH DISP FX OF THIRD CERVICAL VERTEBRA, INIT FOR CLOS FX
Y04.0XXA    ASSAULT BY UNARMED BRAWL OR FIGHT, INITIAL ENCOUNTER
Y92.149     UNSP PLACE IN PRISON AS PLACE
D57.3       SICKLE-CELL TRAIT
```

### Orders

```
Date     Time  Procedure                        Ordering Provider

08/30/17 1422  CT CERVICAL SPINE WO CONTRAST     Sever,Nicholas A P.A.
```

### Patient Instructions

Micromedex Instr given to pt.

### Referrals

POOLE,AHMAD K95348 has been referred to the below for follow up care:

    Unknown,Unknown
    Phone: (111)222-3456:2222

### Departure Forms

Additional Preventative Instr
AFTERCARE INSTRUCTIONS
Patient Portal Instructions

EXHIBIT 7

DATE: 09/08/17 @ 0126
USER: FOLGUEIA

Saint Joseph Medical Center EDM "LIVE"
Patient Short Form wLab Result

Patient: ROUSE/JARRAD K95368
MD Provider: Pain,John M M.D.

Acct No: DCC0S3951590
Unit No: UC110453315

Age/Race: 38/M                    DEMOGRAPHIC

1325 COLLINS ST
JOLIET, IL 60432
(815)727-8241
Insurance: BEYOND HLTH SOURCES - INMATES        PCP : Unknown,Unknown
Next of Kin: ROUSE,JARRAD                        Family Doctr:
  Relation: OTHER                                Referring:
  Phone: (815)727-4141

                                 GENERAL DATA

MD Physician: Pain,John M M.D., MD        Arrival Date/Time: 08/30/17 - 1237
Practitioner: Nicholas A Bevar P.A.        Triage Date/Time: 08/30/17 - 1346
Nurse: Melissa Bartolotti, RN             Date of Birth: 12/10/1982

Stated Complaint: NECK PAIN STATEVILLE
Chief Complaint: Neck Injury/Pain            Priority: L3
Status Event History:
08/30/17   1329 InComing
           1337 Registered
           1337 Check In
           1346 Triaged
           1413 With Advanced Practitioner
           1420 With Doctor
           2067 Patient Left Dept
08/07/17   0006 Clean Up

                                 ALLERGIES

No Known Drug Allergy

Patient: ROUSE/JARRAD K95368

**PRESENCE SAINT JOSEPH MEDICAL CENTER**
**333 N. Madison**
**Joliet, IL**

## HEALTH INFORMATION MANAGEMENT

**NAME:** POOLE,AHMAD K95348          **DOB/AGE/SEX:** 12/18/1982 - 34 – M
**HOME PHONE:** (815)727-6141
**PHYSICIAN:**                               **ADMIT DATE:**
**NONSTAFF:**
**NONSTAFF FAX #:**
**UNIT #:** DC01881219                      **DIS DATE:** 08/30/17
**ACCT#:** DC0029381580                 **LOC/RM/BED:** D01EDA -

**ER PHYSICIAN DOCUMENTATION**
REPORT # : 0830-1094

Chart created at 08/30/2017 15:02 by Nicholas Sever

Chart closed at 08/30/2017 21:04

Patient Registered at 08/30/2017 13:29, departure at 08/30/2017 20:57

Patient Registered at: 08/30/2017 13:29  Patient Seen at: 08/30/2017
14:34  Historian: Patient and Transfer  PCP: Unknown,Unknown MD

Chief Complaint:NECK PAIN STATEVILLE

Initial Vital Signs reviewed.

I confirm that the attending physician has examined the patient, reviewed my
documentation on the patient's chart, and discussed the evaluation, plan of
care and disposition of the patient with me..

Patient interviewed by me.

Temperature: 36.9 C (98.4 F). Pulse: 68. Respiratory
Rate: 16. Blood-pressure: 147/99. Oxygen Saturation: 99% room air; Normal.

History of Present Illness:

34 Year old male inmate in police custody presents with neck pain x2 weeks.
Patient reports he was in an altercation 2 weeks ago, was placed in a head
lock and twisted his neck. Since then, the patient has had pain in the back of
the neck. He reports no weakness, numbness or tingling. No head injury, no
loss of consciousness. No other injuries. Patient was seen in the prison
infirmary today, had plain films showing possible C3-C4 subluxation so he was
sent to the ED for further evaluation.

HPI Elements: Onset: 2 Weeks ago; Location: neck; Severity: now [10];
Context: Trauma

Review of Systems. Constitutional: negative for Chills or Fever Eyes: negative
for Eye Pain or Vis. Changes Ear/Nose/Throat: negative for Congestion or Sore
Throat Cardio-Vascular: negative for Chest Pain or Palpitations Skin: negative

Page 1 of 5
Print time:  at

EXHIBIT 7

**PRESENCE SAINT JOSEPH MEDICAL CENTER**
**HEALTH INFORMATION MANAGEMENT**
REPORT # : 0830-1094

**NAME:** POOLE,AHMAD K95348          **UNIT#:** DC01881219          **ACCT#:** DC0029381580

for Itch or Rash Respiratory: negative for Cough or Dyspnea GI: negative for
Nausea or Vomiting GU: negative for Dysuria or Hematuria Musculo-Skeletal:
negative for Back Pain Neurological: negative for Confusion, Numbness or
Weakness

Past Medical History:

Sickle cell trait

Medications: None.

Allergies: Reviewed RN Note

Social History:

Incarcerated/Police custody

Physical Examination: General: Alert; no apparent distress
HEENT:  Head: Atraumatic.    Oropharynx /
Throat: Moist mucous membranes. Neck: No Lymphadenopathy; C-collar in place.
Midline tenderness in C3-C4 area. No palpable deformity. Respiratory: No Resp
Distress Cardio-Vascular: RRR Extremity: Normal Equal pulses Neurological:
Alert, Oriented X3, Normal Sensation, No Gross Weakness, Speech Normal and 5/5
UE/LE Strength Skin: No rash, Warm and Dry Psychological: Mood/Affect Normal

Medical Decision Making

34 Year old male inmate in custody presents with neck pain after an
altercation 2 weeks ago. He does have some midline tenderness on exam but
otherwise is neurologic exam is within normal limits. He presented the prison
infirmary were a plain film of his C-spine was suggestive of C3 subluxation
according to the report. I have no images accompanying the patient
independently verify this. Plan for CT in the ED. Patient is declining offer
of pain medication. CT C-spine does show a displaced inferior right facet
fracture at C3 with perching on C4. There is also anterior translation of C3
on C4 of 1 mm. Patient is mid maintained in cervical spinal precautions while
in the emergency department. We have no spine coverage today. The University
Illinois at Chicago was called for consultation. They recommend transfer.
Patient is agreeable with this plan. Risks and benefits of transfer were
discussed. Patient will be transported by state vehicle, he is declining
ambulance transport.

Re-Evaluation:

16:27: Updated patient on plan for transfer to UIC. He's agreeable. NPO for
now..

Consults:

15:02: Dr. Johanek; radiology; Informed me of critical read: there is an
inferior facet fracture at C3 with perching on C4

(78000-019) 3123

27

EXHIBIT 7

**PRESENCE SAINT JOSEPH MEDICAL CENTER**
**HEALTH INFORMATION MANAGEMENT**
REPORT # : 0830-1094

**NAME:** POOLE,AHMAD K95348        **UNIT #:** DC01881219        **ACCT #:** DC0029381580

16:11: UIC; has accepted transfer under Dr. Charbel; provided clinical
information to the neurosurgery resident

Additional Information: Discussed Results, Diagnosis and Follow-Up with
Patient.

Clinical Impression:

1. Closed displaced right C3 facet fracture

Disposition: Transferred UIC. Condition: Stable

Electronically signed by Nicholas Sever on 08/30/2017 at 21:04

Direct patient care supervision and electronic documentation review by John
Paik MD on 08/30/2017 21:34.

Imaging Study Obtained:
CT CERVICAL SPINE WO CONTRAST, Status:Signed Report Available

PRESENCE SAINT JOSEPH MEDICAL CENTER

333 North Madison Street

Joliet, IL

NAME: POOLE,AHMAD K95348 DOB/AGE/SEX: 12/18/1982 - 34 - M

PHYSICIAN: ADMIT DATE:

UNIT #: DC01881219 DIS DATE:

ACCT #: DC0029381580 LOC/RM/BED: D01EDA-

DIAGNOSTIC IMAGING SERVICES

CT/CT CERVICAL SPINE WO CONTRAST: 0830-0119

ORDER DATE: 08/30/17

REPORT #: 0830-0377

CT Cervical Spine

History: Altercation, neck pain.

Technique: Helical images of the cervical spine were obtained without the use
of IV contrast.

Coronal and sagittal reformatted images were created and interpreted.

Page 3 of 5
Print time: at

(78000-019) 3124

28

EXHIBIT 7

**PRESENCE SAINT JOSEPH MEDICAL CENTER**
**HEALTH INFORMATION MANAGEMENT**
REPORT # : 0830-1094

**NAME:** POOLE,AHMAD K95348          **UNIT #:** DC01881219          **ACCT #:** DC0029381580

Patients undergoing CT with documentation that one or more of the following dose reductions

techniques were used:

Automated exposure control

Adjustment of the mA and/or kV according to patient size

Use of iterative reconstruction technique

Comparison: None.

Findings:

There is a minimally displaced fractures seen involving the tip of the inferior right C3 articular

facet with slight anterior displacement of C3 with respect to C4 measuring 1 mm. The right inferior

C3 articular facet is perched over the right superior C4 facet. The left-sided C3-4 articulation is

well-maintained.

The remaining cervical levels appear normal in height, mineralization and alignment. No additional

fractures are noted.

Intervertebral disc heights appear well-maintained.

Pre-vertebral soft tissues are within normal limits.

Pre-dental space is normal.

Impression:

There is a minimally displaced fracture identified involving the tip of the inferior right C3

articular facet which is perched over the top of the right superior C4 facet. There is very slight

anterior translation of C3 with respect to C4 noted measuring 1 mm. This was reported to Nicholas

Sever, PA-C by myself via telephone on August 30, 2017 at 1500 hours.

Page 4 of 5
Print time:  at

EXHIBIT 7

**PRESENCE SAINT JOSEPH MEDICAL CENTER**
**HEALTH INFORMATION MANAGEMENT**
REPORT # : 0830-1094

**NAME:** POOLE,AHMAD K95348        **UNIT #:** DC01881219        **ACCT #:** DC0029381580

DICTATED: Andrew Johanek D.O.

<Electronically signed by Andrew Johanek D.O. in OV>

Andrew Johanek D.O.

08/30/17 1509

DRAFT UNTIL SIGNED

S: Signed

D: 08/30/17 1459

T: 08/30/17 1459 PS

REPORT#:0830-0377

CC: Nicholas A Sever, P.A.; Unknown Unknown

of 2

Radiology: Discussed with Radiologist, Image Reviewed and Interpreted by
Radiologist.

DICTATED: Nicholas A Sever P.A.
<Electronically signed by Nicholas A Sever P.A. in OV>

Nicholas A Sever P.A.
08/31/17 0105
**DRAFT UNTIL SIGNED**

S: Signed
D: 08/31/17 0105
T: 08/31/17 0105 FS

REPORT#:0830-1094

CC:

Page 5 of 5
Print time:  at

(78000-019) 3126

**30**

EXHIBIT 7

**PRESENCE SAINT JOSEPH MEDICAL CENTER**
**333 N. Madison**
**Joliet, IL**

## HEALTH INFORMATION MANAGEMENT

**NAME:** POOLE,AHMAD K95348
**HOME PHONE:** (815)727-6141
**PHYSICIAN:**
**NONSTAFF:**
**NONSTAFF FAX #:**
**UNIT #:** DC01881219
**ACCT#:** DC0029381580

**DOB/AGE/SEX:** 12/18/1982 - 34 – M

**ADMIT DATE:**

**DIS DATE:**
**LOC/RM/BED:** D01EDA -

**ER PHYSICIAN DOCUMENTATION**
REPORT # : 0830-1159

Chart created at 08/30/2017 16:35 by John Paik MD

Chart closed at 08/30/2017 16:35

Patient Registered at 08/30/2017 13:29

Patient Registered at: 08/30/2017 13:29  Patient Seen at: 08/30/2017
14:34  Historian: Patient  PCP: Unknown,Unknown MD

Chief Complaint:NECK PAIN STATEVILLE

Triage Note reviewed and Initial Vital Signs reviewed.

Documented by kaur,navedeep for Paik,John at 30 Aug 2017, 16:29.

I have independently evaluated the patient \T\ agree with the advanced practice
provider's diagnostic and treatment plan unless elsewhere noted.

All medical record entries made by the Scribe were at my direction and
personally dictated by me. I have reviewed the chart and agree that the record
accurately reflects my personal performance of the history, physical exam,
assessment and plan. I have also personally directed, reviewed, and agree with
the discharge instructions. .

Patient interviewed by me.

Discussed the evaluation, plan of care, and disposition of the patient with
the mid-level provider.

Temperature: 36.9 C (98.4 F). Pulse: 68. Respiratory
Rate: 16. Blood-pressure: 147/99. Oxygen Saturation: 99% room air; Normal.

History of Present Illness:

All medical record entries made by the Scribe were at my direction and
personally dictated by me. I have reviewed the chart and agree that the record
accurately reflects my personal performance of the history, physical exam,
assessment and plan. I have also personally directed, reviewed, and agree with

Page 1 of 3
Print time:  at

(78000-019) 3127

EXHIBIT 7

**PRESENCE SAINT JOSEPH MEDICAL CENTER**
**HEALTH INFORMATION MANAGEMENT**
REPORT # : 0830-1159

**NAME:** POOLE,AHMAD K95348          **UNIT #:** DC01881219          **ACCT #:** DC0029381580

the discharge instructions.
By signing my name below, I, Navedeep Kaur, attest that this documentation has
been prepared under the direction and in the presence of Dr. Paik.
Electronically signed: Navedeep Kaur, Scribe. 8/30/17.
************************************

I saw and evaluated the patient after discussion with the PA-C. The patient's
symptoms and history were reviewed with the patient. Briefly, the pt is a 34
y/o male with PMHx of sickle cell trait who presents to the ED in c-collar
from Statesville with complaint of neck pain x2 weeks. The pain is moderate
and worse with movement. Pt was involved in a physical altercation two weeks
ago. He had an x-ray on 8/23/17 and a repeat x-ray today at a clinic and was
sent to the ED for further evaluation. No numbness or tingling. No vision
changes. Physical exam findings: no eyelid droop, PERRL, equal and intact hand
grip strength, sensation intact throughout upper extremity, no c-spine
tenderness.

Essentially, 34 year old sent from Statesville after being in a physical
altercation two weeks ago and had neck pain and subsequently had an x-ray done
at Statesville that showed possible subluxation of C3-C4 and sent to our ED
for further evaluation with a C-collar. Initial vital signs show that patient
is afebrile and hemodynamically stable. On exam, he has no cervical spine
tenderness. There is no eyelid droop. Pupils are equal and reactive to light.
Strength and sensation intact in the upper extremity. We do not have spine
surgery on call and it neurosurgeon would not provide any recommendations were
reviewed imaging given that they are not on spine call today. Therefore, I did
speak to Dr. Charbelle who stated that he could not give further
recommendations without image review and evaluation and recommended admission
to UIC to a med surg bed. We will keep the c-collar in place.

Consults:

16:00: Dr. Charbelle; Discussed case.

Clinical Impression:

1. Closed displaced right C3 facet fracture

Electronically signed by John Paik, MD on 08/30/2017 at 16:35

Radiology: Image Reviewed and Interpreted by Radiologist.

DICTATED: John M Paik M.D.
<Electronically signed by John M Paik M.D. in OV>

John M Paik M.D.
08/30/17 2040
**DRAFT UNTIL SIGNED**

S: Signed
D: 08/30/17 2040
T: 08/30/17 2040 FS

Page 2 of 3
Print time:  at

(78000-019) 3128

EXHIBIT 7

PRESENCE SAINT JOSEPH MEDICAL CENTER
HEALTH INFORMATION MANAGEMENT
REPORT # : 0830-1159

**NAME:** POOLE,AHMAD K95348        **UNIT #:** DC01881219        **ACCT #:** DC0029381580

REPORT#:0830-1159

CC:

Page 3 of 3<br>Print time:  at

(78000-019) 3129

**33**

EXHIBIT 7

Sasan Payvar, M.D.   Medical Director
Michael Arthofer, M.D.        Edward Bruno, M.D.
Brian Fagan, M.D.             John S. Groch, M.D.
Mickey B. Jester, D.O.        Andrew Johanek, D.O
Terry Kushner, M.D.           Noah Schwind, M.D
Joshua Tepper, M.D.           Raj Vasnani, M.D.
Alex Wu, M.D.

**PRESENCE SAINT JOSEPH MEDICAL CENTER**
333 North Madison Street
Joliet, IL

### DIAGNOSTIC IMAGING SERVICES

**NAME:** POOLE,AHMAD K95348                **DOB/AGE/SEX:** 12/18/1982 - 34 - M
**ORDERING:** Nicholas A Sever P.A.         **ADMIT DATE:**
**ATTENDING:**                              **NONSTAFF:**

**UNIT # :** DC01881219                     **DIS DATE:**
**ACCT #:** DC0029381580                    **LOC/RM/BED:** D01EDA -

### DIAGNOSTIC IMAGING
CT/CT CERVICAL SPINE WO CONTRAST : 0830-0119
DATE PERFORMED: 08/30/17
REPORT #: 0830-0377

CT Cervical Spine

History: Altercation, neck pain.

Technique: Helical images of the cervical spine were obtained without the use of IV contrast. Coronal and sagittal reformatted images were created and interpreted.

Patients undergoing CT with documentation that one or more of the following dose reductions techniques were used:
Automated exposure control
Adjustment of the mA and/or kV according to patient size
Use of iterative reconstruction technique

Comparison: None.

Findings:

There is a minimally displaced fractures seen involving the tip of the inferior right C3 articular facet with slight anterior displacement of C3 with respect to C4 measuring 1 mm. The right inferior C3 articular facet is perched over the right superior C4 facet. The left-sided C3-4 articulation is well-maintained.

The remaining cervical levels appear normal in height, mineralization and alignment. No additional fractures are noted.

Intervertebral disc heights appear well-maintained.

Pre-vertebral soft tissues are within normal limits.

Pre-dental space is normal.

Impression:

There is a minimally displaced fracture identified involving the tip of the inferior right C3 articular facet which is perched over the top of the right superior C4 facet. There is very slight anterior translation of C3

(78000-019) 3130

**34**

EXHIBIT 7

**PRESENCE SAINT JOSEPH MEDICAL CENTER**
**DIAGNOSTIC IMAGING SERVICES**

**NAME:** POOLE,AHMAD K95348     **UNIT #:** DC01881219          **ACCT #:** DC0029381580

with respect to C4 noted measuring 1 mm. This was reported to Nicholas Sever, PA-C by myself via
telephone on August 30, 2017 at 1500 hours.

DICTATED: Andrew Johanek D.O.
<Electronically signed by Andrew Johanek D.O. in OV>

Andrew Johanek D.O.
08/30/17 1509
**DRAFT UNTIL SIGNED**

S: Signed
D: 08/30/17 1459
T: 08/30/17 1459 PS

REPORT#:0830-0377

CC: Nicholas A Sever, P.A.; Unknown Unknown

2
Print time: at

(78000-019) 3131

**35**

EXHIBIT 7

```
DATE: 08/31/17 @ 0138        Saint Joseph Medical Center RXM *LIVE*         PAGE 1
USER: BKG DAEMON             Ambulatory Prescriptions and Procedures

Patient Name: POOLE,AHMAD K95348          Admission/Registration Date: 08/30/17
Unit Number: DC01881219                   Discharge Date: 08/30/17
Account Number: DC0029381580              Admitting Physcian:
Date of Birth: 12/18/1982   Age/Sex: 34 M  Attending Physcian:
```

Page: 1
Printed 09/01/17 at 0210
Period ending 09/01/17 at 0210

Account #: 000029081500    Archiving Profile

Admitted:                Service:              Age/Sex: 34 M
Room/Bed:           Name: (c)POOLE,AHMAD K95248          Attending:

| Intervention | Last Performed Collection | Status/Done |
|---|---|---|

Vital Signs/Monitoring

| Private Med Corpus | 08/29 1890 MS | D No |
| Vital Signs: Adult w/ Pulse Ox | 08/28 20030 MS | D No |

| Monogram | Initials | Name | Care Provider Type | Cert Key |
|---|---|---|---|---|
| MS | 001BEPME | Melissa Bartolacci | RN | |

5

EXHIBIT 7

AX COMPLETED FORM TO:
(412) 937-9151

**WEXFORD**

## EMERGENCY / HOSPITALIZATION NOTIFICATION FORM

ENTER SITE NAME: Stateville

DATE: 8/30/17     REFERENCE NUMBER: 109684900

INMATE NAME: Poole Ahmad

INMATE NUMBER: 1695348     DOB: 12-18-82

REFERRING PHYSICIAN: Dr Obaisi

TYPE OF SERVICE:

| | | | |
|---|---|---|---|
| [X] ER | ADMIT THROUGH ER | | ER TO OBSERVATION |
| DIRECT ADMIT | HOSPITAL-TO-HOSPITAL TRANSFER | | SCHEDULED ADMISSION |
| URGENT RADIOLOGY/X-RAY | URGENT OFFICE | | OTHER _____ |

FACILITY/PLACE OF SERVICE: _____

ADDRESS: _____

TELEPHONE: _____

TREATING PHYSICIAN: _____

TRANSPORTATION: [ ] AMBULANCE  [X] STATE VEHICLE  [ ] OTHER ____

## SPECIFIC REASON FOR EMERGENCY TREATMENT OR ADMISSION

Recent fight
X-Ray done on 8/25/17 to Skull & spine

ADMISSION DATE: _____  TIME: _____

DATE OUT: _____  TIME: _____

RETURN DATE: _____  TIME: _____

JAIL SITE INSURANCE INFO: _____

TRANSMITTAL DATE: _____  TIME: _____

BY: _____

Doctor A. RTP 0431

EXHIBIT 7

**6**

EXHIBIT 7

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER IN CASE NO. 1:20-CV-00014

ILLINOIS DEPARTMENT OF CORRECTIONS
**Offender Health Status Transfer Summary**

**Transferring Facility:**

Stateville Correctional Center

Date: 8.30.17   Time: 12:00   ☐ a.m. ☒ p.m.

Offender Information:

Last Name: Poole   First Name: Ahmed   MI:   ID#: K95348

**Transfer Screening** (completed by transferring facility health care staff):

Allergies: NKDA

Current / Acute Conditions / Problems: recent fight pt neck was squeezed and twisted.   Food Handler Approved: Ø

Chronic Conditions / Problems: Ø

**Current Medications** (naive, dosage, frequency, and duration):

Acute Short-term: IV Tinol 500mg PRN

Chronic Long-term: Ø

Chronic Psychotropic: Ø

**Current Treatments:** Ø

**Therapeutic Diets:** regular

**Follow-Up Care:** RHC

**Chronic Clinics:** Ø

**Specialty Referrals:** St. Joseph Medical Center ER for CT scan of neck

**Significant Medical History:** S/P Fx femur in 1994; Sickle Cell trait

**Physical Disabilities / Limitations:** Ø

**Assistive Devices / Prosthetics:** Ø   ☐ Glasses  ☐ Dentures

**Mental Health Issues:** ☐ Hx Suicide Attempt  Date: ___/___/___   ☐ Hx Psych Med  ☐ Hx MPC / STC  Substance Abuse: ☐ Alcohol ☐ Drugs

R & C Use Only: ☐ LAB  ☐ EKG  ☐ CXR  ☐ Dental  ☐ MEDS  ☐ MH  ☐ Other: ___   ☐ Packet Complete

D. Pagena
Print Name and Title

D. Pagena
Signature

8.30.17
Date

**Reception Screening** (completed by receiving facility health care staff):

Facility: STATEVILLE C C   Date: 9.8.17   Time: 10:3   ☐ a.m. ☒ p.m.

**Subjective:**
Current Complaint: Ø

Current Medications/Treatment: See New Orders

Assessment: I/M A+O x3, clear speech, slow unsteady gait. I/M must wear brace. I/M has new staples to back of neck. A: Orders notified

**Objective:**
Physical Appearance/Behavior: calm + cooperative

Deformities: Acute/Chronic:

T: 97.1   P: 93   R: 10   B/P: 131/89

**Plan: Disposition:**
☒ Health Information Given   ☐ Emergency Referral: ___
☐ Sick Call: Urgent / Routine
☐ Medication Evaluation   ☐ Therapeutic Diet   ☐ Special Housing   ☐ Chronic Clinics
☐ Work / Program Limitation   ☐ Specialty Referrals   ☐ Other (specify): ___
☐ Infirmary Placement
☐ Other (specify): ___

K. Cunningham, RN
Printed Name and Title

Signature   ___/___/___
Date

**For adult transition center transfers only:**

I understand that medical and dental care are my responsibility while I am housed in a transition center. I also understand that if I am in need of health care and I cannot afford to pay for it, I may be transferred back into a facility within the Department that can provide my medical, mental health, or dental needs.

Offender's Signature   Date   Time   ☐ a.m. ☐ p.m.

Distribution: Offender's Medical Record; Transferring Facility;

DOC 0090 (Eff. 5/2002)

Poole 008

EXHIBIT 7

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER IN CASE NO. 1:20-CV-00014

ILLINOIS DEPARTMENT OF CORRECTIONS

Offender Outpatient Progress Notes

__STATEVILLE CORRECTIONAL__ Center

Offender Information:

Poole                    Ahmad           ID#: K95348
Last Name              First Name      MI

| Date/Time | Subjective, Objective, Assessment | Plans |
|---|---|---|
| 8/23/17 10:20am | Cronat: LFT, Mega Nep panel, PPR | |
| 9/8/17 10:30p | RN Note S: "I'm good." O: I/m AAO×3, clear speech, slow, steady gait. I/m has 17 staples to back of neck and a neck brace. Limited mobility to neck A: 23° Infirmary | SCp P: 23° admit to Infirmary |
| 9/8/17 11⁵⁰Pm | RN Note S: "I need my pain pills" O: I/m up in cell. Neck brace in place (continued) | M Jensen, RN |

Distribution: Offender's Medical Record

Printed on Recycled Paper

DOC 0084 (Eff. 9/2002)
(Replaces DC 7147)

Poole 009

EXHIBIT 7

7

EXHIBIT 7

ILLINOIS DEPARTMENT OF CORRECTIONS
## Medical Special Services Referral and Report

Sheteville
(Facility)

Offender's Name: Poole ahmad          ID# K95348

Reason for Referral: ☑ Consult      ☐ Non-Formulary Medications   ☐ Medical Equipment
☐ Evaluation    ☐ Management
☐ Procedure/service (specify) _____
☐ Other (specify) _____

Urgent: ☐ Yes   ☐ No

Referred to: St. Joes ER _____

Rationale for Referral: _____

S. Oxusi                              8/30/17
Print Referring Practitioner's Name    Referring Practitioner's Signature    Date

Report of Referral (Use Reverse Side, if necessary)

Findings: _____

Assessment: _____

Recommendations/Plans: _____

Print Practitioner's Name          Practitioner's Signature          Date

Facility Medical Director Use Only
I have reviewed the recommendations and:

☐ Approve.

☐ Deny or revise as indicated on the Notification of Medical Service Referral Denial or Revision,
DOC 0255.

Print Facility Medical Director's Name     Facility Medical Director's Signature      Date

Distribution: Offender's Medical File, and          Page 1 of 1          DOC 0254 (Eff.4/2007)
if denied/revised, Heath Care Unit Administrator                              (Replaces DC 7105)

Doctor A. RTP 0751

EXHIBIT 7

FAX COMPLETED FORM TO:
(412) 937-9151

**WEXFORD**
HEALTH SOURCES, INCORPORATED

## EMERGENCY / HOSPITALIZATION NOTIFICATION FORM

ENTER SITE NAME: Stateville

DATE: 8/30/17

REFERENCE NUMBER: _____

INMATE NAME: Poole Ahmad

INMATE NUMBER: K95348

DOB: 12-18-82

REFERRING PHYSICIAN: Dr. Obaisi

TYPE OF SERVICE:

| | | |
|---|---|---|
| ☒ ER | ☐ ADMIT THROUGH ER | ☐ ER TO OBSERVATION |
| ☐ DIRECT ADMIT | ☐ HOSPITAL-TO-HOSPITAL TRANSFER | ☐ SCHEDULED ADMISSION |
| ☐ URGENT RADIOLOGY/X-RAY | ☐ URGENT OFFICE | ☐ OTHER _____ |

FACILITY/PLACE OF SERVICE: _____

ADDRESS: _____

TELEPHONE: _____

TREATING PHYSICIAN: _____

TRANSPORTATION: ☐ AMBULANCE  ☒ STATE VEHICLE  ☐ OTHER

## SPECIFIC REASON FOR EMERGENCY TREATMENT OR ADMISSION

Recent fight
Xray done on 8/25/17 to Skull & spine

ADMISSION DATE: _____  TIME: _____

DATE OUT: _____  TIME: _____

RETURN DATE: _____  TIME: _____

JAIL SITE INSURANCE INFO: _____

TRANSMITTAL DATE: _____  TIME: _____

BY: _____

Doctor A. RTP 0431

EXHIBIT 7

**8**

EXHIBIT 7

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER IN CASE NO. 1:20-CV-00014

**PRESENCE SAINT JOSEPH MEDICAL CENTER**
**333 N. Madison**
**Joliet, IL**

## HEALTH INFORMATION MANAGEMENT

**NAME:** POOLE,AHMAD K95348          **DOB/AGE/SEX:** ▊▊▊ - 34 – M
**HOME PHONE:** (815)727-6141
**PHYSICIAN:**                        **ADMIT DATE:**
**NONSTAFF:**
**NONSTAFF FAX #:**
**UNIT #:** DC01881219                **DIS DATE:** 08/30/17
**ACCT#:** DC0029381580               **LOC/RM/BED:** D01EDA -

### ER PHYSICIAN DOCUMENTATION
REPORT # : 0830-1094

Chart created at 08/30/2017 15:02 by Nicholas Sever

Chart closed at 08/30/2017 21:04

Patient Registered at 08/30/2017 13:29, departure at 08/30/2017 20:57

Patient Registered at: 08/30/2017 13:29   Patient Seen at: 08/30/2017
14:34   Historian: Patient and Transfer   PCP: Unknown,Unknown MD

Chief Complaint:NECK PAIN STATEVILLE

Initial Vital Signs reviewed.

I confirm that the attending physician has examined the patient, reviewed my
documentation on the patient's chart, and discussed the evaluation, plan of
care and disposition of the patient with me..

Patient interviewed by me.

Temperature: 36.9 C (98.4 F). Pulse: 68. Respiratory
Rate: 16. Blood-pressure: 147/99. Oxygen Saturation: 99% room air; Normal.

History of Present Illness:

34 Year old male inmate in police custody presents with neck pain x2 weeks.
Patient reports he was in an altercation 2 weeks ago, was placed in a head
lock and twisted his neck. Since then, the patient has had pain in the back of
the neck. He reports no weakness, numbness or tingling. No head injury, no
loss of consciousness. No other injuries. Patient was seen in the prison
infirmary today, had plain films showing possible C3-C4 subluxation so he was
sent to the ED for further evaluation.

HPI Elements: Onset: 2 Weeks ago; Location: neck; Severity: now [10];
Context: Trauma

Review of Systems. Constitutional: negative for Chills or Fever Eyes: negative
for Eye Pain or Vis. Changes Ear/Nose/Throat: negative for Congestion or Sore
Throat Cardio-Vascular: negative for Chest Pain or Palpitations Skin: negative

Page 1 of 5
Print time:  at

Doctor A. RTP 0952

EXHIBIT 7

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER IN CASE NO. 1:20-CV-00014

**PRESENCE SAINT JOSEPH MEDICAL CENTER**
**HEALTH INFORMATION MANAGEMENT**
REPORT # : 0830-1094

**NAME:** POOLE,AHMAD K95348          **UNIT#:** DC01881219          **ACCT #:** DC0029381580

for Itch or Rash Respiratory: negative for Cough or Dyspnea GI: negative for
Nausea or Vomiting GU: negative for Dysuria or Hematuria Musculo-Skeletal:
negative for Back Pain Neurological: negative for Confusion, Numbness or
Weakness

Past Medical History:

Sickle cell trait

Medications: None.

Allergies: Reviewed RN Note

Social History:

Incarcerated/Police custody

Physical Examination: General: Alert; no apparent distress
HEENT: Head: Atraumatic.    Oropharynx /
Throat: Moist mucous membranes. Neck: No Lymphadenopathy; C-collar in place.
Midline tenderness in C3-C4 area. No palpable deformity. Respiratory: No Resp
Distress Cardio-Vascular: RRR Extremity: Normal Equal pulses Neurological:
Alert, Oriented X3, Normal Sensation, No Gross Weakness, Speech Normal and 5/5
UE/LE Strength Skin: No rash, Warm and Dry Psychological: Mood/Affect Normal

Medical Decision Making

34 Year old male inmate in custody presents with neck pain after an
altercation 2 weeks ago. He does have some midline tenderness on exam but
otherwise is neurologic exam is within normal limits. He presented the prison
infirmary were a plain film of his C-spine was suggestive of C3 subluxation
according to the report. I have no images accompanying the patient
independently verify this. Plan for CT in the ED. Patient is declining offer
of pain medication. CT C-spine does show a displaced inferior right facet
fracture at C3 with perching on C4. There is also anterior translation of C3
on C4 of 1 mm. Patient is mid maintained in cervical spinal precautions while
in the emergency department. We have no spine coverage today. The University
Illinois at Chicago was called for consultation. They recommend transfer.
Patient is agreeable with this plan. Risks and benefits of transfer were
discussed. Patient will be transported by state vehicle, he is declining
ambulance transport.

Re-Evaluation:

16:27: Updated patient on plan for transfer to UIC. He's agreeable. NPO for
now..

Consults:

15:02: Dr. Johanek; radiology; Informed me of critical read: there is an
inferior facet fracture at C3 with perching on C4

Page 2 of 5
Print time:  at

Doctor A. RTP 0953

EXHIBIT 7

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER IN CASE NO. 1:20-CV-00014

**PRESENCE SAINT JOSEPH MEDICAL CENTER**
**HEALTH INFORMATION MANAGEMENT**
REPORT # : 0830-1094

**NAME:** POOLE,AHMAD K95348          **UNIT #:** DC01881219          **ACCT #:** DC0029381580

16:11: UIC; has accepted transfer under Dr. Charbel; provided clinical information to the neurosurgery resident

Additional Information: Discussed Results, Diagnosis and Follow-Up with Patient.

Clinical Impression:

1. Closed displaced right C3 facet fracture

Disposition: Transferred UIC. Condition: Stable

Electronically signed by Nicholas Sever on 08/30/2017 at 21:04

Direct patient care supervision and electronic documentation review by John Paik MD on 08/30/2017 21:34.

Imaging Study Obtained:
CT CERVICAL SPINE WO CONTRAST, Status:Signed Report Available

PRESENCE SAINT JOSEPH MEDICAL CENTER

333 North Madison Street

Joliet, IL

NAME: POOLE,AHMAD K95348 DOB/AGE/SEX: 12/18/1982 - 34 - M

PHYSICIAN: ADMIT DATE:

UNIT #: DC01881219 DIS DATE:

ACCT #: DC0029381580 LOC/RM/BED: D01EDA-

DIAGNOSTIC IMAGING SERVICES

CT/CT CERVICAL SPINE WO CONTRAST: 0830-0119

ORDER DATE: 08/30/17

REPORT #: 0830-0377

CT Cervical Spine

History: Altercation, neck pain.

Technique: Helical images of the cervical spine were obtained without the use of IV contrast.

Coronal and sagittal reformatted images were created and interpreted.

Doctor A. RTP 0954

EXHIBIT 7

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER IN CASE NO. 1:20-CV-00014

PRESENCE SAINT JOSEPH MEDICAL CENTER
HEALTH INFORMATION MANAGEMENT
REPORT # : 0830-1094

**NAME:** POOLE,AHMAD K95348          **UNIT #:** DC01881219          **ACCT #:** DC0029381580

Patients undergoing CT with documentation that one or more of the following dose reductions

techniques were used:

Automated exposure control

Adjustment of the mA and/or kV according to patient size

Use of iterative reconstruction technique

Comparison: None.

Findings:

There is a minimally displaced fractures seen involving the tip of the inferior right C3 articular

facet with slight anterior displacement of C3 with respect to C4 measuring 1 mm. The right inferior

C3 articular facet is perched over the right superior C4 facet. The left-sided C3-4 articulation is

well-maintained.

The remaining cervical levels appear normal in height, mineralization and alignment. No additional

fractures are noted.

Intervertebral disc heights appear well-maintained.

Pre-vertebral soft tissues are within normal limits.

Pre-dental space is normal.

Impression:

There is a minimally displaced fracture identified involving the tip of the inferior right C3

articular facet which is perched over the top of the right superior C4 facet. There is very slight

anterior translation of C3 with respect to C4 noted measuring 1 mm. This was reported to Nicholas

Sever, PA-C by myself via telephone on August 30, 2017 at 1500 hours.

Page 4 of 5
Print time:  at

Doctor A. RTP 0955

EXHIBIT 7

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER IN CASE NO. 1:20-CV-00014

PRESENCE SAINT JOSEPH MEDICAL CENTER
HEALTH INFORMATION MANAGEMENT
REPORT # : 0830-1094

**NAME:** POOLE,AHMAD K95348          **UNIT #:** DC01881219          **ACCT #:** DC0029381580

DICTATED: Andrew Johanek D.O.

<Electronically signed by Andrew Johanek D.O. in OV>

Andrew Johanek D.O.

08/30/17 1509

DRAFT UNTIL SIGNED

S: Signed

D: 08/30/17 1459

T: 08/30/17 1459 PS

REPORT#:0830-0377

CC: Nicholas A Sever, P.A.; Unknown Unknown

of 2

Radiology: Discussed with Radiologist, Image Reviewed and Interpreted by
Radiologist.

DICTATED: Nicholas A Sever P.A.
<Electronically signed by Nicholas A Sever P.A. in OV>

Nicholas A Sever P.A.
08/31/17 0105
**DRAFT UNTIL SIGNED**

S: Signed
D: 08/31/17 0105
T: 08/31/17 0105 FS

REPORT#:0830-1094

CC:

Page 5 of 5
Print time:  at

Doctor A. RTP 0956

EXHIBIT 7

**9**

EXHIBIT 7

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER IN CASE NO. 1:20-CV-00014

DC01881219

DC0029381580    DOB:
POOLE, AHMAD K95348

08/30/17
M 34

+

**Presence**
Saint Joseph Medical Center

| DATE 8.30.17 | Arrival Time 1330 | Stated Complaint | Neck Pain | Room 1 | Room Time 1330 |

B/P 179/68 R 16 T 98.5 □AX/PO □R □T SpO2 at 99 Percent Triage RN Jenne

ESI/Triage Level: 1 2 3 4 5    Weight 85 KG □Scale □Estimated    Height 5'7"    Pain Score 10 □Scale 0-10 □Faces    □FLACC

Allergies: NKDA    Pertinent History: Sickle cell trait    Other:

LMP:    PCP:    Time Seen by ERMD/MLP:

| Imaging Orders: | Lab Orders: | | |
|---|---|---|---|
| □ Chest    □ Portable | □ CBC | □ Amylase | □ Blood Culture times |
| □ Cervical Spine Acute Trauma  □ 5 view | □ WBBMP | □ Lipase | □ RBSA |
| □ Abdominal Series  □ KUB  □ Flat and Upright | | | |
| □ Right | □ CK | □ CMP | □ Influenza |
| □ Left | □ Troponin | □ Hepatic FCT. | □ Mono. Spot |
| □ CT Head Without Contrast    □ CT Head With Contrast | □ D-Dimer | □ ETOH | □ RSV |
| □ CT Angiogram  □ With contrast  □ Without contrast  □ R/O PE | | | |
| □ CT | □ CHF-BNP | □ DSSQ    □ DSUR | □ GC    □ Chlamydia |
| □ US Pelvic OB, Endovaginal IF NECESSARY | □ Pro-time/PTT | □ Accu-check | □ Wet Prep |
| □ US Doppler Pelvic Non-OB, Endovaginal IF NECESSARY | □ Lactic Acid | □ HCG    □ Urine    □ Serum | □ Wound Culture |
| □ US | | | |
| □ Venous Doppler  □ Right  □ Upper Extremity  □ Bilateral  □ Arterial Doppler  □ Left  □ Lower Extremity  □ R/O DVT | □ Magnesium    □ UA    □ C + S | □ HCG Quant. | □ Type/Screen    □ Hemoccult |

| IV/Medication Orders: | Respiratory/CV: | | |
|---|---|---|---|
| □ TD/TT 0.5 ML IM | □ 12 Lead EKG | □ Cardiac Monitor | □ Old Record |
| □ IV 0.9 NaCl at    Bolus  □ Saline Lock | □ ABG    □ O2 at | | Liters per minute |
| □ IV 0.9 NaCl at    ml/hr | □ Nebulizer Treatment | | |
| Pre-Printed Order Set(s): | □ PEF before and after Neb | | |
| □ CAP Order: after Blood Cultures times 2 | □ Pulse Oximetry | | |
| **Non-ICU patients:** | **Behavioral Health Panel - Adult** | | |
| □ Rocephin 2 grams IVPB PLUS Zithromax 500 mg IVPB | □ Regular Diet | | |
| ❖ If Beta-Lactam allergic: | | | |
| □ Levaquin 750 mg IVPB | □ CBC   □ WBBMP   □ DSUR (Urine Toxicology) | | |
| **ICU patients CAP Pneumonia** | □ Alcohol   □ HCG Urina | | |
| □ Rocephin 2 grams IVPB PLUS Zithromax 500 mg IVPB | | | |
| ❖ If Beta-Lactam allergic: | | | |
| □ Levaquin 750 mg IVPB PLUS Azactam 1 gram IVPB | | | |
| □ HEALTHCARE ASSOCIATED PNEUMONIA | | Subsequent Orders: | |
| □ Zosyn 4.5 grams IVPB PLUS Levaquin 750 mg IVPB | Time: | Order: | RN Initials |
| ❖ If Beta-Lactam allergic: | | | |
| □ Levaquin 750 mg IVPB PLUS Azactam 2 gram IVPB | | | |
| □ ASPIRATION PNEUMONIA | | Charbel | |
| ADD the medication below to the above selected medications | | | |
| □ Cleocin 600 mg/ IVPB | | | |

Discharge Orders/Instructions:

Diagnosis:
Diagnosis:
Physician Signature:    Time of Initial Orders:

EMERGENCY SERVICES PHYSICIAN RECORD    PS 2633  (R-3/13)

EXHIBIT 7

**10**

EXHIBIT 7

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER IN CASE NO. 1:20-CV-00014



| | |
|---|---|
| **UNIVERSITY OF ILLINOIS** Hospital & Health Sciences System — Changing medicine. For good. — | Patient Name: POOLE, AHMAD J   MRN: 75692483<br>Sex: MALE   DOB: ███████   Age: 37 years<br>Discharge Date: n/a   FInancial Number: n/a |

---

### Admitting History/Physical

Result Type:
Result Date:
Result Status:
Performed Information:
Signed Information:

History and Physical Note
8/31/2017 00:01 CDT
Auth (Verified)
Chaudhry MD,Nauman (8/31/2017 08:19 CDT)
Chaudhry MD,Nauman (9/11/2017 07:00 CDT); Mehta MD, Ankit (9/9/2017 10:58 CDT)

**University of Illinois Medical Center at Chicago**
**NEUROSURGERY ADMISSION HISTORY and PHYSICAL**

**Transferring:** _
 Facility: _St. Joseph's Hospital, ER, Joliet, IL
 Physician: _Dr. John Piak
 Phone #: _815-741-7660

**PCP:** _

[ ] PCP contacted

**Performed by:** _ Nauman Chaudhry, MD

**Attending:** _Dr. Charbel

**Date of Service:** _8/31/17

**Time of Encounter:** _1200

**Chief Complaint / Reason for Admission:** _ C3-4 subluxation,R perched facet

**History of Present Illness (HPI):** _
AP is a 34M prisoner who presents with neck pain and C3-4 subluxation,R perched facet. Pt has had neck pain for last 2 weeks following a wrestling match with another prisoner who placed in a headlock. Since then he had had ongoing axial neck pain. No neuro deficits or paresthesias, sensory changes, b/b incontinence.. Work up revealed the above findngs. Pt txfrd to UIC for higher level of care. Remains in neck collar.

**Review of Systems (ROS):**

- Constitutional: _nad

- Eyes: _

Doctor A. RTP 0964

**EXHIBIT 7**

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER IN CASE NO. 1:20-CV-00014



**UNIVERSITY OF ILLINOIS**
Hospital & Health Sciences System
——— Changing medicine. For good. ———

| | |
|---|---|
| Patient Name: POOLE, AHMAD J | MRN: 75692483 |
| Sex:MALE     DOB: ▉▉▉▉ | Age: 37 years |
| Discharge Date  n/a | FInancial Number:  n/a |

*Admitting History/Physical*

- Ears, Nose, Throat, Mouth: _
- Cardio/Vascular: _warm dry
- Respiratory: _no resp distres
- GI: _
- GU: _
- Musculoskeletal: _
- Integumentary: _
- Neurological: _see hpi
- Psychological: _
- Endocrine: _
- Hematological and Lymphatic: _
- Allergic and Immunologic: _

**Past Medical History**:
(Allergies must also be entered on the Allergy control, and medications must also be entered on the Medication List.  Auto text can be used.)

- current medications: _none
- allergies: _nka
- major illnesses and injuries: _R finger injuries
- operations: _R finger repair
- hospitalizations:  as above

**Family History**: _neg ich aneurysms brain tumors

**Social History (age appropriate review of past and current activities that include the following):**

Doctor A. RTP 0965

EXHIBIT 7

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER IN CASE NO. 1:20-CV-00014



| | |
|---|---|
| **UNIVERSITY OF ILLINOIS**<br>Hospital & Health Sciences System<br>——— Changing medicine. For good. ——— | Patient Name: POOLE, AHMAD J      MRN: 75692483<br>Sex: MALE     DOB: &#9608;&#9608;&#9608;    Age: 37 years<br>Discharge Date n/a     FInancial Number: n/a |

*Admitting History/Physical*

- marital status and/or living arrangements: _prisoner
- current employment: _prisoner
- use of drugs, alcohol, tobacco: _denies x3
- other relevant social factors: _

**Physical Examination:**

- **Constitutional** (*measurement* of vital signs, height, weight; general appearance): _No acute distress
- **Neurological:** _
  - Orientation to
    - Time: y
    - Place: _y
    - Person: _y
  - Attention span and concentration: follows commands
  - Language (e.g., naming objects, repeating phrases, spontaneous speech): spontaneous
  - Recent and remote memory: _aware past/present
  - Fund of knowledge ( e.g., awareness of current events, past history, vocabulary): _able to provide HPI
  - 2nd cranial nerve (e.g., visual acuity, visual fields): _PERL
  - 3rd, 4th, and 6th cranial nerves: _EOMI
  - 5th cranial nerve: _V1-3 wnl
  - 7th cranial nerve: _FS
  - 8th cranial nerve: _gross hearing intact
  - 9th and 10th cranial nerves: _

University of Illinois Hospital & Health Sciences System

Page 3 of 80

Report Request ID:  43889645
Print Date/Time:  10/19/2020
06:26 CDT

Doctor A. RTP 0966

EXHIBIT 7

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER IN CASE NO. 1:20-CV-00014



| | |
|---|---|
| **UNIVERSITY OF ILLINOIS**<br>Hospital & Health Sciences System<br>—— *Changing medicine. For good.* —— | Patient Name: POOLE, AHMAD J     MRN: 75692483<br>Sex:MALE    DOB: ▮▮▮▮    Age: 37 years<br>Discharge Date n/a     FInancial Number: n/a |

*Admitting History/Physical*

- 11th cranial nerve: _shoulder shrug strong

- 12th cranial nerve: _TML

- Muscle strength in upper **AND** lower extremities: _BUE/BLE 5/5, no drift

- Muscle tone in upper **AND** lower extremities: _no clonus

- DTRs in upper **AND** lower extremities with notation of pathological reflexes: 2+

- Sensation (e.g., by touch, pin, vibration, proprioception): _SILT

- Coordination ( e.g., finger/nose, heel/knee/shin, rapid alternating movement in the upper **AND** lower

  extremities, evaluation of fine motor coordination in young children): _

Gait and station: _

- **Cardiovascular** (carotids, auscultation of heart, peripheral vascular system): _warm, dry

- **Respiratory:** _no resp distress

- **Abdomen:** _soft

- **Skin** (e.g., scars, rashes, lesions, café-au-lait spots, ulcers): _

- **Eyes** (ophthalmoscopic exam of optic discs): _

- **Lymphatic** (palpation of nodes in neck, axillae, groin, and/or other location): _

- **Inspection, percussion, and/or palpation of joint(s), bone(s), muscle(s), tendon(s):** _

- **Range of motion** (e.g. SLR left **AND** right, crepitation, contracture): _

- **Stability with notation of any dislocation/subluxation or laxity:** _

**Data Review (radiology, labs, EMG, etc…):** _
As above. No sig canal compromise. Likely injury to ligaments. will need MRI.

**Consideration for reperfusion therapy:**
      (_) patient **is** eligible for acute reperfusion therapy with (*please specify*):

University of Illinois Hospital & Health Sciences System

Report Request ID: 43889645
Print Date/Time: 10/19/2020
06:26 CDT

Doctor A. RTP 0967

EXHIBIT 7

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER IN CASE NO. 1:20-CV-00014

**UNIVERSITY OF ILLINOIS**
Hospital & Health Sciences System
———— Changing medicine. For good. ————

Patient Name: POOLE, AHMAD J          MRN: 75692483
Sex: MALE          DOB: ▮▮▮▮▮▮          Age: 37 years
Discharge Date  n/a          Financial Number: n/a

---

*Admitting History/Physical*

---

   ( ) IV tPA
   ( ) IA thrombolysis
   ( ) clot retrieval
 ( ) patient **is not** eligible for acute reperfusion therapy because:

**Assessment / Diagnosis / Plan**: _
34M prisoner who presents with neck pain and C3-4 subluxation,R perched facet. No acute nsg intervention as pt is neurostable, but will require either halo vs operation for perched facet. Will require further workup.

      N: MRI Cspine, MJ collar, pain control
      P: RA
      CV: 100-160
      GI: NPO & IVF
      GU: No issues
      H: SCH, SCD, LED
      E: none
ID: No abx
CXR,  EKG, preop labs

D/w Chief Arnone

Nauman Chaudhry, MD
Neurosurgery Resident, PGY-4
b2711

**Attending's Note**: _
Patient with C3-C4 instability, perched facet from traumatic injury.  Operative intervention and stabilization planned

---

University of Illinois Hospital & Health Sciences System

Report Request ID:  43889645
Print Date/Time:  10/19/2020
      06:26 CDT

Doctor A. RTP 0968

EXHIBIT 7

11

EXHIBIT 7

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER IN CASE NO. 1:20-CV-00014



| | |
|---|---|
| **UNIVERSITY OF ILLINOIS** Hospital & Health Sciences System — Changing medicine. For good. — | Patient Name: POOLE, AHMAD J          MRN: 75692483 |
| | Sex: MALE          DOB: ██████          Age: 37 years |
| | Discharge Date n/a          FInancial Number: n/a |

---

*Radiology*

---

ACCESSION
XR-17-0066633

EXAM DATE/TIME
9/29/2017 10:56 CDT

STATUS
Auth(Verified) & Reviewed

**Reason For Exam**
s/p C3-C4 fusion

**Report**
EXAMINATION: XR Spine Cervical 4 or 5 Views.

DATE:    9/29/2017

COMPARISONS: Intraoperative images of 9/6/2017.

TECHNIQUE: Frontal and lateral radiographs of the cervical spine were obtained intraoperatively.

INDICATION: s/p C3-C4 fusion .

FINDINGS:

There is a posterior fixation device seen at the C3 and C4 vertebral levels with 4 total posterior screws, as well as C3-C4 laminectomy. This is unchanged from previous

IMPRESSION:

No change in the fusion between C3 and C4 when compared to the study obtained approximately one month ago

***************FINAL***************

*Attending Radiologist: Michals MD, Edward A*
*Date Signed off: 09.29.2017 13:11*
*Dictated By: Michals MD, Edward A   09/29/2017 13:11*
*Transcribed By: PT   09.29.2017 13:11*

---

Doctor A. RTP 1037

EXHIBIT 7

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER IN CASE NO. 1:20-CV-00014



**UNIVERSITY OF ILLINOIS**
Hospital & Health Sciences System
—— Changing medicine. For good. ——

Patient Name: POOLE, AHMAD J     MRN: 75692483
Sex: MALE     DOB:     Age: 37 years
Discharge Date  n/a     Financial Number: n/a

---

### Radiology

---

ACCESSION
XR-17-0060651

EXAM DATE/TIME
9/6/2017 13:38 CDT

STATUS
Auth(Verified) & Reviewed

**Reason For Exam**
Neck Pain, C4 Fracture (C3-4 PCF)

**Report**
EXAMINATION: XR Spine Cervical 3 views or Less.

DATE:   9/6/2017

COMPARISONS: MRI cervical spine 8/31/2017.

TECHNIQUE: Frontal and lateral radiographs of the cervical spine were obtained intraoperatively.

INDICATION: Neck Pain, C4 Fracture (C3-4 PCF) .

FINDINGS:

There is a posterior fixation device seen at the C3 and C4 vertebral levels with 4 total posterior
screws, as well as C3-C4 laminectomy.

IMPRESSION:

Imaging performed in the operating theater for localization purposes.

These images were reviewed and interpreted with attending radiologist Dr. Michals before dictation
of this final report by resident Dr. Carlos Manuel de Castro IV
***************FINAL***************

*I HAVE REVIEWED THE IMAGES AND INTERPRETATIONS AND AGREE WITH THE FINDING*

*Attending Radiologist:  Michals MD, Edward A*
*Date Signed off:  09.06.2017 14:41*
*Radiology Resident:  De Castro MD, Carlos*
*Dictated By:  De Castro MD, Carlos   09/06/2017 14:41*
*Transcribed By:  PT   09.06.2017 14:41*

---

University of Illinois Hospital & Health Sciences System

Report Request ID:  43889645
Print Date/Time:  10/19/2020
06:26 CDT

Doctor A. RTP 1038

EXHIBIT 7

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER IN CASE NO. 1:20-CV-00014



| | |
|---|---|
| **UNIVERSITY OF ILLINOIS** Hospital & Health Sciences System — *Changing medicine. For good.* — | Patient Name: POOLE, AHMAD J   MRN: 75692483 |
| | Sex: MALE   DOB:   Age: 37 years |
| | Discharge Date n/a   Financial Number: n/a |

### Radiology

ACCESSION
MR-17-0014236

EXAM DATE/TIME
8/31/2017 10:15 CDT

STATUS
Auth(Verified) & Reviewed

**Reason For Exam**
C3-4 subluxation, eval ligament damange

**Report**
Procedure: MRI examination of the cervical spine without contrast.

Examination date: 8/31/2017 at 09:06 hours.

Clinical history: 34-year-old male being evaluated for C3-C4 subluxation and ligamentous damage. Patient had previous imaging demonstrating a right perched facet and a history of neck pain for 2 weeks.

Comparison studies: None available.

Technique: Routine MR imaging through the cervical spine was performed including coronal T2-weighted images, sagittal T1-weighted and T2-weighted and STIR images, axial gradient echo and T2-weighted images.

Findings: There is straightening of the normal cervical lordosis. There is a perched facet at the C3-C4 level on the right with a small fracture fragment . There is accompanying increased signal on STIR images in the surrounding soft tissues, suggestive of associated edema. There is minimal anterior rotational subluxation on the right side. There is increased T2 signal of the atlantooccipital joints bilaterally, nonspecific in nature. Otherwise, vertebral body heights appear maintained.
The craniocervical junction is not compromised. The canal size is maintained. Cord signal and caliber appear normal. No evidence of hemorrhage within the canal. There is mild decreased T2 signal of the cervical disks from C2-C7 with preservation of disc height and no evidence of focal disc herniation.

Impression:
Fracture of the right-sided inferior C3 facet with perching and minimal anterolisthesis at C3-C4 level. Accompanying edema in the soft tissues surrounding the right C3-C4 facet joint. No evidence of cord compression, hemorrhage within the canal or traumatic disc herniation.

This study was reviewed and interpreted with Dr. Ozgen and dictated by Dr. Michael Kim.

Doctor A. RTP 1039

**EXHIBIT 7**

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER IN CASE NO. 1:20-CV-00014

 UNIVERSITY OF ILLINOIS
Hospital & Health Sciences System
——— Changing medicine. For good. ———

Patient Name: POOLE, AHMAD J          MRN: 75692483
Sex: MALE          DOB: ▓▓▓▓▓          Age: 37 years
Discharge Date  n/a          FInancial Number: n/a

| Radiology |
|---|

ACCESSION          EXAM DATE/TIME          STATUS
MR-17-0014236          8/31/2017 10:15 CDT          Auth(Verified) & Reviewed

**Report**
***************FINAL***************

*I HAVE REVIEWED THE IMAGES AND INTERPRETATIONS AND AGREE WITH THE FINDING*

*Attending Radiologist:  Ozgen MD, Burce*
*Date Signed off:  08.31.2017 14:55*
*Radiology Resident:  Kim MD, Michael*
*Dictated By:  Kim MD, Michael   08/31/2017 14:55*
*Transcribed By:  PT   08.31.2017 14:55*

University of Illinois Hospital & Health Sciences System

Report Request ID:  43889645
Print Date/Time:  10/19/2020
06:26 CDT

Doctor A. RTP 1040

EXHIBIT 7

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER IN CASE NO. 1:20-CV-00014



**UNIVERSITY OF ILLINOIS**
Hospital & Health Sciences System
—— Changing medicine. For good. ——

| | |
|---|---|
| Patient Name: POOLE, AHMAD J | MRN: 75692483 |
| Sex: MALE    DOB: ▮▮▮▮▮ | Age: 37 years |
| Discharge Date n/a | FInancial Number: n/a |

| *Radiology* |
|---|

| ACCESSION | EXAM DATE/TIME | STATUS |
|---|---|---|
| XR-17-0059262 | 8/31/2017 00:56 CDT | Auth (Verified) |

**Reason For Exam**
preop

**Report**
EXAM: CHEST RADIOGRAPH, SINGLE FRONTAL VIEW

HISTORY: 34-year-old man referred for preoperative imaging.

DATE: 8/31/2017 5:38 AM

COMPARISON: None available

FINDINGS:
The cardiomediastinal silhouette is normal in size. Central pulmonary vascularity is within normal limits. The trachea projects over midline. The lungs are well expanded without focal consolidation, large pleural effusion or pneumothorax. There is mild left convex curvature of the thoracolumbar spine.

IMPRESSION:
No acute cardiopulmonary process.

******************
Preliminary report issued by resident radiologist Dr. A. Allen at 8/31/2017 5:39 AM.
***************FINAL**************

*I HAVE REVIEWED THE IMAGES AND INTERPRETATIONS AND AGREE WITH THE FINDING*

*Attending Radiologist: Menchaca MD, Martha*
*Date Signed off: 08.31.2017 07:58*
*Radiology Resident: Allen DO, Amanda*
*Dictated By: Allen DO, Amanda  08/31/2017 07:58*
*Transcribed By: PT  08.31.2017 07:58*

University of Illinois Hospital & Health Sciences System

Report Request ID:  43889645
Print Date/Time:  10/19/2020
06:26 CDT

Doctor A. RTP 1041

EXHIBIT 7

12

EXHIBIT 7

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER IN CASE NO. 1:20-CV-00014

```
                    WEXFORD HEALTH SOURCES INCORPORATED

To:        Site Medical Director & HSA

From:      Utilization Management

Date/Time: 10/10/201715:54:45

Subject:   Inmate Name:  POOLE, AHMAD
           Inmate Number: K95348
                  Site:  STATEVILLE CC
               Service:
                         99024   POSTOP FOLLOW-UP VISIT

Authorization ID: 627150465

Based upon a review of the information provided, Service is Approved.


    Comments:
    Post-op Neuro Surg F/Us approved by Dr. Ritz in collegial with Dr.
    Obaisi for a patient admitted to UIC 8-31-17 for R Cervical 3 facet
    fracture and subluxation.  C3-4 posterior cervical fusion done
    9-6-17 while IP.  Discharged 9-6-17; Neuro Surg requesting F/U in 2
    weeks.

    **Global auth for Post-Op Neuro Surg F/Us at UIC until 12-4-17**
```

3-16
auth
expired

```
From:
     Dedicated Utilization Management

    ----------------------------------------------------------------

       INFORMATION CONTAINED IN THIS DOCUMENT IS PRIVILEGED AND CONFIDENTIAL

              Foster Plaza4 - 501 Holiday Drive - Pittsburgh, PA 15220
              877-939-2884 or 800-353-8384 - Phone
                                         412-937-9151 - Fax
              WWW.WEXFORDHEALTH.COM
```

EXHIBIT 7

**13**

EXHIBIT 7

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER IN CASE NO. 1:20-CV-00014

ILLINOIS DEPARTMENT OF CORRECTIONS

Offender Outpatient Progress Notes

_____ STATEVILLE C.C. _____ Center

Offender Information:

| Last Name | First Name | MI | ID#: |
|-----------|------------|-----|------|
| Poole | Ahmad | | K95348 |

| Date/Time | Subjective, Objective, Assessment | Plans |
|-----------|-----------------------------------|-------|
| 11/1/17 11:37 am/pm | **RADIOLOGY NOTE**<br>Presented to department for xray of C-spine and left knee. He states cervical fracture then surgery in August 2017. He recently "strained" neck. Also states left knee pain since original fall in August 2017. | Will send final report once available for physician review.<br><br>A. O'Toole RT(R) 11/1/17 |

Distribution: Offender's Medical Record

Printed on Recycled Paper

DOC 0084 (Eff. 9/2002)
(Replaces DC 7147)

Doctor A. RTP 0865

EXHIBIT 7

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER IN CASE NO. 1:20-CV-00014

ILLINOIS DEPARTMENT OF CORRECTIONS

Offender Outpatient Progress Notes

STATEVILLE CORRECTIONAL Center

Offender Information:

Last Name: Poole    First Name: Ahmad    MI: ____    ID#: K95348

| Date/Time | Subjective, Objective, Assessment | Plans |
|---|---|---|
| 8/23/17 10:20 a.m. | Lab note: LFT, Mag, hep panel, PPR | |
| 9/8/17 10:30p | RN Note S: "I'm good." O: I/m A+O+3, clear speech, slow, steady gait. I/m has 17 staples to back of neck and a neck brace. Limited mobility to neck A: 23° Infirmary | SCD P: 23° admit to Infirmary |
| 9/8/17 11:50 Pm | RN Note S: "I need my pain pills" O: I/m up in cell. Neck brace in place (continued) | M. Jensen, RN |

EXHIBIT 7

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER IN CASE NO. 1:20-CV-00014

ILLINOIS DEPARTMENT OF CORRECTIONS

**Offender Outpatient Progress Notes**

Stateville Correctional Center

Offender Information:

Last Name: Poole    First Name: ahmad    MI:    ID#: K95348

| Date/Time | Subjective, Objective, Assessment | Plans |
|---|---|---|
| 12·6·18 | Med Dr Note | |
| @ 1120 | Pt here s/p visit to neurosurg | Add Voltaren 75mg po |
| T 98.4 | 11/30/18. Note reveals he is doing well | BID x 6mo |
| P 79 | per surg standpt. Pt c/o muscle | Add Robaxin 750mg |
| R 16 | tension, pain everyday. Only taking | BID x 60d. |
| B/P 121/73 | tramadol now. Pt c̄ nl gait / move | Refer back to PT (c/c) |
| O₂ 94/85 | head side to side (slightly limited Rom) | for eval & tx of |
| 10.1/18 109/05 | Pain is subjective. | neck pain / m. |
| | | spasms. |

Distribution: Offender's Medical Record

DOC 0084 (Eff. 9/2002)
(Replaces DC 7147)

Printed on Recycled Paper

EXHIBIT 7

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER IN CASE NO. 1:20-CV-00014

ILLINOIS DEPARTMENT OF CORRECTIONS

Offender Outpatient Progress Notes

Stateville Correctional Center

Offender Information:

POOLE  AHMAD  ID#: X95348
Last Name   First Name   MI

| Date/Time | Subjective, Objective, Assessment | Plans |
|---|---|---|
| 12-21-18 | RN/SC note: | |
| 10A | I'm not seen in RN/SC. Per security I'm not in his cell. I'm to reschedule himself for RN/SC as needed. L. Lemandorff RN | |
| | | P. RIC |
| 1-5-19 9A | S: "I have muscle spasms on the right side of my chest." O: I'm A&Ox3. Gait steady. Speech clear and coherent. I'm is complaining of ® side chest muscle spasms rated 5/10. I'm states "I don't take my Robaxin all the time, just sometimes." A: Muscle spasms. | I'm was prescribed Robaxin + Voltaren for muscle spasms a 12-6-18. I'm advised to take medication as prescribed and return to RN/SC as needed. L. Lemandorff RN |

Distribution: Offender's Medical Record

DOC 0084 (Eff. 9/2002) (Replaces DC 7147)

Printed on Recycled Paper

EXHIBIT 7

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER IN CASE NO. 1:20-CV-00014

ILLINOIS DEPARTMENT OF CORRECTIONS

**Offender Outpatient Progress Notes**

**Stateville Correctional Center**

Offender Information:

Last Name: Poole    First Name: Ahmad    MI:    ID#: K95348

| Date/Time | Subjective, Objective, Assessment | Plans |
|-----------|-----------------------------------|-------|
| 02-22-19 | PT NOTE / EVALUATION | |
| | S: "I'm OK, my Neck is only a | |
| | little stiff I now & then, but I | |
| | can walk, & use I the exercises you | |
| | gave me last time" - pt requesting | |
| | to DX from PT - prefers to tx on his | |
| | own. | |
| | Exam: palpation - mild tenderness | |
| | I C2-C6 level - no spasms noted | |
| | AROM/MM - wnl throughout | |
| | MMT - No significant weakness noted | |
| | Posture - Normal, good cervical | |
| | lordosis | |
| | Functional deficits - none reported | |
| | ample work & ADL I wo regular | |
| | DTR - 2+ brachials / biceps / triceps | |
| | No radiculopathy | PT |

Distribution: Offender's Medical Record

Printed on Recycled Paper

DOC 0084 (Eff. 9/2002)
(Replaces DC 7147)

Poole 055

EXHIBIT 7

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER IN CASE NO. 1:20-CV-00014

ILLINOIS DEPARTMENT OF CORRECTIONS

**Offender Outpatient Progress Notes**

Stateville Correctional Center

Offender Information:

Last Name: _Poole_    First Name: _Ahmed_    MI: ____    ID#: _K95348_

| Date/Time | Subjective, Objective, Assessment | Plans |
|-----------|-----------------------------------|-------|
| 02/22/19 | Pt note continued | |
| | A: Pt current need for firearm | C: Px w/her |
| | Pt. HEP reviewed, responded | or pr |
| | ⊤ Pt. Pt demonstrate Especial | lumotor |
| | understanding | request |

Distribution: Offender's Medical Record

Printed on Recycled Paper

DOC 0084 (Eff 9/2002)
(Replaces DC 7147)

Poole 056

EXHIBIT 7

14

EXHIBIT 7

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER IN CASE NO. 1:20-CV-00014

10/11/2018 17:20 FAX ☒ 0010/0035



| UNIVERSITY OF ILLINOIS | Patient Name: POOLE, AHMAD J | MRN: 75692483 |
| Hospital & Health Sciences System | Sex: MALE     DOB: | Age: 35 years |
| Changing medicine. For good. | Discharge Date 10/5/2018 | Financial Number: 75692483-0372 |

### Neurosurgery Note

Result Type:      Neurosurgery Note    K95348
Result Date:      10/5/2018 00:00 CDT
Result Status:      Auth (Verified)
Performed Information:      Mehta MD,Ankit (10/5/2018 09:04 CDT)
Signed Information:      Mehta MD,Ankit (10/5/2018 09:45 CDT)

**Clinic Progress Note- ATTENDING:.Ankit Mehta, MD**

University of Illinois Hospital & Health Science Systems

CLINIC NOTE          PATIENT: POOLE, AHMAD J

DICT: ANKIT MEHTA, MD      MRN: 075692483
ATTNG: ANKIT MEHTA, MD     DATE OF SERVICE: 10/05/2018

DATE OF BIRTH:

SUBJECTIVE: This is a pleasant 35-year-old gentleman, who is about one year after C3-C4 posterior cervical fusion done for subluxation of his facet joints. He is doing fine at this one year, except he does have some occasional neck pain that he is stating.

OBJECTIVE: His motor strength is 5/5. His sensation is intact to light touch. He has no neurological deficit that is present, but he has some tenderness still in his neck.

ASSESSMENT AND PLAN: I would like to get x-rays on him to assess the fusion, and I will see him back in one month. If his diffusion looks okay, then we would also recommend some physical therapy for doing neck exercises as well.

It was a pleasure seeing Mr. Phoole today.

DD: 10/05/2018 09:04:25
DT: 10/05/2018 09:29:40
AM/MedQ
JOB: 896067/808685975

               ma

University of Illinois Hospital & Health Sciences System      Report Request ID: 36641592
                                         Print Date/Time: 10/11/2018
                Page 1 of 2                              16:33 CDT

EXHIBIT 7

15

EXHIBIT 7

Poole, Ahmad
XLW01

12-1882

AUG 2 2 2017

STATEVILLE CORRECTIONAL CENTER

FOR X-RAY TECH ONLY

## STATE OF ILLINOIS - DEPARTMENT OF CORRECTIONS

### X-RAY REPORT

Inmate's Name: _Poole AHMuns_     Number: _K95348_     Date: _8-17-17_

Age: _____

Reason for X-Ray:

Ordering Physician

Findings:
1. Cerv Spine : Anterior Subluxation of C3 in relation to C4; Otherwise ng.
2. Left Hand.  ⟩ Both areas appear normal.
3. Skull

Date: _____                                    M.D.
                                              27 Aug 2017

FOR CORRECTIONAL CENTER HEALTH CARE UNIT PERSONNEL ONLY

☐ I have reviewed the recommendations contained in this report.

Date: _____                    _____
                                 Signature and Title

IL 426-18393    DCA 42066

AUG 2 5 2017

Doctor A. RTP 0718

EXHIBIT 7

ILLINOIS DEPARTMENT OF CORRECTIONS

**X-Ray Requisition**

STA

Facility

NOV 01 2017

B411

Mailing Address: _____

Phone Number: _____ Ext.: _____
Fax Number: _____

Patient Name: _Poole  Ahmad_  Date of Birth: _12-18-82_
Offender Number: _K95348_  ☑ Male  ☐ Female
Examination(s) Requested:
cervical spine X R
L knee X R

Request Date: _____ Date of Exam: _11/1/17_
History/Symptoms: Post cervical fusion neck
Pain L knee X 2 months or soft
Post Trauma.

Reports: ① Left knee - Neg. study.
② Cerv. - Fusion with parallel anchoring bars C3-C4
Heights of bodies normal. Disc space + curvature
normal. No new pathology.   9 _____
Referring Physician:   3 Nov 2017
S - ODerg

Print Physician Name                    Physician Signature

Technologist:

A. O'Toole RT(R)                    A. O'Toole RT(R)
Print Technologist Name                    Technologist Signature

11-7-17 _____

Distribution: X-Ray Tech          Printed on Recycled Paper          DOC 0392 (Eff. 01/2013)

Doctor A. RTP 0719

EXHIBIT 7

JUN 04 2018

B629

ILLINOIS DEPARTMENT OF CORRECTIONS

**X-Ray Requisition**

STA
_Facility_

Mailing Address: _____

_____

_____

Phone Number: _____ Ext.: _____

Fax Number: _____

Patient Name: Poole, Ahmad     Date of Birth: 12-18-82

Offender Number: K95348     ☐ Male   ☐ Female

Examination(s) Requested: cervical xray

_____

_____

Request Date: 5-31-18     Date of Exam: JUN 04 2018

History/Symptoms: per UIC

_____

Report: Previous resection spinous processes of C3 + C4. Bridging
supportive bars anchored into lateral elements of C3 + C4.
Slight straightening of curvature. Otherwise neg.

Referring Physician: _____

_____ MD
5 June 2018

Aquinaldo
_Print Physician Name_          _Physician Signature_

Technologist:

A. O'Toole                    A. O'Toole RT(R)
_Print Technologist Name_          _Technologist Signature_

Distribution: X-Ray Tech          _Printed on Recycled Paper_          DOC 0392 (Eff. 01/2013)

Doctor A. RTP 0720

EXHIBIT 7

7-31-18

**ILLINOIS DEPARTMENT OF CORRECTIONS**

**X-Ray Requisition**

STATEVILLE
Facility

Mailing Address: _____

B629

Phone Number: _____ Ext.: _____
Fax Number: _____

Patient Name: POOLE, AMHAD    Date of Birth: 12-18-82
Offender Number: K95348    ☑ Male  ☐ Female
Examination(s) Requested: (L) FOOT

Request Date: 7/20/18    Date of Exam: AUG 03 2018
History/Symptoms: 35 y/o. AAM C/O PAIN (L) AREA
X 2 WEEKS, SUDDEN ONSET.

Report: No bone or joint pathology. 
3 Aug 2018

Referring Physician:

_____          _____
Print Physician Name        Physician Signature

Technologist:

A. O'Toole          a. O' Toole RT(R)
Print Technologist Name      Technologist Signature

Doctor A. RTP 0721

EXHIBIT 7

ILLINOIS DEPARTMENT OF CORRECTIONS

**X-Ray Requisition**

STA

Facility

B629

Mailing Address: _____

_____

_____

Phone Number: _____ Ext.: _____

Fax Number: _____

Patient Name: Poole, Ahmed          Date of Birth: 12/8/82

Offender Number: K95348          ☑ Male ☐ Female

Examination(s) Requested: _____

XRay Cervical spine

Request Date: 10/5/18          Date of Exam: OCT 10 2018

History/Symptoms: _____

Report: No fxs visible. Had surgery with resection of spinous
processes C3 & C4. Parallel stabilizing bars anchored into
lateral elements of C3 & C4. Otherwise neg.

Referring Physician:

                                        Oct 12, 2018

Print Physician Name          Physician Signature

Technologist:

A.O'Toole          a.O'Toole RT(R)

Print Technologist Name          Technologist Signature

MM
10/12/18

Distribution: X-Ray Tech          Printed on Recycled Paper          DOC 0392 (Eff. 01/2013)

Doctor A. RTP 0722

EXHIBIT 7

XLW05

ILLINOIS DEPARTMENT OF CORRECTIONS
**X-Ray Requisition**

SEP 1 8 2019

STA

_Facility_

Mailing Address: _____

_____

Phone Number: _____ Ext.: _____
Fax Number: _____

Patient Name: POOLE, AHMAD    Date of Birth: 12 - 18 - 82

Offender Number: K 95348    ☑ Male ☐ Female

Examination(s) Requested: ① cervical spine
② Ⓡ shoulder

Request Date: _____ Date of Exam: SEP 1 8 2019

History/Symptoms: Pt had altercation with pre, hurting neck
and Ⓡ shoulder. Pt had cervical spine surgery in 2017

Reports: ① Cerv. Spine - No new pathology. Old surgery with
laminectomies + resection of spinous process of C3 & C4.
Parallel supporting bars anchored into lateral elements of
C3 & C4.
Referring Physician: ② Ⓡ Shoulder - Normal Study.    J Befus
Sept 20, 2019.

C. BAUER, MD

_Print Physician Name_     _Physician Signature_

Technologist:

4/23/19

A. O'Toole
_Print Technologist Name_

A. O'Toole RT(R)
_Technologist Signature_

RECEIVED
SEP 1 8 2019
By 10

Distribution: X-Ray Tech     _Printed on Recycled Paper_     DOC 0392 (Eff. 01/2013)

Doctor A. RTP 0723

EXHIBIT 7

16

EXHIBIT 7

ILLINOIS DEPARTMENT OF CORRECTIONS

## Offender Outpatient Progress Notes

STATEVILLE CORRECTIONAL Center

Offender Information:

| Last Name | First Name | MI | ID#: |
|-----------|-----------|-----|------|
| Poole | Ahmad | | K05348 |

| Date/Time | Subjective, Objective, Assessment | Plans |
|-----------|-----------------------------------|-------|
| 8/30/11 1145 pm | MD Note | |
| T 97.8 P 69 R 16 B/P 127/76 | 2 week ago during Altercation the Pt neck was Twisted & squezed — has had neck p̄ since no Extrat's weakn NO H&N sympt ⊕ Tendo on bend'g neck only bends restricted Rotation + rotation full c̄ pa̅. No N/abgil deficit XR C3 Subluxd | Consult Collar TO ER by State car Dr Joo inform about the case given MP B̄ Dr Obein |
| | A: On XR C3 Sublux̄ | |

EXHIBIT 7

17

EXHIBIT 7

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| AHMAD POOLE (K-95348), | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 20-cv-00014 |
| | ) | |
| DR. EVARISTO AGUINALDO, et al. | ) | The Hon. Charles R. Norgle, Sr. |
| | ) | |
| Defendants. | ) | **JURY DEMANDED** |

**DEFENDANT, DR. EVARISTO AGUINALDO'S ANSWERS
TO PLAINTIFF'S FIRST SET OF REQUESTS FOR ADMISSION**

NOW COMES, Defendant, DR. EVARISTO AGUINALDO, and in response to

Plaintiff's First Set of Requests for Admission, states as follows:

1.      Admit that you are a general practitioner of medicine, and you do not specialize in

neck, spinal, or neurological injuries.

**ANSWER:**    **Admit.**

2.      Admit that Wexford providers must request that patients be sent offsite for

evaluation or treatment when they are in need of healthcare that a general practitioner cannot

provide.

**ANSWER:**    **Deny.**

3.      Admit that Wexford providers are not required to request that patients be sent

offsite for evaluation or treatment when they are in need of healthcare that a general practitioner

cannot provide.

**ANSWER:**    **Admit.**

EXHIBIT 7

4.      Admit that you did not perform an examination of Plaintiff's neck on August 17, 2017.

**ANSWER:**     **Deny.**

5.      Admit that Mr. Poole reported to you that he was suffering from severe neck pain when you encountered him on August 17, 2017.

**ANSWER:**     **Deny.**

6.      Admit that Mr. Poole did not report to you that he was suffering from severe neck pain when you encountered him on August 17, 2017.

**ANSWER:**     **Admit.**

7.      Admit that Mr. Poole reported to you that he was having difficulty keeping his head up when you encountered him on August 17, 2017.

**ANSWER:**     **Deny.**

8.      Admit that Mr. Poole did not report to you that he was having difficulty keeping his head up when you encountered him on August 17, 2017.

**ANSWER:**     **Admit.**

9.      Admit that Mr. Poole reported a popping sound and painful sensation when he moved his neck to you when you encountered him on August 17, 2017.

**ANSWER:**     **Deny.**

10.     Admit that Mr. Poole did not report a popping sound and painful sensation when he moved his neck to you when you encountered him on August 17, 2017.

EXHIBIT 7

**ANSWER:**    **Admit.**

11.    Admit that you did not take action to provide Mr. Poole with a neck brace following your August 17, 2017 encounter.

**ANSWER:**    **Admit.**

12.    Admit that you did not request that Mr. Poole be seen by a specialist of any sort as a result of your August 17, 2017 encounter.

**ANSWER:**    **Admit.**

13.    Admit that on August 24, 2017, you did not provide a neck examination or treatment for Mr. Poole's neck.

**ANSWER:**    **Admit that on August 24, 2017, I did not provide a neck examination for Mr. Poole's neck. Admit that I did provide treatment for Mr. Poole's neck on August 17, 2017 with Tylenol 500mg B.I.D. 3x day for 10 days, which would have continued through August 24, 2017.**

14.    Admit that on August 24, 2017, you did not provide Mr. Poole with a neck brace.

**ANSWER:**    **Admit.**

15.    Admit that on August 24, 2017, Mr. Poole reported to you that he was suffering from severe neck pain.

**ANSWER:**    **Deny.**

16.    Admit that on August 24, 2017, Mr. Poole reported to you that he was not suffering from severe neck pain.

EXHIBIT 7

**ANSWER:** **Admit.**

17.      Admit that on August 24, 2017, Mr. Poole reported to you that he was having difficulty keeping his head up.

**ANSWER:** **Deny.**

18.      Admit that on August 24, 2017, Mr. Poole did not report to you that he was having difficulty keeping his head up.

**ANSWER:** **Admit.**

19.      Admit that Mr. Poole reported a popping sound and painful sensation when he moved his neck to you when you encountered him on August 24, 2017.

**ANSWER:** **Deny.**

20.      Admit that Mr. Poole did not report a popping sound and painful sensation when he moved his neck to you when you encountered him on August 24, 2017.

**ANSWER:** **Admit.**

21.      Admit that on August 24, 2017, you did not refer Mr. Poole to a specialist.

**ANSWER:** **Admit.**

22.      Admit that on August 28, 2017, you did not provide Mr. Poole with a neck brace.

**ANSWER:** **Admit.**

23.      Admit that on August 28, 2017, Mr. Poole reported to you that he was suffering from severe neck pain.

EXHIBIT 7

**ANSWER:**     Deny.

24.     Admit that on August 28, 2017, Mr. Poole did not report to you that he was suffering from severe neck pain.

**ANSWER:**     **Admit.**

25.     Admit that on August 28, 2017, Mr. Poole reported to you that he was having difficulty keeping his head up.

**ANSWER:**     Deny.

26.     Admit that on August 28, 2017, Mr. Poole did not report to you that he was having difficulty keeping his head up.

**ANSWER:**     **Admit.**

27.     Admit that Mr. Poole reported a popping sound and painful sensation when he moved his neck to you when you encountered him on August 28, 2017.

**ANSWER:**     Deny.

28.     Admit that Mr. Poole did not report a popping sound and painful sensation when he moved his neck to you when you encountered him on August 28, 2017.

**ANSWER:**     **Admit.**

29.     Admit that on August 28, 2017, you told Mr. Poole that he would not need surgery.

**ANSWER:**     Deny.

30.     Admit that on August 28, 2017, you told Mr. Poole that he would need surgery.

EXHIBIT 7

**ANSWER:** **Deny.**

31.     Admit that on August 28, 2017 you did not arrange for Mr. Poole to be seen by a

specialist.

**ANSWER:** **Deny.**

32.     Admit that you did not send Mr. Poole offsite for surgery.

**ANSWER:** **Admit.**

33.     Admit that you did not request that Mr. Poole be sent offsite for surgery.

**ANSWER:** **Admit.**

34.     Admit that you did send Mr. Poole offsite for surgery.

**ANSWER:** **Deny.**

35.     Admit that you did request that Mr. Poole be sent offsite for surgery.

**ANSWER:** **Deny.**

36.     Admit that as of August 17, 2017, Mr. Poole was suffering from an objectively

serious medical condition.

**ANSWER:** **Deny.**

37.     Admit that as of August 24, 2017, Mr. Poole was suffering from an objectively

serious medical condition.

**ANSWER:** **Deny.**

EXHIBIT 7

38.    Admit that as of August 28, 2017, Mr. Poole was suffering from an objectively serious medical condition.

**ANSWER:**    **Deny.**

39.    Admit that on August 24, 2017, Mr. Poole was not suffering from an objectively serious medical condition.

**ANSWER:**    **Admit.**

40.    Admit that on August 28, 2017, Mr. Poole was not suffering from an objectively serious medical condition.

**ANSWER:**    **Admit.**

41.    Admit that Mr. Poole did in fact receive surgery for his neck injury.

**ANSWER:**    **Admit.**

Respectfully submitted,
**CONNOLLY KRAUSE LLC**


/s/    Logan N. Giaquinta
Attorneys for Defendant DR. EVARISTO
AGUINALDO

Robert S. Tengesdal - #6288650
Logan N. Giaquinta - #6326945
CONNOLLY KRAUSE LLC
500 W. Madison Street, Suite 3900
Chicago, Illinois 60661
T: (312) 253-6200
F: (312) 253-6201
rtengesdal@cktrials.com
lgiaquinta@cktrials.com

EXHIBIT 7

## **DECLARATION/VERIFICATION**

Pursuant to 28 U.S.C. Section 1746, I declare under perjury that the foregoing is true and correct.

Executed on 29 of March 2022.

Dr. Evaristo Aguinaldo

EXHIBIT 7

**18**

EXHIBIT 7

October 11, 2022
Isabella Aguilar
Loevy & Loevy
311 N. Aberdeen St.
Chicago, IL 60607

**RE:** Poole, Ahmad, Plaintiff, v. Dr. Evaristo Aguinaldo, Derek Jaburek, Alphonso Norman, and Tina Tomaras, Defendants

Dear Ms. Aguilar,

My report in the above-referenced matter follows:

**Assignment:**

I was asked to review relevant materials in the above-referenced complaint to render an opinion on the medical care received by Ahmad Poole while incarcerated at Stateville Correctional Center.

**Qualifications:**

I am a medical surgeon with certification of the American Board of Neurological Surgery with an office in Hinsdale, Illinois. My C.V. is attached hereto as an exhibit. My C.V. includes all publications I have authored in the previous 10 years.

**Previous testimony:**

In the previous 4 years, I have testified as an expert by trial or deposition in the following cases:

**2019**

- *Zik Charway et. al v. Saint Francis Hospital and Medical Center*
  Case No.-HHD-CV-17-6079415-S

- *Michael Heatherly II v. IAS Logistics DFW, LLC, et.al, v. Alliance Ground International, Inc.*
  Case No. -17 L 4549

- *James Hicks, Bonnie Hicks, Jason Hicks and Mary Hicks v. The State of Iowa*
  Case No. LACV079412

- *Kalena Humphrey v,Oklahoma Spine & Brain , et. al.*
  Case No. CJ-2018/-832

- *Alan Byington v. Barnes-Jewish St. Peters Hospital, et. al.*
  Case No. 1711-CC01128

- *Joy Boberg v. Kevin Daly*
  Case No. 2016 LA 00380

EXHIBIT 7

- *Charles Holt v. Jesse Lewsader, et. al*
  Case No. 18-CV-2169

- *Patricia Caplinger v. Cox Health, Springfield Neurological Institute, LLC & Salim Rahman, M.D.*
  Case No. 1631-CC00227-01

- *Danielle Young/Jasmine Woods v. Robert E. Abbott, M.D. & Christian Hospital Northeast-Northwest*
  Case No. 18SL-CC00041

- *Robert Cichon v. Atria Senior Living*
  Case No. 19 WC 00238

- *Monasena Pugh v. Green Street Apartments*
  Case No. 2017L 009912

- *Lisa Maurin, Administrator of the Estate of Renee Maurin v. Elad Levy, M.D., University at Buffalo Neurosurgery, Inc., Visiting Nursing Association of Western New York, Inc.*
  Case No. 802377/2014

**2020**

- *Steven & Rita Hargrave, co-guardians and co-conservators of the Estate of Travis Hargrave v. Meritas Health Corporations and Kristopher T. Kimmell, M.D.*
  Case No. 19CY-CV01598

- *Charles A. Holt v. Jesse Lewsader, Richard Wilson, Ryan Washburn and City of Paris, Illinois*
  Case No. 18-CV-02169

- *Patricia Caplinger v. Salim Rahman, et. al*
  Case No. 1631-CC00227-01

- *Trtan v. Swamy*
  Case No. 2016 L 000777

**2021**

- *Pamela Jeter v. Guy Music, M.D., et. al*
  Case No. LACV119777

- *Brian Smith v. Pannu et. al*
  Case No.-19-CV-131

- *Chastity Pendleton v. Joseph Stageman, GE Renewable Energy*

EXHIBIT 7

Case No.-19 CV04908
- *Stolarczyk v. Ahluwalia*
  Case No.- CA2010-000435

**2022**
- *John Gethers, Jr. v. American Family Mutual Insurance*
  Case No. 20CV091

- *Tyler Williams v. Malek El Muayed*
  Case No. 2019 L 011825

\*Updated 10/5/2022

**Materials Reviewed:**

- Fourth Amended Complaint, *Poole v. Dr. Evaristo Aguinaldo, et al.* 20-C-00014
- IDOC 1-7
- Doctor A. RTP 0749
- Doctor A RTP 0751
- Doctor A RTP 0431
- Doctor A. RTP 0852-09
- Doctor A. RTP 0933
- Doctor A. RTP 0964-68
- Poole 078
- Doctor A. RTP 0865
- Poole 009
- Poole 053-56
- Poole 083
- Doctor A. RTP 0718-0723
- Doctor A. RTP 000256
- Defendant Dr. Aguinaldo's Answers to Plaintiff's First Set of Requests for Admission
- Plaintiff Ahmad Poole's deposition transcript
- Dr. Ankit Mehta's deposition transcript
- Dr. Aguinaldo's deposition transcript
- Original X-Rays, MRI, and CT images

The opinions stated in this report at my own. They are based on the materials reviewed, listed above, other information provided to me by counsel, and my professional training and experience. I hold these opinions to a reasonable degree of medical certainty. In the event additional information is provided to me, I reserve the right to revise and supplement these opinions.

On Thursday, August 17, 2017, Mr. Poole was attacked in his prison cell at Stateville Correctional Center by his cellmate. During the altercation, Mr. Poole's cellmate swung him by

EXHIBIT 7

his hair and placed him in a headlock, which caused Mr. Poole severe pain in his neck.

Shortly after the altercation, he was taken to the Healthcare Unit where he waited to receive medical treatment. Mr. Poole saw Dr. Aguinaldo and explained the cause of his injuries. He also explained that his neck was in severe pain, describing the pain as electrical shocks running up and down his spine or words to that effect, and expressed concern his neck was broken. The neck pain he has experienced since August 17, 2017 is consistent with the c3-c4 fracture diagnosis. Dr. Aguinaldo did not examine his neck or provide a cervical collar. Mr. Poole was not sent outside of the facility for an immediate x-ray, CT scan, or MRI scan. Mr. Poole was not sent to the medical director for further examination. Instead, Dr. Aguinaldo scheduled Mr. Poole for an x-ray appointment in the prison; those appointments typically only occurred on Tuesdays and Thursdays, and thus I understand the appointment to be a referral for an x-ray to occur the following Tuesday.

On Tuesday, August 22, 2017, Mr. Poole was given a pass for an x-ray. He did not see medical personnel that day.

On Friday, August 25, 2017, Mr. Poole received an x-ray.

On Monday, August 28, 2017, Mr. Poole saw Dr. Aguinaldo at the Healthcare Unit for a follow-up appointment. Dr. Aguinaldo did not provide him with a cervical collar or examine Mr. Poole's neck, despite Mr. Poole's repeated complaints of severe pain. Dr. Aguinaldo did not send Mr. Poole outside of the facility to see a specialist, and instead sent him to Dr. Obaisi for a "second opinion."

On Wednesday, August 30, 2017, Mr. Poole saw the medical director, Dr. Obaisi. Dr. Obaisi provided an examination of Mr. Poole's neck. Upon examination, Dr. Obaisi immediately gave Mr. Poole a cervical collar. Dr. Obaisi also told Mr. Poole he needed a CT scan and MRI to determine his injuries. Dr. Obaisi then sent Mr. Poole offsite to St. Joseph's hospital that same day, where he received a CT scan. That same day Mr. Poole was transferred from St. Joseph's hospital directly to UI Health and received an MRI scan. After receiving these two scans, Mr. Poole received a diagnosis of a C3-C4 fracture.

On September 7, 2017 Mr. Poole received surgery, where a C3-C4 fusion was performed by attending physician Dr. Ankit Meta.

Thus, Mr. Poole was injured with a cervical fracture on August 17, 2017, and received surgery for his injury on September 7, 2017, well after he was injured. Between August 17 and August 30 he did not receive a cervical collar to stabilize his neck, or a meaningful examination of his neck until August 30, 2017, 13 days later.

Since receiving the fusion surgery, Mr. Poole has experienced significant neck pain that persists to this day.

I hold the following opinions to a reasonable degree of medical certainty.

EXHIBIT 7

Mr. Poole did not have neck pain before August 17, 2017.

On August 17, 2017, Mr. Poole experienced trauma to his neck and presented with a history of injuries likely to cause a broken neck and symptoms where he was unable to hold his own neck up and described his pain as severe, "electrical shocks up and down the spine", and expressed concern his neck was broken. Such a history and symptoms are consistent with a fractured neck. When physicians assess patients with such a history and symptoms, the standard of care requires attending physicians to assume the neck is broken until it can be ruled out. This is imperative because the neck is part of the spine, and there is a potential for catastrophic injury such as paralysis or even death. Additionally, a physician should assume the neck is fractured to and provide sufficient support to prevent further injury, such as worsening of a fracture. Finally, an attending physician should assume the neck is broken to prevent a patient from experiencing further or more debilitating pain.

Because diagnosis of a neck fracture requires imaging, on August 17, 2017, Dr. Aguinaldo should have sent Mr. Poole out for such imaging immediately, to get an immediate diagnosis. This should have been done to protect Mr. Poole from catastrophic further injury, worsening of his fracture, and to prevent further pain. A faster diagnosis should have resulted in a surgery sooner than September 7, 2017, and lessened Mr. Poole's pain.

While waiting for a diagnosis, the attending physician should have provided an immediate cervical collar. A cervical collar stabilizes the neck, preventing further injury and preventing and/or reducing pain while the patient is awaiting surgery.

In failing to order immediate imaging and in failing to provide Mr. Poole with a neck brace pending imaging and surgery, Dr. Aguinaldo breached the standard of care.

Dr. Aguinaldo's failure to send Mr. Poole for immediate imaging delayed the diagnosis of his neck fracture and his eventual surgery. Dr. Aguinaldo's failure to provide Mr. Poole with a neck brace meant that Mr. Poole's fractured neck was not stabilized for 13 days.

The failure to diagnose Mr. Poole's injury from August 17-August 30, 2017 caused a delay in surgery. If Mr. Poole had been sent out on August 17, 2017 and received the c3-c4 fracture diagnosis, it is reasonable to assume his care would have been accelerated concurrently and he would have had his fusion operation two weeks earlier.

Neck fractures are extremely painful because an individual cannot function without moving the neck. When a neck is fractured, the area on either side of the fracture has been invaded, causing the neck to move and creating more pain. Surgery addresses this pain by stabilizing the neck and spinal cord. The delay in obtaining Mr. Poole's surgery forced Mr. Poole to experience two weeks of severe, unnecessary pain.

This period of pain was exacerbated by the period with which Mr. Poole was deprived a neck brace. Without a neck brace, a patient will have severe difficulties remaining immobile and stabilizing their body. A neck brace addresses this pain by preventing further injury and stabilizing the neck. Due to the fracture, the patient cannot stabilize their neck. With the aid of

EXHIBIT 7

the neck brace, the patient has that stabilization. Therefore, the delay in obtaining a neck brace for Mr. Poole exacerbated the pain he experienced before surgery.

The prolonged lack of a neck brace likely worsened Mr. Poole's neck fracture. Non-stabilized fractures worsen over time, and can lead to nerve damage, decreased strength, joint damage including cartilage damage, paralysis and even death. Neck braces prevent this from occurring by stabilizing the neck, supporting the spine and limiting movement, thereby preventing worsening of the fracture.

The delay in surgery worsened Mr. Poole's neck fracture. Delaying surgery, particularly without providing a cervical collar, worsened Mr. Poole's fracture because his neck was not stabilized during that 13-day period. Prompt neck surgery helps prevent this from occurring and helps prevent the fracture from worsening.

The likely worsening of Mr. Poole's neck fracture due to (1) the failure to stabilize his neck and (2) the delay in surgery are a likely cause of a significant portion of the pain Mr. Poole continues to experience post-surgery. Worsening of neck fractures like the ones that appear to have been caused here make neck surgeries less successful in reducing pain because when a bone fracture is left untreated, or there is a delay in treatment, it can result in a delayed union or even nonunion. Delayed unions take longer to heal and there can be complications if the bone was not set correctly. If the bones are misaligned due to a lack of stability, they will connect unevenly. If that happens, the misalignment could impact the structural integrity of the tissue, which will lead to more pain and suffering for the patient.

The pain Mr. Poole is currently experiencing and which is attributable to the worsened injury and less successful surgery I have described above is likely to be long-lasting for the reasons described above. Mr. Poole is likely to experience such pain for the rest of his life, and it will likely limit basic daily activities like lifting, looking around, sleeping, bending over, and the like.

It is my opinion within a reasonable degree of medical and professional certainty that Dr. Aguinaldo's failure to provide Mr. Poole with a cervical collar at any time fell below the standard of care. It is consistent with Mr. Poole's C3-C4 fracture that Dr. Aguinaldo's failure to provide a cervical collar would lead to unnecessary and prolonged pain at the time of the injury. It is also consistent with Mr. Poole's injury that a failure to provide a neck collar and stabilize the cervical collar would lead to pain today, which he has reported he is still experiencing from the August 17, 2017 injury. It is also my opinion within a reasonable degree of medical and professional certainty that Dr. Aguinaldo's failure to immediately send out Mr. Poole for imaging to obtain a differential diagnosis fell below the standard of care. It is further my opinion that the failure to send Mr. Poole out for immediate imaging to determine the cause of Mr. Poole's neck and determine if surgery is appropriate caused unnecessary and prolonged pain at the time of the injury, and is consistent with Mr. Poole's reported pain he experiences today, and which he will experience in the future. It is further my opinion that the delay in obtaining surgery caused long-term pain that would not have existed but for (1) additional injury caused by two weeks without a neck brace, and a (2) delay in surgery.

EXHIBIT 7

Sincerely,

R @ Beatty MD

Robert A. Beatty, M.D.

EXHIBIT 7

## CURRICULUM VITAE

**Robert Alfred Beatty, M.D., F.A.C.S, F.A.A.N.S.**

OFFICE:
    15 Salt Creek Lane
    Suite 215
    Hinsdale, IL   60521
    630-986-4430
    Practice limited to Neurological Surgery

EDUCATION:
    University of Oregon B.A. 1959, B.S. 1960
    University of Oregon Medical School M.D. 1961
    Summer Internship, Letterman Army Hospital, San Francisco
    Internship (rotating) University of Illinois Research Educational
    Hospital, Chicago, Illinois 1961-1962
    Residency in general surgery Rush Presbyterian-St. Luke's
    Hospital, Chicago, Illinois 1962-1963
    Residency in neurology and neurological surgery at University of
    Illinois Neuropsychiatric Institute, Chicago, Illinois
    Under Eric Oldberg, M.D. and Oscar Sugar, M.D. 1963-1966

MEDICAL LICENSURE:
    State of Indiana- June 30, 2010-No longer active
    State of Wisconsin- December 2, 2010
    State of Illinois-September 14, 1963
    State of California-July 8, 1965-No longer active
    National Board of Medical Examiners- July 1, 1962

BOARD CERTIFICATION:
    American Board of Neurological Surgery-1970

RESEARCH EXPERIENCE:
    Research Fellow at Atkinson Morley's Hospital, St. George's
    Medical School, London, England under Sir Wylie McKissock
    1966-1967
    Projects-studying carotid ligation and intracranial aneurysms

HONORS:

EXHIBIT 7

Phi Eta Sigma (national freshman men's scholastic honorary)
Phi Beta Kappa
Who's Who in the Midwest
American Medical Association Physician's Recognition Award
1973-present
Who's Who in Science and Engineering 1996- present
Who's Who in America-51st Edition-1996- present
Who's Who in Medicine and Healthcare; 2nd edition; 1997- present
Fellow of the American Association of Neurological Surgeons
2010

## ACADEMIC APPOINTMENTS:

Clinical Assistant Professor in Neurosurgery, University of Illinois
School of Medicine, Chicago, Illinois 1967- 2000

## MILITARY SERVICE:

Captain in U.S. Army Medical Corps, 1962-1968

## MEDICAL SOCIETIES:

American Medical Association
DuPage County, Illinois Medical Society
Illinois State Medical Society
Chicago Neurological Society
Central Neurosurgical Society
Inter-Urban Neurosurgical Society
American Association of Neurological Surgeons
Harvey Cushing Society-1971
North American Spine Society-1988
American College of Surgeons-1972
Society of British Neurological Surgeons-1972
International Microsurgical Society-1981
National Association of Spine Specialists-1999

## SPECIAL TRAINING:

Neurology Course-National Hospital for Nervous Disease
at Queen Square London, England 1966-1967
Course in Microsurgery, Johns Hopkins University School
Of Medicine, February 1981
Course in Laser Microneurosurgery, University if California,
May 1982
Course in Intradiscal Therapy, American Academy of Orthopedic

EXHIBIT 7

Surgeons, Joint Committee on Education for Neurosurgery of the American Association of Neurological Surgeons and the Congress of Neurological Surgeons, January 1983

Course on Spinal Instrumentation, Seattle, Washington, October 1988

Course on Spinal Instrumentation, Boston, Massachusetts, March 1989

Course on Stereotactic Surgery, University of Utah, Salt Lake City Utah, September 1990 Dr. Peter Heilbrun

Course on Transoral Surgery of the Skull Base and Upper Cervical Spine, University College London, London, England September 1992 Alan Crockard, FRCS

Course on Trans-Thoracic Spinal Fusion, American Association of Neurological Surgeons, Ft. Lauderdale, Florida, February 1994

Course on Anterior Column Spine Surgery, New York, New York October 1995

Course on Interbody Fusion with B.A.K. System, Chicago, Illinois 1996

Course in Advances in Laparoscopic and Thorascopic Spinal Surgery, Dallas, Texas 1998 Dr. John Regan

Course in Computer Neuro Navigation; Zeiss Company, Hinsdale, Illinois April 6, 1999

Course in Vertebroplasty and Kyphoplasty, Toronto, Canada April 2001

Course in Kyphoplasty, Chicago, Illinois October 2001

Course in Bone Graft Infusion, Chicago, Illinois July 20, 2002

Advanced Spine Preceptorship, Pittsburgh Medical Center, Pittsburgh, PA October 9-12 2003

Advanced Course in Spine Surgery, Sofamor Danek, Memphis, Tennessee March 5, 2004

Dynamic Stabilization Workshop, Zimmer Spine Institute, Warsaw, Indiana March 18, 2005

Refresher Course on Dynesys, Alexian Brothers Hospital, Zimmer Spine, June 24, 2005

Course on the Latest Minimally Invasive Techniques for the Treatment of Thoracolumbar Disorders, St. Louis University School of Medicine, St. Louis, MO, Feb 10-11, 2006

ISMIE Mutual Managing Risk Fellowship Program, 2008-present

Course on VTI Interfuse Implant Procedure, Orthopedic Learning Center, Rosemont, IL  Feb 2, 2010

Course on Guides to Evaluation of Permanent Impairment, 6th Edition, ABIME, Chicago, IL August 7-8, 2010

CPOE Specialty Class Training, electronic medical records, Hinsdale, IL May 10, 2011

EXHIBIT 7

STAFF APPOINTMENTS:

> Hinsdale Hospital, Hinsdale, Illinois 1967-present, Emeritus Staff
> LaGrange Memorial Hospital, LaGrange, Illinois 1967-present,
> Emeritus Staff

HOSPITAL ACTIVITIES AND COMMUNITY ACTIVITIES:

> Founding Medical Advisor- Marion Joy Rehabilitation Hospital
> Wheaton, Illinois 1967-1970
> Medical Audit Committee, Hinsdale Hospital 1968-1972,
> Chairman 1969-1972
> Executive Committee, Hinsdale Hospital 1969-1972
> Curriculum Committee, University of Illinois Medical School
> 1978-1993
> Student Progress Committee, University of Illinois Medical School
> 1978-1993
> Cancer Committee, LaGrange Memorial Hospital 1983-1986
> Credentials Committee, Hinsdale Hospital 1986-1989
> Credentials Committee Chairman, Hinsdale Hospital 1991-1997
> Hinsdale Hospital Medical Executive Committee 1991-1997
> Joint Conference Committee 1991-1997
> Physician Advisor, Aux Plaines Chapter of Medical Assistants,
> An affiliate of the Illinois Society of Medical Assistants
> The American Association of Medical Assistants 1988-1991
> Illinois State Advisory Council on Spinal Cord and Head Injury,
> founding member, 1990-1998; Vice Chairman 1995-1998
> University of Illinois Neurosurgical Alumni Society Secretary
> 1996-1997

SURGICAL INSTRUMENTS:

> Link-Beatty Foraminotomy Rongeur 1990
> Bipolar forceps cleaner-patent pending

PUBLICATIONS:

1. Beatty, R.A., The focal motor seizure as a false localizing sign. Neurol., 15:752-755, 1965

2. Beatty, R.A., Is the Hippocratic Oath Obsolete? New Physician, 15:18-19, 1966

3. Yashon, D., and Beatty, R.A., Tethering of the conus medullaris within the sacrum. Neurol. Neurosurg. Psychiat., 29:244-250, 1966

4. Beatty, R.A., and Richardson, A.E., Predicting intolerance to common carotid artery

EXHIBIT 7

ligation by carotid angiography. J. Neurosurg., 28:9-13, 1968

5. Beatty, R.A., Sugar, O., and Fox, T., Protrusion of the posterior longitudinal ligament simulating herniated lumbar intervertebral disc. Neurol. Neurosurg. Psychiat., 31:61-66, 1968

6. Paper No. 5 discussed in Year Book of Neurology and Neurosurgery 1969, 386-387

7. Beatty, R.A., Inherent faults in government medicine. Ill Med. J., May 1968

8. Jane, J.A., Yashon, D., Becker, D.P., Beatty, R.A., Sugar, O., The Effect of Destruction of the Corticospinal Tract in the Human Cerebral Peduncle upon Motor Function and Involuntary Movements. J. Neurosurg., 29:581-585, 1969

9. Paper No. 8 discussed in Year Book of Neurology and Neurosurgery 1970, 459-460

10. Beatty, R.A., and Richardson, A.E., the value of electroencephalography in the management of multiple intracranial aneurysms. J. Neurosurg. 30:150-153, 1969

11. Beatty, R.A., Cold dysesthesia; A symptom of extramedullary tumors of the spinal cord. J. Neurosurg., 33:75-78, 1970

12. Beatty, R.A., Fracture of odontoid process related to automobile headrest. JAMA 211:829, 1970

13. Sutcher. H., Underwood, R., Beatty, R.A., and Sugar, O., Orofacial dyskinesia JAMA 216:1459-1463, 1971

14. Beatty, R.A., American Medicine. American Scholar 2:323-324, 1971

15. Beatty, R.A., Malignant melanoma of choroid plexus epithelium. J. Neurosurg. 36:344-347, 1972

16. Sutcher, H., Beatty, R.A., and Underwood, R.B., Orofacial dyskinesia; Effective Prosthetic therapy. J. Prosthetic Dentistry, 30:252-262, 1973

17. Beatty, R.A., Enzyme injection of lumbar discs. J. Neurosurg., 39:793, 1973

18. Beatty, R.A., Surgical treatment of ruptured intracerebral arteriovenous malformation in a newborn. Pediatrics, 53: April, 1974

19. Beatty, R.A., Dissecting hematoma of the internal carotid artery following chiropractic cervical manipulation J. Trauma, 17:248-249, 1977

20. Beatty, R.A., and Sutcher, H., Orofacial Dyskinesias. Arch. Neurol., 30:69-70, 1981

EXHIBIT 7

21. Beatty, R.A., Cervical-peritoneal shunt in the treatment of pseudotumor Cerebri. J. Neurosurg/, 57:853-855, 1982

22. Beatty, R.A., Cervical peritoneal shunt in the treatment of pseudotumor Cerebri. J. Neurosurg., 58:628, 1983

23. Intravenous injection during chemonucleolysis. J. Neurosurg., 61:991, 1984

24. Bulger, R., Rejowski, J., Beatty, R.A., Vocal cord paralysis associated with Anterior cervical fusion; considerations for prevention and treatment. J. Neurosurg., 62:657-661, 1985.

25. Beatty, R.A., Myxomatous degeneration of the lumbar intervertebral disc Neurosurg., 16:817-819, 1985

26. Beatty, R.A., Bulger, R.F., History of the anterior cervical fusion technique. J. Neurosurg., 17:277-280, 1985

27. Beatty, R.A., Splitting of the optic nerve by carotid-opthalmic artery aneurysm. J. Neurosurg., 65:560-562, 1986

28. Beatty, R.A., Sciatica and epidural gas. Neurosurgery 21:537-540, 1987

29. Beatty, R.A., Gas containing cyst in the epidural space. J. Neurosurg. 71:306-307, 1989

30. Beatty, R.A., Intraoperative aneurysm rupture during the predissection stage. J. Neurol. Neurosurg. Psychiat., 53:711-712, 1990

31. Beatty, R.A., Foraminotomy Rongeur. Spine,16:1388-1399, 1991

32. Beatty, R.A., The Piriformis Syndrome: A simple diagnostic maneuver. Neurosurgery, 34:512-514, 1994

33. Beatty, R.A., The use of clip-suture in thoracic sympathectomy. J Neurosurg. 81:482, 1994

34. Yapp, R., Gunn, L., Beatty, R.A., Glassford, H., Minimizing morbidity and mortality in the introduction of a new surgical technique: Laproscopic Cholecystectomy as a case study. Gasteroenterology, 106:A35, 1994(abstract)

35. Beatty, R.A., The Piriformis Syndrome: A simple diagnostic maneuver. Discussed In theYearbook of Sports Medicine, 1996

36. Beatty, R.A., The Piriformis Syndrome: A simple diagnostic maneuver. Discussed

EXHIBIT 7

In the Yearbook of Chiropractic Medicine, 1996.

37. Beatty, R.A., Surgery for patients with central protruded lumbar discs who have failed conservative therapy. British Journal of Neurosurgery, August, 1996.

38. Beatty, R.A., Subdural hematomas in the elderly; experience with treatment by Trephine craniotomy and not closing the dura or replacing the bone plate. British Journal of Neurosurgery 1999; 13,(1):60-64

39. Beatty, R.A., Anterior discectomy: is fusion necessary?; Journal Of Neurosurgery (Spine); August, 1999

40. Beatty, R.A., When one should look at all sides of the spine. Spine Journal 3:2003, 543-545.

41. Beatty, R.A., Piriformis Syndrome. Journal of Neurosurgery: Spine 5:102, 2006.

42. Beatty, R.A., Spinal Stenosis. Journal of Neurosurgery: Spine. Vol. 9, 2008: 229-230.

43. Beatty, R.A., Clearance of the Cervical Spine in Clinically Non-Evaluable Trauma Patients. Spine 36: 2011, 1165-1166.

44. Beatty, R.A., Anterior cervical fusion with a porous tantalum implant. Spine 38: 369, 2013.

45. Beatty, R.A., Extremely wide and asymmetric anterior decompression causes postoperative C5 palsy. Spine 39: 632, 2014.

46. Beatty, R.A., Heterotopic Ossification producing ankyloses should be considered when comparing arthroplasty to anterior cervical fusion. Spine 41, Issue Number 9, May 1, 2016.

47. Beatty, R.A., Distinguishing Due Care from Standard of Care in Medicolegal Cases-Does it Matter? Voir Dire; Spring 2016.

48. Beatty, R.A., Radiological follow-up after implanting cervical disc prosthesis in anterior discectomy: a systematic review. The Spine Journal, 2019, Volume 19, Number 3

49. Beatty, R.A., Heterotopic Ossification Producing Ankylosis Should Be Considered When Comparing Arthroplasty with Anterior Cervical Fusion, Spine 44:2019, E445.

EXHIBIT 7

50. Beatty, R.A., Intradural rhizotomy to treat post-lumbar discectomy pain…why this is superior to spinal cord stimulation and nerve root injections. The Spine Journal, 2019, Volume 19, Number 10

PRESENTATIONS:

1. Tethering of the conus medullaris within the sacrum. Presented at Chicago Neurological Society, 1965

2. Orofacial dyskinesia. Presented at Chicago Neurological Society, 1970

3. Cervical-peritoneal shunt in the treatment of pseudotumor cerebri. Paper Read at St. George's Medical School. Wimbeldon, England, August, 1982

4. Vocal cord paralysis associated with anterior cervical fusion; considerations For prevention and treatment. Paper read at Congress of Neurological Surgeons Meeting, October, 1984

5. Vocal cord paralysis associated with anterior cervical fusion; considerations For prevention and treatment. Paper read at University of Rome, Institute of Neurosurgery and at Catholic University of Rome, August, 1984

6. Myxomatous degeneration of lumbar disc. Paper read at University of Rome, Catholic University, August, 1984

7. Toothpaste extrusion of the lumbar discs. Presented at North American Spine Society, Quebec City, July 28, 1989

8. Central herniated lumbar discs. Read at St. George's Medical School, Wimbeldon, England, March, 1992

9. Surgery and/or Optional Treatments for Your Aching Back. Presented at Midwestern University, October 1, 2005.

10. Workers Compensation Patients and Spine Surgery. Presented at Oak Brook, IL. January 25, 2006.

11. Evidence Based Medicine and the Spine. Presented at Oak Brook, IL. November 28, 2007.

12. Decision Making in Spinal Surgery, Homer Glen, IL. May 22, 2008.

R Q Beatty MD

EXHIBIT 7

**Legal Fee Schedule**

| | |
|---|---|
| Retainer | $1500.00 |
| Initial Record review | $500.00/hr. |
| Focused record review prior to deposition, prior to trial, literature review | $500.00/hr. |
| Telephone conference – per ¼ hour | $125.00 |
| Pre-deposition telephone or in person conference/meeting | $800.00/hr. |
| E-mail correspondence- per ¼ hour | $125.00 |
| Narrative report | $500.00 |
| Edit and sign affidavit or certificate of merit | $200.00 |
| Answers to Interrogatories | $400.00/per hour |
| Pre-Trial<br>Meeting in Office | $1000.00 per hour |
| Pre-Trial telephone conference | $1000.00 per hour |
| Deposition<br> done in our office | $1700.00 per hour |
| Deposition travel time<br> Not done in our office | $500.00 per hour |
| Deposition – video deposition<br> done in our office or recorded or at Burr Ridge Regus | $2,000.00 per hour |
| Appearance at trial/Video Deposition used at trial<br>(Includes travel time, conferences at trail and extension<br>of trial into second day) | $8000.00 flat rate |

EXHIBIT 7

Attorney Conference                                    $400-600/hour
(in office, routine)

For IME fees please refer to the sperate IME fee schedule

*Current prices as of 12/15/21

I agree to the above fee schedule.  I agree to pay Dr. Robert Beatty the $8,000 testimony
fee plus travel expenses two weeks before trial, which means two weeks before start of
jury selection.  Dr. Beatty will make travel arrangements and submit the invoices prior to
two weeks before trial.  If the case settles between one week and 72 hours before the
trial, Dr. Beatty will return two-thirds of the $8,000.  If the case settles within 72 hours
of the trial date, Dr. Beatty will return one-third of the $8,000.  Travel expenses that
cannot be cancelled, such as plane fare, will be repaid to Dr. Beatty.  I agree to these
conditions and the fee schedule above.

Pre-payment is required one week prior to the scheduled appointment.  If cancellation is
made less than one week prior to the scheduled appointment, half of the total fee will be
retained.

_____  8/5/22_____.
(Signature)                                                (Date)

___Loevy & Loevy_____.
(Name of Law Firm)

Please fax this signed agreement back to (630) 986-8312.

Tax I.D. 36-3399709

Address:

15 Salt Creek Lane
Suite 215
Hinsdale, IL  60521

R Q Beatty MD

EXHIBIT 7