**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| AHMAD POOLE (K-95348), | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 20 CV 00014 |
| | ) | |
| DR. EVARISTO AGUINALDO, et al. | ) | The Hon. Manish Shah. |
| | ) | |
| Defendants. | ) | **JURY DEMANDED** |

**PLAINTIFF'S RESPONSE TO DEFENDANT, TINA TOMARAS' RULE 56.1**
**STATEMENT OF UNDISPUTED MATERIAL FACTS**

Plaintiff Ahmad Poole, by and through his undersigned attorneys, pursuant to Local Rule 56.1(b), respectfully submits this response to Tina Tomara's Rule 56.1 Statement:

**Parties**

**Plaintiff – Ahmad Poole**

1.      Plaintiff, AHMAD POOLE ("Plaintiff"), was at all times relevant to Plaintiff's Fourth Amended Complaint ("Complaint"), an inmate at the Stateville Correctional Center. (Ex. 1, ¶ 6).

**RESPONSE: Undisputed.**

2.      Plaintiff has no medical training. (Ex. 2, 13:20-21).

**RESPONSE: Undisputed.**

**Defendant – Dr. Evaristo Aguinaldo**

3.      Defendant, DR. EVARISTO AGUINALDO, is a licensed medical doctor in the state of Illinois, and at all times relevant to Plaintiff's Complaint, was a physician at Stateville

1

Correctional Center. (Ex. 1, ¶ 7; Ex. 4, 26:18-23, 29:4-7).

**RESPONSE: Undisputed.**

4.      Dr. Aguinaldo worked in private practice up until he began working in the correctional setting sometime between 2001 to 2002. Dr. Aguinaldo's employment in the correctional setting is with Wexford Health Sources, Inc., as a staff physician. Dr. Aguinaldo is a medical doctor, trained as a general practitioner. (Ex. 4, 25:11-25, 26:1-12, 27:2-13, 28:4-7; Ex. 8, p. 19, 21).

**RESPONSE: Undisputed.**

**Defendant – Tina Tomaras**

5.      Defendant, TINA TOMARAS n/k/a "Tina Brown," is a Licensed Practical Nurse ("LPN") in the State of Illinois, and at all times relevant to Plaintiff's Complaint, was an LPN at Stateville Correctional Center. (Ex. 1, ¶ 10; Exhibit 5, 7:17-18, 35:22).

**RESPONSE: Undisputed.**

6.      Tina Tomaras became an LPN in 2000 and first started working for Wexford Health Sources, Inc. in the correctional setting on May 3, 2015. As an LPN, Tomaras' job duties depended on where she was assigned by her supervisor and based on her schedule. Those duties included assessing patients and giving out medications and injections, if necessary. As a Wexford LPN at Stateville Correctional Center, Tomaras worked a variety of assignments, including alongside clinic doctors, in the cellhouses to pass out medication, in the infirmary, or in the emergency room ("ER"). (Ex. 5, 32:20, 33:23-24, 35:10, 35:22, 36:17-24).

**RESPONSE: Undisputed.**

7.      In the Stateville ER, Tomaras' job duties included dressing changes, injections, and preparing the inmate patients to see the doctors. LPNs would not communicate directly with the

ER doctors after taking a patient's vitals; rather, the LPNs would take the patient's vital signs, write it down for the doctor in the patient's chart, and then hand off the chart to the doctor when it is time for the patient to be seen by the doctor. The doctor then writes his own notes and orders into the chart. (Ex. 5, 37:2-3, 38:23-40:12, 40:20-22).

> **RESPONSE: Undisputed as to Defendant Tomaras's job duties in the ER. Undisputed that the doctor writes his own notes and orders into the chart. Disputed that LPNs would not communicate directly with doctors. Defendant Tomaras testified that if a patient described neck pain, electrical shocks, and presented with neck trauma, a nurse would typically tell the doctor. ECF 147-2 (Tomaras Dep.) at 73:17-25; 74:1-12.**

8.     The education and training of LPNs do not involve evaluation of cervical spine injuries. (Ex 8, p. 23).

**RESPONSE: Undisputed.**

## Venue and Jurisdiction

9.     Jurisdiction and venue are proper because Plaintiff filed a federal claim under 42 U.S.C. § 1983 for alleged injuries that occurred within the Northern District of Illinois, Eastern Division, while Plaintiff was an inmate at Stateville Correctional Center. (Ex. 1, ¶ 4-6).

**RESPONSE: Undisputed.**

## Undisputed Material Facts

10.     Plaintiff's Complaint contains only one (1) count against Tina Tomaras under 42 U.S.C. § 1983, for "deliberate indifference" to Plaintiff's "objectively serious medical needs," alleging that Tina Tomaras "failed to provide" Plaintiff "with any proper medical care or access to medical care, in violation of the Eighth Amendment to the United States Constitution." (Ex. 1, Count 1, ¶ 4-8).

**RESPONSE: Undisputed.**

11.    On August 17, 2017, Plaintiff's cellmate at Stateville Correctional Center was fellow inmate, Brandon McCarter. On that date, Plaintiff and McCarter engaged in a physical altercation, which started as a verbal argument over the use of a phone in the cellhouse. The verbal argument turned into a physical altercation, during which the two exchanged blows. Eventually, McCarter grabbed Plaintiff by his dreadlocks and aggressively thrashed Plaintiff's head side to side, jerking, twisting, and pulling Plaintiff's head and neck. McCarter placed Plaintiff in a headlock, using his arm to squeeze Plaintiff's neck with force. (Ex. 1, ¶ 1, 11-12; Ex. 2, 57:5-10, 63:10-24, 65:7, 65:12-22, 66:5-7, 69:16).

**RESPONSE: Undisputed.**

12.    Stateville Correctional Officers responded to the fight, breaking up and separating the combatants, restraining them, and escorting Plaintiff to the Stateville Healthcare Unit ("HCU") in cuffs. After arriving at the HCU, Plaintiff was placed in the outside bullpen. (Ex. 2, 67:2-10, 70:22-71:15, 73:23).

**RESPONSE: Undisputed.**

13.    The basic procedure in the Stateville Correctional Center ER is dependent on whether the inmate patient was present for a scheduled appointment or due to an emergency situation. If scheduled, the patient would be on an appointment list to be seen in the ER. Before being seen in the ER, the patient would first be brought to the bullpen. Subsequently, the escorting correctional officer would alert the ER that the patient was present for their appointment. Then, when it is time for the patient's appointment, the patient is brought into the ER by a correctional officer. After being brought into the ER, their vitals are taken, and they are put in front of a doctor for their appointment. (Ex. 5, 37:8-17, 37:21-25).

**RESPONSE: Undisputed.**

14.    Conversely, if the inmate patient is not on the appointment list and is present at the ER due to an emergency situation, they would be seen by a doctor on the same day and dependent upon the urgency of the situation. Urgency of the situation depends on what the patient presents with. If a patient is profusely bleeding or cannot breathe, then that patient would be seen immediately. This is comparable to how patients are seen at hospitals outside of the correctional setting; if a patient presents to the ER with a broken foot, they might wait up to six (6) hours as opposed to someone who presents with a more urgent issue like profuse bleeding or not being able to breathe. (Ex. 5, 86:19-21, 87:22-88:16).

**RESPONSE: Undisputed.**

15.    While an inmate is in the HCU bullpen, it is always a correctional officer who takes the inmate out before escorting the inmate into the HCU. Only correctional officers interact with the inmates while they are in the outside bullpen. Plaintiff testified during his deposition that there is never an instance where a nurse or doctor would come out to the bullpen and healthcare providers do not come out to the bullpen to meet and examine inmates. (Ex. 2, 76:17, 76:20, 76:24, 77:3, 77:13-14, 77:18, 77:21).

**RESPONSE: Undisputed that it is the correctional officers who take the inmate out before escorting the inmate into the HCU, but clarify that Poole testified at his deposition that Defendant Tomaras came out to the outside bullpen because he complained extensively about his pain in an attempt to get immediate medical attention. ECF 147-1 (Poole Dep.) at 80:6-19.**

16.    Plaintiff testified that while he was in the bullpen, Tina Tomaras saw him, looked at his eye, and told him that he needed stitches. Plaintiff testified that was the only interaction he had with Tomaras on August 17, 2017 and that after that date, the only other provider he saw in

the HCU was Dr. Aguinaldo. (Ex. 2, 80:14-81:10, 90:2-5).

> **RESPONSE: Undisputed that Poole saw Defendant Tomaras on August 17, 2017,**
> **but clarify that he told her he had severe neck pain, his neck felt out of place, and he**
> **felt an electrical current running up and down his neck. Dispute that Poole only saw**
> **Defendant Tomaras on August 17, 2017. Poole also saw Defendant Tomaras on**
> **August 19, 2017 and she "shooed [Poole] away…like a dog". ECF 147-1 (Poole Dep.)**
> **at 80:17-19; 81:1-10; 28:10-19. ECF 147-3 (Poole Grievance) at 2040.**

17.     Tina Tomaras testified that she was present in the ER on August 17, 2017, along with several other nurses. Tomaras recalled that Plaintiff, an inmate at Stateville Correctional Center, had been involved in an altercation with his cellmate and was seen in the ER by Dr. Aguinaldo on that date. Tomaras did not have any recollection as to whether she was the nurse who Plaintiff presented to or if she performed a physical assessment of Plaintiff on August 17, 2017. (Ex. 5, 24:12-16, 25:13-20 30:2-3, 61:9, 61:17-18, 71:3-6).

> **RESPONSE: Undisputed.**

18.     There is no chart or medical progress note evidencing that Plaintiff was seen by Tina Tomaras on August 17, 2017. In fact, the record indicates that Plaintiff was seen by Nurse Carnahan in the Stateville HCU. (Ex. 3, Bate Stamp 00749-50; Ex. 4, 133:20-23, 134:18-20; Ex. 8, p. 19).

> **RESPONSE: Undisputed, but clarify Defendant Tomaras saw Poole in the bullpen**
> **before he entered the HCU. Poole is certain he saw Defendant Tomaras on August**
> **17, 2017 because he is familiar with her and he described her to other prisoners to**
> **discover her last name. ECF 147-1 (Poole Dep.) at 36:2-24; 172:12-24, 173:1-11.**

19.     Plaintiff was seen in the HCU only one (1) hour after his physical altercation with cellmate, Brandon McCarter. Medical records from Stateville Correctional Center indicate that

Plaintiff was first seen by Registered Nurse "K. Carnahan" at 3:40 p.m. on August 17, 2017. Nurse Carnahan performed triage, took Plaintiff's vitals, and then immediately referred Plaintiff to be seen by Dr. Evaristo Aguinaldo. Nurse Carnahan charted objective findings of a one-inch (1") laceration to the left cheek, two (2) scratches to the right neck, and scratch to the left forehead. The subjective component of Nurse Carnahan's progress note charts no findings. Nurse Carnahan did not chart that Plaintiff had severe pain, electrical shock sensations, or shooting/referred pain. (Ex. 3, Bate Stamp 00749-50; Ex. 4, 133: 20-23, 134:18-20; Ex. 8, p. 19).

> **RESPONSE: Undisputed that Poole's vitals were taken by Nurse K. Carnahan and he was referred to Dr. Aguinaldo, but clarify Poole complained to every nurse and correctional officer he encountered about the severe pain in his neck. Disputed that Poole was seen in the HCU only 1 hour after his cellmate attacked him. ECF 147-5 (Hernandez Dep.) at 15:3-12; 30:19-22. ECF 147-1 (Poole Dep.) at 78:5-8; 79:1-2.**

20.     Dr. Aguinaldo reviewed Nurse Carnahan's completed chart and checked the box indicating that he would like to see Plaintiff immediately. Plaintiff was seen by Dr. Aguinaldo, ten (10) minutes later, in the Stateville HCU on August 17, 2017, at 3:50 p.m. Plaintiff subjectively reported to Dr. Aguinaldo that he had a fight and was hit on the head, face, and neck and felt pain on both shoulders. After examination, Dr. Aguinaldo charted his objective observations: alert, not in distress. Left side of the face and orbit, open laceration about ¾ inch noted. Right side of the neck, abrasion noted. Bruise in the left upper forehead. Neck is supple, slight pain on rotation of motion and both shoulder, slight pain on rotation of motion noted. Dr. Aguinaldo then charted the following treatment plan: (1) call Stateville Internal Affairs; (2) provide Plaintiff with a tetanus shot, ice compress, and Tylenol 500mg; (3) order X-Rays of Plaintiff's left orbit, skull, neck, and both shoulders; (4) order blood labs to test for Syphilis, Hepatitis, and HIV; (5) perform stitches under local anesthesia to the laceration on the left side of Plaintiff's face; and (6) schedule Plaintiff

for follow-up appointments for dressing changes, to remove his stitches, and to discuss the X-Ray and blood lab results once available. (Ex. 3, Bate Stamp 00251, 00749-50; Ex. 4, 137:13-138:20, 210:17; Ex. 8, p. 19).

> **RESPONSE: Undisputed, but clarify Dr. Aguinaldo ordered x-rays for Poole because of Poole's subjective complaints about his neck pain. ECF 147-15 (Dr. Aguinaldo Dep., Vol I) at 140:9-18.**

21. During the August 17, 2017 appointment, Dr. Aguinaldo examined Plaintiff and checked his neck. Dr. Aguinaldo palpated Plaintiff's neck, observed the posture of Plaintiff's head, performed a neurological examination by testing the sensation and integrity of Plaintiff's hand to determine weakness or numbness, checked Plaintiff's biceps and triceps reflexes, and otherwise performed a full neurological exam. Subsequently, Dr. Aguinaldo charted his positive findings. Dr. Aguinaldo testified that it is his practice to only chart positive findings. (Ex. 3, Bate Stamp 00251; Ex. 4, 183:4-23, 184:14-22, 185:1-21, 186:6-9).

> **RESPONSE: Disputed that Dr. Aguinaldo examined Poole. Poole testified Dr. Aguinaldo did not examine Poole, but rather simply asked Poole to move his legs and fingers. ECF 147-1 (Poole Dep.) at 82:1-12.**

22. Dr. Aguinaldo's examination of Plaintiff on August 17, 2017 was proper and pursuant to standard of care. Dr. Aguinaldo applied his normal custom, habit, and practice for his neck examination of Plaintiff, which is what he does for all patients with complaints of neck pain. Dr. Aguinaldo testified that he performed his standard physical examination of Plaintiff to rule out a cervical spine injury with inspection, palpation, range of motion, sensory and motor neurological examination, upper extremity reflexes, and Spurling compression testing. Dr. Aguinaldo noted that Plaintiff had slight pain in rotation during range of motion testing of the cervical spine. All of Dr. Aguinaldo's objective findings are what would be expected after the described physical altercation

between Plaintiff and Brandon McCarter. (Ex. 3, Bate Stamp 00251; Ex. 4, 186:9-16, 187:16, 222:4-18; Ex. 8, p. 19, 20).

**RESPONSE: Disputed that Dr. Aguinaldo performed a physical examination or Spurling compression test on Poole. ECF 147-1 (Poole Dep.) at 82:1-12.**

23.     Dr. Aguinaldo provided Plaintiff with pain medication on August 17, 2017 in the form of Tylenol 500mg based on his objective finding after Plaintiff raised complaints of pain during physical examination and with rotation in his neck and shoulders. Plaintiff made no subjective complaints of pain on August 17, 2017. Only after Dr. Aguinaldo examined him, did Plaintiff make complaints of pain. Given the pain reasonably associated with Plaintiff's facial laceration and expected increase in pain from a strain or sprain of the cervical spine, it was reasonable and appropriate on August 17, 2017 for Dr. Aguinaldo to prescribe Tylenol 500mg, two (2) tablets, three (3) times a day, for ten (10) days. There was no clinical indication on August 17, 2017 to prescribe narcotics or opioids. After completion of Plaintiff's history and physical examination, Dr. Aguinaldo arrived at an appropriate assessment and plan pending review of Plaintiff's cervical spine X-Rays. Dr. Aguinaldo's conduct and treatment of Plaintiff on August 17, 2017 was consistent with the applicable standard of care. (Ex. 3, Bate Stamp 00251; Ex. 4, 141:10-12, 149:6-23, 150:3-14, 201:9-15; Ex. 8, p. 19, 20, 22).

**RESPONSE: Disputed that Poole did not make subjective complaints of Pain to Dr. Aguinaldo. Disputed that Dr. Aguinaldo performed a physical examination of Poole. Dispute that Dr. Aguinaldo's conduct and treatment of Poole on August 17, 2017 was consistent with the applicable standard of care. ECF 147-1 (Poole Dep.) at 82:2-23; ECF 147-18 (Dr. Davis's Final Expert Report) at 3-4 ("Given the history of present illness and the patient's subjective complaints, Mr. Poole should have received expedited imaging of his neck and should have immediately been provided**

9

**with a stabilizing c-collar until such time as imaging could be obtained. The delay of obtaining imaging of Mr. Poole's neck until August 25 breaches the standard of care."; "Dr. Aguinaldo also breaches the standard of care with the lack of documentation in the medical record. Specifically, the "Subjective" or "S" portion of the record should document Mr. Poole's physical complaints at the time of the encounter.").**

24. Plaintiff's August 17, 2017 fight with cellmate, Brandon McCarter, involved punches, the thrashing of Plaintiff's head and neck via his hair, and Plaintiff's neck being wrenched and twisted while placed in a headlock. These events are consistent with the mechanism of injury of the lacerations, scratches, cervical spine soft tissue injury, anterior subluxation of C3/C4, and the right sided fracture of the tip of the inferior facet of C3 resulting in perching upon C4. The sole cause of the injuries suffered by Plaintiff on August 17, 2017 was the fight between Plaintiff and Brandon McCarter. (Ex. 3, Bate Stamp 00251; Ex. 8, p. 19).

> **RESPONSE: Undisputed that Brandon McCarter caused Poole's initial injuries on August 17, 2017. Disputed that the sole cause of Poole's injuries was McCarter's thrashing of Poole's neck and placing him in a headlock. ECF 147-18 (Dr. Davis's Final Expert Report) at 1-5.**

25. Dr. Aguinaldo performed a focused examination of Plaintiff's head and neck area, ensuring that he charted all pertinent positive findings. Dr. Aguinaldo's examination was appropriate and well within the applicable standard of care for a physician with his training, given Plaintiff's subjective complaints and objective examination. There is no requirement for a physician to chart negative findings. (Ex. 3, Bate Stamp 00251; Ex. 8, p. 19).

> **RESPONSE: Disputed that Dr. Aguinaldo performed a focused examination of Poole's head and neck area. ECF 147-1 (Poole Dep.) at 82:1-12. Disputed that Dr.**

10

**Aguinaldo's "examination" was within the applicable standard of care given**

**Poole's subjective complaints. ECF 147-18 (Dr. Davis's Final Expert Report) at 1-5.**

26.     It was reasonable and appropriate for Dr. Aguinaldo to order X-Rays on August 17, 2017 to evaluate Plaintiff's cervical spine. It was reasonable for Dr. Aguinaldo to order X-Rays given the description of Plaintiff's physical altercation, history, and objective findings. Based upon the documented record and charts, there was no suspicion of acute neurological compromise or fracture of the cervical spine on August 17, 2017. Thus, a direct referral to a hospital on August 17, 2017, for advanced imaging or spinal consult was not required under the standard of care. There was no emergent or urgent need for a cervical spine X-Ray series to be performed. (Ex. 3, Bate Stamp 00251, 00718; Ex. 8, p. 20).

> **RESPONSE: Disputed that a direct referral to a hospital for advanced imaging was not required under the standard of care. Disputed that there was no emergent need for a cervical spine x-ray series to be performed. ECF 147-18 (Dr. Davis's Final Expert Report) at 1-5. ECF 147-15 (Dr. Aguinaldo Dep.) at 60:21-25; 61:1-25; 62:1-14. 63:2-8, 65:20-24.**

27.     Based upon the medical record, there was no medically necessary indication for Dr. Aguinaldo to place Plaintiff in a cervical collar. Examination findings from August 17, 2017 do not evidence a potential underlying fracture or subluxation causing instability of the cervical spine. Absent objective documentation of clinical instability, radiographic evidence of cervical spine fracture or neurologic signs, Dr. Aguinaldo met the standard of care in not placing Plaintiff in a cervical collar. (Ex. 8, p. 21).

> **RESPONSE: Disputed that there was no medically necessary indication for Dr. Aguinaldo to place Poole in a cervical collar. Disputed that Dr. Aguinaldo met the standard of care in not placing Poole in a cervical collar. ECF 147-18 (Dr. Davis's**

11

**Final Expert Report) at 1-5. ECF 147-15 (Dr. Aguinaldo Dep., Vol I) at 60:21-25; 61:1-25; 62:1-14. 63:2-8, 65:20-24.**

28.     Nurse Carnahan is the nurse who performed triage on Plaintiff and charted Plaintiff's vitals on August 17, 2017, not Tina Tomaras. (Ex. 3, Bate Stamp 00749-50; Ex. 4, 133: 20-23, 134:18-20; Ex. 8, p. 19).

**RESPONSE: Undisputed, but clarify Tomaras saw Poole while he was still in the bullpen, before he entered the HCU. Poole is certain he saw Defendant Tomaras on August 17, 2017 because he is familiar with her and he described her to other prisoners to discover her last name. ECF 147-1 (Poole Dep.) at 36:2-24; 172:12-24, 173:1-11.**

29.     During his deposition, Plaintiff was unable to testify as to any of his specific appointment dates after his initial appointment on August 17, 2017, only that he "saw Dr. Aguinaldo like four or five times after that" and that Dr. Aguinaldo was the only provider he met with after August 17, 2017. (Ex. 2, 89:17-22, 90:2, 90:10-14).

**RESPONSE: Undisputed, but clarify Poole saw Defendant Tomaras again on August 19, 2017 and she dismissed him. ECF 147-1 (Poole Dep.) at 28:10-19; ECF 147-3 (Poole Grievance) at 2040.**

**Deposition of Defendant, Tina Tomaras**

30.     As an LPN, Tina Tomaras' job duties are assessment, give medications out, and injections. Tina Tomaras cannot diagnose. (Ex. 5, 33:22-24, 33:25-34:1).

**RESPONSE: Undisputed.**

31.     The duties of an LPN in the ER are to do dressing changes, injections and to prepare patients to see the doctors. (Ex. 5, 36:25-37:3).

**RESPONSE: Undisputed.**

32.     The LPNs in the ER know that the inmate has an appointment because they have an issue that needs to be discussed with the doctor. The LPNs take their vital signs. Most people do not want to talk to the nurses about what is going on with them because they know LPNs cannot treat or diagnose. They want to talk to the doctor. So, the LPNs do vital signs, write it down for the doctor, put the chart in front of the doctor and inmate when it is their turn, and then the inmate discusses whatever is going on with them that they want to discuss with the doctor. (Ex. 5, 40:2-12).

**RESPONSE: Undisputed that LPNs in the ER know that an inmate has an appointment and take an inmate's vital signs, but clarify Poole asked to speak with a medical professional because of the pain in his neck while in the bullpen, and testified Defendant Tomaras came out to speak with him. ECF 147-1 (Poole Dep.) at 80:17-19; 81:1-10; ECF 147-3 (Poole Grievance) at 2040.**

33.     Tina Tomaras, as an LPN, does not communicate anything to the doctor. LPNs do the vital signs and sit the patient in front of the doctor. The patient then communicates to the doctor what their chief complaint is. (Ex. 5, 38:1-7).

**RESPONSE: Disputed, patients first encounter nurses in the ER, who then tell the doctor about the patient. ECF 147-15 (Dr. Aguinaldo Dep., Vol I) at 40:22-24; 41:1-10.**

34.     If a patient is complaining of symptoms, Tina Tomaras would not communicate that to the doctor, as it is the patient who communicates to the doctor what their chief complaint is. (Ex. 5, 38:8-12).

**RESPONSE: Disputed.** *Id.*

35.     It is not a policy and practice of Wexford Health Sources, Inc. for an LPN to not

13

communicate with a doctor. It is healthcare – Tomaras explained during her deposition that when she goes to see a doctor, she does not tell the nurse what is going on with her, the nurse does not tell the doctor. The nurse puts her in front of a doctor and then she talks to the doctor about her symptoms and concerns. (Ex. 5, 39:2-10).

> **RESPONSE: Undisputed that it is not a policy and practice of Wexford for a nurse to not communicate with a doctor. Disputed that nurses do not talk to the doctor about a patient. ECF 147-15 (Dr. Aguinaldo Dep., Vol I) at 40:22-24; 41:1-10.**

36.     In the ER, Tina Tomaras takes vital signs and places them on a progress note. Tina Tomaras does not put anything else on the progress note. The doctor then writes his notes and his orders on the progress note. (Ex. 5, 40:13-22).

> **RESPONSE: Undisputed.**

37.     If an inmate was brought to health care, as Plaintiff was after an assault, then nurses would put that inmate in front of the doctor, without seeing a nurse. (Ex. 5, 43:21-44:2).

> **RESPONSE: Disputed. Poole spoke with Defendant Tomaras while he was in the outside bullpen before Nurse Carnahan took his vitals and Defendant Aguinaldo saw him. ECF 147-1 (Poole Dep.) at 80:6-19.**

38.     Several nurses could be working in the ER at Stateville Correctional Center. Between two to three (2-3) nurses would work in the ER on a shift depending on what is scheduled that day and what is going on. (Ex. 5, 49:17-24).

> **RESPONSE: Undisputed.**

39.     There were two (2) "Nurse Tinas" that worked at Stateville Correctional Center in the HCU. It is possible that it was another Nurse Tina and not Tina Tomaras, who saw Plaintiff. (Ex. 5, 70:6-13, 70:20-22).

> **RESPONSE: Undisputed that Defendant Tomaras testified that two Nurse Tinas worked at Stateville. Disputed that the other Nurse Tina saw Poole. Further, Defendant Tomaras has provided no supporting evidence that another "Nurse Tina" was working in the Emergency Room HCU on August 17, 2017. Defendant Tomaras recalls seeing Poole on August 17, 2017. ECF 147-2 (Tomaras Dep.) at 18:2-9, 20-25; 19:1-8.**

40.     Tina Tomaras does not believe that she saw Plaintiff in August 2017. Tina Tomaras does recall being in the ER but does not recall whether she was the nurse who saw Plaintiff. There were several nurses that initially prepared Plaintiff for the doctor, but Tina Tomaras only recalls being in the ER or near the ER on the day that Plaintiff was assaulted. (Ex. 5, 23:17-25, 24:9-16).

> **RESPONSE: Disputed that Defendant Tomaras does not believe she saw Poole on August 17, 2017. ECF 147-2 (Tomaras Dep.) at 18:2-9, 20-25; 19:1-8. ECF 147-1 (Poole Dep.) at 80:17-19; 81:1-10. ECF 147-3 (Poole Grievance) at 2040.**

41.     Tina Tomaras saw Plaintiff sitting in front of the doctor. Tina Tomaras' recollection was that Plaintiff's head was up with no obvious deformity and neck was not in an odd position. When Plaintiff sat in front of the doctor, Tina Tomaras could not recall his head in any other position than up. (Ex. 5, 25:11-20).

> **RESPONSE: Undisputed.**

42.     When Tina Tomaras saw Plaintiff on the date of his initial assault, Plaintiff was holding his head up with no issues. (Ex. 5, 56:3-6).

> **RESPONSE: Undisputed Defendant Tomaras saw Poole on August 17, 2017, but clarify Poole had to hold his head up with his hands to relieve his severe neck pain. ECF 147-3 (Poole Grievance) at 2040.**

43.     Tomaras does not have a recollection of Plaintiff's actual symptoms on August 17,

15

2017, only that Plaintiff needed to see the doctor after he was brought to the HCU after an altercation. Tina Tomaras was not sure who the nurse was that actually put Plaintiff in front of the doctor. (Ex. 5, 24:17-22, 24:23-25, 71:1-6).

> **RESPONSE: Undisputed.**

44.     Plaintiff did not talk to Dr. Aguinaldo in front of Tina Tomaras. When a patient is put in front of the doctor, the nurse steps away so that the inmate can have a conversation with the doctor. (Ex. 5, 21:12-18).

> **RESPONSE: Disputed, Defendant Tomaras heard what Poole told Dr. Aguinaldo on August 17, 2017. ECF 147-2 (Tomaras Dep.) at 22:7-11.**

45.     Tina Tomaras did not speak to Dr. Aguinaldo about Plaintiff. Once the patient sees the MD, the MD writes orders on what he wants to do, and Tina Tomaras does not discuss that with the doctor. (Ex. 5, 28: 13-17).

> **RESPONSE: Disputed that Defendant Tomaras did not speak to Dr. Aguinaldo about Poole. Defendant Tomaras testified that if a patient described neck pain to her, electrical shocks, and presented with neck trauma, a nurse would typically tell the Doctor. ECF 147-2 (Tomaras Dep.) at 73:17-25; 74:1-2.**

46.     Tina Tomaras has no independent recollection of performing a physical assessment on Plaintiff on August 17, 2017. (Ex. 5, 61:3-9).

> **RESPONSE: Undisputed, but clarify Poole saw Defendant Tomaras on August 17, 2017 when she assessed him in the bullpen. ECF 147-1 (Poole Dep.) at 36:2-24; 172:12-24, 173:1-11.**

47.     Tina Tomaras has no recollection of examining Plaintiff's face but if she did there would most likely be a progress note. (Ex. 5, 61:16-18).

**RESPONSE: Undisputed as to Defendant Tomaras's lack of recollection, but clarify Defendant Tomaras examined Poole's eye and he told her about his neck pain and other symptoms. ECF 147-1 (Poole Dep.) at 80:17-19; 81:1-10. ECF 147-3 (Poole Grievance) at 2040. Clarify further Defendant Tomaras sees many patients per day, and cannot recollect conversations that took place over the past 4-6 years. ECF 147-2 (Tomaras Dep.) at 73:8-16.**

48.     Tomaras has no personal knowledge of whether or not Plaintiff received a neck brace on August 17, 2017. She does not know what treatment was given. (Ex. 5, 62:1-5).

**RESPONSE: Undisputed.**

49.     As an LPN at Stateville Correctional Center, Tina Tomaras is not permitted to diagnose. (Ex. 5, 85:3-5).

**RESPONSE: Undisputed.**

50.     As an LPN, Tina Tomaras is not permitted to send an inmate out to see an outside specialist. (Ex. 5, 85:6-9).

**RESPONSE: Undisputed.**

51.     As an LPN, Tina Tomaras cannot order X-Rays. Only a doctor can order an X-Ray. (Ex. 5, 43:16-18, 43:19-20, 85:10-12).

**RESPONSE: Undisputed.**

52.     Tina Tomaras cannot prescribe medical equipment, like a neck brace. She is allowed to give patients neck braces only on a doctor's order. (Ex. 5, 56:11-15, 85:13-15).

**RESPONSE: Disputed, Defendant Tomaras can give a neck brace to a patient if a doctor is not on site. ECF 147-2 (Tomaras Dep.) at 56:11-21.**

53.     An LPN is not allowed to send a patient to an outpatient hospital without anyone's

17

approval. LPN nurses would have to have approval of the MD. Approval can be by any MD that happens to be on-call. (Ex. 5, 48:16-22).

**RESPONSE: Undisputed.**

54.     As an LPN, the most that Tina Tomaras can give a patient is Tylenol or Ibuprofen. (Ex. 5, 27:18-20).

**RESPONSE: Undisputed.**

55.     It is above Tina Tomaras' scope of practice to know whether or not any testing should be done to evaluate if there is any sort of spinal cord injury if a patient presents with symptoms of electric pains down their back. (Ex. 5, 57:24-58:7).

**RESPONSE: Undisputed.**

56.     Tina Tomaras is not a doctor so she cannot speculate as to what are some causes for concern regarding a neck injury. (Ex. 5, 54:2-7).

**RESPONSE: Undisputed.**

57.     Tina Tomaras cannot speak to axial neck pain and a C3-C4 subluxation. (Ex. 5, 56:13-16).

**RESPONSE: Undisputed.**

58.     Tina Tomaras does not have any personal knowledge of any risk of harm that might result from not stabilizing a patient's neck. (Ex. 5, 57:19-23).

**RESPONSE: Undisputed, but clarify Defendant Tomaras is a medical professional and her job includes assessing patients. ECF 147-2 (Tomaras Dep.) at 33:22-24.**

59.     It is the policy and practice of Tina Tomaras to chart and create patient notes whenever she has a patient encounter. (Ex. 5, 84:15-18).

**RESPONSE: Undisputed.**

60.     If there is not a chart note with a certain inmate on a certain date, that is because she did not have a patient encounter with that inmate on that date. If there is no documentation, there was not an actual interaction with a patient. (Ex. 5, 82:13-22, 84:22-85:2).

> **RESPONSE: Undisputed that Defendant Tomaras testified to this, but clarify that although she failed to document the encounters, Defendant Tomaras saw Poole on August 17, 2017, and again on August 19, 2017. ECF 147-1 (Poole Dep.) at 36:2-24, ECF 147-2 (Tomaras Dep.) at 73:17-25; 74:1-12.**

61.     Tina Tomaras did not see her handwriting on any paper medical records. (Ex. 5, 78:9-79:16).

> **RESPONSE: Undisputed.**

62.     Tina Tomaras had no recollection of an appointment with Plaintiff or seeing Plaintiff on August 19, 2017 and confirmed during her deposition that there was no record or progress note for an appointment on that date. (Ex. 5, 54:24, 62:13, 73:10, 81:10-18).

> **RESPONSE: Undisputed, but clarify Poole presented to the HCU at that time and was dismissed. ECF 147-1 (Poole Deposition) at 28:10-19; ECF 147-3 (Poole Grievance) at 2040.**

63.     Tina Tomaras left Stateville Correctional Center on May 31, 2021. (Ex. 5, 20:16-17).

> **RESPONSE: Undisputed.**

## Defendant's Disclosed Expert – Orthopedic Spine Surgeon Thomas Gleason, M.D.

64.     Even if she had been involved in Plaintiff's care, Tina Tomaras, as an LPN, could not have referred Plaintiff to a specialist, ordered diagnostic imaging, made a medical diagnosis, or treatment plan for Plaintiff. (Ex. 8, p. 23-24).

> **RESPONSE: Undisputed.**

65.     There is no evidence that anything that Tina Tomaras did, or failed to do, caused or exacerbated any injury or pain to Plaintiff. Tina Tomaras did not cause any delay. (Ex. 8, p. 25).

**RESPONSE: Disputed, Defendant Tomaras did not permit Poole to see a Doctor on August 19, 2017, and instead sent him back to Segregation despite his complaints. ECF 147-1 (Poole Dep.) at 28:10-19; ECF 147-3 (Poole Grievance) at 2040.**

66.     Dr. Davis testified that he does not know what the definition of standard of care is. (Ex. 7, 16:13-17; Ex. 9, p. 2).

**RESPONSE: Disputed. Dr. Davis defines the standard of care as "the level at which a physician should complete an evaluation of a patient, be it starting from the initial discussion, complaint, H&P, subjective [complaints]… all the way through physical exam to treatment to diagnostics, whatever we should do as a physician." ECF 147-17 (Dr. Davis Dep.) at 16:3-12.**

67.     The alleged delay in Plaintiff wearing a c-collar or the alleged delay in the C3-C4 fusion performed by Dr. Mehta did not cause or contribute to any injury or pain to Plaintiff. There are no verifiable medical records, X-Rays, CT scans or MRIs that Plaintiff's one millimeter (1 mm) subluxation or C3 inferior facet fracture was made worse by not wearing a c-collar or receiving surgery earlier.  Earlier intervention for Plaintiff's cervical spine injury would not have improved his postoperative outcome. (Ex. 9, p. 4).

**RESPONSE: Disputed. ECF 147-18 (Dr. Davis's Final Expert Report) at 1-5.**

68.     There is no medical evidence that Tina Tomaras had any personal involvement in Plaintiff's care. (Ex. 8, p. 23).

**RESPONSE: Disputed, Poole testified he spoke with her and she assessed his injury immediately after he was brought to the outside bullpen on August 17, 2017. Poole further testified he saw her two days after and was shooed away. ECF 147-1 (Poole**

**Dep.) at 73:17-25, 74:1-12, 80:17-19; 81:1-10; ECF 147-3 (Poole Grievance) at 2040.**

69. There is no evidence that Plaintiff suffered a neurological injury to his cervical spine (Ex. 8, p. 22).

**RESPONSE: Undisputed.**

**Plaintiff's Disclosed Expert – Dr. John Davis Report and Deposition**

70. The expert report of Plaintiff's hospitalist/internal medicine expert, Dr. John Davis, does not mention Defendant Tina Tomaras in the entirety of his report. Dr. Davis, in the materials reviewed section of his report, confirms that he never reviewed the deposition of Defendant Tina Tomaras. Dr. Davis report is limited to opinions only concerning Dr. Aguinaldo. There are no opinions from Dr. Davis concerning Defendant Tina Tomaras. (Ex. 6).

**RESPONSE: Undisputed.**

71. Plaintiff's disclosed expert, Dr. John Davis, testified that he was unaware what the definition of standard of care was and confirmed he made no effort to determine what standard of care would have been for treating a similar-situated patient such as Plaintiff on August 17, 2017. (Ex. 7, 16:17-17:17).

> **RESPONSE: Disputed, Dr. Davis defined the standard of care, and looked at research to review treatment on cervical spine injuries, including on spinal fractures. ECF 147-17 (Dr. Davis Dep.) at 16:3-12; 17:18-24; 18:1-17.**

72. Dr. Davis testified that he was not provided Plaintiff's full medical records from the IDOC and UIC. Further, that he was not provided with all the depositions in this case and was unaware who the neurosurgeon was who performed Plaintiff's cervical fusion procedure, Dr. Mehta. (Ex. 7, 34:8-35:9).

> **RESPONSE: Undisputed that Dr. Davis did not review every single medical record,**

**spanning several years, but clarify Dr. Davis testified he was provided with Dr.**

**Mehta's deposition and relied on it in forming his opinion. ECF 147-17 (Dr. Davis**

**Dep.) 35:8-9.**

73.　　Dr. Davis confirmed during his deposition that it was Nurse Carnahan who saw Plaintiff prior to Dr. Aguinaldo on August 17, 2017. (Ex. 7, 37:6-19).

> **RESPONSE: Undisputed, but clarify Dr. Davis does not dispute Poole saw**
>
> **Defendant Tomaras. ECF 147-18 (Dr. Davis Final Expert Report), ECF 147-17 (Dr.**
>
> **Davis Dep.)**

74.　　Dr. Davis testified that he has no opinions as to proximate cause. (Ex. 7, 90:11).

> **RESPONSE: Undisputed, but clarify that Dr. Davis is a medical professional and**
>
> **does not know what "proximate cause" means. ECF 147-17 (Dr. Davis Dep.) at**
>
> **90:1-7.**

75.　　Dr. Davis testified that there is no documentation in the record of a refusal from Dr. Obaisi, Dr. Aguinaldo, or any other physician to see Plaintiff in August 2017. (Ex. 7, 176:11-12).

> **RESPONSE: Undisputed.**

76.　　Dr. Davis testified that there is no documentation or testimony in the record that lack of a cervical collar affected Plaintiff's outcome. (Ex. 7, 177:1).

> **RESPONSE: Undisputed, but clarify Dr. Davis opined that Dr. Aguinaldo's failure**
>
> **to provide Poole with a cervical collar at any point during their interactions**
>
> **breached the standard of care, and Poole should have been immediately provided**
>
> **with a cervical collar. ECF 147-18 (Dr. Davis Final Expert Report) at 1-5. Dr. Davis**
>
> **further opined that Poole's outcome would have been better if he had a cervical**
>
> **collar because the collar stabilizes the neck, paraspinal muscles, bones and soft**

22

**tissue. ECF 147-17 (Dr. Davis Dep.) at 122:12-18.**

77.     Dr. Davis provided no testimony or opinions regarding Tina Tomaras during his deposition. The only nurse mentioned during the entirety of Dr. Davis's deposition was Nurse K. Carnahan. (Ex. 7).

**RESPONSE: Undisputed.**


Dated: October 30, 2023                              Respectfully submitted,

                                                     **AHMAD POOLE**


                                                     By:/s/ Maria Makar_____
                                                          *One of her Attorneys*

Stephen Weil
Maria Makar
LOEVY & LOEVY
311 North Aberdeen Street
Chicago, IL 60607
makar@loevy.com