## THE UNITED STATES DISTRICT COURT FOR
## THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| AHMAD POOLE (K95348), )<br><br>Plaintiff, )<br><br>v. )<br><br>DR. E. AGUINALDO, *et al.*, )<br><br>Defendants. ) | Case No. 20-CV-0014<br><br>Honorable Manish S. Shah |

## PLAINTIFF'S RESPONSE TO DEFENDANT, DR. EVARISTO AGUINALDO'S RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS

Plaintiff Ahmad Poole, by and through his undersigned attorneys, pursuant to Local Rule 56.1(b), respectfully submits this response to Dr. Evaristo Aguinaldo's Rule 56.1 Statement:

### Parties

### Plaintiff – Ahmad Poole

1.      Plaintiff, AHMAD POOLE ("Plaintiff"), was at all times relevant to Plaintiff's Fourth Amended Complaint ("Complaint"), an inmate at the Stateville Correctional Center. (Ex. 1, ¶ 6).

   **RESPONSE: Undisputed.**

2.      Plaintiff has no medical training. (Ex. 2, 13:20-21).

   **RESPONSE: Undisputed.**

### Defendant – Dr. Evaristo Aguinaldo

3.      Defendant, DR. EVARISTO AGUINALDO, is a licensed medical doctor in the state of Illinois, and at all times relevant to Plaintiff's Complaint, was a physician at Stateville Correctional Center. (Ex. 1, ¶ 7; Ex. 3, 26:18-23, 29:4-7).

**RESPONSE: Undisputed.**

4.     Dr. Aguinaldo worked in private practice up until he began working in the correctional setting sometime between 2001 to 2002. Dr. Aguinaldo's employment in the correctional setting is with Wexford Health Sources, Inc., as a staff physician. Dr. Aguinaldo is a medical doctor, trained as a general practitioner. (Ex. 3, 25:11-25, 26:1-12, 27:2-13, 28:4-7; Ex. 7, p. 19, 21).

**RESPONSE: Undisputed.**

### Venue and Jurisdiction

5.     Jurisdiction and venue are proper because Plaintiff filed a federal claim under 42 U.S.C. § 1983 for alleged injuries that occurred within the Northern District of Illinois, Eastern Division, while Plaintiff was an inmate at Stateville Correctional Center. (Ex. 1, ¶ 4-6).

**RESPONSE: Undisputed.**

### Undisputed Material Facts

**Plaintiff's Fourth Amended Complaint**

6.     Plaintiff's Complaint contains only one (1) count against Dr. Aguinaldo under 42 U.S.C. § 1983, for alleged "deliberate indifference" for denial to Plaintiff's "objectively serious medical needs," alleging that Dr. Aguinaldo "failed to provide" Plaintiff "with any proper medical care or access to medical care, in violation of the Eighth Amendment to the United States Constitution." (Ex. 1, Count 1, ¶ 4-8).

**RESPONSE: Undisputed.**

**Deposition Testimony – Dr. Evaristo Aguinaldo**

7.      Plaintiff was first seen by Dr. Aguinaldo at 3:50 p.m. on August 17, 2017. Plaintiff subjectively reported to Dr. Aguinaldo that he had a fight and was hit on the head, face, and neck and felt pain on both shoulders. Dr. Aguinaldo performed a full physical and neurological examination of Plaintiff, including palpation of Plaintiff's neck, observing the posture of Plaintiff's head, testing the sensation and integrity of Plaintiff's hand to determine weakness or numbness, checked Plaintiff's upper extremity reflexes, range of motion testing, sensory and motor neurological examination, axial loading tests, and Spurling compression testing. After examination, Dr. Aguinaldo charted his positive findings and objective observations: alert, not in distress; left side of the face and orbit, open laceration about 3/4 inch noted; right side of the neck, abrasion noted; bruise in the left upper forehead; neck is supple, slight pain on rotation of motion and both shoulder, slight pain on rotation of motion noted. Dr. Aguinaldo testified that it is his practice to only chart positive findings. Dr. Aguinaldo then charted the following treatment plan: (1) call Stateville Internal Affairs; (2) provide Plaintiff with a tetanus shot, ice compress, and Tylenol 500mg; (3) order X-Rays of Plaintiff's left orbit, skull, neck, and both shoulders; (4) order blood labs to test for Syphilis, Hepatitis, and HIV; (5) perform stitches under local anesthesia to the laceration on the left side of Plaintiff's face; and (6) schedule Plaintiff for follow-up appointments for dressing changes, to remove his stitches, and to discuss the X-Ray and blood lab results once available. Plaintiff made no subjective complaints of pain on August 17, 2017. Only after Dr. Aguinaldo examined him, did Plaintiff make complaints of pain. (Ex. 8, Bate Stamp 00251; Ex. 4, 97:22, 99:6-11, 99:19-100:1, 100:5-8, 137:13-138:20, 183:4-23, 141:10-12, 149:18-23, 150:3-4, 150:14,184:14-22, 185:1-21, 186:6-9, 201:4-15, 210:17-20).

**RESPONSE: Object that this "statement" violates Local Rule 56.1(d)(1) in that it fails to consist of a "concise" paragraph, but instead contains broad-ranging factual assertions and is not concise. Object further that in so drafting the paragraph,**

**Defendant is attempting to evade Local Rule 56.1(d)(5)'s limitation of statements of fact to 80 paragraphs. Object further that numerous assertions in the paragraph are not supported by specific evidentiary material in violation of Local Rule 56.1(d)(2). Subject to and without waiving these objections, undisputed that Poole was seen on August 17, 2017 at 3:50 p.m. and provided with Tylenol, but otherwise disputed. Poole made complaints immediately after his cellmate attacked him to correctional staff, Nurse Tina Tomaras, and Dr. Aguinaldo. Poole told Dr. Aguinaldo his neck was in serious pain and it felt like electrical shocks were going up and down his spine. ECF 147-3 (Poole Grievances) at 2037. Poole further disputes the medical examinations; Poole recollects Dr. Aguinaldo asking him to move his thumb and index finger. ECF 147-1 (Poole Dep.) at 82:1-12.**

8.      Dr. Aguinaldo applied his normal custom, habit, and practice for his neck examination of Plaintiff, which is what he does for all patients with complaints of neck pain. (Ex. 4, p. 222:4-18).

**RESPONSE: Object that the fact is unsupported by admissible evidence that Dr. Aguinaldo performed the particular task in the manner described. Subject to and without waiving this objection, undisputed, but clarify Dr. Aguinaldo has no independent recollection of any of his encounters with Poole. ECF 147-15 (Dr. Aguinaldo Dep., Vol I) at 12:20-25; 13:1-2.**

9.      If Plaintiff had exhibited positive compression findings with the Spurling test, Dr. Aguinaldo would have charted that in his ordinary course of practice. (Ex. 4, p. 225:7-11).

**RESPONSE: Object to the fact as irrelevant, since there is no evidence in the record that such a test was employed. Subject to and without waiving this objection, disputed that Dr. Aguinaldo performed a Spurling Test, there is no evidence in the medical**

**records it was performed.**

10.     Dr. Aguinaldo ordered X-Rays for Plaintiff on August 17, 2017. Generally, after an X-Ray is taken by a technologist, the films are then sent to a radiologist who is licensed as a medical doctor to interpret diagnostic imaging. In this case, the interpreting radiologist was Dr. Gerald Leef. (Ex. 4, 210:17-211:8).

**RESPONSE: Undisputed.**

11.     Plaintiff was next seen by Dr. Aguinaldo on August 21, 2017 for follow-up on the laceration to Plaintiff's left lower lid. Dr. Aguinaldo charted that Plaintiff's laceration looked good, except that Plaintiff's eyeball was a little blood red. Dr. Aguinaldo assessed Plaintiff with a laceration of the left lower lid and subconjunctival hemorrhage of the left eye. Dr. Aguinaldo's charted treatment plan ordered Plaintiff to follow-up with an eye specialist and return on August 28, 2017, when the X-Ray and lab reports were available. (Ex. 8, Bate Stamp 00253; Ex. 4, 139-140:8).

**RESPONSE: Undisputed, but clarify Poole was complaining of severe neck pain at that time. ECF 147-1 (Poole Dep.) at 90:13-23.**

12.     Plaintiff reported "no problems at this time" during his August 21, 2017 follow-up appointment with Dr. Aguinaldo. This meant that Plaintiff did not have a problem when Dr. Aguinaldo saw him on August 21, 2017. Plaintiff did not make a complaint about his neck, so Dr. Aguinaldo did not examine Plaintiff's neck on this date. Dr. Aguinaldo charted that Plaintiff's X-Rays were still pending. (Ex. 8, Bate Stamp 00253; Ex. 4, 143:5-144:10).

**RESPONSE: Disputed. Poole was seen by nurses for a bloodwork panel, and communicated at that time that he was still experiencing pain in his neck. ECF 147-3 (Poole Grievances) at 2040.**

13.     Three (3) days later, Plaintiff saw Dr. Aguinaldo on August 24, 2017 for follow-up on the laceration to the left side of his face. Dr. Aguinaldo charted that Plaintiff's laceration was "much better" and "stable." Dr. Aguinaldo removed Plaintiff's stitches, "as scheduled." Plaintiff made no complaints to Dr. Aguinaldo that could be related to his cervical spine. (Ex. 8, Bate Stamp 00254).

**RESPONSE: Disputed. Poole's stitches were removed by one of the nurses in the healthcare unit. ECF 147-3 (Poole's Grievances) at 2040. After removal, Poole communicated to Dr. Aguinaldo that he was still experiencing neck pain. ECF 147-3 (Poole's Grievances) at 2040; ECF 147-1 (Poole Dep.) at 91:14-18.**

14.     Dr. Aguinaldo is not a radiologist and is not board certified in radiology. (Ex. 4, 211:17-22).  Dr. Aguinaldo relies on the radiologist to interpret films. (Ex. 4, 212:1).

**RESPONSE: Undisputed.**

15.     Dr. Leef never reported to Dr. Aguinaldo that there was a fracture on the right side of the inferior aspect of the C3 facet going to the superior aspect of the C4 facet. Dr. Leef never suggested that Dr. Aguinaldo follow up with either a CT or MRI. Dr. Leef never opined or made a recommendation to suggest neurological consult. Dr. Leef never called or spoke to Dr. Aguinaldo to give Dr. Aguinaldo his findings. Dr. Leef missed the fracture at C3-C4. If Dr. Leef had reported there was a fracture, then Dr. Aguinaldo would have sent out Plaintiff right away to the emergency room. (Ex. 4, 145:19-21, 146:5-14, 146:18-20, 212:2-7, 212:14-22, 213:4-7, 213:16-22).

**RESPONSE: Undisputed, but clarify Dr. Leef was not able to catch the fracture on an x-ray and it required higher imaging to be seen. ECF 147-16 (Dr. Leef Dep.) at 52:8-15; ECF 147-17 (Dr. Davis Dep.) at 61:22-24; 62:1-7; ECF 147-7 (St. Joseph Medical Records Doctor A) RTP 0954; ECF 147-8 (St. Joesph Medical Records Doctor A) RTP 0933; ECF 147-9 (U of I Medical Note) Poole 172.**

16. Plaintiff was next seen by Dr. Aguinaldo on August 28, 2017 for follow-up concerning Plaintiff's ordered labs and diagnostic imaging. Dr. Aguinaldo informed Plaintiff that his HIV, Hepatitis, and RPR profiles were "within normal limits." Further, that Plaintiff's X-Ray results were within normal limits except for a "cervical spine anterior subluxation of C3 in relation to C4 – no other problems at this time." The X-Ray Report did not mention a fracture. Dr. Aguinaldo explained the results to Plaintiff and then promptly sought the opinion of Stateville's Medical Director, Dr. Obaisi, regarding Plaintiff's anterior subluxation at C3/C4. Dr. Aguinaldo did not ignore the anterior subluxation at C3/C4, but rather promptly scheduled Plaintiff for a timely consult, two (2) days later by Dr. Obaisi. Dr. Aguinaldo did not perform an examination of Plaintiff's neck on August 28, 2017, because the purpose of the appointment was to review Plaintiff's lab and X-Ray results. Further, Plaintiff made no complaints of neck pain or problems on August 28, 2017. There is no charting on August 28, 2017, that Plaintiff had neck pain, instability, neurologic findings, or a fracture. As a general practitioner, Dr. Aguinaldo complied with the community standard of care in not providing Plaintiff with a cervical collar. (Ex. 8, Bate Stamp 00255; Ex. 4, 145:1-21, 147:6-7, 147:15-17, 200:10-17, 201:4-15, 202:4-7).

**RESPONSE: Object that this "statement" violates Local Rule 56.1(d)(1) in that it fails to consist of a "concise" paragraph, but instead contains broad-ranging factual assertions and is not concise. Object further that in so drafting the paragraph in said manner, Defendant is attempting to evade Local Rule 56.1(d)(5)'s limitation of statements of fact to 80 paragraphs. Object further that numerous assertions in the paragraph are not supported by specific evidentiary material in violation of Local Rule 56.1(d)(2). Subject to and without waiving these objections, disputed. Poole made complaints of neck pain. Disputed as to complying with the community standard of care in not providing Poole a neck collar. ECF 147-17 (Dr. Davis Dep.) at**

**16:3-12; 17:18-24; 18:1-17. Disputed further as Dr. Aguinaldo testified he does not recall encounters with Plaintiff. ECF 147-4 (Dr. Aguinaldo Dep., Vol II) at 107:9-15.**

17.     Dr. Aguinaldo referred Plaintiff to Dr. Obaisi because Dr. Aguinaldo was concerned about the anterior subluxation. (Ex. 4, 147:1-3).

**RESPONSE: Disputed.  Dr. Aguinaldo testified he does not recall encounters with Poole.  Responding further, Dr. Aguinaldo could have sent Poole to an outpatient hospital immediately rather than sending Poole for a consult with Dr. Obaisi two days later. ECF 147-15 (Dr. Aguinaldo Dep., Vol I) at 34:19-25; 35:1.**

18.     With the exception of a post-operative appointment on March 16, 2018, Dr. Aguinaldo did not treat Plaintiff for his cervical spine condition or complaints after August 28, 2017. (Ex. 8, Bate Stamp 00290; Ex. 4, 225:12-14).

**RESPONSE: Undisputed.**

**Deposition Testimony – Radiologist Dr. Gerald Leef**

19.     Dr. Gerald Leef is a board-certified radiologist. (Ex. 5, 19:17-23). As a radiologist, Dr. Leef's primary duties are to interpret x-ray examinations. (Ex. 5, 20:2-5).

**RESPONSE: Undisputed.**

20.     Dr. Leef's practice is to handwrite his radiology interpretations on the request form. (Ex. 5, 21: 4-7).

**RESPONSE: Undisputed.**

21.     Dr. Leef's x-ray report is dated August 27, 2017. (Ex. 5, p. 36-37: 15-1). Finding number 1 "cervical spine, there was an anterior subluxation of C3 in relation to C4. Otherwise essentially negative." (Ex. 5, p. 37: 16-21). In his report, Dr. Leef did not mention a fracture. (Ex. 5, p. 37: 22-24).

**RESPONSE: Undisputed.**

22.     In the findings section of his report, Dr. Leef did not recommend additional imaging. (Ex. 5, p. 50: 17-21; p. 54: 18-24). Dr. Leef as radiologist did not recommend to the clinician to order a CT or MRI scan. (Ex. 5, p. 50-51: 22-2). Dr. Leef did not recommend to the clinician to order a neurosurgical consult. (Ex. 5, p. 51: 9-13).

> **RESPONSE: Undisputed, but clarify Dr. Leef testified as a radiologist he does not dictate how a physician should treat their patient. ECF-16 (Dr. Leef Dep.) at 56:17-21.**

23.     Dr. Leef did not see a fracture on the films and did not advise the clinician in his August 27, 2017 radiology report that there was a fracture. (Ex. 5, p. 51: 16-20). Dr. Leef's radiology report did not document a C3 right-sided inferior facet fracture or a right-sided superior facet fracture. (Ex. 5, p. 5: 8-15). August 27, 2017 x-ray report does not mention a "perched facet." (Ex. 5, p. 52: 16-19).

> **RESPONSE: Undisputed.**

24.     Once Dr. Leef reviewed the plain film x-rays, made his finding, charted findings, there was nothing that gave Dr. Leef suspicion that he needs to call Dr. Aguinaldo or to actually look at the chart. (Ex. 5, p. 56: 6-12).

> **RESPONSE: Undisputed, but clarify Dr. Leef does not dictate how a physician should treat their patient. *Id.* at 56:17-21. Dr. Leef only reports what he can see. *Id.* at 23:11-20.**

**Deposition Testimony and Expert Report Plaintiff's 26(a)(2)(B) Expert – Dr. John Davis**

25.     Dr. Davis is a medical doctor whose residency is in internal medicine and pediatrics. (Ex. 6, p. 9: 7-8). Dr. Davis practices as a hospitalist. (Ex. 6, p. 12: 7-9). Dr. Davis is

not board certified as a hospitalist. (Ex. 6, p. 12: 13-15).

      **RESPONSE: Undisputed, but clarify Dr. Davis is a general practitioner like Dr. Aguinaldo and Dr. Aguinaldo's setting is sometimes that of an emergency room.**

26.     Dr. Davis is not a spine surgeon; has no training in performance of spinals surgery; ever performed a spine operation and has no privileges to perform a spine operation. (Ex. 6, p. 14: 1-16).

      **RESPONSE: Undisputed.**

27.     Dr. Davis has no knowledge as to what the legal definition of standard of care is as to what the law holds a physician to. (Ex. 6, p. 16: 13-17; p. 17: 2-9).

      **RESPONSE: Object as vague, regarding the meaning of "legal definition of standard of care." Subject to and without waiving the objection, Disputed. While Dr. Davis is not a lawyer, he defines standard of care in medical lay terms as: "the level at which a physician should complete an evaluation of a patient, be it starting from the initial discussion, complaint, [history and physical], subjective, whatever you have, all the way through physical exam to treatment to diagnostics, whatever we should do as a physician." ECF 147-17 (Dr. Davis Dep.) at 16: 3-12.**

28.     At the hospital where Dr. Davis works, x-ray studies are read by radiologist. (Ex. 6, p. 27: 2-4). Radiologists read x-rays because they are the specialists. (Ex. 6, p. 28: 10-19).

      **RESPONSE: Undisputed.**

29.     Dr. Davis did not know and could not interpret IDOC medical record "Segregation Sick Call Rounds Chart." (Ex. 6, p. 47: 11-16; p. 49: 17-19). During nurse sick call, Poole was seen by nurses in segregation and a nurse saw the patient (Poole) from the 18th through the 31st and marked no complaints. (Ex. 6, p. 48: 8-22; p. 50: 4-10).

**RESPONSE: Undisputed, but clarify the medical record Dr. Davis had difficulty reading was Dr. Aguinaldo's handwriting. ECF 147-17 (Dr. Davis Dep.) at 77:8-11. Dr. Aguinaldo acknowledged he is working on his penmanship. ECF 147-15 (Dr. Aguinaldo Dep., Vol I) at 52:18-24.**

30.    Dr. Davis agreed that x-rays were taken on August 25th. (Ex. 6, p. 54: 20-23).

**RESPONSE: Undisputed.**

31.    Dr. Davis opined that if there is a fracture on an x-ray, it is the responsibility of the radiologist to read that, find it, and put in the report that there is a facture. (Ex. 6, p. 58: 14-17). If the radiologist has not conveyed in his report that there is a fracture and does not contact the physician to tell him there's a fracture of the cervical spine, then the physician would not know. (Ex. 6, p. 58-59: 18-3). If radiologist sees a C3 facet fracture on right, the radiologist should report that to treating physician. (Ex. 6, p. 61: 11-18).

**RESPONSE: Undisputed, but clarify Dr. Davis said it is the doctor's responsibility to treat his patient. You use imaging to confirm, not to treat. ("You don't chase imaging. You do your job and let the imaging confirm.") ECF 147-17 (Dr. Davis Dep.) at 165:16-24.**

32.    Dr. Davis did not ask to see the plain film x-ray because he cannot read them. (Ex. 6, p. 62: 9-19). It is the radiologist's job to do these reads and provide the information to physician. (Ex. 6, p. 62: 15-22).

**RESPONSE: Undisputed, but clarify Dr. Davis said that it is the treating doctor's responsibility to order another modality of imaging if the treating doctor cannot identify the problem after an x-ray. ECF 147-17 (Dr. Davis Dep.) at 118:7-13; 118:19-23; 119:1-8; 120:9-15.**

33.    In his August 27th report, Dr. Leef did not recommend superior imaging such as a

CT or MRI follow-up. (Ex. 6, p. 63: 14-19).

**RESPONSE: Undisputed, but clarify Dr. Leef is not required to do so and as a rule, he does not try and dictate the patient's additional work up. ECF 147-16 (Dr. Leef Dep.) at 50:22-25; 51:1-5.**

34.    In Dr. Leef's radiology report, Dr. Leef did not report to Dr. Aguinaldo that there is a right-sided C3 facet fracture. (Ex. 6, p. 63-64: 21-1).

**RESPONSE: Undisputed.**

35.    If there is an inferior facet fracture with C3 perching on C4, Dr. Davis would call that a critical read. (Ex. 6, p. 65: 5-8). There is no evidence in radiology report that radiologist Dr. Leef ever conveyed a critical read of right C3 inferior facet fracture with perching to Dr. Aguinaldo. (Ex. 6, p. 65-66: 20-3).

**RESPONSE: Undisputed.**

36.    On August 30th when Mr. Poole was present at St. Joseph Hospital, Poole was offered pain medication and hospital note indicates that Poole declined pain management. (Ex. 6, p. 83: 10-13; Ex. 9, p.3122 -3126).

**RESPONSE: Undisputed that note so states, but disputed that pain medication was actually offered. Poole testified he was not offered pain medication, and he knows this because if he had been offered the medication, he would have accepted it. ECF 147-1 (Poole Dep.) at 104:22-24; 105:1-7.**

37.    It is always the case that it is the physician's job to recommend the X-Ray but the physician is not the one that actually goes and takes the x-ray. (Ex. 6, p. 89: 10-13).

**RESPONSE: Undisputed.**

38.    Dr. Davis does not know what proximate cause means. (Ex. 6, p. 89: 14-24). In this

case, Dr. Davis does not have any opinions on proximate cause because he does not know what that means. (Ex. 6, p. 90: 1-6). Dr. Davis' expert report contains no opinion(s) that there is anything that Dr. Aguinaldo did, or failed to do that caused any injury, harm or pain to Mr. Poole. (Ex. 10).

> **RESPONSE: Object as vague and confusing. Dr. Davis is not a lawyer; his report offers medical opinions, not opinions on legal terms. Subject to and without waiving these objections, disputed. Dr. Davis testified that Dr. Aguinaldo caused further injuries. ECF 147-17 (Dr. Davis Dep.) at 127:5-18; ECF 147-18 (Dr. Davis Expert Report) at 3-4.**

39.     Given Mr. Poole's complaints on the initial encounter of August 17th, Dr. Davis agreed that it was reasonable for Dr. Aguinaldo to order x-rays. (Ex. 6, p. 94: 9-23).

> **RESPONSE: Undisputed.**

40.     Dr. Davis had no knowledge if a c-collar was available at the prison healthcare unit. (Ex. 6, p. 101: 4-6).

> **RESPONSE: Undisputed, but clarify Dr. Davis testified that a treater has to "figure something out" to stabilize the neck. ECF 147-17 (Dr. Davis Dep.) at 172:21-24; 173:1-3.**

41.     Dr. Davis has no knowledge as to why the X-Ray took a number of days after it was ordered by Dr. Aguinaldo. (Ex. 6, 102: 7-10). Dr. Davis does not know who was responsible for delaying the x-ray and has no opinion that it was Dr. Aguinaldo. (Ex. 6, p. 102: 11-15).

> **RESPONSE: Undisputed that Dr. Davis has no knowledge as to why the x-ray took a number of days for the prison to perform, but disputed that he does not know who was responsible, as he testified and gave an opinion that Poole should have received immediate imaging, whether or not that meant sending him off-site. ECF 147-17 (Dr.**

**Davis Dep.) at 146:18-24 and ECF 147-18 (Dr. Davis Expert Report) at 3.**

42.     If Mr. Poole did not make any complaints and request healthcare to leave segregation to  be evaluated by Dr. Aguinaldo and Dr. Aguinaldo does not see the patient, then there is nothing that Dr. Aguinaldo can do at that point. (Ex. 6, p. 103-104: 19-1). If the patient is not sitting in front of Dr. Aguinaldo, then Dr. Aguinaldo cannot physically treat the patient. (Ex. 6, p. 104: 2-10).

> **RESPONSE: Object to the premise that Poole did not make any complaints and request healthcare to leave segregation. Poole made many complaints while in segregation. Poole presented to healthcare the day after the fight and Tomaras sent him back to segregation. ECF 147-1 (Poole Dep.) at 86:4-24; 87:1-24; 88:1-22. ECF 147-3 (Poole's Grievances) at 2040.**

43.     If the record states on August 24th note that there is no complaint, then there would not be an exam. (Ex. 6, p. 106: 16-24). It would be reasonable and standard of care for Dr. Aguinaldo to remove the stitches 7 days later on August 24th. (Ex. 6, p. 106: 1-24).

> **RESPONSE: Object to the premise, and therefore disputed. Poole made a complaint about his neck pain on August 24. ECF 147-3 (Poole's Grievances) at 2040. Undisputed that it would be reasonable to remove Poole's stitches 7 days later.**

44.     A physician such as Dr. Davis or Dr. Aguinaldo would rely upon the interpretation of the radiologist as to what is contained in the radiology report. (Ex. 6, p. 108: 8-12). If Dr. Aguinaldo has x-ray report on August 28 due to it being interpreted on August 27th, it would be expectation to explain it to patient on August 28. (Ex. 6, p. 107-108: 20-4).

> **RESPONSE: Undisputed.**

45.     There was no fracture mentioned in the August 28th x-ray report, so there is nothing

that Dr. Aguinaldo could have reacted to. (Ex. 6, p. 108-109: 13-5).

**RESPONSE: Undisputed there was no fracture mentioned in the August 28 x-ray report. Disputed as to the remainder. Dr. Aguinaldo did not know Poole had a fracture. Dr. Aguinaldo told Poole on August 28 he had a fracture, but would not need surgery. ECF 147-1 (Poole Dep.) at 92:6-11. ECF 147-3 (Poole's Grievances) at 2041.**

46.     Dr. Davis and most physicians as a normal practice consult with other colleagues on patients. (Ex. 6, p. 110: 13-22).

**RESPONSE: Undisputed.**

47.     According to x-ray report, radiologist based on his reading of subluxation did not suggest further imaging and did not say to correlate clinically the subluxation finding. (Ex. 6, p. 112: 2-9).

**RESPONSE: Undisputed, but clarify a radiologist is not required to suggest further imaging.**

48.     Dr. Davis is aware that you can have a subluxation without requiring surgical intervention. (Ex. 6, p. 112: 11-13).

**RESPONSE: Undisputed.**

49.     Dr. Aguinaldo would not see the fracture on the x-ray. (Ex. 6, p. 120: 22-24).

**RESPONSE: Undisputed, but clarify it is possible he could not see the fracture on the x-ray and clarify Dr. Obaisi provided treatment for the fracture after viewing x-ray films. ECF 147-1 (Poole Dep.) at 94:6-19.**

50.     Dr. Davis has no opinion as to whether a 1mm subluxation would cause pain. (Ex. 6, p. 125: 4-14).

**RESPONSE: Undisputed, but clarify Dr. Davis could not agree that 1mm subluxation**

**did not cause or contribute to any injury or pain. ECF 147-17 (Dr. Davis Dep.) at 125:4-9.**

51.     Dr. Davis's opinion is that Poole sustained his injury as the actual injury of the fracture when Poole lost the fight and got his neck snapped by his cellmate. (Ex. 6, p. 131: 7-12; p. 134: 7-15; p. 135: 8-18).

**RESPONSE: Undisputed. Poole sustained the injury when his cellmate violently attacked him.**

52.     Dr. Davis does not know what Dr. Aguinaldo's medical judgment was as to the diagnosis of the cervical spine on August 17th or if Dr. Aguinaldo ever suspected a fracture of the cervical spine. (Ex. 6, p. 147: 5-22).

**RESPONSE: Undisputed.**

53.     Dr. Davis is not aware that the fracture worsened. (Ex. 6, p. 149: 3-5). Dr. Davis has no evidence that the C3 fracture worsened. (Ex. 6, p. 160: 20-23).

**RESPONSE: Undisputed.**

54.     Dr. Davis does not have an opinion that Mr. Poole has chronic pain or what his chronic pain is from. (Ex. 6, p. 159-160: 23-8).

**RESPONSE: Undisputed, but clarify Poole testified that he has chronic pain. ECF 147-1 (Poole Dep.) at 124:4-24. Dr. Mehta, the surgeon who performed his C3-C4 fusion testified Poole would always have pain as a result of the fracture. ECF 147-13 (Dr. Mehta Dep.) at 32:3-19; 33:13-19; 53:1-14.**

55.     There is no documentation or evidence that Mr. Poole came down seeking heath care for neck pain and Dr. Obaisi, Dr. Aguinaldo, or any other physician refused to see him. (Ex. 6, p. 176: 7-12).

**RESPONSE: Object that reference to "see[ing]" is irrelevant, as it does not indicate that care was provided. Subject to and without waiving, disputed. Poole presented to the healthcare unit on August 19, 2017 and was immediately sent back to segregation by Tomaras despite asking to see a doctor. ECF 147-3 (Poole's Grievances) at 2040. Tomaras admitted that is possible when the doctor is awaiting x-ray results. ECF 147-2 (Tomaras Dep.) at 73:17-25; 74:1-12.**

56.     A doctor has to believe it is necessary in order to prescribe a C-collar stabilization. (Ex. 6, p. 176: 13-20). Nobody in this case including spine surgeon Dr. Mehta has documented that the C-collar affected the outcome of this patient. (Ex. 6, p. 176-177: 21-1).

**RESPONSE: Undisputed, but clarify Dr. Aguinaldo himself believed a c-collar was necessary for conservative management, even if there is no instability from a fracture. ECF 147-4 (Dr. Aguinaldo Dep., Vol II) at 214: 8-12.**

### Expert Report/Declaration – Spine Surgeon Dr. Thomas Gleason

57.     Dr. Thomas Gleason is a board-certified orthopedic surgeon fellowship trained in adult spinal problems. (Ex. 7, p. 1).

**RESPONSE: Undisputed.**

58.     Mr. Poole and his cellmate Mr. Carter both described their fight on August 17, 2017 as involving punches, thrashing of Mr. Poole's head/neck by Mr. McCarter via his pigtails and Mr. Poole's neck being wrenched/twisted while placed in a headlock. These traumatic events are consistent with the mechanism of injury of the lacerations, scratches, cervical spine soft tissue injury, anterior subluxation of C3/C4 and the right sided fracture of the tip of inferior facet of C3 resulting in perching upon C4. The sole cause of the injuries suffered by Mr. Poole on August 17, 2017 of soft tissue injuries of the cervical spine, C3 right-sided inferior facet tip fracture, and a

1mm anterior subluxation of C3/C4 was the fight between Mr. Poole and Mr. McCarter. (Ex. 7, p. 18-19).

**RESPONSE: Undisputed.**

59.     There is no medical evidence that from August 17, 2017, until Dr. Aguinaldo reviewed the x-ray report of Dr. Leef on August 28, 2017 with Mr. Poole that any further injury occurred to the C3/C4 level of the cervical spine. The injuries on x-ray (8/25/2017), CT scan (8/30/2017) and MRI (8/31/2017) are directly caused by the fight on August 17, 2017, and not by any action, or inaction of Dr. Aguinaldo. Similarly, there was no change or exacerbation of his injuries to Mr. Poole's cervical spine that occurred from period after consult with Dr. Aguinaldo on August 28th until medical director Dr. Obaisi's referral on August 30, 2017 to St. Joseph Hospital. The cervical spine x-ray films of August 25th and CT scan of August 30th both demonstrate a minimal 1mm anterolisthesis of C3/C4 subluxation and C3 right-sided inferior facet fracture. (Ex. 7, p. 19).

**RESPONSE: Undisputed.**

60.     Dr. Aguinaldo, at all times met the applicable community standard of care during each and every clinic visit he had with Mr. Poole based upon his education, training and experience as a general practitioner.  (Ex. 7, p.21).

**RESPONSE: Undisputed that Dr. Gleason opined as to this. Disputed that Dr. Aguinaldo met the applicable standard of care at any of the clinic visits he had with Poole. ECF 147-18 (Dr. Davis Expert Report) at 3-4.**

61.     Dr. Aguinaldo did not possess the knowledge, or appreciate any potential serious consequences of the radiographic report of an anterior subluxation at C3/C4.  As a spinal surgeon, Dr. Gleason's report is that the 1 mm anterior subluxation did not pose a serious risk of harm to

Mr. Poole. (Ex. 7, p. 22).

> **RESPONSE: Object that "serious risk of harm" is a legal term; Poole was in severe pain, which is a serious medical need. Subject to and without waiving these objections, disputed. Dr. Aguinaldo testified that he is not a specialist and would refer a patient with neck trauma out to rule out anything serious. ECF 147-15 (Dr. Aguinaldo Dep., Vol I) at 63:2-8; 67:10-25; 68:1-9.**

62.     It was reasonable and met the standard of care for Dr. Aguinaldo to arrive at his medical judgment that the source of the neck pain was from traumatic soft tissue and/or a cervical sprain/strain and/or an exacerbation of his preexisting condition. Absent objective documentation of clinical instability, radiographic evidence of cervical spine fracture or neurologic signs, Dr. Aguinaldo met the standard of care in not placing Mr. Poole in a cervical collar. (Ex. 7, p.22).

> **RESPONSE: Disputed. Dr. Davis states that Plaintiff "should have been immediately provided a C-collar" and "if he was in the ER, he would have had that placed in order to at least stabilize." ECF 147-17 (Dr. Davis Dep.) at 74:8-11.**

63.     As a general practitioner, Dr. Aguinaldo complied with the community standard of care in not providing the patient with a cervical collar. Dr. Gleason did not see any objective medical evidence in the physician notes or imaging that as a result of not being placed in a cervical collar from August 17th through August 30th patient encounter with Dr. Obaisi that the right C3 inferior facet fracture or 1mm anterior subluxation of C3/C4 level worsened or was exacerbated. (Ex. 7, p.22). Given the soft tissue injuries found on both the CT and MRI scan, Mr. Poole would have experienced axial cervical neck pain with or without being placed in a cervical collar by Dr. Aguinaldo. (Ex. 7, p.22).

> **RESPONSE: Object that the statement that Dr. Aguinaldo met the standard of care is vague and unsupported, as it conflates the standard of care as depending on**

**whether Dr. Aguinaldo's lack of care resulted in an additional observable injury. Disputed that Dr. Aguinaldo met the standard of care. ECF 147-18 (Dr. Davis Expert Report) at 3–4.**

64.     Dr. Aguinaldo testified that he did his standard physical examination of Mr. Poole to rule out a cervical spine injury of inspection, palpation, range of motion, sensory and motor neurological examination, upper extremity reflexes and Spurling's compression testing. Dr. Aguinaldo charted that the patient had slight pain in rotation during range of motion testing of the cervical spine. All of the objective findings charted by Dr. Aguinaldo are what would be expected in the fight described. The examination occurred only one-hour post-occurrence. The mechanism of injury described would involve insult to the soft tissues of the cervical spine such as the paraspinal muscles which would swell over the next 24-48 hours resulting in increased pain and stiffness. The examination by Dr. Aguinaldo was appropriate for the chief complaints and within the applicable standard of care for a physician with his training. Physicians perform focused examinations of the areas of complaints. Dr. Aguinaldo on August 17th performed the appropriate focused examinations of the head and neck. Physicians chart pertinent positive physical findings. There is no requirement for a physician to chart negative findings. (Ex. 7, p.19).

**RESPONSE: Object that this "statement" violates Local Rule 56.1(d)(1) in that it fails to consist of a "concise" paragraph, but instead contains broad-ranging factual assertions and is not concise. Object further that in so drafting the paragraph, Defendant is attempting to evade Local Rule 56.1(d)(5)'s limitation of statements of fact to 80 paragraphs. Object further that numerous assertions in the paragraph are not supported by specific evidentiary material in violation of Local Rule 56.1(d)(2). Subject to and without waiving these objections, disputed that Dr. Aguinaldo**

**performed the physical examinations he testified to.**

65.     For a general practitioner such as Dr. Aguinaldo, it was reasonable and appropriate to order X-rays to evaluate the cervical spine.  Based upon the documented record, there was no suspicion of acute neurological compromise or fracture of the cervical spine. Thus, a direct referral to a hospital for advanced imaging or spinal consult was not required under the standard of care. There was no stat, emergent or urgent need for the cervical spine X-ray series to be performed.  (Ex. 7, p.19-20).

> **RESPONSE: Undisputed that it was reasonable to order x-rays to evaluate the cervical spine. Disputed that there was no stat, emergent, or urgent need for the cervical spine x-ray series to be performed. ECF 147-18 (Dr. Davis Expert Report) at 2-3 (explaining the importance of differential diagnosis). ECF 147-15 (Dr. Aguinaldo Dep., Vol I) at 61:3-18 (describing that neck and spinal injuries can lead to paralysis).**

66.     Given the pain reasonably associated with the facial laceration and expected increase in pain from a sprain/strain of the cervical spine, it was reasonable and appropriate for Dr. Aguinaldo to prescribe Tylenol 500 mg, two tablets three times a day for pain for ten days. There was no clinical indication on August 17th for narcotics or opioids. (Ex. 7, p.20).

> **RESPONSE:  Disputed. First, Poole was not taking Tylenol. The Tylenol was confiscated before he had taken any, and he asked Dr. Aguinaldo for pain medication the next time he saw him. Poole was reporting severe pain and received narcotics when he was transferred offsite and continues to take Neurontin and Robaxin for nerve and neck pain. ECF 147-9 (University of Illinois Admitting History/Physical Report) Poole 127; ECF 147-3 (Poole's Grievances); ECF 147-1 (Poole Dep.) at 21:2-24, 22:1-5; 84:22-24; 85:18-23; 91:14-21.**

67.     Dr. Aguinaldo on August 17, 2017, after completion of his history and physical

examination arrived at an appropriate assessment and plan pending review of the cervical spine X-rays consistent with the applicable standard of care. Follow-up care was ordered to evaluate the facial laceration and to remove stitches. (Ex.7, p.20).

**RESPONSE: Disputed. Differential diagnosis was necessary. ECF 147-18 (Dr. Davis Expert Report) at 2-3.**

68.　　There was no delay in obtaining completion of the cervical spine X-ray series ordered by Dr. Aguinaldo. Dr. Aguinaldo ordered the films on August 17th. Radiology tech, C. Rogers completed the cervical spine X-rays on August 25th. There is no indication that the period of time between ordering and completion of the X-rays was as a result of Dr. Aguinaldo. There is no record that Dr. Aguinaldo was ever contacted concerning any delay by the radiology tech in completing the cervical X-ray series. (Ex.7, p.20).

**RESPONSE: Undisputed but clarify that although there was no delay on Dr. Aguinaldo's part in the x-ray technician completing the x-rays, Dr. Aguinaldo could have and should have sent Plaintiff to an outside hospital for immediate imaging on August 17, 2017. ECF 147-18 (Dr. Davis Expert Report) at 3.**

69.　　Dr. Aguinaldo saw the patient on August 21st in follow-up. This was a scheduled follow-up for the facial laceration. The record charts that Mr. Poole had no other problems. Dr. Aguinaldo charted that X-rays were still pending. With no complaints of neck pain, radicular symptoms or spinal cord pathology on August 21st, there was no clinical indication to perform a cervical spine examination or to obtain a stat, emergent, or urgent completion of the previously ordered cervical spine X-rays. Dr. Aguinaldo complied with the community standard of care on August 21st. (Ex.7, p.20).

**RESPONSE: Disputed that Plaintiff made no complaints of neck pain on August 21. ECF 147-3 (Poole's Grievances) at 2040. Disputed that Dr. Aguinaldo complied with**

the community standard of care on August 21. ECF 147-18 (Dr. Davis Expert Report) at 3.

70.     Dr. Aguinaldo saw the patient on August 24th. Mr. Poole on August 24th presented with no complaints of his cervical spine. Stitches of the laceration were removed. There was no reason for Dr. Aguinaldo to perform a cervical spine examination on August 24th absent complaints from the patient. For the same reasons on August 21st, there was no clinical indication to obtain stat, emergent or urgent cervical spine X-rays. Dr. Aguinaldo complied with the community standard of care on August 24th. (Ex. 7, p.20).

**RESPONSE: Disputed that Poole made no complaints of neck pain on August 24. ECF 147-3 (Poole's Grievances) at 2040. Disputed that Dr. Aguinaldo complied with the community standard of care on August 24. ECF 147- 18 (Dr. Davis Expert Report) at 3.**

71.     On August 25th, cervical spine X-rays were completed by radiology tech Rogers. It is standard of care for physicians such as Dr. Aguinaldo to have X-rays interpreted by medical specialist radiologists. Radiology, as a specialty, is charged with interpretation of diagnostic studies such as X-rays, CT and MRI scans. On August 27th, Dr. Leef, as a medical doctor with specialty training as a radiologist, reviewed the August 25th cervical spine X-rays of Mr. Poole and completed his report on August 27th. Dr. Leef's reading was of anterior subluxation of C3 In relation to C4; otherwise negative. In Dr. Gleason's review of the cervical spine X-rays of August 25th, there is demonstrated minor anterior subluxation at C3/C4. There is also a difficult to appreciate fracture of the right sided C3 inferior facet resulting in perching upon the adjacent segment C4 superior articular facet. The C3 inferior facet articulates with the C4 superior facet during movement of the neck. (Ex. 7, p.20).

**RESPONSE: Undisputed.**

72.     Dr. Leef as a radiologist missed the fracture. Dr. Leef never reported to Dr. Aguinaldo that there was a fracture at the right C3 inferior facet perched upon C4. There would be no reasonable expectation that Dr. Aguinaldo as a non-radiologist, would appreciate the fracture at C3. Dr. Leef testified he never called Dr. Aguinaldo to report his reading of the August 25th films. (Ex.7, p.20-21).

**RESPONSE: Undisputed but clarify Dr. Leef does not dictate how a physician should treat their patient. ECF 147-16 (Dr. Leef Dep.) at 56:17-21.**

73.     Dr. Leef, as is common of radiologists if they suspect significant pathology, will recommend in their report that the referring doctor obtain advanced imaging such as CT or MRI and to correlate the findings on the X-ray report to clinical findings. Dr. Leef did not do so in his report. Dr. Leef also did not suggest a spine surgical consult. There was no guidance provided by Dr. Leef as a specialist in radiology that the minor anterior subluxation needed to be further studied by advanced imaging, to be clinically correlated with examination findings of the anterior subluxation or recommend to have the patient evaluated by a spine surgeon. (Ex. 7, p.21).

**RESPONSE: Disputed that Dr. Leef would recommend that the referring doctor obtain advanced imaging to correlate the findings on the x-ray report to the clinical findings. ECF 147-16 (Dr. Leef Dep.) at 50:22-25; 51:1-5.**

74.     Absent Dr. Leef making such recommendations in his August 27th radiology report to Dr. Aguinaldo, Dr. Aguinaldo complied with the standard of care during his August 28th clinical visit with Mr. Poole which was scheduled for follow up concerning labs and imaging. There is no charting that on August 28th that the patient had neck pain, instability, neurologic findings, or a fracture. Dr. Aguinaldo charted on August 28th the findings by Dr. Leef of the anterior subluxation of C3-C4. Dr. Aguinaldo explained the findings of Dr. Leef's X-ray report to Mr. Poole. Dr. Aguinaldo also went one step further as a reasonable and prudent physician in seeking the opinion

on August 28th of Stateville medical director concerning the anterior subluxation at C3/C4. (Ex. 7, p.21).

>**RESPONSE: Undisputed, but clarify Poole testified that he did make complaints about severe neck pain at every encounter with Dr. Aguinaldo, including on August 28.**

75. Dr. Aguinaldo did not disregard the anterior subluxation at C3/C4 but rather scheduled his patient for a timely consult two days later by Dr. Obaisi. (Ex. 7, p.21).

>**RESPONSE: Undisputed, but clarify Dr. Aguinaldo could have sent Poole for an immediate consult with an outside hospital on August 17, August 21, August 24, and August 28. Dr. Obaisi sent Poole for an outside consult on August 30 immediately upon seeing him. ECF 147-19 (Emergency Hospitalization Notification Form) Poole 077.**

76. Following his examination on August 17, 2017, Dr. Aguinaldo prescribed Tylenol 500 mg, two tablets to be taken three times a day by Mr. Poole for up to ten days. This was reasonable and appropriate pain medication. (Ex. 7, p.22).

>**RESPONSE: Undisputed, but clarify Poole is currently on Neurontin and Robaxin for pain.**

77. There is no medical record at Stateville that Mr. Poole during his visits on August 21, August 24 or August 28 reported to Dr. Aguinaldo that he was not obtaining pain control to his cervical spine. There is no record that at any other date subsequent to August 17th until transfer on August 30th that Mr. Poole sought medical treatment for severe or intractable neck pain. The record does indicate that Mr. Poole was obtaining pain control. At Amita St. Joseph Hospital on August 30th emergency room providers document in the record

that Mr. Poole refused pain medication. Refusal of additional, or different pain medication at the ER on August 30th is conclusive that Mr. Poole perceived his pain in his cervical spine as adequate and controlled. (Ex. 7, p.22; Ex. 9, p.3122 -3126).

**RESPONSE: Disputed. Poole told Dr. Aguinaldo about the neck pain he was experiencing at appointments after August 17. Poole also disagrees that emergency room providers ever offered pain medication to Poole and further disputes that he declined pain medication. ECF 147-1 (Poole Dep.) at 90:15-23, 105:5-14, 108:7-10.**

78.     There was no medical necessity for Dr. Aguinaldo to alter his prescription of pain medication to Mr. Poole based upon the record. Dr. Aguinaldo complied with the community standard of care in his prescription of Tylenol in the dose, frequency and duration prescribed by Dr. Aguinaldo. (Ex.7, p.22).

**RESPONSE: Undisputed that this is Dr. Gleason's expert opinion only.**

79.     Dr. Gleason agreed with neurosurgeon Dr. Mehta that Mr. Poole did not suffer a neurologic injury. (Ex. 7, p.22).

**RESPONSE: Undisputed.**

80.     There is nothing that Dr. Aguinaldo did, or failed to do, that caused or exacerbated any injury or pain to Mr. Poole. (Ex. 7, p. 25).

**RESPONSE: Disputed. Dr. Davis opined in his report that lack of a cervical collar caused more pain in the days following the injury, and affected the surgical outcome, causing chronic pain and limitations on Poole's daily activities. ECF 147-18 (Dr. Davis Expert Report) at 3-4.**

**[SIGNATURE ON FOLLOWING PAGE]**

Dated: October 30, 2023

Respectfully submitted,

**AHMAD POOLE**


By: _/s/ Maria Makar_____

               *One of his Attorneys*


Stephen Weil
Maria Makar
LOEVY & LOEVY
311 North Aberdeen Street
Chicago, IL 60607
makar@loevy.com