UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

AHMAD POOLE,

        Plaintiff,

   v.

EVARISTO AGUINALDO, TINA TOMARAS,
DEREK JABUREK, and ALPHONSO
NORMAN,

        Defendants.

No. 20 CV 14

Judge Manish S. Shah

**MEMORANDUM OPINION AND ORDER**

Plaintiff Ahmad Poole was an inmate at Stateville Correctional Center when his cellmate attacked him and fractured his neck. Defendant Derek Jaburek escorted Poole to the facility's health care unit, where Poole was seen by defendants Nurse Tina Tomaras and Dr. Evaristo Aguinaldo. Poole complained of severe neck pain but did not receive an x-ray for eight days. Thirteen days after the altercation, Poole saw Stateville's medical director, and was escorted to an outside hospital by defendant Alphonso Norman for further imaging and surgery. Poole brought a claim against defendants for violations of his Eighth Amendment right against cruel and unusual punishment due to defendants' alleged deliberate indifference to Poole's neck injury. According to Poole, this indifference resulted in delayed treatment, unnecessary pain, and a worse surgical outcome. Defendants now move for summary judgment.

## I. Legal Standard

Summary judgment is warranted if there are no genuine disputes of material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).

"'Material facts' are facts that 'might affect the outcome of the suit,' and a dispute as to those facts is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Hunter v. Mueske*, 73 F.4th 561, 565 (7th Cir. 2023) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A court need consider only the cited materials, but it may consider other materials in the record. Fed. R. Civ. P. 56(c)(3). The non-moving party is given "the benefit of conflicting evidence and any favorable inferences that might be reasonably drawn from the evidence." *Runkel v. City of Springfield*, 51 F.4th 736, 741 (7th Cir. 2022).

## II.    Local Rule 56.1 and Evidentiary Issues

### A.    Poole's Grievances

Poole supports several of his statements of fact and responses with two grievances he submitted to Stateville in August and September 2017, which detail the events at issues in this lawsuit. *See* [148] ¶ 30; [149] ¶¶ 16, 29, 32, 40, 42, 47, 62, 65, 68; [150] ¶¶ 7, 12–13, 42–43, 45, 55, 66, 69, 70; [157] ¶¶ 9, 14, 16, 20–21, 23– 27; [158] ¶¶ 9, 14, 16, 20–21, 23– 27; [162] ¶¶ 9, 14, 16, 20–21, 23– 27.[1] Defendants object to Poole's grievances as hearsay, rendering the factual assertions unsupported by admissible evidence. *See id.* But while Poole's grievances are indeed hearsay, the statements contained therein are matters within his personal knowledge and admissible at trial. *See* Fed. R. Evid. 602; Fed. R. Civ. P. 56(c)(4). Many of the factual assertions at issue are also supported by Poole's deposition testimony. . Defendants

---

[1] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings, except in the case of citations to depositions, which use the deposition transcript's original page number. When a document has numbered paragraphs, I cite to the paragraph, for example [1] ¶ 1.

2

questioned Poole about the grievances during his deposition, and he testified that he wrote them on the dates specified. [147-2] at 24:23–26:8; *see Am. Securit Co. v. Hamilton Glass Co.*, 254 F.2d 889, 893 (7th Cir. 1958) (holding affiant competence and admissibility to be important because "summary judgment procedure lacks the safeguard of cross-examination."). At the summary-judgment stage, a court may consider any evidence that would be admissible at trial; it "need not be admissible in form, but must be admissible in content." *Wheatley v. Factory Card & Party Outlet*, 826 F.3d 412, 420 (7th Cir. 2016).

### B.    Poole's Testimony

Defendants argue that an "inmate cannot dispute the validity of medical records and entries therein without any contrary evidence, and uncorroborated testimony is insufficient to defeat summary judgment." [131] at 5 (citing *Myers v. McAuley*, 2003 WL 22232830, at *11 (N.D. Ill. Sept. 16, 2003); *Cowan v. Glen Brook Sec. Servs., Inc.*, 123 F.3d 438, 446 (7th Cir. 1997)); [159] at 10 (same). Not so. A plaintiff's self-serving testimony can create a material factual dispute, so long as plaintiff's testimony is admissible. *See Hill v. Tangherlini*, 724 F.3d 965, 968 & n. 1 (7th Cir. 2013) ("Deposition testimony, affidavits, responses to interrogatories, and other written statements by their nature are self-serving. … [T]he term 'self-serving' must not be used to denigrate perfectly admissible evidence through which a party tries to present its side of the story at summary judgment.") (cleaned up). And although the Seventh Circuit stated in *Cowan* that "[p]laintiff's own uncorroborated testimony is insufficient to defeat [defendant]'s motion for summary judgment," 123 F.3d at 446, in a later decision, the court qualified that statement, noting that the

3

testimony at issue in *Cowan* was not insufficient because it was "self-serving," but rather it "fail[ed] to thwart summary judgment because [it was] not based on personal knowledge as required by … Rule 56(e)," *Payne v. Pauley*, 337 F.3d 767, 772 (7th Cir. 2003).

Poole's testimony—regarding matters within his personal knowledge like his symptoms and his interactions with defendants—is admissible evidence that may be sufficient to defeat summary judgment. Defendants remain free to attack the credibility and weight of Poole's uncorroborated testimony at trial.

### C. Dr. Davis's Expert Testimony

Defendants challenge the qualifications and methodology of Poole's expert, Dr. John Davis. The credibility of the factual underpinning of Dr. Davis's analysis and the correctness of his conclusions are a matter to be determined by the trier of fact. *Smith v. Ford Motor Co.*, 215 F.3d 713, 719 (7th Cir. 2000). But courts have a "gatekeeping function focuse[d] on an examination of the expert's methodology," and whether the expert is qualified in the relevant field. *Id.* at 718.

Dr. Aguinaldo argues that Dr. Davis is "not a spine surgeon, has not performed a spine operation, never performed a cervical fusion surgery, [and] has no training in the performance of a spinal surgery." [159] at 12. Therefore, Dr. Aguinaldo argues that Dr. Davis is not qualified to opine as to the effects of delay on Poole's injury and surgical outcome. *Id.*

For a witness to be considered an "expert," Fed. R. Evid. 702 requires that person to be qualified as such "by knowledge, skill, experience, training, or education." To be admissible, "a medical expert's ultimate opinion must be grounded

in the scientific process and may not be merely a subjective belief or unsupported conjecture." *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009) (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589–90 (1993)).

Dr. Davis opines that Poole's surgical outcome may have been better if Dr. Aguinaldo's treatment was different. [147-19] at 4 ("Earlier intervention for Mr. Poole's injury may well have improved his postoperative outcome."), 5 ("Poole's outcome would have been better had his initial encounters with Dr. Aguinaldo been different."). Dr. Davis is a licensed physician, board certified in Internal Medicine, practicing as a hospitalist. [147-19] at 2. He describes his position as an inpatient primary care physician. [147-18] at 13:4–21. A generalist can be qualified to testify about specialized subjects if they have the adequate education, skill, and training to reach their conclusions. *United States v. Truitt*, 938 F.3d 885, 889–90 (7th Cir. 2019); *see also Gayton v. McCoy*, 593 F.3d 610, 617 (7th Cir. 2010) (collecting cases where generalists were competent to opine on issues specialists typically treat). But Dr. Davis is not a spine surgeon and has no specific expertise or training in spinal injuries. [147-18] at 14:1–17. His opinion on Poole's surgical outcome is based on his general knowledge that delays in treatment of unstable joints can cause chronic damage such as osteoarthritis and other issues "down the line … if things aren't taken care of in an expedited manner." [147-18] at 127:19–128:12. While Dr. Davis is qualified to speak on the general effects of delays in treatment, his knowledge as a general practitioner does not provide a foundation for him to answer whether Poole's surgical outcome would be different had Dr. Aguinaldo treated him differently. *See,*

*e.g.*, *Gayton*, 593 F.3d at 618 (affirming exclusion of generalist's opinion that specific drugs could have saved plaintiff's life because he did not have specialized cardiac or pharmacological knowledge). Therefore, Dr. Davis's opinion on Poole's surgical outcome is excluded.

Dr. Aguinaldo also argues that Dr. Davis cannot provide an opinion as to whether Poole's neck injury worsened because Dr. Davis did not review imaging of Poole's neck. [159] at 13. But Dr. Davis only opined that a failure to expedite imaging and to stabilize a neck injury can lead to further injury. [147-19] at 5. Dr. Davis is qualified to discuss whether there was a risk of further injury. Similarly, Dr. Davis opines that "the delay in diagnosis and treatment likely caused Mr. Poole unnecessary pain as a c-collar is both protective (to prevent worsening of the injury) and therapeutic (as immobilizing the injury helps reduce pain)." [147-19] at 4. Determining whether a c-collar can protect a neck injury and lessen pain does not require knowledge beyond Dr. Davis's general medical knowledge and primary care practice. Dr. Davis is qualified to opine on these issues.

Dr. Davis also opines that Dr. Aguinaldo breached the standard of care. [147-19] at 4. Dr. Aguinaldo argues that Dr. Davis cannot opine on the standard of care because in deposition Dr. Davis could not provide its legal definition. [159] at 3. But Dr. Davis is not an attorney. He is qualified to speak on the medical standard of care, which he defined as "the level at which a physician should complete an evaluation of a patient, be it starting from the initial discussion, complaint, H&P, subjective whatever you have, all the way through physical exam to treatment to diagnostics."

[147-18] at 16:3–17. Dr. Davis is in a similar medical position as Dr. Aguinaldo. Both treat a wide variety of injuries and do not specialize in a specific area of medicine. As such, Dr. Davis is qualified to opine on whether Dr. Aguinaldo followed a general practitioner's standard of care for patients presenting neck injuries.

## III.  Facts

On August 17, 2017, plaintiff Ahmad Poole's cellmate attacked him, grabbed Poole's hair, thrashed Poole around, and then put him in a headlock. [162] ¶ 1, [147-2] at 65:6–16.[2] Correctional officers arrived and stopped the attack, pushing both Poole and his cellmate to the ground. [162] ¶ 2. An officer placed Poole in handcuffs, and when he picked Poole up, Poole felt "like a building fell on [his] neck." [162] ¶ 3; [147-2] at 73:11–13. Poole was concerned about his neck and immediately told the correctional officers about his pain. [162] ¶ 4. While Defendant Jaburek escorted Poole to the healthcare unit, Poole told Jaburek about his severe neck pain, explaining to Jaburek that he felt his neck popping with every step he took. [162] ¶ 5.

---

[2] The facts are largely taken from Poole's responses to defendants' Local Rule 56.1 statements, [148], [149], [150], and defendants' responses to Poole's 56.1 statement of additional facts, [157], [158], [162], where both the asserted fact and the opposing party's responses are set forth in one document. Any fact not properly controverted is admitted. N.D. Ill. Local R. 56.1(e)(3); *see Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 632 (7th Cir. 2009). I disregard all immaterial facts as to each defendant. I disregard all legal conclusions in statements and responses. *See* [149] ¶¶ 23–25; [150] ¶¶ 60–63, 80; [157] ¶¶ 70–76. I ignore all facts included in statements or responses that are not supported by the parties' evidence. N.D. Ill. Local R. 56.1(d)(2), (e)(3); *see* [148] ¶ 43; [149] ¶ 7; [157] ¶¶ 6, 15, 56; [158] ¶ 6; [162] ¶¶ 6, 16–17, 31. Where the parties dispute facts and both rely on admissible evidence, I set forth both sides' facts, drawing inferences in favor of Poole. *See* [149] ¶¶ 15–16, 19, 21–23, 25–27, 29, 33–35, 40, 58, 60, 65, 67; [150] ¶¶ 7–8, 12–13, 16, 17, 36, 38, 42–43, 50, 55, 64–70, 77; [157] ¶¶ 23, 25, 27, 53–55, 57; [158] ¶¶ 8–10, 21–22; [162] ¶ 8. Many of Dr. Aguinaldo's statements of fact and responses are not "concise" paragraphs as required by Local Rule 56.1, *see, e.g.*, [150] ¶¶ 7, 16, 64; [157] ¶¶ 70–72, 74–76, but I use my discretion to still consider those facts in the record, Fed. R. Civ. P. 56(c)(3).

Jaburek placed Poole in a bullpen outside of the healthcare unit, where Poole waited for thirty to sixty minutes.[3] [162] ¶ 6.

The parties dispute what happened during Poole's medical treatment. According to Poole, after he complained about his neck pain, an officer went into the healthcare unit to get medical staff. [158] ¶ 8. Defendant Nurse Tomaras came to the bullpen. *Id.* Poole told Tomaras about the altercation, the popping sounds when he moved his neck, severe pain when holding his head up, a feeling of misalignment, and an electrical current along his neck. [158] ¶ 9. Poole says Tomaras ignored his complaints, told Poole he needed stitches for a cut near his eye from the attack, and then returned to the healthcare unit. *Id.*

Tomaras denies that she interacted with Poole that day. [158] ¶ 8, [149] ¶ 17. There is no chart or medical progress note that Poole was seen by Tomaras. [149] ¶ 18. Tomaras remembers Poole coming to the healthcare unit that day but has no recollection of going to the bullpen to see Poole. [149] ¶ 17.

Poole was then seen by Nurse Carnahan, who performed triage, took Poole's vitals, and immediately referred Poole to be seen by defendant Dr. Evaristo Aguinaldo. [149] ¶ 19.

---

[3] The parties contest how long Poole was in the bullpen before he saw Dr. Aguinaldo. Poole testified that he waited in the bullpen approximately two and a half hours, [162] ¶ 7, but also admits that he waited thirty minutes to an hour, *see, e.g.,* [147-4] at 4; [148] ¶¶ 7, 18–19. Evidence "so internally inconsistent or implausible on its face that a reasonable fact finder would not credit it" cannot establish a genuine dispute of material fact at summary judgment. *Melton v. Tippecanoe Cnty.*, 838 F.3d 814, 819 (7th Cir. 2016). Therefore, I credit defendants' timeline that Poole was seen within an hour of the fight. *See* [149] ¶¶ 7, 18–19.

The parties dispute what happened during this exam. Dr. Aguinaldo testified, relying on his medical notes, that he performed a full physical and neurological examination of Poole, including palpating of his neck, observing Poole's head posture, testing the sensation and integrity of Poole's hand to determine weakness or numbness, checking Poole's upper extremity reflexes and range of motion, and completing a sensory and motor neurological examination, axial loading tests, and Spurling compression test. [150] ¶ 7.

In contrast, Poole testified that he complained to Dr. Aguinaldo about his neck pain but was told that there was "nothing wrong" with him and to "stop faking." [147-2] at 82:7–12. Dr. Aguinaldo did not physically examine him, but only asked Poole to move his thumb and index finger. [150] ¶ 7, [157] ¶ 13. Poole then inquired about getting x-rays or seeing someone about his neck because of the pain. [147-2] at 82:16–20. Dr. Aguinaldo replied that Poole should "stop being a baby." *Id.*

After the exam, Dr. Aguinaldo charted his positive findings and objective observations, stitched Poole's cheek laceration, ordered Tylenol 500mg, and scheduled an x-ray of Poole's neck. [157] ¶ 14. Dr. Aguinaldo did not provide or order any bracing to stabilize Poole's neck. [157] ¶ 15.

Jaburek escorted Poole to segregation. [162] ¶ 16. Poole's Tylenol was confiscated before he had taken a dose. [162] ¶ 17. The next day, Poole filed an emergency grievance due to his lack of pain medication. [147-4] at 2–3.

Poole testified that he saw Tomaras again two days after the injury, to change his stitches dressing. [158] ¶ 21. Poole told her about his neck pain, and how he could

9

not sleep, eat, bathe, or keep his head up. *Id.* Tomaras ignored his complaints and "shooed [him] away like … a dog." *Id.* Poole was sent back to segregation without further medical treatment. *Id.* Tomaras has no recollection of this interaction, and there are no medical records documenting it. *Id.*

On August 21, 2017 (four days after the cellmate attack), Poole had a follow-up appointment with Dr. Aguinaldo. [150] ¶ 12. The medical records do not indicate that Poole complained about his neck pain. *Id.* Poole testified he did tell Dr. Aguinaldo that he was in pain, and Dr. Aguinaldo dismissed his complaint, again accusing Poole of faking and being a baby. [147-2] at 90:15–23. Poole also had bloodwork done that day, during which he complained to two nurses about his pain and about not receiving an x-ray yet. [157] ¶ 23. The next day, Poole received an x-ray pass, but his x-ray was canceled. [157] ¶ 24.

Poole saw Dr. Aguinaldo again on August 24, 2017, to have his stitches removed. [157] ¶ 25. The medical records again do not indicate that Poole complained about his neck pain, but Poole testified that he did, and that Dr. Aguinaldo similarly dismissed his complaints. [150] ¶ 13.

Poole received an x-ray eight days after the injury and then returned to segregation. [157] ¶ 26. The x-ray report indicated that Poole had a cervical spine anterior subluxation but not that he had a neck fracture. [150] ¶¶ 15–16.

Poole met Dr. Aguinaldo again about the x-ray results on August 28, 2017. [150] ¶ 16. The parties again dispute whether Poole complained about his neck at this

appointment. [150] ¶ 16; [157] ¶ 27. Dr. Aguinaldo scheduled Poole for a consult with Stateville's medical director two days later. [150] ¶ 16.

The medical director reviewed Poole's x-ray films, called an outside hospital to send Poole off-site, and gave Poole a neck brace. [162] ¶¶ 29–30. The director told nurses to get Poole a wheelchair and said they were going to call an ambulance to transfer Poole. [162] ¶ 31. Instead, defendant Officer Norman and another officer escorted Poole through three checkpoints, down a flight of stairs, in handcuffs, waist chains, and ankle chains. [162] ¶ 32. They placed Poole in a van, without buckling his seatbelt, and transported him to a hospital while still in restraints. [162] ¶ 33.

At the hospital, Poole received a CT scan and then transferred to another hospital for a higher level of care where an MRI revealed a neck fracture. [157] ¶¶ 37–39. Poole was immediately placed in a Miami J Collar. [157] ¶ 40. Within a week, Poole underwent surgery for cervical fusion. [157] ¶ 41. Poole continues to have neck pain, limited mobility, and difficulty sleeping. [157] ¶ 44.

Poole brought this case against Dr. Aguinaldo and Tomaras for denial of medical care and against Jaburek and Norman for failure to intervene in violation of the Eighth Amendment. [82] (operative complaint). Defendants now move for summary judgment. [129], [133], [138].

## IV. Analysis

The Eighth Amendment "protects prisoners from prison conditions that cause 'the wanton and unnecessary infliction of pain,'" including "grossly inadequate medical care." *Pyles v. Fahim*, 771 F.3d 403, 408 (7th Cir. 2014) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)) (citing *Estelle v. Gamble*, 429 U.S. 97, 103–04

(1976)). To prevail on a claim of constitutionally inadequate medical care, an inmate must demonstrate (1) there was "a risk of harm to the plaintiff that is so objectively serious as to be excessive;" (2) the defendant knew of the risk; (3) "the defendant's response to the risk [was] so inadequate as to constitute disregard of (or deliberate indifference toward) the risk;" and (4) the defendant's deliberate indifference caused the plaintiff's injury. *Hunter*, 73 F.4th at 565.

Defendants do not dispute that Poole suffered a serious medical condition. *See* [131] at 7; [135] at 2; [139] at 2–3. Instead, defendants argue that they did not know of the risk, that their response was not deliberately indifferent, and that their actions did not cause or exacerbate Poole's injury or pain.

### A.   Aguinaldo's Motion for Summary Judgment

#### 1.   *Knowledge of the risk*

A plaintiff must establish that an "official knows of and disregards an excessive risk to inmate health" or that "the official is both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he draws the inference." *Duckworth v. Ahmad*, 532 F.3d 675, 679 (7th Cir. 2008) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). Dr. Aguinaldo argues there is no evidence that he was aware of Poole's neck fracture, so no jury could possibly find that he knew Poole was at substantial risk of harm. [135] at 6.

This argument misses the point. Poole does not argue that Dr. Aguinaldo should have known about his neck fracture upon examining him or based on the radiology report. Instead, Poole argues that Dr. Aguinaldo was aware of and

consciously disregarded the risk that Poole had a serious neck injury considering the altercation, Poole's pain, and his symptoms. [147] at 20.

The parties agree that Poole saw Dr. Aguinaldo on August 17, 2017, after a physical altercation with his cellmate and complained of neck pain. [150] ¶ 7. Dr. Aguinaldo has acknowledged that recent neck trauma, ongoing pain, pain so excessive that a patient cannot hold their head up without using their hands, restricted movement of the neck, and electric shocks in the neck are cause for concern. [147-16] at 64:11–66:2. Poole presents evidence that he told Dr. Aguinaldo that he was experiencing these symptoms on multiple occasions. [157] ¶¶ 13, 25, 27, 46. At their initial visit, Dr. Aguinaldo ordered x-rays and painkillers. [157] ¶ 14. Based on Poole's evidence, a reasonable jury could infer that Dr. Aguinaldo was aware of the risk that Poole had a serious neck injury and was in pain.

## 2.      *Deliberate indifference*

Considering Dr. Aguinaldo's knowledge that Poole might have a severe neck injury and ongoing pain, the question becomes whether Dr. Aguinaldo's failure to rush x-rays, to stabilize Poole's neck, and to change Poole's pain protocol "reflected an exercise of medical judgment or a complete abandonment thereof." *See Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 242 (7th Cir. 2021).

Deliberate indifference is a subjective standard, requiring that a defendant consciously disregard an excessive risk to inmate health or safety. *Id.* at 241. In the inadequate medical care context, medical malpractice, negligence, or even gross negligence is not enough to establish deliberate indifference. *Johnson v. Dominguez*, 5 F.4th 818, 825 (7th Cir. 2021). But a plaintiff need not show purposeful conduct. *Id.*

13

Medical professionals are afforded "a great deal of deference in their treatment decisions." *Id.* When a plaintiff's claim focuses on a medical professional's treatment decision, "the decision must be so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Id.*

The parties dispute how Dr. Aguinaldo responded to Poole's injury. According to Dr. Aguinaldo and his expert, Dr. Aguinaldo met the applicable community standard of care during Poole's clinic visits based on his education, training, and experience as a general practitioner. [135] at 8; [150] ¶ 60. Dr. Aguinaldo argues that after a standard exam of Poole to rule out cervical spine injury, he had no suspicion of neurological compromise or fracture—there was no urgent need for x-rays, stabilization, or referral to a hospital for advanced imaging. [135] at 6–8; [150] ¶¶ 64–65. In subsequent follow-ups, Poole never raised issues with his neck or pain. [150] ¶¶ 12–13, 16. Poole's x-ray report indicated that he had a subluxation, so Dr. Aguinaldo scheduled Poole for a timely consult with Stateville's medical director. [150] at 17; [135] at 7. Crediting Dr. Aguinaldo's evidence, a jury could reasonably find that Dr. Aguinaldo was not deliberately indifferent to Poole's risk of harm.

But Poole testified that his interactions with Dr. Aguinaldo went very differently. Poole immediately told Dr. Aguinaldo about his neck pain. [157] ¶ 13. Dr. Aguinaldo did not examine Poole's neck, instead he only asked Poole to move his fingers. [157] ¶ 13. At every subsequent interaction with Dr. Aguinaldo, Poole told him that he was in pain. [157] ¶¶ 25, 27, 46. Dr. Aguinaldo repeatedly ignored these

complaints and told Poole that he was "faking" and "being a baby." *See* [147-2] at 82:16–20, 83:17–23, 90:13–23; [157] ¶¶ 13, 25, 27.

Poole argues that Dr. Aguinaldo's failure to expedite imaging and to stabilize his neck was "substantial departure" from the standard of care considering the evident risk that Poole had a neck fracture. [147] at 21–22. Expert testimony that a defendant's "chosen course of treatment" represented "a substantial departure from accepted medical judgment" could permit a jury inference of deliberate indifference. *See Williams v. Mary Diana Schwarz, P.A.*, No. 15-cv-1691, 2018 WL 1961143, at *6–7 (N.D. Ill. Apr. 26, 2018).4 Dr. Davis opined that Dr. Aguinaldo breached the standard of care for neck injuries. [147-19] at 4.

Dr. Aguinaldo testified that when a patient presents with neck pain, a proper exam includes observing the neck, palpation of the cervical vertebrae, having them rotate their neck sideways and extend it, and completing a neurological exam. [147-5] at 99:3–100:8. But according to Poole, Dr. Aguinaldo did none of this. [157] ¶ 13.

Dr. Aguinaldo also acknowledged that neck injuries can be serious, and the best practice for patients presenting with a neck injury is to provide a neck brace and send them to the hospital. [157] ¶¶ 50–51. Dr. Aguinaldo recognized that recent neck trauma, pain for multiple days, pain so excessive that a patient cannot hold their

---

4 Dr. Aguinaldo argues that *Williams* does not support this assertion and that Poole failed to provide support for this argument. He is incorrect. *Williams* recognizes that while "a mere 'difference of opinion among physicians on how an inmate should be treated cannot support a finding of deliberate indifference,'" an expert's "characterization of Defendant's chosen course of treatment as a substantial departure from accepted medical judgment presents far more than a simple disagreement regarding treatment options." 2018 WL 1961143, at *7 (quoting *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006)).

head up without using their hands, restricted movement of the neck, and electric shocks in the neck are cause for concern. [147-16] at 64:11–66:2. Poole testified that he told Dr. Aguinaldo he was experiencing all these symptoms of a serious neck injury, but Dr. Aguinaldo did not stabilize his neck, did not order expedited imaging, or send him to the hospital. [157] ¶¶ 13, 25, 27.

If a jury credits Poole's testimony, Dr. Davis's opinion about the appropriate care, and Dr. Aguinaldo's testimony of how he should have approached a neck injury, it could reasonably find that Dr. Aguinaldo "knew better than to make the medical decisions that [he] did" and so acted with deliberate indifference to Poole's medical needs. *See Petties v. Carter*, 836 F.3d 722, 731 (7th Cir. 2016) (en banc).

Poole also argues that he did not receive constitutionally adequate and reasonable pain control. [147] at 22. The Eighth Amendment does not require that Poole be kept literally "pain free." *See Snipes v. Detella*, 95 F.3d 586, 592 (7th Cir. 1996). But if a jury credits Poole's testimony, they could reasonably find that Dr. Aguinaldo was deliberately indifferent to Poole's pain. Poole testified he complained to Dr. Aguinaldo of severe pain at every encounter. [157] ¶¶ 13, 25, 27, 46. Instead of treating Poole's pain, Dr. Aguinaldo refused to believe Poole, insulted, and belittled him. [147-2] at 82:16–20, 83:17–23, 90:13–23. A reasonable jury could infer that Dr. Aguinaldo knew Poole's pain management regime was not working and was deliberately indifferent to Poole's medical needs. *See Greeno v. Daley*, 414 F.3d 645, 655 (7th Cir. 2005) (persisting in a course of treatment known to be ineffective can support inference of deliberate indifference).

### 3.    *Whether deliberate indifference caused injury*

Dr. Aguinaldo argues that no jury could find that his care, even assuming that Poole's characterization is correct, was the proximate cause of Poole's injuries. [135] at 10. When considering the causation element in 42 U.S.C. § 1983 cases, courts "look to general principals of causation from tort law." *Hunter*, 73 F.4th at 567–68. Although causation is typically a question to be decided by the jury, summary judgment can be granted when no reasonable jury could find that defendant was a proximate cause of plaintiff's injuries. *Id.* at 567–68.

According to Dr. Aguinaldo's expert, nothing that Dr. Aguinaldo did, or failed to do, nor any delay in treatment caused or exacerbated Poole's injury or pain. [150] ¶ 80. But Dr. Davis opined that the delay in diagnosis and treatment likely caused Poole unnecessary pain. [147-19] at 4. Poole also testified that Dr. Aguinaldo dismissed his complaints of pain, leaving Poole in severe pain while waiting for an x-ray without any neck stabilization. [157] ¶¶ 13, 25, 27. Based on Poole's evidence, a reasonable jury could find Poole's ongoing pain was a foreseeable injury of Dr. Aguinaldo's deliberate indifference. *See Hunter*, 73 F.4th at 568. Dr. Davis cannot, however, provide admissible expert testimony about whether Dr. Aguinaldo's treatment exacerbated Poole's spinal injury, so Poole does not have any evidence to defeat summary judgment on causation as to that part of his claim.

The genuine issue of fact over Poole's pain precludes summary judgment. *See Morish v. United States*, 653 F.3d 522, 529 (7th Cir. 2011) ("In a case of dueling experts, such as this one, it is left to the trier of fact, not the reviewing court, to decide how to weigh the competing expert testimony."). A reasonable jury, crediting Poole's

evidence, could find that Dr. Aguinaldo's failure to expedite imagining, to stabilize Poole's neck, and to provide adequate pain management unnecessarily left Poole in serious pain for days. Dr. Aguinaldo's motion for summary judgment, [133], is denied.

### B.    Tomaras's Motion for Summary Judgment

The parties dispute whether Tomaras was ever involved in Poole's medical care for his neck injury. Poole testified that Tomaras came to the bullpen after he asked officers to go to the healthcare unit to get him immediate medical attention. [158] ¶ 8. Poole says he told Tomaras of his severe neck pain, electrical currents running up his neck, popping sounds in his neck, a feeling of misalignment, and that he had to hold his head up with his hands. [158] ¶ 9. Poole testified that he also saw Tomaras on August 19 to have his dressing changed. [158] ¶ 21. Poole again told Tomaras about his neck pain, and inability to sleep, eat, wash himself, or keep his head up. *Id.* Tomaras ignored his complaints and "shooed [him] away like a dog." *Id.*

Tomaras argues these interactions never happened. [131] at 3. While Tomaras had an independent recollection that Poole was at the medical unit on August 17, she does not remember performing a physical assessment of him and there are no medical records reflecting she did. [149] ¶¶ 46–47. Tomaras disputes that she interacted with Poole on August 19, and there is no medical record that Tomaras saw Poole. [158] ¶¶ 21–22. If a jury credits Tomaras's evidence, she could not have known of the risk of harm to Poole or acted deliberately indifferent to it. At summary judgment, however, it's Poole's admissible version of events that controls.

Crediting Poole's evidence, a reasonable jury could not find that Tomaras acted with deliberate indifference on August 17. Poole has produced no evidence as to what

18

Tomaras should have done differently that day as Poole was already at the healthcare unit waiting to see a doctor. *See Gabb v. Wexford Health Sources, Inc.*, 945 F.3d 1027, 1034 (7th Cir. 2019) (affirming summary judgment where plaintiff argued he should have received better treatments for back pain but failed to provide "evidence of what the 'better' treatments were and whether they would have been effective … leav[ing] a jury entirely to its own imagination about what could have been done. Such unmitigated speculation cannot defeat summary judgment"). In contrast, Dr. Aguinaldo's expert opined that Tomaras could not have referred Poole to a specialist, ordered diagnostic imaging, medically diagnosed, or made a treatment plan for Poole. [149] ¶ 64.

As for August 19, crediting Poole's testimony, a reasonable jury could find that Tomaras acted with deliberate indifference when she ignored Poole's symptoms and did not follow up with a doctor. Tomaras was aware of Poole's ongoing pain and the ineffectiveness of the recommended pain medications, yet Tomaras did not consult Dr. Aguinaldo regarding whether further examination or a change in medications was necessary. Instead, Tomaras "shooed [Poole] away like a dog," [158] ¶ 21, delaying his treatment. Whether delay in treatment "is tolerable depends on the seriousness of the condition and the ease of providing treatment." *Smith v. Knox Cnty. Jail*, 666 F.3d 1037, 1040 (7th Cir. 2012). Poole told Tomaras of symptoms—severe neck pain and his inability to hold his head up without supporting it—that even a layperson would understand to present a serious medical need. While Tomaras could not have referred Poole to a specialist, ordered diagnostic imaging, medically

diagnosed, or made a treatment plan for Poole, [149] ¶ 64, she could have easily contacted Dr. Aguinaldo about Poole's symptoms. Based on Poole's evidence, a jury could conclude that Tomaras was deliberately indifferent to Poole's risk of harm.

That said, for a delay in treatment to be actionable under the Eighth Amendment, a "plaintiff must also provide independent evidence that the delay exacerbated the injury or unnecessarily prolonged pain." *Petties*, 836 F.3d at 730–31 (citing *Gil v. Reed*, 381 F.3d 649, 662 (7th Cir. 2004) (finding hours of needless suffering can constitute harm)). Poole offers no evidence that Tomaras's deliberate indifference caused his injury to worsen, affected his surgical outcome, or affected his pain. Accordingly, Tomaras' motion for summary judgment, [129], is granted.

## C. Jaburek and Norman's Motion for Summary Judgment

When an inmate sues prison employees who are not medical staff, "deliberate indifference can be shown with evidence that those employees ignored or interfered with a course of treatment prescribed by a physician." *McDonald v. Hardy*, 821 F.3d 882, 888 (7th Cir. 2016) (citing *Estelle*, 429 U.S. at 104–05 (explaining that deliberate indifference can be "manifested by … prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed.")).

Poole presents no evidence that Jaburek denied or delayed Poole's access to medical care. On the day of the fight, Poole told Jaburek about his neck pain while Jaburek escorted Poole to the medical center. [148] ¶¶ 17–18. Considering the altercation and Poole's complaints, a reasonable jury could find that Jaburek knew that Poole was at serious risk of harm. Poole argues that Jaburek disregarded his

20

serious medical needs by leaving Poole alone in the healthcare unit's bullpen immediately after his injury and doing nothing to help him receive medical care. [147] at 26 (citing [162] ¶ 5). But Jaburek escorted Poole to the healthcare unit immediately after his fight, and Poole admits that he was seen by medical staff within an hour. [148] ¶ 8, 18, 21, 27.

Poole also presents evidence that his pain medication was taken away when Jaburek took Poole to segregation. [162] ¶ 17. The pain medication was in Poole's clothes, which were confiscated prior to being put in segregation. *Id.* But Poole did not complain to Jaburek that his pain medications were taken away. [147-2] at 85:20–23. No reasonable jury could find that Jaburek intentionally interfered with Poole's pain prescription or delayed his access to healthcare.

A jury also could not reasonably find that Norman intentionally interfered with or delayed Poole's medical care. Poole argues that Norman disregarded the medical director's orders to get Poole a wheelchair and to call for an ambulance. [147] at 26–27 (citing [162] ¶ 31). Instead, Norman escorted Poole through three checkpoints and down a flight of stairs in handcuffs, waist chains, and ankle chains. [162] ¶ 32. He placed Poole in a prison van for transport. [162] ¶ 33. Poole argues that Norman's interference with the medical director's orders is itself sufficient to preclude summary judgment. [147] at 27. Norman's actions do  not rise to a constitutional violation. While Norman may not have transported Poole in the way the medical director originally requested, he still followed instructions to take Poole to the hospital right away.

21

Even if a reasonable jury could find Jaburek and Norman were deliberately indifferent, Poole presents no evidence that these actions caused him any injury. Defendants Jaburek and Norman's motion for summary judgment, [138], is granted.

## V.     Conclusion

Defendants Tomaras, Jaburek, and Norman's motions for summary judgment, [129], [138], are granted. Defendant Dr. Aguinaldo's motion for summary judgment, [133], is granted in part, denied in part; plaintiff's claim for unnecessarily prolonged pain from August 17 to August 30, 2017, survives against Dr. Aguinaldo.

ENTER:

_____
Manish S. Shah
United States District Judge

Date:  March 27, 2024